**EXHIBIT 6**

EAG:NMA/AL
F.#2010R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

   - against -                   10 CR 147 (S-6) (DLI)

MICHAEL PERSICO,

          Defendant.

– – – – – – – – – – – – – – – – –X


## MEMORANDUM OF LAW REGARDING
## EVIDENCE PRESENTED AT *FATICO* HEARING


ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Nicole M. Argentieri
Allon Lifshitz
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

DISCUSSION ................................................................................................................... 1

I.   RACKETEERING ...................................................................................................... 1

   A.  The Testimony of Anthony Russo ....................................................................... 1

      1.   The Structure of Organized Crime Families ................................................... 1

      2.   Russo's Role in the Colombo Family ............................................................. 2

      3.   The Defendant's Role in the Colombo Family ............................................... 3

   B.  Additional Evidence .......................................................................................... 6

      1.   1993 Surveillance ........................................................................................ 6

      2.   1997 Surveillance ........................................................................................ 7

      3.   Telephone Evidence ..................................................................................... 8

II.  THE 1993 MURDER OF JOSPEH SCOPO ............................................................. 8

   A.  The Testimony of Anthony Russo ....................................................................... 8

   B.  Additional Evidence ........................................................................................ 13

      1.   Crime Scene Photographs ........................................................................... 13

      2.   Funeral Records .......................................................................................... 15

      3.   Guilty Plea of Theodore Persico, Jr. ........................................................... 15

      4.   Guilty Plea of Anthony Russo ..................................................................... 15

      5.   Docket Sheet for Alphonse Persico's Case .................................................. 16

III. LOANSHARKING ................................................................................................. 16

IV. EXTORTION .......................................................................................................... 19

   A.  The Testimony of Anthony Russo ..................................................................... 19

   B.  Additional Evidence ........................................................................................ 19

V.  CONSPIRACY TO ACQUIRE AND SELL STOLEN VIDEO GAMES ...................... 20

    A.  The Testimony of Anthony Russo ............................................................. 20

    B.  Additional Evidence ................................................................................ 21

CONCLUSION ................................................................................................... 23

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law regarding evidence presented at the Fatico hearing conducted on August 10 and 24, 2016. For the reasons set forth below, the government respectfully submits that it has proven by a preponderance of the evidence that the defendant participated in (1) racketeering; (2) the 1993 murder of Joseph Scopo; (3) loansharking; (4) extortion; and (5) a conspiracy to acquire and sell stolen video games.

## DISCUSSION

### I.     RACKETEERING

#### A.     The Testimony of Anthony Russo

At the Fatico hearing, the government called cooperating witness Anthony Russo to testify. Russo testified that he is a 55-year-old Brooklyn native who began committing crimes at age 16. (Transcript of Fatico Hearing (attached as Ex. A) ("Tr.") at 11.) He was involved in organized crime from that age until his arrest in 2011. (Id. at 12.) He has been involved with the Gambino and Colombo crime families, and has held the positions of associate, soldier and acting captain in organized crime. (Id. at 12-13.)

##### 1.     The Structure of Organized Crime Families

Russo testified that there are five organized crimes families in New York City, namely, the Bonanno, Colombo, Gambino, Genovese and Luchese families. (Id. at 13.) They share a common structure, including the following positions, ranked from top to bottom: boss, underboss, consigliere, captains, soldiers and associate. (Id.) Each position has specific responsibilities, and there is a formal process to becoming a "soldier," i.e., an inducted member. (Id. at 14-17.) Money flows from the bottom of the structure to the top.

1

(Id. at 16.)  The rules of organized crime include prohibitions on narcotics trafficking, murder (absent the boss's permission) and cooperation with law enforcement.  (Id. at 17.)

### 2.    Russo's Role in the Colombo Family

When Russo initially became involved with organized crime, he was associated with the Gambino crime family.  (Id. at 17.)  After he was arrested in 1987 and convicted of assault, he was incarcerated with Theodore Persico, Jr., also known as "Teddy Boy."[1]  (Id. at 18-20.)  Persico, Jr. was an inducted member of the Colombo family and the cousin of the defendant.  (Id. at 21.)  Russo and Persico, Jr. grew close, and Persico, Jr. wanted Russo "around" him, meaning that Russo would be protected by Persico, Jr. and would have to provide money to Persico, Jr.  (Id. at 21-22.)

When Russo was released from prison in late 1992, he became a Colombo family associate; because Persico, Jr. was still incarcerated, Russo reported to Persico, Jr.'s father, Theodore Persico, Sr., also known as "Uncle Teddy," who was a captain in the Colombo family and the brother of Colombo family boss Carmine Persico.  (Id. at 23-24, 26-28.)  At that time, other associates of Persico, Jr. also reported to Persico, Sr., including Bobby Tarantola, Anthony Ferrara, Frank Sparaco and Frank Guerra, also known as "BF." (Id. at 28.)

In early 2009, Russo was inducted into the Colombo family.  (Id. at 113.)  He was assigned to report to Persico, Jr.  (Id.)  In or around 2010, Russo was promoted to acting captain in the Colombo family.  (Id. at 114-15.)

---

[1] In this memorandum, the defendant Michael Persico is referred to as "the defendant," his cousin Theodore Persico, Jr. is referred to as "Persico, Jr.," and Persico, Jr.'s father, Theodore Persico, Sr., is referred to as "Persico, Sr."  Other members of the Persico family are referred to using their full names.

### 3.   The Defendant's Role in the Colombo Family

The defendant is an associate in the Colombo family.  (Id. at 32.)  He is the son of Carmine Persico, the boss of the Colombo family.  (Id. at 21.)  The defendant's brother, Alphonse Persico, has been an inducted member, captain and acting boss within the Colombo family.  (Id. at 25.)

As discussed in greater detail below, in or around 1993, Persico, Sr. and other leaders of the Colombo family were arrested.  (Tr. at 31.)  As a result, Russo and his criminal partner Frank Guerra reported to the defendant.  (Id. at 32.)  Although the defendant was an associate, and it was not common for associates to report to another associate, Russo and Guerra reported to the defendant because they were close with him and his father was the boss.  (Id.)  In or around 1993, Russo and Guerra met with the defendant at locations including Romantique Limousine, which was the defendant's limousine business and was located at 11th Avenue and 67th Street in Brooklyn, New York, as well as at a bus company the defendant had in Coney Island, restaurants, and other locations.  (Id. at 27, 33.)  At that time, Russo discussed loansharking with the defendant – which, as explained below, Russo committed using money provided by the defendant – and observed that Persico, Jr.'s other associates, including Joe Baudanza, Guerra, Tarantola and Ferrara, met with the defendant "all the time."  (Id. at 33-34.)  In approximately 1994, the defendant's brother Alphonse Persico was released from jail, at which time Russo and Guerra were assigned to report to him rather than the defendant.  (Id. at 69-70.)

In the late 1990s, Russo opened a liquor store in Staten Island.  (Id. at 85.)  He obtained money to open the store from the defendant, the defendant's cousin Frank Persico, and Colombo family member Anthony Stropoli.  (Id. at 85-86.)  The store was successful at

first, but then faltered.  (<u>Id.</u> at 86.)  Russo held on to it until he was arrested in late 1999 or

early 2000.[2]  (<u>Id.</u> at 86-87.)  After he was arrested, he discussed the store with the defendant.

(<u>Id.</u> at 87-88.)  The defendant gave Russo several suggestions, including giving the store to

the defendant, which Russo elected to do.  (<u>Id.</u> at 88.)  The defendant then arranged for

Colombo family associate Carl Panarella to work in the store, although it remained registered

to Russo's girlfriend's father.  (<u>Id.</u> at 89.)  The store was then sold, with no profit going to

Russo.  (<u>Id.</u>)

   In the late 1990s, Stropoli told Russo that Stropoli, Dino Calabro, "Andre" and

an associate from Boston were going to be inducted into the Colombo family, which

subsequently happened.  (<u>Id.</u> at 90-91.)  Russo became upset because he thought he and his

friends were more deserving, having ended the Colombo family war by murdering Joseph

Scopo – a sentiment he expressed to Guerra.  (<u>Id.</u> at 91.)  Guerra reported this to the

defendant, and word got back to Stropoli and Frank Persico.  (<u>Id.</u> at 91-92.)  They confronted

Russo for having provided the information to Guerra, and Russo, in turn, confronted Guerra

about having told the defendant that Russo was complaining.  (<u>Id.</u>)  Russo was concerned

that talking as he had could get him killed.  (<u>Id.</u> at 92.)

   In or around November or December 2008, after Russo completed a term of

supervised release, he talked to the defendant about possibly getting inducted into the

---

[2] Public records indicate that Russo was arrested in the Eastern District of New York
on or about January 27, 2000, that he was released on bail four days later, and that the case
was dismissed later that year.  <u>See</u> <u>United States v. Russo</u>, 99 CR 920 (CBA) (E.D.N.Y.).
On March 29, 2000, he was arrested in the Southern District of New York and ordered
released; on June 12, 2000, he pled guilty; and on September 15, 2000, he was sentenced to a
96-month term of imprisonment.  <u>See</u> <u>United States v. Russo</u>, 00 CR 26 (JSM) (S.D.N.Y.).
Notably, in both cases his co-defendant was Francis Guerra.

Colombo family.  (Id. at 109-10.)  The defendant told Russo that his brother, Alphonse

Persico, wanted Russo to be inducted.  (Id. at 110.)  The defendant also gave Russo advice

about how to act after he was inducted, suggesting that he calm down and "speak softer."

(Id.)

   In or around 2009, Russo and Guerra tried to open a legitimate business selling

car detailing products.  (Id. at 115.)  They asked the defendant for money to start the

business, and he directed them to ask Scott Reback, who gave them money.  (Id. at 115-16.)

In late 2009 or early 2010, Russo and Guerra opened the business in the defendant's garage

on 11th Avenue near 67th or 68th Street in Brooklyn, where the defendant formerly kept his

limousines.  (Id. at 116-17.)  The defendant provided this space after Guerra had asked him

for assistance.  (Id.)

   In addition, Russo and Guerra asked the defendant for help getting business

from Colombo family members John Staluppi and John Rosatti, who owned car dealerships.

(Id. at 117-18.)  The defendant agreed.  (Id. at 118.)  Russo and Guerra then got business

from Rosatti, but Russo was not satisfied with the amount they got from Staluppi.  (Id.)

Russo asked the defendant for additional help with Staluppi, but then decided not to bother

the defendant and instead asked Reback, who was Staluppi's son-in-law, to talk to Staluppi

for Russo.  (Id. at 118-19.)  Reback agreed, but instead reported the request to the defendant.

(Id. at 119-20.)  As a result, Russo and Guerra were summoned to meet Persico, Jr. and

Angelo Spata, who was the defendant's brother-in-law.  (Id. at 120.)  Persico, Jr., who was

upset, accused Russo of going behind the defendant's back, and told Russo that only the

defendant was allowed to reach out to Staluppi.  (Id. at 120-21.)  Spata told Russo that the

only people he should listen to were Carmine Persico, Alphonse Persico and the defendant; Russo responded that he listened to Persico, Jr.  (Id. at 121.)

B.    Additional Evidence

1.    1993 Surveillance

Government Exhibits 7003 and 208(a) show that the defendant met with Colombo family member Joseph Monteleone, Sr., in 1993.[3]  Government Exhibit 7003 is a surveillance log prepared by FBI Special Agent Kevin O'Rourke about a surveillance he conducted on March 9, 1993.   As indicated in an entry made on the log at 12:48 p.m., the surveillance was instituted at 6701 11th Avenue in Brooklyn, New York, and is associated with "color roll # 6192."  Entries made beginning at 1:02 p.m. indicate that the agent observed Joseph Monteleone, Sr. exiting that location and entering a car.  An entry made at 1:33 p.m. indicates that the agent saw Monteleone ("JMS") with an unknown white male ("UWM") on a bridge at Cropsey Avenue; the entry also indicates that color photos numbered 15 through 21 depict the two men at that location.

Government Exhibit 208(a) is one of the photographs taken during the surveillance.  The back of the exhibit is labeled with the roll number 6192, photograph number 21, and the agent's initials.  The photograph depicts two men.  As the agent observed in his log, one of the men is Joseph Monteleone, Sr.   The government respectfully submits that the unknown man – the younger of the two, whom the agent identified as "UWM" – is the defendant.  In particular, his appearance in this exhibit is the same as his appearance in the 1997 surveillance discussed below, in which he was positively identified.

_____

[3] Numbered exhibits cited herein are enclosed within Exhibit D.

2.    1997 Surveillance

By way of background, Russo testified that in 1996 or 1997, he was on parole, and was not allowed to meet with Alphonse Persico – a condition that he violated.  (Tr. at 69-71.)  The defendant's cousin Frankie Persico told Russo that there existed a videotape depicting Russo meeting with the defendant and Alphonse Persico.  (Id. at 71-72.)  Russo's parole officer subsequently showed him the videotape, which Russo testified indeed depicted him meeting with the defendant and Alphonse Persico.  (Id. at 72.)

Government Exhibits 7004 and 228 indicate that the defendant in fact met with Anthony Russo and Alphonse Persico in and around the location of Romantique Limousine in Brooklyn, New York in 1997.  Government Exhibit 7004 is the trial testimony of New York City Police Department ("NYPD") Detective Fred Santoro.  As indicated in the testimony, Detective Santoro conducted a surveillance of Russo in or around August 1997 on 11th Avenue between 67th and 68th streets in Brooklyn, New York, where Romantique Limousines was located.  (GX 7004 at 1891-92.)  His surveillance depicted Russo meeting with Alphonse Persico and the defendant.  (Id.)  Government Exhibit 228 is a copy of the video surveillance.  Consistent with Detective Santoro's testimony, the video footage from the beginning to 0:09 depicts Alphonse Persico and Russo together; from 2:00 to 2:15 depicts Russo and the defendant walking out of Romantique together; and from 2:15 to 3:30 depicts the defendant meeting with Alphonse Persico and Russo across the street from Romantique.[4]

_____

[4] The video may be viewed by opening the folder named "VIDEO_TS" withing Government Exhibit 228 and then opening the file named "VIDEO_TS.IFO."  If a video-player application opens and depicts a series of bars, click on the top bar.

### 3.    Telephone Evidence

Government Exhibits 7001 and 1013(b) indicate that the defendant's limousine business (Romantique) had telephone contacts with members and associates of the Colombo family, including Anthony Russo, Frank Guerra and Joseph Monteleone, Sr. Exhibit 7001 is the trial testimony of FBI Intelligence Analyst Maria Kinigopoulos, who testified that she reviewed telephone records and prepared a summary chart showing contacts among certain telephones.  Exhibit 1013(b) is a summary chart that the witness prepared based on those records, which was admitted into evidence in the Guerra trial.  (GX 7001 at 2101-02.)

## II.    THE 1993 MURDER OF JOSPEH SCOPO

### A.    The Testimony of Anthony Russo

Russo testified that when he was released from prison in 1992, the Colombo family was split into two warring factions.  (Tr. at 30.)  One faction was loyal to the defendant's father, official boss Carmine Persico, and the other was loyal to the acting boss, Vic Orena, who was attempting to take over the crime family.[5]  (Id. at 30-31.)  The leaders of the Persico faction included Chucky Russo (no relation to Anthony Russo), Jo Jo Russo (also no relation to Anthony Russo), Persico, Sr., Joseph Monteleone, Sr. (whom Russo knew as "Joe Monte") and Thomas Gioeli.  (Id.)  The leaders of the Orena faction included Joe Scopo and William Cutolo, also known as "Wild Bill."  (Id. at 31.)

---

[5] Russo explained that in organized crime, a member is "officially" in a position if he is appointed to it permanently; alternatively, a member can be appointed to an "acting" position if the person who officially holds it is incarcerated.  (Tr. at 14.)

Russo became involved in the Colombo family war immediately upon his release from prison in 1992.  (Id. at 34.)  Notably, in or around 1993, Persico faction leaders Persico Sr., Chucky Russo, Jo Jo Russo and Joseph Monteleone, Sr. were arrested, along with Persico faction associate Frank Sparaco.  (Id.)

At some point in 1992 or 1993, Russo and Colombo family associates Guerra, Tarantola, Danny Persico (the defendant's cousin and Persico, Jr.'s brother), Anthony Ferrara and Eric Curcio developed a plan to murder Cutolo.  (Id. at 34-35.)  Russo and Guerra apprised the defendant of their plan, including by telling the defendant they had almost killed Cutolo on two occasions.  (Id. at 35.)

After Russo began plotting to murder Cutolo, the defendant asked him to meet Curcio, who "had a line" on Scopo, which Russo understood to mean that Curcio knew where Scopo was and that Russo and others should "do what we had to do" to murder Scopo.  (Id. at 36.)  Curcio was a Colombo family associate who claimed to be related to Joseph Monteleone, Sr.  (Id. at 36-37.)  Russo agreed to meet Curcio, and Russo wanted to murder Scopo to help the Persicos maintain control of the crime family as well as to advance within the crime family himself.  (Id. at 37-38.)

Curcio told Russo and Guerra that he knew where Scopo was, and asked if they were willing to put together a crew to murder Scopo.  (Id. at 38.)  Russo and Guerra agreed.  (Id.)  Originally, the crew included Russo, Guerra, Tarantola, Curcio and Ferrara.  (Id.)  Subsequently, Curcio brought John Sparacino into the crew.  (Id. at 38-39.)

After Russo and Guerra met with Curcio, they told the defendant their plans and told him that they needed weapons.  (Id. at 40.)  The defendant told them, "No problem. We have plenty."  (Id.)  The defendant then pointed at a Colombo family associate known as

"Smiley" and said to Guerra, "You got Smiley's number. Smiley will bring you a bag." (Id.) Later that day, Guerra brought a duffle bag to Russo's house. (Id. at 40-41.) It contained a Mac 10 with a silencer and two pistols. (Id. at 41.) Guerra said he had just received the firearms from "Smiley." (Id.)

Persico, Jr. remained incarcerated during the planning of the Scopo murder. (Id. at 41.) Guerra told Russo that he visited Persico, Jr. and told him about the planning, and that Persico, Jr. said to make sure they got it done. (Id. at 42.) At some point, Russo and others met with Persico, Sr. at a funeral parlor, after Persico, Jr.'s grandmother died.[6] (Id. at 44-45.) The funeral parlor was Scarpaci's on 86th Street and 14th Avenue in Brooklyn, New York. (Id.) Russo understood that although Persico, Jr. was still incarcerated at that time, he was allowed to attend because a close relative had died. (Id.) At the funeral home, Persico, Jr. discussed the Scopo murder with Russo, Guerra and Tarantola, and Persico, Jr. told them, "You got to get it done and I want my guys to do it." (Id. at 45-46.) Russo understood "my guys" to refer to himself, Guerra and Tarantola. (Id. at 46.) Notably, at or around this time, the Scopo murder crew consisted of Russo, Guerra, Curcio, Sparacino and John Pappa, whom Curcio had recruited into the crew. (Id. at 46-47.)

After the funeral, the crew made an unsuccessful attempt to murder Scopo: they saw Scopo taking out the garbage outside his home in Brooklyn, but they did not shoot him because by the time they identified him, he was too close to his front door. (Id. at 47-

---

[6] Russo recalled that the meeting at the funeral parlor took place in the summer of 1994. Because Scopo was murdered in October 1993, and records discussed below indicate the funeral took place in August 1993, the government submits that Russo misspoke or was mistaken about the precise year, and that the meeting with Persico, Jr. occurred in August 1993, not 1994.

48.)  Russo reported this unsuccessful attempt to the defendant.  (Id. at 48-49.)  The

defendant responded, "You got to get this thing done before my brother goes to trial."  (Id. at

49.)  At the time, his brother Alphonse Persico was in jail, awaiting trial for his role in the

Colombo family war, and Russo understood that murdering Scopo soon would allow

Alphonse Persico to assert his incarceration as an alibi.  (Id. at 49-50.)  On another occasion,

the crew located Scopo outside his social club[7], but Russo did not shoot because Scopo was

near a woman and two children.  (Id. at 50-52.)

       The crew eventually succeeding in murdering Scopo.  Russo recalled that the

murder occurred in late 1993 in the Ozone Park neighborhood, in the vicinity of 110th Street

and 109th Avenue, where Scopo's house was then located.  (Id. at 52.)  The plan – which

was largely carried out – called for Russo to drive a car in which Sparacino and Pappa were

passengers; Sparacino was to sit in the back seat with the Mac 10, and was to be the shooter;

and Pappa was the "backup" shooter.  (Id. at 52-53.)  Curcio and Guerra were assigned to

drive separate "crash cars,"[8] for a total of three cars.  (Id.)  During the murder, Russo indeed

drove Sparacino and Pappa, and he recalled that his car was a four-door, brown or beige

Chevrolet.  (Id. at 53-54.)  It had been stolen, and he started it with a screwdriver.  (Id. at 54.)

       The night that the murder was carried out, the crew members set up on a

corner near Scopo's home.  (Id. at 54.)  Sparacino wore a ski mask.  (Id. at 55.)  Curcio

spotted Scopo, and the crew members got in their assigned cars.  (Id. at 54.)  Russo told

---

[7] A "social club" is a place where members of organized crime meet.  (Tr. at 50.)

[8] A "crash car" is used to block law enforcement from accessing a street.  (Tr. at 48.)

Sparacino he was going to pull in front of Scopo's car, at which point Sparacino should kick his door open and fire.  (Id.)

   Scopo approached his home in a car that Russo recalled was a small, light-colored Nissan Altima.  (Id. at 54.)  Scopo was in the passenger seat.  (Id. at 55.)  As Scopo's car parked, Russo pulled up next to it, aligning his own back door with Scopo's front bumper so that Sparacino could open the door and shoot.  (Id.)  Sparacino did so, emptying the Mac 10 at Scopo's car.  (Id. at 55-56.)  This was the Mac 10 that the defendant had previously provided through "Smiley," and it contained thirty rounds.  (Id. at 57.)

   As Sparacino fired, a bullet came through the back window of Russo's car.  (Id. at 56.)  Pappa exited Russo's car and ran into some bushes, carrying an automatic pistol.  (Id.)  Sparacino screamed at Russo to go, and Russo drove off; as he did, he saw Pappa, who was still on the street, beginning to shoot.  (Id.)  Russo drove to a prearranged spot about two blocks away and parked.  (Id. at 57.)  He and Sparacino exited their car, leaving the Mac 10 in it, which the defendant had instructed Russo to do, and left Sparacino's ski mask and Russo's gloves in a bush.  (Id. at 57-58.)  Guerra pulled up to the corner, with Pappa now in his car.  (Id. at 58.)  Russo and Sparacino got in the backseat of Guerra's car, and Guerra drove off.  (Id.)  Scopo died as a result of the defendant and the crew's actions.  (Id.)

   After the Scopo murder, then-Colombo family associate Dino Calabro and Luchese family associate Michael DeRosa separately approached Russo and commented on his participation in the murder.  (Id. at 58-60.)  Russo told each of them that he did not know what they were talking about, because Russo understood that talking about a murder could get him killed.  (Id. at 59-60.)  Russo and Guerra complained to the defendant that Curcio was telling others what they had done, and the defendant instructed them to talk to Curcio.

12

(Id. at 60-61.)  They did; Curcio denied it and said that, because of the murder, the crew

members would get inducted into the crime family and would become captains.[9]  (Id. at 61.)

    B.     <u>Additional Evidence</u>

        1.     <u>Crime Scene Photographs</u>

        Exhibit 7000 is the trial testimony of NYPD Detective John DeGiulio.

Detective DeGiulio testified that on October 20, 1993, he responded to the Joseph Scopo

murder scene and took the photographs admitted into evidence at the <u>Guerra</u> trial as

Government Exhibits 17(c), 18(a), 18(c), 19(a) and 19(b).  (GX 7000 at 1037, 1039-41,

1049-52.)   Initially, he responded to 110th Street between 107th and 109th Avenues in

Queens, New York.  (GX 7000 at 1034-35.)  He later responded to 106th Street, where there

was a vehicle that was believed to be involved in the crime.  (Id. at 1035.)   The photographs

he took depict the following:

- <u>GX 17(c)</u>:  A large, brown, four-door Buick with a shattered back windshield and other damage, as it was found on 106th Street.  (GX 7000 at 1039.)

- <u>GX 18(a) and 18(c)</u>:  A white Nissan Altima found in front of 107-43 and 107-45 110th Street, with shattered windows and ballistics damage. (GX 7000 at 1040-42.)

- <u>GX 19(a)</u>:  The rear passenger area of the Buick, which contained a semiautomatic weapon with a silencer and a wool hat.  (GX 7000 at 1049-50.)

- <u>GX 19(b)</u>:  The semiautomatic weapon and silencer that had been in the Buick.  (GX 7000 at 1049, 1051-52.)

---

[9] Subsequently, Pappa killed Sparacino, and Russo helped mutilate and dispose of the body.  (Tr. at 63-66.)  Curcio also got killed, and Russo believes Pappa was involved in murdering him.  (Id. at 66-68.)

These exhibits corroborate Russo's testimony that he drove a four-door, brown or beige car to murder Scopo (though he recalled it was a Chevrolet), that Scopo arrived in a small, light-colored Nissan Altima, that the murder crew used a semiautomatic weapon with a silencer, that Sparacino had a ski cap (the wool hat), and that bullets were fired both at Scopo in the Nissan and in return at Russo in the brown car, shattering his rear windshield.

Exhibit 7007 is the trial testimony of NYPD Detective Jeffrey Young. Detective Young testified that on October 21, 1993, he took photographs of the Buick and Nissan after they were secured in a garage.  (GX 7007 at 1847-50.)  He took the photographs admitted into evidence at the <u>Guerra</u> trial as Government Exhibits 20(c), 20(d), 20(f), 20(g), 21(e) and 21(i).  (GX 7007 at 1852-54, 1856-57.)  The photographs he took depict the following:

- <u>GX 20(c)</u>:  The Buick, with a shattered rear windshield and other damage.  (GX 7007 at 1852.)

- <u>GX 20(d)</u>:  The interior driver's area of the Buick, including a broken steering wheel column, which is consistent with car theft, and a screwdriver between the seats.  (GX 7007 at 1852-53.)

- <u>GX 20(f)</u>:  The backseat of the Buick, including broken glass and the wool cap.  (GX 7007 at 1853.)

- <u>GX 20(g)</u>:  The backseat of the Buick, including discharged shells.  (GX 7007 at 1854.)

- <u>GX 21(e)</u>:  The exterior of the rear passenger side of the Nissan, including broken glass.  (GX 7007 at 1856-57.)

- <u>GX 21(i)</u>:  The interior of the rear of the Nissan, including shattered glass and bullet fragments.  (GX 7007 at 1856-57.)

These exhibits corroborate Russo's testimony about the types of cars involved, the ski mask, the fact that bullets were fired in both directions, and the fact that the brown car he drove had been stolen and was then started with a screwdriver.

### 2.  Funeral Records

Records corroborate Russo's testimony about meeting with Persico, Jr. during the planning of the Scopo murder even though Persico, Jr. was incarcerated.  Government Exhibit 861 is a death certificate for Elenor Avena indicating a date of death of August 17, 1993.  The government proffers that Ms. Avena was the grandmother of Teddy Persico, Jr.  Government Exhibit 862 is a business record from a funeral home dated August 17, 1993.  (GX 862 at 1.)  It shows that Ms. Avena's place of service was "Scarpaci FH."  (GX 862 at 5.)  Government Exhibit 863 is a state prison record dated August 18, 1993, indicating that an inmate named Persico was transported on a "BKLYN funeral trip."  (GX 863 at 1.)

### 3.  Guilty Plea of Theodore Persico, Jr.

Persico, Jr. was a co-defendant in the present case.  On June 8, 2012, he pled guilty to conspiring to murder Joseph Scopo in aid of racketeering.  (Docket Entry Nos. 562, 563.)  This corroborates Russo's testimony that Persico, Jr. was involved in ordering and planning the murder.

### 4.  Guilty Plea of Anthony Russo

Russo's own guilty plea also corroborates his testimony.  He pled guilty to racketeering conspiracy, including the Scopo murder, which subjected him to a maximum sentence of life imprisonment.  (Tr. at 125-26; see also GX 3500-AR-9(b) (indictment in United States v. Russo, 11 CR 30 (KAM)) ¶¶ 17-21; GX 3500-AR-9(c) (Russo's plea allocution) at 22.)

5.     Docket Sheet for Alphonse Persico's Case

The docket for <u>United States v. Alphonse Persico</u>, 92 CR 351 (DGT)

(E.D.N.Y.), which is attached as Exhibit B, corroborates Russo's testimony that Alphonse

Persico was incarcerated during the planning of the Scopo murder, which motivated the

defendant to order that the murder occur soon, and that Alphonse Persico was released from

incarceration in 1994, at which time Russo and Guerra began reporting to Alphonse Persico

rather than the defendant.  (Tr. at 49-50, 69-70.)  In particular, the docket sheet indicates that

an arrest warrant was issued as to Alphonse Persico on May 14, 1993 (Ex. B at 7), that he

was ordered temporarily detained on June 9, 1993 (<u>id.</u> at 8), that he moved for bail on

September 10, 1993 (<u>id.</u> at 11), that on September 29, 1993 Judge Sifton requested that he

remain in his facility through November 1993 (<u>id.</u>), that the defendant's motion for bail was

argued on October 12, 18, 19 and 20, 1993, and was denied on October 20, 1993 (<u>id.</u> at 11-

13), that another bail motion was denied on April 7, 1994 (<u>id.</u> at 22), and that he was

acquitted following trial – and was "discharged" – on August 8, 1994 (<u>id.</u> at 32-33).[10]

## III.  LOANSHARKING

Russo testified that in the mid-1990s, he and Guerra made money by

loansharking.  (Tr. at 72-73.)  Loansharking involves extending loans in exchange for interest

payments that do not reduce the principal.  (<u>Id.</u> at 72.)  It is generally committed by members

and associates of organized crime.  (<u>Id.</u> at 72-73.)  Russo and Guerra borrowed their

loansharking money from the defendant.  (<u>Id.</u> at 73.)  They borrowed from him at the rate of

---

[10] Alphonse Persico's co-defendants included others identified by Russo as leaders of the Persico faction, including Joseph Russo, Anthony Russo, Joseph Monteleone, Sr., and Theodore Persico, Sr.  (<u>See</u>, <u>e.g.</u>, Ex. B at 7-8.)

one "point," or one percent interest, per week, and they then extended loans to others at the rate of two-and-a-half to three points per week.  (Id. at 73-74.)  This arrangement with the defendant lasted from approximately 1993 to approximately 1996 or 1997.  (Id. at 74.)  In total, Russo recalled that he and Guerra borrowed about $150,000 or $200,000 in loansharking money from the defendant.[11]  (Id.)

   At first, Russo and Guerra had no trouble repaying the defendant.  (Id. at 75.)  After a year-and-a-half or two years, however, they had trouble collecting from their own customers and repaying the defendant.  (Id.)  The defendant initially did not make demands, but after a while, he said to them, "Listen, youse got to bring my money back."  (Id. at 75-76.)  After hearing that, Russo assaulted a series of loansharking customers.  (Id. at 76-80.)  After Russo assaulted a customer known as "Fat Lenny," who owed about $30,000, the defendant told Russo that Gambino family member Tony Anastasio "was going to take care of" the loan.  (Id. at 76-77.)

   In a separate incident, after Russo assaulted a customer named Tony who owed $7,000 or $8,000, a Genovese family member known as "Joe C" urged Russo and Guerra to settle for $2,000 or $3,000.  (Id. at 77.)  Russo declined because the money belonged to the defendant, not Russo.  (Id. at 77-78.)  Russo reported this to the defendant's brother, Alphonse Persico, who then told Russo – in front of "Joe C" – to continue assaulting Tony.  (Id. at 78.)  Subsequently, Gambino family members known as "Big Louie" and "Huck" discussed the debt with Alphonse Persico, who told Russo not to worry about the

---

[11] In addition, the defendant told Russo that he was owed money with interest by Colombo family associate Bobby Tarantola, although Russo did not know what the money was for, and Colombo family associate Anthony Ferrara said he had borrowed money from the defendant to buy a car.  (Tr. at 80-81.)

debt and that he (Alphonse Persico) would get the money and give it to the defendant.[12] (Id. at 78-79.)

While they owed money to the defendant, Russo and Guerra became involved in a dispute in which Tarantola was owed $100,000 by a stockbroker. (Id. at 98-99.) Russo and Guerra got permission from Alphonse Persico to help Tarantola collect the money. (Id. at 99.) They then assaulted the stockbroker. (Id.) Afterward, a Gambino family member known as "Ronnie One Arm" approached Russo on behalf of the stockbroker. (Id. at 99-100.) Russo agreed to leave the stockbroker alone, and, about two weeks later, "Ronnie One Arm" told Russo that the stockbroker would repay the money in two installments of $50,000. (Id. at 100.) When they received the first installment, Russo took $5,000. (Id. at 101.) Alphonse Persico told Russo he should not have taken any money until Alphonse Persico gave him permission. (Id. at 101-02.) Russo offered the $5,000 to Alphonse Persico, who responded that Russo should give it to the defendant because he owed the defendant money. (Id. at 102.) Russo did in fact owe loansharking money to the defendant at that time. (Id.)

After Russo and Guerra were arrested in or around 2000, Russo was out on bail. (Id. at 102-03.) While he was out on bail, Russo discussed money with the defendant. (Id. at 103.) Russo recalled that he then owed the defendant about $60,000 or $70,000. (Id. at 103-04.) The defendant told Russo to forget about that money. (Id. at 104.) Russo understood that the defendant said that because Russo was involved in murdering Scopo, and the defendant did not want Russo to inform on him. (Id.) Subsequently, after Russo was sentenced and became unable to put money into his commissary account, he obtained money

_____

[12] During this period, Russo also assaulted a loansharking customer named Santos, who owed $3,000 or $4,000.

from Colombo family associate Scott Reback, in the amount of approximately $250 or $300 per month.  (<u>Id.</u> at 104-05.)  After Russo was released, Reback told him to thank the defendant for the money.  (<u>Id.</u> at 106.)

IV.    <u>EXTORTION</u>

      A.    <u>The Testimony of Anthony Russo</u>

           Russo testified that in 2009 or 2010, he and Colombo family member Anthony Stropoli wanted to start a valet parking business in New Jersey together.  (Tr. at 121-23.) The choice of business and location was based on the fact that Stropoli already operated a wholesale seafood business selling to restaurants in New Jersey.  (<u>Id.</u> at 122.)  Russo contacted an individual he knew as "Anthony," who operated a valet business on Staten Island, to get advice.  (<u>Id.</u>)  When Russo went to meet "Anthony," the defendant was there. (<u>Id.</u> at 122-23.)  The defendant asked Russo how he and Stropoli would like it if the defendant opened a seafood business.  (<u>Id.</u> at 123.)  The defendant further told Russo to make his life easier by "giv[ing] us the valet" and putting "our" (the defendant's and "Anthony's") valet business in the restaurants that Russo intended to approach, while "you guys" (Russo and Stropoli) "sit back and collect a check."  (<u>Id.</u> at 124.)  Russo then obtained valet business for "Anthony" and the defendant from an Italian restaurant in Red Bank, New Jersey.  (<u>Id.</u> at 124.)  Russo and Stropoli never opened their own valet business because they did not want "problems" from the defendant.  (<u>Id.</u> at 124-25.)

      B.    <u>Additional Evidence</u>

           Exhibit 7002 is an FBI report of an interview of a man who operated an Italian restaurant in Red Bank, New Jersey, who advised that a man named Anthony, possibly with the last name Russo, referred him to a valet business, which he used in or around 2011 for

approximately six months.  Exhibits 838(a) and 838(b) are business records that the restaurant subsequently provided to the FBI, indicating that the restaurant paid Park Plus Valet Service and another company with the same address on various dates between June 2009 and February 2011.[13]  The government proffers that Park Plus Valet Service was operated by Anthony Preza, a co-defendant in this case and an associate of the defendant.

## V.    CONSPIRACY TO ACQUIRE AND SELL STOLEN VIDEO GAMES

### A.    The Testimony of Anthony Russo

Russo testified that in the mid-1990s, he was involved in a scheme to acquire and sell stolen video games.  (Tr. at 81.)  It began when Russo's father told him about someone who wanted to sell the games.  (Id.)  Russo met the seller, known as "Spider," who asked for $75,000 for a tractor-trailer load of the games.  (Id. at 81-82.)  Russo then told the defendant about the scheme, and the defendant referred him to a friend who would provide the money to buy the games.  (Id. at 82.)  Russo and Guerra met the friend, who gave them $70,000 or $75,000.  (Id. at 82, 85)  Russo had his father rent a Ryder truck, and planned to take the games in two loads, each time paying "Spider" $35,000.  (Id. at 82-83.)  He further planned to put the games in the garage of a bus company in Coney Island, which was owned by the defendant, and which the defendant made available for that purpose.  (Id. at 83.)

The plan came to include additional Colombo family associates.  (Id.) "Spider" brought Russo one load of games in the truck that Russo's father had rented.  (Id. at 84.)  However, after "Spider" showed Russo the load, Russo spotted what he believed to be

---

[13] Because Government Exhibits 838(a), 838(b) and 7002 identify the restaurant and certain affiliated individual, the government will seek permission to file them under seal, with copies to the defense, under separate cover.

law enforcement agents photographing him.  (Id.)  Russo took "Spider" into a car service, searched him for a wire, found none, and told him to get rid of the truck and the games.  (Id.)  Russo held on to the money provided by the defendant's friend.  (Id. at 85.)  About two days later, the defendant asked Russo if he was ever going to return the money, and Russo agreed to do so.  (Id.)

B.    Additional Evidence

Russo's testimony is corroborated by the trial testimony of two FBI agents and related exhibits.  Government Exhibit 7006 is the trial testimony of FBI Special Agent Kevin Wevadau, and Government Exhibit 7005 is a surveillance log reflecting a surveillance that Agent Wevadau conducted on October 26, 1994.  Pursuant to Rule 803(5) of the Federal Rules of Evidence, Agent Wevodau read out loud from the log at trial, and it indicated that he took photographs of an unidentified white male that day in the vicinity of 3rd Avenue between 30th and 31st streets in Brooklyn, New York.   He further testified that Exhibits 212(a), 212(b) and 212(c) were those photographs.  The government respectfully submits that those photographs depict Russo and that Russo was looking directly at the camera in Exhibit 212(b).

Government Exhibit 7008 is the trial testimony of FBI Special Agent Matthew Tormey, and Government Exhibits 7009, 7010 and 7011 are reports he prepared in October 1994.  Referring to those reports, Agent Tormey testified that on October 27, 1994, he conducted surveillance at 7th Avenue and 23rd Street in Brooklyn, New York.  (GX 7008 at 1005.)  He observed two individuals remove boxes from a U-Haul truck.  (Id.)  He then looked in the truck and found a load of hand-held video games and a lease agreement for the truck.  (Id.)  Government Exhibit 864 is the lease agreement, and Government Exhibits

865(a)-(e) are photographs of the truck and its contents. (Id. at 1006-07.) The agreement

was signed by "Anthony Russo," whom Agent Tormey later determined was born in 1939.[14]

(Id. at 1007, GX 864.) The photographs depict boxes of video games. (GX 7008 at 1007-08;

GX 865(a)-(e).) Agent Tormey determined that the "Anthony Russo" who rented the truck

had reported it stolen. (GX 7008 at 1008.)

<p style="text-align:center">*        *        *</p>

The government respectfully submits that Russo's testimony was credible and

was corroborated. The Court observed him testify in a straightforward manner on both direct

and cross-examination, and is familiar with his motivations and incentives. Based on the

totality of his testimony and the extensive corroboration described above, Russo's testimony

should be credited.

In addition to the corroborative evidence described above, the government

notes that Russo has been found credible by Judge Townes, who presided over the trial of

Guerra and resolved numerous significant issues prior to sentencing Guerra. In particular,

Judge Townes observed that, with respect to the Scopo murder:

> [T]he testimony of Mr. Russo showed by a preponderance of the
> evidence that [Guerra] as well as he, Mr. Russo, helped plan it;
> that they got guns that [Guerra] came bringing in a gym bag;
> and that the defendant went to prison to discuss murder plans
> with Ted Persico; and that the group of them started to look for
> Mr. Scopo. He, [Guerra], along with Russo and others, met
> with Theodore Persico, Jr. at his grandmother's funeral and
> received the okay or order to commit this murder.

(Transcript of Guerra Sentencing dated September 9, 2013 (attached in relevant part as Ex.

C) at 21.) Although Judge Townes did not need to determine at Guerra's sentencing whether

---

[14] Russo's father was born in or around 1939.

or to what extent the defendant Michael Persico participated in the Scopo murder, her statement about Russo's testimony indicates that she credited Russo's account of how the murder was planned and carried out.

<div align="center">CONCLUSION</div>

For the reasons set forth above, the government respectfully submits that it has proven by a preponderance of the evidence that the defendant Michael Persico participated in (1) racketeering; (2) the 1993 murder of Joseph Scopo; (3) loansharking; (4) extortion; and (5) a conspiracy to acquire and sell stolen video games.

Dated:    Brooklyn, New York
          September 21, 2016

                            Respectfully submitted,

                            ROBERT L. CAPERS
                            UNITED STATES ATTORNEY
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201

              By:    /s/ Allon Lifshitz
                            Nicole M. Argentieri
                            Allon Lifshitz
                            Assistant U.S. Attorneys
                            (718) 254-6232/6164

cc:     Clerk of Court (DLI) (by ECF)
         Defense Counsel (by ECF)
         U.S. Probation Officer Mary Ann Betts (by email)

1

```
                                                                   1
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2    - - - - - - - - - - - - - - X
        UNITED STATES OF AMERICA,    :   10-CR-147 (DLI)
 3                                   :
                                     :
 4          -against-                :   United States Courthouse
                                     :   Brooklyn, New York
 5                                   :
        MICHAEL PERSICO,             :   August 10, 2016
 6                                   :   10:00 a.m.
                Defendant.           :
 7    - - - - - - - - - - - - - - X

 8        TRANSCRIPT OF CRIMINAL CAUSE FOR FATICO HEARING
            BEFORE THE HONORABLE DORA L. IRIZARRY
 9              UNITED STATES DISTRICT JUDGE

10                  A P P E A R A N C E S :

11   For the Government: ROBERT L. CAPERS, ESQ.
                         United States Attorney
12                       Eastern District of New York
                         271 Cadman Plaza East
13                       Brooklyn, New York 11201
                    BY:  ALLON LIFSHITZ, ESQ.
14                       Assistant United States Attorney

15   For the Defendant:  SERCARZ & RIOPELLE
                         810 Seventh Avenue, Suite 620
16                       New York, New York 10019
                    BY:  MAURICE H. SERCARZ, ESQ.
17
                         MARC FERNICH, ESQUIRE
18                       810 Seventh Avenue, Suite 620
                         New York, New York 10019
19
                         SARITA KEDIA, ESQUIRE
20                       5 East 22nd Street, Suite 7B
                         New York, New York 10010
21
     Probation:          Mary Ann Betts
22
     Court Reporter:     Marie Foley, RMR, CRR
23                       Official Court Reporter
                         Telephone: (718) 613-2596
24                       Facsimile: (718) 613-2648
                         E-mail: Marie_Foley@nyed.uscourts.gov
25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

*Proceedings*                                                    2

1        (In open court; defendant present.)

2        COURTROOM DEPUTY:  Criminal cause for Fatico

3   hearing, Docket No. 10-CR-147, United States versus Persico.

4        Please state your appearances.

5        MR. LIFSHITZ:  Allon Lifshitz for the United States.

6   And also at counsel table are FBI Special Agent Chance Adam,

7   Probation Officer Mary Ann Betts, and a paralegal from our

8   office Olivia Lemons.  Good morning, Your Honor.

9        THE COURT:  Good morning to all of you.

10        MR. FERNICH:  Good morning, Your Honor, Marc

11   Fernich.

12        Everybody will introduce themselves.

13        THE COURT:  Of course.  Good morning.

14        MR. SERCARZ:  Good morning.  For the defendant

15   Michael Persico, Maurice Sercarz.

16        THE COURT:  Good morning.

17        MS. KEDIA:  Good morning, Your Honor.  Sarita Kedia

18   also for the defendant Michael Persico, who is seated to my

19   right.  And also at counsel table is Diane Fischer.

20        THE COURT:  Good morning to all of you.

21        So, we are here for a Fatico hearing.  I believe the

22   Government is ready to proceed.

23        Just a couple of things that I wanted to put on the

24   record before we get started.  I just wanted to acknowledge

25   receipt from Probation an addendum that was filed yesterday

 1   with respect to an outstanding issue of defendant's tax

 2   filings.  I'm not sure that this means that the defendant did,

 3   in fact, provide the tax returns.  I'm not clear on that.

 4              PROBATION OFFICER:  Yes, he did, Your Honor.

 5              THE COURT:  He did, okay.  And apparently there's a

 6   statement as well from IRS that he is current in all of his

 7   tax filings, as I understand it.

 8              There is the revised presentence report that was

 9   also disclosed on July 29th based on the Court's rulings on

10   the objections that were discussed the last time that we were

11   here in June, and I'm just going to ask that within 14 days -

12   the deadline may be coming up - of its disclosure, if there

13   are any additional objections to the presentence report,

14   according to my standard requirements in criminal cases, if

15   you would please indicate that, or indicate that you have no

16   objections to the presentence report.  I don't know if you've

17   had a chance to review it before today.  If you want to state

18   on the record today whether or not you have any objections and

19   then we could set a schedule accordingly if that's what you

20   would like to do.

21              Any objections to the revised presentence report by

22   the Government?  Have you had time to review it sufficiently?

23              MR. LIFSHITZ:  We have, Your Honor.  We don't have

24   objections.

25              THE COURT:  Okay.  Mr. Fernich?

1        MR. FERNICH:  We haven't made a determination yet,

2   Your Honor.

3        THE COURT:  I can't hear you.  It may be that the

4   mic is not on.

5        MR. FERNICH:  It's not on.

6        Better?

7        THE COURT:  Yes, now I can hear you.

8        MR. FERNICH:  We haven't made a determination yet.

9   There may be a few more written ones and we'll submit them in

10  due course to the Court.

11       THE COURT:  All right.  Well, do you want me to set

12  a date for that to be done?

13       MR. FERNICH:  Sure.

14       THE COURT:  How much more time do you need for that?

15       MR. FERNICH:  A week.

16       THE COURT:  Okay.  Just bear with me one second.

17       So, shall we say August 17th?

18       MR. FERNICH:  That's fine, Judge.

19       THE COURT:  Okay.  I don't necessarily require the

20  objections to be posted on the docket, as long as Probation

21  and the Government get a copy, and I just need to get a hard

22  courtesy copy.  One hard courtesy copy is fine.

23       If there are objections raised by the defense, then

24  I will need to get a response by the Government by September 1.

25       MR. LIFSHITZ:  Yes, Your Honor.

1          THE COURT:  It's not necessary if the defense says

2    that there are no objections.  Again, I only need one copy and

3    as long as Probation is provided a copy, you can provide it by

4    e-mail or hard copy, or however Probation would prefer you to

5    do that.

6          Is there anything that the parties would like to

7    address before we get started with the taking of evidence?

8          MR. LIFSHITZ:  We just have one brief issue, Your

9    Honor.

10          THE COURT:  Yes, sir.

11          MR. LIFSHITZ:  Last night, Ms. Kedia filed a notice

12    of appearance in the case, the Court may have noticed.  I

13    don't know if the Court is aware, Ms. Kedia originally

14    represented the defendant I believe beginning in 2010.

15          THE COURT:  The name seemed familiar to me from the

16    docket.

17          MR. LIFSHITZ:  She was lead counsel.

18          THE COURT:  She represented Mr. Michael Persico,

19    correct, in the beginning of the case?

20          MR. LIFSHITZ:  Correct, Your Honor.  And she

21    withdrew, I believe, in May 2014.

22          My understanding was that she withdrew because, at

23    that time, the defense was making the breach motions that Your

24    Honor's aware of that was decided by Judge Townes.

25          THE COURT:  Yes.

1       MR. LIFSHITZ:  Part of the defense theory was that

2  the Government breached based on conversations Ms. Kedia

3  participated in with government lawyers.  Therefore, she could

4  have been a witness if there had been a hearing, which the

5  defense had requested at that time.

6       The issue has been resolved by Judge Townes.

7       THE COURT:  Right.

8       MR. LIFSHITZ:  I do expect the defense will appeal

9  on the issue and would request such a hearing if they succeed

10  on the appeal, so Ms. Kedia could in the future be a witness

11  in a hearing.

12       This is a little different from the situation where

13  a lawyer would have to testify at trial about the crimes that

14  are charged, but it's still something I wanted to bring to the

15  Court's attention in case the Court believes further inquiry

16  is appropriate.

17       THE COURT:  Well, I made it clear back in June that

18  we are not relitigating the motion to withdraw the guilty plea

19  or any alleged breach of the plea agreement.  That's been

20  settled by the decisions of Judge Townes, and I made it clear

21  that I was not going to revisit those issues.

22       The issues here are fairly narrow.  They relate to

23  certain relevant conduct that's described in the presentence

24  report, including certain additional alleged extortion

25  activities, activities concerning some, I think, jukeboxes, if

1   I'm correct, and also a homicide that the defendant is alleged

2   to, by the Government, to have participated in.

3            So, I don't know that that necessarily impacts any

4   of the issues concerning the withdrawal of the guilty plea or

5   breach of the agreement.

6            MR. LIFSHITZ:  I agree the issues in the Fatico are

7   separate.  I just didn't want to fail to advise the Court of

8   that possibility.

9            THE COURT:  I appreciate that.

10            Ms. Kedia, would you like to be heard on that

11   question?

12            I ask lawyers, because I'm not sure if you appeared

13   before me or not, to just sit and speak into the microphone,

14   because otherwise it's a little difficult to hear.  You should

15   each have access to -- some are flat microphones and some are

16   the high microphones.  So whatever is convenient.

17            MS. KEDIA:  Yes, Your Honor.  Thank you.  And I'll

18   move that microphone over so that if I have to speak in the

19   future, I won't have to switch chairs with Mr. Sercarz.

20            No, as I understand it, as the Court just stated,

21   the Court has made clear that it does not want to revisit the

22   breach issue or the plea withdrawal issue.  That was the only

23   issue with respect to which I potentially could have been a

24   witness had there been a hearing.  I don't believe that there

25   are any additional issues that would concern the Court in any

1   way in terms of my appearance at this Fatico hearing or at any

2   future sentencing proceeding.

3              THE COURT:  Okay.  I'm not perceiving a problem

4   here.

5              Mr. Persico, are you understanding the issues that

6   we were discussing here?

7              THE DEFENDANT:  Yes, I do.

8              THE COURT:  And are you okay with Ms. Kedia

9   proceeding to represent you during the course of this hearing?

10             THE DEFENDANT:  Yes, I am.

11             THE COURT:  All right.  So that should be fine.

12             Anything else that the parties would like to raise

13  before we get started?

14             MR. LIFSHITZ:  Not from the Government, thank you.

15             THE COURT:  For the defense?

16             MR. FERNICH:  No, ma'am.

17             THE COURT:  All right.  So why don't you call your

18  first witness.

19             MR. LIFSHITZ:  Yes, Your Honor.  The Government

20  calls Anthony Russo.

21             (Anthony Russo enters and takes the witness stand.)

22             THE COURT:  Who's going to be cross-examining on

23  behalf of the defense?

24             MR. SERCARZ:  I am, Your Honor.

25             MS. KEDIA:  Your Honor, Mr. Sercarz is going to be

 1   cross-examining this witness and I'm going to be

 2   cross-examining the next witness.

 3           THE COURT:  Perfect.  Thank you.

 4           COURTROOM DEPUTY:  Please raise your right hand,

 5   sir.

 6    ANTHONY RUSSO,

 7           called by the Government, having been first duly

 8   sworn, was examined and testified as follows:

 9           COURTROOM DEPUTY:  Please be seated.  Please spell

10   your name.

11           THE WITNESS:  Anthony Russo, R-U-S-S-O.

12           COURTROOM DEPUTY:  Thank you.

13           THE COURT:  And Anthony the usual spelling?

14           THE WITNESS:  Yes.

15           THE COURT:  Good morning, sir.

16           THE WITNESS:  Good morning.

17           THE COURT:  I'm just going to ask you to keep your

18   voice up nice and loud and clear.  Please speak slowly.

19           You can adjust the microphone so that you're

20   comfortable with it.  If you want to bring it down on to the

21   table, that's fine.  It's adjustable.  You shouldn't have to

22   be right on top of it.

23           I see you have water there, but we do have more

24   water if you'd like.  Just be careful with that pitcher.  I

25   tell everybody we don't want you wearing the water; we want

Case 1:02-cr-00251-DEK   Document 4869-6   Filed 09/19/21   Page 37 of 635 PageID #:10039
Case 1:02-cr-00251-DEK   Document 4869-6   Filed 09/19/21   Page 37 of 635 PageID #:
4344

1   you drinking it.

2            You may inquire when you're ready, Mr. Lifshitz.

3            MR. LIFSHITZ:  Thank you, Your Honor.

4   DIRECT EXAMINATION

5   BY MR. LIFSHITZ:

6   Q    Mr. Russo, have you committed crimes in your life?

7   A    Yes.

8   Q    What is the worst crime you have committed?

9   A    Murder.

10  Q    Who did you murder?

11  A    Joey Scopo.

12  Q    Did you murder Joey Scopo on your own or with others?

13  A    With others.

14  Q    How was Joe Scopo murdered?

15  A    He was shot.

16  Q    With what kind of guns?

17  A    A MAC-10, machine gun, and a pistol.

18  Q    How did you and your co-conspirators get those guns?

19  A    We asked Michael -- we had a plan to get Joey Scopo and

20  we asked Michael for -- that we needed guns for the hit.

21  Q    Michael who?

22  A    Persico.

23  Q    Do you see Michael Persico here today?

24  A    Yes, he's right there.

25  Q    Can you please point him out and describe what he's

1   wearing?

2   A    He's wearing looks like a blue sport coat, gray hair.

3          MR. SERCARZ:  I'll stipulate to the identification.

4          THE COURT:  It's so noted, the witness has

5   identified the defendant.

6          MR. LIFSHITZ:  Thank you, Your Honor.

7   Q    Mr. Russo, how old are you?

8   A    55.

9   Q    Where did you grow up?

10  A    In Brooklyn.

11  Q    In what neighborhood or neighborhoods?

12  A    I was born and raised -- born down in Court Street and

13  moved to Borough Park.

14  Q    How far did you go in school?

15  A    Eleventh grade.

16  Q    At what age did you begin committing crimes?

17  A    Sixteen.

18  Q    When you were a teenager, what types of crimes did you

19  commit?

20  A    I committed a lot of crimes: stealing trucks, robbing

21  houses, selling drugs.

22  Q    Did you possess guns in your teens?

23  A    Yes, I did.

24  Q    Did you ever fire a gun over someone's head?

25  A    Yes, I did.

1   Q    In your teens and into your early 20s, did you have any

2   legitimate jobs too?

3   A    I had a couple.

4   Q    What were your legitimate jobs?

5   A    I had a trucking route.  I worked -- I had a little -- my

6   own truck and I used to deliver produce to Red Apple

7   Supermarkets.

8   Q    Did that job involve the Hunts Point Market?

9   A    Yes, it did.

10  Q    Did you also commit crimes at Hunts Point Market at that

11  time?

12  A    Yes.

13  Q    What did you do?

14  A    I was selling cocaine and stealing trucks.

15  Q    In addition to operating a truck, did you have any other

16  legitimate jobs in your teens and early 20s?

17  A    Yeah, I drove an ambulette for an ambulance service.

18  Q    Have you been involved in organized crime?

19  A    Yes.

20  Q    Approximately from when to when?

21  A    Approximately from around the age of 15, 16.

22  Q    Until what age?

23  A    'Til the day I was arrested in 2011.

24  Q    With which crime families, if any, have you been

25  associated?

1   A      Gambino and Colombo.

2   Q      And what are the positions you have held in organized

3   crime?

4   A      Associate, soldier, and acting captain.

5   Q      Based on --

6          THE COURT:  And, I'm sorry, acting captain?

7          THE WITNESS:  Yes.

8   Q      Based on your experience, what is the purpose of

9   organized crime?

10  A      Organized crime, the basis for organized crime is to make

11  money for the family.

12  Q      How many crime families are there in New York City?

13  A      There are five.

14  Q      Please name them.

15  A      Genovese, Gambino, Bonanno, Colombo, Lucchese.

16  Q      Do these families have a common structure?

17  A      Yes, they do.

18  Q      If you could start at the top, what are the common

19  positions in an organized crime family?

20  A      The boss, underboss, consigliere, captains, soldiers,

21  associates.

22  Q      Are you familiar with the term "administration" in

23  organized crime?

24  A      Yes.

25  Q      What's the administration?

1   A    Administration's the top three leaders: boss, underboss,

2   consigliere.

3   Q    Do you know what it means to be in an "acting" position

4   in a crime family?

5   A    Yes.

6   Q    What does that mean?

7   A    Acting, you're acting for the captain that's not around

8   at the moment.

9   Q    Why are captains sometimes not around?

10  A    Usually they're in jail most of the times when you're

11  acting for them.

12  Q    Are you familiar with the term "official"?

13  A    Yes.

14  Q    What does that mean in organized crime?

15  A    That's a permanent position.

16  Q    You mentioned the term "associate."

17           What are the responsibilities of an associate in a

18  crime family?

19  A    Associates are people that hang around and want to be

20  involved with people and they usually earn money for people

21  they're around, like the soldiers.

22  Q    So who does an associate report to?

23  A    Soldier.

24  Q    Are there different types of associates?

25  A    Yeah.  There's earners, there's tough guys, guys that,

Case 1:02-cr-00251-DEK Document 869-6 Filed 09/19/21 Page 42 of 635 PageID #: 4349

1   you know, break legs and stuff like that.

2   Q    What type were you?

3   A    I was a supposedly a tough guy.

4   Q    What are the responsibilities of a soldier in a crime

5   family?

6   A    Soldiers, same thing almost as an associate, only you

7   make money, do what he has to do to make money, follow it up

8   to the top.

9   Q    Is a soldier an inducted member of a crime family?

10  A    Made member of the family, yes.

11  Q    Is an associate an inducted member?

12  A    No.

13  Q    What about captain, what are a captain's responsibility?

14  A    The captains run the crews and crews exist of soldiers

15  and associates.

16  Q    Who does a captain report to, if anyone?

17  A    Basically the underboss.

18  Q    What are the responsibilities of the underboss?

19  A    He's in charge of all the captains and make sure

20  everybody stays in line.

21  Q    Does the underboss report to anyone?

22  A    He usually reports to the boss, yes.

23  Q    You mentioned a consigliere.

24       Is that a position?

25  A    Yes.

1   Q     What is the responsibility of a consigliere?

2   A     He's -- he's an advisor to the boss.

3   Q     And what about the boss, what are the boss's

4   responsibilities?

5   A     The boss is the boss.  He oversees the whole family.

6   Q     How does money flow in an organized crime family?

7   A     Up to the top.

8   Q     Is there a process by which an associate can become an

9   inducted member?

10  A     Yeah, he has to -- he has to do what he has to do to

11  become a made member.  He's got to be around a soldier.

12  Soldier's got to put him up for induction into the family.

13  Q     Is there a term for putting someone up for induction?

14  A     Put him up for induction, put him in -- I don't know.

15  Yeah, put him in for to become a wiseguy.

16  Q     After someone's put up for induction, is there a next

17  step in the process?

18  A     Yes, there's a list that goes around to all the other

19  five families.

20  Q     What's the purpose of that list?

21  A     That's so anybody in the other five families could check

22  out who's going to be straightened out and if they have a

23  problem, as long as it's not a personal problem, they can't

24  really deny anybody, but if there is a problem, they -- they

25  talk it out.

1          THE COURT:  What do you mean by "see who is going to

2    be straightened out"?

3          THE WITNESS:  Become a made member of the family.

4    Q    So the families can review each other's lists, is that

5    what you're saying?

6    A    Yes.

7    Q    If someone makes it through the list part of the process,

8    how does the associate become inducted?

9    A    There's a ceremony.

10   Q    What are some of the rules of organized crime families?

11   A    There's bunch of rules.  One of the rules is that you

12   can't raise your hands to another made member of any crime

13   family.  You're not supposed to be involved in any narcotics.

14   You're really not supposed to murder unless if it's okayed by

15   the boss.  Cooperation with government or law enforcement is a

16   definite no-no.

17   Q    At what age did you first become involved with organized

18   crime?

19   A    Around 15, 16 years old.

20   Q    Which family did you become involved with then?

21   A    Gambino.

22   Q    How did you become involved with the Gambinos?

23   A    A soldier from the Gambino family took a liking to me,

24   and I was working at my father's fruit store down on Court

25   Street and he asked my father if I could hang around his club

1   and I did.

2   Q    At some time after you became involved with the Gambino

3   family, were you arrested?

4   A    Yes.

5   Q    In approximately what year?

6   A    Ninety -- '86, '87.

7   Q    What were you arrested for?

8   A    Gun possession and drugs.

9   Q    How did you resolve your case?

10  A    I pled out.

11  Q    What was your sentence?

12  A    Five years probation.

13  Q    Your sentence was five years probation?

14  A    Right.

15  Q    Did you commit crimes while you were on probation?

16  A    Yes.

17  Q    What types of crimes?

18  A    I was selling drugs again.

19  Q    What drugs were you selling at that time?

20  A    Cocaine.

21  Q    In 1987 after the arrest you've just described, were you

22  arrested again?

23  A    Yes.

24  Q    What had you done to get arrested?

25  A    Assault.

1    Q    Describe what you did in the assault.

2    A    I -- I beat a guy with a car jack.

3    Q    Before you beat the guy with the car jack, did you beat

4    up someone else connected --

5    A    Yes, his son.

6    Q    Why did you beat up his son?

7    A    He owed me money for drugs.

8    Q    And why did you beat up the father?

9    A    Because he came looking for me.

10   Q    How badly did you beat the son and father?

11   A    The son, I broke his jaw and the father, I -- pretty

12   badly.  I broke his head open and broke his shoulder.

13   Q    Did you go to trial?

14   A    Yes.

15   Q    What happened?

16   A    I got convicted.

17   Q    What was your sentence?

18   A    Five-and-a-half to twelve, something like that.

19   Q    Was this in the state system or the federal system?

20   A    State.

21   Q    Where were you imprisoned during that sentence?

22   A    I was upstate in Coxsackie, maximum security, a

23   mid-orange medium facility.

24   Q    When you were in Coxsackie, was there anyone there that

25   you knew?

*Russo - Direct / Lifshitz*                    20

1   A    Yes.

2   Q    Who was that?

3   A    "Teddy Boy."

4   Q    What's his full name, his real name?

5   A    Teddy Persico.

6   Q    Is he a junior or a senior?

7   A    He's a junior.

8   Q    So Teddy Persico, Junior?

9   A    Yes.

10  Q    And you call him "Teddy Boy"?

11  A    Yes.

12            MR. LIFSHITZ:  Your Honor, may I show him exhibit

13  156?

14            THE COURT:  That's for identification?

15            MR. LIFSHITZ:  Yes.

16            (The above-referred to exhibit was published.)

17  BY MR. LIFSHITZ:

18  Q    Mr. Russo, do you recognize this person?

19  A    Yes.

20  Q    Who's that?

21  A    Teddy.

22  Q    Teddy Persico, Junior?

23  A    Yes.

24            MR. LIFSHITZ:  We would move to admit 156.

25            THE COURT:  Any objection?

*Russo - Direct / Lifshitz*                    21

1          MR. SERCARZ:  No, Your Honor.

2          THE COURT:  It's admitted.

3          MR. LIFSHITZ:  Thank you.

4          (Government's Exhibit 156 was received in evidence.)

5    BY MR. LIFSHITZ:

6    Q    When you were in prison with Teddy Persico, Junior, what

7    role, if any, did he have in organized crime?

8    A    He was a made member of the Colombo family.

9    Q    Who was the boss of the Colombo family at that time?

10   A    Carmine Persico.

11   Q    Where was Carmine Persico?

12   A    In jail.

13   Q    What's the relationship, if any, between Carmine Persico

14   and the defendant in this case, Michael Persico?

15   A    Carmine's Michael's father.

16   Q    Does Michael Persico have brothers that you know?

17   A    Yes.

18   Q    Who are they?

19   A    Alphonse Persico, Lawrence Persico.

20   Q    And what is the relationship between Michael Persico and

21   the man in this exhibit, Teddy Persico, Junior?

22   A    They're cousins.

23   Q    When you were in prison with Teddy Persico, Junior, what

24   sort of relationship did you have with him, if any?

25   A    I was dear friends with Teddy.

1  Q    Did you two discuss your role in organized crime?

2  A    Yes.

3  Q    What, if anything, did he say about that?

4  A    He said he wanted me around him.

5  Q    What does it mean in organized crime to "be around

6  someone"?

7  A    It means you're on record with them and that you're

8  protected by that family.

9  Q    Do you have obligations to someone you're around?

10 A    Sure, you do.

11 Q    What?

12 A    Whatever they need you to do, so be it beating somebody

13 up, whatever.

14 Q    Are there any obligations relating to money?

15 A    I don't understand your question.

16 Q    If you're around someone, do you have any obligations

17 to --

18 A    Sure, if you make money, you got to send it up.

19 Q    After Teddy Persico, Junior said he wanted you around

20 him, what effect, if any, did that have on your role in

21 organized crime?

22 A    What effect did it have on me?

23 Q    Yes.

24 A    When Teddy asked me to be around him?

25 Q    Yes.

1    A    What kind of effect did it have on me?  I don't

2    understand.

3    Q    Let me ask you this.

4         Before you went to -- started serving that prison

5    sentence, what crime family were you associated with?

6    A    Gambinos.

7    Q    When you came out of Coxsackie, who were you associating

8    with?

9    A    I was associating with the Colombos.

10   Q    And why was that?

11   A    Because I was released and put with Teddy.

12   Q    When were you released from state prison?

13   A    I really don't know.  All I know is Teddy told me his

14   father would take care of it.

15   Q    Do you remember around what year you were released?

16   A    More than likely before I got home.

17   Q    I'm sorry.  When you say "released," what do you mean by

18   "released"?

19   A    Released from the Gambino crime family.

20   Q    Okay.  I think we had an ambiguity.  I meant released

21   from prison.

22   A    Prison, okay.

23   Q    When were you released from state prison?

24   A    1992, late '92.

25   Q    And where was Teddy Persico, Junior when you were

Case 1:02-cr-00351-LEK  Document 849-6 Filed 08/19/21  Page 347 of 635 PageID #: 4358

*Russo - Direct / Lifshitz*                24

1   released?

2   A    In jail.

3   Q    So who, if anyone, did you report to in organized crime

4   when you were released?

5   A    Uncle Teddy.

6   Q    Who is Uncle Teddy?

7   A    Teddy's father.

8   Q    What's his full name?

9   A    Teddy Persico, Senior.

10  Q    And just to be clear, what's the relationship between

11  Teddy Persico, Senior and Carmine Persico, who you testified

12  was the boss?

13  A    They're the brothers.

14        THE COURT:  You mentioned something about being

15  released from the Gambinos.  Can you explain what that means?

16        THE WITNESS:  Being released meaning I was on record

17  with them and Uncle Teddy straightened it out and brought me

18  over to him.  So they released me and brought me over and I

19  was on record with the Colombos.

20        MR. LIFSHITZ:  Your Honor, I'd like to show

21  Government Exhibit 152B for identification.

22        (The above-referred to exhibit was published.)

23  Q    Mr. Russo, do you recognize this person?

24  A    Yes.

25  Q    Who's that?

*Russo - Direct / Lifshitz*                                    25

1   A     It's Alphonse Persico.

2   Q     It's the Alphonse Persico that you testified is Michael

3   Persico's brother?

4   A     Yes.

5          MR. LIFSHITZ:  I'd move to admit 152B, Your Honor.

6          THE COURT:  Any objection?

7          MR. SERCARZ:  No, Your Honor.

8          THE COURT:  It's admitted.

9          (Government's Exhibit 152B was received in

10  evidence.)

11  BY MR. LIFSHITZ:

12  Q     While you've been involved with the Colombo family, what

13  position, if any, did Alphonse Persico hold with the family?

14  A     He was a made member and he was a captain, and when he

15  came home, when I was around, he was a acting boss.

16          MR. LIFSHITZ:  I'd like to show Government

17  Exhibit 155 for identification.

18          (The above-referred to exhibit was published.)

19  BY MR. LIFSHITZ:

20  Q     Do you recognize that person?

21  A     Yes.

22  Q     Who is that?

23  A     It's Michael.

24  Q     Michael Persico?

25  A     Yes.

1      MR. LIFSHITZ:  I'd move to admit 155, Your Honor.

2      THE COURT:  Any objection?

3      MR. SERCARZ:  No, Your Honor.

4      THE COURT:  It's admitted.

5      (Government's Exhibit 155 was received in evidence.)

6      MR. LIFSHITZ:  And finally for now, I'd like to show

7  Government Exhibit 167 for identification.

8      (The above-referred to exhibit was published.)

9  BY MR. LIFSHITZ:

10 Q    Who's this?

11 A    It's me.

12     MR. LIFSHITZ:  I move to admit 167.

13     THE COURT:  Any objection?

14     MR. SERCARZ:  No, Your Honor.

15     THE COURT:  Thank you.

16     (Government's Exhibit 167 was received in evidence.)

17 BY MR. LIFSHITZ:

18 Q    Going back to Teddy Persico, Senior.

19     What positions did he hold in the crime family while

20 you were involved with it?

21 A    Teddy Senior?

22 Q    Teddy Senior.

23 A    When I came home, he was captain.

24 Q    Did you meet him in person when you were released in

25 1992?

1   A    Yes, I met him the same day I came home from prison.

2   Q    At what location?

3   A    On 11th Avenue in Brooklyn.

4   Q    What was at 11th Avenue?

5   A    It was Romantique was down there.

6   Q    What is Romantique?

7   A    It's a limousine company.

8   Q    Who owned it?

9   A    Michael.

10  Q    Michael who?

11  A    Persico.

12  Q    I think you said it was on 11th Avenue; is that right?

13  A    Yeah, 11th Avenue, 67th Street.

14          THE COURT:  In what borough?

15          THE WITNESS:  In Brooklyn.

16  Q    Do you recall any other locations Romantique had over the

17  years?

18  A    Yes, 86th Street off 14th Avenue.  There's another place

19  in Staten Island on Hyland Boulevard.

20  Q    When you mentioned 86th Street, is that in Brooklyn too?

21  A    Yes.

22  Q    When you met Teddy Persico, Senior at Romantique the day

23  you were released, what, if anything, did he say to you?

24  A    He told me to, "Be careful, stay out of trouble, and if

25  you have any problems, come see me."

*Russo - Direct / Lifshitz*                    28

1   Q    What did you understand that to mean?

2   A    If I had any problems, to come see him and he would

3   handle it.

4   Q    Were you around him at that point?

5   A    Yes.

6   Q    Who else was around him at that time, 1992?

7   A    Mostly all "Teddy Boy's" guys:  me, BF, Bobby Tarantola,

8   Anthony Ferrara, Frankie Sparaco.

9   Q    You mentioned a BF.

10          Is that a nickname?

11  A    Yes.

12  Q    What's BF's real name?

13  A    Frank Guerra.

14          MR. LIFSHITZ:  I show the witness Government

15  Exhibit 130A for identification.

16          (The above-referred to exhibit was published.)

17  BY MR. LIFSHITZ:

18  Q    Who's depicted in 130A?

19  A    Frankie.

20  Q    Frankie who?

21  A    Guerra.

22          MR. LIFSHITZ:  I move to admit 130A, Your Honor.

23          THE COURT:  Any objection?

24          MR. SERCARZ:  No, Your Honor.

25          THE COURT:  It's admitted.

1        (Government's Exhibit 130A was received in

2   evidence.)

3   BY MR. LIFSHITZ:

4   Q    Around when did you meet Guerra?

5   A    Excuse me?

6   Q    Around when did you first meet Guerra?

7   A    Around '82, '83.

8   Q    1982 or '83?

9   A    Yes.

10  Q    Did you two develop a relationship?

11  A    Yes.

12  Q    How close were you?

13  A    Very close.

14  Q    Until when?

15  A    Until the day I was arrested in 2011.

16  Q    When you were released from state custody in 1992, were

17  you subject to any rules or court supervision?

18  A    Yes.

19  Q    What do you recall being subject to?

20  A    I was subject to staying out of trouble and not

21  associating with felons, known felons, and I have to go to

22  work and stay clean of everything.

23  Q    Did you live at home at that time?

24  A    I lived with my parents for a couple months, yes.

25  Q    When you were first released?

1    A    Yes.

2    Q    Did you break any of the rules you just mentioned?

3    A    Yeah.  Yes.

4    Q    You said one of the rules was to have a job.

5         Did you get a job?

6    A    Yes.

7    Q    Did you actually go to the job?

8    A    No.

9    Q    Were you ever in a halfway house?

10   A    Yes, I was.

11   Q    When you were released from prison in 1992 and you began

12   reporting to Teddy Persico, Senior, what was happening in the

13   Colombo family?

14   A    There was a family feud going on.  It was an internal

15   war.

16   Q    What were the sides in that war?

17   A    There was the Persico faction against the Orena faction.

18   Q    Orena, who's that named after?

19   A    Vic Orena.  He was the acting boss at the time.

20   Q    The acting boss of the Colombo family?

21   A    Yes.

22   Q    And just to be clear, who was the Persico faction named

23   after?

24   A    Carmine Persico.

25   Q    Who were some of the leaders on the street in the Persico

Case 1:02-cr-00251-DEK  Document 4369-6  Filed 09/19/01  Page 58 of 635 PageID #:10060
Case 1:02-cr-00251-DEK  Document 4369-6  Filed 09/19/01  Page 31 of 547 PageID #:4365

1    faction?

2    A    Who was in the street at the time, Chucky Russo, JoJo

3    Russo, Uncle Teddy, Joe Monte, Tommy Gioeli.

4    Q    Were the two Russos you just mentioned related to you?

5    A    No, not at all.

6    Q    And when you mentioned Uncle Teddy, is that Teddy

7    Persico, Senior?

8    A    Yes.

9    Q    And what about the other side, the Orena faction, who

10   were some of the leaders on that side?

11   A    You had Joey Scopo, you had "Wild Bill" Cuotolo.

12   Q    What was at stake in this war?

13   A    The family, taking over the family.

14   Q    Who was trying to take over the family?

15   A    Vic Orena.

16   Q    Moving ahead to 1993.

17        What, if anything, happened to Teddy Persico,

18   Senior?

19   A    He was arrested.

20   Q    And around the time of his arrest, who else, if anyone,

21   do you recall being arrested from the Colombo family?

22   A    A few people were arrested: Frankie Sparaco, Chucky, JoJo

23   Russo, Joe Monte.

24   Q    By the way, you've mentioned Joe Monte a couple of times.

25        Was there one Joe Monte or more than one?

1   A    Well, he had a son.

2   Q    And the one you've testified about was which one, the

3   father or the son?

4   A    The father.

5   Q    So, after Teddy Persico, Senior was arrested in 1993,

6   who, if anyone, did you and Frank Guerra report to?

7   A    Well, we were hanging out with Michael.

8   Q    Michael who?

9   A    Persico.

10  Q    Now, what was Michael Persico's position in the crime

11  family?

12  A    He didn't have one.  He was an associate.

13  Q    Is it common in organized crime for an associate to

14  report to another associate?

15  A    Not really, no.

16  Q    So why did you report to an associate?

17  A    Because we were really close with Michael and his

18  father's the boss and we didn't trust anybody else.

19          MR. SERCARZ:  Your Honor, I'll move to strike the

20  witness's opinion, no basis for it.

21          MR. LIFSHITZ:  His opinion of why he did something.

22          THE COURT:  Can I hear the last two questions and

23  answers, please?

24          (The requested portion of the record was read back

25  by the Official Court Reporter.)

Case 1:02-cr-00351-DEK  Document 4369-6  Filed 09/19/21  Page 60 of 635 PageID #:
4367

1          THE COURT:  Overruled.

2    BY MR. LIFSHITZ:

3    Q    When you reported to Michael Persico, where, if anywhere,

4    would you meet with him?

5    A    Excuse me?

6    Q    When you reported to Michael Persico in or around 1993,

7    where did you meet him, if anywhere?

8    A    Wherever -- wherever he was, Romantique, 11th Avenue, the

9    bus company he had in Coney Island, restaurants, wherever.

10   Q    What crimes, if any, did you discuss with him?

11   A    I used to take money from him and shylock it.

12   Q    What's shylock?

13   A    Shylock is lending money to people for a percentage to

14   owe every week.

15   Q    Is that loansharking?

16   A    Yes.

17   Q    Okay.  We'll return to that topic later.

18          At that time in 1993, did you observe whether anyone

19   else you knew to be in the Colombo family met with Michael

20   Persico?

21   A    Michael met with a few people, yeah.

22   Q    Who did you see meeting with him?

23   A    I seen him meet with Joe Bonanza, met with all of us all

24   the time.

25   Q    When you say "all of us," who do you mean?

*Russo - Direct / Lifshitz*                                      34

1   A    Meaning Teddy's guys, me, BF, Bobby Tarantola, Little

2   Anthony used to show up.

3   Q    What were the positions of those people?

4   A    All associates.

5   Q    Did you become involved in the Colombo family war?

6   A    Yes, I did.

7   Q    On what side?

8   A    The Persico.

9   Q    And in what year did you become involved?

10  A    The minute I got home in 1992.

11  Q    After you became involved on the Persico side, did you

12  ever plan to commit a murder?

13  A    Yes.

14  Q    Who did you first plan to murder?

15  A    "Wild Bill" Cuotolo.

16  Q    "Wild Bill" Cuotolo?

17  A    Yeah.

18  Q    What was his position in the crime family?

19  A    He was like a captain in the family, I guess.

20  Q    On which side of the war?

21  A    On the Orena side.

22  Q    Who, if anyone, were you planning with to kill "Wild

23  Bill" Cuotolo?

24  A    Me, BF, Bobby Tarantola, Danny Persico, Little Anthony

25  Ferrara, Eric Curcio.

1   Q     You mentioned a Danny Persico.

2           Who's is that?

3   A     That's Michael's cousin.  That's "Teddy Boy's" brother.

4   Q     Teddy Persico, Junior's brother?

5   A     Yes.

6   Q     With who, if anyone, did you discuss the plan to murder

7   "Wild Bill" Cuotolo?

8   A     Well, we told Michael about it.

9   Q     Who told Michael about it?

10  A     Me, BF.

11  Q     When you say "Michael," which Michael do you mean?

12  A     Michael Persico.

13  Q     What do you recall saying to him in substance?

14  A     Told him that we almost had him a couple of times.  We

15  would tell him what we were doing.

16  Q     What does that mean, you almost had him certain times?

17  A     We almost killed him a couple times.

18  Q     Killed who?

19  A     "Wild Bill."

20  Q     After you planned to murder "Wild Bill," who, if anyone,

21  did you next intend to murder?

22  A     Joey Scopo.

23  Q     And what was Joey Scopo's role in the crime family?

24  A     He was like number 2 on the Vic Orena side.

25  Q     Who, if anyone, got you involved in planning to murder

1    Joe Scopo?

2    A    Well, it all started when Michael asked me to go down and

3    see Eric.  He said he had a line on Joey.

4    Q    You mentioned Michael.

5         Who is that?

6    A    Michael Persico.

7    Q    And you said he told you to see Eric.

8         Who is Eric?

9    A    He told me and BF, "You have to go down and see Eric

10   Curcio."

11   Q    And you said Eric had a line on Joey; is that right?

12   A    Yes.

13   Q    What did you understand that to mean?

14   A    It's meant that he knew where he was and --

15        MR. SERCARZ:  Objection.

16        THE COURT:  Overruled.  He's asking what the witness

17   understood him to mean by that.  Overruled.

18   Q    Sorry, you can answer the question.

19   A    Can you repeat it?

20   Q    What did you understand Michael Persico meant when he

21   said that Eric Curcio had a line on Joe Scopo?

22   A    That -- that I understood it was to go see Eric and he

23   knew where Joey was and we could do what we had to do and kill

24   him.

25        MR. LIFSHITZ:  I'd like to show what's marked as

1   Government Exhibit 112B for identification.

2            (The above-referred to exhibit was published.)

3   BY MR. LIFSHITZ:

4   Q    Do you recognize this person?

5   A    Yeah, that's Eric.

6   Q    Eric who?

7   A    Curcio.

8            MR. LIFSHITZ:  We would move to admit 112B.

9            THE COURT:  Any objection?

10           MR. FERNICH:  None, Your Honor.

11           THE COURT:  Thank you.  It's admitted.

12           (Government's Exhibit 112B was received in

13  evidence.)

14  BY MR. LIFSHITZ:

15  Q    Can you tell us or remind us what was Eric Curcio's

16  position in the Colombo family?

17  A    He was an associate.

18  Q    Who, if anyone, did he say he was related to?

19  A    He said he was related to Joe Monte, Senior.

20  Q    And what was Joe Monte's position?

21  A    He was a made member of the Colombo crime family.

22  Q    When Michael Persico told you to see Eric Curcio about

23  Joe Scopo, were you interested in killing Scopo?

24  A    Yes.

25  Q    Why were you interested in that?

*Russo - Direct / Lifshitz*                                        38

1   A    To further advance in the family and to help my friend

2   Teddy out.

3   Q    How would it help Teddy?

4   A    Because getting rid of Joey, the war would end and the

5   Persicos would hold on to control of the family.

6   Q    So, did you go see Eric Curcio?

7   A    Yes, I did.

8   Q    And what, if anything, did he say to you?

9   A    He told me and BF that he knew exactly where Joey was and

10  if we were willing to kill Joey and to put a crew together.

11  Q    What did you say?

12  A    We said yes.

13  Q    Who else, if anyone, became part of this crew?  Who next

14  became part of this crew?

15  A    Well, we put it together, me, BF, Robert Tarantola, Eric

16  Curcio, Little Anthony Ferrara.

17  Q    Was that the original?

18  A    That was the original, yeah.

19  Q    Who became involved next, if anyone?

20  A    Then a little bit down the road, Johnny Sparacino got

21  involved.  Eric brought him into it.

22       MR. LIFSHITZ:  I show Government Exhibit 176 for

23  identification.

24       (The above-referred to exhibit was published.)

25       ///

*Russo - Direct / Lifshitz*                              39

1   BY MR. LIFSHITZ:

2   Q    Do you recognize the person in 176?

3   A    Yeah, that's Johnny Sparacino.

4   Q    You may have just said this, but who brought him into the

5   plan?

6   A    Eric Curcio.

7   Q    After you and Guerra met with Michael -- sorry, after you

8   and Guerra met with Curcio to initially discuss killing Scopo,

9   did you ever discuss that again with --

10            THE COURT:  I'm sorry, did you move Government

11  Exhibit 176 into evidence?

12            MR. LIFSHITZ:  I may have neglected to, Your Honor.

13  I'm sorry.

14            Move to admit 176.

15            THE COURT:  Any objection?

16            MR. SERCARZ:  No, Your Honor.

17            MR. LIFSHITZ:  Thank you.

18            THE COURT:  It's admitted.

19            (Government's Exhibit 176 was received in evidence.)

20  BY MR. LIFSHITZ:

21  Q    After you initially discussed Joe Scopo with Eric Curcio,

22  did you say anything about that to Michael Persico?

23  A    Yes.

24            MR. SERCARZ:  Your Honor, I'm going to object to the

25  leading.

Case 1:02-cr-00251-DEK  Document 4369-6  Filed 09/23/19/21  Page 67 of 635 PageID #: 10069
Case 1:02-cr-00251-DEK  Document 4863-6  Filed 09/23/21  Page 2 of 7 PageID #: 4374

1      THE COURT:  Well, I'm going to overrule.  Just be

2  careful with the wording.

3      MR. LIFSHITZ:  Understood, Your Honor.

4  Q    Did you understand the question?

5  A    I didn't even hear it.

6  Q    After you met with Eric Curcio about Joe Scopo, did you

7  discuss that with Michael Persico?

8  A    Yes, I did.

9  Q    Who were you with, if anyone?

10  A    BF.

11  Q    What, if anything, did you and BF say?

12  A    We told him what our plans were and he said okay, and I

13  told him that we needed weapons and he said, "No problem, we

14  have plenty," and he pointed to Smiley and he told BF, "You

15  got Smiley's number.  Smiley will bring you a bag."

16  Q    Who was Smiley?

17  A    Smiley's an associate of the family.

18  Q    Of the Colombo family?

19  A    Yes.

20  Q    Did you and BF obtain guns after that?

21  A    Yes, we did.

22  Q    Who showed you the guns?

23  A    BF brought them to my house.

24  Q    How long after this meeting with Michael Persico did BF

25  show you the guns?

1    A     The same day.

2    Q     How were the guns packaged, if at all?

3    A     The big gym bag, duffel bag, big black bag.

4    Q     Do you remember what kinds of guns were in there?

5    A     The MAC-10 was in there with the silencer.  There was a

6    couple of broken down silencers in there with a couple of

7    pistols.

8    Q     A MAC-10 with a silencer, you said?

9    A     Yes.

10   Q     And a pistol?

11   A     Couple pistols, yes.

12   Q     What, if anything, did BF tell you about how he obtained

13   those guns?

14   A     Excuse me?  I didn't hear you.

15   Q     What, if anything, did BF say to you about how he got

16   those guns?

17   A     He just brought them over, and I told him, "Where did you

18   get them?"  He said, "I just picked them up from Smiley."

19   Q     During the planning of the Scopo murder, where was Teddy

20   Persico, Junior?

21   A     In prison.

22   Q     Did anyone close to you visit him?

23   A     Yes, BF visited him a lot.

24   Q     What, if anything, did BF tell you about that?

25   A     He told me that he laid it all out to Teddy, told him all

1   we had planned on doing.

2   Q    And what, if anything, did BF report Teddy said?

3   A    Teddy said to make sure --

4            MR. SERCARZ:  Objection, Your Honor.  There are

5   multiple levels of hearsay.

6            MR. LIFSHITZ:  Your Honor, these are --

7            THE COURT:  Go ahead, you can argue.  We don't have

8   a jury here.

9            MR. LIFSHITZ:  These are members and associates of a

10  crime family planning a murder.  They're clearly

11  co-conspirator statements made in furtherance of a conspiracy.

12           THE COURT:  Overruled.  This is a hearing.  There's

13  some relaxation of the rules.

14  BY MR. LIFSHITZ:

15  Q    I'll try to repeat the question, Mr. Russo.

16           What, if anything, did BF tell you Teddy Persico

17  said in those meetings?

18  A    He told me that he told Teddy about everything we were

19  planning on doing and he said to "make sure yous get it done."

20  Q    Who said "make sure yous get it done"?

21  A    Teddy.

22  Q    What, if any, concerns did Teddy Persico express to BF?

23  A    Well, one concern was about me.

24  Q    What was that?

25  A    That he wanted to make sure that I was capable.

1    Q    Capable of what?

2    A    Handling this, you know, getting involved with the

3    murder.

4    Q    Did you say anything to BF about that?

5    A    Yeah, I said a couple things.

6    Q    What did you say?

7    A    One of them is I told him that, "Don't worry about me.  I

8    did something long ago with Munchie."

9    Q    What were you trying to convey when you said that?

10   A    Well, he knew what I meant.  He meant I was conveying

11   that I committed a murder with Munchie.

12   Q    Was that true?

13   A    No.

14   Q    Why did you say it?

15   A    So everybody would be calm and relaxed and understand

16   that I could take care of it.  Just to reassure everybody.

17   Q    After you saw the bag containing the MAC-10 and the

18   pistol you testified about, what person or people did you look

19   to kill?

20   A    Excuse me?  Say that again.

21   Q    After BF showed you the guns in the bag.

22   A    Right.

23   Q    Who did you look to kill?  What person or persons did you

24   look to kill?

25   A    Well, we were going after Billy, but, I mean, yeah,

1  Billy, and we just stopped and we started focusing on Joey a

2  lot.

3  Q    And when you say "Billy," who is that?

4  A    "Wild Bill" Cuotolo.

5  Q    And "Joey" refers to?

6  A    Joey Scopo.

7  Q    Did you or anyone you were making these plans with ever

8  actually kill "Wild Bill" Cuotolo?

9  A    No.

10 Q    Did you come close?

11 A    Yes.

12 Q    What happened?

13 A    One night we were just driving around, me, Johnny Pappa

14 and BF, and we just happened to get lucky going down his block

15 where he lived and we caught Billy coming out of a car right

16 in front of his house, but he was reaching for the back door

17 on the passenger side and when he opened the door, we were a

18 few cars behind, an older woman just got out of the backseat.

19 So I pulled John Pappa back in the car, told him forget it.

20 Q    Why did you tell him to forget it?

21 A    'Cause I didn't want any innocent people getting hurt.

22 Q    At some point during the planning of the Scopo murder,

23 did you meet with Teddy Persico, Junior in person?

24 A    Excuse me?

25 Q    At some point during the planning of the Scopo murder,

Case 1:02-cr-00251-DEK   Document 869-6   Filed 09/19/01   Page 72 of 635 PageID #:74
Case 1:02-cr-00251-DEK   Document 846-6   Filed 09/19/16   Page 2 of 347 PageID #:100
4379

1  did you meet with Teddy Persico, Junior?

2  A    Yes, yes.

3  Q    Approximately when did you meet him?

4  A    I'm going to say the summertime.  His grandmother passed

5  away, I think it was '94.  I'm not hundred percent sure.

6  Q    What time of year was it?

7  A    It was -- it was warm out.  It was the summertime some

8  time.

9  Q    And to be clear, was it before or after the Joe Scopo

10  murder?

11  A    It was before the Scopo murder.

12  Q    What was the location where you met?

13  A    The funeral parlor, Scarpaci's Funeral Parlor.

14  Q    Where is that?

15  A    14th Avenue and 86th Street.

16  Q    In Brooklyn?

17  A    Yes.

18  Q    If he was in jail, what's your understanding of why he

19  was able to be there?

20  A    Well, I was in state prison too and when you lose a

21  family member and it's immediate family, they usually bring

22  you down for so you could view the body for a couple hours and

23  they bring you back.

24  Q    What happened when you saw Teddy Persico, Junior at the

25  Scarpaci Funeral Home?

1   A    Well, when he got there, we were there, me, Bobby and BF,

2   and he went up to the casket.  He said a prayer to his

3   grandmother, and he came back.  As he was walking back, he

4   wanted to speak to me and Bobby and BF.

5   Q    Bobby who?

6   A    Tarantola.

7   Q    And what, if anything, did Teddy say to the three of you?

8   A    We were explaining to him what we were doing again and he

9   was asking us how things were going and he said, "You got to

10  get it done and I want my guys to do it."

11  Q    When he said "you got to get it done," what did you

12  understand that to refer to?

13  A    Make sure we kill him.

14  Q    Kill who?

15  A    Joey Scopo.

16  Q    And when he said he wanted his guys to get it done, what

17  did you understand that to mean?

18  A    He wanted us to get it done, me, Bobby and BF.

19  Q    Did you agree to do that?

20  A    Yes.

21  Q    After that, did you look for Joe Scopo?

22  A    Yes.

23  Q    Who was involved in the crew to kill Joe Scopo by this

24  point?

25  A    The day Joey got killed, it was me, BF, Eric Curcio,

1  Johnny Pappa, and John Sparacino.

2         MR. LIFSHITZ:  I show Government Exhibit 151 for

3  identification.

4         (The above-referred to exhibit was published.)

5  A    That's Johnny Pappa.

6  Q    151 is Johnny Pappa?

7  A    Yes.

8         MR. LIFSHITZ:  I'd move to admit 151, Your Honor.

9         THE COURT:  Any objection?

10        MR. SERCARZ:  No, Your Honor.

11        THE COURT:  Admitted.

12        (Government's Exhibit 151 was received in evidence.)

13 BY MR. LIFSHITZ:

14 Q    How did Pappa become involved in the planning?

15        THE COURT:  I'm sorry, can you spell the name?

16        MR. LIFSHITZ:  John, the usual way, and Pappa,

17 P-A-P-P-A.

18        THE COURT:  Thank you.

19 Q    How did John Pappa become involved in the planning?

20 A    Eric Curcio brought him around.

21 Q    After the funeral you testified about, did you and the

22 crew ever come close to murdering Scopo without actually

23 killing him?

24 A    Yes, one time, yeah.

25 Q    Tell us what happened.

1    A     We were setting up near his house I think in Canarsie and

2    we were just -- there was two crash cars, and me and BF and

3    Johnny Pappa were in -- we were going to be the shooters at

4    that time, and we were going around the block looking for a

5    spot to park and we came around the block and there was

6    somebody, like, basically his whole body was in the garbage

7    can, like he was looking in the garbage can, and we didn't

8    know who it was, so we were still looking for the spot.  When

9    we came back around, Joey was walking up the stairs to his

10   house and we realized it was him, and it was a big joke.  We

11   just called it off 'cause he was too close to his front door.

12   Q     The Joey you mentioned was Joe Scopo?

13   A     Joe Scopo, yes.

14   Q     And I believe you used the phrase "crash car"; is that

15   right?

16   A     Crash cars, yeah.

17   Q     What is a crash car?

18   A     We use them to -- on the hit because you need cars behind

19   you to block in case anybody tries to get involved to be sure

20   the shooters can get away.

21   Q     They block off the street?

22   A     They block off the street.  They block off any law

23   enforcement tries to get -- intervene.

24   Q     After this incident where you saw Joe Scopo but didn't

25   kill him, did you discuss it with anyone?

*Russo - Direct / Lifshitz*                                    49

1   A    Yeah.  Yeah.

2   Q    With who?

3   A    We discussed it with a few people.  We told Michael about

4   it too.

5   Q    Michael who?

6   A    Persico.

7   Q    What did you say to him, if anything?

8   A    Well, we made it like a joke, that we almost had him and

9   he was in the garbage can and when we came around the block

10  again, he was walking up the stairs and we didn't know it was

11  him.

12  Q    What, if anything, did Michael Persico say back?

13  A    He said, "You got to get this thing done before my

14  brother goes to trial."

15  Q    Did he have a brother who was close to going to trial?

16  A    Yeah, "Allie Boy."

17  Q    Alphonse Persico?

18  A    Yes.

19  Q    Where was Alphonse Persico at that time?

20  A    In jail.

21  Q    And what was your understanding of why it was important

22  to kill Scopo before Alphonse Persico went to trial?

23           MR. SERCARZ:  Objection.

24           THE COURT:  It's his understanding of why it was

25  important.  Overruled.

1          You may answer the question.

2   A    My understanding was it was supposed to be done before is

3   because at least he would have an albi.  He's in jail, he had

4   nothing to do with it.

5   Q    Alphonse --

6   A    That's my understanding of it, yeah.  Alphonse Persico.

7   Q    Alphonse would have the albi; is that right?

8   A    Yes, and to get it done and once that was done, the

9   family would come back in order.

10  Q    After that conversation, did you continue to look for

11  Scopo?

12  A    Yes.

13  Q    Did you have any trouble finding him?

14  A    Yeah, we had some problems.

15  Q    What was the problem?

16  A    He moved.  He moved to another area.  We didn't know

17  where he was.

18  Q    Did you ever look for him anywhere other than near his

19  home?

20  A    Yes, we went near his club.  He had a club, social club

21  on 101st Avenue in Ozone Park.

22  Q    What is a social club?

23  A    It's where guys hang out and just meet, play cards.

24  Q    What kind of guys?

25  A    Guys like me, you know, members of the Mafia.

Case 1:02-cr-00351-DEK  Document 4369-6  Filed 09/19/21  Page 78 of 635 PageID #: 4385
Case 1:02-cr-00351-DEK  Document 4369-6  Filed 09/19/21  Page 51 of 347 PageID #: 4080

1   Q    What happened when you looked for him outside a social

2   club?

3   A    Well, we went to the club one night and he was -- we

4   couldn't see, we couldn't find him, so we went by the club to

5   see if we found him.  So, I know he didn't know me, so I got

6   out of the van and I took a walk past his club, I didn't see

7   him.  So I went around the block and I was -- had a radio on

8   me and a pistol, and as I was going around the block just to

9   take a walk, I was going to smoke a cigarette and I -- the

10  radio cracked through and said it was Frankie on the radio

11  telling me, "He's right behind you."

12  Q    Frankie who?

13  A    BF.

14  Q    Okay, go on.

15  A    And I was standing in front of somebody's -- in front of

16  their house and when I turned around, he was right behind me.

17  Q    Who was right behind you?

18  A    Joey and a friend of his Sal.

19  Q    Joe and Sal?

20  A    Joe and Sal.

21  Q    What happened next?

22  A    I was ready to -- I was pulling out my pistol, but at the

23  same time I was grabbing my gun, the lady came out of the

24  front of the house like two feet from me with two little --

25  two kids, and at the same time, Joey was walking right by me.

1    So I just turned and walked away.

2    Q    Did you and your crew eventually succeed in murdering Joe

3    Scopo?

4    A    Yes, we did.

5    Q    Around when did you murder Joe Scopo?

6    A    Late '93.

7    Q    Where?

8    A    Ozone Park.  I don't remember the exact street.  It was

9    between 109th Avenue and I think 111th Street, I'm not sure,

10   110th Street.

11   Q    Repeat what you just said?

12   A    I said like 110th Street, 109th Avenue in Ozone Park,

13   Queens in front of his house.

14   Q    How did you locate him?

15   A    Eric.  Eric found out where he was.

16   Q    Eric Curcio?

17   A    Yes.

18   Q    So, when Joe Scopo was actually murdered, who was present

19   on that scene?

20   A    Me, Johnny Pappa, John Sparacino, Frankie Guerra, BF, and

21   Eric Curcio.

22   Q    Was there a plan?

23   A    Yeah.

24   Q    What was each person's role in the plan?

25   A    Eric was a crash car, BF was a crash car, I was a driver

Case 1:02-cr-00251-DEK   Document 4369-6   Filed 09/19/21   Page 547 PageID #: 4387

1   of the getaway car, and John Sparacino was in the backseat, he

2   was the shooter, he had the MAC-10, and John was there, Pappa

3   was for backup just in case.

4   Q    So how many cars were there in total?

5   A    Three.

6   Q    You were driving one of them?

7   A    I was driving the one, yes.

8   Q    Just to be clear, who, if anyone, was in your car?

9   A    John Sparacino and Johnny Pappa.

10  Q    And BF and Curcio?

11  A    BF was behind me in his car and Eric was on the corner

12  blocking the street off.

13  Q    In a separate car?

14  A    In a separate car, yes.

15  Q    I think we were saying that was the plan.

16          Did you, in fact, drive Sparacino and Pappa during

17  the murder?

18  A    Yes.

19  Q    In what kind of car?

20  A    It was a stolen car I think it was -- I don't remember

21  the exact make.  It might have been a Chevy, brown.

22  Q    What do you remember about what it looked like?

23  A    Excuse me?

24  Q    What, if anything, do you recall about what it looked

25  like?

1   A     It was a four-door I think brown or beige car.

2   Q     You said it was a stolen car?

3   A     Yes.

4   Q     How did you start the car?

5   A     With a screwdriver.

6   Q     Did you have any way to communicate among the three cars?

7   A     Yes, we had radios, walkie-talkies.

8   Q     Please walk us through what happened on the night of the

9   murder.

10  A     On the night of the murder, we got to his house.  We used

11  to set up on the corner of his house if we went by there.  So

12  when set up on the corner, the night of the murder, when we

13  got there, we were just pulling up and setting up where we

14  went and park, and not even two minutes there we -- he turned

15  the corner and Eric turned around and said there he is.  So

16  everybody jumped in their cars and I told them exactly what I

17  was going to do.  I told Johnny Sparacino, "I'm going to pull

18  up to the front of his car and just kick your door open and,

19  you know, empty that gun in there, into the car."

20  Q     Did you see how Scopo was arriving?

21  A     Yes, he -- he -- what do you mean how he was arriving?

22  He was arriving in a car.

23  Q     What kind of car, if you recall?

24  A     It was a light color, small, I think it was an Altima,

25  Nissan.  I think it was a Nissan.

Case 1:02-cr-00351-DEK   Document 4369-6   Filed 09/19/21   Page 82 of 635   PageID #: 4389

1   Q    What were you wearing on your head that night?

2   A    I was wearing a hat.

3   Q    What kind of hat?

4   A    Pink cap.

5   Q    Was Sparacino wearing anything unusual?

6   A    He was wearing a ski mask, yeah.

7   Q    So, after you told Sparacino what to do, what happened

8   next?

9   A    We drove -- we waited for him to see if he was going to

10  park and we caught his reverse lights going on and, you know,

11  he was parking, backing up to park.

12  Q    Who was parking?

13  A    I wasn't -- Joey was on the passenger side of the front

14  seat and I don't know who the kid was in the front seat

15  driving, but he was parking and I told him, "I'm going to pull

16  up.  As soon as he backs in, I'm going to put the back end of

17  your door against his bumper, front bumper, so you can swing

18  your door open and just do what you have to do."

19  Q    Did you do those things?

20  A    Yes, I did.

21  Q    And what did Sparacino do?

22  A    He did exactly what he was supposed to do.

23  Q    What did he do?

24  A    He emptied the machine gun into Joey's car.

25  Q    Was his door closed?

1   A     No, it was wide open.  He opened the door, stood in the

2   back of the car and just emptied the gun into the window.

3   Q     Which gun was that?

4   A     The MAC-10.

5   Q     What, if anything, did Pappa do?

6   A     While he was shooting, while Johnny Sparacino was

7   shooting in the car, a bullet came through the back window of

8   the car I was driving and blew out my driver's window, and at

9   the same time I went down, Johnny Pappa jumped out of the car

10  and he left the door open so I could see what he was doing.

11  He ran to -- into the bushes over there and he was, like,

12  lurking around see what was going on.

13  Q     What did he have with him?

14  A     He had a pistol on him.  I don't remember exact kind of

15  pistol, but I know it was an automatic.

16  Q     What did he do with it?

17  A     Well, at the same time, Johnny Sparacino, after the

18  bullet blew out the window, he was screaming, "Go, go, go,

19  go."  So I started taking off and I could see Johnny starting

20  to shoot.

21  Q     Johnny who?

22  A     Johnny Pappa.

23  Q     So you took off with who in your car?

24  A     Just me and John Sparacino.

25  Q     And Pappa was left on the street?

Case 1:02-cr-00251-DEK  Document 869-6  Filed 09/19/21  Page 847 of 635 PageID #: 4391

1    A    He was left on the scene, yeah.

2    Q    And what was he doing?

3    A    He was shooting.

4    Q    How many rounds were in that MAC-10 that Sparacino had?

5    A    30 rounds.

6    Q    How do you know?

7    A    'Cause I put them in there.

8    Q    And how did you obtain that MAC-10?

9    A    I obtained it from Frankie, BF.

10   Q    Is that the gun you testified about earlier in the bag?

11   A    Yes.

12   Q    What, if anything, happened to your hat when you were

13   receiving return fire?

14   A    It flew off when I went down.

15   Q    Where did you drive to?

16   A    We had a prearranged spot where we were going to park and

17   drop the car.

18   Q    Do you remember where it was?

19   A    It was only a couple blocks away.

20   Q    Did you go there?

21   A    Yes, I did.

22   Q    What did you do when you got there?

23   A    I told John leave the gun in the car and we got out and I

24   took, I don't know why, but I took his hat off his head and

25   put my gloves in there and just stuck it in a bush on the

*Russo - Direct / Lifshitz*                                          58

1   corner.

2   Q    You mentioned "John" just now.

3        Which John was it?

4   A    Johnny Sparacino.

5   Q    Why did you tell him to leave the gun in the car?

6   A    Because we were told to leave the gun in the car.

7   Q    By who?

8   A    Michael told us, "Make sure you leave the gun in the

9   car."

10  Q    Which gun was this?

11  A    The MAC-10.

12  Q    Did you and Sparacino then step out of the car?

13  A    Yes, we did.

14  Q    What happened next?

15  A    Well, as we got out of the car, we were walking towards

16  the corner and BF and Johnny Pappa pulled up.

17  Q    Were they in the same car?

18  A    They were in Frankie's car, yes.

19  Q    Frank Guerra's car?

20  A    Yes.

21  Q    And what did you do next?

22  A    We got in the backseat and left.

23  Q    What happened to Joe Scopo that night?

24  A    He passed away.

25  Q    After the Scopo murder, who, if anyone, from outside the

1  murder crew talked to you about it?

2  A    A couple days after that, I was sitting in front of my

3  house and this kid Michael DeRosa pulled up.

4  Q    Who was Michael DeRosa?

5  A    Michael DeRosa was an associate of the Lucchese family.

6  Q    And what, if anything, did he say to you?

7  A    And he just came out with a big smile on his face and

8  said that, "That was some job.  That was some hit."  And I

9  just looked at him and said, "I don't know what you're talking

10  about."

11  Q    Other than Michael DeRosa, did anyone else outside the

12  murder crew bring this up to you?

13  A    Yes, Dino.

14  Q    Who was Dino?

15  A    Dino Calabro.

16  Q    Who was he in organized crime?

17  A    At the time, he was just an associate.

18  Q    Of what family?

19  A    Colombo crime family.

20  Q    What did he say to you?

21  A    It was basically the same thing, "That was some job yous

22  did, some hit."

23  Q    What did you say to him?

24  A    "That was a nice piece of work."

25         I told him, "I don't know what you're talking

1   about."

2   Q    Why did you make that denial to DeRosa and Calabro?

3   A    Because you shouldn't be talking about things like that.

4   Q    Why not?

5   A    Because you could get killed for doing that.

6   Q    Killed for what?

7   A    For talking about killing somebody.

8   Q    Did DeRosa or Calabro tell you how they knew about it?

9   A    Yes.

10           MR. SERCARZ:  Objection, Your Honor.  I would note

11  that we're past the point of the conspiracy and engaging in

12  this homicide.

13           THE COURT:  I'll sustain.

14  Q    After DeRosa and Calabro approached you about the Scopo

15  murder, did you tell anyone?

16  A    After DeRosa and, excuse me, say it again.

17  Q    After DeRosa and Calabro approached you about the Scopo

18  murder, did you report that fact to anyone?

19  A    Yeah, we brought it to Michael's attention.

20  Q    Who's "we"?

21  A    Me and BF.

22  Q    And who's "Michael"?

23  A    Persico.

24  Q    What did you say to him?

25  A    We told him, "Eric's got a big mouth.  He's telling

1   everybody what we did."

2   Q     Eric who?

3   A     Excuse me?

4   Q     Eric who?

5   A     Curcio.

6   Q     And what, if anything, did Michael Persico say back?

7   A     He says, "He's your friend.  Go talk to him."

8   Q     Did you do that?

9   A     Yes, we did.

10  Q     What happened when you talked to Eric Curcio?

11  A     He denied it all.

12  Q     What else, if anything, did Eric Curcio say to you about

13  the Scopo murder?

14  A     He said a lot of things, Eric.  He said we were all going

15  to get straightened out, everybody's going to become captains

16  of the family.

17  Q     Did you report that to anyone, what Eric Curcio said to

18  you?

19  A     Yes, I -- yes, I did.  Yeah, I did.  I told Michael about

20  it.  I told him, "He's running his mouth saying that he's

21  going up to see your brother and your brother's talking to

22  him."  And I asked him, "Does he talk to him?  Does he go up

23  and see Allie?"  And Michael says, "I doubt it."

24  Q     Who's the "Michael" you're talking about?

25  A     Michael Persico.

1   Q    When you told Michael "he's running his mouth," who's the

2   "he" there?

3   A    Excuse me?

4   Q    Who was running his mouth?

5   A    Eric Curcio.

6   Q    And when you mentioned someone's brother, who were you

7   referring to?

8   A    "Allie Boy" Persico.

9   Q    Why did you report this to -- why did you report all this

10  to Michael Persico?

11  A    Because I wanted to know if his brother knew anything

12  about this.

13  Q    About what?

14  A    About Eric saying all these things.

15  Q    What, if anything, did Michael Persico say to you about

16  that?

17  A    Michael said, "My brother knows nothing about it.  He met

18  him once on a visit, said hello to him, that's it."

19  Q    Who met who once on a visit?

20  A    Allie met Eric on a visit at FCC one time and that was

21  it.

22  Q    After that, did you talk to Eric Curcio again about his

23  prison visits?

24  A    Yeah, he had a problem with, I think, Chucky Russo and he

25  told me he's not going up there no more.

Case 1:02-cr-00251-DEK Document 4869-6 Filed 09/19/21 Page 90 of 635 PageID #: 4397

1    THE COURT:  I'm sorry, who had the problem?

2    THE WITNESS:  Eric Curcio had an argument on a visit

3    with Chucky Russo and he said he wasn't going to go visit him

4    no more, he's had it, you know.

5    Q    Eric said he wouldn't visit Chucky Russo anymore?

6    A    Yeah, he's not going to visit him no more.

7    Q    After the Scopo murder, did you ever discuss John

8    Sparacino with Eric Curcio?

9    A    Yeah, I believe I did, yes.

10   Q    What, if anything, did Curcio say about Sparacino?

11   A    He said he was running his mouth.

12   Q    Who was running his mouth?

13   A    Johnny Sparacino.

14   Q    And after that, did you ever discuss Sparacino with John

15   Pappa?

16   A    Well, Eric Curcio and Johnny Pappa are the ones that told

17   me and BF that Johnny Sparacino was running his mouth about

18   the Joe Scopo murder.

19   Q    Do you recall a time when John Pappa came to you about

20   Sparacino?

21   A    Yeah, it was -- I can't remember the time frame, but he

22   came to my house one day and asked me to help him steal a car

23   and I told him I don't steal cars.

24   Q    What happened next?

25   A    So he's telling me, "I need your help."  And I was like,

1    "Why do you need a car?"  And he told me straight up and down

2    that he just killed Johnny Sparacino.

3    Q    Pappa told you he killed Sparacino?

4    A    Yeah.

5    Q    Is that right?

6    A    Him and Calvin, yeah.  He needed a car so he could put

7    the body in there and get rid of it.

8    Q    Who was that Calvin that you mentioned?

9    A    Calvin, it was a friend of Johnny Pappa.

10   Q    What did you do when Pappa reported this to you?

11   A    I said let me help him 'cause, you know, he just helped

12   us do something, so I figured return the favor.

13   Q    What did you do to help him?

14   A    We -- we went to Frankie's house, BF, and I told him we

15   need to get a car and I explained to him what happened, and

16   then we went and got John Matera and we went and got a car.

17   Q    Who was John Matera?

18   A    John Matera was a friend of Frankie's, BF.

19   Q    How did the three of you get a car?

20   A    We stole it.

21   Q    And where did you take it after that?

22   A    We drove it to Staten Island.

23   Q    To where in Staten Island?

24   A    We drove it to Calvin's house.

25   Q    What happened when you got to Calvin's house?

1    A    We went inside and Calvin started telling us what

2    happened and we went to the basement and John Sparacino was

3    laying on the floor in the basement dead.

4    Q    When you were in the basement, what, if anything, did

5    Pappa say to you?

6    A    He said a bunch of things, you know.  He said, "Look at

7    him now, big mouth."  Then he told me about, "You remember

8    when he called you a BJ."

9    Q    Pappa said that to you?

10   A    Yeah.

11   Q    What did you say?

12   A    I said, "Yeah, I remember when you told me that he said

13   that."

14   Q    That who had said that?

15   A    That Johnny Sparacino had called me a blow job.

16   Q    What happened next?

17   A    I don't know what happened, but all I remember is a knife

18   coming out and we -- we cut his penis off and stuck it in his

19   mouth.

20   Q    Who did that?

21   A    John.

22   Q    John Pappa?

23   A    Yeah, me and John.

24   Q    You and John Pappa did that?

25   A    Yes.

*Russo - Direct / Lifshitz*                                         66

1   Q    What happened with Sparacino's body after that?

2   A    We wrapped him up and threw him in the back of the car,

3   and Johnny Pappa and Calvin and me and BF went our way, they

4   went their way with the stolen car with the body in it.

5   Q    Let me just unpack that a little bit.

6            Who wrapped the body up?

7   A    We wrapped Johnny Sparacino up.

8   Q    Who did that?

9   A    All of us.

10  Q    And what did you wrap him up in?

11  A    I believe it was a rug.

12  Q    And then whose car was the body placed in?

13  A    The stolen car.

14  Q    Who got in that car?

15  A    Johnny Pappa and Calvin.

16  Q    And where did you go?

17  A    I went home.

18  Q    In a separate car?

19  A    In my car, yes.

20  Q    With who?

21  A    With BF and John Matera.

22  Q    After Sparacino was murdered, did you ever discuss him

23  with anyone else?

24  A    I don't remember.

25            Oh, yeah, yeah, yeah, Eric, yeah.

1  Q    Eric Curcio?

2  A    Yeah.

3  Q    What did Curcio say to you?

4  A    Eric wasn't there at the time, but he came -- he was in

5  Florida at the time.  He came back from Florida and he asked

6  to see me and BF.  It was a couple days after it, a day or two

7  after the murder of Sparacino, and we met him and it was late

8  at night and we just thought he wanted to talk to us about

9  something, and out of nowhere, he just said, "I took care of

10 that for us."  And we asked him, "What did you take care of?"

11 He said, "I killed Johnny Sparacino the other day."

12 Q    Who said that?

13 A    Eric Curcio.

14 Q    And did you know if that was true or false?

15 A    It was definitely a lie.  He wasn't there.

16 Q    What happened to Eric Curcio?

17 A    He got killed.

18 Q    Were you present for any part of his murder?

19 A    No.

20 Q    Did you question anyone about it?

21 A    Yes.

22 Q    Who?

23 A    Johnny Pappa.

24 Q    What did you ask him?

25 A    I asked him, "What happened?  And did you have anything

1   to do with this?"

2   Q    How did he respond?

3   A    He responded by laughing hysterically and didn't say a

4   word, just laughed.

5   Q    What did you believe that meant?

6   A    Just my personal opinion, I believe he killed him.

7   Q    At some point after the Scopo murder, did Alphonse

8   Persico, who I think you called "Allie Boy," return home from

9   jail?

10  A    Yes.

11  Q    In what year, approximately?

12  A    '94.

13  Q    Did you or anyone close to you visit him after his

14  release?

15  A    Yeah, BF went to visit him.

16  Q    Did BF report to you about the visit?

17  A    Yes, he did.

18  Q    What did BF report to you?

19  A    BF told me he was upstate with Allie and that, "When he

20  gets hit -- when he gets back to Brooklyn, he wants to meet

21  you and that me and you are going to report to him."

22  Q    So, when you said BF mentioned being upstate with Allie,

23  what did you understand "upstate" to mean?

24  A    The house upstate that he owns.

25  Q    That who owns?

1   A    "Allie Boy."

2   Q    And Allie said what to BF, according to BF?

3   A    That when he gets back to New York -- when he gets into

4   Brooklyn, he wants to meet me and that from here on in that me

5   and BF report to him.

6   Q    After that, did you meet "Allie Boy" Persico?

7   A    Yes, I did.

8   Q    Where?

9   A    I believe it was in Romantique.

10  Q    In Brooklyn?

11  A    Yeah.

12  Q    What, if anything, did "Allie Boy" Persico --

13        MR. LIFSHITZ:  Strike that.

14  Q    Who were you with when you met "Allie Boy" Persico at

15  Romantique?

16  A    BF.

17  Q    What, if anything, did "Allie Boy" Persico say to you and

18  BF?

19  A    He told us that -- he told us a few things.  I don't

20  remember everything.  I remember him telling us that once he

21  puts things back together in the family, that me and BF would,

22  you know, get what we had coming to us and things like that,

23  that we -- that he wanted me and BF around him.

24  Q    Was the Colombo family war still going on at this point?

25  A    No.

*Russo - Direct / Lifshitz*                    70

1   Q    When "Allie Boy" Persico mentioned putting the family

2   together, what did you understand that to mean?

3   A    Meant putting it back together because there was a lot of

4   people that they wanted to come back in and, you know, they

5   were afraid to come back in.  So he was working on putting it

6   back together.

7   Q    The Colombo family?

8   A    Right.

9   Q    And I believe you said he mentioned you and BF would get

10  what was coming to you, is that the phrase you used?

11  A    Yes.

12  Q    What did you understand that to mean?

13  A    Be made members of the family.

14  Q    So, what was the result of "Allie Boy" Persico saying he

15  wanted you and BF around him?

16  A    Excuse me?

17  Q    What was the result of him telling you that you and BF

18  would be around him?

19  A    The result was we were.

20  Q    To be clear, up to that point, who were you and BF

21  reporting to?

22  A    We were hanging out with Michael.

23  Q    After "Allie Boy" told you, in your understanding, that

24  he wanted you two to get inducted, when, if ever, did you

25  discuss that subject again with him, with "Allie Boy"?

*Russo - Direct / Lifshitz*                                    71

1    A    Like a year or two later.

2    Q    And after that, when, if ever, did you discuss it again?

3    A    With Allie?

4    Q    Yes, with Allie.

5    A    I only discussed it with Allie that one time when me and

6    BF were in his office.

7    Q    His office where?

8    A    On Romantique.

9    Q    Around what year was that?

10   A    '96, '97.

11   Q    Were you still on parole from your assault case?

12   A    Yes.

13   Q    Were you allowed to meet with "Allie Boy" Persico?

14   A    I wasn't supposed to, no.

15   Q    Did you ever learn whether law enforcement knew you had

16   met with him?

17   A    Yes.

18   Q    How did you learn that?

19   A    It was in my house when Michael's cousin came to my

20   house.

21   Q    Who?

22   A    Michael Persico's cousin Frankie came to my house and

23   told me that, "We have a little problem, that you're on tape,"

24   meaning with Allie and Michael.

25   Q    Did he say --

1    A    "And it might be a problem with your parole."

2    Q    Did he say at what location the tape showed you meeting

3    with him?

4    A    I don't remember if he told me the location where we met.

5    Q    Did you ever see that tape?

6    A    Yes, I did.

7    Q    How were you able to see that tape?

8    A    I know my parole officer might have showed it to me,

9    definitely showed it to me when I reported in one day.

10   Q    Did it depict you with Michael Persico and Allie Persico?

11   A    Yes, it did.

12   Q    In the mid-'90s after the Scopo murder, how did you make

13   money?

14   A    I was shaking down drug dealers, selling drugs, I was

15   loansharking.

16   Q    Can you define "loansharking" for us, please?

17   A    You lend people money for a percentage back.

18   Q    Is there a term for the percentage?

19   A    It's called the juice, the vig.

20   Q    How often is that juice, vig percentage paid?

21   A    Every week.

22   Q    Does paying the interest reduce the principal of the

23   loan?

24   A    No, not at all.

25   Q    Can just anyone engage in loansharking?

1   A    Not really, no.

2   Q    Who can do that?

3   A    I mean, you -- most of the people I ever met that were

4   doing shylocking were always around one of the five families.

5   Q    Did you have a partner in your loansharking business?

6   A    Yes, I did.

7   Q    Who was that?

8   A    BF.

9   Q    And in the mid-'90s, how did you and BF get money to

10  extend loan shark loans?

11  A    From Michael.

12  Q    Michael Persico?

13  A    Yes.

14  Q    On what terms?

15  A    We used to borrow money from him for a point.

16  Q    You just used the word "point."

17          What is a point?

18  A    Like one percent.

19  Q    So "point" is another term for the percentage?

20  A    Yeah.

21  Q    And how often did you have to pay the point?

22  A    Well, in the beginning, we used to give it every week and

23  then Michael said, "Just see me like once a month with the

24  juice."

25  Q    What interest or points did you charge the people you

1  made loansharking loans to?

2  A    Most of the time it was three points.  Some people we got

3  it for two-and-a-half.

4  Q    What advice, if any, did Michael Persico give you about

5  loansharking?

6  A    He said that it's not a business you stay in forever.

7  Just try to make as much money as you can from it, save your

8  money, and try to do something else with it.

9  Q    Over what period, approximately, did you and Frank Guerra

10 borrow money from Michael Persico to make loansharking loans?

11 A    When I got home in -- around -- after '93, around '93 to

12 '96, '7 we were asking for money for a few years.

13 Q    About how much money in total did you and Guerra borrow

14 from Michael Persico for that purpose?

15 A    Hundred and fifty, 200.  I'm not sure exact number.

16       THE COURT:  You mean thousand?

17       THE WITNESS:  Thousands, yes.

18 Q    150,000 or 200,000?

19 A    Yeah, around there.  I'm not exactly sure.  It's a long

20 time ago.

21 Q    So, if the number was 150,000, how much were you

22 obligated to pay Michael Persico?

23 A    The one point.

24 Q    What would that be?

25 A    1500.

Case 1:92-cr-00351-EK Document 869 Filed 08/19/21 Page 102 of 635 PageID #: 4409
Case 1:92-cr-00351-EK Document 846 Filed 07/21/20 Page 75 of 347 PageID #: 9604

1  Q    How often?

2  A    Like I said, in the beginning, we would give him every

3  week and then he just said, "Listen, just see me once a

4  month."  So, it was around once a month.

5  Q    Where did you typically meet him to pay him?

6  A    Wherever he was.  We'd call him, see where he was doing,

7  hang out, go to eat dinner, see him at Romantique.

8  Q    Did you and BF ever have trouble paying Michael Persico?

9  A    Not in the beginning, no.

10  Q    Did that change?

11  A    Later on, maybe like a year-and-a-half, two years later,

12  maybe earlier.  I don't remember.

13  Q    Why did you and Guerra have trouble paying?

14  A    'Cause guys that borrow money, they're a liability and a

15  lot of them just disappear on you.  You got to hunt them down,

16  look for them to find your money.

17  Q    You were having trouble doing that?

18  A    We had trouble with a couple guys, yeah.

19  Q    What, if anything, did you say to Michael Persico?

20  A    We told him that we were having problems.  When he asked

21  us how come the money's not ready, we would tell him we were

22  having problems with people.

23  Q    What, if anything, did he say back?

24  A    In the beginning, he was -- he was good about it and

25  after a while, he just said, "Listen, yous got to bring my

 1   money back."

 2   Q    What did you understand that to mean?

 3   A    "Get my money."

 4   Q    After that, did you and BF collect your loansharking

 5   money?

 6   A    We started going after some of the money people owed us,

 7   yes.

 8   Q    Did you assault some of those people?

 9   A    Yes.

10   Q    Was there a customer called Lenny?

11   A    "Fat Lenny," yes.

12   Q    What did you do to him?

13   A    I gave him a beating on 13th Avenue.

14   Q    How much money did he owe you?

15   A    Around $30,000.

16   Q    What happened after you beat him?

17   A    I was told by Michael that don't worry about Lenny,

18   everything's taken care of, that Tony Anastasio was going to

19   take care of it.

20   Q    Tony Anastasio?

21   A    "Tony Anastasio worked out something.  I'll get my money.

22   Don't worry about it."

23   Q    Michael Persico said that to you?

24   A    Yes.

25   Q    Who was Tony Anastasio?

1  A     I didn't know who he was at the time.  Then I found out

2  he was a made member of the Gambino crime family.

3  Q     Did you have a loansharking customer called Tony?

4  A     Yeah, Tony, yes.

5  Q     About how much did he owe you and BF?

6  A     Seven or $8,000.

7  Q     Seven or eight?

8  A     Yeah.

9  Q     What did you do to him?

10  A     I gave him a beating.

11  Q     What happened next?

12  A     He ran to somebody to try to squash it.

13  Q     Do you remember who he ran to?

14  A     Yeah, the first person he ran to was a guy named Joe C.

15  He was a made member of the Genovese family.

16  Q     What happened next?

17  A     And me and BF went to meet him and -- at a diner on Kings

18  Highway.

19  Q     You met Joe C?

20  A     Joe C., yes.

21  Q     And what happened?

22  A     And he was telling us that, "The guy's a bum.  He's got

23  no money.  I could get you two, three thousand dollars and,

24  you know, settle for that."  And I was like, "I can't make

25  those decisions.  It's not my money to make that decision."

1   Q     Whose money was it?

2   A     Michael's.

3   Q     Did you report this conversation to anyone?

4   A     Yes.  At the time, Allie was home and we told Allie about

5   it.

6   Q     Alphonse Persico?

7   A     Yeah.

8   Q     What did you say to him?

9   A     We told him that this guy's playing games, this guy Joe

10  C., and he's talking about giving us two, three thousand

11  dollars to settle the deal, to squash the beef.  And Allie

12  told us, "Tell him to wait there.  If he's still at the diner,

13  tell him to wait there."  And we went there, me, Allie and BF,

14  and Allie just didn't like the guy, so he told him --

15  Q     Who was Allie talking to at this point?

16  A     Joe C.

17  Q     Go ahead.

18  A     And he told him straight up and down, "What's the

19  problem?"  Joe C. explained to him the same thing he explained

20  to us about the two, three thousand dollars.  He told Allie,

21  "The guy's a bum.  He's worthless."  And Allie told him --

22  looked at me and said, "Ant, just keep beating him up until he

23  gives you the money," and walked out.

24  Q     And what happened next with this?

25  A     Somebody else came along, "Big Louie."  He was friends

1   with "Big Louie's" brother.

2   Q    Who was "Big Louie"?

3   A    "Big Louie" was a captain in the Gambino family.

4   Q    So who did "Big Louie" talk to?

5   A    "Big Louie" came -- I was in Romantique's on 11th Avenue

6   one day and I was standing there and I forgot what happened,

7   but Big Louie and Huck were --

8   Q    Who's Huck?

9   A    He was a made member of the Gambino family.

10  Q    Go on.

11  A    They came back and I seen them.  Said hello to them, they

12  went into Romantique.  I don't know how long it was.  They

13  came back out a little while later and Allie came out and he

14  told me, "Don't worry about that money.  It's a done deal.

15  I'll make sure when I get the money I give it to my brother."

16  Q    Was there a customer called Santos?

17  A    Yes.

18  Q    How much money did he owe you?

19  A    I don't remember exactly, three, four thousand, maybe

20  more.  I don't know.

21  Q    What did you do to him?

22  A    Well, he was playing a lot of games, and I went to his

23  house one day and I just happened to be leaning on the steps

24  of his house and it was a brick fence there and at the same

25  time I leaned on the brick, he opened the door and the brick

*Russo - Direct / Lifshitz*                                        80

1   was loose, so I had a brick in my hand and I hit him with it.

2   Q    Around this time in the mid-1990s, did you ever talk to

3   Michael Persico about whether anyone else in the Colombo

4   family owed him money?

5   A    We discussed it a couple of times, yeah.  Some couple

6   other people.

7   Q    What, if anything, did Michael Persico say?

8   A    He asked me to reach out to Bobby Tarantola one time.

9   Q    About what?

10  A    About money that was owed to him, that he stopped paying,

11  and he just told me, "Listen, tell him forget about the juice.

12  Just tell him to get my money to me."

13  Q    Who was Bobby Tarantola at that time?

14  A    He was an associate of the Colombo family.

15  Q    Who else, if anyone, did Michael Persico talk to you

16  about?

17  A    I believe Anthony Ferrara owed him money, at times owed

18  Michael money.

19  Q    Who told you that?

20  A    Anthony told me he borrowed money to buy a car one time.

21  Q    From?

22  A    From Michael.

23  Q    Did you know why Bobby Tarantola borrowed the money?

24  A    I don't know why he borrowed the money, no.

25  Q    Did anyone tell you the terms of those loans from

Case 1:92-cr-00351-EK Document 848-9 Filed 08/19/21 Page 108 of 635 PageID #: 4415

Case 1:92-cr-00351-EK Document 846-9 Filed 05/21/26 Page 8 of 34 PageID #: 4010

1    Michael?

2    A    Well, Michael told me to go talk to him about it, "See

3    what he's doing with my money.  Tell him not to -- to forget

4    the juice."  So evidently he was paying juice on it.

5    Q    And that would refer to Bobby Tarantola?

6    A    Right.

7    Q    Shifting topics now.

8         Have you ever been involved in a scheme to sell

9    stolen video games?

10   A    Yes.

11   Q    In what year?

12   A    In the '90s, mid-'90s.

13   Q    How did you first become involved in that?

14   A    I was in my car service on Bay Parkway one day.  I

15   believe my father brought it up to me about a guy had a

16   truckload of video games.

17   Q    Were they stolen?

18   A    Stolen video games, yes.

19   Q    What did you do when you learned that?

20   A    I wanted to buy the load.  I was trying to scrape the

21   money together.

22   Q    Did you meet the person who had the games?

23   A    Yes.

24   Q    Who was he?

25   A    Some guy named Spider.

1  Q    What did you say to each other?

2  A    He told me what he wanted and I told him I'll try to, you

3  know, get the money 'cause I'd like to buy the load 'cause it

4  was nice load to hold on to, especially it was a couple months

5  before Christmas.

6  Q    What did Spider tell you he wanted?

7  A    He wanted 75,000 for the whole load, tractor trailer

8  load.

9  Q    Did you see the video games yourself?

10 A    Not until I reached out for the money.

11 Q    Okay.  So walk us through that.

12        After Spider told you how much he wanted, what did

13 you do next?

14 A    I reached out and I believe I brought it up to Michael.

15 Michael told me he'll look into it, and then he came back to

16 me and told me he has a friend on 18th Avenue and I forgot the

17 street, it was a little storefront there.

18 Q    What did he tell you about this friend?

19 A    His friend would give us the money and he'll buy the

20 whole load from us.

21 Q    Did you go see the friend on 18th Avenue?

22 A    Yes, and we got 75,000 from him.

23 Q    Who's "we"?

24 A    Me, BF.

25 Q    What did you do next after you got that money from the

 1    man on 18th Avenue?

 2    A    Well, I had the money and I -- he needed a truck to bring

 3    the load to us.  So I made my father rent a truck, a Ryder

 4    Truck, and gave it to him to use to bring -- he was going to

 5    bring it in two loads, first load half and then the other load

 6    half the second time around, and I was going to give him

 7    35,000 every time he brought a load.

 8    Q    So two payments of 35,000?

 9    A    Yeah.

10    Q    Did you have a plan about where to put these video games?

11    A    Yeah, we were going to put them in -- in the garage of

12    the bus company in Coney Island.

13    Q    What bus company?

14    A    Michael's bus company.

15    Q    How did you come to plan to put them there?

16    A    We asked Michael where we could do it.  He said no one's

17    using it over there, use the garage.

18    Q    So, I think you mentioned BF going with you.

19              Who else, if anyone, became involved in this plan?

20    A    It was me, BF, Little Anthony and Scotty.

21    Q    Who was Little Anthony?

22    A    Anthony Ferrara.

23    Q    And who was Scotty?

24    A    Scotty Reback.

25    Q    And who are they in organized crime?

1   A    Associates of the family, of the Colombo family.

2   Q    Did Spider then bring you any video games?

3   A    Yes, he did.

4   Q    In what vehicle?

5   A    In the rented truck that my father rented.

6   Q    What happened next?

7   A    He showed me the load, and we were going back to the car

8   service when I spotted what looked like agents.

9   Q    What were they doing when you spotted them?

10  A    They were taking pictures with a six-foot lens.

11  Q    What did you do next?

12  A    I -- I took him into the car -- car service and I -- I

13  made him strip down.

14  Q    Who did you make do that?

15  A    Spider.  I thought he set me up.

16  Q    So why did you make him strip down?

17  A    So I could see if he had a wire in him.

18  Q    Did you see anything like that?

19  A    No.

20  Q    What did you do next?

21  A    I told him, "You got an hour to get rid of that truck and

22  that load and then I'm reporting it stolen."

23  Q    Did you ever actually acquire these video games from

24  Spider?

25  A    No, never.

Case 1:92-cr-00351-EK Document 1869 Filed 08/19/21 Page 342 of 635 PageID #: 4419
Case 1:92-cr-00351-EK Document 846 Filed 05/21/86 Page 85 of 347 PageID #: 10814

 1   Q     You may have said this, but how much money by this point

 2   had you gotten from the man on 18th Avenue?

 3   A     I forget, it was either 70 or 75,000.

 4   Q     What did you do with that money after you ordered this

 5   plan?

 6   A     I had it for a couple of days.

 7   Q     What happened next?

 8   A     Michael came down my block.  I was hanging out in front

 9   of my house and Michael happened to be coming down and he just

10   smiled at me.  He said, "Are you ever going to give that money

11   back to my friend?"

12   Q     Michael who?

13   A     Persico.

14   Q     What did you say?

15   A     I said, "Yes."

16   Q     What did you do?

17   A     I gave it back.

18   Q     In the mid and late 1990s, did you have any legitimate

19   businesses?

20   A     In the late '90s?

21   Q     Yeah.

22   A     Yeah, I opened up a liquor store.

23   Q     Where was the liquor store?

24   A     In Staten Island.

25   Q     Where did you get money to open a liquor store?

*Russo - Direct / Lifshitz*                                                86

1   A    From my friends.

2   Q    Who were your friends?

3   A    Frankie Persico, Michael Persico, Anthony Stropoli.

4   Q    Who was Anthony Stropoli?

5   A    He's a made member of the Colombo family.

6   Q    And Frank Persico, I believe you testified earlier, is a

7   cousin of Michael Persico; is that right?

8   A    Yes.

9   Q    Was the liquor store successful?

10  A    It was in the beginning.

11  Q    And then?

12  A    I screwed up.

13  Q    What do you mean?

14  A    I bought liquor that I shouldn't have bought.  When

15  you -- you know, at a time when you don't -- after the

16  holidays, you shouldn't be buying all the liquor I bought.

17  Q    Did the store suffer as a result?

18  A    It suffered a little bit, yeah.

19  Q    Who, if anyone, did you discuss that with?

20  A    Well, I was holding on to the store until I got arrested,

21  and then when I got arrested, my ex-girlfriend didn't want to

22  be bothered with the store no more.  So I didn't know what to

23  do, so I discussed it with Michael.

24  Q    You mentioned this happening when you were arrested.

25       Which arrest was this?

Case 1:92-cr-00351-DEK  Document 846869-6 Filed 08/19/21  Page 114 of 635 PageID #: 4421
Case 1:92-cr-00351-DEK  Document 846  Filed 07/21/16  Page 87 of 347 PageID #: 10016

1   A      I was arrested in '99, the end of '99, beginning of 2000.

2   Q      Federal case or state case?

3   A      Federal case, yeah.  I was indicted on a RICO charge.

4   Q      Just to back up one step.

5          After you were arrested, what did you decide to do

6   with the store?

7   A      Well, after my girlfriend came to me and told me she

8   didn't want to be bothered with the store no more, I discussed

9   it with Michael.

10  Q      What did you say to him?

11  A      I told him --

12         MR. SERCARZ:  Objection, Your Honor.  Your Honor,

13  we've been told what subject matter would be covered at the

14  hearing, and I would respectfully submit this is outside the

15  scope.

16         MR. LIFSHITZ:  We're covering a 20-year racketeering

17  conspiracy that's been disclosed for a long time, and his

18  association with Michael Persico over the years is highly

19  probative.

20         MR. SERCARZ:  The presentence report contained

21  allegations regarding certain conduct that the Government

22  claimed they were going to prove at a Fatico hearing, and this

23  goes far, far afield, I respectfully submit.

24         THE COURT:  I would agree.

25         I just want to remind the parties based on one of

Case 1:92-cr-00351-EK Document 1869 Filed 08/19/21 Page 145 of 635 PageID #: 4422
Case 1:92-cr-00351-EK Document 846 Filed 09/21/16 Page 88 of 347 PageID #: 10617

1   the latest submissions, August 4th, 2016, page 2 of that

2   letter indicated what was going to be proved.

3           Well, one portion of it, the first part says:

4   "First, the defendant has participated in racketeering as a

5   long-time associate of the Colombo family and has at times

6   been involved in managing the crime family's members and

7   associates."  And the acts in the indictment go up to 2010.

8           So overruled.

9           MR. LIFSHITZ:  Thank you, Your Honor.

10  BY MR. LIFSHITZ:

11  Q    I may be backing up a question or two, Mr. Russo, but you

12  said you went to Michael Persico after you were arrested.

13          What do you recall saying to him about the liquor

14  store?

15  A    I remember bringing it to his attention that I was having

16  problems with the store.

17  Q    What did he say?

18  A    And he gave me some choices that would help me out.

19  Q    What were those choices?

20  A    You know, "Work it and try to fix it on your own or maybe

21  you could give it to me and we'll take it over 'cause you're

22  going to go to jail anyway, so, and we'll run it.  You know,

23  we'll take care of it."

24  Q    What did you decide to do?

25  A    I decided to turn it over to Michael.

Case 1:92-cr-00351-EK Document 1490 Filed 08/19/21 Page 116 of 635 PageID #: 4423
Case 1:92-cr-00351-EK Document 1486-9 Filed 07/21/26 Page 89 of 347 PageID #: 4518

1  Q    And what did he tell you he would do with it?

2  A    He told me that him and Carl would take care of it, Carl

3  Panarello.

4  Q    Who was Carl Panarello?

5  A    He was an associate of the Colombo family.

6  Q    And what happened to the business?

7  A    I gave it to them.  Carl came in, he started working the

8  store.  They asked me if my father-in-law -- well, my

9  girlfriend's father, 'cause it was under his name, the

10  license, if he can leave it under his name for a year or so

11  and when everything's worked out and everything's back to

12  normal, the store's making money again, they would work it out

13  where they, you know, buy it from my father-in-law, take over

14  the store.

15  Q    What happened to the store next?

16  A    What happened to the store, they sold it.

17  Q    Did you profit from that?

18  A    Did they profit from it?

19  Q    Did you profit from that?

20  A    No, not at all.

21  Q    Did you lose any money?

22  A    Not really, no.

23  Q    In the late 1990s, did you talk to anyone in the crime

24  family about who would get inducted into the crime family?

25            THE COURT:  I'm sorry, what was that time frame?

1      MR. LIFSHITZ:  The late 1990s.

2  Q    Let me ask it a different way.

3           In the late 1990s, who, if anyone, told you that he

4  was getting inducted into the crime family?

5  A    Anthony Stropoli.

6  Q    And who was Stropoli at that time?

7  A    Who was Anthony Stropoli?  He was an associate in the

8  Colombo family.

9  Q    What, if anything, did he tell you about himself maybe

10 getting inducted?

11 A    He told me that he was getting inducted and straightened

12 out and became a -- you know, in the Colombo family.

13 Q    Did he mention any other names?

14 A    He mentioned a couple names, yes.

15 Q    Who?

16 A    He mentioned Dino.  He said some guy from Boston, he

17 didn't know who he was.  He said Andre.

18 Q    Who was Dino?

19 A    Dino Calabro.

20 Q    And who was Andre?

21 A    Andre, I forgot his last name.  He's a -- he was an

22 associate.  He's close to "Allie Boy."

23 Q    Just so the record is clear, what did Stropoli tell you

24 about these people, Andre, Dino and someone from Boston?

25 A    He told me they were all getting straightened out.

1    Q    Were those men then in fact inducted into the Colombo

2    family?

3    A    Yes.

4    Q    When Stropoli told you he and those other men would get

5    inducted, what was your reaction?

6    A    I was upset.

7    Q    Why?

8    A    Because I thought I deserved it before a couple of them.

9    Q    I'm sorry?

10   A    I thought I deserved it before a couple of them.

11   Q    Why did you believe that?

12   A    Because basically I ended the war, me and my guys.

13   Q    How did you end the war?

14   A    By killing Joey Scopo.

15   Q    Did you express to anyone the fact that you were upset

16   about this?

17   A    Yes.

18   Q    Who?

19   A    My partner, BF.

20   Q    Who, if anyone, next approached you to discuss the fact

21   that you were upset?

22   A    You know, all I know is that I expressed disappointment

23   to BF, and next day I was in my liquor store and Frankie

24   Persico and Anthony Stropoli walked in and they were a little

25   upset with me and they were telling me, "Why did you do that?

Case 1:92-cr-00351-DLI Document 869 Filed 08/19/21 Page 119 of 635 PageID #: 4426

1  How could you do that?  You know it could get me in trouble."

2  And I was like, "What are you talking about?"  And they were

3  telling me that, "One of your dear friends went up to Michael

4  and told him you expressed disappointment in not being

5  straightened out on that list."  I said, "I don't think BF

6  would do something like that."  And they basically told me

7  straight up and down, "No, it was BF."  And then I went back

8  to BF and I asked him and he said, yes, he did, "But I was

9  just -- I was concerned about you."

10  Q    Who said "I was concerned about you"?

11  A    BF.

12  Q    And what did you say --

13  A    'Cause he didn't want me to get in trouble and

14  expressing, you know, saying things that could get you in

15  trouble, 'cause I was a little upset at the time.

16  Q    What did you say back to BF?

17  A    I told him, "What's wrong with you?  You get me killed

18  doing something like that."

19  Q    Why did you believe that could get you killed?

20  A    'Cause it could get you killed.

21  Q    What could get you killed?

22  A    Talking the way I was talking.

23  Q    Talking about what?

24  A    About being straightened out; I deserve it; you know, I

25  ended the war.

1   Q    Are you familiar with a man named Arthur Alonzo?

2   A    Sure, I am, yes.

3   Q    Who was he?

4   A    He was a -- a kid that hung around me and BF.

5   Q    Did you ever become involved in a dispute he was part of?

6   A    Yes.

7   Q    Approximately when?

8   A    Early '90s, mid-'90s.

9   Q    How did you come to be involved in the dispute?

10  A    He -- he worked in the stock market.  He was a -- he was

11  a stockbroker and he was friendly with me and BF and he did

12  things for us, and he was leaving one firm going to another

13  and basically he just lied to us and me and Frankie didn't

14  know any better and when he told us about the leads that he

15  had --

16            MR. SERCARZ:  Your Honor, forgive me for

17  interrupting the witness.  May we have a date before this

18  continues so we can see whether it's within the parameters of

19  the hearing?

20            THE COURT:  Yes.

21            What time frame are we talking about?

22            MR. LIFSHITZ:  I would ask the witness what time

23  frame he recalls.

24            MR. LIFSHITZ:  But also this is Giglio.

25            THE COURT:  What time frame are you talking about

Case 1:92-cr-00351-EK   Document 1869   Filed 08/19/21   Page 94 of 347 PageID #: 9023

*Proceedings*                                                    94

1   here?

2              THE WITNESS:  Mid-'90s.

3   Q    This Arthur Alonzo dispute was in the mid-'90s?

4              MR. SERCARZ:  May I approach the Government for a

5   moment just to make sure that we're not going into an area

6   that's going to be a problem?

7              THE COURT:  Why don't we take maybe a five minute

8   break and we'll resume in about five minutes.

9              The witness can leave.

10             (Witness leaves the witness stand.)

11             THE COURT:  By the way, counsel, while you're at it,

12  I had originally planned to continue this hearing in the

13  afternoon.  Unfortunately, I have some other matters that came

14  up that I have to address.  So if you want to discuss a date

15  amongst yourselves, or several dates, because it looks like

16  we're going to need to continue the hearing.

17             MS. KEDIA:  Judge, what time are we going to go

18  until today?

19             THE COURT:  About one o'clock.

20             MR. SERCARZ:  Your Honor, do I take it that tomorrow

21  is not going to work to continue this?

22             THE COURT:  No.  This week is definitely out.  If

23  you want me -- I actually have the morning of August 16th

24  open, which is next Tuesday, and I currently have the

25  afternoon of August 17th open and I have all day Wednesday,

1  the 24th right now, just so you have several days that you can

2  work with.  I also have the afternoon of Tuesday, August 23rd

3  open.  This is all as of right now and my schedule changes

4  with every passing minute of the day.  Just to give you an

5  idea.

6        MR. LIFSHITZ:  Yes, thank you.

7        THE COURT:  I gather you have two witnesses.

8        MR. LIFSHITZ:  Two witnesses.

9        THE COURT:  And I don't know if the defense wants to

10  put on a case.

11        MR. LIFSHITZ:  I expect we'll finish our direct by

12  one and then the Government will certainly be flexible in

13  scheduling.  Our main logistical issue is transporting the

14  witness who doesn't live in the New York City area.

15        THE COURT:  Well, you'll work that out whatever

16  among those days are best for everybody.

17        MR. SERCARZ:  Thank you, Your Honor.

18        MS. KEDIA:  Thank you.

19        THE COURT:  You're welcome.

20        (Recess taken.)

21        THE COURT:  This is a Fatico hearing continued.  We

22  have the same appearances as this morning.

23        The only thing I want to address before we bring the

24  witness out is in connection with the objection that was last

25  made.  Well, it wasn't really an objection.  Mr. Sercarz had

1 asked to speak with the Government I suppose about the extent

2 of the testimony, if I'm recalling correctly.

3          MR. SERCARZ:  That's right, Your Honor.

4          THE COURT:  So I figured we could discuss that

5 before we bring the witness out.  We'll bring the witness out

6 and then when we break about one o'clock or so we can talk

7 about the schedule.

8          MR. SERCARZ:  We've had the conversation and I've

9 been reassured by Mr. Lifshitz that the line of questioning he

10 is currently intending to pursue deals with crimes committed

11 by this witness and that he will confine himself to any

12 statements allegedly made by my client that were made during

13 the course of the conspiracy, and in particular the acts which

14 the Government has indicated they intend to offer at the

15 Fatico hearing.

16          So until I hear otherwise, I'm satisfied with that.

17          THE COURT:  Okay.

18          MR. LIFSHITZ:  Just to clarify.

19          THE COURT:  Yes, sir.

20          MR. LIFSHITZ:  I'm going to ask him about two

21 extortions involving stockbrokers.  He started testifying

22 about one.

23          THE COURT:  Right, that was one of the topics that

24 was indicated by the Government.

25          MR. LIFSHITZ:  That crime did not involve Michael

Case 1:92-cr-00351-EK Document 846-9 Filed 08/19/21 Page 124 of 635 PageID #: 4431
Case 1:02-cr-00087-DLI Document 846-9 Filed 07/21/26 Page 9 of 34 PageID #: 9026

1   Persico.  It's offered as the witness's Giglio.

2           Then he extorted another stockbroker.  Michael

3   Persico did not participate in that extortion, but it

4   culminated in a discussion between the witness and Alphonse

5   Persico about the fact that the witness owed the loansharking

6   money to Michael Persico.  So that will come up.

7           THE COURT:  I see, all right.

8           So, let's bring out the witness.

9           (Witness resumes the witness stand.)

10          THE COURT:  You may have a seat, sir.  I remind you

11  that you're still under oath.

12          This is continued direct examination by the

13  Government.  You may proceed when you are ready, Mr. Lifshitz.

14          MR. LIFSHITZ:  Thank you, Your Honor.

15  BY MR. LIFSHITZ:

16  Q    Mr. Russo, before the break, do you remember testifying

17  about a man named Arthur Alonzo?

18  A    Yes.

19  Q    Can you remind us what his job was?

20  A    He was a stockbroker.

21  Q    Were you ever involved in a dispute that he was part of?

22  A    Yes.

23  Q    Can you walk us through what happened in that dispute?

24  A    He came to me and Frankie about --

25  Q    Frankie who?

1   A    BF.

2        About a problem he was having going from one firm to

3   another.  He was trying to go to another firm and he was

4   trying to take leads with him as phone numbers of people that

5   buy stock, and basically he lied to us saying that they were

6   his.  We found out later on after everything that the firm

7   usually holds on to the leads once you accumulate leads.

8   Q    What did you and BF do when Arthur Alonzo presented this

9   situation to you?

10  A    We went to the firm he was working for and we tried to

11  get the leads for him, and the owner, we gave him a beating.

12  Q    Who did that?

13  A    Me, BF, couple other guys that were there.

14  Q    Other than this situation, have you ever assaulted anyone

15  else in the stockbroking business?

16  A    Me?

17  Q    Yes.

18  A    Not that I remember.

19  Q    Did you ever become involved in a dispute that Bobby

20  Tarantola was part of?

21  A    Yes, yes, yes.

22  Q    What was the dispute?

23  A    Bobby did something with a stockbroker where the guy beat

24  him for a hundred thousand dollars.

25  Q    Who owed who that money?

1    A    A stockbroker owed Bobby a hundred thousand.

2    Q    How did you get involved?

3    A    Bobby came to me and Frankie.

4    Q    Frankie who?

5    A    BF.

6    Q    What did Bobby say to you and BF?

7    A    He asked us if we would help him get the money back.  He

8    knew where the guy was, where he worked.

9    Q    Did you agree to help him?

10   A    Yes.

11   Q    So what did you and BF do?

12   A    We went with Bobby and laid on the guy in Long Island.

13   Q    Before you did that, did you seek permission from anyone?

14   A    Yeah, we talked to Allie about it.

15   Q    Alphonse Persico?

16   A    Yes.

17   Q    What did you do when you laid on him, as you said?

18   A    We waited for him to come out of work and we caught him

19   coming to his car and we gave him a beating.

20   Q    What happened after that beating?

21   A    The next day I got a phone call from a member of the

22   Gambino family.

23   Q    What was his name?

24   A    Ronnie, Ronnie "One Arm."

25   Q    Ronnie "One Arm"?

1  A    Yeah.

2  Q    What did he say to you?

3  A    He asked me if I would be able to see him that day.

4  Q    Did you agree?

5  A    Yes.

6  Q    What happened when you met him?

7  A    I met him and we discussed -- he asked me what I did the

8  night before, and I was like, "What do you mean by that?"  And

9  he says, "Did you have fun last night?"  And I said, "Yeah.

10  Why, did you?"  I said, "What do you mean by that?"  And he

11  says, "You ran into a friend of mine.  He's missing a watch."

12  And I was like, "Yeah."  I said, "You're talking about the

13  stockbroker kid?"  He said, "Yes."  And I told him the story

14  what happened.

15  Q    What did he say?

16  A    He said he would handle it, "But as of right now, please

17  leave him alone," and I said, "No problem."

18  Q    What happened next in this dispute?

19  A    In the dispute?  Nothing.  Ronnie called me up a couple

20  weeks later.  Well, he came to my house basically, really.  He

21  came to my house one night, he came out to Staten Island, and

22  he told me the kid agreed to pay the money, but he's going to

23  pay it in -- pay 50 one time and a couple weeks later give us

24  the other 50.

25  Q    50,000?

1    A    50,000, yes, sorry.

2    Q    Did that person pay the money?

3    A    Yes, he did.

4    Q    What happened to the money?

5    A    We split it up.

6    Q    Who split it up?

7    A    Me, BF, Bobby.

8    Q    Do you remember who got what amount?

9    A    Yeah.  Bobby got most of it and we were supposed to whack

10   up the 50,000, me, Bobby and BF.

11   Q    What did you take?

12   A    Excuse me?

13   Q    What did you take?

14   A    Well, the first 50 we got on the way home I took 5,000

15   and left, and Bobby and BF, I don't know where they went, but

16   I got a phone call later on that they --

17   Q    From who?

18   A    From BF.

19   Q    What happened?

20   A    Telling me that Allie wanted to see me.

21   Q    Did you go see Allie?

22   A    Yes.

23   Q    What happened when you saw Allie?

24   A    He was upset that I took $5,000.

25   Q    Did he explain to you why he was upset?

Case 1:92-cr-00351-EK Document 46-8 Filed 09/21/18 Page 129 of 635 PageID #: 4436

1  A    Yes.  He said I shouldn't have took anything until he
2  told me I could take it.
3  Q    What was your response to that?
4  A    I gave the 5,000 back.  I told him, "Here, take it."
5  Q    What happened next with the money?
6  A    He said, "I don't want it."  He says, "I'm just telling
7  you this is how it works.  You don't take nothing unless I
8  tell you you could take it."  And he said something to the
9  effect about my mortgage, "You're two months behind, what's
10  another day?"
11  Q    Were you, in fact, behind on your mortgage?
12  A    Yes, I was.
13  Q    What, if anything, did he tell you to do with the $5,000?
14  A    Well, we were going to give him something.  He said he
15  didn't want it.  He said, "You know what, you owe my brother
16  money.  Give it to him."
17  Q    And who did you understand him to be referring to when he
18  said his brother?
19  A    Michael.
20  Q    Did you, in fact, owe Michael Persico money at that time?
21  A    Yes, I did.
22  Q    For what?
23  A    Loansharking.
24  Q    What happened to you in 2000?
25  A    I was arrested.

1   Q    With who?

2   A    With BF.

3   Q    For what?

4   A    A RICO charge.

5   Q    Federal case or state case?

6   A    Federal.

7   Q    In what district?

8   A    Southern.

9   Q    How did the case get resolved?

10  A    I pled out.

11  Q    What was your sentence?

12  A    96 months, I believe.

13  Q    Before you served that sentence, were you ever out on

14  bail?

15  A    Yes.

16  Q    Who, if anyone, did you talk to about money while you

17  were out on bail?

18  A    Well, when I was out on bail, I had a meeting with

19  Michael about money.

20  Q    What did you say to each other?

21  A    Nothing.  He called me up, he wanted to make sure I was

22  all right and if I had anything to look after for -- if he

23  needed anything take care of, he would handle it, and

24  basically we talked about the money I owed him.

25  Q    How much money did you owe him at that point?

 1  A     I really don't remember.  It's 60, 70.

 2  Q     Sixty, 70,000?

 3  A     Seventy, maybe a little more.  I don't remember exactly.

 4  Q     You're talking about thousands of dollars?

 5  A     Yes.

 6  Q     What, if anything, did Michael say about that money?

 7  A     Well, he told me to forget about the money I owed him.

 8  Q     What's your understanding of why he said to forget about

 9  it?

10  A     Well, I believed he was doing it because he knew that I

11  was part of the murder and that he was trying to make me feel

12  like, you know, I'm doing right thing for you, you do the

13  right thing for me, keep your mouth shut.

14  Q     When you served your sentence in that case, did you have

15  a commissary account?

16  A     Yes, I did.

17  Q     What's a commissary account?

18  A     It's an account so you could go to the store and buy some

19  cosmetics and snacks for you to have when you're in prison.

20  Q     Were you able to put money in it at first?

21  A     In my account?

22  Q     Yes.

23  A     When I did the time in 2000?

24  Q     Yes.

25  A     Yes, I was putting my own money in there.

1  Q   Did that change?

2  A   After a few years, yeah.

3  Q   What changed?

4  A   I couldn't afford to put money in my account anymore.

5  Q   So what did you do?

6  A   I wrote a letter to a friend of mine.

7  Q   Who?

8  A   Scotty.

9  Q   Who's Scotty?

10 A   Scotty Reback.

11 Q   What's his position, if any, in organized crime?

12 A   Associate.

13 Q   Of what?

14 A   Colombos.

15 Q   What do you recall saying to him in your letter?

16 A   I don't remember exactly.  I said that I just need help

17 with money, I have no money.

18 Q   What happened next?

19 A   He reached out to my girlfriend, my ex-girlfriend, and he

20 told her to come by once a month and he'd give her 250, $300 a

21 month.

22       At that time, I only had about two years left on my

23 bid anyway, but he gave my girl some money every month.

24 Q   Did the money get deposited in your commissary account?

25 A   Yes, it did.

1  Q    When you were released, who, if anyone, did you talk to

2  about that money?

3  A    On my release, down the road I talked to Scotty about it.

4  I thanked him for it.

5  Q    I'm sorry?

6  A    I said I thanked Scotty for it when I got home.

7  Q    Did you discuss it with anyone else?

8  A    No, not really, no.

9  Q    Did you learn where the money came from?

10  A    Yeah, through Scotty.

11  Q    What did he say?

12  A    He said through the vending machines.  He told me, "Thank

13  Michael 'cause that vending machine, whatever I get out of it

14  I send to you and sometimes to BF."

15  Q    Do you understand what vending machines he was referring

16  to?

17  A    Yeah, the vending machines in his store.

18  Q    Whose store?

19  A    Scotty's.

20  Q    What kind of store does Scotty have?

21  A    It's a dealership, car dealership.

22  Q    After your 2000 arrest in the federal case, in what year

23  were you released?

24  A    From the feds?

25  Q    Yes.

1   A    2007.

2   Q    Were you allowed to live at home?

3   A    In the beginning, no.

4   Q    Where did you live?

5   A    I was in a halfway house.

6   Q    At that time in 2007, did you get any legitimate work?

7   A    Yes.

8   Q    What kind of work?

9   A    I was working for a moving company.

10  Q    Were you actually going to that job?

11  A    Yes.

12  Q    Were you on supervised release at that time?

13  A    Yes.

14  Q    What were some of the conditions you recall?

15  A    Same thing as -- no hanging out with known felons, no

16  possessing firearms, no -- no getting in trouble basically.

17  Q    Did you violate those conditions?

18  A    Every one of them, yes.

19  Q    When you were in the halfway house, who, if anyone, did

20  you talk to about getting inducted into the Colombo family?

21  A    I talked to -- when I got to the halfway house, I talked

22  to my friend Carmine and Andre.

23  Q    Who was Carmine?

24  A    Carmine is Michael's cousin.

25  Q    Is his last name Persico also?

1   A    Yes, it is.

2   Q    And what was his position in the crime family?

3   A    Associate.

4   Q    Did you mention Andre also?

5   A    Yes.

6   Q    What was his position?

7   A    He was a made member.

8   Q    What, if anything, did Andre say to you about getting

9   inducted?

10  A    He said he got a message recently and to tell me that

11  Alphonse, "Allie Boy" wanted to have me straightened out, have

12  me get inducted into the family.

13  Q    By the way, I don't know if I asked you this.

14       What was Alphonse Persico's position in the crime

15  family at this time?

16  A    When I was home and he was home, he was the acting boss,

17  and when I came home 2007, he sent that message down, I

18  considered him the acting boss still.

19  Q    Where was he at that time?

20  A    In prison.

21  Q    Did you actually get inducted in the year 2007?

22  A    No.

23  Q    Did someone in the family explain to you why you didn't

24  get inducted?

25  A    Yes, Andre did.  Andre came and told me that he was

1    trying to work it out with Dino.

2    Q    Dino who?

3    A    I forgot his last name.

4    Q    Is it the Dino you testified about earlier?

5    A    Yes.

6    Q    So what happened?

7    A    He said, "Dino said right now Tommy can't do nothing for

8    you because they got a lot of heat on them and it would be a

9    bad time."

10    Q    Who was Tommy?

11    A    Tommy Gioeli.

12    Q    What was his position?

13    A    He was a street boss.

14    Q    What is a street boss?

15    A    Street boss acts for the boss of the family.  When the

16    boss is not around, he makes basically the little decisions on

17    the street, but when it comes to big decisions, he's got to

18    get permission.

19    Q    When did your supervised release end from your 2000 case?

20    A    I came home August or September, I don't know, July, some

21    time mid to late 2007.  Eleven months later I was off parole.

22    Around November 2008.

23    Q    That's when your supervised release ended?

24    A    Yeah, November, December.

25    Q    At that time, who, if anyone, did you talk to about your

1   possible induction into the Colombo family?

2   A    Andre and I had a conversation with Michael.

3   Q    What did Michael say to you?

4   A    Well, right after I got off parole, he asked to see me.

5   So I went down to see him, and he was basically telling me,

6   "You know what's going on, my brother wants to have you

7   straightened out."  I said, "Yes, I know," and I even asked

8   about BF.

9   Q    You asked him about BF?

10  A    Yeah.  I said, "What about BF?"  He said, "Don't worry

11  about BF right now."

12  Q    What advice, if anyone, did Michael Persico give you

13  about getting inducted?

14  A    He was telling me that I got to change my ways and calm

15  down, walk with a softer stick, speak softer.  Basically

16  telling me how to act.

17  Q    At some point after you were released in 2007, did you

18  own or lease a Nissan automobile?

19  A    Yes.

20  Q    Did you have any problems with it?

21  A    Car was a good car.  No problems.  I just couldn't afford

22  it.

23  Q    So what did you do?

24  A    I talked to a couple friends of mine, told them to -- I

25  need to get rid of the car 'cause I'm not paying the payments

1   on it no more.

2   Q    Did someone do that for you?

3   A    Yes.

4   Q    Who?

5   A    I talked to Ambrose and Roger and they just told me,

6   Ambrose told me, "Leave the car wherever you're going to park

7   it.  Let me know where it's parked and the next day when you

8   go there, you'll see the car will be totalled."  I said,

9   "Okay, thank you."

10  Q    Did that happen?

11  A    Yes.

12  Q    Who were Ambrose and Roger?

13  A    Ambrose and Roger are associates of the Colombo family.

14  Q    After the car was totalled, did that help you?

15  A    Well, it didn't help me any, but it helped me pay the

16  note on the car and get rid of it.

17  Q    You got rid of the debt?

18  A    Yeah.

19  Q    Have you also -- so just to be clear, was that a form of

20  fraud?

21  A    I believe so, yes.

22  Q    Were you also involved in any fraud involving physical

23  injury?

24  A    Yeah, my knee.

25  Q    What happened?

1   A    I hurt my knee really bad and I needed a surgery and I

2   didn't have insurance.  So, I was talking to a friend of mine

3   one day.  He told me, "You know, just claim that you fell in

4   front of my house and we'll go through the insurance that way

5   this way you get your knee fixed."

6   Q    Did you claim to insurance that you fell in front of your

7   friend's house?

8   A    Yes, I did.

9   Q    Was that true?

10  A    No.

11  Q    Did you get money for it from insurance?

12  A    Yes.

13  Q    Did you ever interfere in a criminal case involving a son

14  of yours?

15  A    Yes, yes, yes, yes.

16  Q    What was your son accused of doing?

17  A    My son Anthony was accused of selling a pound of weed.

18  Q    What did you do?

19  A    I threatened the kid he was with and his family to tell

20  him to take the rap for it.

21  Q    Was that kid a co-defendant?

22  A    Yes, he was.

23  Q    In 2007 how did you make money?

24  A    I was -- I was working legitimately and I was starting my

25  business again, the loansharking.

1   Q    At that time, who did you get money from to loan shark?

2   A    Anthony Stropoli.

3   Q    Were you eventually inducted into the Colombo family?

4   A    Yes.

5   Q    When?

6   A    2009.

7   Q    What time of year?

8   A    It was beginning of the year.

9   Q    After your induction, were you assigned to report to

10  anyone?

11  A    Yes.

12  Q    To who?

13  A    To "Teddy Boy."

14  Q    Teddy Persico, Junior?

15  A    Yes.

16  Q    What was his position?

17  A    At the time, he was a captain.

18  Q    Did he have an acting captain for him at that time?

19  A    No, but he needed one.

20  Q    Did he come to have one?

21  A    Yes.

22  Q    Who was his -- who became his acting captain?

23  A    Anthony Stropoli.

24  Q    Was Teddy Persico, Junior in prison at that time?

25  A    No.

1   Q    So why did he need the acting captain?

2   A    Because they wanted to keep him safe.

3   Q    Just to be clear, right after you were inducted, what was

4   your position in the Colombo family?

5   A    I was a made member.

6   Q    Did that change?  Did you come to assume another

7   position?

8   A    Yeah, down the road, yes.

9   Q    What position did you come to hold?

10  A    Acting captain for Teddy.

11  Q    Around when did you become acting captain for Teddy?

12  A    I don't know, 2010 something.  I don't remember.

13  Q    How did that happen?

14  A    Andrew wanted me to take his position from Anthony

15  Stropoli.

16  Q    Andrew who?

17  A    Russo.

18  Q    Is he related to you?

19  A    No.

20  Q    What was his position in the crime family?

21  A    He was the acting boss.

22  Q    Sorry, in 2010 was he the acting boss?

23  A    Yes.

24  Q    After you became acting captain, who, if anyone, was

25  around you?

 1  A     There was a bunch of guys with me: Joey Savarese, Tommy

 2  McLaughlin, "Fat Larry," BF.  I can't think of them all.

 3  Roger, Ambrose.

 4  Q     What was Joe Savarese's position in the crime family?

 5  A     He was a made member.

 6  Q     And the other people you mentioned, McLaughlin, "Fat

 7  Larry," BF, Roger and Ambrose, what were their positions?

 8  A     They were all associates.

 9  Q     In or around 2009, did you open a legitimate business?

10  A     Tried to, yes.

11  Q     With who?

12  A     With Frankie, BF.

13  Q     What business did you open or try to open?

14  A     Car detailing products.

15  Q     What was it called?

16  A     Maximum Car Protection.

17  Q     How did you and BF get money to start the business?

18  A     Well, Frankie laid out some money that he had and we

19  borrowed the rest.

20  Q     From who?

21  A     Well, we asked Michael about it and he -- he shifted it

22  over to Scotty.  He told us go see Scotty, Scotty will help

23  you out.

24  Q     The Michael you mentioned was Michael Persico?

25  A     Yes.

1  Q    And Scotty was Scotty who?

2  A    Scotty Reback.

3  Q    Did Scotty give you money?

4  A    Yes.

5  Q    Did you actually open this business?

6  A    Yes, we did.

7  Q    Where was it located?

8  A    On 11th Avenue and 67th, 68th Street.

9  Q    In Brooklyn?

10  A    Yes.

11  Q    What space was that?

12  A    It was a garage.

13  Q    Whose garage was it?

14  A    It was Michael's garage.

15  Q    What had it been used for previously?

16  A    It was where he used to keep his limousines.

17  Q    How did you get access to that space?

18  A    I asked -- we asked Michael if he knew of a spot.  I

19  think Frankie asked him if he knew if he could help us out

20  with a garage or something.  He told us we could use the

21  garage, but his brother-in-law had stuff in there.  So if we

22  could share the space, it would be good for both of us.

23          MR. SERCARZ:  Could we have a time frame?

24          THE COURT:  About what year was this?

25          THE WITNESS:  2010, the end of '9, 2009, beginning

1    of '10, around there.

2              MR. SERCARZ:  I'm sorry, I didn't hear the answer.

3              THE COURT:  2009 to 2010, beginning of 2010.

4              MR. SERCARZ:  Thank you, Your Honor.

5              THE COURT:  We need you to keep your voice up a

6    little bit.

7              THE WITNESS:  Thank you.

8    BY MR. LIFSHITZ:

9    Q    What else, if anything, did you ask Michael Persico for

10   at that time?

11   A    I have no clue besides asking him about that.

12   Q    Well, let me ask a different question.

13             Did you need any additional help starting up your

14   business?

15   A    Yeah, if we wanted -- we wanted to get some -- we wanted

16   to get the business going.  We asked him if we could -- he

17   could reach -- he could reach out to John Staluppi and Rosatti

18   so we could get their dealerships and put our products in

19   them.

20   Q    Who were John Staluppi and John Rosatti?

21   A    Rosatti and Staluppi are made members of the Colombo

22   crime family.

23   Q    Just to be clear, who did you ask to reach out to those

24   two guys?

25   A    We asked Michael.

1  Q    Aside from being members of the Colombo family, did

2  Staluppi and Rosatti own legitimate businesses?

3  A    Yes, they do.

4  Q    What kind?

5  A    Car dealerships.

6  Q    What did Michael Persico say when you asked him for help

7  contacting Staluppi and Rosatti?

8  A    He said no problem.

9  Q    Did you get any business through Staluppi or Rosatti?

10  A    Yes, we did.

11  Q    Which one or was it both?

12  A    Rosatti, we got most of his dealerships on Nostrand

13  Avenue.  Staluppi, we got a couple.

14  Q    Were you satisfied with Staluppi's help?

15  A    Not me, no.

16  Q    So what did you do?

17  A    I kept on asking him, you know, and he kept on saying --

18  I kept on asking Michael and I was telling BF, you know, you

19  got to keep going there, we got to try to get more of these

20  dealerships, and I told Michael and he said he would take care

21  of it, he would go back and talk to them, see if we could get

22  some more, and basically I didn't want to bother him anymore,

23  so.

24  Q    Bother who?

25  A    Michael.

1  Q    So what did you do?

2  A    'Cause he was busy doing his own thing.

3  Q    So what did you do?

4  A    So I met Scotty one day, we were just bullshitting around

5  and I asked him instead of me going to Michael all the time

6  and breaking his chops, "Why don't you just do the right

7  thing, go see your father-in-law and tell him to do the right

8  thing for us."

9  Q    Scotty who?

10 A    Scotty Reback.

11 Q    Who was Scotty Reback's father-in-law?

12 A    John Staluppi.

13 Q    So you were asking Reback to go to Staluppi?

14 A    Yes.

15 Q    What did Scotty Reback say to you?

16 A    He says, "All right, I'll see what I can do."

17 Q    What happened next?

18 A    He went and told Michael.

19 Q    How do you know?

20 A    And Michael took it as I was going behind his back.

21 Q    Who told you that?

22 A    Who told me that?

23 Q    Yes.

24 A    Well, Teddy did.

25 Q    Teddy who?

1   A    Teddy Persico, his cousin.

2   Q    What did Teddy say about that?

3   A    I got a phone call from his brother-in-law Angelo and

4   told me to come down, meet him down in Greenpoint.  They were

5   at one of the feasts down there.

6   Q    Whose brother-in-law is Angelo?

7   A    Michael's brother-in-law Angelo.

8   Q    What's his last name?

9   A    Spata.

10  Q    So he called you to meet?

11  A    Yes, he told me to come down, he wanted to see me.  When

12  I got down there, Teddy was down there.

13  Q    So, when you went to meet at the feast, who did you see?

14  A    I went to meet him, I met Angelo.  We went to a little

15  restaurant in the back and I didn't know Teddy was there.

16  When I got there "Teddy Boy" was there.  Me and BF was there.

17  Q    What happened at the meeting?

18  A    We started talking.  Teddy told me, "What did you do?"  I

19  said, "I don't know.  I do a lot of things.  What did I do?"

20  And he said, "You went behind my cousin's back and tried to

21  reach out to Staluppi."  And I was like, "How did I do that?"

22  He says, "You went to Scotty."  I said, "Scotty's our friend.

23  How am I going behind his back by going to Scotty?  It's his

24  father-in-law."  And he made a big thing out of it.

25  Q    Who made a big thing out of it?

1   A     Teddy.  He got upset with me, "Don't ever do it again.

2   The only body reaches out to Staluppi is my cousin Michael."

3   I said, "Okay."

4   Q     What, if anything, did Spata say at this meeting?

5   A     Spata.  Spata said, I remember right, he said something

6   about to the effect that, "You know you only listen to my

7   father-in-law, "Allie Boy," and my cousin Michael -- my

8   brother-in-law Michael."  And I turned around and I said, "I

9   listen to "Teddy Boy."

10  Q     You testified about a Colombo family member named Anthony

11  Stropoli.

12           Do you recall that?

13  A     Excuse me?

14  Q     Do you recall testifying about Anthony Stropoli?

15  A     Yes.

16  Q     Was he a member of the crime family, Colombo crime

17  family?

18  A     Yes.

19  Q     Did he have a legitimate business?

20  A     Yes.

21  Q     What was it?

22  A     Fish company.

23  Q     What did he sell?

24  A     Fish.

25  Q     To who?

1   A    Restaurants, hotels.

2   Q    Like a wholesale business?

3   A    Wholesale, yes.

4   Q    Did you ever try to go into a legitimate business with

5   Stropoli?

6   A    Yes.

7   Q    What kind of business?

8   A    Valet parking.

9   Q    Valet park?

10  A    Yes.

11  Q    Where did you and Stropoli want to do that?

12  A    We were going to try to get something going in New

13  Jersey.

14  Q    Why New Jersey?

15  A    Because that's where most of his business was, his

16  restaurants that he dealt with.

17  Q    Who, if anyone, did you and Stropoli go to for advice?

18  A    Well, after me and Anthony talked about going into

19  business doing that, he directed me to a kid named Anthony, I

20  forgot his last name.  He ran a couple of valet parking

21  systems and so we reached out to him.  I went to meet him.

22  Q    Where did you understand his valet business was?

23  A    Well, I knew he had a company, the kid Anthony had a

24  couple in Staten Island.

25  Q    Did you actually meet Anthony?

1    A    Yeah.

2    Q    What happened?

3    A    Well, when I got there to meet him, Michael was there.

4    Q    Michael who?

5    A    Persico.

6    Q    And what happened?

7    A    Michael asked me what was going on, "I heard you want to

8    open up a business."  I said, "Yeah."  And he says, you know,

9    he was, "Why would you want to go into the valet parking

10   business?"  I said, "'Cause I want to do something legit."

11             MR. SERCARZ:  Again may we have a time frame?

12             THE COURT:  Yes.

13             About what time did this happen, the years?

14             THE WITNESS:  I don't -- it's either 2010.

15             THE COURT:  2010?

16             THE WITNESS:  '9, '10, around that.

17             THE COURT:  2009, 2010.

18   BY MR. LIFSHITZ:

19   Q    I'm sorry, can you repeat what Michael Persico said to

20   you?

21   A    He said a lot of things I don't remember exactly, but I

22   know he said to me, 'cause I got upset when he says, "How

23   about if I open up a -- how would Anthony and you like if I

24   opened up a -- a fish company?"

25   Q    What did you understand that to mean?

1  A    He was being cute.  So I turned around and told him, "Go

2  ahead, open up a fish company."

3  Q    What else did Michael Persico say to you?

4  A    He said, "Why don't you make your life easier, you know,

5  just by doing right -- you know, give us the valet -- do the

6  hotels and the restaurants that you're going to go to.  Let us

7  go there and put our valet there and you guys just sit back

8  and collect a check.  Give you like 20 percent of every

9  company, you know, every place you give us."

10 Q    Did you then go out and try to get business for Anthony

11 and Michael's valet business?

12 A    After I went back and talked to Anthony about it and told

13 him and Anthony said he didn't want to be bothered and then we

14 said yeah, we'll just try to get him some business.

15 Q    Where did you do that?

16 A    Jersey.

17 Q    Did you get him any specific business that you recall?

18 A    One restaurant, maybe two.  I don't remember exactly the

19 name of the restaurant.  It was in Red Bank somewhere.

20 Q    What kind of restaurant?

21 A    I think it's an Italian restaurant.

22 Q    Did you ultimately start your own valet business with

23 Anthony Stropoli?

24 A    No.

25 Q    Why not?

1   A    Because we didn't want problems, me and Anthony.

2   Q    What kind of problems?

3   A    Any kind of problem.

4   Q    From who?

5   A    From Michael.

6   Q    What happened to you in January 2011?

7   A    I was arrested.

8   Q    Federal or state case?

9   A    Federal.

10  Q    What were the most serious crimes you were charged with?

11  A    Murder.

12  Q    Were you charged with a racketeering case?

13  A    Racketeering act, yeah.

14  Q    The murder of who?

15  A    Joey Scopo.

16  Q    What did you decide to do in your case?

17  A    Cooperate.

18  Q    How soon after you were arrested did you decide to

19  cooperate?

20  A    Twenty minutes, half-hour.

21  Q    After you were arrested, were you incarcerated?

22  A    Yes, I was.

23  Q    And were you in jail throughout the pendency of your

24  case?

25  A    Yes, I was.

1  Q    At times after you began cooperating, did the Government

2  provide you some commissary money?

3  A    Yeah.

4  Q    Did you ultimately plead guilty?

5  A    Yes, I did.

6  Q    What were the most serious crimes you pled guilty to?

7  A    Murder, murder conspiracy, gun charge, drugs,

8  racketeering.

9  Q    When you pled guilty, what was the maximum sentence you

10 faced?

11 A    Life.

12 Q    Did you sign a cooperation agreement?

13 A    Yes, I did.

14 Q    What was your understanding of what you had to do under

15 that agreement?

16 A    The agreement that I had to tell the truth, everything,

17 all the truth, and pray to God that the judge understood.

18 Q    And if you fulfilled --

19 A    And give me less time than life.

20 Q    So, if you fulfilled your obligations, what did you

21 believe the Government was obligated to do?

22 A    They weren't obligated to do anything except give me

23 that, you know, the okay, the 5K1 letter.

24 Q    What is your understanding of what a 5K1 letter is?

25 A    It's a cooperating agreement that the judge can look at

1   and go under the guidelines if I did everything I was supposed

2   to do by cooperating, telling the truth.

3   Q    Were you supposed to pay forfeiture under your agreement?

4   A    Yes.

5   Q    Have you done that?

6   A    No.

7   Q    Why not?

8   A    'Cause I don't have the money.

9   Q    After you pled guilty, don't tell us where you went, but

10  were you ever placed in a special kind of facility?

11  A    Yes.

12  Q    What's that called?

13  A    WITSEC.

14  Q    And other than in jail, have you been part of any WITSEC

15  program?

16  A    No.

17  Q    After you pled guilty in your 2011 case, did you

18  eventually testify in court?

19  A    Yes.

20  Q    Was that here in this courthouse?

21  A    In this courthouse, yes.

22  Q    At whose trial?

23  A    Frank Guerra.

24  Q    After you testified, were you sentenced?

25  A    Yes, I was.

1  Q    When you were sentenced, did the Government provide the

2  judge a 5K letter?

3  A    Yes, they did.

4  Q    Do you recall when you were sentenced?

5  A    October 16th.

6  Q    Of what year?

7  A    2013.

8  Q    And what was your sentence?

9  A    Time served.

10 Q    So about how much time did you serve in total?

11 A    I served 33, 34 months.

12 Q    Without telling us where you lived, after you were

13 released, did the Government provide you some help with moving

14 expenses?

15 A    Yeah, they moved my family, yeah.

16 Q    And why are you testifying here today?

17 A    Under the agreement, I have to testify.

18       MR. LIFSHITZ:  No further questions, Your Honor.

19       THE COURT:  So, sir, I'm going to direct you that

20 since we are going to continue this hearing on a different day

21 that you cannot discuss your testimony any further with the

22 Government.  You certainly will be able to discuss scheduling,

23 but that's about it, okay, not your testimony.  And I'm sure

24 the Government will let you know when we're going to need you

25 back here in court to continue the testimony.

1          So, you're excused.

2          THE WITNESS:  Thank you.

3          (The witness leaves the witness stand.)

4          THE COURT:  Did the parties have an opportunity to

5   discuss scheduling?

6          I know it's so hard to kill the impulse to stand,

7   but if you'll just bear with me, it's the marble.  It's

8   something about the acoustics of the room, it's hard for us to

9   hear you and hard for the audience to hear if you're not

10  seated and speaking into the microphone.  I kind of do miss

11  that old habit of standing up, the old protocols, but I'd

12  rather have a clear record.

13         MR. SERCARZ:  I miss it too.  It's good for my

14  joints.

15         THE COURT:  Yes, I can relate to that, absolutely.

16         MR. SERCARZ:  Your Honor, would the 24th work?

17  We've discussed it.  It's a day when all the attorneys seem to

18  be free of conflicts.

19         THE COURT:  And I do have the whole day available

20  right now so that we can go to the end.

21         If the parties would like, I would imagine that,

22  since the Government took all morning to present its case,

23  that it's only fair to assume that the defense might go equal

24  time.  Plus there might be redirect and recross.  If you like,

25  I can just reserve time on the following day, August 25th,

1    which is a Thursday.  If the parties want to just block off

2    some time in the off chance that we need some spillover time,

3    because otherwise I can't guarantee that the days won't get

4    full.

5    　　　　　MR. SERCARZ:  I think that we should do that.

6    　　　　　MS. KEDIA:  I think that makes sense, Judge.

7    　　　　　THE COURT:  Is that good for the Government as well?

8    　　　　　MR. LIFSHITZ:  Yes, Your Honor.

9    　　　　　THE COURT:  All right.  So, for the 24th we'll start

10   at 10 o'clock and continue the hearing.  Then on the 25th I do

11   have one matter in the morning, but it's not going to be very

12   long.  We can start at 11 o'clock and I can leave the rest of

13   the day clear for this case so that we can finish up.

14   　　　　　MR. SERCARZ:  Thank you, Your Honor.

15   　　　　　THE COURT:  If we don't need it, we don't need it,

16   but I'd rather reserve it now just because I know not only my

17   schedule, but I know you're all busy attorneys and I'm sure

18   your schedules get pretty busy as well.

19   　　　　　All right.  Thank you all very much.

20   　　　　　(Time noted:  12:57 p.m.)

21   　　　　　(Proceedings were adjourned to August 24, 2016, at

22   10:00 a.m.)

23

24

25

I N D E X

WITNESS                                    PAGE


    ANTHONY RUSSO

        DIRECT EXAMINATION

        BY MR. LIFSHITZ                        10

132

# **E X H I B I T S**

| | |
|---|---|
| Government's Exhibit 156 | 21 |
| Government's Exhibit 152B | 25 |
| Government's Exhibit 155 | 26 |
| Government's Exhibit 167 | 26 |
| Government's Exhibit 130A | 29 |
| Government's Exhibit 112B | 37 |
| Government's Exhibit 176 | 39 |
| Government's Exhibit 151 | 47 |

## $

**$30,000** [1] - 76:15
**$300** [1] - 105:20
**$5,000** [2] - 101:24, 102:13
**$8,000** [1] - 77:6

**'10** [2] - 117:1, 123:16
**'82** [1] - 29:7
**'83** [2] - 29:7, 29:8
**'86** [1] - 18:6
**'87** [1] - 18:6
**'90s** [3] - 81:12, 85:20, 93:8
**'92** [1] - 23:24
**'93** [3] - 52:6, 74:11
**'94** [2] - 45:5, 68:12
**'96** [2] - 71:10, 74:12
**'97** [1] - 71:10
**'99** [2] - 87:1

## 1

**1** [1] - 4:24
**10** [3] - 1:5, 130:10, 131:6
**10-CR-147** [2] - 1:2, 2:3
**10010** [1] - 1:20
**10019** [2] - 1:16, 1:18
**101st** [1] - 50:21
**109th** [2] - 52:9, 52:12
**10:00** [2] - 1:6, 130:22
**11** [1] - 130:12
**110th** [2] - 52:10, 52:12
**111th** [2] - 52:9
**11201** [1] - 1:13
**112B** [4] - 37:1, 37:8, 37:12, 132:14
**11th** [7] - 27:3, 27:4, 27:12, 27:13, 33:8, 79:5, 116:8
**12:57** [1] - 130:20
**130A** [5] - 28:15, 28:18, 28:22, 29:1, 132:12
**13th** [1] - 76:13
**14** [1] - 3:11
**14th** [2] - 27:18, 45:15
**15** [2] - 12:21, 17:19
**150,000** [2] - 74:18, 74:21
**1500** [1] - 74:25
**151** [5] - 47:2, 47:6, 47:8, 47:12, 132:18
**152B** [4] - 24:21, 25:5, 25:9, 132:6
**155** [4] - 25:17, 26:1, 26:5, 132:8
**156** [4] - 20:13, 20:24, 21:4, 132:4

**16** [2] - 12:21, 17:19
**167** [4] - 26:7, 26:12, 26:16, 132:10
**16th** [2] - 94:23, 128:5
**176** [6] - 38:22, 39:2, 39:11, 39:14, 39:19, 132:16
**17th** [2] - 4:17, 94:25
**18th** [4] - 82:16, 82:21, 83:1, 85:2
**1982** [1] - 29:8
**1987** [1] - 18:21
**1990s** [4] - 85:18, 89:23, 90:1, 90:3
**1992** [6] - 23:24, 26:25, 28:6, 29:16, 30:11, 34:10
**1993** [4] - 31:16, 32:5, 33:6, 33:18

## 2

**2** [2] - 35:24, 88:1
**20** [1] - 124:8
**20-year** [1] - 87:16
**200** [1] - 74:15
**200,000** [1] - 74:18
**2000** [6] - 87:1, 102:24, 104:23, 106:22, 109:19
**2007** [7] - 107:1, 107:6, 108:17, 108:21, 109:21, 110:17, 112:23
**2008** [1] - 109:22
**2009** [5] - 113:6, 115:9, 116:25, 117:3, 123:17
**2010** [10] - 5:14, 88:7, 114:12, 114:22, 116:25, 117:3, 123:14, 123:15, 123:17
**2011** [4] - 12:23, 29:15, 125:6, 127:17
**2013** [1] - 128:7
**2014** [1] - 5:21
**2016** [3] - 1:5, 88:1, 130:21
**20s** [2] - 12:1, 12:16
**21** [1] - 132:4
**22nd** [1] - 1:20
**23rd** [1] - 95:2
**24** [1] - 130:21
**24th** [3] - 95:1, 129:16, 130:9
**25** [1] - 132:6
**250** [1] - 105:20
**25th** [2] - 129:25, 130:10
**26** [2] - 132:8, 132:10
**271** [1] - 1:12
**29** [1] - 132:12
**29th** [1] - 3:9

## 3

**30** [1] - 57:5
**33** [1] - 128:11
**34** [1] - 128:11
**35,000** [2] - 83:7, 83:8
**37** [1] - 132:14
**39** [1] - 132:16

## 4

**47** [1] - 132:18
**4th** [1] - 88:1

## 5

**5** [1] - 1:20
**5,000** [2] - 101:14, 102:4
**50** [3] - 100:23, 100:24, 101:14
**50,000** [3] - 100:25, 101:1, 101:10
**55** [1] - 11:8
**5K** [1] - 128:2
**5K1** [2] - 126:23, 126:24

## 6

**60** [1] - 104:1
**613-2596** [1] - 1:23
**613-2648** [1] - 1:24
**620** [2] - 1:15, 1:18
**67th** [2] - 27:13, 116:8
**68th** [1] - 116:8

## 7

**7** [1] - 74:12
**70** [2] - 85:3, 104:1
**70,000** [1] - 104:2
**718** [2] - 1:23, 1:24
**75,000** [3] - 82:7, 82:22, 85:3
**7B** [1] - 1:20

## 8

**810** [2] - 1:15, 1:18
**86th** [3] - 27:18, 27:20, 45:15

## 9

**9** [2] - 116:25, 123:16
**96** [1] - 103:12

## A

**a.m** [2] - 1:6, 130:22
**able** [5] - 45:19, 72:7, 100:3, 104:20, 128:22
**above-referred** [8] - 20:16, 24:22, 25:18, 26:8, 28:16, 37:2, 38:24, 47:4
**absolutely** [1] - 129:15
**access** [2] - 7:15, 116:17
**according** [2] - 3:14, 69:2
**accordingly** [1] - 3:19
**account** [6] - 104:15, 104:17, 104:18, 104:21, 105:4, 105:24
**accumulate** [1] - 98:7
**accused** [2] - 112:16, 112:17
**acknowledge** [1] - 2:24
**acoustics** [1] - 129:8
**acquire** [1] - 84:23
**act** [2] - 110:16, 125:13
**acting** [19] - 13:4, 13:6, 14:3, 14:7, 14:11, 25:15, 30:19, 30:20, 108:16, 108:18, 113:18, 113:22, 114:1, 114:10, 114:11, 114:21, 114:22, 114:24
**activities** [1] - 6:25
**acts** [3] - 88:7, 96:13, 109:15
**Adam** [1] - 2:6
**addendum** [1] - 2:25
**addition** [1] - 12:15
**additional** [4] - 3:13, 6:24, 7:25, 117:13
**address** [3] - 5:7, 94:14, 95:23
**adjourned** [1] - 130:21
**adjust** [1] - 9:19
**adjustable** [1] - 9:21
**administration** [2] - 13:22, 13:25
**administration's** [1] - 14:1
**admit** [8] - 20:24, 25:5, 26:1, 26:12, 28:22, 37:8, 39:14, 47:8
**admitted** [7] - 21:2, 25:8, 26:4, 28:25, 37:11, 39:18, 47:11
**advance** [1] - 38:1
**advice** [3] - 74:4, 110:12, 122:17
**advise** [1] - 7:7
**advisor** [1] - 16:2
**afford** [2] - 105:4, 110:21
**afield** [1] - 87:23
**afraid** [1] - 70:5
**afternoon** [3] - 94:13,

94:25, 95:2
**age** [4] - 11:16, 12:21, 12:22, 17:17
**Agent** [1] - 2:6
**agents** [1] - 84:8
**ago** [2] - 43:8, 74:20
**agree** [5] - 7:6, 46:19, 87:24, 99:9, 100:4
**agreed** [1] - 100:22
**agreement** [8] - 6:19, 7:5, 126:12, 126:15, 126:16, 126:25, 127:3, 128:17
**ahead** [4] - 31:16, 42:7, 78:17, 124:2
**aided** [1] - 1:25
**albi** [1] - 50:3, 50:7
**allegations** [1] - 87:21
**alleged** [3] - 6:19, 6:24, 7:1
**allegedly** [1] - 96:12
**Allie** [39] - 49:16, 61:23, 62:8, 62:20, 68:8, 68:19, 68:22, 69:1, 69:2, 69:6, 69:12, 69:14, 69:17, 70:1, 70:14, 70:23, 70:25, 71:3, 71:4, 71:5, 71:13, 71:24, 72:10, 78:4, 78:11, 78:13, 78:14, 78:15, 78:20, 78:21, 79:13, 90:22, 99:14, 101:20, 101:21, 101:23, 108:11, 121:7
**ALLON** [1] - 1:13
**Allon** [1] - 2:5
**allowed** [2] - 71:13, 107:2
**almost** [5] - 15:6, 35:14, 35:16, 35:17, 49:8
**alone** [1] - 100:17
**Alonzo** [4] - 93:1, 94:3, 97:17, 98:8
**Alphonse** [16] - 21:19, 25:1, 25:2, 25:13, 49:17, 49:19, 49:22, 50:5, 50:6, 50:7, 68:7, 78:6, 97:4, 99:15, 108:11, 108:14
**Altima** [1] - 54:24
**ambiguity** [1] - 23:20
**Ambrose** [6] - 111:5, 111:6, 111:12, 111:13, 115:3, 115:7
**ambulance** [1] - 12:17
**ambulette** [1] - 12:17
**AMERICA** [1] - 1:2
**amount** [1] - 101:8
**Anastasio** [4] - 76:18, 76:20, 76:21, 76:25
**Andre** [10] - 90:17, 90:20, 90:21, 90:24, 107:22, 108:4, 108:8, 108:25, 110:2
**Andrew** [2] - 114:14, 114:16
**Angelo** [4] - 120:3, 120:6,

120:7, 120:14
**Ann** [2] - 1:21, 2:7
**answer** [3] - 36:18, 50:1, 117:2
**answers** [1] - 32:23
**Ant** [1] - 78:22
**Anthony** [34] - 8:20, 8:21, 9:11, 9:13, 28:8, 34:2, 34:24, 38:16, 80:17, 80:20, 83:20, 83:21, 83:22, 86:3, 86:4, 90:5, 90:7, 91:24, 112:17, 113:2, 113:23, 114:14, 121:10, 121:14, 122:18, 122:19, 122:23, 122:25, 123:23, 124:10, 124:12, 124:13, 124:23, 125:1
**ANTHONY** [2] - 9:6, 131:4
**anyway** [2] - 88:22, 105:23
**appeal** [2] - 6:8, 6:10
**appearance** [2] - 5:12, 8:1
**appearances** [2] - 2:4, 95:22
**appeared** [1] - 7:12
**Apple** [1] - 12:6
**appreciate** [1] - 7:9
**approach** [1] - 94:4
**approached** [3] - 60:14, 60:17, 91:20
**appropriate** [1] - 6:16
**area** [3] - 50:16, 94:5, 95:14
**argue** [1] - 42:7
**argument** [1] - 63:2
**Arm** [2] - 99:24, 99:25
**arrest** [4] - 18:21, 31:20, 86:25, 106:22
**arrested** [20] - 12:23, 18:3, 18:7, 18:12, 18:24, 29:15, 31:19, 31:21, 31:22, 32:5, 86:20, 86:21, 86:24, 87:1, 87:5, 88:12, 102:25, 125:7, 125:18, 125:21
**arriving** [3] - 54:20, 54:21, 54:22
**Arthur** [4] - 93:1, 94:3, 97:17, 98:8
**aside** [1] - 118:1
**assault** [4] - 18:25, 19:1, 71:11, 76:8
**assaulted** [1] - 98:14
**assigned** [1] - 113:9
**Assistant** [1] - 1:14
**associate** [23] - 13:4, 14:16, 14:17, 14:22, 15:6, 15:11, 16:8, 17:8, 32:12, 32:13, 32:14, 32:16, 37:17, 40:17, 59:5, 59:17, 80:14, 88:5, 89:5, 90:7, 90:22, 105:12, 108:3
**associated** [2] - 12:25, 23:5

**associates** [10] - 13:21, 14:19, 14:24, 15:15, 34:4, 42:9, 84:1, 88:7, 111:13, 115:8
**associating** [3] - 23:7, 23:9, 29:21
**association** [1] - 87:18
**assume** [2] - 114:6, 129:23
**attention** [6] - 6:15, 60:19, 88:15
**Attorney** [2] - 1:11, 1:14
**attorneys** [2] - 129:17, 130:17
**audience** [1] - 129:9
**August** [9] - 1:5, 4:17, 88:1, 94:23, 94:25, 95:2, 109:20, 129:25, 130:21
**automatic** [1] - 56:15
**automobile** [1] - 110:18
**available** [1] - 129:19
**Avenue** [20] - 1:15, 1:18, 27:3, 27:4, 27:12, 27:13, 27:18, 33:8, 45:15, 50:21, 52:9, 52:12, 76:13, 79:5, 82:16, 82:21, 83:1, 85:2, 116:8, 118:13
**aware** [2] - 5:13, 5:24

## B

**backing** [2] - 55:11, 88:11
**backs** [1] - 55:16
**backseat** [3] - 44:18, 53:1, 58:22
**backup** [1] - 53:3
**bad** [2] - 109:9, 112:1
**badly** [2] - 19:10, 19:12
**bag** [7] - 40:15, 41:3, 43:17, 43:21, 57:10
**bail** [3] - 103:14, 103:17, 103:18
**Bank** [1] - 124:19
**based** [5] - 3:9, 6:2, 13:5, 13:8, 87:25
**basement** [3] - 65:2, 65:3, 65:4
**basis** [2] - 13:10, 32:20
**Bay** [1] - 81:14
**bear** [2] - 4:16, 129:7
**beat** [8] - 19:2, 19:3, 19:6, 19:8, 19:10, 76:16, 98:23
**beating** [2] - 12:2, 76:13, 77:10, 78:22, 98:11, 99:19, 99:20
**became** [9] - 18:2, 34:11, 38:13, 38:14, 38:19, 83:19, 90:12, 113:22, 114:24
**become** [17] - 16:8, 16:11, 16:15, 17:3, 17:8, 17:17,

17:20, 17:22, 34:5, 34:9, 47:14, 47:19, 61:15, 81:13, 93:5, 98:19, 114:11
**beef** [1] - 78:11
**BEFORE** [1] - 1:8
**began** [2] - 30:11, 126:1
**begin** [1] - 11:16
**beginning** [12] - 5:14, 5:19, 73:22, 75:2, 75:9, 75:24, 86:10, 87:1, 107:3, 113:8, 116:25, 117:3
**behalf** [1] - 8:23
**behind** [11] - 44:18, 48:18, 51:11, 51:16, 51:17, 53:11, 102:9, 102:11, 119:20, 120:20, 120:23
**beige** [1] - 54:1
**believes** [1] - 6:15
**best** [1] - 95:16
**Better** [1] - 4:6
**better** [1] - 93:14
**Betts** [2] - 1:21, 2:7
**between** [5] - 21:13, 21:20, 24:10, 52:9, 97:4
**BF** [101] - 28:7, 28:9, 34:1, 34:24, 35:10, 36:9, 38:9, 38:15, 40:10, 40:11, 40:14, 40:20, 40:23, 40:24, 41:12, 41:15, 41:23, 41:24, 42:2, 42:16, 42:22, 43:4, 43:21, 44:14, 46:1, 46:4, 46:18, 46:25, 48:2, 51:13, 52:20, 52:25, 53:10, 53:11, 57:9, 58:16, 60:21, 63:17, 64:14, 64:18, 66:3, 66:21, 67:6, 68:15, 68:16, 68:18, 68:19, 68:22, 69:2, 69:5, 69:16, 69:18, 69:21, 69:23, 70:9, 70:15, 70:17, 70:20, 71:6, 73:8, 73:9, 75:8, 76:4, 77:5, 77:17, 78:13, 82:24, 83:18, 83:20, 91:19, 91:23, 92:5, 92:7, 92:8, 92:11, 92:16, 93:4, 93:11, 98:1, 98:8, 98:13, 99:5, 99:6, 99:11, 101:7, 101:10, 101:15, 101:18, 103:2, 106:14, 110:8, 110:9, 110:10, 110:11, 115:2, 115:7, 115:12, 115:17, 118:18, 120:16
**BF's** [1] - 28:12
**bid** [1] - 105:23
**big** [9] - 41:3, 48:10, 59:7, 60:25, 65:7, 109:17, 120:24, 120:25
**Big** [7] - 78:25, 79:1, 79:2, 79:3, 79:4, 79:5, 79:7
**Bill** [9] - 31:11, 34:15, 34:16, 34:23, 35:7, 35:19,

35:20, 44:4, 44:8

**Billy** [4] - 43:25, 44:1, 44:3, 44:15

**bit** [4] - 38:20, 66:5, 86:18, 117:6

**BJ** [1] - 65:8

**black** [1] - 41:3

**blew** [2] - 56:8, 56:18

**block** [12] - 44:14, 48:4, 48:5, 48:19, 48:21, 48:22, 49:9, 51:7, 51:8, 85:8, 130:1

**blocking** [1] - 53:12

**blocks** [1] - 57:19

**blow** [1] - 65:15

**blue** [1] - 11:2

**Bobby** [21] - 28:7, 34:1, 34:24, 46:1, 46:4, 46:5, 46:18, 80:8, 80:13, 80:23, 81:5, 98:19, 98:23, 99:1, 99:3, 99:6, 99:12, 101:7, 101:9, 101:10, 101:15

**body** [8] - 45:22, 48:6, 64:7, 66:1, 66:4, 66:6, 66:12, 121:2

**Bonanno** [1] - 13:15

**Bonanza** [1] - 33:23

**born** [2] - 11:12

**borough** [1] - 27:14

**Borough** [1] - 11:13

**borrow** [4] - 73:15, 74:10, 74:13, 75:14

**borrowed** [4] - 80:20, 80:23, 80:24, 115:19

**boss** [23] - 13:20, 14:1, 15:22, 16:2, 16:3, 16:5, 17:15, 21:9, 24:12, 25:15, 30:19, 30:20, 32:18, 108:16, 108:18, 109:13, 109:14, 109:15, 109:16, 114:21, 114:22

**boss's** [1] - 16:3

**Boston** [2] - 90:16, 90:24

**bother** [2] - 118:22, 118:24

**bothered** [3] - 86:22, 87:8, 124:13

**bought** [3] - 86:14, 86:16

**Boulevard** [1] - 27:19

**Boy** [21] - 20:3, 20:10, 49:16, 62:8, 68:8, 69:1, 69:6, 69:12, 69:14, 69:17, 70:1, 70:14, 70:23, 70:25, 71:13, 90:22, 108:11, 113:13, 120:16, 121:7, 121:9

**Boy's** [2] - 28:7, 35:3

**breach** [4] - 5:23, 6:19, 7:5, 7:22

**breached** [1] - 6:2

**break** [5] - 15:1, 30:2, 94:8, 96:6, 97:16

**breaking** [1] - 119:6

**brick** [4] - 79:24, 79:25, 80:1

**brief** [1] - 5:8

**bring** [15] - 6:14, 9:20, 40:15, 45:21, 45:23, 59:12, 75:25, 83:2, 83:4, 83:5, 84:2, 95:23, 96:5, 97:8

**bringing** [1] - 88:15

**broke** [3] - 19:11, 19:12

**broken** [1] - 41:6

**Brooklyn** [11] - 1:4, 1:13, 11:10, 27:3, 27:15, 27:20, 45:16, 68:20, 69:4, 69:10, 116:9

**brother** [19] - 25:3, 35:3, 35:4, 49:14, 49:15, 61:21, 62:6, 62:11, 62:17, 79:1, 79:15, 102:15, 102:18, 110:6, 116:21, 120:3, 120:6, 120:7, 121:8

**brother's** [1] - 61:21

**brother-in-law** [5] - 116:21, 120:3, 120:6, 120:7, 121:8

**brothers** [2] - 21:16, 24:13

**brought** [12] - 24:17, 24:18, 38:21, 39:4, 40:23, 41:17, 47:20, 60:19, 81:15, 82:14, 83:7

**brown** [2] - 53:21, 54:1

**bullet** [2] - 56:7, 56:18

**bullshitting** [1] - 119:4

**bum** [2] - 77:22, 78:21

**bumper** [2] - 55:17

**bunch** [3] - 17:11, 65:6, 115:1

**bus** [4] - 33:9, 83:12, 83:13, 83:14

**bush** [1] - 57:25

**bushes** [1] - 56:11

**business** [26] - 73:5, 74:6, 89:6, 98:15, 112:25, 115:9, 115:13, 115:17, 116:5, 117:14, 117:16, 118:9, 121:19, 122:2, 122:4, 122:7, 122:15, 122:19, 122:22, 123:8, 123:10, 124:10, 124:11, 124:14, 124:17, 124:22

**businesses** [2] - 85:19, 118:2

**busy** [2] - 119:2, 130:17, 130:18

**buy** [7] - 80:20, 81:20, 82:3, 82:19, 89:13, 98:5, 104:18

**buying** [1] - 86:16

**BY** [23] - 1:13, 1:16, 10:5, 20:17, 21:5, 25:11, 25:19, 26:9, 26:17, 28:17, 29:3, 33:2, 37:3, 37:14, 39:1,

39:20, 42:14, 47:13, 88:10, 97:15, 117:8, 123:18, 131:6

## C

**Cadman** [1] - 1:12

**Calabro** [6] - 59:15, 60:2, 60:8, 60:14, 60:17, 90:19

**calm** [2] - 43:15, 110:14

**Calvin** [6] - 64:6, 64:8, 64:9, 65:1, 66:3, 66:15

**Calvin's** [2] - 64:24, 64:25

**Canarsie** [1] - 48:1

**cannot** [1] - 128:21

**cap** [1] - 55:4

**capable** [2] - 42:25, 43:1

**CAPERS** [1] - 1:11

**captain** [16] - 13:4, 13:6, 14:7, 15:13, 15:16, 25:14, 26:23, 34:19, 79:3, 113:17, 113:18, 113:22, 114:1, 114:10, 114:11, 114:24

**captain's** [1] - 15:13

**captains** [5] - 13:20, 14:9, 15:14, 15:19, 61:15

**Car** [1] - 115:16

**car** [67] - 19:2, 19:3, 44:15, 44:19, 48:14, 48:17, 52:25, 53:1, 53:8, 53:11, 53:13, 53:14, 53:19, 53:20, 54:1, 54:2, 54:4, 54:18, 54:19, 54:22, 54:23, 55:24, 56:2, 56:7, 56:8, 56:9, 56:23, 57:17, 57:23, 58:5, 58:6, 58:9, 58:12, 58:15, 58:17, 58:18, 58:19, 63:22, 64:1, 64:6, 64:15, 64:16, 64:19, 66:2, 66:4, 66:12, 66:13, 66:14, 66:18, 66:19, 80:20, 81:14, 84:7, 84:12, 99:19, 106:21, 110:21, 110:25, 111:6, 111:8, 111:14, 111:16, 115:14, 118:5

**cards** [1] - 50:23

**care** [10] - 23:14, 43:16, 67:9, 67:10, 76:18, 76:19, 88:23, 89:2, 103:23, 118:20

**careful** [3] - 9:24, 27:24, 40:2

**Carl** [4] - 89:2, 89:4, 89:7

**Carmine** [8] - 21:10, 21:11, 21:13, 24:11, 30:24, 107:22, 107:23, 107:24

**Carmine's** [1] - 21:15

**cars** [8] - 44:18, 48:2, 48:16, 48:18, 53:4, 54:6, 54:16, 63:23

**case** [26] - 5:12, 5:19, 6:15, 18:9, 21:14, 48:19, 53:3,

71:11, 87:2, 87:3, 95:10, 103:5, 103:9, 104:14, 106:22, 109:19, 112:13, 125:8, 125:12, 125:16, 125:24, 127:17, 129:22, 130:13

**cases** [1] - 3:14

**casket** [1] - 46:2

**caught** [3] - 44:15, 55:10, 99:18

**CAUSE** [1] - 1:8

**ceremony** [1] - 17:9

**certain** [4] - 6:23, 6:24, 35:16, 87:21

**certainly** [2] - 95:12, 128:22

**chairs** [1] - 7:19

**Chance** [1] - 2:6

**chance** [2] - 3:17, 130:2

**change** [4] - 75:10, 105:1, 110:14, 114:6

**changed** [1] - 105:3

**changes** [1] - 95:3

**charge** [5] - 15:19, 73:25, 87:3, 103:4, 126:7

**charged** [3] - 6:14, 125:10, 125:12

**check** [2] - 16:21, 124:8

**Chevy** [1] - 53:21

**choices** [2] - 88:18, 88:19

**chops** [1] - 119:6

**Christmas** [1] - 82:5

**Chucky** [5] - 31:2, 31:22, 62:24, 63:3, 63:5

**cigarette** [1] - 51:9

**City** [2] - 13:12, 95:14

**claim** [2] - 112:3, 112:6

**claimed** [1] - 87:22

**clarify** [1] - 96:18

**clean** [1] - 29:22

**clear** [16] - 3:3, 6:17, 6:20, 7:21, 9:18, 24:10, 30:22, 45:9, 53:8, 70:20, 90:23, 111:19, 114:3, 117:23, 129:12, 130:13

**clearly** [1] - 42:10

**client** [1] - 96:12

**close** [10] - 29:12, 29:13, 32:17, 41:22, 44:10, 47:22, 48:11, 49:15, 68:13, 90:22

**closed** [1] - 55:25

**club** [9] - 17:25, 50:20, 50:22, 51:2, 51:3, 51:4, 51:6

**clue** [1] - 117:11

**co** [3] - 10:18, 42:11, 112:21

**co-conspirator** [1] - 42:11

**co-conspirators** [1] - 10:18

**co-defendant** [1] - 112:21

**coat** [1] - 11:2

**cocaine** [2] - 12:14, 18:20

**collect** [2] - 76:4, 124:8
**Colombo** [34] - 13:1, 13:15, 21:8, 21:9, 25:12, 30:13, 30:20, 31:21, 33:19, 34:5, 37:16, 37:21, 40:18, 59:19, 69:24, 70:7, 80:3, 80:14, 84:1, 86:5, 88:5, 89:5, 90:8, 90:12, 91:1, 107:20, 110:1, 111:13, 113:3, 114:4, 117:21, 118:1, 121:10, 121:16
**Colombos** [3] - 23:9, 24:19, 105:14
**color** [1] - 54:24
**comfortable** [1] - 9:20
**coming** [7] - 3:12, 44:15, 65:18, 69:22, 70:10, 85:9, 99:19
**commissary** [4] - 104:15, 104:17, 105:24, 126:2
**commit** [4] - 11:19, 12:10, 18:15, 34:12
**committed** [5] - 10:6, 10:8, 11:20, 43:11, 96:10
**committing** [1] - 11:16
**common** [2] - 13:16, 13:18, 32:13
**communicate** [1] - 54:6
**company** [11] - 27:7, 33:9, 83:12, 83:13, 83:14, 107:9, 121:22, 122:23, 123:24, 124:2, 124:9
**Computer** [1] - 1:25
**Computer-aided** [1] - 1:25
**computerized** [1] - 1:25
**concern** [2] - 7:25, 42:23
**concerned** [2] - 92:9, 92:10
**concerning** [2] - 6:25, 7:4
**concerns** [1] - 42:22
**conditions** [2] - 107:14, 107:17
**conduct** [2] - 6:23, 87:21
**Coney** [2] - 33:9, 83:12
**confine** [1] - 96:11
**conflicts** [1] - 129:18
**connected** [1] - 19:4
**connection** [1] - 95:24
**considered** [1] - 108:18
**consigliere** [4] - 13:20, 14:2, 15:23, 16:1
**conspiracy** [5] - 42:11, 60:11, 87:17, 96:13, 126:7
**conspirator** [1] - 42:11
**conspirators** [1] - 10:18
**contacting** [1] - 118:7
**contained** [1] - 87:20
**containing** [1] - 43:17
**continue** [7] - 50:10, 94:12, 94:16, 94:21, 128:20, 128:25, 130:10

**continued** [2] - 95:21, 97:12
**continues** [1] - 93:18
**control** [1] - 38:5
**convenient** [1] - 7:16
**conversation** [4] - 50:10, 78:3, 96:8, 110:2
**conversations** [1] - 6:2
**convey** [1] - 43:9
**conveying** [1] - 43:10
**convicted** [1] - 19:16
**cooperate** [2] - 125:17, 125:19
**cooperating** [3] - 126:1, 126:25, 127:2
**cooperation** [2] - 17:15, 126:12
**copy** [6] - 4:21, 4:22, 5:2, 5:3, 5:4
**corner** [6] - 53:11, 54:11, 54:12, 54:15, 58:1, 58:16
**correct** [3] - 5:19, 5:20, 7:1
**correctly** [1] - 96:2
**cosmetics** [1] - 104:19
**counsel** [4] - 2:6, 2:19, 5:17, 94:11
**couple** [29] - 2:23, 12:3, 29:24, 31:24, 35:14, 35:17, 41:6, 41:11, 43:5, 45:22, 57:19, 59:2, 67:6, 75:18, 80:5, 82:4, 85:6, 90:14, 91:8, 91:10, 98:13, 100:19, 100:23, 110:24, 118:13, 122:20, 122:24
**course** [4] - 2:13, 4:10, 8:9, 96:13
**COURT** [98] - 1:1, 2:9, 2:13, 2:16, 2:20, 3:5, 3:25, 4:3, 4:7, 4:11, 4:14, 4:16, 4:19, 5:1, 5:10, 5:15, 5:18, 5:25, 6:7, 6:17, 7:9, 8:3, 8:8, 8:11, 8:15, 8:17, 8:22, 9:3, 9:13, 9:15, 9:17, 11:4, 13:6, 17:1, 20:14, 20:25, 21:2, 24:14, 25:6, 25:8, 26:2, 26:4, 26:13, 26:15, 27:14, 28:23, 28:25, 32:22, 33:1, 36:16, 37:9, 37:11, 39:10, 39:15, 39:18, 40:1, 42:7, 42:12, 47:9, 47:11, 47:15, 47:18, 49:24, 60:13, 63:1, 74:16, 87:24, 89:25, 93:20, 93:25, 94:7, 94:11, 94:19, 94:22, 95:7, 95:9, 95:15, 95:19, 95:21, 96:4, 96:17, 96:19, 96:23, 97:7, 97:10, 116:24, 117:3, 117:5, 123:12, 123:15, 123:17, 128:19, 129:4, 129:15, 129:19, 130:7, 130:9, 130:15

**Court** [13] - 1:22, 1:23, 4:10, 5:12, 5:13, 6:15, 7:7, 7:20, 7:21, 7:25, 11:12, 17:24, 32:25
**court** [4] - 2:1, 29:17, 127:18, 128:25
**Court's** [2] - 3:9, 6:15
**courtesy** [1] - 4:22
**courthouse** [2] - 127:20, 127:21
**Courthouse** [1] - 1:4
**COURTROOM** [4] - 2:2, 9:4, 9:9, 9:12
**cousin** [8] - 35:3, 71:19, 71:22, 86:7, 107:24, 120:1, 121:2, 121:7
**cousin's** [1] - 120:20
**cousins** [1] - 21:22
**covered** [1] - 87:13
**covering** [1] - 87:16
**Coxsackie** [3] - 19:22, 19:24, 23:7
**cracked** [1] - 51:10
**crash** [6] - 48:2, 48:14, 48:16, 48:17, 52:25
**crew** [8] - 38:10, 38:13, 38:14, 46:23, 47:22, 52:2, 59:1, 59:12
**crews** [2] - 15:14
**crime** [50] - 10:8, 12:18, 12:24, 13:3, 13:9, 13:10, 13:12, 13:19, 13:23, 14:4, 14:14, 14:18, 15:4, 15:9, 16:6, 17:10, 17:12, 17:18, 21:7, 22:1, 22:5, 22:21, 22:5, 23:19, 24:3, 26:19, 32:10, 32:13, 34:18, 35:23, 37:21, 42:10, 59:16, 59:19, 77:2, 83:25, 88:6, 89:23, 89:24, 90:4, 96:25, 105:11, 108:2, 108:14, 114:20, 115:4, 117:22, 121:16
**crimes** [12] - 6:13, 10:6, 11:16, 11:18, 11:20, 12:10, 18:15, 18:17, 33:10, 96:10, 125:10, 126:6
**CRIMINAL** [1] - 1:8
**criminal** [3] - 2:2, 3:14, 112:13
**cross** [3] - 8:22, 9:1, 9:2
**cross-examining** [3] - 8:22, 9:1, 9:2
**CRR** [1] - 1:22
**culminated** [1] - 97:4
**Cuotolo** [7] - 31:11, 34:15, 34:16, 34:23, 35:7, 44:4, 44:8
**Curcio** [30] - 34:25, 36:10, 36:21, 37:7, 37:22, 38:6, 38:16, 39:6, 39:8, 39:21,

40:6, 46:25, 47:20, 52:16, 52:21, 53:10, 61:5, 61:10, 61:12, 61:17, 62:5, 62:22, 63:2, 63:8, 63:10, 63:16, 67:1, 67:3, 67:13, 67:16
**Curcio's** [1] - 37:15
**current** [1] - 3:6
**custody** [1] - 29:16
**customer** [2] - 76:10, 77:3, 79:16
**cut** [1] - 65:18
**cute** [1] - 124:1

---

## D

**Danny** [2] - 34:24, 35:1
**date** [3] - 4:12, 93:17, 94:14
**dates** [1] - 94:15
**days** [7] - 3:11, 59:2, 67:6, 85:6, 95:1, 95:16, 130:3
**dead** [1] - 65:3
**deadline** [1] - 94:24
**deal** [2] - 78:11, 79:14
**dealers** [1] - 72:14
**dealership** [2] - 106:21
**dealerships** [4] - 117:18, 118:5, 118:12, 118:20
**deals** [1] - 96:10
**dealt** [1] - 122:16
**dear** [2] - 21:25, 92:3
**debt** [1] - 111:17
**December** [1] - 109:24
**decide** [4] - 87:5, 88:24, 125:16, 125:18
**decided** [2] - 5:24, 88:25
**decision** [1] - 77:25
**decisions** [4] - 6:20, 77:25, 109:16, 109:17
**defendant** [11] - 1:6, 2:1, 2:14, 2:18, 3:2, 5:14, 7:1, 11:5, 21:14, 88:4, 112:21
**DEFENDANT** [2] - 8:7, 8:10
**Defendant** [1] - 1:15
**defendant's** [1] - 3:1
**defense** [10] - 4:23, 5:1, 5:23, 6:1, 6:5, 6:8, 8:15, 8:23, 95:9, 129:23
**define** [1] - 72:16
**definite** [1] - 17:16
**definitely** [3] - 67:15, 72:9, 94:22
**deliver** [1] - 12:6
**denial** [1] - 60:2
**denied** [1] - 61:11
**deny** [1] - 16:24
**depict** [1] - 72:10
**depicted** [1] - 28:18
**deposited** [1] - 105:24
**DEPUTY** [4] - 2:2, 9:4, 9:9,

Case 1:12-cr-00035-1LEK Document 1869-6 Filed 08/19/21 Page 164 of 635 PageID #: 4471

9:12
 DeRosa [9] - 59:3, 59:4,
59:5, 59:11, 60:2, 60:8,
60:14, 60:16, 60:17
  describe [2] - 10:25, 19:1
  described [2] - 6:23, 18:21
  deserve [1] - 92:24
  deserved [2] - 91:8, 91:10
  detailing [1] - 115:14
  determination [2] - 4:1, 4:8
  develop [1] - 29:10
  Diane [1] - 2:19
  different [5] - 6:12, 14:24,
90:2, 117:12, 128:20
  difficult [1] - 7:14
  diner [2] - 77:17, 78:12
  dinner [1] - 75:7
  Dino [11] - 59:13, 59:14,
59:15, 90:16, 90:18, 90:19,
90:24, 109:1, 109:2, 109:4,
109:7
  DIRECT [2] - 10:4, 131:5
  direct [3] - 95:11, 97:12,
128:19
  directed [1] - 122:19
  disappear [1] - 75:15
  disappointment [2] - 91:22,
92:4
  disclosed [2] - 3:9, 87:17
  disclosure [1] - 3:12
  discuss [20] - 22:1, 33:10,
35:6, 39:8, 39:9, 40:7,
48:25, 63:7, 63:14, 66:22,
70:25, 71:2, 86:19, 91:20,
94:14, 96:4, 106:7, 128:21,
128:22, 129:5
  discussed [9] - 3:10, 39:21,
49:3, 71:5, 80:5, 83:6,
87:8, 100:7, 129:17
  discussing [1] - 8:6
  discussion [1] - 97:4
  dispute [9] - 93:5, 93:9,
94:3, 97:21, 97:23, 98:19,
98:22, 100:18, 100:19
  DISTRICT [3] - 1:1, 1:1, 1:9
  district [1] - 103:7
  District [1] - 1:12
  DLI [1] - 1:2
  Docket [1] - 2:3
  docket [2] - 4:20, 5:16
  dollars [5] - 77:23, 78:11,
78:20, 98:24, 104:4
  done [14] - 4:12, 18:24,
42:19, 42:20, 46:10, 46:11,
46:16, 46:18, 49:13, 50:2,
50:8, 79:14, 127:5
  door [11] - 44:16, 44:17,
48:11, 54:1, 54:18, 55:17,
55:18, 55:25, 56:1, 56:10,
79:25

 DORA [1] - 1:8
  doubt [1] - 61:23
  down [32] - 9:20, 11:12,
17:24, 27:5, 36:2, 36:9,
38:20, 41:6, 44:14, 45:22,
56:9, 57:14, 64:1, 72:14,
75:15, 78:18, 84:13, 84:16,
85:8, 85:9, 92:7, 106:3,
108:17, 110:5, 110:15,
114:8, 120:4, 120:5, 120:11,
120:12
  drinking [1] - 10:1
  drive [2] - 53:16, 57:15
  driver [1] - 52:25
  driver's [1] - 56:8
  driving [5] - 44:13, 53:6,
53:7, 55:15, 56:8
  drop [1] - 57:17
  drove [4] - 12:17, 55:9,
64:22, 64:24
  drug [1] - 72:14
  drugs [7] - 11:21, 18:8,
18:18, 18:19, 19:7, 72:14,
126:7
  due [1] - 4:10
  duffel [1] - 41:3
  duly [1] - 9:7
  during [7] - 8:9, 19:21,
41:19, 44:22, 44:25, 53:16,
96:12

### E

 e-mail [1] - 5:4
  E-mail [1] - 1:24
  early [3] - 12:1, 12:16, 93:8
  earn [1] - 14:20
  earners [1] - 14:25
  easier [1] - 124:4
  East [2] - 1:12, 1:20
  EASTERN [1] - 1:1
  Eastern [1] - 1:12
  eat [1] - 75:7
  effect [5] - 22:20, 22:22,
23:1, 102:9, 121:6
  eight [1] - 77:7
  either [2] - 85:3, 123:14
  eleven [1] - 109:21
  eleventh [1] - 11:15
  emptied [5] - 55:24, 56:2
  empty [1] - 54:19
  end [7] - 38:4, 55:16, 87:1,
91:13, 109:19, 116:25,
129:20
  ended [3] - 91:12, 92:25,
109:23
  enforcement [3] - 17:15,
48:23, 71:15
  engage [1] - 72:25

 engaging [1] - 60:11
  enters [1] - 8:21
  equal [1] - 129:23
  Eric [46] - 34:25, 36:3, 36:7,
36:8, 36:9, 36:11, 36:21,
36:22, 37:5, 37:6, 37:15,
37:22, 38:6, 38:15, 38:21,
39:6, 39:21, 40:6, 46:25,
47:20, 52:15, 52:16, 52:21,
52:25, 53:11, 54:15, 61:2,
61:4, 61:10, 61:12, 61:14,
61:17, 62:5, 62:14, 62:20,
62:22, 63:2, 63:5, 63:8,
63:16, 66:25, 67:1, 67:4,
67:13, 67:16
  Eric's [1] - 60:25
  especially [1] - 82:4
  ESQ [3] - 1:11, 1:13, 1:16
  ESQUIRE [2] - 1:17, 1:19
  eventually [3] - 52:2, 113:3,
127:18
  evidence [10] - 5:7, 21:4,
25:10, 26:5, 26:16, 29:2,
37:13, 39:11, 39:19, 47:12
  evidently [1] - 81:4
  ex [2] - 86:21, 105:19
  ex-girlfriend [2] - 86:21,
105:19
  exact [4] - 52:8, 53:21,
56:14, 74:15
  exactly [4] - 38:9, 54:16,
55:22, 74:19, 79:19, 104:3,
105:16, 123:21, 124:18
  examination [1] - 97:12
  EXAMINATION [2] - 10:4,
131:5
  examined [1] - 9:8
  examining [3] - 8:22, 9:1,
9:2
  except [1] - 126:22
  excuse [12] - 29:5, 33:5,
41:14, 43:20, 44:24, 53:23,
60:16, 61:3, 62:3, 70:16,
101:12, 121:13
  excused [1] - 129:1
  exhibit [10] - 20:12, 20:16,
21:21, 24:22, 25:18, 26:8,
28:16, 37:2, 38:24, 47:4
  Exhibit [24] - 21:4, 24:21,
25:9, 25:17, 26:5, 26:7,
26:16, 28:15, 29:1, 37:1,
37:12, 38:22, 39:11, 39:19,
47:2, 47:12, 132:4, 132:6,
132:8, 132:10, 132:12,
132:14, 132:16, 132:18
  exist [1] - 15:14
  expect [2] - 6:8, 95:11
  expenses [1] - 128:14
  experience [1] - 13:8
  explain [3] - 24:15, 101:25,

 108:23
  explained [3] - 64:15, 78:19
  explaining [1] - 46:8
  express [2] - 42:22, 91:15
  expressed [2] - 91:22, 92:4
  expressing [1] - 92:14
  extend [1] - 73:10
  extent [1] - 96:1
  extorted [1] - 97:2
  extortion [2] - 6:24, 97:3
  extortions [1] - 96:21

### F

 face [1] - 59:7
  faced [1] - 126:10
  facility [2] - 19:23, 127:10
  Facsimile [1] - 1:24
  fact [9] - 3:3, 53:16, 60:18,
91:1, 91:15, 91:20, 97:5,
102:11, 102:20
  faction [5] - 30:17, 30:22,
31:1, 31:9
  fail [1] - 7:7
  fair [1] - 129:23
  fairly [1] - 6:22
  false [1] - 67:14
  familiar [4] - 5:15, 13:22,
14:12, 93:1
  families [8] - 12:24, 13:12,
13:16, 16:19, 16:21, 17:4,
17:10, 73:4
  family [92] - 13:11, 13:19,
14:4, 14:18, 15:5, 15:9,
15:10, 16:5, 16:6, 16:12,
17:3, 17:13, 17:20, 17:23,
18:3, 21:8, 21:9, 22:8, 23:5,
23:19, 25:12, 25:13, 26:19,
30:13, 30:14, 30:20, 31:13,
31:14, 31:21, 32:11, 33:19,
34:5, 34:18, 34:19, 35:23,
37:16, 37:21, 38:1, 38:5,
40:17, 40:18, 42:10, 45:21,
50:9, 59:5, 59:18, 59:19,
61:16, 69:21, 69:24, 70:1,
70:7, 70:13, 77:2, 77:15,
79:3, 79:9, 80:4, 80:14,
84:1, 86:5, 88:5, 89:5,
89:24, 90:4, 90:8, 90:12,
91:2, 99:22, 107:20, 108:2,
108:12, 108:15, 108:23,
109:15, 110:1, 111:13,
112:19, 113:3, 114:4,
114:20, 115:4, 117:22,
118:1, 121:10, 121:16,
121:17, 128:15
  family's [1] - 88:6
  far [2] - 11:14, 87:23
  Fat [3] - 76:11, 115:2, 115:6

**father** [19] - 17:25, 19:8, 19:10, 19:11, 21:15, 23:14, 24:7, 32:3, 32:4, 81:15, 83:3, 84:5, 89:8, 89:9, 89:13, 119:7, 119:11, 120:24, 121:7
**father's** [2] - 17:24, 32:18
**father-in-law** [6] - 89:8, 89:13, 119:7, 119:11, 120:24, 121:7
**FATICO** [1] - 1:8
**Fatico** [7] - 2:2, 2:21, 7:6, 8:1, 87:22, 95:21, 96:15
**favor** [1] - 64:12
**FBI** [1] - 2:6
**FCC** [1] - 62:20
**feast** [1] - 120:13
**feasts** [1] - 120:5
**federal** [8] - 19:19, 87:2, 87:3, 103:5, 103:6, 106:22, 125:8, 125:9
**feds** [1] - 106:24
**feet** [1] - 51:24
**fell** [2] - 112:3, 112:6
**felons** [3] - 29:21, 107:15
**fence** [1] - 79:24
**Fernich** [2] - 2:11, 3:25
**FERNICH** [10] - 1:17, 2:10, 4:1, 4:5, 4:8, 4:13, 4:15, 4:18, 8:16, 37:10
**Ferrara** [5] - 28:8, 34:25, 38:16, 80:17, 83:22
**feud** [1] - 30:14
**few** [8] - 4:9, 31:22, 33:21, 44:18, 49:3, 69:19, 74:12, 105:2
**fifty** [1] - 74:15
**figured** [2] - 94:12, 96:4
**filed** [2] - 2:25, 5:11
**filings** [2] - 3:2, 3:7
**finally** [1] - 26:6
**fine** [4] - 4:18, 4:22, 8:11, 9:21
**finish** [2] - 95:11, 130:13
**fire** [2] - 11:24, 57:13
**firearms** [1] - 107:16
**firm** [5] - 93:12, 98:2, 98:3, 98:6, 98:10
**first** [13] - 8:18, 9:7, 17:17, 29:6, 29:25, 34:14, 77:14, 81:13, 83:5, 88:3, 88:4, 101:14, 104:20
**Fischer** [1] - 2:19
**fish** [4] - 121:22, 121:24, 123:24, 124:2
**five** [9] - 13:13, 16:19, 16:21, 18:12, 18:13, 19:18, 73:4, 94:7, 94:8
**five-and-a-half** [1] - 19:18
**fix** [1] - 88:20

**fixed** [1] - 112:5
**flat** [1] - 7:15
**flew** [1] - 57:14
**flexible** [1] - 95:12
**floor** [1] - 65:3
**Florida** [2] - 67:5
**flow** [1] - 16:6
**focusing** [1] - 44:1
**Foley** [1] - 1:22
**follow** [1] - 15:7
**following** [1] - 129:25
**follows** [1] - 9:8
**foot** [1] - 84:10
**FOR** [1] - 1:8
**forever** [1] - 74:6
**forfeiture** [1] - 127:3
**forget** [7] - 44:19, 44:20, 80:11, 81:3, 85:3, 104:7, 104:8
**forgive** [1] - 93:16
**forgot** [5] - 79:6, 82:16, 90:21, 109:3, 122:20
**form** [1] - 111:19
**four** [2] - 54:1, 79:19
**four-door** [1] - 54:1
**frame** [7] - 63:21, 89:25, 93:21, 93:23, 93:25, 116:23, 123:11
**Frank** [6] - 28:13, 32:6, 58:19, 74:9, 86:6, 127:23
**Frankie** [19] - 28:8, 28:19, 28:20, 31:22, 51:10, 51:12, 52:20, 57:9, 71:22, 86:3, 91:23, 93:13, 97:24, 97:25, 99:3, 99:4, 115:12, 115:18, 116:19
**Frankie's** [3] - 58:18, 64:14, 64:18
**fraud** [1] - 111:20, 111:22
**free** [1] - 129:18
**friend** [15] - 38:1, 51:18, 61:7, 64:9, 64:18, 82:16, 82:18, 82:19, 82:21, 85:11, 100:11, 105:6, 107:22, 112:2, 120:22
**friend's** [1] - 112:7
**friendly** [1] - 93:11
**friends** [8] - 21:25, 78:25, 86:1, 86:2, 92:3, 110:24
**front** [14] - 44:16, 48:11, 51:15, 51:24, 52:13, 54:18, 55:13, 55:14, 55:17, 59:2, 85:8, 112:4, 112:6
**fruit** [1] - 17:24
**fulfilled** [2] - 126:18, 126:20
**full** [3] - 20:4, 24:8, 130:4
**fun** [1] - 100:9
**Funeral** [2] - 45:13, 45:25
**funeral** [2] - 45:13, 47:21
**furtherance** [1] - 42:11

**future** [3] - 6:10, 7:19, 8:2

## G

**Gambino** [10] - 13:1, 13:15, 17:21, 17:23, 18:2, 23:19, 77:2, 79:3, 79:9, 99:22
**Gambinos** [3] - 17:22, 23:6, 24:15
**games** [10] - 78:9, 79:22, 81:9, 81:16, 81:18, 81:22, 82:9, 83:10, 84:2, 84:23
**garage** [7] - 83:11, 83:17, 116:12, 116:13, 116:14, 116:20, 116:21
**garbage** [3] - 48:6, 48:7, 49:9
**gather** [1] - 95:7
**Genovese** [2] - 13:15, 77:15
**getaway** [1] - 53:1
**Giglio** [2] - 93:24, 97:1
**Gioeli** [2] - 31:3, 109:11
**girl** [1] - 105:23
**girlfriend** [4] - 86:21, 87:7, 105:19
**girlfriend's** [1] - 89:9
**gloves** [1] - 57:25
**God** [1] - 126:17
**Government** [33] - 1:11, 2:22, 3:22, 4:21, 4:24, 6:2, 7:2, 8:14, 8:19, 9:7, 24:21, 25:16, 26:7, 28:14, 37:1, 38:22, 39:10, 47:2, 87:21, 94:4, 95:12, 96:1, 96:14, 96:24, 97:13, 126:1, 126:21, 128:1, 128:13, 128:22, 128:24, 129:22, 130:7
**government** [2] - 6:3, 17:15
**Government's** [26] - 21:4, 25:9, 26:5, 26:16, 29:1, 37:12, 39:19, 47:12, 132:4, 132:6, 132:8, 132:10, 132:12, 132:14, 132:16, 132:18
**grabbing** [1] - 51:23
**grade** [1] - 11:15
**grandmother** [2] - 45:4, 46:3
**gray** [1] - 11:2
**Greenpoint** [1] - 120:4
**grow** [1] - 11:9
**guarantee** [1] - 130:3
**Guerra** [12] - 28:13, 28:21, 29:4, 29:6, 32:6, 39:7, 39:8, 52:20, 74:9, 74:13, 75:13, 127:23
**Guerra's** [1] - 58:19
**guess** [1] - 34:19

**guidelines** [1] - 127:1
**guilty** [7] - 6:18, 7:4, 126:4, 126:6, 126:9, 127:9, 127:17
**gun** [15] - 10:17, 11:24, 18:8, 51:23, 54:19, 55:24, 56:2, 56:3, 57:10, 57:23, 58:5, 58:6, 58:8, 58:10, 126:7
**guns** [12] - 10:16, 10:18, 10:20, 11:22, 40:20, 40:22, 40:25, 41:2, 41:4, 41:13, 41:16, 43:21
**guy** [12] - 15:3, 19:2, 19:3, 77:14, 78:9, 78:14, 81:15, 81:25, 90:16, 98:23, 99:8, 99:12
**guys** [16] - 14:25, 28:7, 34:1, 46:10, 46:16, 50:23, 50:24, 50:25, 75:14, 75:18, 91:12, 98:13, 115:1, 117:24, 124:7
**gym** [1] - 41:3

## H

**habit** [1] - 129:11
**hair** [1] - 11:2
**half** [6] - 19:18, 74:3, 75:11, 83:5, 83:6, 125:20
**half-hour** [1] - 125:20
**halfway** [4] - 30:9, 107:5, 107:19, 107:21
**hand** [2] - 9:4, 80:1
**handle** [2] - 28:3, 100:16, 103:23
**handling** [1] - 43:2
**hands** [1] - 17:12
**hang** [4] - 14:19, 17:25, 50:23, 75:7
**hanging** [4] - 32:7, 70:22, 85:8, 107:15
**hard** [6] - 4:21, 4:22, 5:4, 129:6, 129:8, 129:9
**hat** [4] - 55:2, 55:3, 57:12, 57:24
**head** [4] - 11:24, 19:12, 55:1, 57:24
**hear** [10] - 4:3, 4:7, 7:14, 32:22, 40:5, 41:14, 96:16, 117:2, 129:9
**heard** [2] - 7:10, 123:7
**HEARING** [1] - 1:8
**hearing** [18] - 2:3, 2:21, 6:4, 6:9, 6:11, 7:24, 8:1, 8:9, 42:12, 87:14, 87:22, 93:19, 94:12, 94:16, 95:21, 96:15, 128:20, 130:10
**hearsay** [1] - 42:5
**heat** [1] - 109:8

**held** [1] - 13:2
**hello** [2] - 62:18, 79:11
**help** [18] - 38:1, 38:3, 63:22, 63:25, 64:11, 64:13, 88:18, 99:7, 99:9, 105:16, 111:14, 111:15, 115:22, 116:19, 117:13, 118:6, 118:14, 128:13
**helped** [2] - 64:11, 111:15
**high** [1] - 7:16
**highly** [1] - 87:18
**Highway** [1] - 77:18
**himself** [2] - 90:9, 96:11
**hit** [6] - 10:20, 48:18, 59:8, 59:22, 68:20, 80:1
**hold** [5] - 25:13, 26:19, 38:5, 82:4, 114:9
**holding** [1] - 86:20
**holds** [1] - 98:7
**holidays** [1] - 86:16
**home** [18] - 23:16, 25:15, 26:23, 27:1, 29:23, 34:10, 50:19, 66:17, 68:8, 74:11, 78:4, 101:14, 106:6, 107:2, 108:16, 108:17, 109:20
**Home** [1] - 45:25
**homicide** [2] - 7:1, 60:12
**Honor** [49] - 2:8, 2:10, 2:17, 3:4, 3:23, 4:2, 4:25, 5:9, 5:20, 7:17, 8:19, 8:24, 8:25, 10:3, 11:6, 20:12, 21:1, 24:20, 25:5, 25:7, 26:1, 26:3, 26:14, 28:22, 28:24, 32:19, 37:10, 39:12, 39:16, 39:24, 40:3, 42:4, 42:6, 47:8, 47:10, 60:10, 87:12, 88:9, 93:16, 94:20, 95:17, 96:3, 97:14, 117:4, 128:18, 129:16, 130:8, 130:14
**Honor's** [1] - 5:24
**HONORABLE** [1] - 1:8
**hotels** [2] - 122:1, 124:6
**hour** [2] - 84:21, 125:20
**hours** [1] - 45:22
**house** [29] - 30:9, 40:23, 44:16, 48:1, 48:10, 51:16, 51:24, 52:13, 54:10, 54:11, 59:3, 63:22, 64:14, 64:24, 64:25, 68:24, 71:19, 71:20, 71:22, 79:23, 79:24, 85:9, 100:20, 100:21, 107:5, 107:19, 107:21, 112:4, 112:7
**houses** [1] - 11:21
**Huck** [2] - 79:7, 79:8
**hundred** [4] - 45:5, 74:15, 98:24, 99:1
**hung** [1] - 93:4
**hunt** [1] - 75:15
**Hunts** [2] - 12:8, 12:10

**hurt** [2] - 44:21, 112:1
**Hyland** [1] - 27:19
**hysterically** [1] - 68:3

**I**

**idea** [1] - 95:5
**identification** [9] - 11:3, 20:14, 24:21, 25:17, 26:7, 28:15, 37:1, 38:23, 47:3
**identified** [1] - 11:5
**imagine** [1] - 129:21
**immediate** [1] - 45:21
**impacts** [1] - 7:3
**important** [2] - 49:21, 49:25
**imprisoned** [1] - 19:21
**impulse** [1] - 129:6
**incarcerated** [1] - 125:21
**incident** [1] - 48:24
**including** [1] - 6:24
**indicate** [1] - 3:15
**indicated** [2] - 88:2, 96:14, 96:24
**indicted** [1] - 87:3
**indictment** [1] - 88:7
**inducted** [19] - 15:9, 15:11, 16:9, 17:8, 70:24, 89:24, 90:4, 90:10, 90:11, 91:1, 91:5, 107:20, 108:9, 108:12, 108:21, 108:24, 110:13, 113:3, 114:3
**induction** [6] - 16:12, 16:13, 16:14, 16:16, 110:1, 113:9
**injury** [1] - 111:23
**innocent** [1] - 44:21
**inquire** [1] - 10:2
**inquiry** [1] - 6:15
**inside** [1] - 65:1
**instead** [1] - 119:5
**insurance** [4] - 112:2, 112:4, 112:6, 112:11
**intend** [2] - 35:21, 96:14
**intending** [1] - 96:10
**interest** [2] - 72:22, 73:25
**interested** [2] - 37:23, 37:25
**interfere** [1] - 112:13
**internal** [1] - 30:14
**interrupting** [1] - 93:17
**intervene** [1] - 48:23
**introduce** [1] - 2:12
**involve** [2] - 12:8, 96:25
**involved** [30] - 12:18, 14:20, 17:13, 17:17, 17:20, 17:22, 18:2, 25:12, 26:20, 34:5, 34:9, 34:11, 35:25, 38:19, 38:21, 43:2, 46:23, 47:14, 47:19, 48:19, 81:8,

81:13, 83:19, 88:6, 93:5, 93:9, 97:21, 98:19, 99:2, 111:22
**involving** [3] - 96:21, 111:22, 112:13
**IRIZARRY** [1] - 1:8
**IRS** [1] - 3:6
**Island** [9] - 27:19, 33:9, 64:22, 64:23, 83:12, 85:24, 99:12, 100:21, 122:24
**issue** [8] - 3:1, 5:8, 6:6, 6:9, 7:22, 7:23, 95:13
**issues** [6] - 6:21, 6:22, 7:4, 7:6, 7:25, 8:5
**Italian** [1] - 124:21

**J**

**jack** [2] - 19:2, 19:3
**jail** [10] - 14:10, 21:12, 24:2, 45:18, 49:20, 50:3, 68:9, 88:22, 125:23, 127:14
**January** [1] - 125:6
**jaw** [1] - 19:11
**Jersey** [2] - 122:13, 122:14
**jersey** [1] - 124:16
**job** [9] - 12:8, 30:4, 30:5, 30:7, 59:8, 59:21, 65:15, 97:19, 107:10
**jobs** [2] - 12:2, 12:4, 12:16
**Joe** [33] - 10:14, 31:3, 31:23, 31:24, 31:25, 33:23, 36:1, 36:21, 37:19, 37:20, 37:23, 39:21, 40:6, 45:9, 46:21, 46:23, 48:12, 48:13, 48:24, 51:19, 51:20, 52:2, 52:5, 52:18, 58:23, 63:18, 77:14, 77:19, 77:20, 78:9, 78:16, 78:19, 115:4
**Joey** [25] - 10:11, 10:12, 10:19, 31:11, 35:22, 35:23, 36:3, 36:11, 36:23, 38:4, 38:9, 38:10, 44:1, 44:5, 44:6, 46:15, 46:25, 48:9, 48:12, 51:18, 51:25, 55:13, 91:14, 115:1, 125:15
**Joey's** [1] - 55:24
**John** [28] - 44:19, 47:1, 47:16, 47:19, 52:20, 53:1, 53:2, 53:9, 56:24, 57:23, 58:2, 58:3, 63:7, 63:14, 63:19, 64:16, 64:17, 64:18, 65:2, 65:21, 65:22, 65:23, 65:24, 66:21, 117:17, 117:20, 119:12
**Johnny** [29] - 38:20, 39:3, 44:13, 47:1, 47:5, 47:6, 48:3, 52:20, 53:9, 54:17, 56:6, 56:9, 56:17, 56:19,

56:21, 56:22, 58:4, 58:16, 63:13, 63:16, 63:17, 64:2, 64:9, 65:15, 66:3, 66:7, 66:15, 67:11, 67:23
**joints** [1] - 129:14
**JoJo** [2] - 31:2, 31:22
**joke** [2] - 48:10, 49:8
**JUDGE** [1] - 1:9
**Judge** [5] - 4:18, 5:24, 6:6, 6:20, 130:6
**judge** [4] - 94:17, 126:17, 126:25, 128:2
**juice** [6] - 72:19, 72:20, 73:24, 80:11, 81:4
**jukeboxes** [1] - 6:25
**July** [2] - 3:9, 109:20
**jumped** [2] - 54:16, 56:9
**June** [2] - 3:11, 6:17
**junior** [2] - 20:6, 20:7
**Junior** [13] - 20:8, 20:22, 21:6, 21:21, 21:23, 22:19, 23:25, 41:20, 44:23, 45:1, 45:24, 113:14, 113:24
**Junior's** [1] - 35:4
**jury** [1] - 42:8

**K**

**KEDIA** [7] - 1:19, 2:17, 7:17, 8:25, 94:17, 95:18, 130:6
**Kedia** [7] - 2:17, 5:11, 5:13, 6:2, 6:10, 7:10, 8:8
**keep** [7] - 9:17, 78:22, 104:13, 114:2, 116:16, 117:5, 118:19
**kept** [3] - 118:17, 118:18
**kick** [1] - 54:18
**kid** [9] - 55:14, 59:3, 93:4, 100:13, 100:22, 112:19, 112:21, 122:19, 122:23
**kids** [1] - 51:25
**kill** [13] - 34:22, 36:23, 38:10, 43:19, 43:23, 43:24, 44:8, 46:13, 46:14, 46:23, 48:25, 49:22, 129:6
**killed** [14] - 35:17, 35:18, 46:25, 60:5, 60:6, 64:2, 64:3, 67:11, 67:17, 68:6, 92:17, 92:19, 92:20, 92:21
**killing** [5] - 37:23, 39:8, 47:23, 60:7, 91:14
**kind** [16] - 10:16, 23:1, 50:24, 53:19, 54:23, 55:3, 56:14, 106:20, 107:8, 118:4, 122:7, 124:20, 125:2, 125:3, 127:10, 129:10
**kinds** [1] - 41:4
**Kings** [1] - 77:17

knee [3] - 111:24, 112:1, 112:5
knife [1] - 65:17
known [2] - 29:21, 107:15
knows [1] - 62:17

**L**

lady [1] - 51:23
laid [4] - 41:25, 99:12, 99:17, 115:18
Larry [2] - 115:2, 115:7
last [10] - 3:10, 5:11, 32:22, 90:21, 95:24, 100:9, 107:25, 109:3, 120:8, 122:20
late [9] - 23:24, 52:6, 67:7, 85:18, 85:20, 89:23, 90:1, 90:3, 109:21
latest [1] - 88:1
laughed [1] - 68:4
laughing [1] - 68:3
law [14] - 17:15, 48:22, 71:15, 89:8, 89:13, 116:21, 119:7, 119:11, 120:3, 120:6, 120:7, 120:24, 121:7, 121:8
Lawrence [1] - 21:19
lawyer [1] - 6:13
lawyers [2] - 6:3, 7:12
laying [1] - 65:3
lead [1] - 5:17
leaders [3] - 14:1, 30:25, 31:10
leading [1] - 39:25
leads [5] - 93:14, 98:4, 98:7, 98:11
leaned [1] - 79:25
leaning [1] - 79:23
learn [3] - 71:15, 71:18, 106:9
learned [1] - 81:19
lease [1] - 110:18
least [1] - 50:3
leave [8] - 57:23, 58:5, 58:6, 58:8, 89:10, 94:9, 100:17, 130:12
Leave [1] - 111:6
leaves [2] - 94:10, 129:3
leaving [1] - 93:12
left [6] - 56:10, 56:25, 57:1, 58:22, 101:15, 105:22
legit [1] - 123:10
legitimate [9] - 12:2, 12:4, 12:16, 85:18, 107:6, 115:9, 118:2, 121:19, 122:4
legitimately [1] - 112:24
legs [1] - 15:1
Lemons [1] - 2:8
lend [1] - 72:17
lending [1] - 33:13

Lenny [3] - 76:10, 76:11, 76:17
lens [1] - 84:10
less [1] - 126:19
letter [6] - 88:2, 105:6, 105:15, 126:23, 126:24, 128:2
levels [1] - 42:5
liability [1] - 75:14
license [1] - 89:10
lie [1] - 67:15
lied [2] - 93:13, 98:5
life [4] - 10:6, 124:4, 126:11, 126:19
Lifshitz [4] - 2:5, 10:2, 96:9, 97:13
LIFSHITZ [75] - 1:13, 2:5, 3:23, 4:25, 5:8, 5:11, 5:17, 5:20, 6:1, 6:8, 7:6, 8:14, 8:19, 10:3, 10:5, 11:6, 20:12, 20:15, 20:17, 20:24, 21:3, 21:5, 24:20, 25:5, 25:11, 25:16, 25:19, 26:1, 26:6, 26:9, 26:12, 26:17, 28:14, 28:17, 28:22, 29:3, 32:21, 33:2, 36:25, 37:3, 37:8, 37:14, 38:22, 39:1, 39:12, 39:17, 39:20, 40:3, 42:6, 42:9, 42:14, 47:2, 47:8, 47:13, 47:16, 69:13, 87:16, 88:9, 88:10, 90:1, 93:22, 93:24, 95:6, 95:8, 95:11, 96:18, 96:20, 96:25, 97:14, 97:15, 117:8, 123:18, 128:18, 130:8, 131:6
light [1] - 54:24
lights [1] - 55:10
likely [1] - 23:16
limousine [1] - 27:7
limousines [1] - 116:16
line [5] - 15:20, 36:3, 36:11, 36:21, 96:9
liquor [8] - 85:22, 85:23, 85:25, 86:9, 86:14, 86:16, 88:13, 91:23
list [4] - 16:18, 16:20, 17:7, 92:5
Listen [3] - 75:3, 75:25, 80:11
listen [2] - 121:6, 121:9
lists [1] - 17:4
live [4] - 29:23, 95:14, 107:2, 107:4
lived [3] - 29:24, 44:15, 128:12
load [12] - 81:20, 82:3, 82:4, 82:7, 82:8, 82:20, 83:3, 83:5, 83:7, 84:7, 84:22
loads [1] - 83:5
loan [3] - 72:23, 73:10, 113:1
loans [4] - 73:10, 74:1, 74:10, 80:25
loansharking [13] - 33:15, 72:15, 72:16, 72:25, 73:5, 74:1, 74:5, 74:10, 76:4, 77:3, 97:5, 102:23, 112:25
locate [1] - 52:14
located [1] - 116:7
location [4] - 27:2, 45:12, 72:2, 72:4
locations [1] - 27:16
logistical [1] - 95:13
long-time [1] - 88:5
look [10] - 43:18, 43:23, 43:24, 46:21, 50:10, 50:18, 75:16, 82:15, 103:22, 126:25
Look [1] - 65:6
looked [6] - 51:1, 53:22, 53:24, 59:9, 78:22, 84:8
looking [1] - 19:9, 48:4, 48:7, 48:8
looks [1] - 11:2, 94:15
loose [1] - 80:1
lose [2] - 45:20, 89:21
loud [1] - 9:18
Louie [6] - 78:25, 79:2, 79:3, 79:4, 79:5, 79:7
Louie's [1] - 79:1
Lucchese [2] - 13:15, 59:5
lucky [1] - 44:14
lurking [1] - 56:12

**M**

ma'am [1] - 8:16
MAC-10 [9] - 10:17, 41:5, 41:8, 43:17, 53:2, 56:4, 57:4, 57:8, 58:11
machine [3] - 10:17, 55:24, 106:13
machines [3] - 106:12, 106:15, 106:17
Mafia [1] - 50:25
mail [2] - 1:24, 5:4
main [1] - 95:13
man [5] - 21:21, 83:1, 85:2, 93:1, 97:17
managing [1] - 88:6
marble [1] - 129:7
MARC [1] - 1:17
Marc [1] - 2:10
Marie [1] - 1:22
Marie_Foley@nyed. uscourts.gov [1] - 1:24
marked [1] - 36:25
market [1] - 93:10
Market [2] - 12:8, 12:10
Mary [2] - 1:21, 2:7
mask [1] - 55:6
Matera [4] - 64:16, 64:17, 64:18, 66:21
matter [2] - 87:13, 130:11
matters [1] - 94:13
Maurice [1] - 2:15
MAURICE [1] - 1:16
maximum [3] - 19:22, 115:16, 126:9
McLaughlin [2] - 115:2, 115:6
mean [24] - 14:6, 14:14, 17:1, 22:5, 23:17, 28:1, 33:25, 35:11, 35:16, 36:13, 36:17, 43:25, 46:17, 54:21, 68:23, 70:2, 70:12, 73:3, 74:16, 76:2, 86:13, 100:8, 100:10, 123:25
meaning [3] - 24:16, 34:1, 71:24
means [4] - 3:2, 14:3, 22:7, 24:15
meant [7] - 23:20, 36:14, 36:20, 43:10, 68:5, 70:3
medium [1] - 19:23
meet [24] - 26:24, 29:4, 29:6, 33:4, 33:7, 33:23, 44:23, 45:1, 45:3, 50:23, 68:20, 69:4, 69:6, 71:13, 75:5, 77:17, 81:22, 120:4, 120:10, 120:13, 120:14, 122:21, 122:25, 123:3
meeting [6] - 33:22, 40:24, 72:2, 103:18, 120:17, 121:4
meetings [1] - 42:17
member [21] - 15:9, 15:10, 15:11, 16:9, 16:11, 17:3, 17:12, 21:8, 25:14, 37:21, 45:21, 77:2, 77:15, 79:9, 86:5, 99:21, 108:7, 114:5, 115:5, 121:10, 121:16
members [6] - 42:9, 50:25, 70:13, 88:6, 117:21, 118:1
men [2] - 91:1, 91:4
mention [2] - 90:13, 108:4
mentioned [24] - 14:16, 15:23, 24:14, 27:20, 28:9, 30:2, 31:4, 31:6, 31:24, 35:1, 36:4, 48:12, 58:2, 62:6, 64:8, 68:22, 70:1, 70:9, 83:18, 86:24, 90:14, 90:16, 115:6, 115:24
message [2] - 108:10, 108:17
met [22] - 27:1, 27:22, 33:19, 33:21, 33:23, 39:7, 39:8, 40:6, 45:12, 62:17, 62:19, 62:20, 67:7, 69:14, 71:16, 72:4, 73:3, 77:19,

100:6, 100:7, 119:4, 120:14
**mic** [1] - 4:4
**MICHAEL** [1] - 1:5
**Michael** [124] - 2:15, 2:18,
5:18, 10:19, 10:20, 10:21,
10:23, 21:14, 21:16, 21:20,
25:2, 25:23, 25:24, 27:9,
27:10, 32:7, 32:8, 32:10,
32:17, 33:3, 33:6, 33:19,
33:21, 35:8, 35:9, 35:11,
35:12, 36:2, 36:4, 36:6,
36:20, 37:22, 39:7, 39:22,
40:7, 40:24, 49:3, 49:5,
49:12, 58:8, 59:3, 59:4,
59:5, 59:11, 60:22, 61:6,
61:19, 61:23, 61:24, 61:25,
62:1, 62:10, 62:15, 62:17,
70:22, 71:22, 71:24, 72:10,
73:11, 73:12, 73:23, 74:4,
74:10, 74:14, 74:22, 75:8,
75:19, 76:17, 76:23, 80:3,
80:7, 80:15, 80:18, 80:22,
81:1, 81:2, 82:14, 82:15,
83:16, 85:8, 85:9, 85:12,
86:3, 86:7, 86:23, 87:9,
87:18, 88:12, 88:25, 92:3,
96:25, 97:2, 97:6, 102:19,
102:20, 103:19, 104:6,
106:13, 110:2, 110:3,
110:12, 115:21, 115:24,
116:18, 117:9, 117:25,
118:6, 118:18, 118:20,
118:25, 119:5, 119:18,
119:20, 121:2, 121:7, 121:8,
123:3, 123:4, 123:7, 123:19,
124:3, 125:5
**Michael's** [10] - 21:15, 35:3,
60:19, 71:19, 78:2, 83:14,
107:24, 116:14, 120:7,
124:11
**microphone** [4] - 7:13,
7:18, 9:19, 129:10
**microphones** [2] - 7:15,
7:16
**mid** [3] - 19:23, 85:18,
109:21
**mid-'90s** [6] - 72:12, 73:9,
81:12, 93:8, 94:2, 94:3
**mid-1990s** [1] - 80:2
**mid-orange** [1] - 19:23
**might** [5] - 53:21, 72:1,
72:8, 129:23, 129:24
**mine** [4] - 100:11, 105:6,
110:24, 112:2
**minute** [3] - 34:10, 94:7,
95:4
**minutes** [3] - 54:14, 94:8,
125:20
**miss** [2] - 129:10, 129:13
**missing** [1] - 100:11

**moment** [2] - 14:8, 94:5
**money** [87] - 13:11, 14:20,
15:7, 16:6, 19:7, 22:14,
22:18, 33:11, 33:13, 72:13,
72:17, 73:9, 73:15, 74:7,
74:8, 74:10, 74:12, 74:13,
75:14, 75:16, 76:1, 76:3,
76:5, 76:6, 76:14, 76:21,
77:23, 77:25, 78:1, 78:23,
79:14, 79:15, 79:18, 80:4,
80:10, 80:12, 80:17, 80:18,
80:20, 80:23, 80:24, 81:3,
81:21, 82:3, 82:10, 82:19,
82:25, 83:2, 85:1, 85:4,
85:10, 85:25, 89:12, 89:21,
97:6, 98:25, 99:7, 100:22,
101:2, 101:4, 102:5, 102:16,
102:20, 103:16, 103:19,
103:24, 103:25, 104:6,
104:7, 104:20, 104:25,
105:4, 105:17, 105:23,
105:24, 106:2, 106:9,
112:11, 112:23, 113:1,
115:17, 115:18, 116:3,
126:2, 127:8
**money's** [1] - 75:21
**Monte** [5] - 31:3, 31:23,
31:24, 31:25, 37:19
**Monte's** [1] - 37:20
**month** [6] - 73:23, 75:4,
105:20, 105:21, 105:23
**months** [6] - 29:24, 82:4,
102:9, 103:12, 109:21,
128:11
**morning** [14] - 2:8, 2:9,
2:10, 2:13, 2:14, 2:16, 2:17,
2:20, 9:15, 9:16, 94:23,
95:22, 129:22, 130:11
**mortgage** [2] - 102:9,
102:11
**most** [8] - 14:10, 73:3, 74:2,
101:9, 118:12, 122:15,
125:10, 126:6
**mostly** [1] - 28:7
**motion** [1] - 6:18
**motions** [1] - 5:23
**mouth** [10] - 60:25, 61:20,
62:1, 62:4, 63:11, 63:12,
63:17, 65:7, 65:19, 104:13
**move** [11] - 7:18, 20:24,
25:5, 26:1, 26:12, 28:22,
32:19, 37:8, 39:10, 39:14,
47:8
**moved** [4] - 11:13, 50:16,
128:15
**moving** [3] - 31:16, 107:9,
128:13
**MR** [115] - 2:5, 2:10, 2:14,
3:23, 4:1, 4:5, 4:8, 4:13,
4:15, 4:18, 4:25, 5:8, 5:11,

5:17, 5:20, 6:1, 6:8, 7:6,
8:14, 8:16, 8:19, 8:24, 10:3,
10:5, 11:3, 11:6, 20:12,
20:15, 20:17, 20:24, 21:1,
21:3, 21:5, 24:20, 25:5,
25:7, 25:11, 25:16, 25:19,
26:1, 26:3, 26:6, 26:9,
26:12, 26:14, 26:17, 28:14,
28:17, 28:22, 28:24, 29:3,
32:19, 32:21, 33:2, 36:15,
36:25, 37:3, 37:8, 37:10,
37:14, 38:22, 39:1, 39:12,
39:16, 39:17, 39:20, 39:24,
40:3, 42:4, 42:6, 42:9,
42:14, 47:2, 47:8, 47:10,
47:13, 47:16, 49:23, 60:10,
69:13, 87:12, 87:16, 87:20,
88:9, 88:10, 90:1, 93:16,
93:22, 93:24, 94:4, 94:20,
95:6, 95:8, 95:11, 95:17,
96:3, 96:8, 96:18, 96:20,
96:25, 97:14, 97:15, 116:23,
117:2, 117:4, 117:8, 123:11,
123:18, 128:18, 129:13,
129:16, 130:5, 130:8,
130:14, 131:6
**MS** [6] - 2:17, 7:17, 8:25,
94:17, 95:18, 130:6
**multiple** [1] - 42:5
**Munchie** [2] - 43:8, 43:11
**murder** [40] - 10:9, 10:10,
10:12, 17:14, 34:12, 34:14,
35:6, 35:20, 35:21, 35:25,
41:19, 42:10, 43:3, 43:11,
44:22, 44:25, 45:10, 45:11,
52:5, 53:17, 54:9, 54:10,
54:12, 58:25, 59:1, 59:12,
60:15, 60:18, 61:13, 63:7,
63:18, 67:7, 67:18, 68:7,
72:12, 104:11, 125:11,
125:14, 126:7
**murdered** [3] - 10:14,
52:18, 66:22
**murdering** [2] - 47:22, 52:2

## N

**name** [17] - 5:15, 9:10,
13:14, 20:4, 24:8, 28:12,
47:15, 89:9, 89:10, 90:21,
99:23, 107:25, 109:3, 120:8,
122:20, 124:19
**named** [8] - 30:18, 30:22,
77:14, 81:25, 93:1, 97:17,
121:10, 122:19
**names** [2] - 90:13, 90:14
**narcotics** [1] - 17:13
**narrow** [1] - 6:22
**near** [3] - 48:1, 50:18, 50:20
**necessarily** [2] - 4:19, 7:3

**necessary** [1] - 5:1
**need** [19] - 4:14, 4:21, 4:24,
5:2, 22:12, 48:18, 63:25,
64:1, 64:15, 94:16, 105:16,
110:25, 114:1, 117:5,
117:13, 128:24, 130:2,
130:15
**needed** [7] - 10:20, 40:13,
64:6, 83:2, 103:23, 112:1,
113:19
**neglected** [1] - 39:12
**neighborhood** [1] - 11:11
**neighborhoods** [1] - 11:11
**never** [1] - 84:25
**NEW** [1] - 1:1
**New** [14] - 1:4, 1:12, 1:13,
1:16, 1:18, 1:20, 13:12,
69:3, 95:14, 122:12, 122:14
**next** [30] - 9:2, 16:16,
35:21, 38:13, 38:19, 51:21,
55:8, 58:14, 58:21, 63:24,
65:16, 77:11, 77:16, 78:24,
82:13, 82:25, 84:6, 84:11,
84:20, 85:7, 89:15, 91:20,
91:23, 94:24, 99:21, 100:18,
102:5, 105:18, 111:7,
119:17
**nice** [3] - 9:18, 59:24, 82:4
**nickname** [1] - 28:10
**night** [12] - 5:11, 44:13,
51:3, 54:8, 54:10, 54:12,
55:1, 58:23, 67:8, 100:8,
100:9, 100:21
**ninety** [1] - 18:6
**Nissan** [3] - 54:25, 110:18
**none** [1] - 37:10
**normal** [1] - 89:12
**Nostrand** [1] - 118:12
**note** [2] - 60:10, 111:16
**noted** [2] - 11:4, 130:20
**nothing** [6] - 50:4, 62:17,
100:19, 102:7, 103:21,
109:7
**notice** [1] - 5:11
**noticed** [1] - 5:12
**November** [2] - 109:22,
109:24
**nowhere** [1] - 67:9
**number** [4] - 35:24, 40:15,
74:15, 74:21
**numbers** [1] - 98:4

## O

**o'clock** [4] - 94:19, 96:6,
130:10, 130:12
**oath** [1] - 97:11
**object** [1] - 39:24
**objection** [15] - 20:25, 25:6,

26:2, 26:13, 28:23, 36:15, 37:9, 39:15, 42:4, 47:9, 49:23, 60:10, 87:12, 95:24, 95:25

**objections** [9] - 3:10, 3:13, 3:16, 3:18, 3:21, 3:24, 4:20, 4:23, 5:2

**obligated** [3] - 74:22, 126:21, 126:22

**obligations** [4] - 22:9, 22:14, 22:16, 126:20

**observe** [1] - 33:18

**obtain** [2] - 40:20, 57:8

**obtained** [2] - 41:12, 57:9

**October** [1] - 128:5

**OF** [3] - 1:1, 1:2, 1:8

**offer** [1] - 96:14

**offered** [1] - 97:1

**office** [3] - 2:8, 71:6, 71:7

**officer** [1] - 72:8

**Officer** [1] - 2:7

**OFFICER** [1] - 3:4

**official** [1] - 14:12

**Official** [2] - 1:23, 32:25

**often** [3] - 72:20, 73:21, 75:1

**okayed** [1] - 17:14

**old** [4] - 11:7, 17:19, 129:11

**older** [1] - 44:18

**Olivia** [1] - 2:8

**once** [2] - 50:8, 62:18, 62:19, 69:20, 73:23, 75:3, 75:4, 98:7, 105:20

**one** [51] - 4:16, 4:22, 5:2, 5:8, 17:11, 30:4, 31:25, 32:2, 32:12, 42:23, 43:7, 44:13, 47:24, 51:3, 53:6, 53:7, 62:20, 63:22, 71:5, 72:9, 73:4, 73:18, 74:23, 79:6, 79:23, 80:8, 80:20, 81:14, 87:4, 87:25, 88:3, 93:12, 94:19, 95:12, 96:6, 96:22, 96:23, 98:2, 100:21, 100:23, 107:18, 112:3, 113:19, 113:20, 118:11, 119:4, 120:5, 124:18, 130:11

**One** [3] - 92:3, 99:24, 99:25

**one's** [1] - 83:16

**ones** [2] - 4:9, 63:16

**open** [17] - 2:1, 19:12, 54:18, 55:18, 56:1, 56:10, 85:25, 94:24, 94:25, 95:3, 115:9, 115:13, 116:5, 123:8, 123:23, 124:2

**opened** [5] - 44:17, 56:1, 79:25, 85:22, 123:24

**operating** [1] - 12:15

**opinion** [3] - 32:20, 32:21, 68:6

**opportunity** [1] - 129:4

**orange** [1] - 19:23

**order** [1] - 50:9

**ordered** [1] - 85:4

**Orena** [7] - 30:17, 30:18, 30:19, 31:9, 31:15, 34:21, 35:24

**organized** [20] - 12:18, 13:2, 13:9, 13:10, 13:19, 13:23, 14:14, 16:6, 17:10, 17:17, 21:7, 22:1, 22:5, 22:21, 24:3, 32:13, 59:16, 83:25, 105:11

**original** [2] - 38:17, 38:18

**originally** [2] - 5:13, 94:12

**otherwise** [3] - 7:14, 96:16, 130:3

**outside** [4] - 51:1, 58:25, 59:11, 87:14

**outstanding** [1] - 3:1

**overrule** [1] - 40:1

**overruled** [5] - 33:1, 36:17, 42:12, 49:25, 88:8

**Overruled** [1] - 36:16

**oversees** [1] - 16:5

**owe** [7] - 33:14, 76:14, 77:5, 79:18, 102:15, 102:20, 103:25

**owed** [11] - 19:7, 76:6, 80:4, 80:10, 80:17, 97:5, 98:25, 99:1, 103:24, 104:7

**own** [6] - 10:12, 12:6, 88:20, 104:25, 110:18, 118:2, 119:2, 124:22

**owned** [1] - 27:8

**owner** [1] - 98:11

**owns** [2] - 68:24, 68:25

**Ozone** [3] - 50:21, 52:8, 52:12

**P**

**P-A-P-P-A** [1] - 47:17

**p.m** [1] - 130:20

**packaged** [1] - 41:2

**page** [1] - 88:1

**PAGE** [1] - 131:2

**paid** [1] - 72:20

**Panarello** [2] - 89:3, 89:4

**Pappa** [31] - 44:13, 44:19, 47:1, 47:5, 47:6, 47:14, 47:16, 47:19, 48:3, 52:20, 53:2, 53:9, 53:16, 56:5, 56:9, 56:22, 56:25, 58:16, 63:15, 63:16, 63:19, 64:3, 64:9, 64:10, 65:5, 65:9, 65:22, 65:24, 66:3, 66:15, 67:23

**paralegal** [1] - 2:7

**parameters** [1] - 93:18

**parents** [1] - 29:24

**park** [7] - 48:5, 54:14, 55:10, 55:11, 57:16, 111:6, 122:9

**Park** [4] - 11:13, 50:21, 52:8, 52:12

**parked** [1] - 111:7

**parking** [6] - 55:11, 55:12, 55:15, 122:8, 122:20, 123:9

**Parkway** [1] - 81:14

**parlor** [1] - 45:13

**Parlor** [1] - 45:13

**parole** [5] - 71:11, 72:1, 72:8, 109:21, 110:4

**part** [11] - 6:1, 17:7, 38:13, 38:14, 67:18, 88:3, 93:5, 97:21, 98:20, 104:11, 127:14

**participate** [1] - 97:3

**participated** [3] - 6:3, 7:2, 88:4

**particular** [1] - 96:13

**parties** [6] - 5:6, 8:12, 87:25, 129:4, 129:21, 130:1

**partner** [2] - 73:5, 91:19

**passed** [2] - 45:4, 58:24

**passenger** [2] - 44:17, 55:13

**passing** [1] - 95:4

**past** [2] - 51:6, 60:11

**pay** [9] - 73:21, 74:22, 75:5, 100:22, 100:23, 101:2, 111:15, 127:3

**paying** [6] - 72:22, 75:8, 75:13, 80:10, 81:4, 110:25

**payments** [2] - 83:8, 110:25

**pendency** [1] - 125:23

**penis** [1] - 65:18

**people** [22] - 14:19, 14:20, 31:22, 33:13, 33:21, 34:3, 43:18, 44:21, 49:3, 70:4, 72:17, 73:3, 73:25, 74:2, 75:22, 76:6, 76:8, 80:6, 90:24, 98:4, 115:6

**perceiving** [1] - 8:3

**percent** [3] - 45:5, 73:18, 124:8

**percentage** [5] - 33:13, 72:17, 72:18, 72:20, 73:19

**perfect** [1] - 9:3

**period** [1] - 74:9

**permanent** [1] - 14:15

**permission** [2] - 99:13, 109:18

**PERSICO** [1] - 1:5

**Persico** [122] - 2:3, 2:15, 2:18, 5:18, 8:5, 10:22, 10:23, 20:5, 20:8, 20:22, 21:6, 21:10, 21:11, 21:13,

21:14, 21:16, 21:19, 21:20, 21:21, 21:23, 22:19, 23:25, 24:9, 24:11, 25:1, 25:2, 25:13, 25:24, 26:18, 27:11, 27:22, 30:12, 30:17, 30:22, 30:24, 30:25, 31:7, 31:17, 32:5, 32:9, 33:3, 33:6, 33:20, 34:8, 34:11, 34:24, 35:1, 35:4, 35:12, 36:6, 36:20, 37:22, 39:22, 40:7, 40:24, 41:20, 42:16, 42:22, 44:23, 45:1, 45:24, 49:6, 49:12, 49:17, 49:19, 49:22, 50:6, 60:23, 61:6, 61:25, 62:8, 62:10, 62:15, 68:8, 69:6, 69:12, 69:14, 69:17, 70:1, 70:14, 71:13, 72:10, 73:12, 74:4, 74:10, 74:14, 74:22, 75:8, 75:19, 76:23, 78:6, 80:3, 80:7, 80:15, 85:13, 86:3, 86:6, 86:7, 87:18, 88:12, 91:24, 97:1, 97:3, 97:5, 97:6, 99:15, 102:20, 107:25, 110:12, 113:14, 113:24, 115:24, 117:9, 118:6, 120:1, 123:5, 123:19, 124:3

**Persico's** [4] - 25:3, 32:10, 71:22, 108:14

**Persicos** [1] - 38:5

**person** [12] - 20:18, 24:23, 25:20, 26:24, 37:4, 39:2, 43:18, 43:23, 44:23, 77:14, 81:22, 101:2

**person's** [1] - 52:24

**personal** [2] - 16:23, 68:6

**persons** [1] - 43:23

**phone** [4] - 98:4, 99:21, 101:16, 120:3

**phrase** [2] - 48:14, 70:10

**physical** [1] - 111:22

**picked** [1] - 41:18

**pictures** [1] - 84:10

**piece** [1] - 59:24

**pink** [1] - 55:4

**pistol** [7] - 10:17, 41:10, 43:18, 51:8, 51:22, 56:14, 56:15

**pistols** [2] - 41:7, 41:11

**pitcher** [1] - 9:24

**place** [2] - 27:18, 124:9

**placed** [2] - 66:12, 127:10

**plan** [12] - 10:19, 34:12, 34:14, 35:6, 39:5, 52:22, 52:24, 53:15, 83:10, 83:15, 83:19, 85:5

**planned** [1] - 35:20, 42:1, 94:12

**planning** [9] - 34:22, 35:25, 41:19, 42:10, 42:19, 44:22,

44:25, 47:14, 47:19
**plans** [1] - 40:12, 44:7
**play** [1] - 50:23
**playing** [2] - 78:9, 79:22
**Plaza** [1] - 1:12
**plea** [4] - 6:18, 6:19, 7:4, 7:22
**plead** [1] - 126:4
**pled** [6] - 18:10, 103:10, 126:6, 126:9, 127:9, 127:17
**plenty** [1] - 40:14
**plus** [1] - 129:24
**point** [19] - 10:25, 28:4, 44:22, 44:25, 46:24, 60:11, 68:7, 69:24, 70:20, 73:15, 73:16, 73:17, 73:19, 73:21, 74:23, 78:15, 85:1, 103:25, 110:17
**Point** [2] - 12:8, 12:10
**pointed** [1] - 40:14
**points** [2] - 73:25, 74:2
**portion** [2] - 32:24, 88:3
**position** [20] - 14:3, 14:15, 15:24, 25:13, 32:10, 34:18, 37:16, 37:20, 105:11, 108:2, 108:6, 108:14, 109:12, 113:16, 114:4, 114:7, 114:9, 114:14, 114:20, 115:4
**positions** [5] - 13:2, 13:19, 26:19, 34:3, 115:7
**possess** [1] - 11:22
**possessing** [1] - 107:16
**possession** [1] - 18:8
**possibility** [1] - 7:8
**possible** [1] - 110:1
**posted** [1] - 4:20
**potentially** [1] - 7:23
**pound** [1] - 112:17
**pray** [1] - 126:17
**prayer** [1] - 46:2
**prearranged** [1] - 57:16
**prefer** [1] - 5:4
**present** [4] - 2:1, 52:18, 67:18, 129:22
**presented** [1] - 98:8
**presentence** [6] - 3:8, 3:13, 3:16, 3:21, 6:23, 87:20
**pretty** [2] - 19:11, 130:18
**previously** [1] - 116:15
**principal** [1] - 72:22
**prison** [15] - 21:6, 21:23, 23:4, 23:12, 23:21, 23:22, 23:23, 27:1, 30:11, 41:21, 45:20, 62:23, 104:19, 108:20, 113:24
**Probation** [6] - 1:21, 2:7, 2:25, 4:20, 5:3, 5:4
**PROBATION** [1] - 3:4
**probation** [3] - 18:12, 18:13, 18:15

**probative** [1] - 87:19
**problem** [16] - 8:3, 16:23, 16:24, 40:13, 50:15, 62:24, 63:1, 71:23, 72:1, 78:19, 94:6, 98:2, 100:17, 118:8, 125:3
**problems** [10] - 27:25, 28:2, 50:14, 75:20, 75:22, 88:16, 110:20, 110:21, 125:1, 125:2
**proceed** [2] - 2:22, 97:13
**proceeding** [2] - 8:2, 8:9
**proceedings** [1] - 130:21
**Proceedings** [1] - 1:25
**process** [3] - 16:8, 16:17, 17:7
**produce** [1] - 12:6
**produced** [1] - 1:25
**products** [2] - 115:14, 117:18
**profit** [3] - 89:17, 89:18, 89:19
**program** [1] - 127:15
**protected** [1] - 22:8
**Protection** [1] - 115:16
**protocols** [1] - 129:11
**prove** [1] - 87:22
**proved** [1] - 88:2
**provide** [3] - 3:3, 5:3, 126:2, 128:1, 128:13
**provided** [1] - 5:3
**published** [8] - 20:16, 24:22, 25:18, 26:8, 28:16, 37:2, 38:24, 47:4
**pull** [2] - 54:17, 55:15
**pulled** [3] - 44:19, 58:16, 59:3
**pulling** [2] - 51:22, 54:13
**purpose** [3] - 13:8, 16:20, 74:14
**pursue** [1] - 96:10
**put** [21] - 2:23, 16:12, 16:14, 16:15, 16:16, 23:11, 38:10, 38:15, 55:16, 57:7, 57:25, 64:6, 83:10, 83:11, 83:15, 95:10, 104:20, 105:4, 117:18, 124:7
**puts** [1] - 69:21
**putting** [5] - 16:13, 70:1, 70:3, 70:5, 104:25

## Q

**Queens** [1] - 52:13
**questioning** [1] - 96:9
**questions** [2] - 32:22, 128:18

## R

**R-U-S-S-O** [1] - 9:11
**racketeering** [5] - 87:16, 88:4, 125:12, 125:13, 126:8
**radio** [3] - 51:7, 51:10
**radios** [1] - 54:7
**raise** [3] - 8:12, 9:4, 17:12
**raised** [2] - 4:23, 11:12
**ran** [6] - 56:11, 77:12, 77:13, 77:14, 100:11, 122:20
**rap** [1] - 112:20
**rather** [2] - 129:12, 130:16
**reach** [5] - 80:8, 117:17, 117:23, 120:21
**reached** [4] - 82:10, 82:14, 105:19, 122:21
**reaches** [1] - 121:2
**reaching** [1] - 44:16
**reaction** [1] - 91:5
**read** [1] - 32:24
**ready** [5] - 2:22, 10:2, 51:22, 75:21, 97:13
**real** [2] - 20:4, 28:12
**realized** [1] - 48:10
**really** [12] - 16:24, 17:14, 23:13, 32:15, 32:17, 73:1, 89:22, 95:25, 100:20, 104:1, 106:8, 112:1
**reassure** [1] - 43:16
**reassured** [1] - 96:9
**Reback** [6] - 83:24, 105:10, 116:2, 119:10, 119:13, 119:15
**Reback's** [1] - 119:11
**recalling** [1] - 96:2
**receipt** [1] - 2:25
**received** [8] - 21:4, 25:9, 26:5, 26:16, 29:1, 37:12, 39:19, 47:12
**receiving** [1] - 57:13
**recently** [1] - 108:10
**recess** [1] - 95:20
**recognize** [5] - 20:18, 24:23, 25:20, 37:4, 39:2
**record** [8] - 2:24, 3:18, 22:7, 24:16, 24:19, 32:24, 90:23, 129:12
**recorded** [1] - 1:25
**recross** [1] - 129:24
**Red** [2] - 12:6, 124:19
**redirect** [1] - 129:24
**reduce** [1] - 72:22
**refer** [2] - 46:12, 81:5
**referred** [8] - 20:16, 24:22, 25:18, 26:8, 28:16, 37:2, 38:24, 47:4
**referring** [3] - 62:7, 102:17,

106:15
**refers** [1] - 44:5
**regarding** [1] - 87:21
**relate** [2] - 6:22, 129:15
**related** [4] - 31:4, 37:18, 37:19, 114:18
**relating** [1] - 22:14
**relationship** [5] - 21:13, 21:20, 21:24, 24:10, 29:10
**relaxation** [1] - 42:13
**relaxed** [1] - 43:15
**release** [5] - 68:14, 106:3, 107:12, 109:19, 109:23
**released** [22] - 23:11, 23:12, 23:15, 23:17, 23:18, 23:19, 23:20, 23:23, 24:1, 24:4, 24:15, 24:16, 24:18, 26:24, 27:23, 29:16, 29:25, 30:11, 106:1, 106:23, 110:17, 128:13
**relevant** [1] - 6:23
**relitigating** [1] - 6:18
**remember** [29] - 23:15, 41:4, 52:8, 53:20, 53:22, 56:14, 57:18, 63:21, 65:7, 65:12, 65:17, 66:24, 69:20, 72:4, 75:12, 77:13, 79:19, 88:15, 97:16, 98:18, 101:8, 104:1, 104:3, 105:16, 114:12, 121:5, 123:21, 124:18
**remind** [4] - 37:15, 87:25, 97:10, 97:19
**rent** [1] - 83:3
**rented** [2] - 84:5
**repeat** [4] - 36:19, 42:15, 52:11, 123:19
**report** [24] - 3:8, 3:13, 3:16, 3:21, 6:24, 14:22, 15:16, 15:21, 24:3, 32:6, 32:14, 32:16, 42:2, 60:18, 61:17, 62:9, 68:16, 68:18, 68:21, 69:5, 78:3, 87:20, 113:9
**reported** [4] - 33:3, 33:6, 64:10, 72:9
**Reporter** [3] - 1:22, 1:23, 32:25
**reporting** [3] - 30:12, 70:21, 84:22
**reports** [1] - 15:22
**represent** [1] - 8:9
**represented** [2] - 5:14, 5:18
**request** [1] - 6:9
**requested** [2] - 6:5, 32:24
**require** [1] - 4:19
**requirements** [1] - 3:14
**reserve** [2] - 129:25, 130:16
**resolve** [1] - 18:9
**resolved** [2] - 6:6, 103:9
**respect** [2] - 3:1, 7:23

**respectfully** [2] - 87:14, 87:23
**respond** [1] - 68:2
**responded** [1] - 68:3
**response** [2] - 4:24, 102:3
**responsibilities** [4] - 14:17, 15:4, 15:18, 16:4
**responsibility** [2] - 15:13, 16:1
**rest** [2] - 115:19, 130:12
**restaurant** [5] - 120:15, 124:18, 124:19, 124:20, 124:21
**restaurants** [4] - 33:9, 122:1, 122:16, 124:6
**result** [4] - 70:14, 70:17, 70:19, 86:17
**resume** [1] - 94:8
**resumes** [1] - 97:9
**return** [4] - 33:17, 57:13, 64:12, 68:8
**returns** [1] - 3:3
**reverse** [1] - 55:10
**review** [3] - 3:17, 3:22, 17:4
**revised** [2] - 3:8, 3:21
**revisit** [2] - 6:21, 7:21
**RICO** [2] - 87:3, 103:4
**rid** [6] - 38:4, 64:7, 84:21, 110:25, 111:16, 111:17
**RIOPELLE** [1] - 1:15
**RMR** [1] - 1:22
**road** [3] - 38:20, 106:3, 114:8
**robbing** [1] - 11:20
**ROBERT** [1] - 1:11
**Robert** [1] - 38:15
**Roger** [5] - 111:5, 111:12, 111:13, 115:3, 115:7
**role** [5] - 21:7, 22:1, 22:20, 35:23, 52:24
**Romantique** [10] - 27:5, 27:6, 27:16, 27:22, 33:8, 69:9, 69:15, 71:8, 75:7, 79:12
**Romantique's** [1] - 79:5
**Ronnie** [4] - 99:24, 99:25, 100:19
**room** [1] - 129:8
**Rosatti** [7] - 117:17, 117:20, 117:21, 118:2, 118:7, 118:9, 118:12
**rounds** [2] - 57:4, 57:5
**route** [1] - 12:5
**rug** [1] - 66:11
**rules** [7] - 17:10, 17:11, 29:17, 30:2, 30:4, 42:13
**rulings** [1] - 3:9
**run** [2] - 15:14, 88:22
**running** [6] - 61:20, 62:1, 62:4, 63:11, 63:12, 63:17

**Russo** [17] - 8:20, 8:21, 9:11, 10:6, 11:7, 20:18, 24:23, 31:2, 31:3, 31:23, 42:15, 62:24, 63:3, 63:5, 88:11, 97:16, 114:17
**RUSSO** [2] - 9:6, 131:4
**Russos** [1] - 31:4
**Ryder** [1] - 83:3

## S

**safe** [1] - 114:2
**Sal** [3] - 51:18, 51:19, 51:20
**Santos** [1] - 79:16
**SARITA** [1] - 1:19
**Sarita** [1] - 2:17
**satisfied** [2] - 96:16, 118:14
**Savarese** [1] - 115:1
**Savarese's** [1] - 115:4
**save** [1] - 74:7
**saw** [4] - 43:17, 45:24, 48:24, 101:23
**Scarpaci** [1] - 45:25
**Scarpaci's** [1] - 45:13
**scene** [2] - 52:19, 57:1
**schedule** [4] - 3:19, 95:3, 96:7, 130:17
**schedules** [1] - 130:18
**scheduling** [3] - 95:13, 128:22, 129:5
**scheme** [1] - 81:8
**school** [1] - 11:14
**scope** [1] - 87:15
**Scopo** [43] - 10:11, 10:12, 10:14, 10:19, 31:11, 35:22, 36:1, 36:21, 37:23, 39:8, 39:21, 40:6, 41:19, 44:6, 44:22, 44:25, 45:9, 45:11, 46:15, 46:21, 46:23, 47:22, 48:12, 48:13, 48:24, 49:22, 50:11, 52:3, 52:5, 52:18, 54:20, 58:23, 58:25, 60:14, 60:17, 61:13, 63:7, 63:18, 68:7, 72:12, 91:14, 125:15
**Scopo's** [1] - 35:23
**Scotty** [24] - 83:20, 83:23, 83:24, 105:8, 105:9, 105:10, 106:3, 106:6, 106:10, 106:20, 115:22, 116:1, 116:2, 116:3, 119:4, 119:9, 119:10, 119:11, 119:15, 120:22, 120:23
**Scotty's** [2] - 106:19, 120:22
**scrape** [1] - 81:20
**screaming** [1] - 56:18
**screwdriver** [1] - 54:5
**screwed** [1] - 86:12
**seat** [2] - 55:14, 97:10

**seated** [3] - 2:18, 9:9, 129:10
**second** [2] - 4:16, 83:6
**security** [1] - 19:22
**see** [47] - 9:23, 10:23, 17:1, 27:25, 28:2, 33:22, 36:3, 36:7, 36:9, 36:22, 37:22, 38:6, 51:4, 51:5, 51:6, 54:20, 55:9, 56:10, 56:12, 56:19, 61:21, 61:23, 67:6, 72:5, 72:7, 73:23, 75:3, 75:6, 75:7, 82:9, 82:21, 84:17, 84:18, 93:18, 97:7, 100:3, 101:20, 101:21, 110:4, 110:5, 111:8, 115:22, 118:21, 119:7, 119:16, 120:11, 120:13
**See** [1] - 81:2
**seek** [1] - 99:13
**seem** [1] - 129:17
**sell** [2] - 81:8, 121:23
**selling** [6] - 11:21, 12:14, 18:18, 18:19, 72:14, 112:17
**send** [2] - 22:18, 106:14
**senior** [1] - 20:6
**Senior** [11] - 24:9, 24:11, 26:18, 26:21, 26:22, 27:22, 30:12, 31:7, 31:18, 32:5, 37:19
**sense** [1] - 130:6
**sent** [1] - 108:17
**sentence** [10] - 18:11, 18:13, 19:17, 19:21, 23:5, 103:11, 103:13, 104:14, 126:9, 128:8
**sentenced** [3] - 127:24, 128:1, 128:4
**sentencing** [1] - 8:2
**separate** [4] - 7:7, 53:13, 53:14, 66:18
**September** [2] - 4:24, 109:20
**Sercarz** [3] - 2:15, 7:19, 8:25, 95:25
**SERCARZ** [34] - 1:15, 1:16, 2:14, 8:24, 11:3, 21:1, 25:7, 26:3, 26:14, 28:24, 32:19, 36:15, 39:16, 39:24, 42:4, 47:10, 49:23, 60:10, 87:12, 87:20, 93:16, 94:4, 94:20, 95:17, 96:3, 96:8, 116:23, 117:2, 117:4, 123:11, 129:13, 129:16, 130:5, 130:14
**serious** [2] - 125:10, 126:6
**serve** [1] - 128:10
**served** [4] - 103:13, 104:14, 128:9, 128:11
**service** [4] - 12:17, 81:14, 84:8, 84:12

**serving** [1] - 23:4
**set** [5] - 3:19, 4:11, 54:11, 54:12, 84:15
**setting** [2] - 48:1, 54:13
**settle** [2] - 77:24, 78:11
**settled** [1] - 6:20
**seven** [2] - 77:6, 77:7
**Seventh** [2] - 1:15, 1:18
**Seventy** [1] - 104:3
**several** [2] - 94:15, 95:1
**shaking** [1] - 72:14
**shall** [1] - 4:17
**share** [1] - 116:22
**shark** [2] - 73:10, 113:1
**shifted** [1] - 115:21
**shifting** [1] - 81:7
**shoot** [1] - 56:20
**shooter** [1] - 53:2
**shooters** [2] - 48:3, 48:20
**shooting** [3] - 56:6, 56:7, 57:3
**shot** [1] - 10:15
**shoulder** [1] - 19:12
**show** [10] - 20:12, 24:20, 25:16, 26:6, 28:14, 34:2, 36:25, 38:22, 40:25, 47:2
**showed** [4] - 40:22, 43:21, 72:2, 72:8, 72:9, 84:7
**shut** [1] - 104:13
**shylock** [3] - 33:11, 33:12, 33:13
**shylocking** [1] - 73:4
**side** [9] - 31:9, 31:10, 34:7, 34:11, 34:20, 34:21, 35:24, 44:17, 55:13
**sides** [1] - 30:16
**sign** [1] - 126:12
**silencer** [2] - 41:5, 41:8
**silencers** [1] - 41:6
**sit** [2] - 7:13, 124:7
**sitting** [1] - 59:2
**situation** [3] - 6:12, 98:9, 98:14
**six** [1] - 84:10
**six-foot** [1] - 84:10
**sixteen** [1] - 11:17
**sixty** [1] - 104:2
**ski** [1] - 55:6
**slowly** [1] - 9:18
**small** [1] - 54:24
**smile** [1] - 59:7
**smiled** [1] - 85:10
**Smiley** [4] - 40:14, 40:15, 40:16, 41:18
**Smiley's** [2] - 40:15, 40:17
**smoke** [1] - 51:9
**snacks** [1] - 104:19
**social** [3] - 50:20, 50:22, 51:1

**softer** [2] - 110:15
**sold** [1] - 89:16
**soldier** [6] - 13:4, 14:23, 15:4, 15:9, 16:11, 17:23
**soldier's** [1] - 16:12
**soldiers** [4] - 13:20, 14:21, 15:6, 15:14
**someone** [9] - 16:13, 17:7, 19:4, 22:6, 22:9, 22:16, 90:24, 108:23, 111:2
**sometimes** [2] - 14:9, 106:14
**somewhere** [1] - 124:19
**son** [9] - 19:5, 19:6, 19:10, 19:11, 32:1, 32:3, 112:13, 112:16, 112:17
**soon** [2] - 55:16, 125:18
**sorry** [15] - 13:6, 23:17, 36:18, 39:7, 39:10, 39:13, 47:15, 63:1, 89:25, 91:9, 101:1, 106:5, 114:22, 117:2, 123:19
**sort** [1] - 21:24
**southern** [1] - 103:8
**space** [3] - 116:11, 116:17, 116:22
**Sparacino** [31] - 38:20, 39:3, 47:1, 52:20, 53:1, 53:9, 53:16, 54:17, 55:5, 55:7, 55:21, 56:6, 56:17, 56:24, 57:4, 58:4, 58:12, 63:8, 63:10, 63:13, 63:14, 63:17, 63:20, 64:2, 64:3, 65:2, 65:15, 66:7, 66:22, 67:7, 67:11
**Sparacino's** [1] - 66:1
**Sparaco** [2] - 28:8, 31:22
**Spata** [4] - 120:9, 121:4, 121:5
**speaking** [1] - 129:10
**Special** [1] - 2:6
**special** [1] - 127:10
**specific** [1] - 124:17
**spell** [2] - 9:9, 47:15
**spelling** [1] - 9:13
**Spider** [6] - 81:25, 82:6, 82:12, 84:2, 84:15, 84:24
**spillover** [1] - 130:2
**split** [2] - 101:5, 101:6
**sport** [1] - 11:2
**spot** [4] - 48:5, 48:8, 57:16, 116:18
**spotted** [2] - 84:8, 84:9
**squash** [2] - 77:12, 78:11
**stairs** [2] - 48:9, 49:10
**stake** [1] - 31:12
**Staluppi** [11] - 117:17, 117:20, 117:21, 118:2, 118:7, 118:9, 118:13, 119:12, 119:13, 120:21,

121:2
**Staluppi's** [1] - 118:14
**stand** [5] - 8:21, 94:10, 97:9, 129:3, 129:6
**standard** [1] - 3:14
**standing** [3] - 51:15, 79:6, 129:11
**start** [4] - 13:18, 54:4, 115:17, 124:22, 130:9, 130:12
**started** [12] - 2:24, 5:7, 8:13, 23:4, 36:2, 44:1, 56:19, 65:1, 76:6, 89:7, 96:21, 120:18
**starting** [3] - 56:19, 112:24, 117:13
**state** [11] - 2:4, 3:17, 19:19, 19:20, 23:12, 23:23, 29:16, 45:20, 87:2, 103:5, 125:8
**statement** [1] - 3:6
**statements** [2] - 42:11, 96:12
**Staten** [6] - 27:19, 64:22, 64:23, 85:24, 100:21, 122:24
**STATES** [3] - 1:1, 1:2, 1:9
**States** [5] - 1:4, 1:11, 1:14, 2:3, 2:5
**stay** [5] - 27:24, 29:22, 74:6
**staying** [1] - 29:20
**stays** [1] - 15:20
**steal** [2] - 63:22, 63:23
**stealing** [1] - 11:20, 12:14
**stenography** [1] - 1:25
**step** [3] - 16:17, 58:12, 87:4
**steps** [1] - 79:23
**stick** [1] - 110:15
**still** [7] - 6:14, 48:8, 69:24, 71:11, 78:12, 97:11, 108:18
**stipulate** [1] - 11:3
**stock** [2] - 93:10, 98:5
**stockbroker** [6] - 93:11, 97:2, 97:20, 98:23, 99:1, 100:13
**stockbrokers** [1] - 96:21
**stockbroking** [1] - 98:15
**stole** [1] - 64:20
**stolen** [8] - 53:20, 54:2, 66:4, 66:13, 81:9, 81:17, 81:18, 84:22
**stood** [1] - 56:1
**stopped** [2] - 44:1, 80:10
**store** [21] - 17:24, 85:22, 85:23, 85:25, 86:9, 86:17, 86:20, 86:22, 87:6, 87:8, 88:14, 88:16, 89:8, 89:14, 89:15, 89:16, 91:23, 104:18, 106:17, 106:18, 106:20
**store's** [1] - 89:12
**storefront** [1] - 82:17

**story** [1] - 100:13
**straight** [3] - 64:1, 78:18, 92:7
**straightened** [10] - 16:22, 17:2, 24:17, 61:15, 90:11, 90:25, 92:5, 92:24, 108:11, 110:7
**Street** [11] - 1:20, 11:12, 17:25, 27:13, 27:18, 27:20, 45:15, 52:9, 52:10, 52:12, 116:8
**street** [12] - 30:25, 31:2, 48:21, 48:22, 52:8, 53:12, 56:25, 82:17, 109:13, 109:14, 109:15, 109:17
**strike** [2] - 32:19, 69:13
**strip** [2] - 84:13, 84:16
**Stropoli** [17] - 86:3, 86:4, 90:5, 90:6, 90:7, 90:23, 91:4, 91:24, 113:2, 113:23, 114:15, 121:11, 121:14, 122:5, 122:11, 122:17, 124:23
**structure** [1] - 13:16
**stuck** [2] - 57:25, 65:18
**stuff** [2] - 15:1, 116:21
**subject** [5] - 29:17, 29:19, 29:20, 70:25, 87:13
**submissions** [1] - 88:1
**submit** [3] - 4:9, 87:14, 87:23
**substance** [1] - 35:13
**succeed** [2] - 6:9, 52:2
**successful** [1] - 86:9
**suffer** [1] - 86:17
**suffered** [1] - 86:18
**sufficiently** [1] - 3:22
**Suite** [3] - 1:15, 1:18, 1:20
**summertime** [2] - 45:4, 45:7
**Supermarkets** [1] - 12:7
**supervised** [3] - 107:12, 109:19, 109:23
**supervision** [1] - 29:17
**suppose** [1] - 96:1
**supposed** [8] - 17:13, 17:14, 50:2, 55:22, 71:14, 101:9, 127:1, 127:3
**supposedly** [1] - 15:3
**surgery** [1] - 112:1
**sustain** [1] - 60:13
**swing** [1] - 55:17
**switch** [1] - 7:19
**sworn** [1] - 9:8
**system** [2] - 19:19
**systems** [1] - 122:21

| | T |
|---|---|

**table** [3] - 2:6, 2:19, 9:21
**talkies** [1] - 54:7
**tape** [4] - 71:23, 72:2, 72:5, 72:7
**Tarantola** [10] - 28:7, 34:1, 34:24, 38:15, 46:6, 80:8, 80:13, 80:23, 81:5, 98:20
**tax** [3] - 3:1, 3:3, 3:7
**Teddy** [62] - 20:3, 20:5, 20:8, 20:10, 20:21, 20:22, 21:6, 21:21, 21:23, 21:25, 22:19, 22:24, 23:11, 23:13, 23:25, 24:5, 24:6, 24:9, 24:11, 24:17, 26:18, 26:21, 26:22, 27:22, 28:7, 30:12, 31:3, 31:6, 31:17, 32:5, 35:3, 35:4, 38:2, 38:3, 41:19, 41:25, 42:2, 42:3, 42:16, 42:18, 42:21, 42:22, 44:23, 45:1, 45:24, 46:7, 113:13, 113:14, 113:24, 114:10, 114:11, 119:24, 119:25, 120:1, 120:2, 120:12, 120:15, 120:16, 120:18, 121:1, 121:9
**Teddy's** [2] - 24:7, 34:1
**teenager** [1] - 11:18
**teens** [3] - 11:22, 12:1, 12:16
**Telephone** [1] - 1:23
**term** [6] - 13:22, 14:12, 14:16, 16:13, 72:18, 73:19
**terms** [3] - 8:1, 73:14, 80:25
**testified** [11] - 9:8, 24:11, 25:2, 32:2, 43:18, 47:21, 57:10, 86:6, 109:4, 121:10, 127:24
**testify** [3] - 6:13, 127:18, 128:17
**testifying** [4] - 96:21, 97:16, 121:14, 128:16
**testimony** [4] - 96:2, 128:21, 128:23, 128:25
**thanked** [2] - 106:4, 106:6
**themselves** [1] - 2:12
**theory** [1] - 6:1
**therefore** [1] - 6:3
**thousand** [7] - 74:16, 77:23, 78:10, 78:20, 79:19, 98:24, 99:1
**thousands** [2] - 74:17, 104:4
**threatened** [1] - 112:19
**three** [10] - 14:1, 46:7, 53:5, 54:6, 64:19, 74:2, 77:23, 78:10, 78:20, 79:19

threw [1] - 66:2
throughout [1] - 125:23
Thursday [1] - 130:1
today [5] - 3:17, 3:18, 10:23, 94:18, 128:16
together [7] - 38:10, 38:15, 69:21, 70:2, 70:3, 70:6, 81:21
Tommy [5] - 31:3, 109:7, 109:10, 109:11, 115:1
tomorrow [1] - 94:20
Tony [5] - 76:18, 76:20, 76:21, 76:25, 77:3, 77:4
took [12] - 17:23, 51:6, 56:23, 57:24, 67:9, 84:12, 101:14, 101:24, 102:1, 119:20, 129:22
top [5] - 9:22, 13:18, 14:1, 15:8, 16:7
topic [1] - 33:17
topics [2] - 81:7, 96:23
total [3] - 53:4, 74:13, 128:10
totalled [2] - 111:8, 111:14
tough [2] - 14:25, 15:3
towards [1] - 58:15
Townes [3] - 5:24, 6:6, 6:20
tractor [1] - 82:7
trailer [1] - 82:7
Transcript [1] - 1:25
TRANSCRIPT [1] - 1:8
Transcription [1] - 1:25
transporting [1] - 95:13
trial [6] - 6:13, 19:13, 49:14, 49:15, 49:22, 127:22
tried [2] - 98:10, 115:10, 120:20
tries [2] - 48:19, 48:23
trouble [11] - 27:24, 29:20, 50:13, 75:8, 75:13, 75:17, 75:18, 92:1, 92:13, 92:15, 107:16
Truck [1] - 83:4
truck [6] - 12:6, 12:15, 83:2, 83:3, 84:5, 84:21
trucking [1] - 12:5
truckload [1] - 81:16
trucks [2] - 11:20, 12:14
true [3] - 43:12, 67:14, 112:9
trust [1] - 32:18
truth [3] - 126:16, 126:17, 127:2
try [12] - 42:15, 74:7, 74:8, 77:12, 82:2, 88:20, 115:13, 118:19, 122:4, 122:12, 124:10, 124:14
trying [7] - 31:14, 43:9, 81:20, 98:3, 98:4, 104:11, 109:1

Tuesday [2] - 94:24, 95:2
turn [1] - 88:25
turned [6] - 51:16, 52:1, 54:14, 54:15, 121:8, 124:1
twelve [1] - 19:18
twenty [1] - 125:20
two [27] - 22:1, 29:10, 31:4, 32:22, 48:2, 51:24, 51:25, 54:14, 67:6, 70:24, 71:1, 74:3, 75:11, 77:23, 78:10, 78:20, 83:5, 83:8, 88:11, 95:7, 95:8, 96:20, 102:9, 105:22, 117:24, 124:18
two-and-a-half [1] - 74:3
type [1] - 15:2
types [3] - 11:18, 14:24, 18:17
typically [1] - 75:5

## U

ultimately [2] - 124:22, 126:4
Uncle [5] - 24:5, 24:6, 24:17, 31:3, 31:6
under [7] - 89:9, 89:10, 97:11, 126:14, 127:1, 127:3, 128:17
underboss [5] - 13:20, 14:1, 15:17, 15:18, 15:21
understood [4] - 36:17, 36:22, 40:3, 126:17
unfortunately [1] - 94:13
UNITED [3] - 1:1, 1:2, 1:9
United [5] - 1:4, 1:11, 1:14, 2:3, 2:5
unless [2] - 17:14, 102:7
unpack [1] - 66:5
unusual [1] - 55:5
up [66] - 3:12, 9:18, 11:9, 15:7, 16:7, 16:12, 16:13, 16:14, 16:16, 19:4, 19:6, 19:8, 22:13, 22:18, 34:2, 41:18, 46:2, 48:1, 48:9, 49:10, 54:11, 54:12, 54:13, 54:18, 55:11, 55:16, 58:16, 59:3, 59:12, 61:21, 61:22, 62:25, 64:1, 66:2, 66:6, 66:7, 66:10, 70:20, 78:18, 78:22, 81:15, 82:14, 84:15, 85:22, 86:12, 87:4, 88:7, 88:11, 92:3, 92:7, 94:14, 97:6, 100:19, 101:5, 101:6, 101:10, 103:21, 117:5, 117:13, 123:8, 123:23, 123:24, 124:2, 129:11, 130:13
upset [9] - 91:6, 91:15, 91:21, 91:25, 92:15, 101:24,

101:25, 121:1, 123:22
upstate [5] - 19:22, 68:19, 68:22, 68:23, 68:24
usual [2] - 9:13, 47:16

## V

valet [5] - 122:8, 122:9, 122:20, 122:22, 123:9, 124:5, 124:7, 124:11, 124:22
van [1] - 51:6
vehicle [1] - 84:4
vending [4] - 106:12, 106:13, 106:15, 106:17
versus [1] - 2:3
Vic [3] - 30:19, 31:15, 35:24
video [7] - 81:9, 81:16, 81:18, 82:9, 83:10, 84:2, 84:23
view [1] - 45:22
vig [2] - 72:19, 72:20
violate [1] - 107:17
visit [11] - 41:22, 62:18, 62:19, 62:20, 63:2, 63:3, 63:5, 63:6, 68:13, 68:15, 68:16
visited [1] - 41:23
visits [1] - 62:23
voice [2] - 9:18, 117:5

## W

wait [2] - 78:12, 78:13
waited [2] - 55:9, 99:18
walk [6] - 51:6, 51:9, 54:8, 82:11, 97:23, 110:15
walked [3] - 52:1, 78:23, 91:24
walkie [1] - 54:7
walkie-talkies [1] - 54:7
walking [5] - 46:3, 48:9, 49:10, 51:25, 58:15
wants [4] - 68:20, 69:4, 95:9, 110:6
war [10] - 30:15, 30:16, 31:12, 34:5, 34:20, 38:4, 69:24, 91:12, 91:13, 92:25
warm [1] - 45:7
watch [1] - 100:11
water [3] - 9:23, 9:24, 9:25
ways [1] - 110:14
weapons [1] - 40:13
wearing [7] - 9:25, 11:1, 11:2, 55:1, 55:2, 55:6, 55:6
Wednesday [1] - 94:25
weed [1] - 112:17
week [6] - 4:15, 33:14,

72:21, 73:22, 75:3, 94:22
weeks [2] - 100:20, 100:23
welcome [1] - 95:19
whack [1] - 101:9
whole [5] - 16:5, 48:6, 82:7, 82:20, 129:19
wholesale [2] - 122:2, 122:3
wide [1] - 56:1
Wild [9] - 31:11, 34:15, 34:16, 34:22, 35:7, 35:19, 35:20, 44:4, 44:8
willing [1] - 38:10
window [4] - 56:2, 56:7, 56:8, 56:18
wire [1] - 84:17
wiseguy [1] - 16:15
withdraw [1] - 6:18
withdrawal [2] - 7:4, 7:22
withdrew [2] - 5:21, 5:22
WITNESS [16] - 9:11, 9:14, 9:16, 13:7, 17:3, 24:16, 27:15, 63:2, 74:17, 94:2, 116:25, 117:7, 123:14, 123:16, 129:2, 131:2
witness [27] - 6:4, 6:10, 7:24, 8:18, 8:21, 9:1, 9:2, 11:4, 28:14, 36:16, 93:17, 93:22, 94:9, 94:10, 95:14, 95:24, 96:5, 96:11, 97:4, 97:5, 97:8, 97:9, 97:9, 129:3
witness's [2] - 32:20, 97:1
witnesses [2] - 95:7, 95:8
WITSEC [2] - 127:13, 127:14
woman [1] - 44:18
word [2] - 68:4, 73:16
wording [1] - 40:2
works [1] - 102:7
worry [5] - 43:7, 76:17, 76:22, 79:14, 110:10
worst [1] - 10:8
worthless [1] - 78:21
wrap [1] - 66:10
wrapped [3] - 66:2, 66:6, 66:7
written [1] - 4:9
wrote [1] - 105:6

## Y

year [16] - 18:5, 23:15, 34:9, 45:6, 68:11, 71:1, 71:9, 75:11, 81:11, 89:10, 106:22, 108:21, 113:7, 113:8, 116:24, 128:6
year-and-a-half [1] - 75:11
years [10] - 17:19, 18:12, 18:13, 27:17, 74:12, 75:11,

87:18, 105:2, 105:22,
123:13
 **yesterday** [1] - 2:25
 **YORK** [1] - 1:1
 **York** [12] - 1:4, 1:12, 1:13,
1:16, 1:18, 1:20, 13:12,
69:3, 95:14
 **yourself** [1] - 82:9
 **yourselves** [1] - 94:15
 **yous** [4] - 42:19, 42:20,
59:21, 75:25

Case 1:02-cr-02351-FK   Document 869-6   Filed 08/19/21   Page 175 of 625 PageID #:
Case 1:10-cr-00147-DLF   Document 340-1   Filed 09/21/16   Page 148 of 347 PageID #: 4482

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                          10-CR-147(DLI)
 3    UNITED STATES OF AMERICA,
                                          United States Courthouse
 4              Plaintiff,                Brooklyn, New York

 5              -against-                 August 24, 2016
                                          10:00 a.m.
 6    MICHAEL PERSICO,

 7              Defendant.
      ------------------------------x
 8
              TRANSCRIPT OF CRIMINAL CAUSE FOR FATICO HEARING
 9              BEFORE THE HONORABLE DORA L. IRIZARRY
                 UNITED STATES CHIEF DISTRICT JUDGE
10
      APPEARANCES
11    For the Government:        ROBERT L. CAPERS, ESQ.
                                 United States Attorney
12                               Eastern District of New York
                                 271 Cadman Plaza East
13                               Brooklyn, New York 11201
                                 BY:  ALLON LIFSHITZ
14                               Assistant United States Attorney

15    For the Defendant:         SERCARZ & RIOPELLE
                                 810 Seventh Avenue
16                               Suite 620
                                 New York, New York 10019
17                               BY:  MAURICE H. SERCARZ, ESQ.

18                               MARC FERNICH, ESQUIRE
                                 810 Seventh Avenue
19                               Suite 620
                                 New York, New York 10019
20
                                 SARITA KEDIA, ESQUIRE
21                               5 East 22nd Street
                                 Suite 7B
22                               New York, New York 10010
      Court Reporter:            LINDA D. DANELCZYK, RPR, CSR, OCR
23                               Phone:  718-613-2330
                                 Fax:  718-804-2712
24                               Email:  LindaDan226@gmail.com
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

Case 1:93-cr-00351-FK   Document 869-6   Filed 08/19/21   Page 176 of 635 PageID
Case 1:10-cr-00147-DLI   Document 340-1   Filed 09/21/16   Page 149 of 347 PageID #: 9017a
#: 4483
134

Proceedings

1              (In open court.)

2              THE COURT:  Please be seated.

3              THE COURTROOM DEPUTY:  Criminal cause for continued

4    Fatico hearing, Docket Number 10-CR-147, United States versus

5    Michael Persico.

6              Please state your appearances.

7              MR. LIFSHITZ:  Allon Lifshitz for the United States,

8    and I'm joined at counsel table by FBI Special agent Chance

9    Adam, and a paralegal from our office named Olivia Lemons.

10             Good morning, Your Honor.

11             THE COURT:  Good morning to all of you.

12             For defendant.

13             MR. FERNICH:  Good Morning, Your Honor, Marc Fernich

14   from Mr. Persico.

15             THE COURT:  Good Morning.

16             MR. SERCARZ:  Maurice Sercarz, S-E-R-C-A-R-Z.

17             THE COURT:  Good morning.

18             MS. KEDIA:  Good morning, Your Honor, Sarita Kedia

19   for Mr. Persico.

20             THE COURT:  Good morning.

21             Good morning, Mr. Persico.

22             THE DEFENDANT:  Good morning.

23             THE COURT:  All right, so this is continuation of a

24   Fatico hearing.  The Government's first witness, Anthony

25   Russo, the direct was completed of Mr. Russo, so we're on for

Case 1:02-cr-00351-EK   Document 869-6   Filed 09/19/21   Page 177 of 635 PageID #:
Case 1:16-cr-00147-DLF   Document 340-1   Filed 09/21/18   Page 155 of 347 PageID #: 10173
#: 4484
135

Proceedings

1   cross-examination, and I gather your witness is here.

2          MR. LIFSHITZ:  Yes, he is, Your Honor.  We can go

3   get him, if the Court is ready.

4          THE COURT:  So there were a number of letters that

5   were filed at the very last minute yesterday afternoon.  I

6   will address those after we get done with the witness today,

7   okay.  And let's move forward with the testimony.

8          So if you want to get set up while we bring in the

9   witness.  Thank you.

10          (Witness resumes the stand.)

11  ANTHONY RUSSO, called as a witness, by the Government, having

12  been previously first duly sworn/affirmed, was examined and

13  testified further as follows:

14          THE COURT:  Good morning, sir.  If you could just

15  tell your name again for the record.

16          THE WITNESS:  Anthony Russo.

17          THE COURT:  Thank you.  Good morning.  And I'm going

18  to remind you that you are still under oath.

19          Again, this is cross-examination by defense counsel.

20          Ms. Kedia, are you conducting the cross?

21          MS. KEDIA:  I am, Your Honor.

22          THE COURT:  Okay.  You may proceed whenever you're

23  ready.

24  CROSS-EXAMINATION

25

Case 1:03-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 178 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 181 of 347 PageID #: 16180
#: 4485
136

Russo - Cross - Kedia

1   BY MS. KEDIA:

2   Q    Mr. Russo, good morning.

3   A    Good morning.

4   Q    So you testified here a couple of weeks ago on direct

5   examination; you recall that.

6   A    Yes.

7   Q    And before your direct examination, Mr. Russo, did you

8   meet with the government to prepare for your testimony?

9   A    Yes, I did.

10  Q    How often did you meet with them?

11  A    Before last week?

12  Q    Yes.

13  A    One time.

14  Q    And did you speak to them on the phone?

15  A    Not that I remember, no.

16  Q    And you prepared for your testimony at -- there was going

17  to be a hearing at a prior occasion, right; you remember that?

18  A    Yes.

19  Q    And you prepared at that time as well?

20  A    Went over certain things, yes.

21  Q    You went over certain things with the government about

22  what you were going to say on the witness stand?

23  A    Not what I was going to say.  What I testified against.

24  Q    What you were testifying to?

25  A    Yes.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Case 1:03-cr-00351-FK Document 1860-6 Filed 08/19/21 Page 179 of 625 PageID
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 152 of 347 PageID #: 40181
#: 4486
137

Russo - Cross - Kedia

1  Q    And before you testified at Frank Guerra's trial, you

2  went over your testimony repeatedly with the government; is

3  that right?

4  A    A few times, yes.

5  Q    You met with them 15 to 20 times; is that right?

6  A    I don't remember that number.

7  Q    You don't remember that?

8  A    Twenty times you're telling me?  I don't remember how

9  many times.  It was quite a few.

10 Q    It was quite a few.

11 A    Yes.

12 Q    You don't remember --

13           THE COURT:  Okay, enough.  All right, this is a

14 hearing.  So asked and answered.  You get one shot at asking

15 your question.

16           MS. KEDIA:  Yes, Your Honor.

17           THE COURT:  There's no jury here.  Move it.

18 Q    Mr. Russo, you testified about a number of crimes you

19 committed since you were 15 or 16 years old, right?

20 A    Yes.

21 Q    You stole cars and trucks?

22 A    Yes.

23 Q    You carried guns?

24 A    Yes.

25           THE COURT:  Are you asking a question or making a

Case 1:03-cr-00351-EK Document 1869-6 Filed 08/19/21 Page 180 of 635 PageID #: 4487
Case 1:10-cr-00147-DLF Document 846-1 Filed 09/21/16 Page 159 of 347 PageID #:80182
138

Russo - Cross - Kedia

1    statement?

2              MS. KEDIA:  I'm asking a question.

3              THE COURT:  That's not a question, you're making a

4    statement.  Ask the question.  At least make some attempt at

5    putting it in a question form, at the very least.  You're

6    given some leeway on cross to ask leading questions, but at

7    least put it in a question.  You want to testify, get on the

8    stand.

9    BY MS. KEDIA:

10   Q    Mr. Russo, what kind of guns did you carry?

11   A    Handguns.

12   Q    What kind of handguns specifically, if you recall?

13   A    .38 special.  .38-caliber.  .25-automatic.

14   Q    A number -- you carried a number of different types --

15   A    I got arrested with a .32-automatic in my hands -- my

16   pants, yes.

17   Q    I'm sorry?

18   A    Quite a few different guns.

19   Q    And from the time you were 15 or 16 years old, did you

20   consider yourself to be associated with the Gambino family?

21   A    Yes.

22   Q    And were you around a guy, associating with a guy by the

23   name of Frankie Martin?

24   A    Yes.

25   Q    And did you commit crimes with Mr. Martin?

Russo - Cross - Kedia

```
 1   A    No, I did not.

 2   Q    You didn't commit any crimes?

 3   A    No, I did not; no.

 4   Q    Did you start shylocking with Frankie Martin?

 5   A    No, with Perkie.

 6        THE COURT:  Perkie?  Who's Perkie?

 7   A    He was just a guy around Frankie.  He used to give me the

 8   money so I could shylock.

 9   Q    So someone around --

10   A    Frankie.

11   Q    -- Frankie, this Gambino guy --

12   A    Yes.

13   Q    -- you were shylocking with this other person?

14   A    Yes.

15   Q    Okay.  And when I say "shylocking," do you understand

16   that to be lending out money to people for --

17   A    I understand that.

18   Q    Now, you spoke about a guy, a kid whose jaw you broke.

19        Do you remember that?

20   A    Okay.

21   Q    Is that right?

22   A    Yeah.

23   Q    You testified about that on direct examination?

24   A    Yes, I did.

25   Q    And you said that you broke his father's head open as
```

Russo - Cross - Kedia

```
 1   well?

 2   A    No, he just asked me if I broke his jaw, yes.  Yes, I

 3   did.

 4   Q    Did you break his father's head open as well?

 5   A    Yes, I did.

 6   Q    And was this over a drug debt?

 7   A    Yes.

 8   Q    And do you remember that it was a 50-dollar drug debt?

 9   A    It wasn't $50.

10   Q    It wasn't or you don't remember?

11   A    I don't believe it was, no.

12   Q    Let me show you, if I may --

13   A    Show me whatever you want.

14        THE COURT:  Wait for a question to be asked, okay?

15        THE WITNESS:  Thank you, yes.  No problem.

16   Q    Let me show you, if I may, 3500AR2A.

17        Your Honor, may I approach?

18        THE COURT:  What is that, please, for the record.

19        MS. KEDIA:  3500AR2A, it's a New York City

20   Department of Probation document, Your Honor.

21   Q    And I'll refer you to page 2.

22        Your Honor, may I question the witness from here?

23        THE COURT:  No, go up there.

24        You're asking him if this refreshes his

25   recollection, correct?
```

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Case 1:03-cr-00351-FK Document 1869-6 Filed 09/19/21 Page 183 of 635 PageID #: 4490
Case 1:10-cr-00147-DLI Document 846-1 Filed 09/21/18 Page 1583 of 347 PageID #:20185
141

Russo - Cross - Kedia

1      MS. KEDIA:  Yes, Your Honor.

2      THE COURT:  Just take a look at it, let us know when

3  you're done looking at it, okay?

4      THE WITNESS:  Yes.  Okay.

5  Q   Mr. Russo, does that refresh your recollection that it

6  was a 50-dollar drug debt?

7  A     No.

8      MR. LIFSHITZ:  Your Honor, the document appears to

9  contain information provided by the plaintiff, not by the

10  witness.  It speaks for itself.

11      THE COURT:  This isn't a document that was prepared

12  by this witness, this was prepared presumably by a probation

13  officer.

14  Q   Mr. Russo, do you recall the father, the kid's father,

15  had already repaid the debt before you broke his head open?

16  A     Yes, he did pay me.

17  Q   And you still broke his head open.

18  A     Well, he came at me first, so.

19      He's the one that started the problem.  He swung a

20  carjack at me.

21  Q   The father swung a carjack at you?

22  A     Yes, he swung a carjack at me.

23      THE COURT:  Okay, two people cannot talk at the same

24  time because the reporter cannot take down everything.

25      So, ma'am, you need to wait until he finishes his

Case 1:03-cr-00351-FK   Document 869-6   Filed 08/19/21   Page 184 of 635 PageID
Case 1:16-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 15 of 347 PageID #: 6180
#: 4491
142

Russo - Cross - Kedia

1    answer; and you need to wait, sir, until the attorney finishes

2    her question, okay?

3            THE WITNESS:  Okay.

4    BY MS. KEDIA:

5    Q    Now, Mr. Russo, you have been committing crimes your

6    entire life; is that fair to say?

7            THE COURT:  Asked and answered.

8    Q    You were -- you committed murder; is that right?

9    A    Yes.

10   Q    Attempted murder on a number of occasions?

11   A    Yes.

12   Q    Various home invasions and brutal assaults; is that

13   right?

14   A    Home invasions?

15   Q    Yes.

16   A    Yes, I did.

17   Q    Brutal assaults?

18   A    Brutal?  Assaults.

19           You want to call them brutal, you can call them

20   whatever you want.

21   Q    Mr. Russo, when you were arrested in 2011, did the

22   government seek to detain you?

23           Do you recall that?

24   A    Yes.

25   Q    And did you see the government's detention memo at that

Russo - Cross - Kedia

1   time?

2   A    I don't remember.

3   Q    Are you aware that they had you on recordings stating

4   that you were carrying pistols, that you were threatening to

5   hit someone in the head with a pipe, that you were saying you

6   wanted to chop the head of a rat?  Isn't that right?

7            MR. LIFSHITZ:  Objection to form.

8            THE COURT:  Sustained.

9            You know, I realize that the rules of evidence are

10   relaxed, but this isn't a free for all.

11            MS. KEDIA:  Yes, Your Honor.  I'll ask the questions

12   one at a time.  Sorry, I was trying to speed it up.

13            THE COURT:  Well not only that, you're reading from

14   a document that is not in evidence as well.

15            MS. KEDIA:  I understand.  I'm asking the witness --

16            THE COURT:  I understand and I'm telling you about

17   what rules to follow.

18            MS. KEDIA:  Yes, Your Honor.

19            THE COURT:  Thank you.

20            MS. KEDIA:  I will try.

21            THE COURT:  Thank you.

22   Q    Mr. Russo, do you recall that the government had you on

23   recording stating that you were carrying a pistol?

24   A    When I was at my detention hearing?

25   Q    Yes.

Case 1:02-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 186 of 635 PageID
Case 1:16-cr-00147-DLF   Document 846-1   Filed 05/21/18   Page 1595 of 347 PageID #: 8903
#: 4493
144

Russo - Cross - Kedia

1   A    I didn't know about that, no.

2   Q    When did you learn about the government's recording?

3        THE COURT:  Assuming a fact not in evidence.

4   Q    Did you learn, did you come to learn that there were

5   recordings of you talking about committing a number of crimes?

6   A    Yes.

7   Q    When did you learn that?

8   A    When I met my lawyer.

9   Q    And when was that?

10  A    Couple of days after I was arrested.

11  Q    And what did you learn specifically about that?

12  A    Specifically?  That I was on tape talking about a lot of

13  things, yes.

14  Q    And did you learn that -- who you were on tape with?

15  A    Yes.

16  Q    And who was that?

17  A    Bunch of guys.

18  Q    Did you learn who recorded you?

19  A    Yes, I did.

20  Q    Who recorded you?

21  A    Tommy McLaughlin.

22  Q    Did you learn that Peter Tagliavia also recorded you?

23  A    Yes, I did.

24  Q    Who is Tommy McLaughlin?

25  A    Tommy McLaughlin was an associate of ours.

Case 1:02-cr-00351-EK  Document 1869-6  Filed 08/19/21  Page 187 of 635 PageID #: 4494
Case 1:16-cr-00147-DLF  Document 840-1  Filed 09/21/16  Page 109 of 347 PageID #: 40183
145

Russo - Cross - Kedia

```
 1    Q    Someone you spent a lot of time with; is that right?

 2    A    Yes, I did.  Yes.

 3              THE COURT:  I'm sorry, when you say "of ours," who

 4    do you mean?

 5              THE WITNESS:  He was around the family.  He's an

 6    associate of the family.

 7              THE COURT:  Colombo family?

 8              THE WITNESS:  Yes.

 9    Q    And, Mr. Russo, and he was specifically an associate of

10    yours; is that right?

11    A    Yes.

12    Q    He's someone who answered to you; is that right?

13    A    Yes, I guess you could say that.

14    Q    And Peter Tagliavia, who is he?

15    A    He's an associate of mine.

16    Q    He's also someone you spent a lot of time with?

17    A    Not as much as Tommy but, yeah.

18    Q    And you learned that he made a number of recordings of

19    you as well?

20    A    Yes.

21    Q    Now, you were surprised, certainly, to learn that these

22    guys had been recording you; is that right?

23    A    A hundred percent.

24    Q    You had committed a lot of crimes with these guys; isn't

25    that right?
```

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Case 1:02-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 188 of 635 PageID
#: 4495
Case 1:16-cr-00147-DLF   Document 846-1   Filed 09/21/18   Page 163 of 347 PageID #: 10190
146

Russo - Cross - Kedia

1   A    Not really.

2   Q    You hadn't been committing crimes --

3   A    I committed crimes but not what you're saying.

4   Q    Well, explain what kind of crimes you committed.

5   A    We talked --

6   Q    With these two individuals?

7        We'll talk about McLaughlin and Tagliavia.

8   A    Well, they would do pushing money for me, shylocking

9   money for me.

10  Q    Did go out and assault people with them?

11  A    You act like I was assaulting people every day, the way

12  you say it.

13       THE COURT:  Stop.

14       Okay, instead of being argumentative, just answer

15  the question, okay?  Answer the question, to the best of your

16  ability.

17  Q    Mr. Russo, did you go out and assault people with them?

18  A    Yes, I did.

19  Q    Now, at some point after you were arrested and learned

20  about these recordings and these individuals having taped you,

21  you began cooperating with the government; is that right?

22  A    Yes, I did.

23  Q    And after you began cooperating, you entered into a

24  cooperation agreement and took a guilty plea, right?

25  A    Yes.

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 189 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 162 of 347 PageID #: 10131
#: 4496                                                                        147

Russo - Cross - Kedia

1  Q    And you were in prison at the time; is that right?

2  A    Yes.

3  Q    And you were told that you were going to testify at a

4  trial; is that right?

5  A    Yes.

6  Q    And the three individuals what you were going to testify

7  against were Frank Guerra, Theodore Persico, Jr., and Michael

8  Persico?  Did you understand that to be the case?

9  A    Yes.

10  Q   And as it turned out, it was Frank Guerra at the trial?

11  A   Yes.

12  Q   Not Theodore Persico, Jr. or Michael Persico; is that

13  right?

14  A   No.

15  Q   Now, before you testified at that trial, you gave the

16  government, you wrote the government a letter, a sort of wish

17  list about what Anthony Russo would like from the government;

18  is that right?

19  A   I don't remember that wish list.

20  Q   Let me show you what's been marked as 3500AR56.

21       Take a look at that.

22       THE COURT:  Just take a look at that and let us know

23  if that refreshes your recollection as you're done reading it.

24       (Witness reviewing document.)

25  A   I remember this, yes.

Case 1:03-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 190 of 635 PageID #: 4497
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 190 of 347 PageID #: 0192
148

Russo - Cross - Kedia

1   Q   Is that the document that you wrote, Mr. Russo?

2   A   Yes.

3   Q   And in that document -- that document are questions that

4   you wrote to the government?

5   A   No, these are the questions I wrote to myself.

6   Q   But to ask the government?

7   A   Yeah.  Concerns that I had.

8   Q   Concerns that you had?

9   A   Yeah.  Yes.

10  Q   And one of your concerns was you wanted to express to the

11  government how hard it was in jail; is that right?

12  A   How hard it was on me and my family, yes.

13  Q   And you wanted make sure you that you weren't taken out

14  of the location that you were in until it was time to testify

15  at trial; is that right?

16  A   Yes, I think so, I'm not sure.

17  Q   Is that right, Mr. Russo?

18  A   Ask me that again, please.

19  Q   You wanted to ensure that when you finished testifying

20  that you were returned back to Florida as soon as possible; is

21  that right?

22  A   Yes.

23  Q   Now, one of your other concerns is what the scope of your

24  cooperation was, right?

25  A   Yes.

Case 1:03-cr-00351-FK Document 1869-6 Filed 09/19/21 Page 191 of 635 PageID #: 4498
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 1043 of 341 PageID #:00193
149

Russo - Cross - Kedia

1   Q    And whether the government would still be needing you

2   after you testified?

3   A    Yes.

4   Q    And what were you told, Mr. Russo?

5   A    They told me you'll have to testify 'til you're off

6   parole.

7   Q    Until you're off of parole, meaning your supervised

8   release?

9   A    Right.

10  Q    And so as long as you're on supervised release, you're

11  obligated to do --

12  A    I'm obligated under my 5K1 --

13       THE COURT:  Stop.  Stop.  Stop.  You can't talk over

14  each other.  Please let Ms. Sarita finish.

15       THE WITNESS:  Sorry about that.

16       THE COURT:  Ms. Kedia, I'm sorry.  Finish the

17  question and then you can answer.

18       Can you finish the question, please.

19       MS. KEDIA:  Yes, Your Honor.

20  Q    When you say, Mr. Russo, when you're off parole, you're

21  referring to you were placed on supervised release; is that

22  right?

23  A    Yes.

24  Q    For a number of years?

25  A    Yes.

Case 1:03-cr-00351-EK   Document 1860-6   Filed 09/19/21   Page 192 of 635 PageID #: 4499
Case 1:16-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 1058 of 347 PageID #:01234

150

Russo - Cross - Kedia

1   Q    And the judge specifically made it a condition of your

2   supervised release, the government asked the judge to make it

3   a condition of your supervised release that you be required to

4   continue cooperating with them, right?

5   A    I believe so, yes.

6   Q    And, in fact, your cooperation agreement requires you to

7   continue cooperating with the government; is that right?

8   A    Yes, I believe so; yes.

9   Q    And you understand that if you violate your cooperation

10  agreement or your supervised release, that you can serve a

11  long prison term; is that right?

12  A    Yes.

13  Q    Now, Mr. Russo, it's fair to say that you've been

14  dishonest your entire life; is that right?

15  A    No, that's not fair to say.

16  Q    Well, you've been committing crimes since you were 15 or

17  16; is that right?

18       THE COURT:  Asked and answered.

19  Q    Would you say it's easy for you to lie, Mr. Russo?

20  A    No, it's not easy.

21       Have I lied?  Yes.

22  Q    You told a lot of lies; is that right?

23  A    I don't know what a lot is.

24       Have I lied?  Yes.

25  Q    Well, do you recall, Mr. Russo, at Frank Guerra's trial

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Russo - Cross - Kedia

1   being asked this question and giving this answer.  AR53

2   page 481 and 482, Your Honor.

3           "Q   Now, would it be fair to say, Mr. Russo,

4   that you've been telling lies virtually of day of your

5   entire life?

6           "A   I told a lot of lies, yes."

7           Do you recall that?

8   A   I don't remember that.  If you say so.  I don't remember

9   exactly what I said.

10          MS. KEDIA:  I offer that portion of --

11          THE COURT:  Excuse me?

12          MS. KEDIA:  I offer that portion Mr. Russo's

13   testimony.

14          THE COURT:  It's not an inconsistent statement to

15   the testimony that he just gave.  Move on.

16   Q   Mr. Russo, your entire life you've been lying whenever

17   you needed to lie; is that right?

18   A   I've lied and told the truth when I needed to, yes.

19   Q   Well, you've had parole hearings and you've had to report

20   to probation officers on any number of times over the last 25

21   years; is that right?

22   A   I don't understand your question.

23   Q   You were first arrested in 1986; is that right?

24   A   Yes.

25   Q   And you were last arrested in 2011; is that right?

Case 1:03-cr-00351-FK   Document 869-6   Filed 08/10/21   Page 194 of 635 PageID
Case 1:16-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 16 of 347 PageID #:50190
#: 4501                                                                    152

Russo - Cross - Kedia

1    A    Yes.

2    Q    And between that time you had been in courtrooms; is that

3    right?

4    A    Yes.

5    Q    You've been in front of judges; is that right?

6    A    Yes.

7    Q    You have met with parole officers and probation officers;

8    is that right?

9    A    Yes.

10   Q    You've been violating your conditions of release

11   throughout that entire time period; is that right?

12   A    Yes.

13   Q    And you certainly haven't reported that to your probation

14   officers, right, or your parole officers?

15   A    That I was committing crimes?

16   Q    Yes.

17   A    No.

18   Q    In fact, every time a parole officer discussed with you

19   what it was that Anthony Russo was doing during this period of

20   time, you certainly did not admit that you were committing

21   crimes; is that right?

22   A    They never asked me if I was -- I never lied to them

23   because when you don't tell them everything, it's not a lie.

24        They just asked me how I'm doing on the street.  Am

25   I working.  That's it.  So I never lied to them.

Case 1:03-cr-00251-FK... Document 860-6 ... Filed 08/19/21 ... Page 195 of 635 PageID...
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/16 Page 108 of 347 PageID #50197
#: 4502
153

Russo - Cross - Kedia

1    Q    You never lied to them.

2    A    Never told them anything.  Never asked.

3    Q    So this entire time, from 1986 to 2011, you were never

4    questioned by a parole officer or a probation officer --

5    A    If I was -- sorry if I was --

6    Q    -- about whether you were following the law or committing

7    crimes?

8    A    No.

9    Q    Mr. Russo, do you recall having a parole hearing on

10   October 29th, 2000 -- I'm sorry October 29th, 1993?

11   A    I don't remember, no.

12   Q    Let me show you what's been marked as AR3.

13        You can look at the whole document, but I refer you

14   specifically to page 4 of that document.

15        THE COURT:  It would you be helpful for the record

16   to indicate what this is.

17        MS. KEDIA:  Yes, Your Honor.

18        May I see the front page, I will tell you the title

19   of this document, AR3.

20        It's inmate status report for parole board

21   appearance.

22   Q    Mr. Russo, do you recall having a parole hearing on

23   October 29th, 1993?

24   A    Yes.

25   Q    And do you recall that that's nine days after Joseph

Case 1:03-cr-00251-FK Document 1869-6 Filed 08/19/21 Page 196 of 635 PageID #:
Case 1:16-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 196 of 347 PageID #:40193
#: 4503
154

Russo - Cross - Kedia

1   Scopo's murder?

2   A    Yes.

3   Q    Now, when you were interviewed by your parole officer of

4   that parole board, did you tell them that you had just

5   committed a murder?

6   A    Why would I do that?

7          THE COURT:  Please don't argue with the attorney.

8   Either yes or no.

9   A    No.

10  Q    Did you tell them about any of the crimes that you had

11  been committing since you got out of jail?

12  A    No, I did not.

13  Q    Now, Mr. Russo, you want the judge to believe that you're

14  a changed person now, right?

15  A    I am a changed person.

16  Q    But do you recall telling Tommy McLaughlin, your friend

17  and associate, that you don't change, you just get older?

18  A    I don't remember that.

19  Q    Mr. Russo, if I could have you here --

20         THE COURT:  You don't even have a time frame.  Can

21  we have a time frame?

22         MS. KEDIA:  Yes, Your Honor, I apologize.

23         Before I let you hear anything me ask you this:

24  Q    Tommy McLaughlin is somebody that you were associating

25  with between mid-2009 until you got arrested in January of

Case 1:02-cr-00351-EK   Document 860-6   Filed 08/19/21   Page 197 of 635 PageID #: 10199
Case 1:10-cr-00147-DLI   Document 340-1   Filed 05/21/16   Page 170 of 347 PageID #: 4504

155

Russo - Cross - Kedia

1    2011; is that right?

2    A    Yes.

3    Q    And do you remember saying to Mr. McLaughlin, on

4    August 8th of 2009:

5            I'm Anthony Russo, I don't change, I just get older.

6    A    I don't remember that.

7            (Audio recording played.)

8            THE COURT:  In the first place, okay, how about an

9    exhibit number telling me what this is?  This is not in

10   evidence.

11           MS. KEDIA:  I understand, Your Honor, I'm just

12   setting it up.  I just wanted to make sure we have the audio

13   prepared.

14   Q    Mr. Russo, I'm going to play you a clip of a recording

15   made by Mr. McLaughlin on August 8th, 2009 and see if that

16   refreshes your recollection as to what you told him,

17   Mr. McLaughlin?

18           THE COURT:  Is there any objection by the government

19   to this?

20           MR. LIFSHITZ:  Your Honor, we share the Court's

21   interest in having a marked exhibit of this so that we can...

22           THE COURT:  You know, what did I just say?  You had

23   better have these things marked.

24           MS. KEDIA:  Yes, Your Honor.

25           THE COURT:  And do you have transcripts of this?

Case 1:03-cr-00351-FK   Document 1860-6   Filed 08/19/21   Page 198 of 635 PageID
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 17 of 347 PageID #: 10200
#: 4505
156

Russo - Cross - Kedia

1              MS. KEDIA:  I don't have a transcript of this

2     particular portion.

3              THE COURT:  Well, I expect that you're going to have

4     to produce transcripts of any audio recordings.

5              MS. KEDIA:  Yes, Your Honor.

6              THE COURT:  You had plenty of time to prepare for

7     this hearing.  You've got three attorneys on this -- four

8     attorneys on this case.  This should have been done in

9     advance.  Give me an exhibit number and I want a date and a

10    time of the conversation.

11             MS. KEDIA:  Yes, Your Honor.

12             THE COURT:  Okay, this is not a free for all.  We

13    have to have some structure here so that there is a record.

14             MS. KEDIA:  Yes, Your Honor.

15             I intend to provide all of the clips --

16             THE COURT:  Do it now.  Do it now.

17             MS. KEDIA:  Yes, Your Honor.

18             THE COURT:  Exhibit Number.

19             MS. KEDIA:  I will mark it as Defendant's A.

20             THE COURT:  And?

21             MS. KEDIA:  It's a recording by Mr. McLaughlin,

22    between Mr. McLaughlin and Anthony Russo on August 8th, 2009.

23             THE COURT:  Is there any objection to having this in

24    evidence?

25             MR. LIFSHITZ:  No, Your Honor.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 199 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 172 of 347 PageID #: 10201
#: 4506
157

Russo - Cross - Kedia

```
 1              THE COURT:  Then let's move it in evidence.  It's

 2     fine.

 3              MS. KEDIA:  Yes, Your Honor.  Thank you.  I move --

 4     this clip.

 5              THE COURT:  It's done.  It's moved in evidence.

 6              (Defense Exhibit A, was received in evidence.)

 7              MS. KEDIA:  May we play this recording?

 8              THE COURT:  Yes.

 9              (Audio recording played.)

10     Q    Do you remember -- does that refresh your recollection

11     that you told Mr. McLaughlin --

12              THE COURT:  I could barely make out what was said on

13     that recording.

14              Could you make out what was said in that recording?

15     I could not make out what was said in that recording.

16              MS. KEDIA:  I apologize, Your Honor.

17              Do we have headphones for the witness?

18              THE COURT:  We do.

19              You know, what part of preparation in advance is not

20     understood here?

21              MS. KEDIA:  I apologize, Your Honor, I thought we

22     tested the system and I thought we could hear it well.

23              THE COURT:  Well, I would like a set of headphones,

24     too.  I don't know if anybody else understood what was said on

25     there.
```

Russo - Cross - Kedia

1          MR. LIFSHITZ:  Your Honor, am I free to speak?

2          THE COURT:  Yes.

3          MR. LIFSHITZ:  We don't object to clips being played

4    for the witness.  I assume at the end of this, the Court will

5    want post-hearing briefing to the extent there's additional

6    context on these tapes that we feel is appropriate.

7          THE COURT:  You have an opportunity to redirect.

8          MR. LIFSHITZ:  To redirect, yes, but I don't have

9    the entirety of every tape they're planning to playing and I

10   don't know what they're planning to play, so --

11         THE COURT:  And that's why it's a problem of not

12   having an entire transcript in advance.

13         MS. KEDIA:  Your Honor, let me explain, if I may.

14         These recordings are hours and hours and hours long

15   and they are hundreds and hundreds of them and that's why we

16   took specific clips.  This is something that's -- this was a

17   fashion in which the government played them at the Guerra

18   trial as well.  You know we need to --

19         THE COURT:  I was not there for the Guerra trial.

20         MS. KEDIA:  I understand, Your Honor, I didn't think

21   that this would be a problem to do it in this fashion.  I

22   apologize to the Court.

23         THE WITNESS:  Your Honor, this wasn't played at the

24   Guerra trial.  I would remember that.

25         THE COURT:  The witness says this wasn't played --

Case 1:02-cr-00351-FK  Document 869-6  Filed 08/19/21  Page 201 of 635 PageID
Case 1:10-cr-00147-DLF  Document 840-1  Filed 09/21/18  Page 174 of 341 PageID #0203
#: 4508
159

Russo - Cross - Kedia

1    MS. KEDIA:  Not this particular clip.

2    THE WITNESS:  You just said that.

3    THE COURT:  Well, you know what, be careful what you

4    represent to the Court.  And in any event, even if you were

5    planning to do an excerpt, you should have had a transcript of

6    the excerpt as well as a transcript of the entire

7    conversation.

8    MS. KEDIA:  Yes, Your Honor.

9    THE COURT:  I don't abide by sloppiness.

10   MS. KEDIA:  And I certainly didn't intend to be

11   sloppy, Your Honor, I apologize.

12   THE COURT:  Play it again.

13   (Audio recording played.)

14   Q    Now, Mr. Russo, having heard that does that --

15   THE COURT:  First of all, I don't know who was the

16   speaker.

17   Q    Mr. Russo, were those -- was that you and Mr. McLaughlin

18   speaking to each other?

19   A    I couldn't make it out if it was me.  It sounded like me.

20   Q    It sounded like you?

21   A    I'm not a hundred percent sure.  I never heard that tape.

22   Then, again, I didn't hear any of the tapes.

23   Q    You didn't hear any of the tapes that Mr. McLaughlin and

24   Mr. Tagliavia made of you?

25   A    No.

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 202 of 635 PageID #: 4509
Case 1:16-cr-00147-DLF Document 540-1 Filed 09/21/18 Page 173 of 347 PageID #: 20204
160
Russo - Cross - Kedia

1  Q    Mr. Russo, you were sentenced on October 16th of 2013; is

2  that right?

3  A    Yes, I was.

4  Q    For all of your crimes, you were sentenced to 33 months

5  in prison, time served?

6  A    Yes, I was.

7  Q    And you were ordered to pay $110,000 in forfeiture,

8  right?

9  A    Yes, I was.

10 Q    Now do you have a job?

11 A    Yeah, but it's not a steady.

12 Q    Have you had a job since you got out of prison in October

13 of 2013?

14 A    Yes.

15 Q    And was it the job that you represented to the judge that

16 was waiting for you when you got out of prison?

17 A    No.  No.

18 Q    What happened to that job?

19 A    Never came through.

20 Q    Oh, so you represented to a judge that you had a job

21 waiting for you but you didn't actually have a job waiting?

22 A    No, I did but it just didn't pan out.

23 Q    Well, what does that mean?

24 A    It didn't work out.

25 Q    You found another job?

1    A    Yes, I did.

2    Q    Do you make money?

3    A    Yes, I do.

4    Q    The judge ordered you to pay 25 percent of the income

5    that you earned during towards forfeiture; is that right?

6    A    I believe so.

7    Q    Have you paid a single dime in forfeiture?

8    A    No.

9    Q    Do you understand that the judge said that if there was a

10   failure to pay that you could be violated?

11   A    I believe so.

12   Q    Have you been violated?

13   A    No.

14   Q    Do you know if the government has submitted any kind of

15   violation letter to the judge?

16   A    No, not that I know of; no.

17   Q    Do you know if anyone has told the judge that you failed

18   to pay any -- even a single dime towards forfeiture?

19   A    Well, I was told only a month ago if I don't start

20   paying, that my parole officer would put in paperwork.

21   Q    Your parole officer told you that?

22   A    Yes.

23   Q    Did anyone from the government tell you that?

24   A    No.  Parole officer did tell me, not the government.

25   Q    Mr. Russo, you're driving around in a $75,000

Russo - Cross - Kedia

1   Mercedes-Benz; is that right?

2   A     You're kidding me, right?

3   Q     No.

4             THE COURT:  Please don't argue with the attorney.

5   The answer is either yes or no.

6   A     75,000 Mercedes-Benz?

7   Q     Yes.

8   A     How about $10,000?

9   Q     Meaning your Mercedes-Benz is worth $10,000; is that what

10  that means?

11  A     Yes.  It's 12 years old.

12  Q     Where did you get the funds to purchase that vehicle?

13  A     When I sold my house.

14  Q     When you sold your house where?

15  A     In Florida.

16  Q     So you owned a home in Florida?

17  A     No --

18            MR. LIFSHITZ:  Your Honor --

19  A     -- my girlfriend did.

20            THE COURT:  Sustained.

21  Q     Mr. Russo, how much money did you get from the sale of

22  your house?

23  A     Between 12 and $15,000.

24  Q     And did you pay any of that towards forfeiture?

25  A     No, because I had to find a new place to live, a car to

Case 1:02-cr-00351-FK   Document 1860-6   Filed 08/19/21   Page 205 of 635 PageID
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 1783 of 847 PageID #: 020207
#: 4512
163

Russo - Cross - Kedia

1  get back and forth to work, and by the time that happened, I

2  was broke.

3  Q    Now, Mr. Russo, at the time that you decided to

4  cooperate, you certainly understood that the government wanted

5  evidence on Michael Persico; is that right?

6  A    No, I didn't understand that; no.

7  Q    You didn't understand that?

8  A    They didn't come to me tell me I had to give stuff on

9  Michael.

10  Q    Do you recall talking to Thomas McLaughlin on

11  January 21st of 2010 and explaining to them how you were in

12  prison with Frank Sparaco in 1999 or 2000 and that the agent

13  came to him and they told Sparaco that if he could tell them

14  something about Michael Persico they would have him out of

15  jail by the weekend?

16  A    I don't remember that, no.

17  Q    Let me show you what I'm making as Defendant's Exhibit B,

18  and BT, Your Honor.

19        B, will be the recording, and BT will be the

20  transcript of the recording.

21        THE COURT:  Recording of what?

22        MS. KEDIA:  A recording of a conversation between

23  Anthony Russo and Thomas McLaughlin on January 21st, 2010.

24        If I may hand this up to the Court.

25        THE COURT:  Please hand it to my deputy.  Don't

Case 1:03-cr-00351-FK   Document 1369-6   Filed 08/19/21   Page 206 of 635 PageID
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 1791 of 847 PageID #: 90200
#: 4513
164

Russo - Cross - Kedia

 1    approach the bench like that.

 2                MS. KEDIA:  Sure.  No problem.

 3                THE COURT:  Is there any objection from the

 4    government to introduce this into evidence?

 5                MR. LIFSHITZ:  Your Honor, again, we don't object to

 6    introducing the portion.  If we learn of its context that

 7    matters --

 8                THE COURT:  Well, you have the opportunity to

 9    introduce anything else that you want to introduce.

10                MR. LIFSHITZ:  Thank you, Your Honor.

11                THE COURT:  You can't expect not to be open to that.

12                MR. LIFSHITZ:  Thank you.  Then I will stop saying

13    that.  And I certainly do not object to introducing this

14    exhibit.

15                THE COURT:  Yes, you'll have the right to introduce

16    any evidence to rebut.

17    Q    Mr. Russo, if I could have you listen to this portion of

18    the recording and look at the transcript while you do, please.

19    A    Is that it?

20    Q    January 21st, 2010?

21                (Playing audio.)

22    Q    Mr. Russo, having heard that recording, does that refresh

23    your recollection about telling Thomas McLaughlin on

24    January 21st, of 2010 that Frank Sparaco had discussed with

25    you that agents came to see him and told him that if you can

Russo - Cross - Kedia

1   get anything out of Russo, or you can tell us about Michael,

2   we'll have you out of here by the weekend?

3   A     Yes.

4   Q     And you even told Thomas McLaughlin, in a subsequent

5   conversation on May 12th, 2010, that agents asked Teddy

6   Michael Persico, Michael's cousin, to flip; is that right?

7   A     That's what I was told by his brother Carmine.

8   Q     You were told by Teddy's brother, Carmine?

9   A     Carmine Persico, yes.

10  Q     That agents asked Teddy to flip against his cousin,

11  Michael; is that right?

12  A     That's what I was told, yes.

13  Q     You do recall that?

14           THE COURT:  You know, that's at least double hearsay

15  in connection with, you know, these are not coconspirator

16  statements.

17           MS. KEDIA:  I understand, Your Honor.

18           THE COURT:  Stricken.  It's stricken.

19           MR. FERNICH:  Judge, we would object to that.

20           THE COURT:  Your objection is noted for the record

21  and it's stricken.

22           MR. FERNICH:  It's not offered for the truth of the

23  matter asserted, it's offered for his state of mind and it's

24  bias and motive, it's non-hearsay.

25           THE COURT:  It's stricken.  Move on.

Case 1:02-cr-00351-FK Document 860-6 Filed 09/19/21 Page 209 of 635 PageID #: 4515
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 161 of 847 PageID #: 10210

166

Russo - Cross - Kedia

1   Q    Mr. Russo, in any event, you understood certainly by the

2   time you cooperated in 2011, that the agent wanted information

3   on Michael Persico; is that fair to say?

4              MR. LIFSHITZ:  Objection.  Asked and answered.

5              THE COURT:  I will allow him to answer the question.

6              Was that your understanding?

7              THE WITNESS:  Yes.

8              THE COURT:  At some point?

9              THE WITNESS:  Yes, at some point; yes.

10  Q    Now, you were in jail with Teddy Persico, Jr. in the

11  '80s; is that right?

12  A    Yes.

13  Q    You spent about -- a little less than a year in jail with

14  him from mid-1988 to mid-1989; is that right?

15  A    Yes.

16  Q    And when you got out of jail, that was several years

17  later, 1992; is that right?

18  A    Yes.

19  Q    So the three years between 1989 and 1992, you were in a

20  different jail with this Teddy Persico, Jr.; is that right?

21  A    Yes.

22              (Continued on next page.)

23

24

25

ANGELA GRANT, RPR, CRR
Official Court Reporter

Case 1:03-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 209 of 635 PageID #: 4516
Case 1:10-cr-00147-DLF   Document 640-1   Filed 09/21/18   Page 162 of 847 PageID #: 9021

167
RUSSO - CROSS - KEDIA

1  CROSS EXAMINATION

2  BY MS. KEDIA:

3  Q    And you got out on August 26, 1992.  You got into a

4  halfway house; is that right?

5  A    Yes.

6  Q    You began reporting at Edgecombe?

7  A    Yes.

8  Q    That's a halfway house, Edgecombe?

9  A    Work facility, yes.  Work release facility, yes.

10 Q    And when you say a "work release facility," that means

11 you went out and worked during the day and then you had to

12 report back there at night?

13 A    Yes.

14 Q    Now, you said you met Teddy, Senior, Teddy Persico,

15 Junior's father, on the same day that you got out of prison;

16 is that right?

17 A    Yes.

18 Q    And did you know at that time what Teddy, Senior's

19 position was in the Colombo family?

20 A    Yes.

21 Q    How did you know?

22 A    I was with Danny and he was telling me.

23 Q    When were you with Danny?

24 A    That day.  Him and Toots.

25 Q    Who is Toots?

```
1   A    Toots is a friend of ours.  He passed away.

2   Q    So the day -- when you say that day, you mean the day you

3   got out of jail?

4   A    The day, yes.

5   Q    In 1992, in August of 1992?

6   A    Yes.

7   Q    And when you got out you went to see Danny Persico?

8   A    Danny came and picked me up at my house, yes.

9   Q    And he told you what his father's position was?

10  A    His father wanted to speak to me, yeah.

11  Q    Now, you hung out a lot at a candy store on 11th Avenue;

12  is that right?

13  A    Yes.

14  Q    And you hung out with Uncle Teddy you called him; is that

15  right?

16  A    Yes.

17  Q    Frank Sparaco?

18  A    Yes.

19  Q    Frank Guerra, you called him BF; is that right?

20  A    Yes.

21  Q    Bobby Tarantola?

22  A    Yes.

23  Q    Anthony Ferrara?

24  A    Yes.

25  Q    All of you hung out at this candy store together?
```

RUSSO - CROSS - KEDIA

```
 1   A    Yeah.

 2   Q    Who owned that candy store?

 3   A    I don't know.

 4   Q    Do you recall meeting Frank Sparaco?

 5   A    Yes.

 6   Q    And when did you meet him?

 7   A    I don't recall.  Sometime when I got out in the first few

 8   days.

 9   Q    In 1992 after you got out of jail?

10   A    Yes.

11   Q    You'd never met him before?

12   A    No.

13   Q    Now, did you begin committing crimes with Mr. Sparaco

14   immediately?

15   A    No.

16   Q    Who is Frank Sparaco?

17   A    From what I understood when I first met him, he was

18   Michael's dear friend.

19   Q    And Mr. Sparaco?

20        THE COURT:  I'm sorry.  He was Michael's...

21        THE WITNESS:  Dear friend.  One of his closest

22   friends.

23   Q    When did you meet Michael?

24   A    Same time.

25   Q    Around the same time in the --
```

RUSSO - CROSS - KEDIA

1   A      Yeah.

2   Q      -- in the days after getting out of jail?

3   A      Yes.

4   Q      And where did you meet him?

5   A      I don't remember.  It was around on the avenue there

6   somewhere.

7   Q      When you say "on the avenue" --

8   A      Right across the street near Romantique, the candy store.

9   Somewhere over there.  I don't remember exactly.

10  Q      Romantique is a car service business; is that right?

11  A      Limousine service, yes.

12  Q      Now, Mr. Sparaco, did there come a point in time very

13  soon after you got out of jail that Mr. Sparaco asked you to

14  be involved in a murder?  Do you remember that?

15  A      He asked me to help him with something.

16  Q      Did he tell you what that something was?

17  A      Well, I kind of figured knowing who Frankie was and what

18  he's about, so I went and told Danny about it.

19  Q      Did you agree to be involved in something with Frank

20  Sparaco?

21  A      Yes, I told him I would help him.

22          THE COURT:  Ms. Kedia, can I just bother you for the

23  spelling, the last name of Sparaco.  Can you spell that for

24  us, please.

25          MS. KEDIA:  Yes, Your Honor, S-p-a-r-a-c-o.

RUSSO - CROSS - KEDIA

1        THE COURT:  Thank you.

2    Q    And you understood that Mr. Sparaco was asking you to be

3    involved in a murder; is that right?

4    A    Yes.

5    Q    Now, did you tell Mr. Sparaco you had committed other

6    murders in the past?

7    A    No, I don't believe so.

8    Q    Well, do you understand why he asked you, Anthony Russo,

9    someone he had just met, to be involved in a murder?

10   A    I have no clue.

11   Q    And yet you agreed to do it?

12   A    Yes.

13   Q    Now, you met another person around that same timeframe

14   when you first got out of jail by the name of Eric Curcio; is

15   that right?

16   A    Yes, I did.

17   Q    And where did you meet Eric Curcio?

18        THE COURT:  Again, could we just have the timeframe,

19   please.

20   Q    In 1992, shortly after you got out of jail in August of

21   1992; is that right?

22   A    Around there, yeah.

23   Q    And how did you meet Mr. Curcio?

24   A    On the avenue.  Near the candy store, I believe.

25   Q    The same candy store --

1   A   Yes.

2   Q   -- that you hung out with Frank Sparaco?

3   A   Yes.

4   Q   And did Frank Sparaco introduce you to Eric Curcio?

5   A   I don't remember who introduced me to him.

6   Q   Do you recall telling the government that Frank Sparaco

7   introduced you to Eric Curcio?

8   A   I don't recall who introduced me to him.  It might have

9   been Frankie.  I don't know.  I don't remember.

10  Q   And you began committing crimes with Eric Curcio soon

11  thereafter, right?

12  A   Yes.

13  Q   You started dealing cocaine?

14  A   Yes.

15  Q   You started selling credit cards?

16  A   Yes.

17  Q   What does that mean, you started selling credit cards?

18  A   We were selling active credit cards for 20 percent of

19  what they were worth.

20  Q   So meaning they were stolen credit cards?

21  A   Stolen credit cards, yes.

22  Q   You stole them from people and then you --

23  A   No, we didn't steal the credit card.

24  Q   -- sold them to other people?

25  A   I didn't steal them from nobody.

RUSSO - CROSS - KEDIA

1    Q    Somebody else stole them?

2    A    So Eric had them and he would give them to me and I would

3    sell them for 20 percent.

4    Q    And how did you get involved with that with Eric?

5    A    He just came to me.

6    Q    Eric Curcio just came to you?

7    A    Yes.

8    Q    And asked you to help sell cocaine?

9    A    Well, that's what we do on the street.  We're criminals.

10   We hang out together and we do bad things.

11   Q    Did you meet Eric Curcio before you were in jail in

12   between 1988 and 1992?

13   A    No, I don't believe so.  No.

14   Q    So this is as soon as you came out he started committing

15   crimes with you?

16   A    Yeah.  Yes.

17   Q    Did you meet a guy by the name of Dino Basciano?

18   A    I know who he is.  I don't remember actually meeting him.

19   Q    Who is he?

20   A    He's an associate of the Luccheses.

21   Q    Was he very close to Eric Curcio?

22   A    I believe so.

23   Q    And he was someone Eric Curcio also dealt cocaine with;

24   is that right?

25   A    I don't know what they did together.

RUSSO - CROSS - KEDIA

1    Q    You know he was a major gun dealer?

2    A    No.  I didn't know that, no.

3    Q    Now, Eric Curcio had a group that was around him a lot;

4    is that right?

5    A    Yes.

6    Q    Who did they consist of?

7    A    Johnny Sparacino, Johnny Pappa, Sal Sparacino.  I don't

8    know who else.  There was a lot of kids from downtown that

9    stood around.

10   Q    Joe Monte, Junior?

11   A    Yes, he was another one.

12   Q    John Miccio, is that somebody?

13   A    Joe Miccio?

14   Q    Joe Miccio?

15   A    I don't know.  I don't know if he hung around him.

16   Q    You know who he is?

17   A    I heard of him, yeah.

18   Q    Not someone you hung around with a lot?

19   A    No.

20   Q    Now, did Curcio know Frank Guerra or Bobby Tarantola?

21   A    I'm sure they did, yes.

22   Q    He knew them before he knew you; is that right?

23   A    Oh, yes.  A hundred percent, yeah.

24   Q    Had you told -- did you ever tell Eric Curcio that you

25   were involved in murders?

Case 1:03-cr-00351-FK   Document 869-6   Filed 08/19/21   Page 217 of 635 PageID #: 4524
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 1993 of 847 PageID PageID3
175

RUSSO - CROSS - KEDIA

1  A    I don't remember that.

2  Q    Did you ever discuss with Eric Curcio other crimes that

3  you had committed?

4  A    I don't remember what I talked about with Eric.

5  Q    Now, how did you meet Johnny Pappa?  You met Johnny

6  Pappa; is that right?

7  A    Yes.

8  Q    How did you meet him?

9  A    Through Eric.

10  Q    When?

11  A    Sometime in '92.

12  Q    Sometimes in 1992.  Soon after you got out?

13  A    Maybe early '93.  I don't remember exactly.  It's a long

14  time ago.

15  Q    Well, this is someone you committed a murder with, right?

16  A    Yes.

17  Q    And certainly at the time that you committed a murder

18  with him, you knew him pretty well?

19  A    Excuse me?

20  Q    At the time that you committed a murder with him, you

21  knew him pretty well; is that right?

22  A    As you're on to, yeah.

23  Q    Is that a yes?

24  A    I said yes.

25  Q    What about John Sparacino?

Case 1:03-cr-00351-FK   Document 869-6   Filed 08/19/21   Page 819 of 635 PageID
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 1918 of 847 PageID #:10220
#: 4525
176

RUSSO - CROSS - KEDIA

1    A    What about him?

2    Q    Do you know who John Sparacino is?

3    A    Yes.

4    Q    When did you meet him?

5    A    I met them all around the same time.

6    Q    Soon after you got out of jail in 1992; is that right?

7    A    Yes.

8    Q    Now, when you got out of jail you learned things about

9    what you called was a family feud; is that right?

10            MR. LIFSHITZ:   Objection to the --

11   Q    An internal war?

12            THE COURT:   Sustained as to form.

13   Q    Mr. Russo, did you learn about something when you were

14   released from jail that you called an internal war, a family

15   war?

16   A    Yeah.   Yes.

17   Q    And you testified that there was the Persico side and the

18   Orena side; is that right?

19   A    Yes.

20   Q    And you testified that Chuckie Russo, JoJo Russo, Uncle

21   Teddy, Joe Monte and Tommy Gioeli were people who were in the

22   street at the time that you were released who were on the

23   Persico side; is that right?

24   A    Yes.

25   Q    Now who is Tommy Gioeli?

RUSSO - CROSS - KEDIA

1   A    I don't know him.  I met him when I came home, Tommy, but

2   he was a made member of the Colombo crime family when I met

3   him.

4   Q    And he's someone you also met when you came home in 1992?

5   A    I believe I met him once, yeah.  Maybe twice.

6   Q    Now, there were also leaders on the Orena side of this

7   war; is that right?

8   A    Yes.

9   Q    In fact, three quarters of the family was on the Orena

10  side of the war; is that right?

11  A    Most of them were on that side, yes.

12  Q    And you had heard about this war from the news and from

13  Frank Guerra and from hanging around in the candy store and

14  the bagel store in the neighborhood; is that right?

15  A    Yes.

16  Q    And you discussed the war a lot with Frank Guerra and

17  Bobby Tarantola and Frank Sparaco; is that right?

18  A    Yes, I did.  Danny Persico too.

19  Q    And Danny Persico too?

20  A    Yep.  Eric, everybody.

21  Q    And Frank Guerra told you about things that had happened

22  to him, about people laying on him, about how he almost got

23  killed; is that right?

24  A    Yes.

25  Q    And you heard stories about everybody hiding out in safe

Case 1:03-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 220 of 635 PageID #: 4527
Case 1:16-cl-00147-DLF   Document 840-1   Filed 05/21/18   Page 1888 of 847 PageID #:50022
178

RUSSO - CROSS - KEDIA

```
 1   houses during the war and carrying guns?

 2            THE COURT:  Are we going somewhere with this?

 3            MS. KEDIA:  Yes, Your Honor.

 4            THE COURT:  Well, get there.

 5   Q    Did you hear about --

 6            THE COURT:   There's no jury here.

 7            MS. KEDIA:  I understand, Your Honor.

 8            THE COURT:  So get to the point.

 9            THE WITNESS:  Excuse me.

10   Q    You heard about safe houses and everybody carrying guns;

11   is that right?

12   A    Heard about it and seen it.

13   Q    You heard about it and you saw it?

14   A    Everybody is carrying guns when I came home.

15   Q    Now, did you hear about people, these people Joey Fusco,

16   do you know who he is?

17   A    Joey Fusco?

18   Q    A guy Goo?

19   A    Yes, Sally's brother.

20   Q    Sally's brother.  Who's Sally?

21   A    Sally Fusco's brother.

22   Q    And, Nicki Tormenia, do you know who he is?

23   A    Nicki Tormenia.

24   Q    Who is he?

25   A    He was a friend of ours.
```

RUSSO - CROSS - KEDIA

1   Q    An associate --

2   A    Associate.

3   Q    -- on the Persico side?

4   A    He was an associate of Teddy, yeah, Teddy, Junior.

5   Q    And Eddie Garafolo?

6   A    Same thing, yes.

7   Q    An associate of Teddy, Junior?

8   A    Yes.

9   Q    And Angelo Fifi, who is he?

10  A    Yes.

11  Q    Same thing meaning --

12  A    Yes.

13  Q    -- associate of Teddy, Junior?

14       Big Stevie?

15  A    Big Stevie.

16       THE COURT:  Where are we going with this?

17       MS. KEDIA:   Your Honor, I want to clarify that

18  these are people who are associates, Mr. Russo's understanding

19  that these are people who are associates of the Colombo family

20  on the Persico side of this war, Your Honor.

21       THE COURT:  Let's get to the point.

22  Q    Is that correct?

23  A    I don't know who Big Stevie is.

24  Q    Now, you testified that you --

25       THE COURT:  No.  We're not trying this whole case

ANGELA GRANT, RPR, CRR
Official Court Reporter

Case 1:03-cr-00351-EK   Document 1869-6   Filed 08/19/21   Page 222 of 635 PageID #: 4529
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 1533 of 847 PageID #: 0224
180
RUSSO - CROSS - KEDIA

1  all over again.  We're here for limited purposes concerning

2  certain relevant conduct that the defendant doesn't want the

3  Court to take into consideration.  So I really would

4  appreciate you getting to the point.

5          MS. KEDIA:  Yes, Your Honor.

6  Q    Mr. Russo, you testified you became involved in this war

7  the minute that you got home in 1992; is that right?

8  A    The minute I got home?

9  Q    Yes.

10 A    Yeah, I believe so.

11 Q    What did you do?

12 A    Just hanging around I was involved.  Just being there my

13 life was in danger.

14 Q    Mr. Russo, weren't you told that there was -- the war was

15 at a standstill when you got home?

16 A    Ceasefire, yeah.

17 Q    I'm sorry?

18 A    A ceasefire like I heard.

19 Q    A ceasefire?  What is a ceasefire?

20 A    Supposedly.

21          A ceasefire means nobody is shooting right now.

22 That everything is being calmed.  Trying to work things out.

23 That's what I took it as.

24 Q    And that's what you understood when you got out?

25 A    That's what, yes.

RUSSO - CROSS - KEDIA

1    Q    And do you know the reason for the ceasefire?

2    A    No, I don't.

3    Q    Did you know that a lot of people from both sides had

4    been arrested from the Persico side and the Orena side?

5    A    Yes.  And a lot of people were killed too.  Yes.

6    Q    And you testified that at stake during this war was Vic

7    Orena was trying to take over the family; is that right?

8    A    Yes.

9    Q    Now, did you know that when you got out of prison in

10   August of 1992 Vic Orena had been arrested and he was awaiting

11   trial?

12   A    Was he arrested when I came home?

13   Q    Yes.

14   A    I believe he was still out.  He got arrested after I came

15   home.

16   Q    Did you know that he was convicted at trial in December

17   of 1992 and received a life sentence?

18   A    Yes.

19   Q    Now, between the time you got out when you say your life

20   was in danger, were you ever shot at?

21   A    No.  I don't believe so, no.

22        THE COURT:  When?

23   Q    When you came home in 1992, from the moment that you came

24   home in 1992 and in the year that followed up until the time

25   that you killed Joe Scopo in October of 1993, were you ever

Case 1:92-cr-00351-FK   Document 1860-6   Filed 08/19/21   Page 224 of 635 PageID #: 4531
Case 1:10-cr-00147-DLI   Document 340-1   Filed 09/21/16   Page 159 of 847 PageID #: 9220
182

RUSSO - CROSS - KEDIA

1    shot at?

2    A    Yes.

3    Q    By whom?

4    A    I don't know who shot at me, no.  I just don't know.  The

5    night of the murder of Joey Scopo.

6    Q    On the night of the murder?

7    A    Yes.

8    Q    But before the night of the murder?

9    A    No.

10   Q    Between --

11   A    I don't -- no.

12   Q    -- August of 1992 and the night of the murder?

13   A    Not that I remember.  No.

14   Q    Now, you testified that when you first became involved in

15   the war the first thing that you did was you planned to murder

16   Bill Cuotolo; is that right?

17   A    Yeah, I believe so.

18   Q    You called him Wild Bill; is that right?

19   A    Yes.

20   Q    And do you recall when this was, approximately?

21   A    I'm going to say early '93.

22   Q    And how is it that you came about planning to kill Bill

23   Cuotolo?

24   A    I don't remember how I came about it.

25   Q    Well, you said you planned to kill him with Eric Curcio,

Case 1:03-cr-00351-FK   Document 1860-6   Filed 09/10/21   Page 225 of 635 PageID #:
Case 1:16-cr-00147-DLF   Document 340-1   Filed 09/21/18   Page 1563 of 847 PageID #:0227
#: 4532

183

RUSSO - CROSS - KEDIA

1   Frank Guerra, Bobby Tarantola, Danny Persico and Anthony

2   Ferrara; is that right?

3   A   Well, you asked me how it came about.  I'm not sure how

4   it came about, but I do know we did try to kill him.

5   Q   Did Eric Curcio ask you to get involved in this?

6   A   I don't remember.

7   Q   This is before you ever went after Joe Scopo; is that

8   right?

9   A   Yes.

10   Q   Now, where were these attempts on Bill Cuotolo?

11   A   Where he used to get his hair cut on 20th Avenue, 86th

12   Street.

13   Q   And what you did do in preparation for this?

14   A   We laid back about a block and a half with shooters in

15   one car and a crash car.  Guys in another car, a crash car.

16   Q   I'm sorry?

17   A   We did it specifically on a Wednesday.  We believe it was

18   a Wednesday.

19   Q   Why do you believe it was a Wednesday?

20   A   Because that's when Billy used to get his hair cut.  It

21   was either a Wednesday or Thursday.

22   Q   So you would go by this location where he would get his

23   hair cut?

24   A   Yes, at a certain time.

25   Q   Was it always the same people going by?

Case 1:03-cr-00351-FK   Document 869-6   Filed 08/19/21   Page 226 of 635 PageID #:
Case 1:16-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 1009 of 847 PageID #:9022a
#: 4533

1   A    Yes.

2   Q    And how many people?

3   A    Four or five of us.

4   Q    Who were the people?

5   A    Me, Bobby, BF, Little Anthony, Eric.

6   Q    Johnny Pappa?

7   A    No.  He wasn't there in the beginning.

8   Q    Mr. Russo, when you say "in the beginning," was he

9   involved in attempts on Bill Cuotolo?

10  A    He wasn't involved in the beginning.

11  Q    Was he involved in attempts to murder Bill Cuotolo?

12  A    Yeah, he got involved.  Yes.

13  Q    When did he get involved?

14  A    Shortly after we started looking for Billy.

15  Q    And so he was one of the people who was also part of this

16  crew in crash cars or regular cars; is that right?

17  A    Yes.

18  Q    How many cars did you take out when you went to look for

19  Bill Cuotolo?

20  A    I don't remember.  Two.  I don't remember.  Had to be at

21  least two.

22  Q    And whose cars were they?

23  A    I don't remember.

24  Q    Did you steal cars?

25  A    I don't remember.

RUSSO - CROSS - KEDIA

1  Q    Were you in cars with multiple people?

2  A    Yes.

3  Q    When you say that there were crash cars, how many crash

4  cars were there?

5  A    I don't remember.

6  Q    What is a crash car?

7  A    It's a car that protects the guys that are going to do

8  the piece of work so nobody intervenes.

9  Q    Did you also look for Bill Cuotolo at his house?

10  A    Yes.

11  Q    Where was his house?

12  A    40 something street.  Canarsie.  I don't remember

13  exactly.

14  Q    And you described an incident where Johnny Pappa was with

15  you and you --

16  A    With me and Frankie, yes.

17       Sorry I cut you off.

18  Q    And Frankie meaning BF?

19  A    Yes.

20  Q    And you went by Bill Cuotolo's house and you were looking

21  to kill him; is that right?

22  A    Yes.

23  Q    And you all had guns that day, right?

24  A    I know me and John had guns, yes.

25  Q    What kind of guns did you have?

RUSSO - CROSS - KEDIA

1   A    I had a .38 on me and John had the Mack ten.

2   Q    John had the MAC-10?

3   A    Yeah.

4   Q    So what is the MAC-10?

5   A    Machine gun.

6   Q    Where did he get it?

7   A    Where did he get it from?

8   Q    Yes.

9   A    From me.

10  Q    He got it from you?

11  A    Yes.

12  Q    Where did you get it?

13          THE COURT:    Excuse me.

14          Ms. Kedia, the issue here is the murder of

15  Scopolo -- of Scopo, excuse me, and other relevant conduct for

16  the Court to consider as described in the presentence report,

17  loansharking, sale of stolen or some incident involving stolen

18  videos and so on.  So I don't know why we're going into so

19  much detail about other incidents that do not address this

20  relevant conduct.

21          It seems to me that if you direct your cross

22  examination to what was discussed on direct, that you can

23  accomplish the same thing.

24          MS. KEDIA:  I understand, Your Honor.

25          This was specifically discussed on direct, and I

Case 1:02-cr-00351-FK... Document 1869-6 Filed 08/19/21 Page 229 of 635 PageID...
Case 1:16-cr-00747-DLF Document 840-1 Filed 05/21/18 Page 203 of 847 PageID #00231
#: 4536
187

RUSSO - CROSS - KEDIA

1   would explain what I'm getting at, but I would not -- I would

2   ask that I not explain it in front of the witness.

3           THE COURT:  Well, we're not doing a mini trial here.

4           MS. KEDIA:  I understand, Your Honor.

5           THE COURT:  You're not understanding because I've

6   said this now ten times this morning in the span of an hour

7   and 20 minutes.  So can you move it on, please.

8           MS. KEDIA:  I will, Your Honor.

9   Q    Mr. Russo, you started looking for Bill Cuotolo before

10  you ever started looking for Joe Scopo; is that right?

11  A    Yes.

12  Q    And you attempted to kill Bill Cuotolo before you ever

13  started looking for Joe Scopo; is that right?

14  A    Yes.

15  Q    And on these occasions you and other people had weapons;

16  is that right?

17  A    Yes.

18  Q    And there were any number of people with you who were

19  armed and had various cars that they were using on these hunts

20  to kill Bill Cuotolo; is that right?

21  A    Yes.

22  Q    Now, you next decided after going after Bill Cuotolo --

23  you ever never able to get Bill Cuotolo, is that what

24  happened?

25  A    No.

Case 1:03-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 339 of 635 PageID#
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/16 Page 230 of 347 PageID #: 4537
188

RUSSO - CROSS - KEDIA

1  Q    And why is that?

2  A    Because we never got him.

3  Q    Because you couldn't locate him or you just --

4  A    Because the --

5  Q    -- or you never had the opportunity?

6  A    The situation just didn't work out.

7  Q    You knew where he was, at his home and at the barber

8  shop, right?

9  A    Yeah.

10 Q    Now, when you started going after Scopo, do you recall

11 when that was?

12 A    Sometime in '93.

13 Q    How long had you been trying to get Bill Cuotolo at that

14 time?

15 A    I don't remember.

16 Q    Well, do you remember if it was weeks or months?

17 A    I don't remember.

18 Q    When did you start looking for Joe Scopo in '93?

19 A    I can't give you an exact date.  It was sometime in '93.

20 Q    You don't recall if it was the middle of the year or the

21 beginning of the year, the end of the year?

22 A    No, I don't.

23 Q    And did you look for him on multiple occasions?

24 A    Yes, we did.

25 Q    And, in fact, Curcio, Eric Curcio, is the one who found

ANGELA GRANT, RPR, CRR
Official Court Reporter

RUSSO - CROSS - KEDIA

1   out where Joe Scopo was living; is that right?

2   A    Yes.

3   Q    And where was he living?

4   A    First he was in Canarsie and then he moved to Queens.

5   Q    And Joe Scopo is someone that you tried to kill when he

6   was living in Canarsie; is that right?

7   A    Yes.

8   Q    You described an incident, a time when you went by his

9   house and his head was in a garbage can; is that right?

10  A    Yes.

11  Q    Now, describe this incident.

12       Were you in a car with -- who were you in a car

13  with, let me ask you that?

14       THE COURT:  What incident?

15       MS. KEDIA:  Mr. Russo testified on direct

16  examination about an attempt on Joe Scopo's life when he was

17  living in a house in Canarsie so I'm asking --

18       THE COURT:  Are you talking about the day that his

19  head was in the garbage?

20       MS. KEDIA:  Yes, I am.

21       THE COURT:  Okay.  That was a very simple statement.

22  Do you see how easy that was.  Thank you.

23  Q    Mr. Russo, do you recall testifying about this incident

24  when you --

25  A    Yes.

RUSSO - CROSS - KEDIA

1    Q    Now, who was with you that day?

2    A    Me and BF and I believe John was in the car with us.  I

3    think Eric and Anthony Ferrara were together in crash cars.

4    They had their own cars.

5    Q    Who had their own cars?

6    A    Eric and Anthony.

7    Q    They each had their own car?

8    A    I believe so, yes.

9    Q    And you and Guerra were together?

10   A    Yes.  Me, Guerra and Johnny Pappa.

11   Q    And Johnny Pappa.

12        And you were all in one car together?

13   A    Yes, I believe so.  I think Johnny was with Eric and then

14   he jumped out of the car and came with me and BF.

15   Q    What car were you in?

16   A    Ah, I was in Frankie's truck, his jeep.  His father's

17   jeep.

18   Q    And were you going to be a shooter that day?

19   A    Well, I had a pistol on me.  Yes.

20   Q    Well, did you have a plan on --

21   A    Yes, we had a plan.

22   Q    -- that you were going to --

23   A    And we were going to go out and get him, yes, me and

24   John.

25   Q    You and John --

ANGELA GRANT, RPR, CRR
Official Court Reporter

RUSSO - CROSS - KEDIA

1    A    Pappa.

2    Q    You and John Pappa were going to be the shooters?

3    A    Yes.

4    Q    And as you drove around Mr. Scopo's house, explain what

5    happened?

6    A    We were looking for a nice place to park.

7    Q    A nice place to park?

8    A    A nice place to park so we could lay on him, yes.  And we

9    went around the block and when we started pulling up to park

10   the car we seen a guy in the garbage can when we went around

11   the block.  When we came back, he was walking up the stairs.

12   Q    Where was this garbage can, in front of his house?

13   A    Right in front of his house, yes.

14   Q    Right in front of his house?

15   A    Yes.

16   Q    And you just couldn't make out who it was?

17   A    No.

18   Q    And when you went around the block, meaning behind the

19   his house or around --

20   A    He was up on his porch going in his front door already.

21   Yes.

22   Q    And going up the stairs and going into his front door?

23   A    Yes.

24   Q    And you have a vivid recollection of this?

25   A    Vivid, as best as I can recall, yes.

ANGELA GRANT, RPR, CRR
Official Court Reporter

RUSSO - CROSS - KEDIA

1    Q    Now, do you recall where this house was?

2    A    No, not exactly.  No.

3    Q    No?

4    A    No.

5    Q    When you started cooperating and you told the agents

6    stories about looking for Joe Scopo, you went on drive-arounds

7    with them, right, with the agents?

8    A    Did I go on drive -- one time, yeah.

9         THE COURT:  At what time frame?

10   Q    Yes.  Mr. Russo, after you started cooperating --

11   A    Yes.

12   Q    -- in 2011, you had told the agents about various

13   attempts on Bill Cuotolo and on Joe Scopo; is that right?

14   A    Yes.

15   Q    And did you go on drive-arounds with agents at some

16   point?

17   A    Yes.

18   Q    Did you show them where Joe Scopo's house was?

19   A    In Queens, yes.

20   Q    Did you show them where Joe Scopo's house was in

21   Brooklyn?

22   A    No.

23   Q    Why not?

24   A    Because they didn't ask.  And I don't recall.

25   Q    You showed them where Joe Scopo's club was; is that

RUSSO - CROSS - KEDIA

1    right?

2    A     Yes.

3    Q     Now, Mr. Russo, you testified about getting guns for the

4    Scopo murder, right?

5    A     Yes.

6    Q     When did you get these guns?

7    A     Exactly when I got them?  I can't give you a date and

8    time.

9    Q     Approximately?

10   A     Mid '93.  February, March, April, like that.

11   Q     You'd been going after Cuotolo for a while at this point,

12   right?

13   A     Yes.

14   Q     Now you decided to focus on Joe Scopo; is that right?

15   A     Yes.

16   Q     And at some point while you're focusing on Joe Scopo you

17   get guns; is that right?

18   A     We get more guns, yes.

19   Q     You get more guns?

20   A     Yeah.

21   Q     So you had guns already?

22   A     We had a couple guns, yeah.

23   Q     Guerra was involved in the war for a number of years and

24   had a number of guns, right?

25   A     Excuse me?

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 236 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 209 of 347 PageID #: 3023
#: 4543
194

RUSSO - CROSS - KEDIA

1   Q    Frank Guerra was involved in the war for a number of

2   years and had a number of guns; is that right?

3   A    Frank Guerra didn't have no guns.

4   Q    He didn't have no guns?

5   A    He didn't have no guns when I was with him.

6   Q    Bobby Tarantola had guns?

7   A    I don't know.  He might have.

8   Q    Anthony Ferrara?

9   A    I don't know.

10  Q    Well, who had guns?  You said you had a bunch of guns.

11  A    When we showed up, we had guns for the Billy thing and I

12  don't remember exactly who had the guns.  I'm sorry.

13  Q    Who is "we"?  You did?

14  A    I had a gun, yeah.

15  Q    John Pappa did?

16  A    Yes.

17  Q    John Sparacino did?

18  A    John Sparacino wasn't with us when we went looking for

19  Billy.

20  Q    What about Eric Curcio?

21  A    I don't believe he had a gun on him.  No, he was just a

22  crash car driver.

23  Q    Eric Curcio was always going to be a crash car driver?

24  A    Yes.

25  Q    How was it decided, Mr. Russo, who was going to be a

ANGELA GRANT, RPR, CRR
Official Court Reporter

Case 1:03-cr-00351-FK Document 869-6 Filed 08/19/21 Page 237 of 635 PageID Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 2109 of 847 PageID #: 4544

195

RUSSO - CROSS - KEDIA

1  shooter and who was going to be a crash car driver?

2       MR. LIFSHITZ:  Can we just clarify for which plot

3  this was?

4       THE COURT:  Yes.

5       MS. KEDIA:  Yes.

6  Q    Let's start with Cuotolo.

7  A    I don't remember.

8       THE COURT:  Again with the Cuotolo.  Can we just

9  stick to the Scopo.

10      MS. KEDIA:  Yes, Your Honor.

11 Q    With respect to Joe Scopo?

12 A    We decided that Johnny Sparacino and Johnny Pappa would

13 do the shooting.  I was the driver and I had a gun on me also

14 just in case.

15 Q    You had a gun on you when you -- you're talking about the

16 day you shot Scopo?

17 A    Yes.

18 Q    The day you shot and killed him?

19 A    Yeah, I had a gun in the car.

20 Q    Well, Mr. Russo, do you recall testifying at Frank

21 Guerra's trial that you didn't have a gun on you?

22 A    No, I don't.

23      MS. KEDIA:  Give me one moment, Your Honor.

24 Q    Mr. Russo, do you recall being asked this question and

25 giving this answer?  It's AR 63, page 704.

ANGELA GRANT, RPR, CRR
Official Court Reporter

RUSSO - CROSS - KEDIA

1    THE COURT:  You mean 3500 AR.

2    MS. KEDIA:  AR 63.

3    THE COURT:  63.  I'm sorry, what was the page?

4    MS. KEDIA:  Page 704.

5    And I'll start actually on page 703 at the bottom,

6  Your Honor.

7  Q    Question:  Okay -- line 23.  And who was in your car?

8    Answer:  Me, Johnny Pappa and John Sparacino.

9    Question:  And who was driving?  Who was the

10  passenger?  Who was rear passenger?

11    Answer:  I was driving, Johnny Pappa was in the

12  front passenger, and Johnny Sparacino is behind me.

13    Question:  And who had guns?

14    Answer:  Johnny Pap and Johnny Sparacino.

15    Question:  What were the guns that they had?

16    Answer:  Johnny Sparacino had the MAC-10, and I

17  don't know exactly what Johnny -- he had a pistol on him.  I

18  know that.  I don't know what caliber.

19    Question:  And for those of us who don't know what a

20  MAC-10 is, what is a MAC-10?

21    Answer:  It's a machine gun.

22    Question:  And you loaded that with 30 rounds?

23    Answer:  Yes, I did.

24    Question:  Did you have a gun?

25    Answer:  No, I don't believe I did.  No.

ANGELA GRANT, RPR, CRR
Official Court Reporter

Case 1:03-cr-00351-FK   Document 1869-6   Filed 09/10/21   Page 239 of 635 PageID #: 4546
Case 1:16-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 239 of 847 PageID #:10241
197

RUSSO - CROSS - KEDIA

1          Question:  You don't remember if you had a gun?

2          Answer:  I didn't have a gun, no.

3          Question:  Would you go out on a hit and not have a

4     gun?

5          Answer:  I didn't have a gun.  I was the driver.

6          Do you remember being asked those questions and

7     giving those answers.

8     A     Yes, I do.

9     Q     Are you telling the truth today or were you telling the

10    truth at that time when you testified at the Frank Guerra

11    trial?

12          MR. LIFSHITZ:  Objection.

13          MS. KEDIA:  I'm sorry.  I didn't hear the answer.

14          THE COURT:  Sustained as to form.

15          Can you rephrase your question, please.

16          MS. KEDIA:  Yes, Your Honor.

17    Q     Were you lying when you testified at the Frank Guerra

18    trial --

19    A     No, I wasn't.

20    Q     -- about carrying a gun?

21    A     No, I wasn't.  Maybe I made a mistake.  I don't remember.

22    Q     When did you make a mistake?

23    A     About the gun.

24    Q     When did you make a mistake, at that time or now?

25    A     I don't remember.  You know what, I'm so confused right

Case 1:03-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 240 of 635 PageID #: 4547
Case 1:16-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 240 of 849 PageID #: 0242
198

RUSSO - CROSS - KEDIA

1   now.  Going over the same thing over and over and over.

2   Q    You've gone over and over and over it many, many, many,

3   many times with the government; is that right?

4               MR. LIFSHITZ:  Objection to "it".

5               THE COURT:  Yes.  Sustained as to form.

6   Q    Mr. Russo, you've gone over your stories about attempts

7   on Joe Scopo and the actual hit on Joe Scopo on any number of

8   occasions with the government; is that right?

9   A    I'm sure I did, yeah.

10  Q    Do you remember the things that you told them or you

11  don't?

12  A    Do I remember?

13  Q    Yes.

14  A    I can't --

15              THE COURT:  Sustained as to form.  That's a very

16  vague question.

17              As you sit here right now, do you remember whether

18  or not you had a gun?  This was the first incident, correct?

19              MS. KEDIA:  This is the night of the murder, Your

20  Honor.

21              THE COURT:  The night of the murder.

22              THE WITNESS:  I don't remember.

23              THE COURT:  Okay.  Move on.

24  Q    Now, Mr. Russo, you -- on the night of the murder, you

25  were in a stolen vehicle; is that right?

ANGELA GRANT, RPR, CRR
Official Court Reporter

RUSSO - CROSS - KEDIA

1    A    Yes.

2    Q    And you testified that you thought it was a Chevy; is

3    that right?

4    A    I testified I believe that I don't remember what it was.

5    I know it was a brown four door.

6    Q    Well, when you testified in this courtroom on direct

7    examination just a short time ago, you testified that you

8    thought it was a brown Chevy; is that right?

9    A    If that's what I said, yes, then.

10   Q    Well, do you remember saying that, Mr. Russo?

11   A    Listen, I -- Your Honor, I got to say something.

12           THE COURT:  Okay.  Please, no arguing.  Do you

13   remember?

14           THE WITNESS:  I got a lot of things on my mind.  I

15   just lost my son and that's not really --

16           THE COURT:  I'm sorry.  When did that happen?

17           THE WITNESS:  June 29th.  And I'm starting to like

18   get aggravated right now.

19           THE COURT:  Okay.  Just --

20           THE WITNESS:  I got a lot of things on my mind.

21           THE COURT:  Okay.  You need to step back.  Just

22   answer the question.

23           We can reread the question.  Can you reread the last

24   question, please.

25           (Record read.)

ANGELA GRANT, RPR, CRR
Official Court Reporter

Case 1:03-cr-00929-FK Document 869-6 Filed 08/19/21 Page 342 of 635 PageID #: 4549
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 213 of 347 PageID #:00241
200

RUSSO - CROSS - KEDIA

1    THE COURT:  The question is do you remember when you

2    were testifying on direct a couple of weeks ago at this

3    hearing in this courtroom that the car involved was a brown or

4    tan Chevy?

5    THE WITNESS:  I believe so.

6  Q    Mr. Russo, did you steal other cars before you stole this

7  particular car?

8  A    I've never stolen cars.  I don't know how to steal a car.

9  John Matera stole that car for us.

10 Q    Did John Matera or anyone that you were doing attempts to

11 kill Scopo with steal any other cars on other occasions?

12 A    I don't remember.

13 Q    Do you remember ever using a stolen car on attempts to

14 murder Joe Scopo before this particular --

15 A    We used a van.  We had a van.

16 Q    Where did the van come from?

17 A    I don't recall where it came from.

18 Q    What kind of van?

19 A    It was a white van.

20 Q    Who stole it?

21 A    Pulled up to meet everybody and they were in the van.

22 Q    And tell us about that occasion when you pulled up to

23 meet everybody and they were in the van.  Tell us when it was

24 first.

25 A    It was when we were looking for Joey Scopo.

RUSSO - CROSS - KEDIA

1    Q    And when approximately is this?

2    A    I don't know.  Twenty something years ago.  I really

3    don't.

4    Q    I understand, Mr. Russo, but you've testified to a lot of

5    events from --

6    A    Okay.

7    Q    -- twenty something years ago; is that right?

8    A    Excuse me?

9    Q    You've testified to a lot of events from 20 something

10   years ago; is that right?

11   A    Well, just to the one, the murder, is 20 something years

12   ago.

13   Q    Well, and attempts to murder Mr. Scopo?

14   A    Yes.  Yes.

15   Q    And Mr. Cuotolo?

16   A    Yes.

17   Q    And on direct examination you gave significant details

18   about both of those situations; is that right?

19   A    Yes.

20   Q    And do you remember them or are you making them up?

21   A    No, I'm not making that up.  I remember them as I

22   remember them.

23   Q    So when you had this van, where were you?  When you

24   talked about this van where people pulled up in and you just

25   got in --

1    A    I met them in Queens.

2    Q    Where in Queens?

3    A    Me and Frankie met Eric and Johnny Pappa, Robert

4    Tarantola.

5            MR. LIFSHITZ:   Your Honor, I don't know if the

6    Court was planning to take a break during the morning, but if

7    you were, maybe this is a good time for it.

8            THE COURT:   I was going to take a break in a couple

9    of minutes.

10   Q    So where in Queens, Mr. Russo?

11   A    Around the area where his club was which is, I believe,

12   Ozone Park.  I don't know.

13   Q    And what did you do on that occasion?

14   A    We met and we just drove around and looked for him.

15   Q    Meaning you didn't know where he was?

16   A    Well, we'd go home, we'd have to go look for him.  We

17   went by his club, his house.

18   Q    And did you have other cars or just the stolen car that

19   day?

20   A    Well, we had our cars parked and we just went in the van,

21   all of us.

22   Q    Everybody went in the van?

23   A    Yes.

24   Q    Did you have guns on you?

25   A    I don't remember.

Case 1:03-cr-00351-EK   Document 1869-6   Filed 08/19/21   Page 345 of 635 PageID #: 4552
Case 1:16-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 2168 of 847 PageID #:0247
203

RUSSO - CROSS - KEDIA

1    Q    If you found him, were you going to kill him?

2    A    You're talking about one occasion.  I don't remember that

3    occasion.  We did it multiple times looking for him over there

4    near his club so.

5    Q    Is this a van you used on multiple occasions?

6    A    We used it a few times, yes.

7    Q    When you were in this van, all of you, the people that

8    you described just a few moments ago, all of you were in this

9    van and you're looking for Joe Scopo; is that right?

10   A    Yes.

11   Q    This is before -- certainly before October 20 of 1993

12   when he was killed?

13   A    Absolutely.

14   Q    And were you planning on killing him if you found him?

15   A    If we found him, yes.

16   Q    There are no other cars than the crash cars.  There are

17   no other -- just everybody --

18   A    We had the car.

19   Q    -- piled in one car?

20   A    The incident I'm talking about is we were just driving

21   around looking to see if we could find him.

22        THE COURT:  Okay.  Please, you need to let Ms. Kedia

23   finish asking her question before you answer.

24        Why don't we take a break now.  We'll come back.

25   The clock in the courtroom is wrong.  It's about five or six

ANGELA GRANT, RPR, CRR
Official Court Reporter

1  minutes behind so we'll gather back up here at noon.  We'll

2  take a 15-minute break.  Okay.

3          So remember that you can't talk about your testimony

4  with the government.

5          THE WITNESS:  Yes, Judge.

6          THE COURT:  Scheduling you can talk about, but not

7  your testimony.  Okay.

8          All right.  I'll see everybody back here at noon.

9  Thank you.

10          Ms. Kedia, are you going to play any more tapes?

11          MS. KEDIA:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MR. SERCARZ:  Your Honor, are we still on the

14  record?

15          THE COURT:  We could be.

16          MR. SERCARZ:  I thought it -- just sitting here I

17  thought it might be helpful if I made an offer of proof so

18  that the Court understood why Ms. Kedia went back to the

19  Cuotolo attempt.  After all, you're the finder of the fact.

20  We want you to understand the import of this cross

21  examination.  And, quite frankly, I'd like for my colleague to

22  have some latitude.

23          Can I explain it to you, showing you citations from

24  the transcript now?  Will that be helpful?

25          THE COURT:  No.  I need to take a break and take

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/10/21 Page 847 of 635 PageID #: 4554
Case 1:10-cr-00147-DLF Document 846-1 Filed 05/21/16 Page 220 of 847 PageID #: 10243

205

RUSSO - CROSS - KEDIA

```
1    care of something now.

2              MR. SERCARZ:  That's fine.

3              THE COURT:  And this is a limited hearing.  This is

4    not a free for all.

5              MR. SERCARZ:  Understood.

6              (Recess taken.)

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:02-cr-00351-FK Document 1869-6 Filed 09/19/21 Page 849 of 635 PageID
Case 1:16-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 221 of 849 PageID #90250
#: 4555
206

PROCEEDINGS

1    THE COURT:  Before we bring out the witness,

2    Mr. Secarz, you wanted to make some legal argument.

3    MR. SERCARZ:  A factual argument rather than a legal

4    argument.  Frankly, Your Honor, it's to try and assist

5    Ms. Kedia and the Court in understanding the relationship

6    between that effort on the life of Mr. Cuotolo and the Scopo

7    homicide.

8    Your Honor, at page 37 of the -- withdrawn.  At

9    page 35 of the transcript of the direct examination, Mr. Russo

10   makes it clear that the plan to kill Mr. Scopo took place and,

11   I quote, after they planned to murder "Wild Bill".

12   THE COURT:  Cuotolo.

13   MR. SERCARZ:  Let me get you there.  It will take

14   three seconds.  The Court may recall and, indeed, you should

15   next go to page 40 of the direct testimony.

16   The plan to the plan to kill Scopo allegedly began

17   when Michael Persico said, Go see Eric, he's a line on Joey.

18   The next piece of testimony on the direct

19   examination is, the meeting takes place between Eric and

20   Mr. Russo and Mr. Russo comes back and asks Mr. Persico for

21   weapons.  At that point, according to the direct testimony

22   that you heard two weeks ago, my client, Mr. Persico, says

23   that Smiley is going to deliver a bag and the bag contains

24   weapons.  The weapons are a MAC 10 and two pistols.

25   Now the import of this cross-examination, I

Case 1:02-cr-00351-FK Document 1869-6 Filed 09/19/21 Page 249 of 635 PageID #: 4556
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 221 of 849 PageID #: 10251
207

PROCEEDINGS

 1    respectfully submit, is that if they already had the MAC 10

 2    and the pistols when they were going after Mr. Cuotolo, they

 3    didn't get those weapons as a result of a conversation that

 4    they had with Michael Persico.  That's why it's important for

 5    us to elicit the sequence of events and Ms. Kedia made it very

 6    clear with this again with this witness today, that first they

 7    went after Cuotolo, then they went after Scopo.  That when

 8    they went after Cuotolo they already had the MAC 10 and the

 9    .38 caliber weapon.

10         Now the government may attribute this to a faulty

11    memory of an event that is 25 years old, but given that the

12    only evidence that they have tying Mr. Persico to the Scopo

13    homicide or statements they are attributing to him, these

14    inconsistencies have weight.  And I thought it would be useful

15    for you to have that, Your Honor, in hearing where Ms. Kedia

16    is going with this cross-examination.  Unfortunately, we don't

17    get to give opening statements at hearings like this, so it's

18    not always clear to the finder of the fact where we're headed,

19    but that's where we're headed.  And, indeed, I respectful

20    submit --

21         THE COURT:  But she's already elicited all of this

22    business about the Cuotolo murders and when it occurred.  So

23    let's move on to the gist of what we have to do.

24         MR. SERCARZ:  Fair enough.  But I wanted you to

25    understand from our perspective this piece so that you could

Case 1:03-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 859 of 635 PageID
Case 1:10-cr-00147-DLF   Document 340-1   Filed 09/21/18   Page 2239 of 847 PageID #:9252
#: 4557
208

PROCEEDINGS

1   have it for what it's worth and consider whether or not there

2   aren't similar factual inconsistencies which cast doubt on the

3   other statements that they've attributed to Michael Persico.

4            THE COURT:  Aren't there transcripts of

5   conversations of Mr. Persico that were suppressed in the

6   Guerra trial --

7            MS. KEDIA:  No, Your Honor.

8            THE COURT:  -- concerning the Scopo murder?

9            I'm asking the government.

10           MS. KEDIA:  Oh, I apologize.

11           THE COURT:  And let me finish asking the question

12   before you answer.

13           MR. LIFSHITZ:  Your Honor, no, I don't believe so.

14   There were prison recordings that may have related to a

15   different murder that was charged against Guerra that were

16   suppressed --

17           THE COURT:  Okay.

18           MR. LIFSHITZ:  -- but not relating to the Scopo

19   murder.

20           THE COURT:  Okay.

21           We have folks in the audience, I assume nobody there

22   is a witness for this hearing.

23           MS. KEDIA:  No, Your Honor --

24           MR. LIFSHITZ:  Not for the government.

25           MS. KEDIA:  -- not for the defense.

Georgette K. Betts, RPR, CSR
Official Court Reporter

Case 1:03-cr-00351-FK   Document 1860-6   Filed 08/19/21   Page 851 of 635 PageID
Case 1:16-cr-00147-DLF   Document 340-1   Filed 09/21/18   Page 224 of 341 PageID #: 0253
#: 4558
209

PROCEEDINGS

1          THE COURT:  I wanted to make sure.  I wanted to ask

2   earlier.

3          Do you wish to respond, Mr. Lifshitz?

4          MR. LIFSHITZ:  Your Honor, I think whatever the

5   defense argument is, the record is now made.  I don't think

6   this witness said that the same Mac 10 was used to kill Scopo

7   as it had been provided previously for Cuotolo, but if they

8   want to make that argument based on the record I think they

9   have the tools that they have tried to establish to do that.

10         THE COURT:  I think that the ground has been covered

11  sufficiently, so let's just move on with the rest of it.

12         We can bring out the witness.

13         MR. LIFSHITZ:  Thank you, Your Honor.  Can we ask

14  for a rough estimate how much longer the cross?

15         THE COURT:  How much more do you have on cross?

16         MS. KEDIA:  Certainly I'll be going after lunch,

17  Your Honor, it really depends on how quickly I get the witness

18  to answer the question.  I have still several areas to cover

19  though.

20         THE COURT:  All right.  Well, get to the point.

21  Okay.  I made time until tomorrow if we have to continue the

22  hearing until tomorrow.

23         MS. KEDIA:  Thank you, Your Honor.

24         Judge, I take it we will be sitting until

25  5:00 o'clock today?

<div align="center">PROCEEDINGS</div>

```
 1              THE COURT:  Yes, we'll probably take a mid-afternoon

 2    break.

 3              This is a Fatico hearing continued, same appearances

 4    as this morning.  Mr. Russo has resumed the witness stand.

 5              I remind, sir, you that you are still under oath.

 6    There is water there for you --

 7              THE WITNESS:  Yes.

 8              THE COURT:  -- if you would like some water just

 9    always be careful with the pitcher.

10              You may inquire when you are ready, Ms. Kedia.

11              MS. KEDIA:  Thank you, Your Honor.

12    CROSS-EXAMINATION

13    BY MS. KEDIA:

14    Q    Mr. Russo, you testified on direct examination that you

15    started looking for Joey Scopo when Michael asked you to go

16    down to see Eric, you recall that?

17    A    Yes.

18    Q    And you testified that Michael said Eric had told him

19    that he had a line on Joey; is that right?

20    A    Yes.

21    Q    You were with BF on that date?

22    A    When I went to see Eric, yes.

23    Q    Did you go see Eric just following your conversation with

24    Michael Persico?

25    A    We went down to see Eric, yes.
```

<div align="center">Georgette K. Betts, RPR, CSR<br>Official Court Reporter</div>

Case 1:02-cr-00351-FK Document 1869-6 Filed 09/19/21 Page 353 of 635 PageID #: 4560
Case 1:10-cl-00147-DLF Document 340-1 Filed 09/21/16 Page 23 of 847 PageID #:10255
211

RUSSO - CROSS - KEDIA

1   Q   So you had the conversation and then you went to see

2   Eric, meaning I'm asking if it happened all on the same day?

3   A   Yes.

4   Q   Do you recall testifying at the Guerra trial that when

5   you went to see Eric you were alone, you were not with BF?

6   A   Excuse me?

7   Q   Do you recall testifying at the Guerra trial that you

8   were not with BF --

9   A   No, I don't.

10  Q   -- you were alone when you went to see Eric?

11  A   No I don't remember that.

12  Q   Where did you go see Eric?

13  A   Downtown, Brooklyn.

14  Q   Where?

15  A   Downtown, Henry Street.

16  Q   And what's on Henry Street?

17  A   He had a club down there.

18  Q   And do you recall that when you went to see Eric that

19  you -- that it was just you and Eric on that particular

20  occasion?

21  A   No, I don't remember that.

22  Q   Because that's not what happened, you were with BF; is

23  that right?

24  A   I believe so, yes.

25  Q   Do you recall -- let me ask you this -- being asked these

1    questions and giving these answers?

2              THE COURT:  When?

3              MS. KEDIA:  I'm just looking for the page, Your

4    Honor, on --

5              THE COURT:  When and at what proceeding?

6    BY MS. KEDIA:

7    Q    Mr. Russo, at the Guerra trial, at Frank Guerra's trial

8    when you testified, do you recall being asked these questions

9    and giving these answers on page 206 and 207.

10             THE COURT:  Can we have the exhibit number again,

11   please.

12             MS. KEDIA:  Yes, 3500AR63, Your Honor.

13             THE COURT:  I'm sorry, the page again.

14             MS. KEDIA:  Page 206 starting at line 22.

15             "Q    You said that after you spoke to Michael

16   Persico you went to see Eric at his club, what happened

17   during that meeting?

18             "A    He called me about that he had a lead on

19   Joey, that he wanted to get Joey.  He wanted to know if

20   I was interested and BF.  And I told him I don't know

21   about BF I would have to talk to him about it.  I said,

22   we'll get together and we'll discuss it.

23             "Q    What happened next?

24             "A    I went to talk to BF, we had a

25   discussion, he said no problem.  I told him maybe just

RUSSO - CROSS - KEDIA

1    me him and Bobby Tarantola would get involved, Little

2    Anthony, the four of us and Eric.

3            "Q    What happened next?

4            "A    And then Eric -- after we decided we

5    were going to do this, we went to see Eric, me and BF,

6    and we told him we were going to do it."

7            Do you remember being asked those questions and

8    those answers?

9    A    No, I don't.

10   Q    And do you remember being asked at that same proceeding

11   at page 694, Your Honor -- line 6, Your Honor, I'm starting

12   at.

13           "Q    Now Mr. Curcio had a club on Henry

14   Street.

15           "A    I believe so, yes.

16           "Q    And you were there?

17           "A    Yes.

18           "Q    And this is when he told you that he was

19   laying on Joey?

20           "A    He said he wanted to know if we could

21   help him out with that.

22           "Q    And did he say Joey or Joey Scopo?

23           "A    I think he just said Joey Scopo, yes.

24           "Q    And he asked you for your help?

25           "A    He asked if I would help him, me,

Georgette K. Betts, RPR, CSR
Official Court Reporter

Case 1:03-cr-00351-FK Document 1860-6 Filed 09/19/21 Page 256 of 635 PageID
Case 1:16-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 229 of 347 PageID #: 10253
#: 4563
214

RUSSO - CROSS - KEDIA

1   Frankie and Bobby.

2           "Q   Okay.  So he just blurted out saying

3   would the three of you help even though the other two

4   weren't with you at the time?

5           "A   Yes.

6           "Q   So he's having a conversation with you

7   and the other two at the same time?

8           "A   Me and the other two?  It was just me

9   and Eric that day."

10          Do you remember being --

11  A   No, I don't.

12  Q   -- asked those questions and giving those answers?

13  A   No.

14  Q   Mr. Russo, do you remember if it was just you and Eric

15  that day or not?

16  A   No, I believe it was me and BF.

17  Q   So if you testified that it was just you and Eric, were

18  you lying?

19  A   No, I was not.

20          MR. LIFSHITZ:  Objection, Your Honor.

21          THE COURT:  Overruled.  I'll allow it.  The answer

22  will stand.

23  Q   Now, Mr. Russo, at this time when you are -- this is when

24  you first begin to start looking for Joe Scopo; is that right?

25  Following this conversation, is that right, with Eric?

Case 1:02-cr-00351-FK Document 869-6 Filed 09/18/21 Page 357 of 635 PageID #: 4564
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 2339 of 847 PageID #: 2025

215

RUSSO - CROSS - KEDIA

1  A    A certain amount of time after that, yes.  A little while

2  after the conversation I guess we --

3  Q    You had this conversation with Eric and then sometime,

4  what, weeks, days, months after that?

5  A    I don't -- I don't know.

6  Q    And at that point you had already been looking for Bill

7  Cuotolo for some time?

8  A    Yes, we did.

9  Q    And at that point you stopped looking for Bill Cuotolo

10  and you started looking for -- you stopped looking to kill

11  Bill Cuotolo and you started looking to kill Joe Scopo?

12  A    Yes.

13  Q    And did you have any understanding as to why you were

14  stopping looking for Bill Cuotolo and starting to look for Joe

15  Scopo?

16  A    I don't remember why we stopped looking for Billy.

17  Q    Now, Mr. Russo, you testified about a conversation that

18  you allegedly had with Mr. Persico while you were looking for

19  Joe Scopo.  Do you recall testifying about various

20  conversations you had with him?

21  A    With Michael?

22  Q    Yes.

23  A    Yeah.

24  Q    And you testified that at some point Michael Persico

25  said, you've got to get this done before Allie goes to trial,

1    do you recall that?

2    A    That's what I remember, yes.

3    Q    And do you know when Allie was scheduled to go to trial?

4    A    No, I do not.

5    Q    Do you know what Allie was scheduled to go to trial for?

6    A    Something about the war.

7    Q    What does that mean, something about the war?

8    A    He was on trial for something that had to do with the

9    war, I don't know.  He was on trial, he was going to trial.

10   Q    He was in prison right?

11   A    Yes.

12   Q    And you testified that the reason -- your understanding

13   of the reasons you had to get this done before he went to

14   trial is that at least he would have an alibi, meaning Allie

15   Persico would have an alibi, right?

16   A    That's the way I took it, yes.

17   Q    That if he's in jail he had nothing to do it?

18   A    That's the way I took it, yes.

19   Q    Nobody said that to you that's just what you understood

20   it to be?

21   A    Yes.

22   Q    When was this conversation?

23   A    I don't remember.

24   Q    How long before you killed Joe Scopo was this

25   conversation?

Case 1:03-cr-00351-FK  Document 1869-6  Filed 08/19/21  Page 359 of 635 PageID #: 4566
Case 1:16-cr-00147-DLI  Document 340-1  Filed 09/21/18  Page 259 of 347 PageID #: 5201
217

RUSSO - CROSS - KEDIA

1    A    It was before we killed him, yes.

2    Q    How long before?

3    A    I can't recall.

4    Q    You testified about a funeral --

5    A    Right.

6    Q    -- where you saw Teddy Persico --

7    A    Right.

8    Q    -- junior.

9         Do you recall that?

10   A    Yes.

11   Q    Do you recall when that was?

12   A    It was sometime in '93, I don't know exactly.  It was

13   warm out, maybe March, April, May, June, I don't remember.  I

14   don't recall.

15   Q    Was this conversation with Michael Persico about getting

16   this done before his brother goes to trial, was this before or

17   after the funeral?

18   A    It was before his brother was going to trial.

19   Q    Was it before or after the funeral?

20   A    I don't recall.

21   Q    Do you know how long before you killed Joe Scopo this

22   conversation occurred?

23        THE COURT:  Asked and answered.  Move on.

24   Q    Did you know Allie Persico at that point?

25   A    No.

Case 1:03-cr-00351-EK   Document 1869-6   Filed 09/19/21   Page 860 of 635 PageID
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 260 of 347 PageID #:9020
#: 4567
218

RUSSO - CROSS - KEDIA

1   Q    He had been in jail the whole time that you were out; is
2   that right --
3   A    Yes.
4   Q    -- after you got out in 1992?
5   A    Yes.
6   Q    Do you know that he was indicted in May of 1993?
7   A    No.  I know he was in jail.
8   Q    Do you know that he was facing several war related
9   murders having ordered them?
10  A    Did I know that?
11  Q    Right.
12  A    I heard that, something like that.
13  Q    And that he was facing a trial for conspiracy to murder
14  those aligned with the Orena faction?
15  A    No, I don't know.
16  Q    You don't know.
17            Do you know that he went to trial in the summer of
18  1994?
19  A    I believe so, I believe that's right.
20  Q    You believe that's right?
21  A    I believe so.
22  Q    He was acquitted on August 8th, 1994, do you recall that?
23  A    Yes.
24  Q    You said that after -- so you have no recollection of
25  when that conversation was, but you testified on direct

Case 1:03-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 261 of 625 PageID #: 4568
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 254 of 341 PageID #: 20203
219

RUSSO - CROSS - KEDIA

1  examination that that conversation occurred and then you lost

2  Scopo for a little while; is that right?

3  A    You're asking for specific dates and times, I can't do

4  that.

5           THE COURT:  It's a compound question.

6  Q    You testified about this conversation you had --

7  A    Yes.

8           THE COURT:  Okay, yes.

9  A    Yes.

10 Q    And you testified on direct examination that after that

11 conversation, we had problems finding Scopo because he moved

12 to another area and we didn't know where he was.

13 A    Is that what I testified to then, yes.

14 Q    Well do you recall that?  Is that correct?

15 A    Yes.

16 Q    I'm talking about two weeks ago.

17 A    How do I say this again?  Yes.

18 Q    Do you know when Scopo moved out of his Brooklyn home and

19 into his Queens home?

20 A    Do I know when Scopo moved out --

21 Q    Yes.

22 A    -- of Brooklyn to Queens?

23 Q    Yes.

24 A    No, I can't give you specific dates and times.  '93.

25 Q    In '93.

Case 1:02-cr-00351-FK   Document 1860-6   Filed 08/19/21   Page 262 of 635 PageID
Case 1:16-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 262 of 347 PageID #:9204
#: 4569
220

RUSSO - CROSS - KEDIA

1    A    Yeah.

2    Q    About?

3    A    Yeah.

4    Q    And you said you stopped looking for him for a few weeks;

5    is that right?

6    A    Yes, I believe so.

7    Q    And you stopped looking for him even though you were told

8    to hurry up and get him before Allie went to trial --

9    A    We couldn't find him.

10   Q    -- right?

11        You didn't stop looking for him --

12   A    We couldn't find him.

13   Q    -- you just couldn't find him?

14   A    Yes.

15   Q    You talked about an occasion where you got out of --

16   where you went by his club; is that right?

17   A    Yes.

18   Q    And you got out --

19   A    Yes.

20   Q    -- out by his club and you walk past him --

21   A    No, he walked past me.

22   Q    -- and you --

23        THE COURT REPORTER:  I'm sorry.

24        THE COURT:  You're both doing this again.

25        You have to wait until she finishes asking the

Georgette K. Betts, RPR, CSR
Official Court Reporter

Case 1:03-cr-00351-FK... Document 860-6 ... Filed 09/19/21 ... Page 863 of 635 PageID
Case 1:16-cr-00147-DLF ... Document 840-1 ... Filed 09/21/18 ... Page 2883 of 847 PageID #:10265
#: 4570
221

RUSSO - CROSS - KEDIA

1    question --

2              THE WITNESS:  Okay.  Sorry about that.

3              THE COURT:  -- and if he starts talking you need to

4    stop because nothing is getting written down.

5              So why don't you start asking your question again.

6              MS. KEDIA:  Yes, Your Honor.

7    Q    Mr. Russo, you testified about going around the block

8    outside of Mr. Scopo's club just to take a walk, you were

9    going to smoke a cigarette; is that right?

10   A    I went down to the club to see if he was around at his

11   club figuring he didn't know who I was, so I went past it to

12   see if he was in the club.

13   Q    And when you say he didn't know who you were --

14   A    Joe Scopo did not know me.

15   Q    -- he didn't know -- he wouldn't recognize your face or

16   as someone who might be a problem for him?

17   A    No.

18   Q    And did you know what he looked like at the time?

19   A    Yes.

20   Q    How did you know what he looked like?

21   A    I had pictures.

22   Q    I'm sorry?

23   A    I seen pictures.  And I seen him at his house, so I knew

24   what he looked like.

25   Q    Mr. Russo, do you recall testifying at the Guerra trial,

Case 1:02-cr-00351-FK — Document 1860-6 — Filed 08/19/21 — Page 264 of 625 PageID Doc
Case 1:16-cr-00147-DLF Document 840-1 Filed 09/21/16 Page 264 of 841 PageID #: 4571

222

RUSSO - CROSS - KEDIA

1   the trial against Frank Guerra --

2   A    Yes.

3   Q    -- and being asked this question and giving this answer?

4   3500AR63, Your Honor, page 724.

5           You're testifying about the night of the murder and

6   you were asked this question and gave this answer.

7           "Q    Did you know where Joey was sitting in

8   the car?

9           "A    The passenger seat of the Altima.

10          "Q    But you didn't know what Joey looked

11  like?

12          "A    Well, that was him, we knew --

13          "Q    You know that now, but you didn't know

14  what he looks like?

15          "A    I didn't know what he looks like."

16          THE COURT:  We don't know what time frame --

17  Q    Do you recall --

18          THE COURT:  -- that question concerns.

19          MS. KEDIA:  I can back it up, Your Honor.  This is

20  the night of the murder.

21  Q    Do you recall being asked those questions and giving

22  those answers about the night of the actual murder of Joe

23  Scopo?

24  A    No, I don't.

25          MS. KEDIA:  Your Honor, the several pages before --

Case 1:03-cr-00951-EK   Document 1860-6   Filed 08/19/21   Page 865 of 635 PageID #: 4572
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 2369 of 847 PageID #: 0207
223

RUSSO - CROSS - KEDIA

1    if I may just explain to the Court, the several pages before

2    this question and answer it's making it very clear that the

3    questions and answers pertain to the night of the Scopo

4    murder.  If I may just offer that to the Court rather than

5    just reading the questions and answers all to the witness.

6             THE COURT:  Okay.

7    BY MS. KEDIA:

8    Q    Now you just testified that the night that you were out

9    at his club walking by smoking -- going to smoke a cigarette

10   that you knew what he looked like, right?

11   A    Yes.

12   Q    Do you recall being asked this question on direct

13   examination at Mr. Guerra's trial and giving this answer?

14            THE COURT:  What page number is that?

15            MS. KEDIA:  Page 219, Your Honor.

16   Q    Question -- and this is, let's start at line 7 --

17            "Is that where you murdered him in Queens?

18            "A    Yes.

19            "Q    Prior to that, when you were going out

20   to surveil him, did you ever have a close call with

21   him?

22            "A    Yes.

23            "Q    What happened?

24            "A    One night me and Frankie, I don't know

25   exactly who was there, I know Eric was there, I got out

Georgette K. Betts, RPR, CSR
Official Court Reporter

RUSSO - CROSS - KEDIA

1    of the car because we were going by the club on 100 and

2    First Avenue.  And he had a club there, Joe Scopo, and

3    so I knew he didn't know what I looked like and I

4    just -- so I just told him I'll get out of the car and

5    buy a pack of cigarettes, I'm going to look in the club

6    to see if he's in there.  And I just walked past his

7    club, I turned the corner, I'm walking around, I'm

8    getting ready to light a cigarette and I had a radio on

9    me, a walkie-talkie, and they told me he's right behind

10   me, so I shut things down.  I looked behind me and I

11   turned around and started walking back.  And it was

12   this guy Joey and this guy Sal Miciotto, "Fat Sally"

13   that's what they called him.

14            "Q    You said Sally Miciotto?

15            "A    Yes.

16            "Q    What was your understanding of who Sally

17   Miciotto was?

18            "A    He was a made member of the Colombos.

19            "Q    What side of the war was he on?

20            "A    Orena side.

21            "Q    What were you using that night that you

22   were able to communicate?

23            "A    Walkie-talkies."

24   Q    Do you recall being asked those questions and giving

25   those answers?

Case 1:03-cr-00251-FK   Document 1869-6   Filed 08/19/21   Page 267 of 635 PageID
#: 4574
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/16   Page 249 of 847 PageID #: 5203
225

RUSSO - CROSS - KEDIA

1    A    Yes.

2    Q    And it was Frank Guerra that told you, according to you,

3    that Scopo was in the area, right?  It wasn't because you

4    recognized him; is that right?

5    A    Excuse me?

6    Q    It wasn't because you recognized him; is that right?

7              MR. LIFSHITZ:  Your Honor, the testimony is what it

8    is, and it's that Scopo was behind him.  And if the defense

9    wants to move in the entire Guerra transcript of this witness

10   as an exhibit for sentencing, we don't object to that.  We've

11   provided it to the Court previously.  Maybe we can cut through

12   reading portions of the testimony and asking him if he

13   remembers saying these things.  If they are in the record

14   they're in the record.

15             MS. KEDIA:  Judge, I have no problem with that and

16   certainly to the extent that we want to emphasize any issue

17   with the Court, we can certainly submit that to the Court.  I

18   have no objection to that.

19             THE COURT:  That's fine.  If the parties agree to

20   that it will go in as Defense Exhibit C.  That's the entire

21   transcript, correct?

22             MS. KEDIA:  Yes, Your Honor.

23             (Defense Exhibit C, was received in evidence.)

24   Q    Mr. Russo, we were discussing earlier you that had stolen

25   a vehicle that you used on the night of the murder, right?

Case 1:03-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 868 of 635 PageID
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/16 Page 24 of 347 PageID #90270
#: 4575
226

RUSSO - CROSS - KEDIA

1    A    Uh-huh.

2    Q    When did you steal this car?

3    A    I don't remember.  It's before the murder.

4    Q    Do you remember --

5    A    I didn't steal it.  John Matera did it, got it for us.

6    Q    You don't recall when?

7    A    No, I don't.

8    Q    Whether it was months or weeks or --

9    A    No, I don't.

10   Q    Do you recall what you did with it?

11        THE COURT:  When?

12   BY MS. KEDIA:

13   Q    After it was stolen and before the murder -- before the

14   night of the murder, do you recall what you did with it?

15   A    No.  I don't.

16   Q    Do you recall testifying that you had it for a while, you

17   gave it to BF for a while?

18        THE COURT:  Testifying when?

19   Q    Testifying at the Guerra trial.  You've only testified on

20   one occasion, right, Mr. Russo --

21   A    Yes.

22   Q    -- is your testimony here?

23        Do you recall testifying at the Guerra trial that

24   you kept the car for a while yourself, you moved it around for

25   a while, you gave it to BF for a while, you kept it in John

Case 1:03-cr-00351-FK   Document 1860-6   Filed 08/19/21   Page 869 of 635 PageID:
Case 1:16-cr-00147-DLF   Document 846-1   Filed 09/21/18   Page 242 of 847 PageID #:4571

#: 4576
227

RUSSO - CROSS - KEDIA

1    Matera's garage for a while?

2    A    Yes.

3          THE COURT:  Stricken as to form.  Either you're

4    going to ask, do you recall being asked this question or

5    giving this answer, or else just point it out in the

6    testimony.  I don't understand what the whole point was then

7    of moving in the entire transcript.

8          MS. KEDIA:  Yes, Your Honor, I just want to know

9    what the witness recalls here today actually.

10          Do you recall --

11          THE COURT:  Then ask it the way I suggested.

12          MS. KEDIA:  Yes, Your Honor.  I'll just move on from

13    this particular topic.

14    Q    Now, Mr. Russo, you testified about getting a bag of

15    guns; is that right --

16    A    Yes.

17    Q    -- do you recall that?

18          And this is a bag of guns that came as a result of

19    what?  How did you get this bag of guns?

20    A    Got 'em from Frankie, BF.

21    Q    BF?

22    A    Yes.

23    Q    When did you get this bag of guns?

24    A    The day we were talking to Michael, that same night

25    talking to him about getting guns.

Case 1:03-cr-00351-FK  Document 1869-6  Filed 09/19/21  Page 270 of 635 PageID #: 4577
Case 1:16-cr-00147-DLF  Document 840-1  Filed 09/21/18  Page 248 of 847 PageID #:8272

228

RUSSO - CROSS - KEDIA

1    Q    What same night?

2    A    The night we -- the day we talked to Michael.  I can't

3    give you a date and time.  My testimony was that I talked to

4    Michael with BF, he told Smiley to get the bag, bring it to

5    us.  BF brought it to my house that night.  That was my

6    testimony.

7    Q    Was Smiley present during this conversation?

8    A    When we were asking Michael --

9    Q    Yes.

10   A    -- for the guns?

11   Q    Yes.

12   A    He was standing right there.

13   Q    And what did you do with this bag of guns?

14        THE COURT:  You know what?  Both of you do the same

15   thing.  You put your hands over your mouth when you're talking

16   and that kind of muddies up the words as they are coming out.

17   So if both you of would refrain from putting your hands in

18   front of your mouth, I'd appreciate it so that the words come

19   out clearly.

20        Thank you.  I'm sorry to interrupt you, but you were

21   both doing that.

22        MS. KEDIA:  Sorry, Judge.

23        THE COURT:  That's okay.  You do it too.

24   BY MS. KEDIA:

25   Q    You testified about having a conversation with Michael

Case 1:03-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 371 of 635 PageID 229
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/16   Page 244 of 341 PageID #: 4273
#: 4578
RUSSO - CROSS - KEDIA

1   and on that same day -- it's your recollection that on that

2   same day you received a bag of guns?

3          MR. LIFSHITZ:  Asked and answered multiple times,

4   Your Honor.

5          THE COURT:  I'll allow the answer.  You can answer

6   the question.

7   A     Yes.

8   Q     What was in the bag?

9   A     Guns.

10  Q     What kind of guns?

11  A     There was a Mac 10, a silencer, a couple of other guns,

12  couple of home-made silencers that were just discarded.

13  Q     What other kinds of guns besides --

14  A     I can't recall.

15  Q     How many other guns?

16  A     I don't recall.

17  Q     Well, do you recall telling agents before what was in

18  that bag?

19  A     I'm sure I did.

20  Q     Do you recall --

21  A     I know --

22  Q     -- telling them that there was a Mac 10 and a .38 snub?

23  A     If that's what my testimony was, yes.

24  Q     Do you recall that those were the only two guns that you

25  said were in the bag?

RUSSO - CROSS - KEDIA

1   A    I don't remember.

2   Q    Let me show you what is marked as 3500AR28, page 10.

3        THE COURT:  If you can tell us what that is, please,

4   for the record.

5        MS. KEDIA:  Yes.  These are notes taken during a

6   debriefing of Mr. Russo.

7        THE COURT:  By the FBI agents?

8        MS. KEDIA:  Yes.

9        THE COURT:  Just take your time and take a look at

10  them and let us know once you're done.

11  A    I can't even read these notes.

12       THE COURT:  Those are handwritten notes?

13       THE WITNESS:  Yeah.

14       MS. KEDIA:  They are, Your Honor.

15       THE WITNESS:  They are horrible.

16       MS. KEDIA:  May I approach the witness and show him

17  the specific spot.

18       THE COURT:  Yes.  If you can tell us what page it

19  is.

20       MS. KEDIA:  Page 10 of 3500AR28.

21       THE WITNESS:  What is this?  I can't understand his

22  writing.

23       THE COURT:  Well, if you can't understand the

24  handwriting, you can't understand the handwriting.  I don't

25  want you to guess.

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 373 of 635 PageID #:
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 240 of 847 PageID #: 10275
#: 4580
231

RUSSO - CROSS - KEDIA

1      THE WITNESS:  No, I'm not.

2      THE COURT:  The handwriting is atrocious.

3      THE WITNESS:  Yes, a hundred percent.

4   BY MS. KEDIA:

5   Q    So, Mr. Russo, do you recall what was in the bag or you

6   don't, how many pistols were in there --

7   A    Yes --

8   Q    -- or not?

9   A    -- I testified to what I -- just now what I said, a

10  silencer, Mac 10, a couple of silencers that were home-made,

11  we just didn't even bother with them.  There was a couple of

12  other things in there, a couple of guns we didn't even bother

13  with.

14  Q    When you say you didn't bother with them --

15  A    We didn't use them.

16  Q    -- what does that mean?

17       So the only one that you used was the Mac 10?

18  A    Yes.

19  Q    And this is after you have this conversation with Eric

20  about looking for Joey; is that right?

21  A    I don't understand that question.

22  Q    I'm sorry.  When you get this bag of guns --

23  A    Yes.

24  Q    -- this is after you have this conversation with Eric

25  about looking for Joey, that you're going to look for Joey

Case 1:93-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 374 of 635 PageID
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 274 of 347 PageID #270
#: 4581
232

RUSSO - CROSS - KEDIA

 1   Scopo --

 2   A    Possibly, I don't remember.

 3   Q    -- is that right?

 4        You don't remember?

 5   A    No, I don't.

 6   Q    Do you remember what happened to the pistols?

 7   A    I don't.

 8   Q    Do you remember telling agents that the .38 was thrown

 9   off the Verrazano Bridge in the water?

10   A    No, I don't.

11   Q    Do you remember -- did you ever fire any of the guns?

12   A    Yes, once by accident.

13   Q    When you say by accident, explain what you mean.

14   A    I had the Mac 10 in my car and I was putting it in

15   between the seat of my car and it went off.

16   Q    And it went off when you did that?

17   A    Yes.

18   Q    Do you remember at Mr. Guerra's trial testifying that you

19   didn't remember ever firing any of them?

20   A    No.

21   Q    Do you remember being asked this question and giving this

22   answer, Mr. Russo, on direct examination at page 209?

23   Question, line 11.

24        "Where did you store the guns?

25        "A   In my house.

RUSSO - CROSS - KEDIA

1        "Q   Did you ever fire any of them?

2        "A   No, not that I remember."

3   A    Well, I said it was an accident in my car.  I remember

4   specifically telling the agents about it.  And they even asked

5   me where the car was because they wanted to try to find the

6   car.

7   Q    Did they find the car?

8   A    Not that I know of.

9   Q    Do you remember giving that testimony on direct

10  examination at the Guerra trial --

11  A    I don't remember them --

12  Q    -- the Guerra trial?

13  A    -- asking me that on direct, no.

14  Q    You don't.

15       Did you ever test fire any of the guns, meaning on

16  purpose?

17  A    No.

18  Q    Do you know that people during the war were test firing

19  the weapons that they were using on a regular basis?

20  A    I've heard that.

21  Q    But you didn't think that that was necessary in this

22  particular case?

23  A    No.

24       THE COURT:  I'm not going to allow him to answer the

25  question.  Really, can you move on?

Case 1:03-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 876 of 635 PageID #: 4583
Case 1:16-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 2499 of 847 PageID #:90270
234

RUSSO - CROSS - KEDIA

1    BY MS. KEDIA:

2    Q    You testified that during this time that you were looking

3    for Joe Scopo that BF was visiting Teddy Persico in prison a

4    lot; is that right?

5    A    Was that my words, a lot?

6    Q    Yes.

7    A    Okay.

8    Q    Do you remember that?

9    A    No, I don't.

10   Q    This is on direct examination two weeks ago, Mr. Russo --

11   A    I said a lot --

12   Q    -- do you remember --

13   A    -- then that's what I said.

14            THE COURT:  You have to wait until she finishes --

15            THE WITNESS:  I'm sorry.

16            THE COURT:  -- the question, please.

17            THE WITNESS:  She's starting to get to me.

18   BY MS. KEDIA:

19   Q    Well, was it a lot?

20   A    A few times is a lot, I don't know.

21   Q    Well, do you know --

22   A    He's been up there a few times, yeah, so to me that's a

23   lot.

24   Q    You testified that he went up to there to discuss the

25   murder, the plan to murder Joe Scopo with Teddy Persico,

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 277 of 625 PageID #:
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/16 Page 253 of 847 PageID #: 9027
#: 4584
235

RUSSO - CROSS - KEDIA

1   right?

2   A    Yeah.

3   Q    And that, in fact, Teddy Persico expressed a concern that

4   you had never participated in a murder --

5   A    Yes.

6   Q    -- before --

7   A    Well, he didn't --

8   Q    -- or questioned whether he had?

9   A    He never expressed that, he was just concerned if I ever

10  did anything before.

11  Q    Well, when you say did anything, what do you mean?

12  A    That I was involved in a murder before.

13  Q    And he wanted to make sure that --

14  A    I was capable of --

15  Q    -- you were capable of handling it --

16  A    Right.

17  Q    -- is that right?

18  A    Yes.

19  Q    And you said that you had done something along time ago

20  with a guy by the name of Munchie; is that right?

21  A    Yes, I did, yes.

22  Q    And that wasn't really true, you were just telling him --

23  A    Yes.

24  Q    -- that to --

25           Now, did Mr. Guerra go see Mr. Persico again,

Case 1:02-cr-00351-FK   Document 869-6   Filed 08/19/21   Page 379 of 625 PageID #: 4585
Case 1:16-cr-00147-DLF   Document 340-1   Filed 09/21/18   Page 259 of 847 PageID #: 10280

236

RUSSO - CROSS - KEDIA

1   meaning Theodore Persico, back in jail to tell him don't

2   worry, this is okay?

3   A     I don't remember.

4   Q     Well, wasn't that the point of telling him about Munchie?

5   A     The point?  The point was for everybody not to get

6   nervous and just relax.

7   Q     Right, but --

8   A     If I told Teddy, I don't remember.

9   Q     Now you testified about a funeral at which you saw Teddy

10  Persico?

11  A     Uh-huh, yes.

12  Q     And this is when he gave you an order to kill Joe Scopo;

13  is that right?

14  A     Yes.

15  Q     And he came to the funeral from jail; is that right?  He

16  was in prison at the time?

17  A     Yes.

18  Q     And he was accompanied by guards?

19  A     Yes.

20  Q     And he met with you, Mr. Russo?

21  A     He came down to pay his respects to his grandmother.  We

22  were there.

23  Q     Who is we?

24  A     There was a lot of people there.

25  Q     Describe what happened.

Case 1:02-cr-00351-EK   Document 1860-6   Filed 08/19/21   Page 379 of 635 PageID #:
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 252 of 847 PageID #: 4586
#: 4586
237

RUSSO - CROSS - KEDIA

1   A     He came in, he went up to the casket, we were standing

2   there.  We sat down with him, we had a discussion, and that

3   was it.

4   Q     And who was we, when you say "we"?

5   A     Me, Bobby and BF.

6   Q     When you had a discussion with Teddy Persico at this

7   funeral, were there guards around him?

8   A     No.

9   Q     Where were you sitting?

10  A     In the chapel.

11  Q     Where in the chapel?

12  A     I don't exactly remember where.

13  Q     Was he --

14  A     It was in the chapel.

15  Q     Was he handcuffed or shackled?

16  A     He wasn't handcuffed.

17  Q     Was he shackled?

18  A     I don't remember if he was shackled or not.

19  Q     Well, do you remember testifying at Mr. Guerra's trial

20  that he definitely didn't have any shackles on?

21  A     No, I don't remember that.

22  Q     Where did you have this conversation with Mr. Persico

23  with you -- and when I say, Mr. Persico, Theodore Persico?

24        MR. LIFSHITZ:  Asked and answered.

25  A     In the chapel.

RUSSO - CROSS - KEDIA

1    Q    Where in the chapel though?

2    A    In the chapel.

3           THE COURT:  Sustained.  Asked and answered.  Asked

4    and answered.  And the answer is stricken.

5    BY MS. KEDIA:

6    Q    Mr. Russo, the night of the murder you testified that you

7    pulled up on Joe Scopo as he was turning the corner toward his

8    home; is that right?

9    A    Could you repeat that, please.

10   Q    The night of the murder --

11   A    Yeah.

12   Q    -- the night that you killed Joe Scopo --

13   A    Yes.

14   Q    -- you testified that you -- as he was turning the corner

15   to go home you and others pulled up on him as they were

16   parking; is that right?

17   A    Yes.

18   Q    Now it was you Eric Curcio, John Pappa, John Sparacino

19   that day?

20   A    Sparacino.

21   Q    Sparacino.

22   A    Yeah, uh-huh.

23   Q    Anyone else?

24   A    BF.

25   Q    And there were how many cars --

Georgette K. Betts, RPR, CSR
Official Court Reporter

RUSSO - CROSS - KEDIA

1   A    Three.

2   Q    -- that you had on that occasion?

3   A    Three cars.

4   Q    Now when you saw Mr. Scopo turning the corner, how is it

5   that you recognized it to be Mr. Scopo?

6   A    Eric said, there he goes --

7   Q    And when you --

8   A    -- that's Joey making the -- turning the corner.

9   Q    And would you have recognized him otherwise?

10  A    Yes.

11  Q    Because you had seen him before?

12  A    Yes, when he walked up behind me.

13  Q    But on this particular occasion you didn't see him, you

14  saw Eric get out --

15  A    I didn't see nothing.  I just saw --

16          THE COURT REPORTER:  I'm sorry, I didn't hear the

17  end of your question.

18          THE COURT:  Again, please, you need to wait until

19  she finishes the question.

20          THE WITNESS:  Yes, Your Honor.

21  BY MS. KEDIA:

22  Q    On this particular occasion, sir, it's not you that

23  noticed Mr. Scopo it was Eric Curcio that pointed it out to

24  you; is that right?

25  A    Yes.

RUSSO - CROSS - KEDIA

1    Q    He was in a Nissan Altima, I think you said?

2    A    Yes.

3    Q    Is that a car that you had seen him driving before?

4    A    No.

5    Q    Do you know if that was his car?

6    A    No.

7    Q    Now you said that as they turned the corner you got into

8    your car -- you were outside your car; is that right?

9    A    Yes.

10   Q    You got into your car and you pulled up?

11   A    Yes.

12   Q    And you described wearing -- that you were wearing a hat

13   and your hat flew off --

14   A    Yes.

15   Q    -- as gunfire exchanged, right?

16   A    Yes.

17   Q    Now let me ask you this, you said there were three people

18   in the car, right?

19   A    Yes.

20   Q    And you knew that there were three people in the car at

21   the time?

22        THE COURT:  In which car?

23   Q    I'm sorry, in Joe Scopo's car.

24   A    Yes.

25   Q    Did you know that there were three people in Joe Scopo's

RUSSO - CROSS - KEDIA

1  car --

2  A     Yes.

3  Q     -- at the time that you pulled up on him --

4  A     Yes.

5  Q     -- you saw the other two people?

6  A     Yes.

7            THE COURT:  Okay, enough already.

8  Q    Did you know --

9            THE COURT:  You're banging the damn nail on the head

10 50,000 times.

11 BY MS. KEDIA:

12 Q    Did you know who they were?

13 A     I know who the other two are?

14 Q    Yes.

15 A     No.

16 Q    They were strangers to you at the time?

17 A     I did not know them, no.

18 Q    So you testified on direct examination, Mr. Russo, that

19 there were occasions -- there was another occasion where you

20 pulled up on Scopo, the time you saw him outside the club and

21 you went to light a cigarette and that you were about to pull

22 out your pistol --

23 A     Yes.

24 Q    -- but there were other people walking out of their

25 house; is that right?

Case 1:03-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 284 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 25 of 341 PageID #:280
#: 4591
242

RUSSO - CROSS - KEDIA

1    A    Yes.  Yes.

2    Q    Right?

3    A    Yes.

4    Q    And you didn't shoot him because you didn't want to hurt

5    any innocent people?

6    A    Yes.

7    Q    You testified about the same thing with respect to Billy

8    Cuotolo, you were about to kill him one day --

9    A    Yes.

10   Q    -- but there were other people around?

11   A    Yes.

12   Q    But on this particular occasion you didn't care there

13   were two other people in the car, you still had --

14   A    They were part of that life.

15   Q    How do you know that they were part of that life?  You

16   just said they were strangers?

17   A    They were with him, they were part of that life.

18   Q    So if they were with him, they could have been his wife,

19   his daughter --

20   A    We knew it wasn't a woman.  And they shot back, so

21   evidently they were part of that life.

22   Q    They shot back but you didn't know they were going to

23   shoot back, right?

24   A    No, I didn't, but they did.

25   Q    Mr. Russo, you didn't care if you killed any innocent

Case 1:02-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 285 of 635 PageID #:
Case 1:10-cr-00147-DLI   Document 840-1   Filed 09/21/18   Page 285 of 347 PageID #:0287
#: 4592
243

RUSSO - CROSS - KEDIA

1   people --

2   A     Yeah, yeah --

3         THE COURT:  Okay.  Stop enough.

4   BY MS. KEDIA:

5   Q     Now, Mr. Russo, you testified that Johnny Pappa jumped

6   out of the car at some point, right?

7   A     Yes, I did.

8   Q     John Sparacino had --

9   A     Sparacino.

10  Q     Sparacino had already fired all of his rounds that were

11  in the Mac 10; is that right?

12  A     Yes.

13  Q     And he didn't -- and he wasn't successful in shooting

14  Joey Scopo?

15  A     I guess they were all successful; he passed away.

16  Q     What does that mean, that John Sparacino shot him?

17  A     It was successful, yes.

18  Q     Well, do you know if John Sparacino shot Joe Scopo?

19  A     Yes, I did -- yes, I do, I know he shot him.  He emptied

20  out the gun through the window in the car.

21  Q     He emptied out the gun, did he actually hit Joe Scopo?

22  A     I can't tell you that.  I wasn't there in the car with

23  him, Joey Scopo, I was in my car with Johnny Sparacino and

24  Johnny Pappa.

25  Q     So why did John Pappa get out of the car?

Georgette K. Betts, RPR, CSR
Official Court Reporter

Case 1:02-cr-00351-EK   Document 1869-6   Filed 09/10/21   Page 286 of 635 PageID
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 259 of 347 PageID #:90283
#: 4593
244

RUSSO - CROSS - KEDIA

1    A      I have no clue, ask John Pappa that.

2               (Continued on the next page.)

Case 1:03-cr-00351-FK   Document 1869-6   Filed 08/10/21   Page 287 of 635 PageID
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/16   Page 2009 of 847 PageID #:10283
#: 4594

1    CROSS-EXAMINATION (Continued)

2    BY MS. KEDIA:

3    Q    Well, do you recall testifying at Mr. Guerra's trial that

4    Johnny got out of the car because you told him to get out?

5    A    He said something to that effect.

6    Q    I'm sorry?

7    A    He said something to the effect which I thought he said

8    "get out."

9    Q    Why did you tell him to get out of the car?

10   A    Because he asked me, which I told him I said "get out."

11   And make it's done.

12   Q    Mr. Russo, do you recall testifying, I asked you a moment

13   ago about your hat flying off, right, during the gun fire.

14   A    Yes.

15   Q    And what kind of hat was that?

16   A    A P cap.

17   Q    And what happened to your hat?

18   A    It fell out.

19   Q    What happened to it?

20   A    I don't know.

21   Q    Well, did you walk away with it that night?

22   A    No.  I don't remember what happened.

23        THE COURT:  Enough with the hat.  Enough with the

24   hat.

25   Q    You testified, Mr. Russo, about leaving the MAC-10 in the

Case 1:03-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 288 of 635 PageID #: 4595
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 288 of 847 PageID #: 10290

Russo - Cross - Kedia

1  car.

2  A    Yes, I did.

3  Q    You recall that, right?

4  A    Yes.

5  Q    And you told John Sparacino to leave the MAC-10 in the

6  car.

7  A    Yes, I did.

8  Q    Did he ask you what he should do or did you just...

9  A    I just told him to leave it in the car.

10  Q    And when did you tell him that, before the murder had

11  taken place?  Was it the plan that you had in effect or was

12  this something that you just did at that moment?

13  A    I don't remember exactly when I told him.  I know when we

14  got out of the car, I said leave the gun in the car.  I can't

15  remember if I told him before that moment.

16  Q    And you said that you took his hat and you put your

17  gloves in it and you put them in a bush; is that right?

18  A    Gloves in it, yes.

19  Q    Gloves in his hat and you put them in a bush?

20  A    Yes.

21  Q    And this is -- this is a hat that Sparacino was wearing,

22  the ski mask, right?

23  A    Ski mask, yes.

24  Q    Were these gloves that you were wearing?

25  A    No.

Russo - Cross - Kedia

1    Q    Where did the gloves come from?

2    A    I don't remember.  I don't remember if it was my gloves,

3    his gloves, I don't remember.

4    Q    Well you remember -- wait, you testified on direct

5    examination --

6    A    That I had put gloves in a ski mask, yes.

7    Q    But now you don't remember whose gloves they were?

8    A    I don't.

9         THE COURT:  Why don't we break here for the lunch

10   recess.  We will resume at 2:15.

11        So again, I'm just going to instruct you that you

12   can't discuss your testimony with the government, you can

13   discuss scheduling but nothing else.

14        All right, thank you.

15        All right, we'll come back at 2:15.  Thank you.

16        (Whereupon, a recess was taken at 1:02 p.m.)

17

18

19

20

21

22

23

24

25

Case 1:02-cr-00351-EK Document 369-6 Filed 08/19/21 Page 290 of 635 PageID
Case 1:16-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 26 of 347 PageID #:6292
#: 4597                                                                    248
Proceedings

```
 1              A F T E R N O O N   S E S S I O N

 2              (Time noted:  2:27 p.m.)

 3              (In open court.)

 4              THE COURT:  This is the Fatico hearing continued.

 5    Same appearances as this morning.

 6              Thank you all for waiting, and if we're ready to

 7    continue, you can take the position that the --

 8              MS. KEDIA:  Thank you.

 9              MR. LIFSHITZ:  Your Honor, I'm sorry to ask again,

10    but I would ask again for an estimate of how long it will be.

11    I strongly ask that we finish the cross-examination today, in

12    light of the fact that the direct took about two and a half

13    hours.

14              THE COURT:  Well, I don't know how much more do you

15    have?  You are about 300 pages left on your notebook.

16              MS. KEDIA:  No, there aren't that many, Judge.

17              THE COURT:  If you didn't ask the same question

18    three or four times we could be done, and it wouldn't be so

19    annoying.

20              MS. KEDIA:  I spent the lunch break trying to cut

21    out some things, Judge.

22              THE COURT:  Good.

23              MS. KEDIA:  I hope I can be done this afternoon.  I

24    have some recordings that I intend to play and I know the

25    government agrees that we should just submit certain
```

Case 1:02-cr-00351-EK   Document 1860-6   Filed 08/19/21   Page 291 of 635 PageID #:
Case 1:10-cr-00147-DLF   Document 340-1   Filed 09/21/18   Page 264 of 841 PageID #:0293

249

Proceedings

1   recordings and that will make it go along faster, rather than

2   asking the witness about each of them.

3        THE COURT:  Do you have transcripts of those

4   recordings?

5        MS. KEDIA:  Yes.

6        THE COURT:  Okay.  All right.

7        MS. KEDIA:  Anything that I submit to the Court I,

8   will give a transcript.

9        THE COURT:  Okay.

10       Well, just because Ms. -- I keep wanting to use your

11  first name first because it's such a pretty name -- Ms. Kedia.

12  All right, even if Ms. Kedia gets done with her

13  cross-examination, is there going to be redirect?

14       MR. LIFSHITZ:  Yes.  If it were now, it would be

15  very brief.  I don't expect it will be more than 10 or 15

16  minutes.

17       THE COURT:  Well, they would to be entitled to do

18  recross.  We'll go as far as we can go today.  I have tomorrow

19  open so the parties should have scheduled for tomorrow.

20       MR. LIFSHITZ:  We have, Your Honor.

21       THE COURT:  All right.  Let's go get the witness.

22       (Pause.)

23       (Witness resumes the stand.)

24       THE COURT:  Welcome back, Mr. Russo.  I remind you

25  that you are still under oath.  This is continued

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Russo - Cross - Kedia

1    cross-examination by Ms. Kedia.

2              You may proceed when you are ready.

3              MS. KEDIA:  Thank you, Your Honor.

4    CROSS-EXAMINATION (Continued)

5    BY MS. KEDIA:

6    Q    Mr. Russo, when we left off, we were discussing your

7    testimony that you took John Sparacino's ski mask and you put

8    some gloves in it, you didn't know whose gloves they were, and

9    that you put them in a bush near the car, right?

10   A    Yes.

11   Q    Do you recall testifying at Mr. Guerra's trial, at Frank

12   Guerra's trial, that you didn't leave a ski mask anywhere,

13   that John Sparacino left his ski mask in the car?

14   A    I don't remember that.

15   Q    Do you recall --

16             MS. KEDIA:  Your Honor, this is 3500AR63, page 228.

17             "Q    What, if anything, did you leave in the

18   car?

19             "A    We left the mask hanging in the car.

20             "Q    Anything else?

21             "A    I think a hat.  I think Johnny might

22   have left a hat, his ski mask.

23             "Q    Was he wearing a hat?

24             "A    He was wearing a ski mask."

25             MS. KEDIA:  And, Your Honor, I would then go to the

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Case 1:03-cr-00251-FK   Document 1869-6   Filed 08/19/21   Page 293 of 635 PageID #:
Case 1:16-cr-00647-DLF   Document 340-1   Filed 09/21/18   Page 293 of 847 PageID #:10295
#: 4600

Russo - Cross - Kedia

```
 1   same 3500AR63, pages 735 and 736, beginning at line 21.

 2              "Q   So you already -- so you had already

 3   left the stolen car?

 4              "A   Yes, we did.

 5              "Q   Had you left the MAC-10 machine gun and

 6   Sparacino's ski mask in the stolen car?

 7              "A   I didn't leave a ski mask in the car, I

 8   told him to leave the machine gun in the car.

 9              "Q   You were sort of running this hit?

10              "A   He said, 'What should I do?'  I said,

11   'Leave the machine gun and get out of the car.'

12              "Q   You weren't running this hit?

13              "A   No.

14              "Q   You were giving the orders?

15              "A   We were all part of it.

16              "Q   I didn't ask that.  I asked were you

17   Anthony Russo running the hit?

18              "A   No.

19              "Q   You gave instructions; did you not?"

20              THE COURT:  This goes beyond the questions about the

21   ski mask.

22              MS. KEDIA:  I'm going to end.

23              THE COURT:  No, that's it.

24              MS. KEDIA:  There's three more questions.

25              THE COURT:  Well go to the ski mask and skip this
```

Russo - Cross - Kedia

1    other stuff.

2              MS. KEDIA:  Yes, Your Honor.

3              "Q   Okay, so you didn't know the ski mask

4    was there but it was left in the car?

5              "A   He had at a ski mask on.  He left it in

6    the car."

7              Do you recall giving those answers to those

8    questions?

9    A    I don't remember.  I don't recall.

10   Q    Now, Mr. Russo, you testified about a number of

11   conversations that you had with Michael Persico regarding Joe

12   Scopo, right?

13   A    Excuse me?

14   Q    You testified about a number of conversations that you

15   had with Michael Persico regarding Joe Scopo; is that right?

16   A    Yes.

17   Q    And those are the conversations that you remember having

18   with Mr. Persico?

19   A    Which conversations --

20   Q    The ones you testified to.  Those are the only

21   conversations that you have a recollection of having with

22   Mr. Persico?

23   A    About Joe Scopo?

24   Q    About Joe Scopo.

25   A    Yes.

1   Q    And the conversations occurred over a period of a few

2   weeks or a few months or do you recall?

3   A    I don't know.  I can't recall exact time frame.

4   Q    And the last conversation that you had with Michael

5   Persico before the Scopo murder was this conversation that you

6   testified to about gettin' it done before my brother goes to

7   trial; is that right?

8   A    Was that one of the conversations that I had with him?

9   Q    Is that the last conversation you had with him before you

10  actually got the job done?

11  A    I don't -- I don't remember if that was the last

12  conversation that you're talking about.

13        THE COURT:  Well, you mean the last conversation

14  that he had with Michael Persico about the Scopo murder?

15        MS. KEDIA:  That's correct, Your Honor.

16        THE COURT:  Was that the last conversation that you

17  had with him about the Scopo murder?

18        THE WITNESS:  I'm not a hundred percent sure.  I

19  know it was one of the last conversations before Joey got

20  killed.

21  Q    One of the last ones.

22        And do you recall any others?

23  A    No, not really; no.

24  Q    Do you recall when the last time it was that you saw

25  Michael Persico before the murder?

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 296 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 2099 of 347 PageID #:10290
#: 4603
254

Russo - Cross - Kedia

1   A   I see Michael a lot.

2   Q   You don't recall specifically?

3   A   Nah, I don't remember the time frame.  The day.  The

4   hour.

5   Q   Now, Mr. Russo, did Eric Curcio tell you whether he was

6   authorized to kill Joe Scopo?

7           THE COURT:  I'm sorry, I missed the first part of

8   the question, can you repeat it?  Your voice dropped down a

9   little bit, I couldn't hear it.

10          MS. KEDIA:  I apologize, Your Honor.

11  Q   Did Eric Curcio tell you whether he was authorized to

12  kill Joe Scopo?

13  A   That he was authorized?  He never said that word, no.

14  Q   Do you know whether this was just something that he was

15  doing on his own with his own crew?

16  A   I was told to go see him, so.

17          Was he doing it with his own crew?  I don't know.

18  Q   Do you know if this was something that Eric Curcio was

19  doing on his own with his own crew?

20  A   No, I don't know if he was doing it on his own, no.  I

21  don't know if he was authorized.  I know he did it.

22  Q   Now, at some point, Mr. Russo, I think it was 1994, the

23  summer of 1994, Alphonse Persico comes home; is that right?

24  He gets out of jail?

25  A   I guess so, yeah.

Case 1:92-cr-00351-FK Document 1860-6 Filed 08/19/21 Page 297 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 27 of 347 PageID #: 10233
#: 4604
255

Russo - Cross - Kedia

```
 1   Q    Well, do you recall?

 2   A    Yeah.  He got out of jail, '94.

 3   Q    I'm sorry?

 4   A    Yeah, '94 I came out of jail.

 5   Q    And Eric Curcio was dying to meet Alphonse Persico; is

 6   that right?

 7   A    Dying to meet him?

 8   Q    Yes.

 9   A    Yeah, he really wanted to meet him.

10   Q    He really wanted to meet him.  He was harassing you to

11   introduce him?

12   A    Yes, he was harassing us; yes.

13   Q    And he died in October of 1994, right?

14            THE COURT:  Who died?

15            MS. KEDIA:  I'm sorry.

16   Q    Eric Persico was killed in October of 1994?

17   A    Was he?  In October?  That's when he died?  I'm not sure

18   of the date he died.

19   Q    Okay, he was killed shortly after Alphonse Persico got

20   out of jail?

21   A    I guess so.

22   Q    And between the time that he died and -- between the time

23   that Alphonse Persico got out and Eric Curcio died, he

24   continually asked you, Anthony Russo, to introduce him?

25   A    He asked me, BF, yeah.
```

Case 1:02-cr-00351-EK   Document 1869-6   Filed 08/19/21   Page 298 of 635 PageID #: 4605
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/16   Page 27 of 847 PageID #: 10300
256

Russo - Cross - Kedia

```
 1   Q    Now, you testified, Mr. Russo, that you were loan

 2   sharking during the 1990s and the 2000s, beginning in the

 3   '80s; is that right?

 4   A    In the '80s?  Yeah.

 5   Q    Yes?

 6   A    Yes.

 7   Q    And you testified about getting money from Michael

 8   Persico?

 9   A    Yes.

10   Q    And you said in the beginning you paid the interest once

11   every week and after a little while, you paid it every -- the

12   interest once a month; is that right?

13   A    Yes.

14   Q    Now, did you keep a loan shark book?

15   A    Me personally?

16   Q    Did you keep a book, yes.

17   A    I had a little record, yeah.

18   Q    And did you have little record throughout the time that

19   you were loan sharking?

20        You were loan sharking up until the day you got

21   arrested in 2011; is that right?

22   A    I wasn't loan sharking when I was in jail for eight

23   years, no.  So there was a period when it stopped.

24   Q    Okay.  So when you were on the street, though, you were

25   loan sharking the entire time period?
```

Case 1:03-cr-00351-EK   Document 1869-6   Filed 08/19/21   Page 299 of 635 PageID #: 4606
Case 1:10-cr-00147-DLI   Document 840-1   Filed 09/21/16   Page 272 of 347 PageID #: 10301
257

Russo - Cross - Kedia

```
 1    A    Yes.

 2    Q    Up until the time that you got arrested in 2011 and began

 3    cooperating, right?

 4    A    Uh-huh.  Yes.

 5    Q    Did you turn over your loan shark book to the government?

 6    A    No.

 7    Q    Did you have your loan shark book?

 8    A    Did I have a loan shark book?  I don't know.  Yeah, I

 9    did.

10    Q    Did they --

11    A    No, I didn't.  I had paper, yeah.  I think got ripped up.

12    Q    I'm sorry?

13    A    It was ripped up and destroyed.

14    Q    When was it ripped up and destroyed?

15    A    Long time ago.  When I got arrested.

16    Q    But was it ripped up and destroyed before you got

17    arrested or after you got arrested?

18    A    Probably after I got arrested.

19    Q    Well after you got arrested, within 20 to 30 minutes, you

20    decided to cooperate; isn't that right?

21    A    Right.

22    Q    And after you decided to cooperate, you ripped up your

23    loan shark book?

24    A    No.  No.  Not at all.

25    Q    Well you just testified --
```

Case 1:03-cr-00351-FK Document 1860-6 Filed 08/19/21 Page 300 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 278 of 347 PageID #:4607
#: 4607
258

Russo - Cross - Kedia

```
 1    A    I wasn't there --

 2              THE COURT:  Wait until he gives the answer.  You

 3    asked a question.

 4              And stop arguing.

 5    A    No, I did not rip up the book then.

 6              It was ripped up later on.  While I was in jail.

 7    Q    Did you ask somebody else to rip it up?

 8    A    I don't remember.  I know it was gone.

 9    Q    And this is after you agreed to cooperate; is that

10    correct?

11    A    Yeah.

12    Q    Now, you testified that you borrowed approximately 150 or

13    $200,000 from Michael Persico; is that right?

14    A    Yes.  I don't remember exact number.

15    Q    Well do you recall testifying at Frank Guerra's trial

16    that you borrowed maybe $100,000 from Michael Persico?

17    A    I don't remember that.

18    Q    Do you recall being asked this question and giving this

19    answer at the trial of Frank Guerra.

20              3500AR63, Your Honor, page 259 at the bottom,

21    line 24.

22              "Q    And approximately how many money did you

23    borrow from Michael Persico in that time period?

24              "A    A hundred, maybe a little more, a

25    hundred thousand."
```

Russo - Cross - Kedia

1   A     Yeah, I said it.  A hundred, maybe a little more, a

2   hundred thousand.  You just read it to me.

3   Q     Yes.  And two weeks ago you said it was 150 or 200,000,

4   right?

5   A     The same thing.  I said a hundred or more.

6           I don't know what you're trying to say.

7   Q     I'm sorry go ahead, you want to finish?

8   A     I finished.

9   Q     When you met with agents back in, when you first started

10  cooperating, do you recall saying that perhaps you borrowed 70

11  to $80,000?

12  A     No, I don't remember that.

13  Q     Let me show you what's been marked as 3500AR22, page 80.

14          Mr. Russo, if you could look at this document.  And

15  I direct your attention to the loan sharking 1992 to 2000.  If

16  you read the first couple of sentences, please, to yourself.

17          (Witness reviewing document.)

18  A     I read it.

19  Q     Mr. Russo, does that refresh your recollection that you

20  told agents previously that it was between 70 and $80,000?

21  A     That's their -- that's their -- them writing it out, so I

22  don't know if they heard me right or not, so.  I didn't write

23  that.

24  Q     They might not have heard you right?

25          THE COURT:  Will you let him finish.  You know what,

Russo - Cross - Kedia

```
 1   I'm going to stop this if you can't wait until he finishes
 2   answering.
 3             MS. KEDIA:  I apologize, Your Honor.
 4             THE COURT:  All right, I spent the entire morning
 5   doing this.
 6             Finish your answer, please.
 7   A    I said that's not my writing so I don't know what they
 8   heard.  Maybe they heard me wrong, I don't know.  I didn't
 9   write that down.
10   Q    Now, you said, Mr. Russo, that there was a guy by the
11   name of Fat Lenny that you beat up on 13th Avenue.  You
12   testified to that on direct examination, right?
13   A    Yes, I remember.
14   Q    And he owed about $30,000 to you?
15   A    To me and Frankie, yes.
16   Q    Do you recall telling agents that you and Frank did not
17   loan more than $3,000 per customer?
18   A    Yes.  5,000.
19   Q    I'm sorry?  You loaned 5,000?
20   A    I didn't know Frankie gave Lenny that money 'til later on
21   when he told me.  I got mad at him for lending that kind of
22   money to 'em.
23   Q    So you normally only loaned $3,000 per customer; is that
24   right?
25   A    Yeah, around there.  Depending on who you were.
```

Russo - Cross - Kedia

1   Q    And so you didn't even know about this loan; is that

2   right?

3   A    I knew about it but I didn't know it was that much until

4   later on when he couldn't collect it.  So I went and collected

5   it.

6   Q    So this wasn't part of what was in your loan shark book?

7   A    Was it in my loan shark book?

8   Q    Yes.

9   A    No.

10          I had 10,000 in there for Lenny.

11  Q    Now, you testified about getting arrested in 2000,

12  approximately 1999 or 2000; is that right?

13  A    Yeah, around there.

14  Q    And you said that you owed Michael some money at that

15  point; is that right?

16  A    Yes.

17  Q    Do you know how much money you owed at that point?

18  A    After I got arrested?  I really don't remember exactly,

19  the exact amount.

20  Q    Did you forget the exact amount or the approximate amount

21  between the time you testified on direct examination two weeks

22  ago and today?

23  A    Well I don't know the question you asked.  Did I owe him

24  when I met with him that day and he told me forget about the

25  money?  I don't know where you're going.

Russo - Cross - Kedia

1  Q    You got arrested in 1999 or 2000?

2  A    Yes.  Yes.

3  Q    Did you owe -- you testified you owed Michael Persico

4  money, right?

5  A    Yes.

6  Q    I'm asking you how much money you owed?

7  A    I think I was saying somewhere around a hundred and

8  change.  I don't remember exactly, you know.

9  Q    You don't remember two weeks ago saying it was 60 or

10  $70,000?

11  A    A piece.  Between the both of you us each, we come out

12  over a hundred thousand.

13  Q    Mr. Russo, do you recall discussing monies that were owed

14  to Alphonse Persico with Thomas McLaughlin?

15  A    No.

16  Q    Do you recall discussing with Thomas McLaughlin that

17  Alphonse Persico -- that you owed Alphonse Persico and that he

18  allowed you not to repay the loan?

19         THE COURT:  I'm sorry, can you repeat the question

20  or can you read that question back to me?

21         (Whereupon, the record was read.)

22         THE COURT:  Can you rephrase the question.

23         MS. KEDIA:  Yes, Your Honor.

24  Q    Mr. Russo, do you recall discussing with Thomas

25  McLaughlin money that you owed to Alphonse Persico which

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Russo - Cross - Kedia

1   Alphonse Persico forgave?

2   A    No.  But I'm sure you'll remind me.  I don't remember.

3   Q    Well, let me show you...

4              And I'm marking as Defendant's E and ET.

5              Mr. Russo, perhaps I can first show you the

6   transcript and see if it will refresh your recollection.

7              THE COURT:  Can you tell me what this exhibit is,

8   please?

9              MS. KEDIA:  Yes, it's a transcript of a conversation

10  between Mr. Russo and Thomas McLaughlin on October 1st, 2009,

11  Your Honor.

12             (Witness reviewing document.)

13  A    Okay, I read it.

14  Q    You don't recall that, Mr. Russo?

15  A    No.

16             MS. KEDIA:  Can we play it?

17  Q    Mr. Russo, can you put your headphones on so you can hear

18  it?

19             THE COURT:  We took the headphones to recharge them.

20  Hang on a second.

21             Okay, if you want to press "play".

22             (Audio recording played.)

23  BY MS. KEDIA:

24  Q    Mr. Russo, having heard the recording, does that refresh

25  your recollection that you had this discussion with Thomas

Case 1:02-cr-00351-EK Document 1869-6 Filed 08/19/21 Page 306 of 635 PageID #: 4613
Case 1:18-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 279 of 347 PageID #:10900
264
Russo - Cross - Kedia

1    McLaughlin?

2    A    I don't remember this whole conversation, no, I don't.  I

3    can remember some of these things but not all of them.  Some I

4    can't even hear that good.  I can read it pretty good.

5    Q    I'm sorry?

6    A    I said I didn't hear the whole conversation that good but

7    I could read it pretty good.

8    Q    But you don't recall it?

9    A    I don't recall a lot of this conversation.

10   Q    Do you recall -- withdrawn.

11        You testified about a time that you had a load of

12   stolen video games that you were going to buy from some guy

13   named Spider?

14        THE COURT:  Can you just clarify which testimony

15   you're talking about, please?

16        MS. KEDIA:  Yes, Your Honor.

17   Q    You testified on direct examination here that you -- that

18   there was a load of stolen video games that you were going to

19   buy from some guy named Spider; is that right?

20   A    Yes.

21   Q    And do you recall when that was?

22   A    '90s.  I don't remember.  '95, about '6.  I'm not sure.

23   Q    When you went on -- after you started cooperating --

24   withdrawn.

25        You testified about putting -- that your plan was --

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 307 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 26 of 347 PageID #:8308
#: 4614
265

Russo - Cross - Kedia

1  you didn't end up buying these stolen video games, right?

2  A    No.

3  Q    But your plan was that you were going to put them in the

4  garage of a bus company in Coney Island that was owned by

5  Michael; is that right?

6  A    By Michael the bus company was owned?  Yeah, I guess so.

7  Q    Well, do you recall testifying --

8  A    Yes.  Yes.

9  Q    Now, when you started cooperating, soon after you started

10  cooperating, you went on a drive around with the agent and you

11  pointed out this garage that you were going to put in -- put

12  this load of stolen video games in.

13         Do you recall that?

14  A    Yes.

15  Q    And this stolen video games you pointed out an address at

16  27 West -- 2733 West 15th Street.

17         Do you recall that?

18  A    Is that the address I pointed out?  Yeah.  I showed him

19  some place, yes, in Coney Island.

20  Q    Well do you recall where you showed him or you don't?

21  A    I mean --

22         THE COURT:  Do you recall the address?

23         THE WITNESS:  No, I don't recall the address, but...

24  Q    Let me show you what's previously been marked as

25  3500AR22, pages 90 and 99.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Case 1:02-cr-00307-FK   Document 1860-6   Filed 09/19/21   Page 309 of 635 PageID
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 26 of 347 PageID #: 10310
#: 4615
266

Russo - Cross - Kedia

1    THE COURT:  90?  I'm sorry, 90 and?

2    MS. KEDIA:  99.

3  Q   Mr. Russo, I'm going to show you page 99 of 3500AR22.

4        Do you recall showing agents this spot, the garage?

5  A   It looks like, yes.

6  Q   And do you recall -- I'm going to show you page 90,

7  number five.

8        Do you recall that the address of this was 2733 --

9        THE COURT:  Does that refresh your recollection is

10  the question.

11        THE WITNESS:  Yes.  It refreshes.  Yes.

12  Q   Do you know a person by the name of Emil Caucig?

13  A   No.

14  Q   Ever heard that name when you were with Michael Persico

15  or with any of the people that you were --

16  A   No.

17  Q   -- hanging around in 1993, '94, '95, that time period?

18  A   What was the name again, Emil?

19  Q   Emil Caucig?

20  A   No.

21  Q   Do you know if he's the person who owned that property?

22  A   No, I don't know that.

23  Q   From 1980 to 2002?

24  A   No, I do not know that.

25  Q   Now, Mr. Russo, you testified about a time period that

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Russo - Cross - Kedia

1   you got out of jail after serving about seven years or so in

2   the 2000s; is that right?

3   A     Yes, I was released in 2007.

4   Q     And you were released, in fact, on June 26th of 2007,

5   right?

6   A     No, I don't believe it was June 26th.

7   Q     You don't believe it was June 26th?

8   A     I don't remember.  I thought it was July.  All right, but

9   you must have the right answer there, not me.

10  Q     Let's say approximately June or July is your

11  recollection.

12  A     Yeah, around there; yeah.

13  Q     And you served about 11 months on supervised release; is

14  that right, you said?

15  A     Yes.  Yeah.

16  Q     So that would have put you off of supervised release in

17  the mid-2008?

18  A     November.

19  Q     You were off of supervised release in November?

20  A     November 2008, yeah.

21  Q     So you served more than 11 months of supervised release,

22  Mr. Russo?

23  A     I remember getting off in November 2008.

24  Q     When you -- after you got out of jail, you said you had a

25  conversation with Andre and Carmine Persico.

Case 1:03-cr-00951-FK Document 1860-6 Filed 08/19/21 Page 310 of 635 PageID #: 4617
Case 1:16-cr-00147-DLI Document 846-1 Filed 09/21/18 Page 268 of 347 PageID #: 9312
268

Russo - Cross - Kedia

1          That's Teddy, Jr.'s brother; is that right?

2     A    Carmine, yes.

3     Q    And Andre is somebody that's related to them or a friend?

4     A    A friend.

5     Q    And Andre and Carmine Persico, Jr. told you that you were

6     getting inducted; is that right?

7     A    Yes.

8     Q    Now, you testified that soon after you got off of

9     supervised release, Michael asked to see you; is that right?

10    A    After I was off of supervised release?  Yes, I seen

11    Michael.

12    Q    You testified that he asked to see you; is that right?

13    A    I said, yes, I want to see Michael.

14    Q    And you went to see Michael about opening up a business;

15    is that right?

16    A    That and other things, yes.

17    Q    You went to see him about a construction business; is

18    that right?

19    A    Yes.

20    Q    And at this point in time, were you contemplating opening

21    up a business with BF, Frank Guerra?

22    A    Yes.

23    Q    And the reason that you waited 'til you were off parole

24    is because you couldn't see BF until you were off parole; is

25    that right?

Case 1:03-cr-00251-FK    Document 1869-6    Filed 08/19/21    Page 311 of 635 PageID #: 4618
Case 1:16-cr-00147-DLF    Document 840-1    Filed 09/21/18    Page 264 of 311 PageID #: 0313
269
Russo - Cross - Kedia

 1    A    No, I was seeing BF before I was off parole.

 2    Q    So why did you wait until you were off parole --

 3    A    Because I couldn't see Michael.  He didn't want to see me

 4    'til after I got off parole.

 5    Q    Oh, Michael didn't want to see you?

 6    A    Yeah.

 7    Q    Michael and you understood was not -- he had no

 8    convictions or anything, right, it wasn't --

 9    A    No.

10    Q    Now, you testified about that there came a point in time

11    where you were, in fact, inducted, correct?

12    A    Yes.

13    Q    Became a made member of the Colombo family.

14         Do you recall when that was?

15    A    Yes.

16    Q    When was it?

17    A    2009, February.

18    Q    And you opened up a car -- the car detailing business

19    around that same time?

20    A    Something.  Yeah, some time around there; yeah.

21    Q    Well, do you recall when it was?

22    A    I'm trying to figure that one out right now.

23         Sometime after that, yeah.

24    Q    And you testified about wanting to go into the valet

25    parking business, right?

Russo - Cross - Kedia

1    A    Uh-huh.

2              THE COURT:  I'm sorry, you need to answer.

3              THE WITNESS:  Yes.  I'm sorry.

4    A    Yes.

5    Q    Now, you opened up the car detailing business with your

6    friend Frank Guerra; is that right?

7    A    Yes.

8    Q    And you -- and you testified about using the garage that

9    was owned by Michael; is that right?

10   A    Yes.

11   Q    And this was a garage that you rented, right, you had to

12   pay rent?

13   A    No, we didn't paid rent after -- in the beginning, no.

14   Q    Let me show you AR -- let me ask you this:

15              You didn't pay rent or you don't recall if you paid

16   rent?

17   A    We didn't pay in the beginning, no.

18   Q    Do you remember telling agents that you paid rent each

19   month?

20   A    Yeah, after a couple of months we started paying rent.

21   Q    So the first month or two there was no rent; is that

22   right?  And then you started paying rent?

23   A    Yes.

24   Q    How much rent did you pay?

25   A    I don't remember.

Case 1:03-cr-00351-EK   Document 1869-6   Filed 08/19/21   Page 313 of 635 PageID #: 4620
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 260 of 347 PageID #:10315
271

Russo - Cross - Kedia

```
 1   Q    And is this a car detailing business that you had going
 2   up until you were arrested in 2011?
 3   A    Yes.
 4   Q    Now, when did you try to go into the valet parking
 5   business, before you went into the car detailing business or
 6   after?
 7   A    I'm not sure.
 8   Q    When you testified about going to discuss potentially
 9   opening a valet parking business with your friend, Anthony
10   Stropoli; is that right?
11   A    Yes.
12   Q    And do you recall if it was around the same time frame,
13   years before, years after?
14   A    Around the same time frame.
15   Q    I'm sorry?
16   A    Not years before, around the same time frame.
17   Q    And you learned from your friend, Anthony Stropoli, that
18   Anthony Preza was in this valet parking business?
19   A    Anthony who?
20   Q    Preza.
21   A    Preza, that's his last name?
22   Q    Well, did you learn that?
23   A    Yes.
24   Q    Did you know Anthony Preza?
25   A    I met him.
```

Case 1:03-cr-00351-FK   Document 1869-6   Filed 08/10/21   Page 314 of 635 PageID
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 26 of 347 PageID #: 10310
#: 4621                                                                          272

Russo - Cross - Kedia

```
 1   Q    You met him when?

 2   A    When I came home.

 3   Q    Did you meet him before you went to talk to him about a

 4   valet parking business?

 5   A    I don't really recall what time about.  It might have

 6   been the first time.  I don't know.

 7   Q    And during this meeting, you said that Michael Persico

 8   was at this meeting; is that right?

 9   A    In the diner?  Yes.

10   Q    You say "in the diner."

11        This was a meeting that you had about discussing

12   opening up a valet parking business?

13   A    Well, I went there to meet Anthony, yes.

14   Q    To get pointers --

15   A    Pointers from who?

16   Q    Anthony Preza.

17   A    Yes.

18   Q    Because he was in the business?

19   A    Yes.

20   Q    And you were offered a percentage for referring customers

21   rather than --

22   A    Yes.

23   Q    -- rather than starting your own business?

24   A    Yes.

25   Q    And you declined, right?
```

Case 1:03-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 315 of 635 PageID #: 4622
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 2689 of 347 PageID #:9017
273

Russo - Cross - Kedia

```
 1   A    Probably.  I don't remember.
 2   Q    Now, Mr. Russo, you have, as we discussed before, there
 3   were a number of conversations that you had between 2009 and
 4   2011 with Mr. McLaughlin and Mr. Tagliavia which were recorded
 5   by both of those individuals, right?
 6   A    A lot of conversations.
 7   Q    And you talked about criminal activity by you and by BF;
 8   is that right?
 9   A    Yes.
10   Q    And you talked about criminal activity by Teddy Persico
11   and by Allie Persico, right?
12   A    I don't remember if I talked about Ali to anybody about
13   criminal activity.  I might have.  I don't remember.
14   Q    Do you recall telling them about how Anthony Stropoli was
15   acting as a captain for Teddy Persico in the family?
16   A    And who was I talking to?
17   Q    Thomas McLaughlin and Peter Tagliavia.
18   A    Probably, yeah.
19   Q    And did you -- and that you were replacing Teddy
20   Persico -- you were replacing Anthony Stropoli as Teddy
21   Persico's acting captain in 2010?
22           THE COURT:  Is that the question?
23           MS. KEDIA:  Yes, Your Honor.
24           THE COURT:  It's not a question, it's a statement.
25   Q    When you spoke to -- do you recall speaking to Thomas
```

Case 1:03-cr-00251-FK   Document 869-6   Filed 08/19/21   Page 316 of 635 PageID #: 4623
Case 1:16-cr-00147-DLF   Document 340-1   Filed 09/21/16   Page 269 of 347 PageID #:003b

274
Russo - Cross - Kedia

1   McLaughlin and Peter Tagliavia about how you were going to be

2   replacing Anthony Stropoli and Teddy --

3           THE COURT:  Is the question whether he actually

4   spoke to them about that?

5   Q    Did you speak to them about that?  First I can ask you

6   that, sure.

7   A    Did I speak to him about me taking over for Anthony?

8   Q    Yes?

9   A    As acting captain?

10  Q    Yes.

11  A    Yes, I believe so.

12  Q    Did you speak to them about wanting to get your son

13  inducted into the family?

14  A    I probably did.  Yes.

15  Q    Did you speak to them about wanting to go rob millions in

16  a safe from a guy on Todt Hill?

17  A    I believe we had a conversation like that, yeah.

18  Q    And, Mr. Russo, you spoke to them also about potentially

19  wanting to cooperate; is that right?

20  A    I don't remember that.

21  Q    Well, do you remember an agent coming to your home about

22  two weeks before you were arrested?

23  A    Yes.

24  Q    And who was that agent?

25  A    Scott Curtis.

Russo - Cross - Kedia

1    Q    And do you recall speaking to Mr. McLaughlin and

2    Mr. Tagliavia about Scott Curtis coming to your home?

3    A    I remember talking to Tommy about it.

4    Q    You don't remember if Mr. Tagliavia was there or not?

5    A    No, I don't.

6    Q    Do you remember what was discussed?

7    A    Not everything, no.

8    Q    Did you speak to Mr. McLaughlin about how the agent,

9    Mr. Curtis, told you don't be the fall guy for the Persicos?

10   A    I don't remember that exact statement, no.

11             THE COURT:  What is the relevance of all this?

12             MS. KEDIA:  Judge, if I could ask that the witness

13   be excused, I'll be happy to talk to you about it.

14             THE COURT:  Yes, can I just ask you to step out for

15   a minute.  We'll call you right back.

16             (Whereupon, the witness left the room.)

17             THE COURT:  The witness is no longer present.

18             What is the relevance of all of this?

19             MS. KEDIA:  The relevance of this, Your Honor, is

20   this witness' state of mind, which is that he understands --

21             THE COURT:  As to what?

22             MS. KEDIA:  -- an agent --

23             THE COURT:  State of mind as to what?

24             MS. KEDIA:  As to the fact that the government wants

25   to get anyone with the last name Persico.  Wants to indict

Case 1:02-cr-00351-FK Document 1869-6 Filed 09/19/21 Page 318 of 635 PageID #: 4625
Case 1:10-cr-00147-DLF Document 640-1 Filed 09/21/16 Page 291 of 347 PageID #: 10320
276

Russo - Cross - Kedia

```
 1   them.  Wants evidence on them.

 2              THE COURT:  So what?

 3              MS. KEDIA:  It shows --

 4              THE COURT:  He's already cooperating.

 5              MS. KEDIA:  No, Judge, this is at a time period

 6   before he's cooperating.

 7              This is in the weeks before he begins cooperating.

 8   He knows who they want him to implicate.  That's the

 9   relevance.

10              There's specific conversations about Michael Persico

11   and there are conversations about the Persicos in general and

12   how the government and this agent in particular --

13              THE COURT:  So you had the conversation between him

14   and the agent about what it is that they discussed.  Who cares

15   what he talks about with anybody else?

16              MS. KEDIA:  That's fine.  I'll ask it that way to

17   begin with, Judge.

18              THE COURT:  I mean, you already have

19   cross-examination about the issue in connection with a bunch

20   of different Frankies and Franks all over the place in here.

21              MR. LIFSHITZ:  I believe it was Sparaco, Your Honor.

22              THE COURT:  Yes, exactly.  Sparaco.  Exactly.

23              MS. KEDIA:  Yes, Judge.

24              THE COURT:  So we're there.

25              MS. KEDIA:  Yes, Your Honor.  That was a
```

Case 1:02-cr-00351-FK  Document 1869-6   Filed 09/19/21   Page 319 of 635 PageID #: 4626
Case 1:16-cr-00147-DLF  Document 340-1  Filed 09/21/18  Page 292 of 347 PageID #30321
277

Russo - Cross - Kedia

1   conversation that was had in 2010.  We're talking about a

2   conversation that he had just within two weeks of his being

3   arrested and beginning to cooperate.

4           I'm perfectly happy to submit again -- I cannot ask

5   the witness more questions along this line, I can just

6   amend --

7           THE COURT:  You know, every other question is:  And

8   did you talk to this one?  Enough already.  There's no jury

9   here.

10          MS. KEDIA:  I'm well aware.

11          THE COURT:  I think I get the point.  Bring the

12  witness in.

13          (Witness resumes the stand.)

14          THE COURT:  The witness is back.

15          Welcome back, sir.  I'm just going to remind you

16  again that you're still under oath.

17          You may inquiry when you're ready, Ms. Kedia.

18          MS. KEDIA:  Thank you, Your Honor.

19  Q    Mr. Russo, do you recall discussing with Mr. McLaughlin

20  or Mr. Tagliavia that Mike Persico is a legitimate

21  businessman?

22  A    Yes, I think I remember that; yeah.

23  Q    And that he's got a lot of legitimate businesses and he

24  just got wrapped up in this because people dropped his name?

25          Do you recall that?

Case 1:02-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 320 of 635 PageID #:
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 299 of 347 PageID #: 4627

Russo - Cross - Kedia

1   A     Not all that I don't remember, but I remember talking

2   about legitimate businesses.

3   Q     Do you recall saying that he's truly legitimate and the

4   Feds think he's doing other things but the guy has nothing to

5   do with anything?

6   A     I don't recall that.

7   Q     Let me show you what I'm marking as Defendant's E and ET.

8         (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:02-cr-00351-EK   Document 1869-6   Filed 08/19/21   Page 321 of 635 PageID #: 4628
Case 1:16-cr-00147-DLF   Document 340-1   Filed 09/21/18   Page 294 of 341 PageID #: 0323

279
Russo - Cross - Kedia

1

2                 THE COURT:  You have two Defense Exhibits, D and DT,

3   I assume D is the audio recording?

4                 MS. KEDIA:  D is the audio recording.

5                 THE COURT:  You did not move that into evidence, did

6   you want it to be moved into evidence?

7                 MS. KEDIA:  I do, Your Honor.

8                 THE COURT:  Any objection to it?

9                 MR. LIFSHITZ:  No, Your Honor.

10                THE COURT:  It's D and DT -- well, obviously the

11  transcript is not evidence, it's --

12                MS. KEDIA:  An aid.

13                THE COURT:  An aid, thank you.

14                And the same with E and ET?

15                MS. KEDIA:  Yes, Your Honor.

16                THE COURT:  Any objection.

17                MR. LIFSHITZ:  No, Your Honor.

18                THE COURT:  Okay.

19                (Defense Exhibit D and DT, was received in

20  evidence.)

21                (Defense Exhibit E and ET, was received in

22  evidence.)

23                MS. KEDIA:  Can we play it?

24                (Audio played.)

25

RUSSO - REDIRECT - LIFSHITZ

1  BY MS. KEDIA:

2  Q    Mr. Russo, was that your voice on that recording?

3  A    Yeah.

4         MS. KEDIA:  I have nothing further.

5         THE COURT:  Why don't we take our mid-afternoon

6  break at this point.  We will come back in about 15 minutes.

7  That's about 3:35.  And the witness can take a break as well.

8         THE WITNESS:  Thank you.

9         THE COURT:  Okay.

10        (Recess.)

11        THE COURT:  Is the government going to have any

12  redirect examination?

13        MR. LIFSHITZ:  Yes, a brief redirect, if I may, Your

14  Honor.

15        THE COURT:  Okay, let's bring out the witness.

16        MR. LIFSHITZ:  Thank you.

17        THE COURT:  Welcome back, sir.  This is a Fatico

18  hearing continued, the same appearances as this morning.

19  Mr. Russo is back on the stand.

20        I remind you, sir, that you are still under oath.

21  This is redirect examination by Mr. Lifshitz.  You may proceed

22  when you are ready.

23        MR. LIFSHITZ:  Thank you, Your Honor.

24  REDIRECT EXAMINATION

25

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/10/21 Page 323 of 625 PageID #: 4630
Case 1:16-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 290 of 347 PageID #: 10325
281

RUSSO - REDIRECT - LIFSHITZ

 1   BY MR. LIFSHITZ:

 2   Q    Good afternoon, Mr. Russo.

 3   A    Good afternoon.

 4   Q    Do you recall being asked on cross-examination about

 5   whether you have told lies in your lifetime?

 6   A    Yes.

 7   Q    Is it true that before you started cooperating in 2011

 8   you told lies?

 9   A    Yeah.

10   Q    After you began cooperating in 2011, did you lie to the

11   government or the Court?

12   A    No.

13   Q    And after you began cooperating in 2011, what did you

14   think would happen to you if you lied to the government or the

15   Court?

16   A    My agreement would be tossed out.

17   Q    And what sentence could you face?

18   A    Life in prison.

19   Q    Do you recall being asked questions on cross-examination

20   about a conversation in which you refer to Michael Persico as

21   legitimate?

22   A    Yeah.

23   Q    Was it true that Michael Persico had legitimate

24   businesses?

25   A    A hundred percent, yeah.

Case 1:02-cr-00351-EK   Document 1869-6   Filed 09/19/21   Page 324 of 635 PageID #: 4631
Case 1:10-cr-00147-DLF   Document 846-1   Filed 09/21/18   Page 23 of 34   PageID #: 5030

282

RUSSO - REDIRECT - LIFSHITZ

1   Q    Did he also participate in crimes?

2   A    Yes, he did.

3   Q    Would it have been a good idea for you to discuss Michael

4   Persico's crimes with Peter Tagliavia?

5   A    No, not at all.

6   Q    Why not?

7   A    'Cause I never would have talked bad about Michael to

8   Peter, he was just my -- he was just around me, he was an

9   associate.  He did nothing.  He was my driver and he did

10  errands for me.  Why would I tell him anything about Michael?

11  Q    Who are you referring to when you say "he"?

12  A    Peter.

13  Q    Thank you.

14         Do you recall being asked on cross-examination about

15  a conversation you had with Frank Sparaco about agents being

16  interested in Michael Persico?

17  A    You talking about when I was in prison?

18  Q    Yes.

19  A    Yes.

20  Q    You recall that conversation, correct?

21  A    Yes.

22  Q    Just to clarify, in that conversation -- strike that.

23  When you testified about that conversation, were you reporting

24  information agents had given to you, or were you reporting

25  what Sparaco had told you agents said to him?

Case 1:02-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 325 of 635 PageID
Case 1:10-cr-00147-DLI   Document 840-1   Filed 09/21/18   Page 283 of 347 PageID #: 4632
283

RUSSO - REDIRECT - LIFSHITZ

1  A    I was telling him -- I was talking about what Sparaco had

2  told me that the agents told him.

3  Q    Do you recall being asked additional questions on

4  cross-examination about whether you believed that the agents

5  wanted you to implicate Michael Persico in crimes?

6  A    Did I believe they wanted me to implicate him?

7  Q    Do you recall being asked on cross-examination

8  questions --

9  A    Yes.

10  Q    -- along those lines?

11        After you began proffering with the government in

12  2011, did you provide information only about the Scopo murder

13  or also about other murders?

14  A    Other murders.

15  Q    Who is Michael Devine?

16  A    He was a club owner.

17  Q    Did you provide information about what happened to him?

18  A    Yes, I did.

19  Q    What happened to him as far as you know?

20  A    He was killed.

21  Q    And as far as you know who killed him?

22  A    Frankie Sparaco.

23  Q    Did anyone help him?

24  A    Yes.

25  Q    Who?

RUSSO - REDIRECT - LIFSHITZ

1   A    Frankie BF, Robert Tarantola, Fifi that's what I

2   understand.

3   Q    How did you come to learn about who participated in that

4   murder?

5   A    That I learned through BF.

6   Q    Frank Guerra?

7   A    Yes.

8   Q    Did you tell the government what you knew about that

9   murder?

10  A    Yes, I did.

11  Q    Did Guerra tell you why they killed Michael Devine?

12  A    Yes.

13  Q    What did he tell you about that?

14  A    Because he was having an affair with Allie Persico's

15  wife.

16  Q    Alphonse Persico's wife?

17  A    Yes.

18  Q    Did you ever tell the government that Michael Persico was

19  involved in that murder?

20  A    No, not at all.

21  Q    Have you known someone by the name Steve Mancuso or

22  Mancusi?

23  A    Yes.

24  Q    Who was he?

25  A    He was an associate, Colombo family.

RUSSO - REDIRECT - LIFSHITZ

1    Q    What happened to him?

2    A    He was killed.

3    Q    How did you learn about that?

4    A    That I learned from Frankie Sparaco, from BF.

5    Q    Each of them told you about it?

6    A    Yes.

7    Q    What's your understanding of what happened to Mancusi?

8    A    Frankie killed him.

9    Q    Frankie who?

10   A    Sparaco.

11   Q    Did he tell you why?

12   A    He said he was doing something with drugs.

13   Q    And is this the Frank Sparaco who you said was a dear

14   friend of Michael Persico?

15   A    Yes.

16   Q    Did you ever tell the government that Michael Persico had

17   anything to do with that?

18   A    No, not at all.

19   Q    When you began proffering with the government in 2011,

20   did you provide information only about Michael Persico or also

21   about other people in organized crime?

22   A    Everybody, everybody that I had met.

23   Q    Did you provide information about anyone in the Colombo

24   family administration?

25   A    Yes.

RUSSO - REDIRECT - LIFSHITZ

1    Q    Who?

2    A    Andrew Russo --

3    Q    Who are some of the people you recall?

4    A    Andrew Russo, Benji was the underboss, Richie Fusco.

5    Q    Did you provide information about any captains to the

6    government?

7    A    Yes.

8    Q    Who were some of the captains you told the government

9    about?

10   A    Lollipop.  I don't know his whole name.  Dennis DeLuccia,

11   Reynolds.  I can't think offhand right now.

12   Q    Did you provide information about Teddy Persico?

13   A    Yes.

14   Q    What was his position in the Colombo family?

15   A    He was a captain.

16   Q    Did you provide information about any soldiers in the

17   Colombo family?

18   A    Yes, a lot of them, yes.

19   Q    Who were some of the soldiers you recall providing

20   information about?

21   A    Well, Joey Savarese, Larry, John Maggio, Manny, I don't

22   know his last name, Danny Capalbo.

23   Q    Did you provide information about any people you

24   understood to be associates of the Colombo family besides

25   Michael Persico?

RUSSO - RECROSS - KEDIA

1    A    Yes.

2    Q    Who were some of the associates you provided information

3    about?

4    A    Jim Rogie was a bookmaker, John, his brother-in-law, a

5    bunch of guys.  I just can't remember offhand.

6    Q    When you proffered with the government did you feel any

7    pressure to give information about Michael Persico?

8    A    No, not at all.

9    Q    Do you want to be here today testifying against Michael

10   Persico?

11   A    No, not really.

12   Q    Why not?

13   A    'Cause I just don't want to be here.  I'm, you know.

14   Q    Why not?

15   A    Because I'm afraid of what he could have done to me.

16            MR. LIFSHITZ:  No further questions, Your Honor.

17            THE COURT:  Any recross?

18            MS. KEDIA:  Yes, Your Honor.

19   RECROSS EXAMINATION

20   BY MS. KEDIA:

21   Q    Mr. Russo, you were asked just now about conversations

22   that you had with Peter Tagliavia, right?  Yes?

23   A    Yes.

24   Q    And he and Tommy McLaughlin were related; is that right?

25   A    I believe they were brother-in-laws, yes.

Case 1:03-cr-00351-EK    Document 1869-6    Filed 08/19/21    Page 330 of 635 PageID
Case 1:16-cr-00147-DLF    Document 340-1    Filed 09/21/16    Page 308 of 347 PageID #: 4035
#: 4637
288

RUSSO - RECROSS - KEDIA

1  Q    And the two of you were -- I'm sorry, the three of you

2  were around each other all the time talking about criminal

3  activity --

4  A    A lot.

5  Q    -- between 2009 and 2011 --

6  A    Yes.

7  Q    -- right?

8       Do you know how many recordings Peter Tagliavia and

9  Tommy McLaughlin made of you talking about the criminal

10 activity --

11      THE COURT:  Sustained.  Beyond the scope.

12 Q    Mr. Russo, you testified about all kinds of people

13 committing crimes, you discussed all kinds of people

14 committing crimes with the two of them, right?  Yourself, is

15 that right?

16 A    Yes.

17      MR. LIFSHITZ:  Objection to form.

18      THE COURT:  Sustained.

19 Q    Mr. Russo, did you discuss --

20      THE COURT:  Keep in mind that your cross-examination

21 is restricted to what was discussed on redirect.

22      MS. KEDIA:  I understand, Your Honor.

23 Q    Mr. Russo, did you discuss with Peter Tagliavia and Tommy

24 McLaughlin criminal activity that you and many, many other

25 people committed?

289

RUSSO - RECROSS - KEDIA

1    A    Yes.

2    Q    And you even discussed the Scopo murder, didn't you?

3    A    I believe so, yes.

4    Q    In fact, you discussed being involved in it, with Guerra

5    right, Frank Guerra?

6    A    Yes.

7    Q    Who was at the time your best friend --

8    A    Uh-huh.

9    Q    -- is that right?

10   A    Yes.

11   Q    You do recall that?

12   A    Yes.

13              MS. KEDIA:  Thank you.  I have nothing further.

14              THE COURT:  Anything further on redirect?

15              MR. LIFSHITZ:  No, thank you, Your Honor.

16              THE COURT:  Thank you, sir, you may step down.

17   You're excused.

18              (Witness excused.)

19              THE COURT:  The witness is no longer in the room,

20   does the government have any other additional evidence to

21   present today?

22              MR. LIFSHITZ:  Your Honor, just the evidence

23   referred to in our letter.

24              THE COURT:  Let's discuss these letters that came at

25   the 11th hour yesterday, despite the fact we had a two-week

Case 1:03-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 332 of 635 PageID #: 4639
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/16 Page 3089 347 PageID #:0034

290
RUSSO - RECROSS - KEDIA

1   hiatus from when you broke from this hearing the last time.

2          I gather that the defense saw the filing that was

3   made by the government yesterday, correct?

4          MS. KEDIA:  Yes, Your Honor, we did.

5          THE COURT:  So what's your position on the

6   government's request.

7          MS. KEDIA:  Your Honor --

8          THE COURT:  If you could sit and speak into the

9   microphone.

10         MS. KEDIA:  Certainly.

11         THE COURT:  We could hear each other a lot better.

12  That would be great, thank you.

13         MS. KEDIA:  Your Honor, I had prepared a number of

14  exhibits that I intended to introduce through the agent and

15  cross examine him about, I don't know that that is necessary

16  that I need to actually cross examine Mr. Adam about them, but

17  there are a number of exhibits that I would like to also

18  submit to the Court if the Court is amenable to that.

19         Our thought is -- obviously, there are a number of

20  exhibits that I need to explain the import of to the Court, so

21  I had discussed this with the government after seeing its

22  letter that it submitted yesterday and our thought was that we

23  would submit briefs explaining the import of the various

24  exhibits that we would like the Court to consider in making

25  its determination.  And if the Court is amenable to that we

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 333 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/18 Page 308 of 347 PageID #: 4835
#: 4640
291

RUSSO - RECROSS - KEDIA

 1   will just do it in a submission in which case I don't have an

 2   objection to the government simply submitting the evidence

 3   rather than calling the agent.

 4           THE COURT:  How are we supposed to know what the

 5   significance of any of this is without having a live body to

 6   talk about it --

 7           MR. LIFSHITZ:  Your Honor, first of all --

 8           THE COURT:  -- besides having the lawyer's

 9   interpretation about it?  I mean that has about the same kind

10   of help as what the parties did in their previous submissions

11   attaching transcripts from the Guerra trial and then arguing

12   credibility of the witness.  I have to see the witness to

13   determine credibility.

14           There's a certain level of sloppiness with which I

15   am not willing to abide on both sides for the sake of

16   expediency of the parties.

17           That still doesn't tell me where you stand,

18   Ms. Kedia, with respect to the government's request.

19           MS. KEDIA:  Your Honor, I don't object to the

20   government --

21           THE COURT:  Sit.  Why do I have to keep repeating my

22   instructions to people --

23           MS. KEDIA:  I apologize.

24           THE COURT:  -- for God's sake.

25           MS. KEDIA:  Your Honor, I don't have a problem with

Case 1:03-cr-00351-FK   Document 1860-6   Filed 08/19/21   Page 334 of 635 PageID #:
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/16   Page 30 of 347 PageID #:0336
#: 4641
292

RUSSO - RECROSS - KEDIA

1  the government's suggestion that we do this by submission

2  rather than by calling the agent, however, if the Court is not

3  accepting of that, I am perfectly happy for the agent to be

4  called and cross examine the agent about this.

5         MR. LIFSHITZ:  Your Honor, may I be heard briefly?

6         THE COURT:  Yes.

7         MR. LIFSHITZ:  First of all, I'm sorry for the late

8  submission.  The exhibits that we are referring to in our

9  submission are largely surveillances that were conducted in

10  the 1990s.  Our original thought was to put them in through

11  our case agent, he was not the case agent at the time, he

12  could say these were exhibits admitted in the Guerra trial and

13  we could have read out loud portions of the testimony.

14         THE COURT:  He wasn't the agent at the time.

15         MR. LIFSHITZ:  Correct, Your Honor.

16         THE COURT:  Where is the agent who was the agent at

17  the time?

18         MR. LIFSHITZ:  Your Honor, we were never intending

19  to call all the agents from the 1990s to put in the

20  surveillances at the Fatico hearing.

21         THE COURT:  How is the case agent who you are

22  planning to call qualified to talk about any of this?

23         MR. LIFSHITZ:  Well, Your Honor, that's my point.

24  Having him direct and --

25         THE COURT:  Are the other agents alive?

Case 1:03-cr-00351-FK - Document 1869-6 Filed 08/19/21 Page 335 of 635 PageID
Case 1:10-cr-00147-DLF Document 840-1 Filed 09/21/16 Page 308 of 347 PageID #:6037
#: 4642
293

RUSSO - RECROSS - KEDIA

 1          MR. LIFSHITZ:  Yes.

 2          THE COURT:  Are they still working for the bureau?

 3          MR. LIFSHITZ:  Some are, some aren't.  A lot of them

 4  are retired NYPD detectives.  Your Honor, for the sake of the

 5  Fatico hearing we weren't intending to try the entire Scopo

 6  murder.  We've provided the defense along time ago with the

 7  list of our witnesses, which was always Anthony Russo and

 8  Agent Adam.  There was never any objection to us putting in

 9  exhibit through the agent.

10          THE COURT:  How is the agent familiar with any of

11  the exhibits?

12          MR. LIFSHITZ:  By virtue of being the case agent on

13  the Guerra trial.  He doesn't have personal knowledge about

14  the surveillances that were conducted in the 1990s.

15          THE COURT:  Did he testify in the Guerra trial?

16          MR. LIFSHITZ:  Not about these exhibits.

17          THE COURT:  I'm not saying that you have to try the

18  entire Scopo murder here, but to the extent that you want to

19  provide any corroboration of the witness who just testified,

20  then I need to have some indicia of reliability.

21          So you've got a picture that allegedly depicts the

22  defendant that was taken what, 13 years ago, and I'm supposed

23  to, based on my looking at Mr. Persico now, be able to tell

24  that that indeed is the person in the picture.  I don't know

25  what the quality of the surveillance picture is.  I don't know

Georgette K. Betts, RPR, CSR
Official Court Reporter

Case 1:02-cr-00351-EK  Document 1869-6  Filed 08/19/21  Page 336 of 635 PageID #: 4643
Case 1:10-cr-00147-DLF  Document 840-1  Filed 09/21/18  Page 309 of 347 PageID #:3033
294

RUSSO - RECROSS - KEDIA

1    what's in there other than whatever is in some log entry.

2            MR. LIFSHITZ:  Your Honor, with respect to that one,

3    the agent who took the picture I believe identified him as an

4    unidentified male.

5            THE COURT:  Exactly my point.  Which you say is that

6    the unknown man, the younger of the two, is the defendant.

7            MR. LIFSHITZ:  That's our argument, Your Honor.

8    There is not a live witness who could prove to you that it is.

9    We're asking the Court to look at the picture and reach that

10   conclusion but that's all we can do with that one.  So having

11   Agent Adam testify about it wouldn't advance the ball.

12           THE COURT:  So with respect to the 1997

13   surveillance, why couldn't you have shown -- if there was no

14   contesting the foundation for the exhibit by the defense, why

15   couldn't you have shown that through Mr. Russo?  Because

16   apparently he's one of the people depicted in the video.  He

17   would have been qualified to testify about who was in that

18   picture and where they were and everything else.

19           MR. LIFSHITZ:  Your Honor, we generally don't put in

20   recordings, audio or video, through a witness who didn't make

21   them because we don't want him to be accused of conforming

22   testimony to fit evidence that was gathered outside of him.

23           THE COURT:  But you don't want to put the agents on

24   either.

25           MR. LIFSHITZ:  That would turn this into a very long

RUSSO - RECROSS - KEDIA

1    proceeding.  I don't think --

2              THE COURT:  You know what?  I don't care if it takes

3    two weeks.  I am the trier of fact here.  I am the one who is

4    going to sentence Mr. Persico.  I do not appreciate the

5    attempt of the parties to pidgeon hole me into only

6    considering the sentencing guidelines, which were made

7    advisory over 11 years ago.  Because that's what's happening

8    here.  And both sides are just as guilty.

9              At this stage of the game, whatever reasons you may

10   have for not presenting the video through the witness who was

11   just here, really are of no moment because you could have just

12   put it on at the end of his testimony.  We could have arranged

13   that and then they could have opened up cross-examination

14   based on just this.  There is nobody then available to explain

15   to me what that video is about.

16             MR. LIFSHITZ:  Your Honor, there was testimony about

17   that video in Guerra.  There was no objection to that video

18   and I don't believe there's any objection to it here.  The

19   video depicts three people and the witnesses at Guerra said

20   they are --

21             THE COURT:  So is the defense not objecting to that

22   testimony even though the defendant was not present at the

23   trial and did not have any opportunity to cross examine the

24   witnesses?

25             MS. KEDIA:  Your Honor, I apologize for this but the

Case 1:02-cr-00351-EK   Document 1869-6   Filed 09/19/21   Page 338 of 635 PageID #:
Case 1:10-cr-00147-DLF   Document 840-1   Filed 09/21/16   Page 339 of 347 PageID #: 10340
#: 4645
296

RUSSO - RECROSS - KEDIA

1   only way I can answer that question is to say I don't object

2   to the government making submissions to the Court if both

3   parties are given the opportunity to explain their various

4   submissions.  I understand the Court's position completely and

5   certainly if the Court wants the witnesses to be called for

6   each of these, we'll be prepared to cross examine each of the

7   witnesses, otherwise we can do it as the government has

8   suggested, that's entirely up to the Court.  I...

9           (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:02-cr-00307-FK Document 1869-6 Filed 08/19/21 Page 339 of 635 PageID #: 4646
Case 1:16-cr-00247-DLF Document 840-1 Filed 09/21/18 Page 312 of 347 PageID #: 6341

297

PROCEEDINGS

 1          THE COURT:  So let's move on to the defendant's

 2   proposed testimony.  What is the relevance of the testimony of

 3   these different people that are on the defendant's letter?

 4          MS. KEDIA:   Your Honor, with respect to -- and I

 5   apologize, I don't even have the letter in front of me.

 6          THE COURT:  Oh, geez Louise.  The testimony of Dino

 7   Basciano, all of these were at the Guerra trial.  Testimony of

 8   Dino Basciano, Joseph Iborti.

 9          Is it Matthew or Matthe?

10          MS. KEDIA:   Matthew, I believe, Tormey.

11          THE COURT:  Matthew with a "W" at the end.  There's

12   a typo.  Tormey.  And Michelle Fama.

13          What is the relevance?  What are they testifying

14   about?

15          MS. KEDIA:   Your Honor, Dino Basciano testified at

16   the Guerra trial that, as he understood it, Eric Curcio

17   received a message from his uncle at the MCC within two weeks

18   of the murder of Joseph Scopo that it was his uncle that, in

19   fact, ordered the murder and it just began in the two weeks

20   prior to the murder.

21          He also testified that he had weapons, a significant

22   number of weapons, that he sold including ones exactly like

23   the MAC-10 and the silencer that were found at the scene.

24   That's the primary significance.

25          THE COURT:  You're talking about a portion of the

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/19/21 Page 349 of 635 PageID #: 4647
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 349 of 349 PageID #: 4647
298

PROCEEDINGS

1    testimony?

2         MS. KEDIA:   Yes.  I'm talking about what we believe

3    to be the relevant portion of the testimony.  Dino Basciano

4    didn't testify about Michael Persico in any way.  I don't

5    believe that Michael's name was mentioned during his

6    examination.  The relevance of his testimony is that if, in

7    fact, he is to be believed and the order came from the uncle

8    two weeks before --

9         THE COURT:   So how am I supposed to test the

10   credibility of these witnesses?

11        MS. KEDIA:   Judge, if the Court would prefer that we

12   call them, we can certainly call them.

13        THE COURT:   Based on a cold record?

14        MS. KEDIA:    I understand the Court's position,

15   Judge.  I understood that the government wanted to do this by

16   submission, and I didn't understand that the Court had any

17   objection to that prior to this.

18        THE COURT:   Well, how could I say it when you submit

19   this in the afternoon the day before the hearing?

20        MR. FERNICH:   Your Honor, could I be heard for just

21   a second?

22        THE COURT:   No.  You know what, this is triple

23   teaming.  I thought that Mr. Sercarz was going to take charge

24   of this hearing, and I've heard from everybody but him except

25   for one objection today.  Get the story straight.

Case 1:09-cr-00951-FK Document 1869-6 Filed 08/19/21 Page 341 of 635 PageID #: 4648
Case 1:16-cr-00147-DLF Document 346-1 Filed 09/21/18 Page 341 of 341 PageID #: 40543
299

PROCEEDINGS

1          How am I supposed to judge the credibility of these

2  witnesses, not to mention the relevance of all of this?

3          Go ahead, Mr. Fernich, go ahead.

4          MR. FERNICH:  Judge, under Chapter 6 of the

5  guidelines and voluminous case law from our circuit and the

6  Supreme Court --

7          THE COURT:  Of which none was cited at all.  At

8  least the government made an attempt to make argument.

9          MR. FERNICH:  Well, your Honor, there's no limit on

10  the source or type of the material that the Court can consider

11  at sentencing.

12          THE COURT:  I agree.

13          MR. FERNICH:  Right.  And with regard to the

14  testimony that was cross-examined at the Guerra trial, your

15  Honor can ascribe such weight as you think --

16          THE COURT:  I wasn't the judge who presided at the

17  trial.

18          MR. FERNICH:  Yes, ma'am, I understand that.  I'm

19  not asking you to make a credibility determination with

20  respect to the testimony that was given in Guerra's trial, but

21  your Honor could consider that material in assessing the

22  credibility of the witness who testified before you today and

23  whether that --

24          THE COURT:  How?  I haven't had an opportunity to

25  see the witness testify.

PROCEEDINGS

1    MR. FERNICH:   Ma'am, you heard Russo testify

2    today --

3    THE COURT:   That's right, but I haven't heard any of

4    these other people testify.

5    MR. FERNICH:   Well, your Honor then could ascribe

6    the Guerra testimony such weight, if any, as the Court feels

7    it deserves with regard to making an assessment of the

8    credibility of Russo, that's all, under Chapter 6.   It's your

9    Honor's prerogative to give it, again, such weight as the

10   Court feels it deserves, if any.   And if the Court is of the

11   view that it's not worth anything in determining Russo's

12   credibility, your Honor could also make that determination as

13   well.

14   We're just proffering it, you know, for what it's

15   worth in terms of this Fatico hearing.   It's not our burden to

16   go forward anyway, but in the nature of extrinsic impeachment,

17   let's say, your Honor could also consider that examination in

18   addition to the cross-examination that was elicited today in

19   the mix of factors relevant to Russo's credibility.

20   And if the Court deems it unworthy of any weight

21   with regard to the witness's credibility, I understand that as

22   well.

23   THE COURT:   And what is the testimony of Joseph

24   Iborti?

25   MS. KEDIA:   Joseph Iborti similarly testified that

PROCEEDINGS

```
 1   he understood that the order came in the days before the Scopo
 2   murder to the extent that there was any kind of an order.  And
 3   that Eric Curcio did this based on that, meaning, committed
 4   the Scopo homicide based on that.  His testimony also
 5   conflicts with Russo in other ways.
 6           As I understand it, your Honor, with respect to a
 7   credibility -- I understand that your Honor would like to see
 8   the witnesses.  I will say this:  These are government
 9   witnesses that they called at the Guerra trial.
10           THE COURT:  I don't care who called them.
11           MS. KEDIA:  I understand that.
12           THE COURT:  It doesn't matter to me.
13           MS. KEDIA:  They had cooperation agreements with the
14   government that were --
15           THE COURT:  But Mr. Persico wasn't the person on
16   trial.
17           MS. KEDIA:  I understand that.
18           MR. LIFSHITZ:  Your Honor, may I be heard on those
19   two witnesses, at least Basciano and Iborti?
20           THE COURT:  Yes.
21           MR. LIFSHITZ:  My understanding is the purpose
22   defense has in putting in their testimony is largely the
23   absence of reference to Michael Persico.
24           THE COURT:  But that's my point.  So there's no
25   reference to Michael Persico.  Michael Persico wasn't on trial
```

PROCEEDINGS

1   so I don't see why the government would have the necessity to

2   ask about Michael Persico necessarily.

3          MR. LIFSHITZ:  That's correct.  But those witnesses

4   had information from a limited source which was largely Eric

5   Curcio.  So we don't dispute that they did not have knowledge

6   about Michael Persico's role in the murder.  And that's why we

7   certainly do not object to their testimony being presented on

8   paper because we're not going to elicit admissions from them

9   about Michael Persico.  They don't know him to be involved in

10  the Scopo murder.

11          THE COURT:  What about the testimony of Matthew

12  Tormey?  I mean, it would have been helpful if you could have

13  in your submission instead of just listing all this different

14  testimony said what it was, gave me some sort of a proffer as

15  to what it was about instead of just giving me a laundry list.

16          MS. KEDIA:  I understand, Judge.  I apologize.

17          THE COURT:  So I'm pulling teeth now.  So what is

18  Tormey's testimony?

19          MS. KEDIA:   Your Honor, if I might just get my

20  reference to Tormey's testimony.

21          (Brief pause.)

22          THE COURT:  You should be prepared to address this

23  like now.

24          MS. KEDIA:  Your Honor, I understand.  I was not

25  intending to address this in this fashion.  I believed that we

Lisa S. Schwam, CRR, RPR, RMR
Official Court Reporter

Case 1:03-cr-00351-FK - Document 1869-6 - Filed 09/19/21 - Page 345 of 635 PageID #:
Case 1:10-cr-00147-DLI Document 340-1 Filed 09/21/18 Page 3168 of 347 PageID #: 4652
303

PROCEEDINGS

1    would be calling an agent today and cross-examining --

2              THE COURT:  I don't care.  You have to have a basis

3    and know what it is in that testimony that is relevant.

4              (Brief pause.)

5              THE COURT:  Any day now.

6              MS. KEDIA:  Yes, Judge.  I apologize.  Just a

7    moment.

8              (Brief pause.)

9              MS. KEDIA:  Mr. Tormey was the case agent between

10   1995 and 1999 who was involved in investigating the murder of

11   Joseph Scopo.  He had information about -- from various

12   sources about the murder.  Those sources implicated John

13   Pappa, Anthony Russo, Frank Guerra, John Sparacino and Eric

14   Curcio, as I understand it, and did not implicate Michael

15   Persico.

16             THE COURT:  And Michelle Fama.

17             MS. KEDIA:  Michelle Fama testified as an alibi

18   witness at the Guerra trial.

19             THE COURT:  Alibi for who?

20             MS. KEDIA:  For Mr. Guerra.  She said that he was

21   not present on the night of the murder.

22             THE COURT:  How is that relevant?

23             MS. KEDIA:  Because it contradicts Mr. Russo's

24   testimony, your Honor.  I intended to submit to the Court a

25   recording --

Case 1:03-cr-00351-FKB   Document 1869-6   Filed 08/19/21   Page 346 of 635 PageID
Case 1:10-cr-00147-DLF   Document 3461   Filed 09/21/18   Page 319 of 347 PageID #: 30034
#: 4653
304

PROCEEDINGS

1    THE COURT:  Was Mr. Guerra found guilty of the Scopo

2  murder or not?

3    MR. LIFSHITZ:  He was not found not guilty at trial,

4  and Judge Townes subsequently found at sentencing that he

5  participated in it.

6    THE COURT:  I don't care about the Michelle Fama

7  testimony.

8    What is this government chart at a Pappa trial?

9  About what?

10    MS. KEDIA:  Your Honor, this is the government's

11  theory of the Pappa trial about how this murder took place

12  based on the witnesses that were cooperating at the time and

13  the investigation of the agents at the time.

14    THE COURT:  When did this trial occur?

15    MS. KEDIA:  In 1999, your Honor.  And the government

16  submitted that the order to kill Joseph Scopo was given in the

17  two weeks prior to the Joseph Scopo murder by his uncle and

18  other people not affiliated -- not Mr. Michael Persico, by an

19  uncle and other people at the MCC.  They also submitted that

20  the car that Mr. Russo used in the murder was stolen the night

21  before the murder.

22    THE COURT:  Which car are you talking about?

23    MS. KEDIA:  The car that was used on the night of

24  the murder.

25    THE COURT:  The car that was used by whom?

Lisa S. Schwam, CRR, RPR, RMR
Official Court Reporter

Case 1:03-cr-00351-FK   Document 1869-6   Filed 08/10/21   Page 347 of 635 PageID #: 4654
Case 1:16-cr-00147-DLF   Document 340-1   Filed 09/21/18   Page 320 of 347 PageID #: 10343
305

PROCEEDINGS

1        MS. KEDIA:   By Mr. Russo, the stolen car, your

2   Honor.

3        THE COURT:   Well, that's prior to Mr. Russo even

4   cooperating.

5        MS. KEDIA:   Yes, it is, your Honor.   But in any

6   event, Mr. Russo has testified both at the Guerra trial --

7        THE COURT:   Which occurred after 2011.

8        MS. KEDIA:   Right.   He testified at the Guerra

9   trial that the car was stolen several weeks before the murder

10  and was used in numerous surveillances and attempts to kill

11  Mr. Scopo.   That's contrary to the stipulation that the

12  government entered into during the Pappa trial and contrary to

13  other witnesses that were called at the Pappa trial.

14        THE COURT:   And the government's Giglio letter from

15  June 1, is it from this case?

16        MS. KEDIA:   It is from this case, your Honor.

17        THE COURT:   What's the docket entry number?   Was it

18  filed?

19        MS. KEDIA:   I don't believe that it was filed.

20        THE COURT:   And Giglio letter as to whom?

21        MS. KEDIA:   Giglio letter as to many witnesses.

22  But for the Court's consideration, my primary issue was to

23  submit the Giglio material with respect to Anthony Russo.   The

24  government has numerous sources that has informed it, but

25  Anthony Russo participated in multiple murders, not just the

Case 1:02-cr-00351-FK   Document 1869-6   Filed 09/19/21   Page 349 of 635 PageID
Case 1:16-cr-00147-DLF   Document 840-1   Filed 09/21/18   Page 321 of 347   PageID #: 10350
#: 4655
306

PROCEEDINGS

1    one that he claims now to have participated in.  And also has

2    advised that on multiple occasions he threatened his ex-wife,

3    Michelle Fama, who testified as an alibi witness, threatened

4    to kill her even on one occasion.  And I was intending to

5    submit along with that a recording to the Court --

6                 THE COURT:  That's not mentioned in your letter.

7                 MS. KEDIA:  No, your Honor.  The letter was not -- I

8    apologize.  The letter was not intended to be a submission to

9    the Court about what --

10               THE COURT:  Then why file it on ECF?  If it was not

11   meant to be a submission to the Court and if it's not meant to

12   require action by the Court, then you don't need to file it on

13   ECF.

14               MS. KEDIA:  That's fine, Judge.  Some judges would

15   like us to file all of our correspondence with each other on

16   ECF.  And that's been our practice when the case --

17               THE COURT:  That's not my practice.

18               MS. KEDIA:  I understand that, but I didn't know

19   that prior.

20               THE COURT:  Well, a simple inquiry would have

21   sufficed, no, to find out?

22               MS. KEDIA:  Yes, Judge.  I was just responding to

23   the government's letter that it had filed on ECF.

24               THE COURT:  What is this discovery letter in the

25   Russo case?  I imagine that that also was not docketed.

PROCEEDINGS

1    MS. KEDIA:   I believe that that was docketed in

2   Mr. Russo's case.  I don't know that it was docketed in --

3    THE COURT:  In this docket number?  In this docket?

4    MS. KEDIA:  No, your Honor.

5    THE COURT:  A separate docket?

6    MR. LIFSHITZ:  Russo's docket is 11-CR-30.  It's

7   Judge Matsumoto's case.  And I do believe the letter was

8   docketed in that case.

9    THE COURT:  Okay.  So it would have been nice to

10  have the docket number and the docket entry number in the

11  letter.

12    MS. KEDIA:  I understand that, Judge.  Again, I

13  apologize.  This letter was really for the government.  It

14  wasn't for the Court.  I wasn't trying to explain to the Court

15  the relevance of this --

16    THE COURT:  Okay.  Enough of your excuses.

17    How long is it going to take each of you to provide

18  submissions and to provide what are going to be voluminous

19  exhibits?  Because, quite frankly, I think bringing the

20  witnesses in would have been far faster than having to review

21  all of this cold.

22    MR. LIFSHITZ:  Your Honor, I discussed this with

23  Ms. Kedia earlier in the day.  We'll present our joint

24  proposal.

25    We were proposing to submit complete post-hearing

Case 1:03-cr-00251-FK  Document 1869-6  Filed 08/19/21  Page 350 of 635 PageID#
Case 1:16-cr-00147-DLF  Document 340-1  Filed 09/21/18  Page 323 of 347 PageID#: 4657
308

PROCEEDINGS

1   briefs arguing the credibility of Anthony Russo and submitting

2   these exhibits that we would submit corroborate them, and they

3   would submit contradiction, we would ask to do that in about

4   four weeks and to respond --

5            THE COURT:  No, no, that's ridiculous.  You've had

6   all of this stuff.  You've had all of this for years, for

7   years.  I was expecting to have the hearing done by tomorrow

8   so that we could move forward with sentencing on this case --

9   a decision and sentencing on this case.

10           This is going to be rather voluminous so it's going

11  to take you four weeks to put this together.  I assume that

12  you're going to want to respond to each other's arguments,

13  correct?

14           MR. LIFSHITZ:   Yes, your Honor.  We can do it as

15  quickly as the Court wants.  Frankly, the part that will take

16  longest is just getting the transcript of Russo's

17  cross-examination and making our arguments about that.  We can

18  certainly make submissions about these exhibits very quickly,

19  as quickly as the Court would like.

20           THE COURT:  It will be a simultaneous briefing

21  schedule.  So both the government's and defendant's initial

22  submissions by September 21.

23           How long for a response?

24           MR. LIFSHITZ:   One week, your Honor.

25           THE COURT:  Ms. Kedia?

Case 1:03-cr-00351-FK Document 360-6 Filed 09/19/21 Page 351 of 635 PageID #: 4658
Case 1:16-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 324 of 341 PageID #: 6353
309

PROCEEDINGS

1          MS. KEDIA:   I think that's fine, your Honor.  One

2   week would be fine.

3          THE COURT:  Do not forget that I require two

4   courtesy copies of all your submissions.

5          And on that note, I haven't gotten a single courtesy

6   copy from the defense until my deputy has gone and chased

7   after it.  I did not get a courtesy copy of this filing on

8   ECF.

9          I also have not gotten a courtesy copy of any

10  objections or non-objections from defendant to the presentence

11  report even though I specifically requested that.  My deputy

12  had to go and chase it down and ask for it to be brought in

13  today, which apparently it was done.

14         MR. FERNICH:   It's my fault, your Honor.  I

15  apologize.  We do not have any further objections to --

16         THE COURT:  I don't care.  I made it very clear that

17  if there were no objections to the presentence report, that a

18  letter had to be written to probation and that I should get a

19  copy of it.

20         MR. FERNICH:   Yes.  And I take responsibility.

21         THE COURT:  And it was in the minute entry order.

22         MR. FERNICH:   You are correct, and it's my fault.

23         MS. KEDIA:   Your Honor, in addition to two hard

24  courtesy copies, would your Honor like the exhibits on a disk

25  as well or in any other format, electronic format?

Case 1:03-cr-00351-EK Document 1860-6 Filed 08/19/21 Page 352 of 635 PageID #: 4659
Case 1:10-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 3299 of 347 PageID #: 8834

310

PROCEEDINGS

```
1              THE COURT:  I want -- no.  I want them in hard copy.

2              MS. KEDIA:  That's fine, Judge.  I just wanted to

3    check.

4              THE COURT:  I'll tell you what, give me one hard

5    copy of the exhibits and one disk copy, okay.  Law clerks like

6    the disk.  I like the hard copy.

7              MS. KEDIA:  The exhibits are voluminous; that's why

8    I asked.

9              THE COURT:  If you could make it a searchable PDF,

10   that would be a great help.

11             MS. KEDIA:  Judge, I believe that we can make most

12   of the documents a searchable PDF.  There are, for example,

13   certified copies of property documents that will not be

14   searchable, but they are very short.

15             THE COURT:  I'm more interested in the transcripts

16   and the longer documents being in a searchable PDF.

17             MS. KEDIA:  Certainly, Judge.

18             Judge, I do have one very brief witness that I could

19   call as well.

20             THE COURT:  Now?

21             MS. KEDIA:  Yes.

22             THE COURT:  Yeah.  Go ahead.

23             MS. KEDIA:  Your Honor, I neglected, I think, I'm

24   not sure if I neglected to move into evidence Defense Exhibits

25   A and B that I had marked.
```

Case 1:93-cr-00351-FK   Document 1869-6   Filed 08/19/21   Page 353 of 635 PageID 5
Case 1:10-cr-00147-DLF   Document 846-1   Filed 09/21/18   Page 328 of 347 PageID #10055
#: 4660
311

PROCEEDINGS

1          THE COURT:  They were moved into evidence.

2          MS. KEDIA:  Okay.  Very good.

3          THE COURT:  A, B, C, D and E and the transcripts

4   are, of course, aids.

5          MS. KEDIA:   Thank you.

6          (Witness enters the courtroom.)

7          THE COURTROOM DEPUTY:  Please raise your right hand,

8   sir.

9          (Witness takes the witness stand.)

10  RONALD J. DWYER, called as a witness, by the Defendant, having

11  been first duly sworn/affirmed, was examined and testified as

12  follows:

13         THE COURTROOM DEPUTY:  Please be seated.

14         Please state and spell your name.

15         THE WITNESS:  Ronald Dwyer, D-w-y-e-r.

16         THE COURT:  I'm sorry.  It's Ronald?

17         THE WITNESS:  Yes, ma'am.

18         THE COURT:  Dwyer, D-w-y-e-r?

19         THE WITNESS:  That's correct.

20         THE COURT:  Thank you.  I'm just going to -- good

21  afternoon, sir.  I'm just going to ask you to speak slowly in

22  a nice, loud, clear voice and you can adjust the microphone as

23  you -- to make it comfortable for you.  There's water there

24  for you.  Just be careful with the pitcher.

25         You may inquire when you're ready.

Russo - Direct - Kedia

1    DIRECT EXAMINATION

2    BY MS. KEDIA:

3    Q    Good afternoon, Mr. Dwyer.

4    A    Good afternoon.

5    Q    Mr. Dwyer, how are you employed?

6    A    I'm a private investigator.

7    Q    And were you previously employed with the New York Police

8    Department?

9    A    Yes, I was.

10   Q    For how long?

11   A    Ten years.

12   Q    And since then, have you been working as a private

13   investigator?

14   A    Yes.  About the last 23 years.

15   Q    I'm going to show you what has been marked collectively

16   as Defendant's F.

17        Mr. Dwyer, do you recognize those photographs?

18   A    Yes.  These are printouts of photos I took last Friday.

19   Q    And what address are those photographs of?

20   A    1378 East 72nd Street in Brooklyn.

21        THE COURT:  Okay.  I'm sorry, but you need to

22   individually mark these as F-1, F-2, F-3 so we can keep track

23   of what they are.

24        MS. KEDIA:   I will.

25        THE COURT:  You should have had these marked before

```
 1    coming here.

 2                 (Brief pause.)

 3    Q    Mr. Dwyer, this home at 1378 East 72nd Street, did you

 4    walk around it, drive around it?  What did you do?

 5    A    I drive past it, parked my car and then walked around the

 6    front.  Walked to both sides without necessarily going on the

 7    property but could view both sides.

 8                 And then I also walked around the back of the house.

 9    There's a street right behind the house that is adjacent to a

10    six-foot cement wall that is there so I could see the back of

11    the house as well.

12    Q    And Mr. Dwyer, did you look around the house, the

13    exterior of the house, closely when you visited it and took

14    these photographs?

15    A    Yes, I did.

16    Q    Are there any exterior stairs going up to the home

17    of -- going up to this home?

18                 MR. LIFSHITZ:   Objection to relevance, your Honor.

19                 THE COURT:  Yes.  What is the relevance of all of

20    this?

21                 MS. KEDIA:   Your Honor, this was Mr. Scopo's home

22    in Brooklyn at the time that Mr. Russo testified that he

23    attempted to kill him.  He testified --

24                 THE COURT:  How would this witness know that?

25                 MS. KEDIA:   He doesn't know that, your Honor.  He
```

PROCEEDINGS

1    is simply saying that this was --

2            THE COURT:  How do you know that?

3            MS. KEDIA:   Because I have property deeds showing

4    this was Mr. Scopo's home --

5            THE COURT:  How do you know that's the condition of

6    the home at the time?

7            MS. KEDIA:   It was built in 1985, your Honor.

8            THE COURT:  How do you know that was the condition

9    of the home at the time?

10           MS. KEDIA:   I have property deeds showing --

11           THE COURT:  How do you know that that was the

12   condition of the home at the time?

13           MS. KEDIA:   Your Honor can take it for what it's

14   worth.  I don't know that this was the precise condition of

15   the home.  We can show that there are no exterior stairs.  If

16   your Honor looks at the photographs, I don't see how you could

17   think that there would have been exterior stairs in the past.

18           THE COURT:  You have no idea what the condition of

19   the home was 20 years ago.

20           We're done.  Thank you, sir.  You can step down.

21           (Witness exits the courtroom.)

22           THE COURT:  Anything else for today?

23           MR. LIFSHITZ:   Not from the government.

24           MS. KEDIA:   No, your Honor.

25           THE COURT:  I'm going to put this on for sentence

Case 1:03-cr-20351-FK   Document 1869-6   Filed 08/19/21   Page 357 of 635 PageID
Case 1:16-cr-00147-DLF   Document 340-1   Filed 09/21/18   Page 359 of 347 PageID #: 1033
#: 4664
315

PROCEEDINGS

 1   for November 2nd.  The briefing on the Fatico issue will be

 2   complete by September 28th.  Defendant's sentence memorandum

 3   will be due November 12th.

 4             THE COURTROOM DEPUTY:  Do you mean October 12th,

 5   Judge?

 6             THE COURT:  I'm sorry.  I mean October 12th.  And

 7   the government's sentencing memorandum will be due on November

 8   19th.

 9             MR. SERCARZ:   October 19th, your Honor?

10             THE COURT:  October 19th.  I'm sorry.  I'm saying

11   November.  Thank you.

12             MR. FERNICH:   Could I ask, your Honor, what time on

13   November 2?  I just have another appearance.

14             THE COURT:  2 o'clock.  Is that good?

15             MR. FERNICH:   Yes, Judge.

16             THE COURT:  Do you want it a little later than that?

17             MR. FERNICH:   2:00 should work, your Honor.  It's

18   in this courthouse.  I thank you.

19             THE COURT:  Want to make it 2:30 to be on the safe

20   side?

21             MR. FERNICH:   Yes.  That would be fine.  Thank you

22   very much.

23             THE COURT:   Okay.  Is that still good for the

24   government?

25             MR. LIFSHITZ:   Yes, your Honor.

Case 1:02-cr-00351-FK Document 1869-6 Filed 08/10/21 Page 359 of 635 PageID
Case 1:16-cr-00147-DLF Document 340-1 Filed 09/21/18 Page 359 of 347 PageID #: 9100
#: 4665
316

PROCEEDINGS

 1          THE COURT:  Okay.  I always have probation here so

 2     we'll double-check and make sure that that's a good time for

 3     probation as well.  At 2:30 p.m.

 4          And any -- also if you could make sure to copy

 5     probation on your sentencing -- I'm sorry.  Not only on your

 6     sentencing memorandum, but also on your Fatico submissions.  I

 7     leave it up to probation if they want to have a disk for the

 8     exhibits.  That's entirely up to them how they want to have

 9     the exhibits.  And any addendum from probation by October 26.

10     And that would include any addendum with respect to Fatico.

11          All right.  Anything else that the parties want to

12     address today?

13          MR. LIFSHITZ:   Not from the government.

14          THE COURT:  Anything else?

15          MS. KEDIA:   No, your Honor.

16          THE COURT:  All right.  Thank you.

17          (Time noted:  4:50 p.m.)

18          (Proceedings concluded.)

19

20

21

22

23

24

25

Case 1:02-cr-00351-FK  Document 1869-6   Filed 09/19/21   Page 359 of 625 PageID
Case 1:10-cr-00147-DLF  Document 340-1   Filed 09/21/16   Page 332 of 347 PageID #: 20361
#: 4666                                                                    317

PROCEEDINGS

1                          I N D E X

2     WITNESS                                    PAGE

3     ANTHONY RUSSO

4     CROSS-EXAMINATION      BY MS. KEDIA       135
      REDIRECT EXAMINATION   BY MR. LIFSHITZ    280
5     RECROSS EXAMINATION    BY MS. KEDIA       287

6

      RONALD J. DWYER
7
      DIRECT EXAMINATION     BY MS. KEDIA       312
8

9                        E X H I B I T S

10    DEFENSE                    PAGE
      A                          157
11    C                          225
      D and DT                   279
12    E and ET                   279

13

14

15

16

17

18

19

20

21

22

23

24

25

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

(Time noted: [1] 316/16
MR. FERNICH: [17] 134/12 165/18
165/21 298/19 299/3 299/8 299/12
299/17 299/25 300/4 309/13 309/19
309/21 315/11 315/14 315/16 315/20
MR. LIFSHITZ: [68] 134/6 135/1 141/7
143/6 155/19 156/24 157/25 158/2
158/7 162/17 164/4 164/9 164/11 166/3
176/9 195/1 197/11 198/3 202/4 208/12
208/17 208/23 209/3 209/12 214/19
225/6 229/2 237/23 248/8 249/13
249/19 276/20 279/8 279/16 280/12
280/15 280/22 287/15 288/16 289/14
289/21 291/6 292/4 292/6 292/14
292/17 292/22 292/25 293/2 293/11
293/15 294/1 294/6 294/18 294/24
295/15 301/17 301/20 302/2 304/2
307/5 307/21 308/13 308/23 313/17
314/22 315/24 316/12
MR. SERCARZ: [9] 134/15 204/12
204/15 205/1 205/4 206/2 206/12
207/23 315/8
MS. KEDIA: [182]
Question: [1] 196/21
THE COURT REPORTER: [2] 220/22
239/15
THE COURT: [343]
THE COURTROOM DEPUTY: [4]
134/2 311/6 311/12 315/3
THE DEFENDANT: [1] 134/21
THE WITNESS: [36] 135/15 140/14
141/3 142/6 145/4 145/7 149/14 158/22
159/1 166/6 166/8 169/20 178/8 198/21
199/13 199/16 199/19 200/4 204/4
210/6 221/1 230/12 230/14 230/20
230/25 231/2 234/14 234/16 239/19
253/17 265/22 266/10 270/2 280/7
311/16 311/18

## $

$10,000 [2] 162/8 162/9
$100,000 [1] 258/16
$110,000 [1] 160/7
$15,000 [1] 162/23
$200,000 [1] 258/13
$3,000 [2] 260/17 260/23
$30,000 [1] 260/14
$50 [1] 140/9
$70,000 [1] 262/10
$75,000 [1] 161/25
$80,000 [2] 259/11 259/20

## '

'6 [1] 264/22
'80s [3] 166/11 256/3 256/4
'90s [1] 264/22
'92 [1] 175/11
'93 [9] 175/13 182/21 188/12 188/18
188/19 193/10 217/12 219/24 219/25
'94 [3] 255/2 255/4 266/17
'95 [2] 264/22 266/17
'em [2] 227/20 260/22
'Leave [1] 251/11
'til [4] 149/5 260/20 268/23 269/4
'What [1] 251/10

## -

------------------------------x [2] 133/2 133/7
-against [1] 133/5

.25 [1] 138/13
.25-automatic [1] 138/13
.32 [1] 138/15
.32-automatic [1] 138/15
.38 [6] 138/13 138/13 186/1 207/9
229/22 232/8
.38 caliber [1] 207/9
.38-caliber [1] 138/13

## 1

10 [22] 186/2 186/4 196/16 196/20
196/20 206/24 207/1 207/8 209/6
229/11 229/22 230/2 230/20 231/10
231/17 232/14 243/11 245/25 246/5
249/15 251/5 297/23
10,000 [1] 261/10
10-CR-147 [2] 133/2 134/4
100 [1] 224/1
10010 [1] 133/22
10019 [2] 133/16 133/19
10:00 [1] 133/5
11 [4] 232/23 267/13 267/21 295/7
11-CR-30 [1] 307/6
11201 [1] 133/13
11th [2] 168/11 289/25
12 [2] 162/11 162/23
12th [4] 165/5 315/3 315/4 315/6
13 [1] 293/22
1378 [2] 312/20 313/3
13th [1] 260/1
147 [2] 133/2 134/4
15 [6] 137/5 137/19 138/19 150/16
249/15 280/6
15-minute [1] 204/2
150 [2] 258/12 259/3
16 [3] 137/19 138/19 150/17
16th [1] 160/1
1980 [1] 266/23
1985 [1] 314/7
1986 [2] 151/23 153/3
1988 [2] 166/14 173/12
1989 [2] 166/14 166/19
1990s [4] 256/2 292/10 292/19 293/14
1992 [20] 166/17 166/19 167/3 168/5
168/5 169/9 171/20 171/21 173/12
175/12 176/6 177/4 180/7 181/10
181/17 181/23 181/24 182/12 218/4
259/15
1993 [6] 153/10 153/23 181/25 203/11
218/6 266/17
1994 [6] 218/18 218/22 254/22 254/23
255/13 255/16
1995 [1] 303/10
1997 [1] 294/12
1999 [5] 163/12 261/12 262/1 303/10
304/15
19th [3] 315/8 315/9 315/10
1:02 [1] 247/16
1st [1] 263/10

## 2

20 [6] 137/5 201/9 201/11 203/11
257/19 314/19
20 minutes [1] 187/7
20 percent [2] 172/18 173/3
200,000 [1] 259/3
2000 [6] 153/10 163/12 259/15 261/11
261/12 262/1
2000s [2] 256/2 267/2

2002 [1] 266/23
2005 [1] 263/12
2008 [3] 267/17 267/20 267/23
2009 [8] 154/25 155/4 155/15 156/22
263/10 269/17 273/3 288/5
2010 [7] 163/11 163/23 164/20 164/24
165/5 273/21 277/1
2011 [17] 142/21 151/25 153/3 155/1
166/2 192/12 256/21 257/2 271/2 273/4
281/7 281/10 281/13 283/12 285/19
288/5 305/7
2013 [2] 160/1 160/13
2016 [1] 133/5
206 [2] 212/9 212/14
207 [1] 212/9
209 [1] 232/12
20th [1] 183/11
21 [2] 251/1 308/22
219 [1] 223/15
21st [4] 163/11 163/23 164/20 164/24
22 [1] 212/14
228 [1] 250/16
22nd [1] 133/21
23 [2] 196/7 312/14
2330 [1] 133/23
24 [2] 133/5 258/21
25 [2] 151/20 207/11
25 percent [1] 161/4
259 [1] 258/20
26 [2] 167/3 316/9
26th [3] 267/4 267/6 267/7
27 [1] 265/16
271 [1] 133/12
2712 [1] 133/23
2733 [2] 265/16 266/8
28th [1] 315/2
29th [4] 153/10 153/10 153/23 199/17
2:00 [1] 315/17
2:15 [2] 247/10 247/15
2:27 [1] 248/2
2:30 [2] 315/19 316/3
2nd [1] 315/1

## 3

30 [3] 196/22 257/19 307/6
300 [1] 248/15
33 [1] 160/4
35 [1] 206/9
3500 [1] 196/1
3500AR22 [3] 259/13 265/25 266/3
3500AR28 [2] 230/2 230/20
3500AR2A [2] 140/16 140/19
3500AR56 [1] 147/20
3500AR63 [5] 212/12 222/4 250/16
251/1 258/20
37 [1] 206/8
3:35 [1] 280/7

## 4

40 [2] 185/12 206/15
481 [1] 151/2
482 [1] 151/2
4:50 p.m [1] 316/17

## 5

5,000 [2] 260/18 260/19
50,000 [1] 241/10
50-dollar [2] 140/8 141/6
5:00 o'clock [1] 209/25
5K1 [1] 149/12

**6**

60 [1]  262/9
620 [2]  133/16 133/19
63 [3]  195/25 196/2 196/3
694 [1]  213/11

**7**

70 [2]  259/10 259/20
703 [1]  196/5
704 [2]  195/25 196/4
718-613-2330 [1]  133/23
718-804-2712 [1]  133/23
724 [1]  222/4
72nd [2]  312/20 313/3
735 [1]  251/1
736 [1]  251/1
75,000 [1]  162/6
7B [1]  133/21

**8**

80 [1]  259/13
810 [2]  133/15 133/18
86th [1]  183/11
8th [4]  155/4 155/15 156/22 218/22

**9**

90 [4]  265/25 266/1 266/1 266/6
99 [3]  265/25 266/2 266/3

**A**

a.m [1]  133/5
abide [2]  159/9 291/15
ability [1]  146/16
able [3]  187/23 224/22 293/23
about -- from [1]  303/11
absence [1]  301/23
Absolutely [1]  203/13
accepting [1]  292/3
accident [3]  232/12 232/13 233/3
accompanied [1]  236/18
accomplish [1]  186/23
according [2]  206/21 225/2
accused [1]  294/21
acquitted [1]  218/22
act [1]  146/11
acting [3]  273/15 273/21 274/9
action [1]  306/12
active [1]  172/18
activity [6]  273/7 273/10 273/13 288/3 288/10 288/24
actual [2]  198/7 222/22
Adam [4]  134/9 290/16 293/8 294/11
addendum [2]  316/9 316/10
addition [1]  300/18 309/23
additional [3]  158/5 283/3 289/20
address [11]  135/6 186/19 265/15 265/18 265/22 265/23 266/8 302/22 302/25 312/19 316/12
adjacent [1]  313/9
adjust [1]  311/22
administration [1]  285/24
admissions [1]  302/8
admit [1]  152/20
admitted [1]  292/12
advance [4]  156/9 157/19 158/12 294/11
advised [1]  306/2
advisory [1]  295/7
affair [1]  284/14
affiliated [1]  304/18
affiliated -- not [1]  304/18

affirmed [2]  135/12 311/11
afraid [2]  287/6 287/8
afternoon [10]  210/1 248/23 280/5 281/2 281/3 298/19 311/21 312/3 312/4
agent [29]  134/8 163/12 166/2 265/10 274/21 274/24 275/8 275/22 276/12 276/14 290/14 291/3 292/2 292/3 292/4 292/11 292/11 292/14 292/16 292/16 292/21 293/8 293/9 293/10 293/12 294/3 294/11 303/1 303/9
agents [25]  164/25 165/5 165/10 192/5 192/7 192/12 192/15 229/17 230/7 232/8 233/4 259/9 259/20 260/16 266/4 270/18 282/15 282/24 282/25 283/2 283/4 292/19 292/25 294/23 304/13
aggravated [1]  199/18
ago [23]  136/4 161/19 175/14 199/7 200/2 201/2 201/7 201/10 201/12 203/8 206/22 219/16 234/17 235/19 245/13 257/15 259/3 261/22 262/9 293/6 293/22 295/7 314/19
agree [3]  170/19 225/19 299/12
agreed [2]  171/11 258/9
agreement [4]  146/24 150/6 150/10 281/16
agreements [1]  301/13
agrees [1]  248/25
ahead [4]  199/12 299/3 299/3 310/22
aid [2]  279/12 279/13
aided [1]  133/25
aids [1]  311/4
Ali [1]  273/12
alibi [5]  216/14 216/15 303/17 303/19 306/3
aligned [1]  218/14
alive [1]  292/25
allegedly [3]  206/16 215/18 293/21
Allie [8]  215/25 216/3 216/5 216/14 217/24 220/8 273/11 284/14
ALLON [2]  133/13 134/7
allow [4]  166/5 214/21 229/5 233/24
allowed [1]  262/18
almost [1]  177/22
alone [2]  211/5 211/10
Alphonse [10]  254/23 255/5 255/19 255/23 262/14 262/17 262/17 262/25 263/1 284/16
Altima [2]  222/9 240/1
amenable [2]  290/18 290/25
amend [1]  277/6
AMERICA [1]  133/3
amount [2]  215/1 261/19 261/20 261/20
Andre [3]  267/25 268/3 268/5
Andrew [2]  286/2 286/4
Angelo [1]  179/9
annoying [1]  248/19
answer [39]  142/1 146/14 146/15 149/17 151/1 162/5 166/5 195/25 196/8 196/11 196/14 196/16 196/21 196/23 196/25 197/2 197/5 197/13 199/22 203/23 208/12 209/18 214/21 222/3 222/6 223/2 223/13 227/5 229/5 229/5 232/22 233/24 238/4 258/2 258/19 260/6 267/9 270/2 296/1
answered [10]  137/14 142/7 145/12 150/18 164/4 217/23 229/3 237/24 238/3 238/4
answering [1]  260/2
answers [10]  197/7 212/1 212/9 213/8 214/12 222/22 223/3 223/5 224/25

252/7
afraid [3] 147/19 147/22 165/17 165/23
147/17 152/19 155/5 156/22 163/23
168/23 171/8 183/1 184/5 190/3 190/6
194/8 213/2 251/17 255/24 271/9
271/17 271/18 271/19 271/24 272/13
272/16 273/14 273/20 274/2 274/7
293/7 303/13 305/23 305/25 308/1
any -- also [1]  316/4
anyway [1]  300/16
apologize [16]  154/22 157/16 157/21 158/22 159/11 208/10 254/10 260/3 291/23 295/25 297/5 302/16 303/6 306/8 307/13 309/15
appearance [2]  153/21 315/13
appearances [5]  133/10 134/6 210/3 248/5 280/18
appreciate [3]  180/4 228/18 295/4
approach [3]  140/17 164/1 230/16
appropriate [1]  158/6
approximate [1]  261/20
April [2]  193/10 217/13
AR [4]  195/25 196/1 196/2 270/14
AR3 [2]  153/12 153/19
AR53 [1]  151/1
area [2]  202/11 219/12 225/3
areas [1]  209/18
argue [2]  154/7 162/4
arguing [4]  199/12 258/4 291/11 308/1
argument [7]  206/2 206/3 206/4 209/5 209/8 294/7 299/8
argumentative [1]  146/14
arguments [2]  308/12 308/17
armed [1]  187/19
arounds [2]  192/6 192/15
arranged [1]  295/12
arrested [24]  138/15 142/21 144/10 146/19 151/23 151/25 154/25 181/4 181/10 181/12 181/14 256/21 257/2 257/15 257/17 257/17 257/18 257/19 261/11 261/18 262/1 271/2 274/22 277/3
ascribe [1]  299/15 300/5
assault [2]  146/10 146/17
assaulting [1]  146/11
assaults [3]  142/12 142/17 142/18
asserted [1]  165/23
assessing [1]  299/21
assessment [1]  300/7
assist [1]  206/4
Assistant [1]  133/14
associate [13]  144/25 145/6 145/9 145/15 154/17 173/20 179/1 179/2 179/4 179/7 179/13 282/9 284/25
associated [1]  138/20
associates [4]  179/18 179/19 286/24 287/2
associating [2]  138/22 154/24
assume [4]  158/4 208/21 279/3 308/11
Assuming [1]  144/3
atrocious [1]  231/2
attaching [1]  291/11
attempt [5]  138/4 189/16 204/19 295/5 299/8
attempted [3]  142/10 187/12 313/23
attempts [9]  183/10 184/9 184/11 192/13 198/6 200/13 200/13 201/13 305/10
attention [1]  259/15
attribute [1]  207/10

Case 1:03-cr-00351-FK Document 45-1 Filed 08/19/21 Page 1 of 1

## A

attributed [1]  208/3
attributing [1]  207/13
audience [1]  208/21
audio [11]  155/7 155/12 156/4 157/9 159/13 164/21 263/22 279/3 279/4 279/24 294/20
August [10]  133/5 155/4 155/15 156/22 167/3 168/5 171/20 181/10 182/12 218/22
August 8th [3]  155/4 155/15 218/22
authorized [4]  254/6 254/11 254/13 254/21
automatic [2]  138/13 138/15
available [1]  295/14
avenue [9]  133/15 133/18 168/11 170/5 170/7 171/24 183/11 224/2 260/11
awaiting [1]  181/10
aware [2]  143/3 277/10

## B

bad [2]  173/10 282/7
bag [14]  206/23 206/23 227/14 227/18 227/19 227/23 228/4 228/13 229/2 229/8 229/18 229/25 231/5 231/22
bagel [1]  177/14
ball [1]  294/11
banging [1]  241/9
barber [1]  188/7
barely [1]  157/12
Basciano [6]  173/17 297/7 297/8 297/15 298/3 301/19
based [7]  209/8 293/23 295/14 298/13 301/3 301/4 304/12
basis [2]  233/19 303/2
beat [1]  260/11
became [3]  180/6 182/14 269/13
began [11]  146/21 146/23 167/6 172/10 206/16 257/2 281/10 281/13 283/11 285/19 297/19
begin [3]  169/13 214/24 276/17
beginning [10]  184/7 184/8 184/10 188/21 251/1 256/2 256/10 270/13 270/17 277/3
begins [1]  276/7
bench [1]  164/1
Benji [1]  286/4
Benz [3]  162/1 162/6 162/9
best [3]  146/15 191/25 289/7
beyond [2]  251/20 288/11
BF [31]  168/19 184/5 185/18 190/2 190/14 210/21 211/5 211/8 211/22 212/20 212/21 212/24 213/5 214/16 226/17 226/25 227/20 227/21 228/4 228/5 234/3 237/5 238/24 255/25 268/21 268/24 269/1 273/7 284/1 284/5 285/4
bias [1]  165/24
Big [3]  179/14 179/15 179/23
Bill [21]  182/16 182/18 182/22 183/10 184/9 184/11 184/19 185/9 185/20 187/9 187/12 187/20 187/22 187/23 188/13 192/13 206/11 215/6 215/9 215/11 215/14
Billy [6]  183/20 184/14 194/11 194/19 215/16 242/7
bit [1]  254/9
block [5]  183/14 191/9 191/11 191/18 221/7
blurted [1]  214/2

## B (col 2 continued)

board [2]  153/20 154/4.
board [6]  185/7 185/21 179/21 184/5 184/15 194/6 213/7 214/1 237/5
body [1]  291/5
book [9]  256/14 256/16 257/5 257/7 257/8 257/23 258/5 261/6 261/7
bookmaker [1]  287/4
borrow [1]  258/23
borrowed [3]  258/12 258/16 259/10
bother [4]  170/22 231/11 231/12 231/14
bottom [2]  196/5 258/20
break [11]  140/4 202/6 202/8 203/24 204/2 204/25 210/2 247/9 248/20 280/6 280/7
Bridge [1]  232/9
brief [7]  249/15 280/13 302/21 303/4 303/8 310/18 313/2
briefing [3]  158/5 308/20 315/1
briefly [1]  292/5
briefs [2]  290/23 308/1
bring [6]  135/8 206/1 209/12 228/4 277/11 280/15
bringing [1]  307/19
broke [7]  139/18 139/25 140/2 141/15 141/17 163/2 290/1
Brooklyn [8]  133/4 133/13 192/21 211/13 219/18 219/22 312/20 313/22
brother [11]  165/7 165/8 178/19 178/20 178/21 217/16 217/18 253/6 268/1 287/4 287/25
brother-in-law [1]  287/4
brother-in-laws [1]  287/25
brought [2]  228/5 309/12
brown [3]  199/5 199/8 200/3
brutal [4]  142/12 142/17 142/18 142/19
BT [2]  163/18 163/19
built [1]  314/7
bunch [4]  194/17 194/10 276/19 287/5
burden [1]  300/15
bureau [1]  293/2
bus [2]  265/4 265/6
bush [3]  246/17 246/19 250/9
business [17]  170/10 207/22 268/14 268/17 268/25 269/18 269/25 270/5 271/1 271/5 271/5 271/9 271/19 271/24 272/12 272/18 272/23
businesses [3]  277/23 278/2 281/24
businessman [1]  277/21
buy [3]  224/5 264/12 264/19
buying [1]  265/1

## C

Cadman [1]  133/12
caliber [3]  138/13 196/18 207/9
calmed [1]  180/22
Canarsie [4]  185/12 189/4 189/6 189/17
candy [7]  168/11 168/25 169/2 170/8 171/24 171/25 177/13
cannot [3]  141/23 141/24 277/4
cap [1]  245/16
capable [2]  235/14 235/15
Capalbo [1]  286/22
CAPERS [1]  133/11
captain [4]  273/15 273/21 274/9 286/15
captains [2]  286/5 286/8
car [85]  162/25 170/10 183/15 183/15 183/15 183/15 185/6 185/7 189/12 189/12 190/2 190/7 190/12 190/14 190/15 191/10 194/22 194/23 195/1 195/19 196/7 200/3 200/7 200/8 200/9

## C (col 3 continued)

200/13 202/18 203/18 203/19 222/8 222/20 225/5 225/22 226/22 230/23 232/5 232/8 234/21 235/16 236/25 237/24 244/1 247/23 249/7 249/9 250/4
232/15 233/3 233/5 233/6 233/7 240/3 240/5 240/8 240/8 240/10 240/18 240/20 240/22 240/23 241/1 242/13 243/6 243/20 243/22 243/23 243/25 245/4 245/9 246/1 246/6 246/9 246/14 246/14 250/9 250/13 250/18 250/19 251/3 251/6 251/7 251/8 252/4 252/6 269/18 269/18 270/5 271/1 271/5 304/20 304/22 304/23 304/25 305/1 305/9 313/5
car.' [1]  251/11
card [1]  172/23
cards [5]  172/15 172/17 172/18 172/20 172/21
careful [3]  159/3 210/9 311/24
cares [1]  276/14
carjack [3]  141/20 141/21 141/22
Carmine [6]  165/7 165/8 165/9 267/25 268/2 268/5
carried [2]  137/23 138/14
carry [1]  138/10
carrying [6]  143/4 143/23 178/1 178/10 178/14 197/20
cars [22]  137/21 184/16 184/16 184/18 184/22 184/24 185/1 185/3 185/4 187/19 190/3 190/4 190/5 200/6 200/8 200/11 202/18 202/20 203/16 203/16 238/25 239/3
case [21]  147/8 156/8 179/25 195/14 233/22 291/1 292/11 292/11 292/21 293/12 299/5 303/9 305/15 305/16 306/16 306/25 307/2 307/7 307/8 308/8 308/9
casket [1]  237/1
cast [1]  208/2
Caucig [2]  266/12 266/19
ceasefire [6]  180/16 180/18 180/19 180/19 180/21 181/1
cement [1]  313/10
certain [7]  136/20 136/21 180/2 183/24 215/1 248/25 291/14
certainly [18]  145/21 152/13 152/20 159/10 163/4 164/13 166/1 175/17 203/11 209/16 225/16 225/17 290/10 296/5 298/12 302/7 308/18 310/17
certified [1]  310/13
Chance [1]  134/8
change [3]  154/17 155/5 262/8
changed [2]  154/14 154/15
chapel [6]  237/10 237/11 237/14 237/25 238/1 238/2
Chapter [2]  299/4 300/8
charge [1]  298/23
charged [1]  208/15
chart [1]  304/8
chase [1]  309/12
chased [1]  309/6
check [2]  310/3 316/2
Chevy [3]  199/2 199/8 200/4
CHIEF [1]  133/9
chop [1]  143/6
Chuckie [1]  176/20
cigarette [4]  221/9 223/9 224/8 241/21
cigarettes [1]  224/5
circuit [1]  299/5
citations [1]  204/23
cited [1]  299/7
City [1]  140/19

**C**

claims [1]  306/1
clarify [4]  179/17 195/2 264/14 282/22
clear [6]  206/10 207/6 207/18 223/2 309/16 311/22
clearly [1]  228/19
clerks [1]  310/5
client [1]  206/22
clip [3]  155/14 157/4 159/1
clips [3]  156/15 158/3 158/16
clock [1]  203/25
close [2]  173/21 223/20
closely [1]  313/13
closest [1]  169/21
club [20]  192/25 202/11 202/17 203/4 211/17 212/16 213/13 220/16 220/20 221/8 221/10 221/11 221/12 223/9 224/1 224/2 224/5 224/7 241/20 283/16
clue [2]  171/10 244/1
cocaine [1]  172/13 173/8 173/23
coconspirator [1]  165/15
cold [2]  298/13 307/21
colleague [1]  204/21
collect [1]  261/4
collected [1]  261/4
collectively [1]  312/15
Colombo [10]  145/7 167/19 177/2 179/19 269/13 284/25 285/23 286/14 286/17 286/24
Colombos [1]  224/18
comfortable [1]  311/23
coming [4]  228/16 274/21 275/2 313/1
commit [2]  138/25 139/2
committed [13]  137/19 142/8 145/24 146/3 146/4 154/5 171/5 175/3 175/15 175/17 175/20 288/25 301/3
committing [13]  142/5 144/5 146/2 150/16 152/15 152/20 153/6 154/11 169/13 172/10 173/14 288/13 288/14
communicate [1]  224/22
company [2]  265/4 265/6
complete [2]  307/25 315/2
completed [1]  134/25
completely [1]  296/4
compound [1]  219/5
computer [1]  133/25
computer-aided [1]  133/25
concern [1]  235/3
concerned [1]  235/9
concerning [2]  180/1 208/8
concerns [5]  148/7 148/8 148/10 148/23 222/18
concluded [1]  316/18
conclusion [1]  294/10
condition [7]  150/1 150/3 314/5 314/8 314/12 314/14 314/18
conditions [1]  152/10
conduct [3]  150/2 186/15 186/20
conducted [2]  292/9 293/14
conducting [1]  135/20
Coney [2]  265/4 265/19
conflicts [1]  301/5
conforming [1]  294/21
confused [1]  197/25
connection [2]  165/15 276/19
consider [7]  138/20 186/16 208/1 290/24 299/10 299/21 300/17
consideration [2]  180/3 305/22
considering [1]  295/6

consist [1]  174/6
conspiracy [1]  166/11
construction [1]  268/17
contain [1]  141/9
contains [1]  206/23
contemplating [1]  268/20
contesting [1]  294/14
context [2]  158/6 164/6
continually [1]  255/24
continuation [1]  134/23
continue [4]  150/4 150/7 209/11 248/7
continued [12]  134/3 166/22 205/7 210/3 244/2 245/1 248/4 249/25 250/4 278/8 280/18 296/9
contradiction [1]  308/3
contradicts [1]  303/23
contrary [2]  305/11 305/12
conversation [45]  156/10 159/7 163/22 165/5 207/3 210/23 211/1 214/6 214/25 215/2 215/3 215/17 216/12 216/25 217/15 217/22 218/25 219/1 219/6 219/11 228/7 228/25 231/19 231/24 237/22 253/4 253/5 253/9 253/12 253/13 253/16 263/9 264/2 264/6 264/9 267/25 274/17 276/13 277/1 277/2 281/20 282/15 282/20 282/22 282/23
conversations [15]  208/5 215/20 252/11 252/14 252/17 252/19 252/21 253/1 253/8 253/19 273/3 273/6 276/10 276/11 287/21
convicted [1]  181/16
convictions [1]  269/8
cooperate [6]  163/4 257/20 257/22 258/9 274/19 277/3
cooperated [1]  166/2
cooperating [19]  146/21 146/23 150/4 150/7 192/5 192/10 257/3 259/10 264/23 265/9 265/10 276/4 276/6 276/7 281/7 281/10 281/13 304/12 305/4
cooperation [5]  146/24 148/24 150/6 150/9 301/13
copies [3]  309/4 309/24 310/13
copy [9]  309/6 309/7 309/9 309/19 310/1 310/5 310/5 310/6 316/4
corner [6]  224/7 238/7 238/14 239/4 239/8 240/7
correct [15]  140/25 179/22 198/18 219/14 225/21 253/15 258/10 269/11 282/20 290/3 292/15 302/3 308/13 309/22 311/19
correspondence [1]  306/15
corroborate [1]  308/2
corroboration [1]  293/19
counsel [2]  134/8 135/19
couple [12]  136/4 144/10 193/22 200/2 202/8 229/11 229/12 231/10 231/11 231/12 259/16 270/20
course [1]  311/4
Court's [4]  150/20 296/4 298/14 305/22
courtesy [5]  309/4 309/5 309/7 309/9 309/24
courthouse [2]  133/3 315/18
courtroom [5]  199/6 200/3 203/25 311/6 314/21
courtrooms [1]  152/2
cousin [2]  165/6 165/10
cover [1]  209/18
covered [1]  209/10
CR [3]  133/2 134/4 307/6
crash [11]  183/15 183/15 184/16 185/3

185/3 185/6 190/3 194/22 194/23 195/1 195/11
credibility [12]  291/12 291/13 298/10 299/1 299/19 299/22 300/8 300/12 300/19 300/21 301/7 308/1
credibility -- I [1]  301/7
credit [2]  172/15 172/17 172/18 172/20 172/21 172/23
crew [4]  184/16 254/15 254/17 254/19
crime [2]  177/2 285/21
crimes [24]  137/18 138/25 139/2 142/5 144/5 145/24 146/2 146/3 146/4 150/16 152/15 152/21 153/7 154/10 160/4 169/13 172/10 173/15 175/2 282/1 282/4 283/5 288/13 288/14
criminal [8]  133/8 134/3 273/7 273/10 273/13 288/2 288/9 288/24
criminals [1]  173/9
cross [35]  135/1 135/19 135/20 135/24 138/6 167/1 186/21 204/20 206/25 207/16 209/14 209/15 210/12 245/1 248/11 249/13 250/1 250/4 276/19 281/4 281/19 282/14 283/4 283/7 288/20 290/15 290/16 292/4 295/13 295/23 296/6 299/14 300/18 303/1 308/17
cross-examination [21]  135/1 135/19 135/24 206/25 207/16 210/12 245/1 248/11 249/13 250/1 250/4 276/19 281/4 281/19 282/14 283/4 283/7 288/20 295/13 300/18 308/17
cross-examined [1]  299/14
cross-examining [1]  303/1
CSR [1]  133/22
Cuotolo [31]  182/16 182/23 183/10 184/9 184/11 184/19 185/9 187/9 187/12 187/20 187/22 187/23 188/13 192/13 193/11 195/6 195/8 201/15 204/19 206/6 206/12 207/2 207/7 207/8 207/22 209/7 215/7 215/9 215/11 215/14 242/8
Cuotolo's [1]  185/20
Curcio [32]  171/14 171/17 171/23 172/4 172/7 172/10 173/6 173/11 173/21 173/23 174/3 174/10 174/24 175/2 182/25 183/5 188/25 188/25 194/20 194/23 213/13 238/18 239/23 254/5 254/11 254/18 255/5 255/23 297/16 301/3 302/5 303/14
Curtis [3]  274/25 275/2 275/9
customer [2]  260/17 260/23
customers [1]  272/20
cut [6]  183/11 183/20 183/23 185/17 225/11 248/20

**D**

D-w-y-e-r [2]  311/15 311/18
damn [1]  241/9
DANELCZYK [1]  133/22
danger [2]  180/13 181/20
Danny [9]  167/22 167/23 168/7 168/8 170/18 177/18 177/19 183/1 286/22
date [6]  156/9 188/19 193/7 210/21 228/3 255/18
dates [2]  219/3 219/24
daughter [1]  242/19
dealer [1]  174/1
dealing [1]  172/13
dealt [1]  173/23
dear [5]  169/18 169/21 285/13

Case 1:23-cr-00351-EK   Document 361   Filed 09/21/24   Page 364 of 635 PageID #: 10366

debriefing [1] 230/6
debt [4] 140/6 140/8 141/6 141/15
December [1] 181/16
decided [8] 163/3 187/22 193/14 194/25 195/12 213/4 257/20 257/22
decision [1] 308/9
declined [1] 272/25
deeds [2] 314/3 314/10
deems [1] 300/20
defendant [9] 133/7 133/15 134/12 180/2 293/22 294/6 295/22 309/10 311/10
defendant's [9] 156/19 163/17 263/4 278/7 297/1 297/3 308/21 312/16 315/2
defense [18] 135/19 157/6 208/25 209/5 225/8 225/20 225/23 279/2 279/19 279/21 290/2 293/6 294/14 295/21 301/22 309/6 310/24 317/10
definitely [1] 237/20
deliver [1] 206/23
DeLuccia [1] 286/10
Dennis [1] 286/10
Department [2] 140/20 312/8
depicted [1] 294/16
depicts [2] 293/21 295/19
deputy [3] 163/25 309/6 309/11
describe [2] 189/11 236/25
described [5] 185/14 186/16 189/8 203/8 240/12
deserves [2] 300/7 300/10
despite [1] 289/25
destroyed [3] 257/13 257/14 257/16
detail [1] 186/19
detailing [4] 269/18 270/5 271/1 271/5
details [1] 201/17
detain [1] 142/22
detectives [1] 293/4
detention [2] 142/25 143/24
determination [3] 290/25 299/19 300/12
determine [1] 291/13
determining [1] 300/11
Devine [2] 283/15 284/11
died [6] 255/13 255/14 255/17 255/18 255/22 255/23
different [7] 138/14 138/18 166/20 208/15 276/20 297/3 302/13
dime [2] 161/7 161/18
diner [2] 272/9 272/10
Dino [5] 173/17 297/6 297/8 297/15 298/3
direct [32] 134/25 136/4 136/7 139/23 186/21 186/22 186/25 189/15 199/6 200/2 201/17 206/9 206/15 206/18 206/21 210/14 218/25 219/10 223/12 232/22 233/9 233/13 234/10 241/18 247/4 248/12 259/15 260/12 261/21 264/17 292/24 312/1
discarded [1] 229/12
discovery [1] 306/24
discuss [10] 175/2 212/22 234/24 247/12 247/13 271/8 282/3 288/19 288/23 289/24
discussed [14] 152/18 164/24 177/16 186/22 186/25 273/2 275/6 276/14 288/13 288/21 289/2 289/4 290/21 307/22
discussing [7] 225/24 250/6 262/13 262/16 262/24 272/11 277/19

discussion [4] 212/25 237/2 237/6 241/11 237/11
dishonest [1] 150/11
disk [4] 309/24 310/5 310/6 316/7
dispute [1] 302/5
DISTRICT [4] 133/1 133/1 133/9 133/12
DLI [1] 133/2
docket [8] 134/4 305/17 307/3 307/3 307/5 307/6 307/10 307/12
docketed [4] 306/25 307/1 307/2 307/8
document [14] 140/20 141/8 141/11 143/14 147/24 148/1 148/3 148/3 153/13 153/14 153/19 259/14 259/17 263/12
documents [3] 310/12 310/13 310/16
dollar [2] 140/8 141/6
done [20] 135/6 141/3 147/23 156/8 157/5 215/25 216/13 217/16 230/10 235/19 245/11 248/18 248/23 249/12 253/6 253/10 287/15 308/7 309/13 314/20
door [3] 191/20 191/22 199/5
DORA [1] 133/9
double [2] 165/14 316/2
double-check [1] 316/2
doubt [1] 208/2
down [14] 141/24 210/16 210/25 211/17 221/4 221/10 224/10 236/21 237/2 254/8 260/9 289/16 309/12 314/20
downtown [3] 174/8 211/13 211/15
drive [6] 192/6 192/8 192/15 265/10 313/4 313/5
drive-arounds [2] 192/6 192/15
driver [6] 194/22 194/23 195/1 195/3 197/5 282/9
driving [5] 161/25 196/9 196/11 203/20 240/3
dropped [2] 254/8 277/24
drove [2] 191/4 202/14
drug [3] 140/6 140/8 141/6
drugs [1] 285/12
DT [3] 279/2 279/10 279/19
due [2] 315/3 315/7
duly [1] 135/12 311/11
DWYER [8] 311/10 311/15 311/18 312/3 312/5 312/17 313/3 313/12
dying [2] 255/5 255/7

E

early [2] 175/13 182/21
earned [1] 161/5
East [4] 133/12 133/21 312/20 313/3
EASTERN [2] 133/1 133/12
easy [3] 150/19 150/20 189/22
ECF [5] 306/10 306/13 306/16 306/23 309/8
Eddie [1] 179/5
Edgecombe [2] 167/6 167/8
effect [3] 245/5 245/7 246/11
effort [1] 206/6
eight [1] 256/22
either [5] 154/8 162/5 183/21 227/3 294/24
electronic [1] 309/25
elicit [2] 207/5 302/8
elicited [2] 207/21 300/18
Email [1] 133/24
Emil [3] 266/12 266/18 266/19
emphasize [1] 225/16
employed [2] 312/5 312/7

emptied [2] 243/19 243/21
entered [2] 146/23 305/12
enters [1] 311/6
entire [15] 142/6 150/14 151/5 151/16 152/11 153/3 158/12 159/6 225/9 225/20 227/7 256/25 260/4 293/5 293/18
entirely [2] 296/8 316/8
entirety [1] 158/9
entitled [1] 249/17
entry [4] 294/1 305/17 307/10 309/21
Eric [66] 171/14 171/17 172/4 172/7 172/10 173/2 173/4 173/6 173/11 173/21 173/23 174/3 174/24 175/2 175/4 175/9 177/20 182/25 183/5 184/5 188/25 190/3 190/6 190/13 194/20 194/23 202/3 206/17 206/19 210/16 210/18 210/22 210/23 210/25 211/2 211/5 211/10 211/12 211/18 211/19 212/16 212/23 213/4 213/5 214/9 214/14 214/17 214/25 215/3 223/25 231/19 231/24 238/18 239/6 239/14 239/23 254/5 254/11 254/18 255/5 255/16 255/23 297/16 301/3 302/4 303/13
errands [1] 282/10
ESQ [2] 133/11 133/17
ESQUIRE [2] 133/18 133/20
establish [1] 209/9
estimate [2] 209/14 248/10
ET [4] 263/4 278/7 279/14 279/21
event [4] 159/4 166/1 207/11 305/6
events [3] 201/5 201/9 207/5
evidence [25] 143/9 143/14 144/3 155/10 156/24 157/1 157/5 157/6 163/5 164/4 164/16 207/12 225/23 276/1 279/5 279/6 279/11 279/20 279/22 289/20 289/22 291/2 294/22 310/24 311/1
evidently [1] 242/21
ex [1] 306/2
ex-wife [1] 306/2
exact [6] 188/19 253/3 258/14 261/19 261/20 275/10
exactly [8] 151/9 170/9 175/13 185/13 192/2 193/7 194/12 196/17 217/12 223/25 237/12 246/13 261/18 262/8 276/22 276/22 294/5 297/22
examination [51] 135/1 135/19 135/24 136/5 136/7 139/23 167/1 186/22 189/16 199/7 201/17 204/21 206/9 206/19 206/25 207/16 210/12 210/14 219/1 219/10 223/13 232/22 233/10 234/10 241/18 245/1 247/5 248/11 249/13 250/1 250/4 260/12 261/21 264/17 276/19 280/12 280/21 280/24 281/4 281/19 282/14 283/4 283/7 287/19 288/20 295/13 298/6 300/17 300/18 308/17 312/1
examine [5] 290/15 290/16 292/4 295/23 296/6
examined [3] 135/12 299/14 311/11
examining [1] 303/1
example [1] 310/12
except [1] 298/24
excerpt [2] 159/5 159/6
exchanged [1] 240/15
excuse [10] 151/11 175/19 178/9 186/13 186/15 193/25 201/8 211/6 225/5 252/13

Case 1:92-cr-00351-EK Document 1103-5 Filed 03/21/25 Page 65 of 367
Case 1:92-cr-00351-EK Document 1107-5 Filed 03/21/25 Page 65 of 367

**E**

excused [3] 275/13 289/17 289/18
excuses [1] 307/16
exhibit [16] 155/9 155/21 156/9 156/18
157/6 163/17 164/14 212/10 225/10
225/20 225/23 263/7 279/19 279/21
293/9 294/14
exhibits [18] 279/2 290/14 290/17
290/20 290/24 292/8 292/12 293/11
293/16 307/19 308/2 308/18 309/24
310/5 310/7 310/24 316/8 316/9
exits [1] 314/21
expect [1] 156/3 164/11 249/15
expecting [1] 308/7
expediency [1] 291/16
explain [12] 146/4 158/13 187/1 187/2
191/4 204/23 223/1 232/13 290/20
295/14 296/3 307/14
explaining [2] 163/11 290/23
express [1] 148/10
expressed [2] 235/3 235/9
extent [4] 158/5 225/16 293/18 301/2
exterior [4] 313/13 313/16 314/15
314/17
extrinsic [1] 300/16

**F**

F-1 [1] 312/22
F-2 [1] 312/22
F-3 [1] 312/22
face [2] 221/15 281/17
facility [3] 167/9 167/9 167/10
facing [2] 218/8 218/13
fact [17] 144/3 150/6 152/18 177/9
188/25 204/19 207/18 235/3 248/12
267/4 269/11 275/24 289/4 289/25
295/3 297/19 298/7
faction [1] 218/14
factors [1] 300/19
factual [2] 206/3 208/2
failed [1] 161/17
failure [1] 161/10
fair [4] 142/6 150/13 150/15 151/3 166/3
207/24
fall [1] 275/9
Fama [5] 297/12 303/16 303/17 304/6
306/3
familiar [1] 293/10
family [20] 138/20 145/5 145/6 145/7
148/12 167/19 176/9 176/14 177/2
177/9 179/19 181/7 269/13 273/15
274/13 284/25 285/24 286/14 286/17
286/24
far [4] 249/18 283/19 283/21 307/20
fashion [3] 158/17 158/21 302/25
faster [2] 249/1 307/20
Fat [2] 224/12 260/11
father [5] 141/14 141/14 141/21 167/15
168/10
father's [4] 139/25 140/4 168/9 190/16
FATICO [12] 133/8 134/4 134/24 210/3
248/4 280/17 292/20 293/5 300/15
315/1 316/6 316/10
fault [2] 309/14 309/22
faulty [1] 207/10
Fax [1] 133/23
FBI [2] 134/8 230/7
February [2] 193/10 269/17
Feds [1] 278/4
fell [1] 245/18

**FERNICH [3]** 133/18 134/13 299/3
feud [1] 176/5
few [12] 137/4 137/9 137/10 138/18
169/7 203/6 203/8 220/4 234/20 234/22
253/1 253/2
Fifi [2] 179/9 284/1
figure [1] 269/22
figured [1] 170/17
figuring [1] 221/11
file [3] 306/10 306/12 306/15
filed [2] 135/5 305/18 305/19 306/23
filing [2] 290/2 309/7
finder [2] 204/19 207/18
fine [9] 157/2 205/2 225/19 276/16
306/14 309/1 309/2 310/2 315/21
finish [9] 149/14 149/16 149/18 203/23
208/11 248/11 259/7 259/25 260/6
finished [2] 148/19 259/8
finishes [6] 141/25 142/1 220/25 234/14
239/19 260/1
fire [4] 232/11 233/1 233/15 245/13
fired [1] 243/10
firing [2] 232/19 233/18
first [29] 134/24 135/12 141/18 151/23
155/8 159/15 169/7 169/17 171/14
182/14 182/15 189/4 198/18 200/24
207/6 214/24 224/2 241/9 241/9 249/11
254/7 259/9 259/16 263/5 270/21 272/6
274/5 291/7 292/7 311/11
fit [1] 294/22
five [4] 184/3 203/25 266/7
flew [1] 240/13
flip [2] 165/6 165/10
Florida [3] 148/20 162/15 162/16
flying [1] 245/13
focus [1] 193/14
focusing [1] 193/16
folks [1] 208/21
follow [1] 143/17
followed [1] 181/24
following [4] 153/6 205/7 210/23 214/25
follows [2] 135/13 311/12
foot [1] 313/10
forfeiture [5] 160/7 161/5 161/7 161/18
162/24
forgave [1] 263/1
forget [3] 261/20 261/24 309/3
form [8] 138/5 143/7 176/12 197/14
198/5 198/15 221/7 288/17
format [2] 309/25 309/25
forth [1] 163/1
forward [1] 135/7 300/16 308/8
foundation [1] 294/14
four [7] 156/7 184/3 199/5 213/2 248/18
308/4 308/11
frame [9] 154/20 154/21 192/9 222/16
253/3 254/3 271/12 271/14 271/16
Frank [39] 137/1 147/7 147/10 150/25
163/12 164/24 168/17 168/19 169/4
169/16 170/19 172/2 172/4 172/6
174/20 177/13 177/16 177/17 177/21
183/1 194/1 194/3 195/20 197/10
197/17 212/7 222/5 222/5 250/11
258/15 258/19 260/16 268/21 270/6
282/15 284/6 285/13 289/5 303/13
Frankie [20] 138/23 139/4 139/7 139/10
139/11 170/17 172/9 185/16 185/18
202/3 214/1 223/24 227/20 260/15
260/20 283/22 284/1 285/8 285/9

**Frankie's [1]** 190/16
Jankies [1] 296/6
frankly [4] 204/21 206/4 307/19 308/15
Franks [1] 215/4
free [4] 143/10 156/12 158/1 205/4
Friday [1] 312/18
friend [12] 154/16 168/1 169/18 169/21
178/25 268/3 268/4 270/6 271/9 271/17
285/14 289/7
friends [1] 169/22
front [12] 152/5 153/18 187/2 191/12
191/13 191/14 191/20 191/22 196/12
228/18 297/5 313/6
funds [1] 174/3
funeral [6] 217/4 217/17 217/19 236/9
236/15 237/7
Fusco [3] 178/15 178/17 286/4
Fusco's [1] 178/21

**G**

Gambino [2] 138/20 139/11
game [1] 295/9
games [5] 264/12 264/18 265/1 265/12
265/15
Garafolo [1] 179/5
garage [6] 227/1 246/4 265/11 266/4
270/8 270/11
garbage [4] 189/9 189/19 191/10 191/12
gather [2] 135/1 204/1 290/2
gathered [1] 294/22
geez [1] 297/6
general [1] 276/11
generally [1] 294/19
gettin' [1] 253/6
Giglio [4] 305/14 305/20 305/21 305/23
Gioeli [2] 176/21 176/25
girlfriend [1] 162/19
gist [1] 207/23
given [6] 138/6 207/11 282/24 296/3
299/20 304/16
gloves [11] 246/17 246/18 246/19
246/24 247/1 247/2 247/3 247/6 247/7
250/8 250/8
gmail.com [1] 133/24
Goo [1] 291/24
Goo [1] 178/18
government [67] 133/11 135/11 136/8
136/21 137/2 142/22 143/22 146/21
147/16 147/16 147/17 148/4 148/6
148/11 149/1 150/2 150/7 155/18
158/17 161/14 161/23 161/24 163/4
164/4 172/6 198/3 198/8 204/4 207/10
208/9 208/24 247/12 248/25 257/5
275/24 276/12 280/11 281/11 281/14
283/11 284/8 284/18 285/16 285/19
286/6 286/8 287/6 289/20 290/3 290/21
291/2 291/20 296/2 296/7 298/15 299/8
301/8 301/14 302/1 304/8 304/15
305/12 305/24 307/13 314/23 315/24
316/13
government's [11] 134/24 142/25 144/2
290/6 291/18 292/1 304/10 305/14
306/23 308/21 315/7
grandmother [1] 236/21
great [2] 290/12 310/10
ground [1] 209/10
group [1] 174/3
guards [2] 236/18 237/7
Guerra [56] 147/7 147/10 158/17 158/19
158/24 168/19 174/20 177/13 177/16

## G

Guerra... [47] 177/21 183/1 190/9
190/10 193/23 194/1 194/3 197/10
197/17 208/6 208/15 211/4 211/7 212/7
221/25 222/1 225/2 225/9 226/19
226/23 233/10 233/12 235/25 258/19
268/21 270/6 284/6 284/11 289/4 289/5
291/11 292/12 293/13 293/15 295/17
295/19 297/7 297/16 299/14 300/6
301/9 303/13 303/18 303/20 304/1
305/6 305/8

Guerra's [12] 137/1 150/25 195/21 212/7
223/13 232/18 237/19 245/3 250/11
250/12 258/15 299/20

guess [7] 145/13 215/2 230/25 243/15
254/25 255/21 265/6

guidelines [2] 295/6 299/5

guilty [4] 146/24 295/8 304/1 304/3

gun [24] 174/1 186/5 194/14 194/21
195/13 195/15 195/19 195/21 196/21
196/24 197/1 197/2 197/4 197/5 197/20
197/23 198/18 243/20 243/21 245/13
246/14 251/5 251/8 251/11

gunfire [1] 240/15

guns [48] 137/23 138/10 138/18 178/1
178/10 178/14 185/23 185/24 185/25
193/3 193/6 193/17 193/18 193/19
193/21 193/22 193/24 194/2 194/3
194/4 194/5 194/6 194/10 194/10
194/11 194/12 196/13 196/15 202/24
227/15 227/18 227/19 227/23 227/25
228/10 228/13 229/2 229/9 229/10
229/11 229/13 229/15 229/24 231/12
231/22 232/11 232/24 233/15

guy [17] 138/22 138/22 139/7 139/11
139/18 173/17 178/18 191/10 224/12
224/12 235/20 260/10 264/12 264/19
274/16 275/9 278/4

guys [6] 144/17 145/22 145/24 183/15
185/7 287/5

## H

hair [3] 183/11 183/20 183/23

half [2] 183/14 248/12

halfway [2] 167/4 167/8

hand [3] 163/24 163/25 311/7

handcuffed [2] 237/15 237/16

handguns [2] 138/11 138/12

handling [1] 235/15

hands [3] 138/15 228/15 228/17

handwriting [1] 230/24 230/24 231/2

handwritten [1] 230/12

hang [2] 173/10 263/20

hanging [4] 177/13 180/12 250/19
266/17

happy [3] 275/13 277/4 292/3

harassing [2] 255/10 255/12

hard [6] 148/11 148/12 309/23 310/1
310/4 310/6

hat [13] 240/12 240/13 245/13 245/15
245/17 245/23 245/24 246/16 246/19
246/21 250/21 250/22 250/23

head [9] 139/25 140/4 141/15 141/17
143/5 143/6 189/19 241/9

headed [2] 207/18 207/19

headphones [4] 157/17 157/23 263/17
263/19

heard [25] 159/14 159/21 164/22 174/17
177/12 177/25 178/10 178/12 178/13
180/18 206/22 218/12 233/20 259/22

259/24 260/8 260/8 263/24 266/14
266/25 297/4 298/3 298/6 298/8
301/18

hearings [2] 151/19 207/17

hearsay [2] 165/14 165/24

helpful [4] 153/15 204/17 204/24 302/12

Henry [3] 211/15 211/16 213/13

hiatus [1] 290/1

hiding [1] 177/25

Hill [1] 274/16

hit [7] 143/5 197/3 198/7 243/21 251/9
251/12 251/21

hole [1] 295/5

home [35] 142/12 142/14 162/16 177/1
177/4 178/14 180/7 180/8 180/15
181/12 181/15 181/23 181/24 188/7
202/16 219/18 219/19 229/12 231/10
238/8 238/15 254/23 272/2 274/21
275/2 313/3 313/16 313/17 313/21
314/4 314/6 314/9 314/12 314/15
314/19

home-made [2] 229/12 231/10

homicide [3] 206/7 207/13 301/4

Honor [172]

Honor's [1] 300/9

HONORABLE [1] 133/9

hope [1] 248/23

horrible [1] 230/15

hour [3] 187/6 254/4 289/25

hours [4] 158/14 158/14 158/14 248/13

house [29] 162/13 162/14 162/22 167/4
167/8 168/8 185/9 185/11 185/20 189/9
189/17 191/4 191/12 191/13 191/14
191/19 192/1 192/18 192/20 202/17
221/23 228/5 232/25 241/25 313/8
313/9 313/11 313/12 313/13

houses [2] 178/1 178/10

hundred [13] 145/23 159/21 174/23
231/3 253/18 258/24 258/25 259/1
259/2 259/5 262/7 262/12 281/25

hundred percent [5] 145/23 159/21
231/3 253/18 281/25

hundreds [2] 155/15 158/15

hung [6] 168/11 168/14 168/25 172/2
174/15 174/18

hunts [1] 187/19

hurry [1] 220/8

hurt [1] 242/4

## I

Iborti [4] 297/8 300/24 300/25 301/19

idea [2] 282/3 314/18

identified [1] 294/3

imagine [1] 306/25

immediately [1] 169/14

impeachment [1] 300/16

implicate [4] 276/8 283/5 283/6 303/14

implicated [1] 303/12

import [4] 204/20 206/25 290/20 290/23

important [1] 207/4

in Queens [1] 202/2

incident [8] 185/14 186/17 189/8 189/11
189/14 189/23 198/18 203/20

incidents [1] 186/19

include [1] 316/10

including [1] 297/22

income [1] 161/4

inconsistencies [1] 207/14 208/2

inconsistent [1] 151/14

indeed [2] 206/14 207/19 293/24

indicate [1] 153/16

indicating [1] 150/21

indict [1] 275/25

indicted [1] 218/6

individually [1] 312/22

individuals [4] 146/6 146/20 147/6 273/5

inducted [3] 268/6 269/11 274/13

information [16] 141/9 166/2 282/24
283/12 283/17 285/20 285/23 286/5
286/12 286/16 286/20 286/23 287/2
287/7 302/4 303/11

informed [1] 305/24

initial [1] 308/21

inmate [1] 153/20

innocent [2] 242/5 242/25

inquire [2] 210/10 311/25

inquiry [2] 277/17 306/20

instead [3] 146/14 302/13 302/15

instruct [1] 247/11

instructions [2] 251/19 291/22

intend [3] 156/15 159/10 248/24

intended [3] 290/14 303/24 306/8

intending [4] 292/18 293/5 302/25 306/4

interest [3] 155/21 256/10 256/12

interested [3] 212/20 282/16 310/15

internal [2] 176/11 176/14

interpretation [1] 291/9

interrupt [1] 228/20

intervenes [1] 185/8

interviewed [1] 154/3

introduce [3] 164/4 164/9 164/9 164/15
172/4 255/11 255/24 290/14

introduced [3] 172/5 172/7 172/8

introducing [2] 164/6 164/13

invasions [2] 142/12 142/14

investigating [1] 303/10

investigation [1] 304/13

investigator [2] 312/6 312/13

involved [24] 170/14 170/19 171/3 171/9
173/4 174/25 180/6 180/12 182/14
183/5 184/9 184/10 184/11 184/12
184/13 193/23 194/1 200/3 213/1
235/12 284/19 289/4 302/9 303/10

involving [1] 186/17

IRIZARRY [1] 133/9

Island [2] 265/4 265/19

issue [5] 186/14 225/16 276/19 305/22
315/1

itself [1] 141/10

## J

jail [30] 148/11 154/11 163/15 166/10
166/13 166/16 166/20 168/3 169/9
170/2 170/13 171/14 171/20 173/11
176/6 176/8 176/14 216/17 218/1 218/7
236/1 236/15 254/24 255/2 255/4
255/20 256/22 258/6 267/1 267/24
January [5] 154/25 163/11 163/23
164/20 164/24

January 21st [4] 163/11 163/23 164/20
164/24

jaw [2] 139/18 140/2

jeep [2] 190/16 190/17

Jim [1] 287/4

job [8] 160/10 160/12 160/15 160/18
160/20 160/21 160/25 253/10

Joe [48] 174/10 174/13 174/14 176/21
181/25 183/7 187/10 187/13 188/18
189/1 189/5 189/16 192/6 192/13
192/18 192/20 192/25 193/14 193/16

## J

Joe... [29]  195/11 198/7 198/7 200/14
203/9 214/24 215/11 215/14 215/19
216/24 217/21 221/14 222/22 224/2
234/3 234/25 236/12 238/7 238/12
240/23 240/25 243/18 243/21 252/11
252/15 252/23 252/24 254/6 254/12
Joey [24]  178/15 178/17 182/5 200/25
206/17 210/15 210/19 212/19 212/19
213/19 213/22 213/22 213/23 222/7
222/10 224/12 231/20 231/25 231/25
239/8 243/14 243/23 253/19 286/21
John [32]  174/12 175/25 176/2 185/24
186/1 186/2 190/2 190/24 190/25 191/2
194/15 194/17 194/18 196/8 200/9
200/10 226/5 226/25 238/18 238/18
243/8 243/16 243/18 243/25 244/1
246/5 250/7 250/13 286/21 287/4
303/12 303/13
Johnny [24]  174/7 174/7 175/5 175/5
184/6 185/14 190/10 190/11 190/13
195/12 195/12 196/8 196/11 196/12
196/14 196/14 196/16 196/17 202/3
243/5 243/23 243/24 245/4 250/21
joined [1]  134/8
joint [1]  307/23
JoJo [1]  176/20
Joseph [8]  153/25 297/8 297/18 300/23
300/25 303/11 304/16 304/17
Jr [5]  147/7 147/12 166/10 166/20 268/5
Jr.'s [1]  268/1
judge [39]  133/9 150/1 150/2 154/13
160/15 160/20 161/4 161/9 161/15
161/17 165/19 204/5 209/24 225/15
228/22 248/16 248/21 275/12 276/5
276/17 276/23 298/11 298/15 299/1
299/4 299/16 302/16 303/6 304/4
306/14 306/22 307/7 307/12 310/2
310/11 310/17 310/18 315/5 315/15
judges [2]  152/5 306/14
July [2]  267/8 267/10
jumped [2]  190/14 243/5
June [7]  199/17 217/13 267/4 267/6
267/7 267/10 305/15
June 26th [3]  267/4 267/6 267/7
June 29th [1]  199/17
junior [5]  174/10 179/4 179/7 179/13
217/8
Junior's [1]  167/15
jury [3]  137/17 178/6 277/8

## K

KEDIA [25]  133/20 134/18 135/20
149/16 167/2 170/22 186/14 203/22
204/10 204/18 206/5 207/5 207/15
210/10 249/11 249/12 250/1 277/17
291/18 307/23 308/25 312/2 317/4
317/5 317/7
keep [6]  249/10 256/14 256/16 288/20
291/21 312/22
kept [2]  226/24 226/25
kid [1]  139/18
kid's [1]  141/14
kidding [1]  162/2
kids [1]  174/8
kill [22]  182/22 182/25 183/4 185/21
187/12 187/20 189/5 200/11 203/1
206/10 206/16 209/6 215/10 215/11
236/12 242/8 254/6 254/12 304/16
305/10 306/4 313/23

killed [18]  177/23 181/5 181/25 195/18
200/13 208/24 215/5 229/21 236/3
242/25 253/20 255/16 255/19 283/20
283/21 284/11 285/2 285/8
killing [1]  203/14
kinds [3]  229/13 288/12 288/13
knowing [1]  170/17
knowledge [2]  293/13 302/5
known [1]  284/21
knows [1]  276/8

## L

laid [1]  183/14
largely [3]  292/9 301/22 302/4
Larry [1]  286/21
late [1]  292/7
latitude [1]  204/22
laundry [1]  302/15
law [4]  153/6 287/4 299/5 310/5
laws [1]  287/25
lawyer [1]  144/8
lawyer's [1]  291/8
lay [1]  191/8
laying [2]  177/22 213/19
lead [1]  212/18
leaders [1]  177/6
leading [1]  138/6
learn [14]  144/2 144/4 144/4 144/7
144/11 144/14 144/18 144/22 145/21
164/6 176/13 271/22 284/3 285/3
learned [6]  145/18 146/19 176/8 271/17
284/5 285/4
least [8]  138/4 138/5 138/7 165/14
184/21 216/14 299/8 301/19
leave [8]  246/5 246/9 246/14 250/12
250/17 251/7 251/8 316/7
leaving [1]  245/25
leeway [1]  134/5
left [10]  248/15 250/6 250/13 250/19
250/22 251/3 251/5 252/4 252/5 275/16
legal [2]  206/2 206/3
legitimate [6]  277/20 277/23 278/2 278/3
281/21 281/23
Lemons [1]  134/9
lending [2]  139/16 260/21
Lenny [3]  260/11 260/20 261/10
less [1]  166/13
letter [18]  147/11 161/15 289/23 290/22
297/3 297/5 305/14 305/20 305/21
306/6 306/7 306/8 306/23 306/24 307/7
307/11 307/13 309/18
letters [2]  135/4 289/24
level [1]  291/14
lie [4]  150/19 151/17 152/23 281/10
lied [7]  150/21 150/24 151/18 152/22
152/25 153/1 281/14
lies [5]  150/22 151/4 151/6 281/5 281/8
life [14]  142/6 151/4 151/5 151/16
180/13 181/17 181/19 186/2 206/6
242/14 242/15 242/17 242/21 281/18
lifetime [1]  281/5
LIFSHITZ [5]  133/13 134/7 209/3 280/21
317/4
light [3]  224/8 241/21 248/12
limit [1]  299/9
limited [3]  180/1 205/3 302/4
Limousine [1]  170/11
LINDA [1]  133/22
LindaDan226 [1]  133/24

killed [18]  177/23 181/5 181/25 195/18
213/11 223/16 232/23 251/1 258/21
line 11 [1]  232/23
line 21 [1]  251/1
line 22 [1]  212/14
line 24 [1]  258/21
line 6 [1]  213/11
line 7 [1]  223/16
lines [1]  283/10
list [4]  147/17 147/19 293/7 302/15
listen [2]  164/17 199/11
listing [1]  302/13
load [3]  264/11 264/18 265/12
loaded [1]  196/22
loan [16]  256/1 256/14 256/19 256/20
256/22 256/25 257/5 257/7 257/8
257/23 259/15 260/17 261/1 261/6
261/7 262/18
loaned [2]  260/19 260/23
loansharking [1]  186/17
locate [1]  188/3
location [2]  188/14 183/22
log [1]  294/1
Lollipop [1]  286/10
longest [1]  308/16
looked [8]  202/14 221/18 221/20 221/24
222/10 223/10 224/3 224/10
looks [4]  222/14 222/15 266/5 314/16
lost [2]  199/15 219/1
loud [1]  292/13 311/22
Louise [1]  297/6
Luccheses [1]  173/20
lunch [3]  209/16 247/9 248/20
lying [3]  151/16 197/17 214/18

## M

ma'am [4]  141/25 299/18 300/1 311/17
MAC [19]  186/2 186/4 196/16 196/20
196/20 206/24 207/1 207/8 209/6
229/11 229/22 231/10 231/17 232/14
243/11 245/25 246/5 251/5 297/23
MAC-10 [9]  186/2 186/4 196/16 196/20
196/20 245/25 246/5 251/5 297/23
machine [5]  186/5 196/21 251/5 251/8
251/11
Mack [1]  186/1
mad [1]  260/21
Maggio [1]  286/21
major [1]  174/1
male [1]  294/4
man [1]  294/6
Mancusi [2]  284/22 285/7
Mancuso [1]  284/21
Manny [1]  286/21
MARC [2]  133/18 134/13
March [2]  193/10 217/13
mark [2]  156/19 312/22
marked [10]  147/20 153/12 155/21
155/23 230/2 259/13 265/24 310/25
312/15 312/25
marking [2]  263/4 278/7
Martin [3]  138/23 138/25 139/4
mask [15]  246/22 246/23 247/6 250/7
250/12 250/13 250/19 250/22 250/24
251/6 251/7 251/21 251/25 252/3 252/5
Matera [3]  200/9 200/10 226/5
Matera's [1]  227/1
material [3]  299/10 299/21 305/23
Matsumoto's [1]  307/7
matter [2]  165/23 301/12

Case 1:92-cr-00351-EK Document 208-11 Filed 09/11/18 Page 75 of 85 PageID #: 4225

## M

matters [1] 164/7
Matthe [1] 297/9
Matthew [4] 297/9 297/10 297/11 302/11
MAURICE [2] 133/17 134/16
May 12th [1] 165/5
MCC [2] 297/17 304/19
McLaughlin [32] 144/21 144/24 144/25
146/7 154/16 154/24 155/3 155/15
155/17 156/21 156/22 157/11 159/17
159/23 163/10 163/23 164/23 165/4
262/14 262/16 262/25 263/10 264/1
273/4 273/17 274/1 275/1 275/8 277/19
287/24 288/9 288/24
mean [17] 145/4 160/23 168/2 172/17
196/1 216/7 231/16 232/13 235/11
243/16 253/13 265/21 276/18 291/9
302/12 315/4 315/6
meaning [12] 149/7 162/9 172/20 179/11
185/18 191/18 202/15 211/2 216/14
233/15 236/1 301/3
means [3] 162/10 167/10 180/21
meant [2] 306/11 306/11
mechanical [1] 133/24
meet [20] 136/8 136/10 169/6 169/23
170/4 171/17 171/23 173/11 173/17
175/5 175/8 176/4 200/21 200/23 255/5
255/7 255/9 255/10 272/3 272/13
meeting [7] 169/4 173/18 206/19 212/17
272/7 272/8 272/11
member [3] 177/2 224/18 269/13
memo [1] 142/25
memorandum [3] 315/2 315/7 316/6
memory [1] 207/11
mention [1] 299/2
mentioned [2] 298/5 306/6
Mercedes [3] 162/1 162/6 162/9
Mercedes-Benz [3] 162/1 162/6 162/9
message [1] 297/17
met [23] 137/5 144/8 152/7 167/14
169/11 169/17 171/9 171/13 175/5
176/5 177/1 177/2 177/4 177/5 202/1
202/3 202/14 236/20 259/9 261/24
271/25 272/1 285/22
Miccio [3] 174/12 174/13 174/14
MICHAEL [77] 133/6 134/5 147/7
147/12 163/5 163/9 163/14 165/1 165/6
165/11 166/3 169/23 206/17 207/4
208/3 210/15 210/18 210/24 212/15
215/21 215/24 217/15 227/24 228/2
228/4 228/8 228/25 252/11 252/15
253/4 253/14 253/25 254/1 256/7
258/13 258/16 258/23 261/14 262/3
265/5 265/6 266/14 268/9 268/11
268/13 268/14 269/3 269/5 269/7 270/9
272/7 276/10 281/20 281/23 282/3
282/7 282/10 282/16 283/5 283/15
284/11 284/18 285/14 285/16 285/20
286/25 287/7 287/9 298/4 301/23
301/25 301/25 302/2 302/6 302/9
303/14 304/18
Michael's [4] 165/6 169/18 169/20 298/5
Michelle [5] 297/12 303/16 303/17 304/6
306/3
Miciotto [3] 224/12 224/14 224/17
microphone [2] 290/9 311/22
mid [7] 154/25 166/14 166/14 193/10
210/1 267/17 280/5
mid-1988 [1] 166/14

mid-1989 [1] 166/14
mid-1990s [1] 254/25
mid-2009 [1] 254/25
mid-afternoon [2] 210/1 280/5
middle [1] 188/20
might [9] 172/8 194/7 204/17 221/16
250/21 259/24 272/5 273/13 302/19
Mike [1] 277/20
millions [1] 274/15
mind [6] 165/23 199/14 199/20 275/20
275/23 288/20
mine [1] 145/15
mini [1] 187/3
minute [6] 135/5 180/7 180/8 204/2
275/15 309/21
minutes [6] 187/7 202/9 204/1 249/16
257/19 280/6
missed [1] 254/7
mistake [3] 197/21 197/22 197/24
mix [1] 300/19
moment [7] 181/23 195/23 245/12
246/12 246/15 295/11 303/7
moments [1] 203/8
money [16] 139/8 139/16 146/8 146/9
161/2 162/21 256/7 258/22 260/20
260/22 261/14 261/17 261/25 262/4
262/6 262/25
monies [1] 262/13
Monte [2] 174/10 176/21
month [4] 161/19 256/12 270/19 270/21
months [8] 160/4 188/16 215/4 226/8
253/2 267/13 267/21 270/20
morning [19] 134/10 134/11 134/13
134/15 134/17 134/18 134/20 134/21
134/22 135/14 135/17 136/2 136/3
187/6 202/6 210/4 248/5 260/4 280/18
most [2] 177/11 310/11
motive [1] 165/24
mouth [2] 228/15 228/18
move [18] 135/7 137/17 151/15 157/1
157/3 165/25 187/7 198/23 207/23
209/11 217/23 225/9 227/12 233/25
279/5 297/1 308/8 310/24
moved [8] 157/5 189/4 219/11 219/18
219/20 226/24 279/6 311/1
moving [1] 227/7
Mr. Adam [1] 290/16
Mr. Cuotolo [2] 201/15 206/6 207/2
Mr. Curcio [2] 171/23 213/13
Mr. Curtis [1] 275/9
Mr. Dwyer [5] 312/3 312/5 312/17 313/3
313/12
Mr. Fernich [1] 299/3
Mr. Guerra [3] 235/25 303/20 304/1
Mr. Guerra's [5] 223/13 232/18 237/19
245/3 250/11
Mr. Lifshitz [1] 280/21
Mr. Martin [1] 138/25
Mr. McLaughlin [12] 155/3 155/15
155/17 156/21 156/22 157/11 159/17
159/23 273/4 275/1 275/8 277/19
Mr. Michael [1] 304/18
Mr. Persico [16] 134/14 134/19 134/21
206/20 206/22 212/2 208/5 215/18
235/25 237/22 237/23 252/18 252/22
293/23 295/4 301/15
Mr. Russo [107]
Mr. Russo's [4] 151/12 179/18 303/23
307/2
Mr. Scopo [6] 201/13 206/10 239/4

239/5 239/23 305/11
Mr. Secarz [1] 206/2
Mr. Sercarz [1] 298/23
Mr. Sparaco [6] 169/13 169/19 170/12
170/13 171/2 171/5
Mr. Tagliavia [5] 159/24 273/4 275/2
275/4 277/20
Mr. Tormey [1] 303/9
Ms. Kedia [17] 135/20 149/16 170/22
186/14 203/22 204/10 206/5 207/5
207/15 210/10 249/11 249/12 250/1
277/17 291/18 307/23 308/25
Ms. Sarita [1] 149/14
muddies [1] 228/16
multiple [7] 185/1 188/23 203/3 203/5
229/3 305/25 306/2
Munchie [2] 235/20 236/4
murder [71] 142/8 142/10 154/1 154/5
170/14 171/3 171/9 175/15 175/17
175/20 182/5 182/6 182/8 182/12
182/15 184/11 186/14 193/4 198/19
198/21 198/24 200/14 201/11 201/13
206/11 208/8 208/15 208/19 218/13
222/5 222/20 222/22 223/4 225/25
226/3 226/13 226/14 234/25 234/25
235/4 235/12 238/6 238/10 246/10
253/5 253/14 253/17 253/25 283/12
284/4 284/9 284/19 289/2 293/6 293/18
297/18 297/19 297/20 301/2 302/6
302/10 303/10 303/12 303/21 304/2
304/11 304/17 304/20 304/21 304/24
305/9
murdered [1] 223/17
murders [7] 171/6 174/25 207/22 218/9
283/13 283/14 305/25
must [1] 267/9

## N

Nah [1] 254/3
nail [1] 241/9
name [20] 135/15 138/23 170/23 171/14
173/17 235/20 249/11 249/11 260/11
266/12 266/14 266/18 271/21 275/25
277/24 284/21 286/10 286/22 298/5
311/14
named [3] 134/9 264/13 264/19
nature [1] 300/16
near [4] 170/8 171/24 203/4 250/9
necessarily [2] 302/2 313/6
necessary [2] 233/21 290/15
necessity [1] 302/1
need [14] 141/25 142/1 158/18 199/21
203/22 204/25 221/3 239/18 270/2
290/16 290/20 293/20 306/12 312/21
needed [2] 151/17 151/18
needing [1] 149/1
neglected [2] 310/23 310/24
neighborhood [1] 177/14
nervous [1] 236/6
never [20] 152/22 152/22 152/25 153/1
153/2 153/2 153/3 159/21 160/19
169/11 187/23 188/2 188/5 200/8 235/4
235/9 254/13 282/7 292/18 293/8
news [1] 177/12
next [9] 166/22 187/22 206/15 206/18
212/23 213/3 244/2 278/8 296/9
nice [5] 191/6 191/7 191/8 307/9 311/22
Nicki [2] 178/22 178/23

Case 1:93-cr-00947-BB2 Documents83 Filed 08/19/21 Page 382 of 635 PageID 371

## N

night [28]  167/12 182/5 182/6 182/8
182/12 198/19 198/21 198/24 222/5
222/20 222/22 223/3 223/8 223/24
224/21 225/25 226/14 227/24 228/1
228/2 228/5 238/6 238/10 238/12
245/21 303/21 304/20 304/23
nine [1]  153/25
Nissan [1]  240/1
nobody [6]  172/25 180/21 185/8 208/21
216/19 295/14
non [2]  165/24 309/10
non-hearsay [1]  165/24
non-objections [1]  309/10
none [1]  299/7
noon [2]  204/1 204/8
normally [1]  260/23
note [1]  309/5
notebook [1]  248/15
noted [2]  165/20 248/2
notes [3]  230/5 230/11 230/12
nothing [8]  216/17 221/4 239/15 247/13
278/4 280/4 282/9 289/13
noticed [1]  239/23
November [9]  267/18 267/19 267/20
267/23 315/1 315/3 315/7 315/11
315/13
November 2008 [2]  267/20 267/23
number [35]  134/4 135/4 137/6 137/18
138/14 138/14 142/10 144/5 145/18
149/24 151/20 155/9 156/9 156/18
187/18 193/23 193/24 194/1 194/2
198/7 212/10 223/14 252/10 252/14
258/14 266/7 273/3 290/13 290/17
290/19 297/22 305/17 307/3 307/10
307/10
numerous [2]  305/10 305/24
NYPD [1]  293/4

## O

o'clock [2]  209/25 315/14
oath [5]  135/18 210/5 249/25 277/16
280/20
object [8]  158/3 164/5 164/13 165/19
225/10 291/19 296/1 302/7
objecting [1]  295/21
objection [21]  143/7 155/18 156/23
164/3 165/20 166/4 176/10 197/12
198/4 214/20 225/18 279/8 279/16
288/17 291/2 293/8 295/17 295/18
298/17 298/25 313/18
objections [4]  309/10 309/10 309/15
309/17
obligated [2]  149/11 149/12
obviously [2]  279/10 290/19
occasion [14]  136/17 200/22 202/13
203/2 203/3 211/20 220/15 226/20
239/2 239/13 239/22 241/19 242/12
306/4
occasions [8]  142/10 187/15 188/23
198/8 200/11 203/5 241/19 306/2
occur [1]  304/14
occurred [5]  207/22 217/22 219/1 253/1
305/7
OCR [1]  133/22
October [16]  153/10 153/10 153/23
160/1 160/12 181/25 203/11 255/13
255/16 255/17 263/10 315/4 315/6
315/9 315/10 316/9
October 12th [2]  315/4 315/6

October 16th [1]  160/1
October 18 [1]  163/19
October 20 [1]  203/10
October 29th [3]  153/10 153/10 153/23
of -- going [1]  313/17
offer [4]  151/10 151/12 204/17 223/4
offered [3]  165/22 165/23 272/20
offhand [2]  286/11 287/5
office [1]  134/9
officer [8]  141/13 152/18 153/4 153/4
154/3 161/20 161/21 161/24
officers [5]  151/20 152/7 152/7 152/14
152/14
often [1]  136/10
old [4]  137/19 138/19 162/11 207/11
older [2]  154/17 155/5
Olivia [1]  134/9
open [8]  134/1 139/25 140/4 141/15
141/17 164/11 248/3 249/19
opened [3]  269/18 270/5 295/13
opening [5]  207/17 268/14 268/20 271/9
272/12
opportunity [6]  158/7 164/8 188/5 295/23
296/3 299/24
order [6]  236/12 298/7 301/1 301/2
304/16 309/21
ordered [4]  160/7 161/4 218/9 297/19
orders [1]  251/14
Orena [6]  176/18 177/6 177/9 181/4
181/7 181/10 218/14 224/20
organized [1]  285/21
original [1]  292/10
otherwise [2]  239/9 296/7
outside [4]  221/8 240/8 241/20 294/22
Overruled [1]  214/21
owe [2]  261/23 262/3
owed [8]  260/14 261/14 261/17 262/3
262/6 262/13 262/17 262/25
own [10]  190/4 190/5 190/7 254/15
254/15 254/17 254/19 254/19 254/20
272/23
owned [6]  162/16 169/2 265/4 265/6
266/21 270/9
owner [1]  283/16
Ozone [1]  202/12

## P

p.m [4]  247/16 248/2 316/3 316/17
pack [1]  224/5
page 10 [2]  230/2 230/20
page 2 [1]  140/21
page 206 [2]  212/9 212/14
page 209 [1]  232/22
Page 219 [1]  223/15
page 228 [1]  250/16
page 259 [1]  258/20
page 35 [1]  206/8
page 37 [1]  206/8
page 4 [1]  153/14
page 481 [1]  151/2
page 694 [1]  213/11
page 724 [1]  213/2
page 80 [1]  259/13
page 90 [1]  266/6
page 99 [1]  266/3
pages [5]  222/25 223/1 248/15 251/1
265/25
pages 735 [1]  251/1
pages 90 [1]  265/25
paid [6]  161/7 256/10 256/11 270/13

270/15 270/18
pants [1]  138/16
Pap [1]  196/14
paper [2]  257/11 302/8
paperwork [1]  161/20
Pappa [24]  174/7 175/5 175/6 184/6
185/14 190/10 190/11 191/1 191/2
194/15 195/12 196/8 196/11 202/3
238/18 243/5 243/24 243/25 244/1
303/13 304/8 304/11 305/12 305/13
paralegal [1]  134/9
park [5]  191/6 191/7 191/8 191/9 202/12
parked [2]  202/20 313/5
parking [7]  238/16 269/25 271/4 271/9
271/18 272/4 272/12
parole [21]  149/6 149/7 149/20 151/19
152/7 152/14 152/18 153/4 153/9
153/20 153/22 154/3 154/4 161/20
161/21 161/24 268/23 268/24 269/1
269/2 269/4
part [10]  157/19 184/15 242/14 242/15
242/17 242/21 251/15 254/7 261/6
308/15
participate [1]  282/1
participated [5]  235/4 284/3 304/5
305/25 306/1
particular [11]  156/2 159/1 200/7 200/14
211/19 227/13 233/22 239/13 239/22
242/12 276/12
parties [7]  225/19 249/19 291/10 291/16
295/5 296/3 316/11
passed [2]  168/1 243/15
passenger [4]  196/10 196/10 196/12
222/9
past [7]  171/6 220/20 220/21 221/11
224/6 313/5 314/17
pause [5]  249/22 302/21 303/4 303/8
313/2
pay [11]  141/16 160/7 161/4 161/10
161/18 162/24 236/21 270/12 270/15
270/17 270/24
paying [3]  161/20 270/20 270/22
PDF [3]  310/9 310/12 310/16
per [2]  260/17 260/23
percent [9]  145/23 159/21 161/4 172/18
173/3 174/23 231/3 253/18 281/25
percentage [1]  272/20
perfectly [2]  277/4 292/3
perhaps [2]  259/10 263/5
period [9]  152/11 152/19 253/1 256/23
256/25 258/23 266/17 266/25 276/5
Perkie [3]  139/5 139/6 139/6
PERSICO [107]
Persico's [5]  273/21 282/4 284/14
284/16 302/6
Persicos [2]  275/9 276/11
person [8]  139/13 154/14 154/15 171/13
266/12 266/21 293/24 301/15
personal [1]  293/13
personally [1]  256/15
perspective [1]  207/25
pertain [1]  223/3
Peter [10]  144/22 145/14 273/17 274/1
282/4 282/8 282/12 287/22 288/8
288/23
phone [2]  133/23 136/14
photographs [4]  312/17 312/19 313/14
314/16
photos [1]  312/18

Case 1:03-cr-00351-FK-K Document 8-1 Filed 08/19/21 Page 1 of 1 PageID #: 4677
Case 1:03-cr-00351-FK-K Document 47 Filed 08/18/21 Page 1 of 1 PageID #: 4677

## P

picked [1] 168/8
picture [6] 293/21 293/24 293/25 294/3 294/9 294/18
pictures [2] 221/21 221/23
pidgeon [1] 295/5
piece [4] 185/8 206/18 207/25 262/11
piled [1] 203/19
pipe [1] 143/5
pistol [4] 143/23 190/19 196/17 241/22
pistols [5] 143/4 206/24 207/2 231/6 232/6
pitcher [2] 210/9 311/24
place [11] 155/8 162/25 191/6 191/7 191/8 206/10 206/19 246/11 265/19 276/20 304/11
placed [1] 149/21
plaintiff [2] 133/4 141/9
plan [9] 190/20 190/21 206/10 206/16 206/16 234/25 246/11 264/25 265/3
planned [3] 182/15 182/25 206/11
planning [7] 158/9 158/10 159/5 182/22 202/6 203/14 292/22
play [9] 155/14 157/7 158/10 159/12 204/10 248/24 263/16 263/21 279/23
played [9] 155/7 157/9 158/3 158/17 158/23 158/25 159/13 263/22 279/24
playing [2] 158/9 164/21
Plaza [1] 133/12
plea [1] 146/24
plenty [1] 156/6
plot [1] 195/2
point [32] 146/19 166/8 166/9 170/12 178/8 179/21 180/4 192/16 193/11 193/16 206/21 209/20 215/6 215/9 215/24 217/24 227/5 227/6 236/4 236/5 236/5 243/6 254/22 261/15 261/17 268/20 269/10 277/11 280/6 292/23 294/5 301/24
pointed [4] 239/23 265/11 265/15 265/18
pointers [2] 272/14 272/15
Police [1] 191/20
porch [1] 191/20
portion [7] 151/10 151/12 156/2 164/6 164/17 297/25 298/3
portions [2] 225/12 292/13
position [7] 167/19 168/9 248/7 286/14 290/5 296/4 298/14
possible [1] 148/20
Possibly [1] 232/2
post [2] 155/5 307/25
post-hearing [2] 158/5 307/25
potentially [2] 271/8 274/18
practice [2] 306/16 306/17
precise [1] 314/14
prefer [1] 298/11
preparation [2] 157/19 183/13
prepare [2] 136/8 156/6
prepared [8] 136/16 136/19 141/11 141/12 155/13 290/13 296/6 302/22
prerogative [1] 300/9
present [6] 228/7 275/17 289/21 295/22 303/21 307/23
presented [1] 302/7
presentence [3] 186/16 309/10 309/17
presenting [1] 295/10
presided [1] 299/16
press [1] 263/21
pressure [1] 287/7

presumably [1] 141/12
pretty [6] 175/9 197/3 198/7 228/11 241/17 264/7
previous [1] 291/10
previously [6] 135/12 209/7 225/11 259/20 265/24 312/7
Preza [5] 271/18 271/20 271/21 271/24 272/16
primary [2] 297/24 305/22
printouts [1] 312/18
prison [14] 147/1 150/11 160/5 160/12 160/16 163/12 167/15 181/9 208/14 216/10 234/3 236/16 281/18 282/17
private [2] 312/6 312/12
probation [12] 140/20 141/12 151/20 152/7 152/13 153/4 309/18 316/1 316/3 316/5 316/7 316/9
problem [9] 140/15 141/19 158/11 158/21 164/2 212/25 221/16 225/15 291/25
problems [1] 219/11
proceed [1] 135/22 250/2 280/21
proceeding [3] 212/5 213/10 295/1
Proceedings [2] 133/24 316/18
produce [1] 156/4
produced [1] 133/25
proffer [1] 302/14
proffered [1] 287/6
proffering [3] 283/11 285/19 300/14
proof [1] 204/17
property [5] 266/21 310/13 313/7 314/3 314/10
proposal [1] 307/24
proposed [1] 297/2
proposing [1] 307/25
protects [1] 185/7
prove [1] 294/8
provide [2] 156/15 283/12 283/17 285/20 285/23 286/5 286/12 286/16 286/23 293/19 307/17 307/18
provided [5] 141/9 209/7 225/11 287/2 293/6
providing [1] 286/19
pull [1] 241/21
pulled [8] 200/21 200/22 201/24 238/7 238/15 240/10 241/3 241/20
pulling [2] 191/9 302/17
purchase [1] 162/12
purpose [2] 233/16 301/21
purposes [1] 180/1
pushing [1] 146/8
put [21] 138/7 161/20 228/15 246/16 246/17 246/19 247/6 250/7 250/9 263/17 265/3 265/11 265/11 267/16 292/10 292/19 294/19 294/23 295/12 308/11 314/25
putting [6] 138/5 228/17 232/14 264/25 293/8 301/22

## Q

qualified [2] 292/22 294/17
quality [1] 293/25
quarters [1] 177/9
Queens [8] 189/4 192/19 202/1 202/2 202/10 219/19 219/22 223/17
questioned [2] 153/4 235/8
questions [21] 138/6 143/11 148/3 148/5 197/6 212/1 212/8 213/7 214/12 222/21 223/3 223/5 224/24 251/20 251/24 252/8 277/5 281/19 283/3 283/8 287/11

quickly [4] 209/17 308/15 308/18 308/19
quiet [1] 307/13
quite [2] 175/6 307/16
quote [1] 206/11

## R

radio [1] 224/8
raise [1] 311/7
rat [1] 143/6
rather [8] 206/3 223/4 249/1 272/21 272/23 291/3 292/2 308/10
reach [1] 294/9
read [11] 199/25 230/11 259/2 259/16 259/18 262/20 262/21 263/13 264/4 264/7 292/13
reading [4] 143/13 147/23 223/5 225/12
ready [9] 135/3 135/23 210/10 224/8 248/6 250/2 277/17 280/22 311/25
realize [1] 143/9
really [15] 146/1 180/3 199/15 201/2 209/17 233/25 235/22 253/23 255/9 255/10 261/18 272/5 287/11 295/11 307/13
rear [1] 196/10
reason [3] 181/1 216/12 268/23
reasons [2] 216/13 295/9
rebut [1] 164/16
received [7] 157/6 181/17 225/23 229/2 279/19 279/21 297/17
recess [4] 205/6 247/10 247/16 280/10
recharge [1] 263/19
recognize [2] 221/15 312/17
recognized [4] 225/4 225/6 239/5 239/9
recollection [15] 140/25 141/5 147/23 155/16 157/10 164/23 191/24 218/24 229/1 252/21 259/19 263/6 263/25 266/9 267/11
record [16] 135/15 140/18 153/15 156/13 165/20 199/25 204/14 209/5 209/8 225/13 225/14 230/4 256/17 256/18 262/21 298/13
recorded [5] 133/24 144/18 144/20 144/22 273/4
recording [25] 143/23 144/2 145/22 155/7 155/14 156/21 157/7 157/9 157/13 157/14 157/15 159/13 163/19 163/20 163/21 163/22 164/18 164/22 263/22 263/24 279/3 279/4 280/2 303/25 306/5
recordings [12] 143/3 144/5 145/18 146/20 156/4 158/14 208/14 248/24 249/1 249/4 288/8 294/20
recross [3] 249/18 287/17 287/19
redirect [9] 158/7 158/8 249/13 280/12 280/13 280/21 280/24 288/21 289/14
refer [3] 140/21 153/13 281/20
reference [3] 301/23 301/25 302/20
referred [1] 289/23
referring [4] 149/21 272/20 282/11 292/8
refrain [1] 228/17
refresh [7] 141/5 157/10 164/22 259/19 263/6 263/24 266/9
refreshes [4] 140/24 147/23 155/16 266/11
regard [3] 299/13 300/7 300/21
regarding [2] 252/11 252/15
regular [2] 184/16 233/19
related [4] 208/14 218/8 268/3 287/24
relating [1] 208/18
relationship [1] 206/5

**R**

relax [1] 236/6
relaxed [1] 143/10
release [15] 149/8 149/10 149/21 150/2
150/3 150/10 152/10 167/9 167/10
267/13 267/16 267/19 267/21 268/9
268/10
released [4] 176/14 176/22 267/3 267/4
relevance [11] 275/11 275/18 275/19
276/9 297/2 297/13 298/6 299/2 307/15
313/18 313/19
relevant [7] 180/2 186/15 186/20 298/3
300/19 303/3 303/22
reliability [1] 293/20
remember [139]
remembers [1] 225/13
remind [6] 135/18 210/5 249/24 263/2
277/15 280/20
rent [9] 270/12 270/13 270/15 270/16
270/18 270/20 270/21 270/22 270/24
rented [1] 270/11
repaid [1] 141/15
repay [1] 262/18
repeat [3] 238/9 254/8 262/19
repeatedly [1] 137/2
repeating [1] 291/21
rephrase [2] 197/15 262/22
replacing [3] 273/19 273/20 274/2
report [6] 151/19 153/20 167/12 186/14
309/11 309/17
reported [1] 152/13
reporter [2] 133/22 141/24
reporting [3] 167/6 282/23 282/24
represent [1] 159/4
represented [2] 160/15 160/20
request [2] 290/6 291/18
requested [1] 309/11
require [2] 306/12 309/3
required [1] 150/3
requires [1] 150/6
reread [2] 199/23 199/23
respect [10] 195/11 242/7 291/18 294/2
294/12 297/4 299/20 301/6 305/23
316/10
respectful [1] 207/19
respectfully [1] 207/1
respects [1] 236/21
respond [3] 209/3 308/4 308/12
responding [1] 306/22
response [1] 308/23
responsibility [1] 309/20
rest [1] 209/11
restricted [1] 288/21
result [2] 207/3 227/18
resume [1] 247/10
resumed [1] 210/4
resumes [3] 135/10 249/23 277/13
retired [1] 293/4
returned [1] 148/20
review [1] 307/20
reviewing [3] 147/24 259/17 263/12
Reynolds [1] 286/11
Richie [1] 286/4
ridiculous [1] 308/5
RIOPELLE [1] 133/15
rip [2] 258/5 258/7
ripped [6] 257/11 257/13 257/14 257/15
257/22 258/6
rob [1] 274/15

ROBERT [3] 133/11 202/3 284/1
role [1] 302/6
Romantique [2] 170/8 170/10
RONALD [3] 311/10 311/15 311/16
room [2] 275/16 289/19
rough [1] 209/14
rounds [2] 196/22 243/10
RPR [1] 133/22
rules [2] 143/9 143/17
running [3] 251/9 251/12 251/17
Russo [138]
Russo's [8] 151/12 179/18 300/11
300/19 303/23 307/2 307/6 308/16

**S**

S-E-R-C-A-R-Z [1] 134/16
S-p-a-r-a-c-o [1] 170/25
safe [4] 177/25 178/10 274/16 315/19
sake [3] 291/15 291/24 293/4
Sal [2] 174/7 224/12
sale [2] 162/21 186/17
Sally [5] 178/20 178/21 224/12 224/14
224/16
Sally's [1] 178/19 178/20
SARITA [3] 133/20 134/18 149/14
sat [1] 237/2
Savarese [1] 286/21
saw [10] 178/13 217/6 236/9 239/4
239/14 239/15 241/5 241/20 253/24
290/2
scene [1] 297/23
schedule [1] 308/21
scheduled [3] 216/3 216/5 249/19
scheduling [2] 246/24 247/13
scope [2] 148/23 288/11
Scopo [88] 181/25 182/5 183/7 186/15
187/10 187/13 188/10 188/18 189/1
189/5 192/6 192/13 193/4 193/14
193/16 195/9 195/11 195/16 198/7
198/7 200/11 200/14 200/25 201/13
203/9 206/6 206/10 206/16 207/7
207/12 208/8 208/18 209/6 210/15
213/22 213/23 214/24 215/11 215/15
215/19 216/24 217/21 219/2 219/11
219/18 219/20 221/14 222/23 223/3
224/2 225/3 225/8 232/1 234/3 234/25
236/12 238/7 238/12 239/4 239/5
239/23 241/20 243/14 243/18 243/21
243/23 252/12 252/15 252/23 252/24
253/5 253/14 253/17 254/6 254/12
283/12 289/2 293/5 293/18 297/18
301/1 301/4 302/10 303/11 304/1
304/16 304/17 305/11
Scopo's [11] 154/1 189/16 191/4 192/18
192/20 192/25 221/8 240/23 240/25
313/21 314/4
Scopolo [1] 186/15
Scott [2] 274/25 275/2
searchable [4] 310/9 310/12 310/14
310/16
seat [2] 222/9 232/15
seated [2] 134/2 311/13
Secarz [1] 206/2
second [2] 263/20 298/21
seconds [1] 206/14
seek [1] 142/22
sell [2] 173/3 173/8
selling [3] 172/15 172/17 172/18
Senior [1] 167/14

Senior's [1] 167/18
sense [2] 171/2 182/25
sentence [3] 314/24 314/25 314/25
314/25 315/2
sentenced [2] 160/1 160/4
sentences [1] 259/16
sentencing [9] 225/10 295/6 299/11
304/4 308/8 308/9 315/7 316/5 316/6
sentencing -- I'm [1] 316/5
separate [1] 307/5
September [2] 308/22 315/2
sequence [1] 207/5
SERCARZ [4] 133/15 133/17 134/16
298/23
serve [1] 150/10
served [3] 160/5 267/13 267/21
service [2] 170/10 170/11
serving [1] 267/1
set [2] 135/8 157/23
setting [1] 155/12
seven [1] 267/1
Seventh [2] 133/15 133/18
several [6] 166/16 209/18 218/8 222/25
223/1 305/9
shackled [3] 237/15 237/17 237/18
shackles [1] 237/20
share [1] 155/20
shark [7] 256/14 257/5 257/7 257/8
257/23 261/6 261/7
sharking [6] 256/2 256/19 256/20 256/22
256/25 259/15
shoot [2] 242/4 242/23
shooter [2] 190/18 195/1
shooters [2] 183/14 191/2
shooting [3] 180/21 195/13 243/13
shop [1] 188/8
short [2] 199/7 310/14
shortly [3] 171/20 184/14 255/19
shot [11] 137/14 181/20 182/1 182/4
195/16 195/18 242/20 242/22 243/16
243/18 243/19
shown [2] 294/13 294/15
shut [1] 224/10
shylock [1] 139/8
shylocking [4] 139/4 139/13 139/15
146/8
side [13] 176/17 176/18 176/23 177/6
177/10 177/11 179/3 179/20 181/4
181/4 224/19 224/20 315/20
sides [5] 181/3 291/15 295/8 313/6
313/7
significance [2] 291/5 297/24
significant [2] 201/17 297/21
silencer [3] 229/11 231/10 297/23
silencers [1] 229/12 231/10
similar [1] 208/2
similarly [1] 300/25
simple [2] 189/21 306/20
simply [2] 291/2 314/1
simultaneous [1] 308/20
single [3] 161/7 161/18 309/5
sit [3] 198/17 290/8 291/21
sitting [4] 204/16 209/24 222/7 237/9
situation [1] 188/6
situations [1] 201/18
six [2] 203/25 313/10
six-foot [1] 313/10
ski [14] 246/22 246/23 247/6 250/7
250/12 250/13 250/22 250/24 251/6
251/7 251/21 251/25 252/3 252/5
skip [1] 251/25

Case 1:03-cr-00351-EK Document 46-2 Filed 09/01/21 Page 372 of 635 PageID #: 1374

sloppiness [2]  159/9 291/14
sloppy [1]  159/11
slowly [1]  311/21
Smiley [1]  206/23 228/4 228/7
smoke [2]  221/9 223/9
smoking [1]  223/9
snub [1]  229/22
sold [4]  162/13 162/14 172/24 297/22
soldiers [2]  286/16 286/19
someone [13]  139/9 143/5 145/1 145/12
145/16 171/9 173/23 174/18 175/15
177/4 189/5 221/16 284/21
somewhere [4]  170/6 170/9 178/2 262/7
son [2]  199/15 274/12
soon [8]  148/20 170/13 172/10 173/14
175/12 176/6 265/9 268/8
sorry [46]  138/17 143/12 145/3 149/15
149/16 153/5 153/10 169/20 180/17
183/16 185/17 194/12 196/3 197/13
199/16 212/13 220/23 221/2 221/22
228/20 228/22 231/22 234/15 239/16
240/23 245/6 248/9 254/7 255/3 255/15
257/12 259/7 260/19 262/19 264/5
266/1 270/2 270/3 271/15 288/1 292/7
311/16 312/21 315/6 315/10 316/5
sort [3]  147/16 251/9 302/14
sounded [2]  159/19 159/20
source [2]  299/10 302/4
sources [3]  303/12 303/12 305/24
span [1]  187/6
Sparacino [24]  174/7 174/7 175/25
176/2 194/17 194/18 195/12 196/8
196/12 196/14 196/16 238/18 238/20
238/21 243/8 243/9 243/10 243/16
243/18 243/23 246/5 246/21 250/13
303/13
Sparacino's [2]  250/7 251/6
Sparaco [27]  163/12 163/13 164/24
168/17 169/4 169/13 169/16 169/19
170/12 170/13 170/20 170/23 171/2
171/5 172/2 172/4 172/6 177/17 276/21
276/22 282/15 282/25 283/1 283/22
285/4 285/10 285/13
speaker [1]  159/16
speaking [3]  159/18 273/25 275/1
speaks [1]  141/10
special [2]  134/8 138/13
specific [5]  158/16 219/3 219/24 230/17
276/10
specifically [11]  138/12 144/11 144/12
145/9 150/1 153/14 183/17 186/25
233/4 254/2 309/11
speed [1]  143/12
spell [2]  170/23 311/14
spelling [1]  170/23
spent [5]  145/1 145/16 166/13 248/20
260/4
Spider [2]  264/13 264/19
spot [2]  230/17 266/4
stage [1]  295/9
stairs [5]  191/11 191/22 313/16 314/15
314/17
stake [1]  181/6
stand [10]  135/10 136/22 138/8 210/4
214/22 249/23 277/13 280/19 291/17
311/9
standing [2]  228/12 237/1
standstill [1]  180/15

start [8]  139/4 161/19 188/18 195/6
198/16 207/22 273/10 281/21
started [24]  141/4 147/9 172/13 172/15
172/17 173/14 184/14 187/9 187/10
187/13 188/10 191/9 192/5 192/10
210/15 215/10 215/11 224/11 259/9
264/23 265/9 265/9 270/20 270/22
281/7
starting [6]  199/17 212/14 213/11
215/14 234/17 272/23
starts [1]  221/3
state [5]  134/6 165/23 275/20 275/23
311/14
statement [6]  138/1 138/4 151/14
189/21 273/24 275/10
statements [4]  165/16 207/13 207/17
208/3
STATES [8]  133/1 133/3 133/3 133/9
133/11 133/14 134/4 134/7
stating [2]  143/3 143/23
status [1]  153/20
steady [1]  160/11
steal [8]  172/23 172/25 184/24 200/6
200/8 200/11 226/2 226/5
stenography [1]  133/24
step [4]  199/21 275/14 289/16 314/20
Steve [1]  284/21
Stevie [3]  179/14 179/15 179/23
stick [1]  195/9
stipulation [1]  305/11
stole [6]  137/21 172/22 173/1 200/6
200/9 200/20
stolen [20]  172/20 172/21 186/17 186/17
198/25 200/8 200/13 202/18 225/24
226/13 251/3 251/6 264/12 264/18
265/1 265/12 265/15 304/20 305/1
305/9
stood [1]  174/9
stop [10]  146/13 149/13 149/13 149/13
164/12 220/11 221/4 243/3 258/4 260/1
stopped [6]  215/9 215/10 215/16 220/4
220/7 256/23
stopping [1]  215/14
store [9]  168/11 168/25 169/2 170/8
171/24 171/25 177/13 177/14 232/24
stories [4]  177/25 192/6 198/6
story [1]  298/25
straight [1]  298/25
strangers [2]  241/16 242/16
street [15]  133/21 152/24 170/8 173/9
176/22 183/12 185/12 211/15 211/16
213/14 256/24 265/16 312/20 313/3
313/9
stricken [6]  165/18 165/18 165/21
165/25 227/3 238/4
strike [1]  282/22
strongly [1]  248/11
Stropoli [5]  271/10 271/17 273/14
273/20 274/2
structure [1]  156/13
stuff [3]  163/8 252/1 308/6
submission [8]  291/1 292/1 292/8 292/9
298/16 302/13 306/8 306/11
submissions [8]  291/10 296/2 296/4
307/18 308/18 308/22 309/4 316/6
submit [15]  207/1 207/20 225/17 248/25
249/7 277/4 290/18 290/23 298/18
303/24 305/23 306/5 307/25 308/2
308/3
submitted [4]  161/14 290/22 304/16

304/19
subscribing [1]  133/16
subsequent [1]  165/4
subsequently [1]  304/4
successful [3]  243/13 243/15 243/17
sufficed [1]  306/21
sufficiently [1]  209/11
suggested [2]  227/11 296/8
suggestion [1]  292/1
Suite [3]  133/16 133/19 133/21
summer [2]  218/17 254/23
supervised [12]  149/7 149/10 149/21
150/2 150/3 150/10 267/13 267/16
267/19 267/21 268/9 268/10
supposed [4]  291/4 293/22 298/9 299/1
Supposedly [1]  180/20
suppressed [2]  208/5 208/16
Supreme [1]  299/6
surprised [1]  145/21
surveil [1]  223/20
surveillance [3]  293/25 294/13
surveillances [4]  292/9 292/20 293/14
305/10
Sustained [9]  143/8 162/20 176/12
197/14 198/5 198/15 238/3 288/11
288/18
sworn [2]  135/12 311/11
sworn/affirmed [2]  135/12 311/11
swung [3]  141/19 141/21 141/22
system [1]  157/22

T
table [1]  134/8
Tagliavia [14]  144/22 145/14 146/7
159/24 273/4 273/17 274/1 275/2 275/4
277/20 282/4 287/22 288/8 288/23
talkie [1]  224/9
talkies [1]  224/23
talks [1]  276/15
tan [1]  200/4
tape [4]  144/12 144/14 158/9 159/21
taped [1]  146/20
tapes [4]  158/6 159/22 159/23 204/10
Tarantola [8]  168/21 174/20 177/17
183/1 194/6 202/4 213/1 284/1
teaming [1]  298/23
Teddy [27]  165/5 165/10 166/10 166/20
167/14 167/14 167/18 168/14 176/21
179/4 179/4 179/7 179/13 217/6 234/3
234/25 235/3 236/8 236/9 237/6 268/1
273/10 273/15 273/19 273/20 274/2
286/12
Teddy's [1]  165/8
teeth [1]  302/17
ten [3]  186/1 187/6 312/11
term [1]  150/11
terms [1]  300/15
test [3]  233/15 233/18 298/9
tested [1]  157/22
testified [88]  135/13 136/4 136/23 137/1
137/18 139/23 147/15 149/2 176/17
176/20 179/24 180/6 181/6 182/14
189/15 193/3 197/10 197/17 199/2
199/4 199/6 199/7 201/4 201/9 210/14
210/18 212/8 214/17 215/17 215/24
216/12 217/4 218/25 219/6 219/10
219/13 221/7 223/8 226/19 227/14
228/25 231/9 234/2 234/24 236/9 238/6
238/14 241/18 242/7 243/5 245/25
247/4 252/10 252/14 252/20 253/6

**T**

testified... [32]  256/1 256/7 257/25
258/12 260/12 261/11 261/21 262/3
264/11 264/17 264/25 266/25 268/8
268/12 269/10 269/24 270/8 271/8
282/23 288/12 293/19 297/15 297/21
299/22 300/25 303/17 305/6 305/8
306/3 311/11 313/22 313/23

testify [12]  138/7 147/3 147/6 148/14
149/5 293/15 294/11 294/17 298/4
299/25 300/1 300/4

testifying [23]  136/24 148/19 189/23
195/20 200/2 211/4 211/7 215/19
221/25 222/5 226/16 226/18 226/19
226/23 232/18 237/19 245/3 245/12
250/11 258/15 265/7 287/9 297/13

testimony [48]  135/7 136/8 136/16 137/2
151/13 151/15 204/3 204/7 206/15
206/18 206/21 225/7 225/12 226/22
227/6 228/3 228/6 229/23 233/9 247/12
250/7 264/14 292/13 294/22 295/12
295/16 295/22 297/2 297/2 297/6 297/7
298/1 298/3 298/6 299/14 299/20 300/6
300/23 301/4 301/22 302/7 302/11
302/14 302/18 302/20 303/3 303/24
304/7

Theodore [4]  147/7 147/12 236/1 237/23

theory [1]  304/11

thereafter [1]  172/10

they've [1]  208/3

Thomas [11]  163/10 163/23 164/23
165/4 262/14 262/16 262/24 263/10
263/25 273/17 273/25

thousand [3]  258/25 259/2 262/12

threatened [2]  306/2 306/3

threatening [1]  143/4

three [15]  147/6 156/7 166/19 177/9
206/14 214/3 239/1 239/3 240/17
240/20 240/25 248/18 251/24 288/1
295/19

throughout [2]  152/11 256/18

thrown [1]  232/8

Thursday [1]  183/21

timeframe [2]  171/13 171/18

title [1]  153/18

to -- and [1]  297/4

to -- good [1]  311/20

today [18]  135/6 197/9 207/6 209/25
227/9 248/11 249/18 261/22 287/9
289/21 298/25 299/22 300/2 300/18
303/1 309/13 314/22 316/12

Todt [1]  274/16

together [8]  168/25 173/10 173/25 190/3
190/9 190/12 212/22 308/11

Tommy [11]  241/21 144/24 144/25
145/17 154/16 154/24 176/21 176/25
177/1 275/3 287/24 288/9 288/23

tomorrow [5]  209/21 209/22 249/18
249/19 308/7

tools [1]  209/9

Toots [3]  167/24 167/25 168/1

topic [1]  227/13

Tormenia [2]  178/22 178/23

Tormey [4]  297/10 297/12 302/12 303/9

Tormey's [2]  302/18 302/20

tossed [1]  281/16

toward [1]  238/7

towards [3]  161/5 161/18 162/24

Townes [1]  304/4

track [1]  312/22

transcripts [7]  135/24 136/4 248/4 248/6
291/11 310/15 310/20

trial [69]  137/1 147/4 147/10 147/15
148/15 150/25 158/18 158/19 158/24
181/11 181/16 187/3 195/21 197/11
197/18 208/6 211/4 211/7 212/7 212/7
215/25 216/3 216/5 216/8 216/9 216/9
216/14 217/16 217/18 218/13 218/17
220/8 221/25 222/1 223/13 226/19
226/23 232/18 233/10 233/12 237/19
245/3 250/11 250/12 253/7 258/15
258/19 291/11 292/12 293/13 293/15
295/23 297/7 297/16 299/14 299/17
299/20 301/9 301/16 301/25 303/18
304/3 304/8 304/11 304/14 305/6 305/9
305/12 305/13

trier [1]  295/3

triple [1]  298/22

truck [1]  190/16

trucks [1]  137/21

true [3]  235/22 281/7 281/23

truly [1]  278/3

truth [4]  151/18 165/22 197/9 197/10

turn [2]  257/5 294/25

turned [4]  147/10 242/7 224/11 240/7

turning [4]  238/7 238/14 239/4 239/8

twenty [3]  137/8 201/2 201/7

twice [1]  177/5

two [35]  141/23 146/6 184/20 184/21
206/22 206/24 214/3 214/7 214/8
219/16 229/24 234/10 241/5 241/13
242/13 248/12 259/3 261/21 262/9
270/21 274/22 277/2 279/2 288/1
288/14 289/25 294/6 295/3 297/17
297/19 298/8 301/19 304/17 309/3
309/23

two-week [1]  289/25

tying [1]  207/12

type [1]  299/10

types [1]  138/14

typo [1]  297/12

**U**

uncle [7]  168/14 176/20 297/17 297/18
298/7 304/17 304/19

underboss [1]  286/4

understood [15]  157/20 157/24 163/4
166/1 169/17 171/2 180/24 204/18
205/5 216/19 269/7 286/24 297/16
298/15 301/1

Unfortunately [1]  207/16

unidentified [1]  294/4

UNITED [8]  133/1 133/3 133/3 133/9
133/11 133/14 134/4 134/7

unknown [1]  294/6

unworthy [1]  300/20

useful [1]  207/14

**V**

vague [1]  198/16

valet [6]  269/24 271/4 271/9 271/18
272/4 272/12

van [14]  200/15 200/15 200/16 200/18
200/19 200/21 200/23 201/23 201/24
202/20 202/22 203/5 203/7 203/9

various [7]  142/12 187/19 192/12 215/19
290/23 296/3 303/11

vehicle [3]  162/12 198/25 225/25

Verrazano [1]  232/9

versus [1]  134/4

vertical [1]  253/24

video [12]  264/12 264/18 265/1 265/12
265/15 294/16 294/20 295/10 295/15
295/17 295/17 295/19

videos [1]  186/18

view [2]  300/11 313/7

violate [1]  150/9

violated [2]  161/10 161/12

violating [1]  152/10

violation [1]  161/15

virtually [1]  151/4

virtue [1]  293/12

visited [1]  313/13

visiting [1]  234/3

vivid [2]  191/24 191/25

voice [3]  254/8 280/2 311/22

voluminous [4]  299/5 307/18 308/10
310/7

**W**

wait [10]  140/14 141/25 142/1 220/25
234/14 239/18 247/4 258/2 260/1 269/2

waited [1]  268/23

waiting [4]  160/16 160/21 160/21 248/6

walk [4]  220/20 221/8 245/21 313/4

walked [6]  220/21 224/6 239/12 313/5
313/6 313/8

walkie [1]  224/9 224/23

walkie-talkie [1]  224/9

Walkie-talkies [1]  224/23

walking [5]  191/11 223/9 224/7 224/11
241/24

wall [1]  313/10

want -- no [1]  310/1

wants [6]  225/9 275/24 275/25 276/1
296/5 308/15

war [21]  176/11 176/14 176/15 177/7
177/10 177/12 177/16 178/1 179/20
180/6 180/14 181/6 182/15 193/23
194/1 216/6 216/7 216/9 218/8 224/19
233/18

warm [1]  217/13

water [4]  210/6 210/8 232/9 311/23

ways [1]  301/5

weapon [1]  207/9

weapons [5]  115/9 206/21 206/24
206/24 207/3 233/19 297/21 297/22

wearing [6]  240/12 240/12 246/21
246/24 250/23 250/24

Wednesday [4]  183/17 183/18 183/19
183/21

week [5]  136/11 256/11 289/25 308/24
309/2

weekend [2]  163/15 165/2

weeks [24]  136/4 188/16 200/2 206/22
215/4 219/16 220/4 226/8 234/10 253/2
259/3 261/21 262/9 274/22 276/7 277/2
295/3 297/17 297/19 298/8 304/17
305/9 308/4 308/11

weight [5]  207/14 299/15 300/6 300/9
300/20

Welcome [3]  249/24 277/15 280/17

West [2]  265/16 265/16

West 15th Street [1]  265/16

white [1]  200/19

whole [7]  153/13 179/25 218/1 227/6
264/2 264/6 286/10

wife [4]  242/18 284/15 284/16 306/2

Wild [2]  182/18 206/11

## W

willing [1]  291/15
window [1]  243/20
wish [3]  147/16 147/19 209/3
withdrawn [3]  206/8 264/10 264/24
witness [62]  134/24 135/1 135/6 135/9
 135/10 135/11 136/22 140/22 141/10
 141/12 143/15 147/24 157/17 158/4
 158/25 187/2 206/1 207/6 208/22 209/6
 209/12 209/17 210/4 223/5 225/9 227/9
 230/16 249/2 249/21 249/23 259/17
 263/12 275/12 275/16 275/17 277/5
 277/12 277/13 277/14 280/7 280/15
 289/18 289/19 291/12 291/12 293/19
 294/8 294/20 295/10 299/22 299/25
 303/18 306/3 310/18 311/6 311/9 311/9
 311/10 311/15 313/24 314/21 317/2
witness' [1]  275/20
witness's [1]  300/21
witnesses [15]  293/7 295/19 295/24
 296/5 296/7 298/10 299/2 301/8 301/9
 301/19 302/3 304/12 305/13 305/21
 307/20
woman [1]  242/20
word [1]  254/13
words [3]  228/16 228/18 234/5
worry [1]  236/2
worth [6]  162/9 172/19 208/1 300/11
 300/15 314/14
wrapped [1]  277/24
write [2]  259/22 260/9
writing [3]  230/22 259/21 260/7
written [2]  221/4 309/18
wrote [4]  147/16 148/1 148/4 148/5

## Y

year [5]  166/13 181/24 188/20 188/21
 188/21
years [26]  137/19 138/19 149/24 151/21
 162/11 166/16 166/19 193/23 194/2
 201/2 201/7 201/10 201/11 207/11
 256/23 267/1 271/13 271/13 271/16
 293/22 295/7 308/6 308/7 312/11
 312/14 314/19
yesterday [4]  135/5 289/25 290/3 290/22
YORK [12]  133/1 133/4 133/12 133/13
 133/16 133/16 133/19 133/19 133/22
 133/22 140/19 312/7
you -- to [1]  311/23
younger [1]  294/6
yourself [4]  138/20 226/24 259/16
 288/14

Case 1:92-cr-00351-DGT   Document 1869-6   Filed 09/19/21   Page 375 of 635 PageID #: 4682
Case 1:92-cr-00351-DGT   Document 1862-6   Filed 09/16/21   Page 375 of 635 PageID #: 4682

CLOSED,MJSELECT

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:92-cr-00351-DGT-11

Case title: USA v. Orena, et al                    Date Filed: 04/01/1992
Magistrate judge case numbers: 1:92-mj-00400       Date Terminated: 08/15/1994
                              1:93-mj-00689 5 Related

Assigned to: Judge David G. Trager

**Defendant (11)**

**Alphonse Persico**                    represented by **Barry Levin**
*TERMINATED: 08/17/1994*                              600 Old Country Road, Suite 333
*also known as*                                       Garden City, NY 11530
"Allie Boy"                                           516-222-4502
                                                      Fax: 516-228-8120
                                                      Email: bl3160@aol.com
                                                      *TERMINATED: 08/17/1994*
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Retained*

                                                      **Barry I. Slotnick**
                                                      Slotnick & Shapiro LLP
                                                      100 Park Avenue
                                                      New York, NY 10017
                                                      212-687-5700
                                                      *TERMINATED: 08/17/1994*
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Retained*

**Pending Counts**                                    **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                                 **Disposition**

Case 1:92-cr-00351-ILG   Document 1862-6   Filed 09/19/21   Page 376 of 635   PageID #: 4683

18:1962 (c) and 3551 et seq.___
MURDER, SECOND DEGREE
(1)

18:1962(c) and 3551 et seq.
RACKETEERING
(1s)

The defendant was found no guilty to
any charges in the indictment.

18:1962 (d) and 3551 et seq.___
INTERSTATE COMMERCE
(2)

18:1962(d) and 3551 et seq.
RACKETEERING
(2s)

The defendant was found no guilty to
any charges in the indictment.

18:1959 (a)(1), 2 and 3551 et seq.___
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(3)

18:1959(a)(5) and 3551 et seq.
CONSPIRACY, MURDER, KIDNAP
(3s)

The defendant was found no guilty to
any charges in the indictment.

18:1959 (a)(1), 2 and 3551 et seq.___
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(4)

18:1959(a)(1), 2 and 3551 et seq.
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(4s)

The defendant was found no guilty to
any charges in the indictment.

18:1959 (a)(1), 2 and 3551 et seq.___
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(5)

18:1959(a)(1), 2 and 3551 et seq.
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(5s)

The defendant was found no guilty to
any charges in the indictment.

18:1959 (a)(1), 2 and 3551 et. seq.___
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(6)

18:1959(a)(1), 2 and 3551 et seq.
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(6s)

The defendant was found no guilty to
any charges in the indictment.

18:1959 (a)(1), 2 and 3551 et seq.___
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(7)

18:1959(a)(1), 2 and 3551 et seq.
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(7s)

The defendant was found no guilty to
any charges in the indictment.

18:1959 (a)(3), 2 and 3551 et. seq.___
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(8)

18:1959(a)(1), 2 and 3551 et seq.
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(8s)

The defendant was found no guilty to
any charges in the indictment.

18:1959 (a)(5) and 3551 et seq.___
VIOLENT CRIME IN AID OF
RACKETEERING, MURDER FIRST
DEGREE
(9)

18:1959(a)(3), 2 and 3551 et seq.
CONSPIRACY, MURDER, KIDNAP
(9s)

The defendant was found no guilty to
any charges in the indictment.

18:924 (c)(1), 2 and 3551 et seq.___
FIREARMS
(12)

18:924(c)(1), 2 and 3551 et seq.
FIREARMS
(12s)

The defendant was found no guilty to
any charges in the indictment.

**Highest Offense Level (Terminated)**

Felony

**Complaints**                                    **Disposition**

None

Case 1:92-cr-00351-ILG   Document 1869-6   Filed 09/19/21   Page 378 of 635 PageID #: 10360
Case 1:92-cr-00351-ILG   Document 1869-6   Filed 09/19/21   Page 4 of 53 PageID #: 4685

**Plaintiff**

**USA**                 represented by    **Andrew Weissman**
United States Attorneys Office
Criminal Division
225 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-7000
*TERMINATED: 03/11/1999*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Seth Dorsky**
Office of the United States Attorney
Civil Division
225 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6288
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Geddes**
United States Attorneys Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820
718-254-6430
Fax: 718-254-6478
Email: elizabeth.geddes@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ellen Corcella**
United States Attorney's Office
Criminal Division
225 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-7000
*TERMINATED: 03/11/1999*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George Stamboulidis**
U.S. Attorney's Office
825 East Gate Blvd.
Garden City, NY 11530
516-228-8630

Eastern District of New York - LIVE Database V6.1.1                    Page 5 of 53
Case 1:92-cr-00351-ILK   Document 1869-6   Filed 09/19/21   Page 379 of 635 PageID #: 10391
#: 4686

*TERMINATED: 03/11/1999*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Gleeson**
United States Attorney's Office
Criminal Division
One Pierrepont Plaza
Brooklyn, NY 11201
(718) 254-7000
*TERMINATED: 03/11/1999*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Kelly**
United States Attorney's Office
Criminal Division
One Pierrepont Plaza
Brooklyn, NY 11201
(718) 254-7000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia E Notopoulos**
United States Attorneys Office
Criminal Division
225 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6354
Fax: 718-254-6478
Email: patricia.notopoulos@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/27/1992 | 1 | COMPLAINT as to DOE-1-92-400M-01 DOE-1-92-400M-01 (1) count(s) cmp [ 1:92-m -400 ] (Best, Trish) (Entered: 03/10/1992) |
| 02/27/1992 | | ARREST WARRANT issued as to DOE-1-92-400M-01 [ 1:92-m -400 ] (Best, Trish) (Entered: 03/10/1992) |
| 04/01/1992 | | Magistrate Chrein has been selected by random selection to handle any matters that may be referred in this case. (Greves, Liz) (Entered: 04/07/1992) |
| 04/01/1992 | | Added Government Attorney George A. Stamboulidis (Greves, Liz) (Entered: 04/07/1992) |
| 04/01/1992 | 5 | NOTICE of Appearance for Victor Orena by Attorney Gustave H. Newman (Greves, Liz) (Entered: 04/09/1992) |
| 04/06/1992 | 7 | |

| | | ORDER OF DETENTION as to Victor Orena ( Signed by Judge I. L. Glasser , dated: 4/6/92) (Greves, Liz) (Entered: 04/09/1992) |
|---|---|---|
| 04/16/1992 | 12 | Letter dated 4/7/92 from Gustave Newman to Judge Glasser advising that deft Orena does not desire to make a motion to seal government's proffer. (Greves, Liz) (Entered: 04/16/1992) |
| 05/06/1992 | 24 | Government's Memo in support of its Rule 16(d) motion for a protective order pertaining to discovery of certain electronic surveillance material. (Greves, Liz) (Entered: 05/19/1992) |
| 05/26/1992 | 25 | MOTION by Victor Orena to sever Ct 4 of the superseding indictment , to suppress post-arrest statements ; motion hearing set for 6/12/92 at 11:30AM. (Greves, Liz) (Entered: 05/27/1992) |
| 05/26/1992 | 26 | MEMORANDUM by Victor Orena 1 in support of [25-1] motion to sever Ct 4 of the superseding indictment, [25-2] motion to suppress post-arrest statements (Greves, Liz) (Entered: 05/27/1992) |
| 06/12/1992 | 31 | Letter dated 6/10/92 from AUSA Leopold Laufer to Mr. Newman, re: discovery. (Lui, Lin) (Entered: 06/12/1992) |
| 06/29/1992 | 35 | REPLY MEMORANDUM by Victor Orena in support of motion to suppress post-arrest statements. (Greves, Liz) (Entered: 06/29/1992) |
| 07/14/1992 | 38 | SUPERSEDING INDICTMENT as to Victor J. Orena (1) count(s) 1sss, 2sss, 3sss, 4sss, 7sss, 9sss, 10sss, 11sss, 13sss (Greves, Liz) (Entered: 07/15/1992) |
| 07/20/1992 | 40 | Copy of letter dated 7/14/92 from Leopold Laufer to Messrs Newman & Brafman advising that the government will not offer into evidence any electronic surveillance obtained pursuant to the lst Order or the 2nd Order. (Greves, Liz) (Entered: 07/20/1992) |
| 08/19/1992 | 48 | Copy of letter dated 8/4/92 from Gustave H. Newman to Judge Glasser regarding the 4th superseding indictment. (see letter for further details). (Greves, Liz) (Entered: 08/19/1992) |
| 08/19/1992 | 49 | Copy of letter dated 8/5/92 from Gustave H. Newman to Mr. Laufer re: discovery. (Greves, Liz) (Entered: 08/19/1992) |
| 08/19/1992 | 50 | ORDER dated 8/10/92 that hearing & argument on the outstanding motions by Orena & Amato are adjourned from 8/14/92 to 8/20/92 at 4:30PM ( Signed by Judge I. L. Glasser on letter dated 8/7/92 from Leopold Laufer ) (Greves, Liz) (Entered: 08/19/1992) |
| 08/19/1992 | 51 | Faxed letter dated 8/10/92 from Gustave H. Newman to Judge Glasser requesting that the Orena/Amato motions presently scheduled to be heard on 8/20/92 be heard instead on 8/24/92. (Greves, Liz) (Entered: 08/19/1992) |
| 08/31/1992 | | CASE reassigned from Judge I. Leo Glasser to Judge Jack B. Weinstein by direction. (Francis, Jackie) (Entered: 08/31/1992) |
| 09/09/1992 | 57 | Ltr. to Mr. Laufer from G.Newman dtd. 9/2/92 re: discovery (Jackson, Ramona) (Entered: 09/09/1992) |
| | | |

Eastern District of New York - LIVE Database V6.1.1                    Page 7 of 53

Case 1:92-cr-00351-DLI   Document 1869-6   Filed 09/19/21   Page 381 of 635 PageID #: 10363
Case 1:92-cr-00351-DLI   Document 4868-6   Filed 02/19/21   Page 381 of 635 PageID #: 4688

| 09/10/1992 | 58 | Ltr. to counsels from G.Stamboulidis dtd. 9/7/92 re: discovery (Jackson, Ramona) (Entered: 09/10/1992) |
|---|---|---|
| 09/10/1992 | 59 | SEALED DOCUMENT as to ORENA Letter dtd. 9/8/92 (Jackson, Ramona) (Entered: 09/10/1992) |
| 09/17/1992 | 65 | NOTICE of Phone Message dtd. 9/11/92 (Jackson, Ramona) (Entered: 09/17/1992) |
| 10/26/1992 | | Added Government Attorney John Gleeson (Jackson, Ramona) (Entered: 10/26/1992) |
| 10/26/1992 | 105 | TRANSCRIPT filed in case for hearing before Mag. Azrack as to Steven Cartergainer dates of 7/8/92 ; (Jackson, Ramona) (Entered: 10/26/1992) |
| 12/03/1992 | | Added Government Attorney Andrew Weissman (Jackson, Ramona) (Entered: 12/03/1992) |
| 05/14/1993 | 322 | ORDER UNSEALING Superseeding Indictment as to Alphonse Persico ( Signed by Magistrate Joan M. Azrack , dated: 5/14/93) (Jackson, Ramona) (Entered: 05/18/1993) |
| 05/14/1993 | | Arreest WARRANT issued as to Alphonse Persico By Mag. Azrack dtd. 5/13/93 (Jackson, Ramona) (Entered: 05/19/1993) |
| 05/14/1993 | 323 | SUPERSEDING INDICTMENT as to Lawrence A. Fiorenza (5) count(s) 1sss, 2sss, 7sss, 9sss, 10sss, 11sss, 12sss, 13sss, Lawrence Mazza (6) count(s) 1ss, 2ss, 3ss, 4ss, 7ss, 8ss, 9ss, 10ss, 11ss, 12ss, Joseph Russo (7) count(s) 1s, 2s, 5s, 6s, 9s, 10s, 11s, 12s, Anthony Russo (8) count(s) 1s, 2s, 5s, 6s, 9s, 10s, 11s, 12s, Robert Zambardi (9) count(s) 1s, 2s, 9s, 10s, 11s, 12s, 15s, Joseph Monteleone (10) count(s) 1s, 2s, 5s, 6s, 9s, 12s, 16s, Alphonse Persico (11) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 12, Joseph Tomasello (12) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 12, Theodore Persico (13) count(s) 1, 2, 9, 10, 11, 12, Richard Fusco (14) count(s) 1, 2, 9, 10, 11, 12, 14, James Delmastro (15) count(s) 1, 2, 3, 4, 7, 8, 9, 10, 11, 12 (Jackson, Ramona) (Entered: 05/19/1993) |
| 05/19/1993 | 333 | Ltr. to Mag. Azrack from AUSA'S in support as to Alphonse Persico in support of [331-1] order of detention (Jackson, Ramona) (Entered: 05/19/1993) |
| 05/25/1993 | 346 | Ltr. to Mr. Stamboulidis from LInda Sheffield dtd. 5/24/93 re: Alphonse Persico in opposition to rescheduling of arraignment (Jackson, Ramona) (Entered: 05/25/1993) |
| 05/27/1993 | 355 | ORDER as to Alphonse Persico, scheduling conference for 10:00 5/31/93 for Alphonse Persico On ltr. dtd. 5/21/93 from AUSA ( Signed by Judge Jack B. Weinstein , dated: 5/24/93) (Jackson, Ramona) (Entered: 05/27/1993) |
| 06/02/1993 | 358 | ORDER as to Alphonse Persico No objection by US Atty., Federal Bureau of Prisons to preserve all of its official records Motion GRANTED Copies mailed ( Signed by Judge Jack B. Weinstein , dated: 6/1/93) (Jackson, Ramona) (Entered: 06/02/1993) |
| 06/03/1993 | 373 | Ltr. to counsels from AUSA'S dtd. 5/27/93 re: tapes in relation to case to Carroll Audio (Jackson, Ramona) (Entered: 06/03/1993) |

| 06/04/1993 | 377 | Ltr. to JBW from Linda S.Sheffield dtd. 6/1/93 re: arraignemnt of deft. (Jackson, Ramona) (Entered: 06/04/1993) |
|---|---|---|
| 06/07/1993 | 382 | TRANSCRIPT filed in case as to Alphonse Persico for detention hearing before Mag. Chrein dates of 5/18/93 ; (Jackson, Ramona) (Entered: 06/07/1993) |
| 06/07/1993 | 385 | Ltr. to L.Bouchillon from Linda Sheffield dtd. 5/25/93 re: object to entire administrative process (Jackson, Ramona) (Entered: 06/07/1993) |
| 06/07/1993 | 386 | Ltr. to Mr.Stamboulidis from L.Sheffield dtd. 5/24/93 re: RESPONSE by Alphonse Persico in opposition to rescheduling of arraignment (Jackson, Ramona) (Entered: 06/07/1993) |
| 06/07/1993 | 391 | CALENDAR ENTRY as to Alphonse Persico ; Case called before Judge Jack B. Weinstein on date of 6/7/93 for Pleading Court Reporter/ESR J.Howell For deft. L.Sheffield AUSA G.Stamboulidis Deft. appears with counsel Deft. arraigned , Not Guilty: , Alphonse Persico (11) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 12 (Jackson, Ramona) (Entered: 06/08/1993) |
| 06/07/1993 | 410 | Rule 40 Documents as to Alphonse Persico received from ED Michigan Ackn. mailed (Jackson, Ramona) (Entered: 06/11/1993) |
| 06/09/1993 | 398 | ORDER as to Alphonse Persico deft. remain at MCC until at least 6.21.93 ( Signed by Judge Jack B. Weinstein , dated: 6/7/93) (Jackson, Ramona) (Entered: 06/09/1993) |
| 06/09/1993 | 399 | WAIVER of Speedy Trial and ORDER of Excludable Delay by Alphonse Persico. ( Signed by Judge Jack B. Weinstein , Dated 6/7/93). (Yuen, Sui May) (Entered: 06/09/1993) |
| 06/09/1993 | 401 | AFFIDAVIT as to Alphonse Persico Re: [358-1] order received 6/4/93 (Jackson, Ramona) (Entered: 06/09/1993) |
| 06/10/1993 | 423 | CALENDAR ENTRY as to Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, Richard Fusco ; Case called before Judge Jack B. Weinstein on date of 6/10/93 for Pretrial Conf., Deft's pres. with counsels AUSA'S pres. Pretrial conf. held set status conference for 7/20/93 for Lawrence A. Fiorenza, for Lawrence Mazza, for Robert Zambardi, for Alphonse Persico, for Theodore Persico, for Richard Fusco , set status conference for 6/24/93 for Joseph Russo, for Anthony Russo, for Joseph Monteleone SR. (Jackson, Ramona) (Entered: 06/17/1993) |
| 06/11/1993 | 411 | WAIVER of Speedy Trial and/or ORDER of Excludable Delay by Lawrence A. Fiorenza, Lawrence Mazza, Robert Zambardi, Alphonse Persico, Theodore Persico, Richard Fusco ( Signed by Judge Jack B. Weinstein , Dated 6/10/93) (Jackson, Ramona) (Entered: 06/11/1993) |
| 06/14/1993 | 417 | ORDER as to Alphonse Persico MOTION GRANTED to preserve all of its officical records concerning deft., including telephone and visitation records, DHO records and his entire central file. Copies mailed ( Signed by Judge Jack B. Weinstein , dated: 6/4/93) (Jackson, Ramona) (Entered: 06/14/1993) |

Eastern District of New York - LIVE Database V6.1.1                    Page 9 of 53
Case 1:92-cr-00351-ILK   Document 869-6   Filed 09/19/21   Page 383 of 635 PageID #: 10365
Case 1:92-cr-00351-DLI   Document 1662   Filed 09/19/21   Page 9 of 53 PageID #: 4690

| 06/22/1993 | 426 | Ltr. to JBW from AUSA'S dtd. 6/19/93 re: RESPONSE by USA as to Alphonse Persico motion for an order detaining deft. By JBW ORDER dtd. 6/21/93 set for prompt argument (Jackson, Ramona) (Entered: 06/22/1993) |
| 06/23/1993 | 429 | NOTICE of Appearance by B.Slotnick for Alphonse Persico (Jackson, Ramona) (Entered: 06/23/1993) |
| 06/23/1993 | | Added for Alphonse Persico Attorney Barry I. Slotnick (Jackson, Ramona) (Entered: 06/23/1993) |
| 06/28/1993 | 445 | Ltr. to JBW from G Lombardi dtd. 6/23/93 re: ackn. to ltr. dtd. 6/5/93 (Jackson, Ramona) (Entered: 06/28/1993) |
| 06/30/1993 | 454 | MAIL RETURNED Memo. & Order to J.Winograd returned on 6/30/93 (Jackson, Ramona) (Entered: 06/30/1993) |
| 07/12/1993 | 462 | USCA Order dtd 7/9/93 motion for a stay pending appeal of orders releasing the Deft from pretrial detention is granted to the extent of continuing the motion by a panel of the court. (McGee, Maryann) (Entered: 07/12/1993) |
| 07/23/1993 | 487 | Letter dated 7/23/93 from Andrew Weissman to Ms. Seltzer and Mssrs. Goldberg, Golub, Lopez, Maffeo, Marinello, Roth, Slotnic and Washor, Re: Enclosing the draft transcrips that were used in the Orena or Sessa trials for (1) Ambrosino car tapes, (2) Imbriale consensual tapes and (3) Audino tapes. (Piper, Francine) (Entered: 07/28/1993) |
| 07/26/1993 | 484 | USCA Order filed on 7/9/93 the motion for Stay Pending Appeal of Orders Releasing Defendants it is Ordered that the one-judge order staying release on bail is still in effect. Judge notified.. Ackn mailed. USCA # 93-1473. (Gonzalez, Mary) (Entered: 07/26/1993) |
| 07/28/1993 | 488 | Letter dated 7/23/93 from Thomas J. King to Judge Weinstein, Re: The U.S Attorney's Office have agreed to file a motion to quash the subpoena on our behalf, therefore we are requesting an additional 10 days in which to respond to the subpoena. (Piper, Francine) (Entered: 07/28/1993) |
| 07/30/1993 | | CASE reassigned from Judge Jack B. Weinstein to Judge Charles P. Sifton by random selection. (Francis, Jackie) (Entered: 07/30/1993) |
| 07/30/1993 | 501 | COPY OF LETTER dated 7/26/93 from Leon Rodriguez to Mr. Brief. Re: Several issues pertaining to discovery. Govt opposes request for a delineation of the dft's and co-conspirators' roles in the acts contained in this letter.(fe) Modified on 08/04/1993 (Entered: 08/04/1993) |
| 08/02/1993 | 497 | COPY of letter from AUSA George Stamboulidis to counsel dated 7/29/93 Re: advising that this action has been reassigned to Judge Sifton and that there will be a status conference held on 8/5/93 at 3:45. (Conte, Daniela) (Entered: 08/02/1993) |
| 08/04/1993 | | ENDORSED ORDER as to Alphonse Persico granting [488-1] adjournment of 10 days to respond to subpoena Alphonse Persico (11) ( Judge Jack B. Weinstein , dated 7/30/93) Copies mailed (Jackson, Ramona) (Entered: 08/04/1993) |
| 08/05/1993 | 509 | |

Case 1:02-cr-00251-DEK  Document 4369  Filed 09/29/16  Page 884 of 635 PageID #: 4691

| | | |
|---|---|---|
| | | CALENDAR ENTRY as to Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, Richard Fusco; Case called before Judge Charles P. Sifton on date of 8/5/93 at 3:45 for status conference. All defendants present with counsel except Richard Fusco and Joseph Montelone, who are present without counsel. Court Reporter/ESR Fred Guerino. Status conference held. (First appearance before Judge Sifton.) Pretrial order signed, setting jury selection and trial for 2/1/94 at 9:30AM. A pretrial conference will be held on 1/20/94 at 2:00PM. Pretrial motions will be argued on 9/21/93 at 9:30AM. Conformed copies of order given to counsel. The subpoenas served by dft Joseph Russo on the Nassau County Police Dept. and by dft Lawrence Mazza on the New York City Police Dept. are extended to 9/1/93. If the subpoenas are not satisfied by then, the dfts shall make their motions to compel compliance returnable on 9/21. The [498-1] motion by the NYC Police Dept. to quash the subpoena for the production of documents as to Lawrence Mazza (6) is marked off the calendar at this time, in anticipation of the resolution of the matter by the parties. If counsel Mitchell Golub or Frank Lopez object to any portion of the schedule set today, they shall move promptly, on notice to all parties for its modification. (Conte, Daniela) (Entered: 08/16/1993) |
| 08/09/1993 | 504 | ORDER of Excludable Delay as to Carmine Sessa, Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Joseph Tomasello, Theodore Persico, Richard Fusco, James Delmastro ( Signed by Judge Charles P. Sifton , dated: 8/5/93) (fe) (Entered: 08/09/1993) |
| 08/09/1993 | 505 | PRETRIAL SCHEDULING ORDER as to Carmine Sessa, Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Joseph Tomasello, Theodore Persico, Richard Fusco, James Delmastro. 1) To appear with counsel on 2/1/94; 2) To appear to select a jury to try case on 2/1/94 at 9:30; 3) To make all pretrial motions based on any defense, objection, or request, which is capable of determination before the trial of the general issue, in writing, returnable on or before 9/21/93 at 12:00; 4) To appear with counsel who is to try case at pretrial conference on 1/20/94 at 2:00; 5) Counsel for the Govt is directed to attend the pretrial conference with material required to be produced at trial. ( Signed by Judge Charles P. Sifton , dated: 8/5/93) (fe) (Entered: 08/09/1993) |
| 08/10/1993 | 506 | Ltr. to JBW from Thomas J.King dtd. 7/23/93 re: Nassau County Police Dept. Request to quash subpoena & extension of time to respond for additional ten days (Jackson, Ramona) (Entered: 08/10/1993) |
| 08/19/1993 | 511 | TRANSCRIPT filed in case as to Alphonse Persico, Lawrence Mazza, Richard Fusco, Joseph Monteleone SR., Joseph Russo for status conf. before JBW dates of 7/20/93 ; Court Reporter/ESR: M.Gjelaj (Jackson, Ramona) (Entered: 08/19/1993) |
| 08/31/1993 | 516 | ORDER as to Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Richard Fusco (Signed by Judge Charles P. Sifton, dated: 8/24/93). The dfts' |

Eastern District of New York - LIVE Database V6.1.1          Page 11 of 53
Case 1:02-cr-00251-DEK   Document 4869   Filed 08/19/21   Page 385 of 635 PageID
#: 4692

| | | request to be housed at MCC is denied without prejudice to its renewal after counsel for the dfts and counsel for the U.S. have conferred in an effort to arrange a solution satisfactory to both sides. So ordered on request itself. (Conte, Daniela) (Entered: 08/31/1993) |
| --- | --- | --- |
| 09/10/1993 | 526 | MOTION by counsel for Alphonse Persico, dated 9/10/93, for disclosure and inspection; to dismiss counts 1-9 of the indictment; for severance and to have dft released on bail . Motion Hearing/Return date of 12:00 on 9/21/93 for Alphonse Persico [526-1] motion. Supporting documents attached. (Conte, Daniela) (Entered: 09/10/1993) |
| 09/15/1993 | 542 | ORDER as to all remaining defendants, extending time until 9/13/93 for the filing of dft's motions; until 9/24/93 for the government to respond; return date rescheduled to 9/28/93 (Signed by Judge Charles P. Sifton, dated: 9/13/93). So ordered on letter from AUSA George Stamboulidis to Judge Sifton dated 9/9/93. (Conte, Daniela) (Entered: 09/15/1993) |
| 09/27/1993 | 571 | Letter from AUSA George Stamboulidis and Ellen Corcella to Judge Sifton dated 9/23/93, Re: requesting additional time to file responses to the motions of defendants. (Conte, Daniela) (Entered: 09/27/1993) |
| 09/28/1993 | 572 | MEMORANDUM by AUSA Ellen Corcella, Leon Rodriguez and George Stamboulidis, dated 9/27/93, in opposition to the defendants' pretrial motions for discovery; suppression; severance; dismissal, etc. (Conte, Daniela) (Entered: 09/28/1993) |
| 09/29/1993 | 576 | Letter from Judge Sifton to the Warden of Metropolitan Correctional Center dtd 09/24/93, re: Requesting that defts Alphonse Persico, Monteleone and Joseph and Anthony Russo remain at the facility through November. (Francis, Jackie) (Entered: 09/29/1993) |
| 09/29/1993 | 579 | RESPONSE by the USA as to Alphonse Persico in support of its motion to detain the defendant. Response submitted in the form of a letter from AUSA George Stamboulidis and Andrew Weissman to Magistrate Azrack dated 5/14/93. Enclosures. (Conte, Daniela) (Entered: 09/29/1993) |
| 10/08/1993 | 585 | REPLY by counsel for Alphonse Persico, dated 10/6/93, to response to [526-1] motion for disclosure and inspection; to dismiss counts 1-9 of the indictment; for severance and to have dft released on bail. (Conte, Daniela) (Entered: 10/08/1993) |
| 10/08/1993 | 586 | ORDER, extending time to 10/22/93 for the parties to submit papers in regard to the pending motions (Signed by Magistrate A. S. Chrein, dated: 9/30/93). So ordered on faxed copy of letter from Robert Kalina, Esq., to Magistrate Chrein dated 9/30/93. c/m (Conte, Daniela) (Entered: 10/08/1993) |
| 10/12/1993 | 597 | CALENDAR ENTRY as to Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, Richard Fusco; Case called before Judge Charles P. Sifton on date of 10/12/93 at 9:30 for motion hearing. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella present. All defendants present with counsel except for Richard Fusco. Court Reporter/ESR Carmella Jannuzzi. Alphonse Persico's motion for bail is argued. The gov't is to provide |

Eastern District of New York - LIVE Database V6.1.1      Page 12 of 53
Case 1:02-cr-00251-DEK   Document 1430-9   Filed 09/19/21   Page 386 of 635 PageID #: 10038
Case 1:02-cr-00251-DEK   Document 84869-9   Filed 09/20/19   Page 12 of 53 PageID #: 4693

the Court and the dft with a copy of the transcript of previous bail proceedings. Gov't to file papers in response by 5PM on 10/13- any reply to be filed by 10/14- a hearing is scheduled for 10/18 at 9:30AM. Dft Mazza's motion to strike surplussage is argued- decision reserved. Dft Zambardi's motion for dismissal on double joepardy argued- decision reserved. The dfts' motion for a Bill of Particulars is scheduled for discussion on 10/18 at 9:30AM. Each dft is to state by 10/15 what particulars he still wants the gov't to state. A hearing on the audibility motions is scheduled for 1/10/94 at 9:30AM. The gov't is to disclose to dfts by 12/13/93 which tapes it intends to use at trial. Dfts are to submit to the Court by 1/3/94 a statement of any disputes with the govt's transcripts, and their counter-designations of transcript portions that they wish used at trial. Dfts are to provide the Court by 10/15 with a written statement of the discovery demands that are still outstanding, and are to appear on this matter on 10/18. The gov't is to disclose to dfts by 12/13/93 what evidence of other criminal acts it intends to use at trial. Any opposing papers generated by the govt's disclosure are to be filed by 1/4/94. Any issues in dispute will by argued on 1/10/94 at 9:30AM. Dft Fiorenza's motion for leave to obtain transcripts of court proceedings pursuant to the Criminal Justice Act is granted. Dft Fusco's motion for the suppression of post-arrest statements is resolved by counsel and is withdrawn. Dft Monteleone's motion challenging his photo identification is argued- decision reserved. Decision is also reserved on all other motions for suppression of evidence or statements and for severance. (Conte, Daniela) (Entered: 10/21/1993)

| 10/18/1993 | 599 | CALENDAR ENTRY as to Alphonse Persico ; Case called before Judge Charles P. Sifton on date of 10/18/93 for Motion conference Court Reporter/ESR Mary Ann Danielle. Dft's motions for bail is argued. Detention hearing begun. Hearing continued to 10/19/93 at 9:30. Temporary detention order signed. (fe) (Entered: 10/21/1993) |
|---|---|---|
| 10/19/1993 | 598 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 10/19/93 at 2:00 for bail application. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella present. Dft present with counsel, Barry Slotnick. Court Reporter/ESR Marsha Diamond. Dft Alphonse Persico's detention hearing is continued. Hearing concluded. Decision reserved. Case continued to 10/20/93 for decision. (Conte, Daniela) (Entered: 10/21/1993) |
| 10/20/1993 | 600 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 10/20/93 at 9:30 for motion hearing. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella and, defense attorney Barry Slotnick present. Dft present; in custody. Court Reporter/ESR Marsha Diamond. Further argument of the defendants' motion for bail is heard. The Court dictates its decision on the record, ordering that the defendant be detained pending trial. (Conte, Daniela) (Entered: 10/22/1993) |
| 10/22/1993 | 601 | TEMPORARY COMMITMENT issued as to Alphonse Persico (Signed by Judge Charles P. Sifton, dated 10/18/93). The dft is to be kept seperate from the other inmates and shall be able to have private meetings with counsel. The dft shall be delivered to a US Marshal to be brought to court appearances. |

|  |  | (Certified copies forwarded to the US Marshal's Office.) (Conte, Daniela) (Entered: 10/22/1993) |
|---|---|---|
| 10/22/1993 | 602 | ORDER OF DETENTION as to Alphonse Persico (Signed by Judge Charles P. Sifton, dated: 10/20/93. (Conte, Daniela) (Entered: 10/22/1993) |
| 10/22/1993 | 603 | TRANSCRIPT of motion hearing before Judge Sifton filed in case as to Alphonse Persico for date of 10/19/93 at 2:00. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella, and defense attorneys Barry Slotnick and Michael Bader present. Court Reporter/ESR: Marsha Diamond. (Conte, Daniela) (Entered: 10/22/1993) |
| 10/26/1993 | 604 | TRANSCRIPT of detention hearing before Judge Sifton filed in case as to Alphonse Persico for date of 10/18/93 at 9:30. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella and defense attorney Barry Slotnick present. Court Reporter/ESR: Mary Ann Daniele. (Conte, Daniela) (Entered: 10/26/1993) |
| 11/01/1993 | 606 | COPY of letter from AUSA Ellen Corcella to Matthew Brief, Esq., dated 10/29/93, Re: forwarding ballistics evidence and property vouchers. Enclosures. (Conte, Daniela) (Entered: 11/01/1993) |
| 11/01/1993 | 607 | COPY of letter from AUSA Ellen Corcella to all counsel, dated 10/28/93, Re: advising that 13 additional audio cassettes exist. (Conte, Daniela) (Entered: 11/01/1993) |
| 11/02/1993 | 608 | TRANSCRIPT of conference before Judge Sifton filed in case as to Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, and Richard Fusco for date of 10/12/93 at 9:30. AUSA George Stamboulidis, Andrew Weissmann and Ellen Corcella present. Appearances by defense counsel: Mark Baker for dft A. Persico; Michael Washor for dft T. Persico; Salvatore Marinello for dft J. Russo; Melvin Roth for dft A. Russo; Mitchell Golub for dft R. Fusco; Joshua Dratel for dft R. Zambardi; Marion Seltzer for dft J. Monteleone; Martin Goldberg for dft L. Firorenza and Bruce Maffeo and Matthew Brief for dft Mazza. Court Reporter/ESR: Carmella Jannuzzi. (Conte, Daniela) (Entered: 11/02/1993) |
| 11/02/1993 | 609 | CALENDAR ENTRY as to Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, and Richard Fusco; Case called before Judge Charles P. Sifton on date of 11/2/93 at 9:30 for motion hearing. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella present. All defendants appeared with counsel except for Anthony Russo who appeared without counsel. Court Reporter/ESR Guerino. Counsel Salvatore Marinello stands in for Melvyn Roth as counsel for dft Anthony Russo for this days proceedings. Rulings on the defendants' discovery motions are made on the record. The government is to provide the dfts with a Bill of Particulars within 10 days. (Conte, Daniela) (Entered: 11/04/1993) |
| 11/15/1993 | 610 | COPY of letter from AUSA George Stamboulidis to counsel, dated 11/12/93, Re: advising that a copy of the audio cassette of a conversation between A. |

Eastern District of New York - LIVE Database V6.1.1                    Page 14 of 53
Case 1:02-cr-00251-DEK   Document 4369   Filed 09/29/16   Page 388 of 635 PageID #: 10690
#: 4695

| | | Persico and Stanley Meyer is available at Carroll Audio Services. (Conte, Daniela) (Entered: 11/15/1993) |
|---|---|---|
| 11/18/1993 | 615 | SEALED DOCUMENT placed in vault, containing a letter dated 11/9/93 from Andrew Weissman to the Court. (Conte, Daniela) (Entered: 11/18/1993) |
| 12/09/1993 | 620 | ORDER, extending time to 12/21/93 for the government to make disclosures (Signed by Judge Charles P. Sifton, dated: 12/7/93). So ordered on letter from AUSA George Stamboulidis to Judge Sifton of 12/7/93. (Conte, Daniela) (Entered: 12/09/1993) |
| 12/22/1993 | 624 | COPY of letter from AUSA George Stamboulidis to defense counsel, dated 12/21/93, Re: advising about tapes to be used at trial. (Conte, Daniela) (Entered: 12/22/1993) |
| 01/10/1994 | 628 | CALENDAR ENTRY as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, Richard Fusco; Case called before Judge Charles P. Sifton on date of 1/10/94 at 9:30 for hearing. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella present. Defense attorneys Barry Slotnick for dft A. Persico; Michael Washor for T. Persico; Salvatore Marinello for dft J. Russo; Melvyn Roth for dft A. Russo; Marvin Segal for dft R. Fusco; Joshua Dratel for dft R. Zambardi; Marion Seltzer for dft Monteleone; and Martin Goldberg for dft Fiorenza. All defendants present with counsel. Court Reporter/ESR Jeffrey Howell. Dft Zambardi's application for greater particularization of its Bill of Particulars is granted. A hearing on tape audibility will be held on 1/13/94 at 9:30AM. The dfts are to furnish by the end of the day on 1/12/94 their alternate interpretations of the tapes. WADE hearing as to dft Monteleone adjourned to 1/11 at 9:30AM. (Conte, Daniela) (Entered: 01/11/1994) |
| 01/13/1994 | 633 | CALENDAR ENTRY as to Joseph Russo, Anthony Russo, Joseph Monteleone SR., and Alphonse Persico; Case called before Judge Charles P. Sifton on date of 1/13/94 at 10:00 for hearing. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella and defense attorneys Salvatore Marinello for dft J. Russo; Melvyn Roth for dft A. Russo; and Marion Seltzer for dft Monteleone present. Dfts A. Persico, J. Russo and Monteleone present with counsel. Counsel present without dft A. Russo. Court Reporter/ESR Mark Gjelaj. Hearing concerning tape audibility adjourned to 1/14 at 2PM. (Conte, Daniela) (Entered: 01/14/1994) |
| 01/14/1994 | 634 | COPY of letter from AUSA Ellen Corcella to defense counsel, dated 1/13/94, Re: providing transcripts of tapes. (Enclosures) (Conte, Daniela) (Entered: 01/14/1994) |
| 01/14/1994 | 635 | CALENDAR ENTRY as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, and Richard Fusco; Case called before Judge Charles P. Sifton on date of 1/14/94 at 2:00 for hearing. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella present. Defense attorneys Barry Slotnick for dft A. Persico; Michael Washor and Joel Winograd for dft T. Persico; Salvatore Marinello for dft J. Russo; Melvyn Roth for dft A. Russo; |

| | | |
|---|---|---|
| | | Marvin Segal for dft R. Fusco; Franl Lopez for dft R. Zambardi; Marion Seltzer for dft Monteleone; and Martin Goldberg for dft L. Fiorenza present. Court Reporter/ESR Mark Gjelaj. Sealed proceedings held involving only dft A. Persico, his defense counsel and gov't counsel. Conference held for all dfts and counsel concerning the transcripts of the tape recorded conversations. (Conte, Daniela) (Entered: 01/18/1994) |
| 01/18/1994 | 636 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 1/18/94 at 12:30 for motion hearing. AUSA George Stamboulidis and defense attorney Mark Baker present. Dft not present. Court Reporter/ESR Marsha Diamond. Rulings are given concerning all defendants' motions with respect to the audibility of telephone tapes. (Conte, Daniela) (Entered: 01/19/1994) |
| 01/20/1994 | 638 | CALENDAR ENTRY as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, Richard Fusco; Case called before Judge Charles P. Sifton on date of 1/20/94 at 2:00 for motion hearing. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella; and, defense attorneys Barry Slotnick for dft A. Persico; Michael Washor for dft T. Persico; Salvatore Marinello for dft J. Russo; Melvyn Roth for dft A. Russo; Mitchell Golub for dft Fusco; Frank Lopez for dft R. Zambardi; Marion Seltzer for dft J. Monteleone; and Martin Goldberg for dft Fiorenza present. Dfts present with counsel. Court Reporter/ESR Marsha Diamond. Pretrial conference held. Govt's motion for an anonymous and sequestered jury is to be filed by 1/24/94. The dfts are to file responses by 1/26. (Conte, Daniela) (Entered: 01/21/1994) |
| 01/24/1994 | 641 | Proposed Jury Instructions by AUSA George Stamboulidis, Andrew Weissmann and Ellen Corcella. (Conte, Daniela) (Entered: 01/24/1994) |
| 01/24/1994 | 642 | MEMORANDUM by AUSA George Stamboulidis, Andrew Weissmann and Ellen Corcella, dated 1/23/94, in support of its motion for an anonymous and partially sequestered jury. Exhibits annexed. (Conte, Daniela) (Entered: 01/24/1994) |
| 01/24/1994 | 644 | CALENDAR ENTRY as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, and Richard Fusco; Case called before Judge Charles P. Sifton on date of 1/24/94 at 9:30 for motion hearing. AUSA George Stamboulidis and defense attorneys Barry Slotnick and Mark Baker for dft A. Persico; Michael Washor and Joel Winograd for dft T. Persico; Salvatore Marinello for dft J. Russo; Melvyn Roth for dft A. Russo; Marvin Siegel for dft R. Fusco; Frank Lopez for dft R. Zambardi; Marion Seltzer for dft J. Monteleone; and Martin Goldberg for dft L. Fiorenza present. Only dft A. Persico present with counsel. All other counsel present without dfts. Court Reporter/ESR Sheldon Silverman. Status conference held. Briefing schedules for various applications are set. Next appearance for all dfts will be 1/28/94 at 11AM. (Conte, Daniela) (Entered: 01/25/1994) |
| 01/25/1994 | 643 | LIMITED Witness list by AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella. (Conte, Daniela) (Entered: 01/25/1994) |
| | | |

Case 1:02-cr-00251-DEK　Document 4369-6　Filed 09/29/16　Page 18 of 635 PageID #: 4697

| 01/27/1994 | 645 | ORDER as to Alphonse Persico, signed by Judge Charles P. Sifton, dated: 1/26/94. Barry Slotnick is disqualified from representing the dft. The parties are to appear on 1/28/94 at 11:00AM to determine dft's future representation. c/m (Conte, Daniela) (Entered: 01/27/1994) |
|---|---|---|
| 01/27/1994 | 646 | SEALED DOCUMENT placed in vault containing a copy of a letter from Matthew Brief dated 1/20/94. (Conte, Daniela) (Entered: 01/27/1994) |
| 01/28/1994 | 647 | MEMO/ORDER defendants' motions to dismiss the indictment; for seperate trials; for disclosure of grand jury testimony; suppression; for a James hearing; double joepardy issue; for a Wade hearing; for pretrial interviews of government witnesses; and to strike surplusage are all denied. (Signed by Judge Charles P. Sifton, dated: 1/26/94). c/m (Conte, Daniela) (Entered: 01/28/1994) |
| 01/28/1994 | 650 | CALENDAR ENTRY as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, Richard Fusco; Case called before Judge Charles P. Sifton on date of 1/28/94 at 11:00 for motion hearing. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella; defense attorneys Barry Slotnick for dft A. Persico; Michael Washor for dft T. Persico; Salvatore Marinello for dft J. Russo; Melvyn Roth for dft A. Russo; Marvin Segal for dft R. Fusco; Richard Rosenkranz for dft R. Zambardi; Marion Seltzer for dft Monteleone; Martin Goldberg for dft Fiorenza present. All dfts except for R. Fusco present. Dft A. Persico's motion for reconsideration of the Court's ruling of 1/26/94 disqualifying the firm of Slotnick & Baker as counsel for A. Persico is granted. Upon reconsideration, the Court adheres to its ruling. Dft R. Zambardi moves for severance- decision reserved. Dft A. Persico is to appear through new counsel as soon as possible, and in any event not later than 2/11/94. The application of dfts Zambardi and T. Persico for additional time to prepare for trial is granted, to the eztent that the commencement of voir dire is adjourned from 2/1 to 2/8/94 at 9:30AM. (Conte, Daniela) (Entered: 01/31/1994) |
| 01/31/1994 | 648 | ORDER as to Carmine Sessa, Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Joseph Tomasello, Theodore Persico, Richard Fusco, James Delmastro, ordered that the Warden of the MCC allow each deft 2 suits, 2 slacks, and 2 sweaters to be exchanged each Friday during the course of the trial in the above matter, scheduled to begin on 2/1/94. ( Signed by Judge Charles P. Sifton , dated: 1/27/94) (Dobkin, David) (Entered: 01/31/1994) |
| 01/31/1994 | 649 | ORDER of excludable delay from 9/2/93 to 1/26/94 as to Carmine Sessa, Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Joseph Tomasello, Theodore Persico, Richard Fusco, James Delmastro ( Signed by Judge Charles P. Sifton , dated: 1/26/94) (Dobkin, David) (Entered: 01/31/1994) |
| 01/31/1994 | 651 | SEALED MEMORANDUM OPINION AND ORDER dtd 1/26/94 ORDER as to Michael Sessa, Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, |

Eastern District of New York - LIVE Database V6.1.1     Page 17 of 53
Case 1:02-cr-00251-DEK   Document 4369-6   Filed 08/19/21   Page 391 of 635 PageID #: 10093
#: 4698

| | | Carmine Sessa, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Joseph Tomasello, Theodore Persico, Richard Fusco, James ( Signed by Judge Charles P. Sifton , dated: 1/16/94) (Glenn, Marilyn) (Entered: 02/02/1994) |
|---|---|---|
| 02/02/1994 | 652 | SEALED DOCUMENT containing a discovery letter. (Conte, Daniela) (Entered: 02/02/1994) |
| 02/04/1994 | 657 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 2/4/94 at 11:30 for status conference. AUSA George Stamboulidis and defense attorney Barry Slotnick present. Dft present; in custody. Court Reporter/ESR Fred Guerino. Status conference held. Barry Slotnick reports that Alphonse Persico is still attempting to retain substitute counsel. (Conte, Daniela) (Entered: 02/08/1994) |
| 02/07/1994 | 653 | SEALED DOCUMENT placed in vault containing Amended Memorandum & Order dated 2/4/94. (Conte, Daniela) (Entered: 02/07/1994) |
| 02/07/1994 | 655 | AMENDED MEMO/ORDER signed by Judge Charles P. Sifton, dated: 2/1/94. The dft's motions to dismiss; for seperate trials; for examination of grand jury minutes; for suppression of records; for a James hearing; on the fear of double jeopardy; for suppression of photos; pretrial interviews of government witnesses; and to strike surplus language in the indictment are all denied. A hearing on the procedures employed in the photo identification of some of the dfts will be held at a later date, without a jury. c/m (Conte, Daniela) (Entered: 02/07/1994) |
| 02/07/1994 | 656 | ORDER, signed by Judge Charles P. Sifton, dated: 2/4/94. Juror questionnaires are to be distributed commencing 2/4/94 at 10:00. The selction of jurors will be anonymous. The contents of this order are to be communicated to anyone receiving a questionnaire in this case. (Conte, Daniela) (Entered: 02/07/1994) |
| 02/14/1994 | 661 | Letter from Judge Sifton to all counsel, dated 2/8/94, Re: providing a list of jurors to be excused. (Conte, Daniela) (Entered: 02/14/1994) |
| 02/14/1994 | 662 | ORDER as to Alphonse Persico (Signed by Judge Charles P. Sifton, dated: 2/7/94). Barry Slotnick and the members of the firm of Lefcourt & Dratel are to be given access to the Court's order, filed under seal, dated 1/26/94, for purposes of assisting the dft in the defense of the action and is subject to the directions of the Court with respect to confidentiality. (Conte, Daniela) (Entered: 02/14/1994) |
| 02/14/1994 | 666 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 2/14/94 at 12:30 for status conference. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella; and defense attorneys Barry Slotnick and Mark Baker present. Dft present; in custody. Court Reporter/ESR Anthony Mancuso. Status conference held. Dft has not yet retained new counsel. Set further status conference for 4:30 on 2/17/94 for Alphonse Persico before Judge Charles P. Sifton . (Conte, Daniela) (Entered: 02/15/1994) |
| 02/15/1994 | 667 | |

| | | ORDER as to Alphonse Persico, that the dft is to be housed at the Metropolitan Correctional Center until 3/18/94 at 5:00, subject to further direction of this Court (Signed by Judge Charles P. Sifton, dated: 2/14/94). (Conte, Daniela) (Entered: 02/15/1994) |
|---|---|---|
| 02/17/1994 | 668 | USCA Order filed on 2/14/94 the defendant Michael Sessa the motion for reinstatment for appeal, permission to file oversize brief is granted as to reinstatement only. Attorney is directed to file a motion for permission to file an oversized brief. The undersigned has authority to act only the former relief. Judge notified. Ackn mailed. USCA # 93-1413. (Gonzalez, Mary) (Entered: 02/17/1994) |
| 02/17/1994 | 675 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 2/17/94 at noon for status conference. AUSA George Stamboulidis, Andrew Weissman, and Ellen Corcella; and, defense attorney Barry Slotnick present. Dft present; in custody. Court Reporter/ESR Anthony Mancuso. Status conference held at sidebar. Proceedings sealed. (Conte, Daniela) (Entered: 02/18/1994) |
| 02/18/1994 | 669 | SEALED DOCUMENT placed in vault containing the transcript of jury selection dated 2/1/94. (Conte, Daniela) (Entered: 02/18/1994) |
| 02/18/1994 | 674 | AFFIDAVIT by AUSA George Stamboulidis, dated 2/14/94, Re: in support of the unsealing of recordings to be used at this trial. (Conte, Daniela) (Entered: 02/18/1994) |
| 02/18/1994 | 676 | ORDER as to Alphonse Persico (Signed by Judge Charles P. Sifton, dated: 2/17/94). The Bureau of Prisons is to maintain the dft at the Metropolitan Correctional Center until 2/25/94 at 5:00, subject to further direction of the Court. (Conte, Daniela) (Entered: 02/18/1994) |
| 02/22/1994 | 680 | ORDER of excludable delay as to Alphonse Persico for the period of 1/26/94 until the appearance of new counsel (Signed by Judge Charles P. Sifton, dated: 2/18/94). (Conte, Daniela) (Entered: 02/22/1994) |
| 02/24/1994 | 689 | CALENDAR ENTRY as to Alphonse Persico ; Case called before Judge Charles P. Sifton on date of 2/24/94 at 12:00p.m. for status conference.ESR Roseann Guzzi. AUSA George Stamboulidis. Andrew Weissman and Ellen Corcella. Defense counsel: Barry Slotnick and Mark Baker. Deft not present. Deft in custody. Case called. Status conference held. Deft is still interviewing prospective counsel to be substituted for Barry Slotnick. Status conference to continue to 3/4/94 at 12:00p.m. (Dobkin, David) (Entered: 03/02/1994) |
| 02/28/1994 | 685 | COPY of letter from AUSA George Stamboulidis to all counsel, dated 2/25/94, Re: providing additional information on the financial report regarding Joseph Ambrosino. (Conte, Daniela) (Entered: 02/28/1994) |
| 02/28/1994 | 686 | COPY of letter from AUSA Andrew Weissmann to Martin Siegel, Esq., dated 2/21/94, Re: forwarding copies of pre-trial rulings, the Bill of Particulars. Further discovery will be available upon his return to the office. (Conte, Daniela) (Entered: 02/28/1994) |
| 03/02/1994 | 1311 | |

Case 1:02-cr-00251-DEK   Document 4369-6   Filed 09/29/19   Page 393 of 635 PageID #: 4700

| | | |
|---|---|---|
| | | LETTER dated 3/2/94 from AUSA, Andrew Weissman, to Judge Sifton, advising the Court and counsel as to three areas which the government intends to examine Ambrosino on re-direct examination. (Asreen, Wendy) (Entered: 04/09/1997) |
| 03/02/1994 | 687 | SEALED DOCUMENT placed in vault containing letter dated 2/24/94. (Conte, Daniela) (Entered: 03/02/1994) |
| 03/02/1994 | 688 | SEALED DOCUMENT placed in vault containing letter dated 2/24/94. (Conte, Daniela) (Entered: 03/02/1994) |
| 03/02/1994 | 693 | ORDER as to Alphonse Persico, ordered that sealed proceedings dated 1/14/and 1/24/94, be transcribed and that a copy of the transcripts be provided to the govt and to the Court. The transcripts shall remain under seal and not be disseminated. (received 3/2/94). ( Signed by Judge Charles P. Sifton , dated: 1/5/94) (Dobkin, David) (Entered: 03/02/1994) |
| 03/02/1994 | 695 | ORDER as to Alphonse Persico, ordered the Bureau of Prisons is directed to maintain deft in custody at the MCC until 3/4/94 for the purpose of obtaining new counsel. ( Signed by Judge Charles P. Sifton , dated: 2/24/94) (Dobkin, David) (Entered: 03/02/1994) |
| 03/02/1994 | 697 | COPY of letter from AUSA George Stamboulidis to counsel, dated 3/1/94, Re: forwarding additional 3500 material. Enclosures. (Conte, Daniela) (Entered: 03/02/1994) |
| 03/03/1994 | 701 | SCHEDULING ORDER as to Alphonse Persico, James Delmastro setting Pretrial Conference for 2:00 on 9/2/94 for Alphonse Persico, for James Delmastro; Motion Filing deadline on 12:00 on 5/4/94 for Alphonse Persico, for James Delmastro; Jury Selection for 9:30 on 9/6/94 for Alphonse Persico, for James Delmastro; Jury Trial for 9:30 on 9/6/94 for Alphonse Persico, for James Delmastro (Signed by Judge Charles P. Sifton on 2/22/94). (Conte, Daniela) (Entered: 03/03/1994) |
| 03/04/1994 | 702 | Letter from AUSA Ellen Corcella, Andrew Weissman and George Stamboulidis to defense counsel, dated 3/4/94, Re: furnishing the "302's" pertaining to interviews of Joseph Ambrosino. Enclosures. (Conte, Daniela) (Entered: 03/04/1994) |
| 03/04/1994 | 706 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 3/4/94 at noon for status conference. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella; and, defense attorney Richard Michel present. Court Reporter/ESR Henri LeGendre. Status conference held concerning dft's efforts to retain new counsel. Set continued conference for 12:30 on 4/11/94 for Alphonse Persico before Judge Charles P. Sifton . (Conte, Daniela) (Entered: 03/07/1994) |
| 03/07/1994 | 705 | ORDER as to Alphonse Persico. Metropolitan Correctional Center is to maintain custody of dft A. Persico until 3/11/94 at the close of business or pending further order of this Court (Signed by Judge Charles P. Sifton, dated: 3/4/94). (Conte, Daniela) (Entered: 03/07/1994) |
| 03/07/1994 | 708 | |

| | | |
|---|---|---|
| | | TRANSCRIPT of pretrial conference before Judge Sifton filed in case for date of 1/10/94 at 9:30AM. AUSA George Stambouldis, Andrew Weissman, Ellen Corcella; and, defense attorneys Barry Slotnick, Mark Baker, Michael Washor, Joel Winograd, Salvatore Marinello, Melvyn Roth, Mithcell Golub, Frank Lopez, Joshua Dratel, Marion Seltzer, Martin Goldberg, Bruce Maffeo and Matthew Brief present. Court Reporter/ESR: Jeff Howell. (Conte, Daniela) (Rocco, Christine). (Entered: 03/07/1994) |
| 03/07/1994 | 710 | TRANSCRIPT of hearing before Judge Sifton filed in case for date of 1/13/94. AUSA George Stamboulidis, Andrew Weissman and Ellen Corcella; and, defense attorneys Barry Slotnick, Mark Baker, Michael Washor, Joel Winograd, Salvatore Marinello, Melvyn Roth and Marion Seltzer present. Court Reporter/ESR: Mark Gjelaj. (Conte, Daniela) (Rocco, Christine). (Entered: 03/07/1994) |
| 03/07/1994 | 711 | TRANSCRIPT of proceeding before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Alphonse Persico, Theodore Persico, Richard Fusco for dates of 1/14/94 at 2:00. AUSA George Stamboulidis; and, defense attorneys Barry Slotnick for dft A. Persico; Michael Washor for dft T. Persico; Salvatore Marinello for dft J. Russo; Melvyn Roth for dft A. Russo; Marvin Segal for dft R. Fusco; Marion Seltzer for dft Monteleone and Martin Goldberg for dft Fiorenza all present. Court Reporter/ESR: Mark Gjelaj. (Conte, Daniela) (Rocco, Christine). (Entered: 03/07/1994) |
| 03/09/1994 | 716 | CALENDAR ENTRY as to Alphonse Persico, Joseph Russo, Anthony Russo, Richard Fusco, Joseph Monteleone SR., Lawrence A. Fiorenza ; Case called before Judge Charles P. Sifton on date of 3/9/94 at 9:30a.m. for trial. Court Reporter Burt Sulzer. AUSA George Stamboulidis, Andrew Weissman, and Ellen Corcella. Case called. Deft's and counsel present. trial resumed. A mistrial declared as to deft Richard Fusco. Deft Fusco is severed from the other defts and will be tried with deft Alphonse Persico. beginning 9/6/94. Trial continued to 3/10/94. (Dobkin, David) (Entered: 03/11/1994) |
| 03/10/1994 | 717 | CALENDAR ENTRY as to Alphonse Persico, Joseph Russo, Anthony Russo, Richard Fusco, Joseph Monteleone SR., Lawrence A. Fiorenza ; Case called before Judge Charles P. Sifton on date of 3/10/94 for trial. Court Reporter Burt Sulzer. AUSA George Stamboulidis, Andrew Weissman, and Ellen Corcella. Case called. Deft's and counsel present. Trial resumed. Trial to continue to 4/11/94. (Dobkin, David) (Entered: 03/11/1994) |
| 03/11/1994 | 718 | ORDER of excludable delay from 1/26/94 to 9/6/94 as to Alphonse Persico ( Signed by Judge Charles P. Sifton , dated: 3/9/94) (Dobkin, David) (Entered: 03/11/1994) |
| 03/11/1994 | 724 | CALENDAR ENTRY as to Alphonse Persico ; Case called before Judge Charles P. Sifton on date of 3/11/94 for status conference, set status conference for 12:30 3/30/94 for Alphonse Persico before Judge Charles P. Sifton , reset jury selection for 6/13/94 for Alphonse Persico before Judge Charles P. Sifton , set Jury trial for 6/13/94 for Alphonse Persico before Judge Charles P. Sifton Barry Levin appears as new counsel for Alphonse Persico. (fe) (Entered: 03/16/1994) |

Case 1:02-cr-00251-DEK   Document 4369-6   Filed 08/19/21   Page 395 of 635 PageID #: 10497

| 03/11/1994 | 725 | NOTICE of Appearance for Alphonse Persico by Attorney Barry Levin (fe) (Entered: 03/16/1994) |
|---|---|---|
| 03/14/1994 | 720 | COPY of letter from AUSA George Stamboulidis to all counsel dated 2/10/94, Re: enclosing 3500 material. (Conte, Daniela) (Entered: 03/14/1994) |
| 03/14/1994 | 721 | COPY of letter from AUSA George Stamboulidis to all counsel dated 2/14/94, Re: forwarding additional 3500 material. (Conte, Daniela) (Entered: 03/14/1994) |
| 03/14/1994 | 722 | TRANSCRIPT of status conference before Judge Sifton filed in case for date of 2/24/94 at 2:00. AUSA Andrew Weissman, Ellen Corcella and George Stamboulidis; and, defense attorneys Mark Baker and Richard Michelle present. Court Reporter/ESR: Roseann Guzzi. (Conte, Daniela) (Entered: 03/14/1994) |
| 03/16/1994 | 723 | ORDER as to Alphonse Persico (Signed by Judge Charles P. Sifton, dated: 3/11/94). The dft is to be housed at the Metropolitan Correctional Facility until 3/30/94. (Conte, Daniela) (Entered: 03/16/1994) |
| 03/18/1994 | 731 | ORDER of excludable delay as to Alphonse Persico for the period of 1/26/94 to 3/11/94 (Signed by Judge Charles P. Sifton, dated: 3/15/94). (Conte, Daniela) (Entered: 03/18/1994) |
| 03/25/1994 | 733 | COPY of letter from AUSA Andrew Weissmann to defense counsel dated 3/22/94, Re: forwarding additional 302 reports. (Conte, Daniela) (Entered: 03/25/1994) |
| 03/29/1994 | 734 | Letter from AUSA Ellen Corcella to defense counsel, dated 3/29/94, Re: forwarding proposed stipulations regarding certain evidence. Enclosures. (Conte, Daniela) (Entered: 03/29/1994) |
| 03/30/1994 | 738 | CALENDAR ENTRY as to Alphonse Persico, and Richard Fusco; Case called before Judge Charles P. Sifton on date of 3/30/94 for status conference. AUSA George Stamboulidis and defense attorneys Barry Levin for dft A. Persico and Marvin Segal for dft Fusco present. Defendants present; in custody. Court Reporter/ESR Mary Ann Daniele. Status conference held. Trial of dfts Alphonse Persico and Richard Fusco are rescheduled from 9/5/94 to 6/13/94 at 9:30AM. Pretrial conference set for 6/7 at 2PM. Any pretrial motions are to be made returnable on or before 5/2/94. Second amended pretrial order signed. Conformed copies given to counsel. Bail motion for Alphonse Persico scheduled for 4/6/94 at 4:30PM; dft's papers by 4/4; govt's response by 4/5. Counsel for the gov't and dft Fusco are to attempt to agree on a way for the dft to get medical treatment for his high blood pressure. If unable to do so, counsel shall submit their positions in writing and call chambers for an appearance date. (Conte, Daniela) (Entered: 04/04/1994) |
| 04/04/1994 | 739 | ORDER as to Alphonse Persico. The dft is to be housed at the Metropolitan Correctional Facility until 4/6/94 (Signed by Judge Charles P. Sifton, dated: 3/30/94). (Conte, Daniela) (Entered: 04/04/1994) |
| 04/04/1994 | 740 | SCHEDULING ORDER as to Alphonse Persico, Richard Fusco setting Pretrial Conference for 2:00 on 6/7/94 for Alphonse Persico, for Richard |

| | | |
|---|---|---|
| | | Fusco ; Motion Filing deadline on 12:00 on 5/2/94 for Alphonse Persico, for Richard Fusco ; Jury Selection for 9:30 on 6/13/94 for Alphonse Persico, for Richard Fusco ; Jury Trial for 9:30 on 6/13/94 for Alphonse Persico, for Richard Fusco (Signed by Judge Charles P. Sifton). (Conte, Daniela) (Entered: 04/04/1994) |
| 04/05/1994 | 743 | MOTION by counsel for Alphonse Persico, dated 4/4/94, for an order releasing the dft on bail pending trial . Motion Hearing/Return date of 4:30 on 4/6/94 for Alphonse Persico [743-1] motion. Affidavit in support attached. (Conte, Daniela) (Entered: 04/05/1994) |
| 04/05/1994 | 744 | Letter from Barry Levin to Judge Sifton of 3/25/94, Re: advising of issues he will address at the 3/30/94 conference. (Conte, Daniela) (Entered: 04/05/1994) |
| 04/05/1994 | 746 | ORDER of excludable delay as to Alphonse Persico, and Richard Fusco for the period of 3/9/94 to 6/13/94 (Signed by Judge Charles P. Sifton, dated: 4/4/94). (Conte, Daniela) (Entered: 04/05/1994) |
| 04/05/1994 | 747 | COPY of letter from Barry Levin to AUSA George Stamboulidis, dated 3/31/94, Re: confirming that documents will be made available to be picked up on 4/1/94. (Conte, Daniela) (Entered: 04/05/1994) |
| 04/07/1994 | 751 | CALENDAR ENTRY as to Alphonse Persico ; Case called before Judge Charles P. Sifton on date of 4/7/94 for Motion hearing Court Reporter/ESR Carmella Jannuzi For deft. Barry Levine AUSA G.Stamboulidis A.Weissman E.Corcella Deft. appears with counsel Deft's renewed bail application is argued denying [743-1] motion for an order releasing the dft on bail pending trial as to Alphonse Persico (11) (Jackson, Ramona) (Entered: 04/11/1994) |
| 04/08/1994 | 749 | ORDER as to Alphonse Persico (Signed by Judge Charles P. Sifton, dated: 4/6/94). The dft is to be housed at Metropolitan Correctional Center until 4/8/94. (Conte, Daniela) (Entered: 04/08/1994) |
| 04/12/1994 | 752 | TRANSCRIPT of bail application before Judge Sifton filed in case as to Alphonse Persico for date of 4/7/94 at 9:30. AUSA George Stamboulidis and defense attorney Barry Levin present. Court Reporter/ESR: Carmella Jannuzzi. (Conte, Daniela) (Entered: 04/12/1994) |
| 04/12/1994 | 754 | Letter from Barry Levin, counsel for dft A. Persico, to Assistant Warden Gerlinski dated 4/7/94, Re: requesting to know if the dft will be maintained at the Metropolitan Correctional Facility. (Conte, Daniela) (Entered: 04/12/1994) |
| 04/12/1994 | 755 | Letter from Barry Levin to Judge Sifton dated 4/8/94, Re: forwarding a copy of a letter from the undersigned to Assistant Warden Gerlinski dated 4/8/94, in which they have agreed to house dft A. Persico at the Metropolitan Correctional Facility to prepare for trial. He will then be moved to FCI Otisville. (Conte, Daniela) (Entered: 04/12/1994) |
| 04/12/1994 | 756 | ORDER as to Alphonse Persico (Signed by Judge Charles P. Sifton, dated: 4/11/94). The dft is to be housed at the Metropolitan Correctional Facility until 4/29/94. He is then to be housed at FCI Otisville until the |

| | | commencement of trial on 6/9/94, at which time he will be transported back to the Metropolitan Facility. (Conte, Daniela) (Entered: 04/12/1994) |
|---|---|---|
| 04/18/1994 | 759 | TRANSCRIPT of proceedings before Judge Sifton filed in case as to Alphonse Persico for date of 3/11/94 at 12:45. AUSA Andrew Weissmann and defense attorneys Richard Michel and Barry Levine present. Court Reporter/ESR: Burton Sulzer. (Conte, Daniela) (Entered: 04/18/1994) |
| 04/21/1994 | 766 | COPY of letter from Barry Levin to Officer Wang at the Metorpolitan Correctional Facility, dated 4/18/94, Re: requesting compliance with 2 subpoenas for tape recorded calls. (Conte, Daniela) (Entered: 04/21/1994) |
| 04/26/1994 | 779 | Copy of a letter from Michael S. Washor to AUSA George Stamboulidis dtd. 4/26/94 we have reason to believe that the gov't. is conducting DNA tests in a attmept to forensically corroborate some of the witnesses' testimony. Please provide counsel with the details of these tests as weel as any of the related results and reports. (Virno (Entered: 05/06/1994) |
| 04/28/1994 | 771 | MOTION by counsel for Alphonse Persico, dated 4/27/94, for an order granting disclosure and inspection of grand jury minutes; to dismiss count 12; severing dft A. Persico from co-defendant Fusco; severing counts 10,11, and 14 for trial; for a hearing to determine the competency of government witness John Pate; determining that certain conversations are inadmissible; and precluding the government from introducing evidence of prior criminal activity . Motion Hearing/Return date of 12:00 on 5/2/94 for Alphonse Persico. Affidavit and exhibits in support attached. (Conte, Daniela) (Entered: 04/28/1994) |
| 04/28/1994 | 772 | MEMORANDUM by counsel for Alphonse Persico, dated 4/27/94, in support of [771-1] motion for an order granting disclosure and inspection of grand jury minutes; to dismiss count 12; severing dft A. Persico from co-defendant Fusco; severing counts 10,11, and 14 for trial; for a hearing to determine the competency of government witness John Pate; determining that certain conversations are inadmissible; and precluding the government from introducing evidence of prior criminal activity. (Conte, Daniela) (Entered: 04/28/1994) |
| 05/02/1994 | 775 | COPY of letter from Barry Levin to AUSA George Stamboulidis, dated 4/22/94, Re: advising of outstanding discovery requests. (Conte, Daniela) (Entered: 05/02/1994) |
| 05/05/1994 | 793 | SUPERSEDING INDICTMENT as to Alphonse Persico (11) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, 9s, 12s, Joseph Tomasello (12) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, 9s, 12s, Richard Fusco (14) count(s) 1s, 2s, 3s, 10s, 11s, 12s, 13s . (Conte, Daniela) (Entered: 05/09/1994) |
| 05/06/1994 | 780 | TRANSCRIPT of jury selection before Judge Sifton filed in case for date of 2/1/94 at 11:15. No appearances. Court Reporter/ESR: Frederick Guerino. (Conte, Daniela) (Entered: 05/06/1994) |
| 05/09/1994 | 799 | CALENDAR ENTRY as to Alphonse Persico, and Richard Fusco. Case called before Judge Charles P. Sifton on date of 5/9/94 for conference. ESR/ Roseann Guzzi. AUSA George Stamboulidis present. Dfts present w/ counsel. |

Eastern District of New York - LIVE Database V6.1.1                    Page 24 of 53
Case 1:02-cr-00251-DEK   Document 4869   Filed 08/19/21   Page 398 of 635 PageID
#: 4705

| | | |
|---|---|---|
| | | Not Guilty Plea by Alphonse Persico on counts 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, 9s, 12s, by Richard Fusco on counts 1s, 2s, 10s, 11s, 12s, 13s . Jury selection and trial are adjourned to 6/27/94 at 9:30. An amended pre-trial order will be filed. Counsel are to submit any rpoposed jury questionaries by 5/31/94. (Yuen, Sui May) (Entered: 05/16/1994) |
| 05/09/1994 | 809 | Letter from Barry Levin, counsel for deft Alphonse Persico, to Judge Sifton file dated May 9, 1994. Counsel request that the Court issue an order maintaining Mr. Persico at the Metropolitan Correctional Center pending trial. (Joseph, Derek) (Entered: 05/17/1994) |
| 05/10/1994 | 795 | MEMORANDUM by AUSA George Stamboulidis and Ellen Corcella, as to Alphonse Persico, dated 5/9/94, in opposition to dft's motion for an order granting disclosure and inspection of grand jury minutes; to dismiss count 12; severing dft A. Persico from co-defendant Fusco; severing counts 10,11, and 14 for trial; for a hearing to determine the competency of government witness John Pate; determining that certain conversations are inadmissible; and precluding the government from introducing evidence of prior criminal activity. Exhibits in support attached. (Conte, Daniela) (Entered: 05/10/1994) |
| 05/10/1994 | 796 | COPY of letter from Barry Levin to AUSA George Stamboulidis, dated 4/26/94, Re: a supplemental request for discovery. (Conte, Daniela) (Entered: 05/10/1994) |
| 05/12/1994 | 810 | ORDER that Alphonse Persico, deft in this matter, be transported from the FCI at Otisville, NY, to the Metropolitan Correction Center, NY for a Court appearance on May 16, 1994 and that said deft be detained at the MCC pending further order of this Court. ( Signed by Judge Charles P. Sifton , dated: May 12, 1994) (Joseph, Derek) (Entered: 05/17/1994) |
| 05/13/1994 | 800 | MEMORANDUM by USA in opposition to Alphonse Persico's supplemental pretrial motions. (Greves, Liz) (Entered: 05/16/1994) |
| 05/16/1994 | 803 | THIRD AMENDED CRIMINAL PRETRIAL SCHEDULING ORDER as to Alphonse Persico, Richard Fusco setting Pretrial Conference for 2:00 6/13/94 for Alphonse Persico, for Richard Fusco ; Motion Filing deadline 5/20/94 for Alphonse Persico, for Richard Fusco ; Jury selection 6/27/94 at 9:30 for Alphonse Persico and Richard Fusco; Jury Trial 6/27/94 at 9:30 for Alphonse Persico and Richard Fusco; ( by Judge Charles P. Sifton 5/9/94) c/m (Piper, Francine) (Entered: 05/16/1994) |
| 05/16/1994 | 804 | ORDER OF EXCLUDABLE DELAY as to Alphonse Persico, Richard Fusco from 6/13/94 to 6/27/94 ( Signed by Judge Charles P. Sifton , dated: 5/9/94) (Piper, Francine) (Entered: 05/16/1994) |
| 05/16/1994 | 805 | Letter dated 5/4/94 from Barry Levin to Wallace H. Cheney, Re: Enclosing two "so ordered" subpoenas signed by Judge Sifton. (Piper, Francine) (Entered: 05/16/1994) |
| 05/16/1994 | 806 | Copy of Letter dated 5/2/94 from George A. Stamboulidis to Barry Levin, Re: Enclosing a copy of the transcript of the testimony of Carmine Sessa from the trial of U.S. v. Theodore Persico. (Piper, Francine) (Entered: 05/16/1994) |
| | | |

| 05/16/1994 | 807 | Deft Alphonse Persico's Supplemental Memo in further support of his motion for various forms of relief. (Greves, Liz) (Entered: 05/17/1994) |
| 05/16/1994 | 808 | SUPPLEMENTAL MEMORANDUM by USA in opposition to deft Alphonse Persico's supplemental pretrial motions. (Greves, Liz) (Entered: 05/17/1994) |
| 05/17/1994 | 811 | LETTER dtd 5/9/94 to Ms. Corcella from Lois watts re: to acknowledge receipt of subpoena for guest records and to advise that there are three Holiday Inn Hotels in Ann Harbor. (Roker, Michelle) (Entered: 05/17/1994) |
| 05/18/1994 | 814 | TRANSCRIPT of arraignment & motion before Judge Sifton filed in case as to Alphonse Persico, Richard Fusco for dates of 5/9/94; ESR Operator R. Guzzi. (Greves, Liz) (Entered: 05/19/1994) |
| 05/18/1994 | 815 | TRANSCRIPT of bail application before Judge Sifton filed in case as to Alphonse Persico for dates of 5/9/94; ESR Operator R. Guzzi. (Greves, Liz) (Entered: 05/19/1994) |
| 05/19/1994 | 819 | MEMORANDUM by USA in opposition to Alphonse Persico's Motion to dismiss counts 4-9 and racketeering act one, under count one, to sever and for examination of the grand jruy minutes. (Yuen, Sui May) (Entered: 05/20/1994) |
| 05/20/1994 | 816 | LETTER dated 5/12/94 from Barry Levin to Judge Sifton requesting that the Judge grant the defense until 5/18/94 to serve their supplemental brief. (fe) (Entered: 05/20/1994) |
| 05/20/1994 | 818 | Copy of letter dated 5/11/94 from Nushin Ghofrany to Samantha Susskind, regarding the movement of deft Persico from MCC to FCI Otisville. (Dobkin, David) (Entered: 05/20/1994) |
| 05/24/1994 | 824 | Ltr. to Mr. Stamboulidis from Barry Levin dtd. 5/17/94 re: confirm that Gov't will copy the following exhibits and foward to my office (see document). (Jackson, Ramona) (Entered: 05/24/1994) |
| 05/24/1994 | 825 | REPLY by Alphonse Persico to government's response to defendant's [771-1] motion for an order granting disclosure and inspection of grand jury minutes; to dismiss count 12; severing dft A. Persico from co-defendant Fusco; severing counts 10,11, and 14 for for a hearing to determine the competency of government witness John Pate; determining that certain conversations are inadmissible; and precluding the government from introducing evidence of prior criminal activity. (Asreen, Wendy) (Entered: 05/24/1994) |
| 05/24/1994 | 827 | MOTION by Alphonse Persico for an order, pursuant to Fed. R. Crim. P. 15 permitting the defendant to take the video taped deposition of Greg an inmate at FMC Rochester, Minnesota Motion date of 2:00 5/25/94 for Alphonse Persico [827-1] motion (Roker, Michelle) (Entered: 05/25/1994) |
| 05/24/1994 | 829 | MEMORANDUM OF LAW by Alphonse Persico in support of [827-1] motion for an order, pursuant to Fed. R. Crim. P. 15 permitting defendant to take the video taped deposition of Greg an inmate at FMC Rochester, Minnesota (Roker, Michelle) (Entered: 05/25/1994) |

Eastern District of New York - LIVE Database V6.1.1                    Page 26 of 53
Case 1:02-cr-00251-DEK   Document 4369   Filed 08/19/21   Page 400 of 635 PageID #: 104402
#: 4707

| 05/25/1994 | 826 | LETTER dtd 5/24/94 to Clerk from Barry Levin re: enclosing (attached) Notice of Motion & Affidavit in Support. (Roker, Michelle) (Entered: 05/25/1994) |
| 05/25/1994 | 828 | AFFIDAVIT IN SUPPORT (attached to doc. #827) by Alphonse Persico in support of [827-1] motion for an order, pursuant to Fed. R. Crim. P. 15 permitting defendant to take the video taped deposition of Greg an inmate at FMC Rochester, Minnesota (Roker, Michelle) (Entered: 05/25/1994) |
| 05/25/1994 | 832 | CALENDAR ENTRY as to Alphonse Persico ; Case called before Judge Charles P. Sifton on date of May 25, 1994, at 2 p.m., for motion hearing. Court Reporter/ESR - Robert Eppenstein, ESR. Govt. rep. by George Stamboulidis and Ellen Corcella. Deft. A. Persico present, in custody, and rep. by Barry Levin. Deft. A. Persico's pretrial motions argued and continued to 5/31/94 at 2 p.m. Deft.'s appl. for an order permitting the deft. to take a videotaped deposition of Greg Scarpa forthwith at FMC Rochester, Minn., is continued to 5/31/94 at 2 p.m. (Vaughn, Terry) (Entered: 05/31/1994) |
| 05/25/1994 | | Added Government Attorney Ellen M. Corcella. (Vaughn, Terry) (Entered: 05/31/1994) |
| 05/26/1994 | 830 | TRANSCRIPT filed as to defts. Persico, J. Russo, A. Russo, Monteleone and Fiorenza, for a conference held before Judge Sifton on May 10, 1994. AUSA: Valerie Caproni. Court Reporter: Gene Rudolph (Asreen, Wendy) (Entered: 05/27/1994) |
| 05/26/1994 | 831 | TRANSCRIPT filed for conference held before Judge Sifton on 05/12/94. AUSA: George Syamboulidis, Karen Popp, Ellen Corcella. Defense Counsel: Salvatore Marinello. Also present: Elizabeth Baren. Court Reporter: Gene Rudolph. (Asreen, Wendy) (Entered: 05/27/1994) |
| 05/31/1994 | 836 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 5/31/94 at 2:30 for motion hearing. AUSA George Stamboulidis and Ellen Corcella and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Burt Sulzer. Motion of defendant for leave to depose Gregory Scarpa is heard. The application is adjourned to permit Stephen Kartogener, former counsel for Mr. Scarpa, to consult with him and attempt to determine his position. (Conte, Daniela) (Entered: 06/03/1994) |
| 06/02/1994 | 835 | COPY of letter from AUSA Ellen Corecella to Barry Levin, Esq., dated 5/31/94, Re: forwarding a copy of Dr. Kucharski's handwritten report. Enclosures. (Conte, Daniela) (Entered: 06/02/1994) |
| 06/06/1994 | 837 | RESPONSE by USA as to Alphonse Persico re: in opposition to his motion for a new trial as to counts 1,2,9,10,11 and 12. Response submitted in the form of a letter from AUSA Ellen Corcella and George Stamboulidis to Judge Sifton of 6/3/94. (Conte, Daniela) (Entered: 06/06/1994) |
| 06/07/1994 | 839 | Copy of letter dated 6/7/94 from AUSA Ellen M. Corcella to Mr. Levin enclosing copies of medical examiners report, crime scene report & lab report pertaining to the Steven Piazza homicide; copies of 3500-78(J26) thru 3500- |

Case 1:02-cr-00251-DEK　Document 1469-6　Filed 08/19/21　Page 401 of 635 PageID #: 4708

| | | |
|---|---|---|
| | | 78(J82) for John Pate; copies of GX 624H, GX 624 (H-1) & GX 624N. (Greves, Liz) (Entered: 06/09/1994) |
| 06/10/1994 | 843 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 6/10/94 at 2:00 for pre-trial conference. AUSA George Stamboulidis and Ellen Corcella and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR not indicated. Pre-trial conference held. (Conte, Daniela) (Entered: 06/15/1994) |
| 06/14/1994 | 841 | COPY of letter from AUSA Ellen Corcella to Barry Levin, Esq., dated 6/13/94, Re: in response to his 6/10/94 letter. All requested materials that he is entitled to have been received. Other material is 3500 material and will be turned over when the witnesses testify. (Conte, Daniela) (Entered: 06/14/1994) |
| 06/20/1994 | 844 | RESPONSE by USA as to Alphonse Persico in opposition to his motion in limine requesting to examine and photocopy materials the government wishes to use at trial. Response submitted in the form of a letter from AUSA Ellen Corcella to Judge Sifton dated 6/18/94. (Conte, Daniela) (Entered: 06/20/1994) |
| 06/20/1994 | 846 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 6/20/94 at 9:30 for jury selection and trial. AUSA George Stamboulidis and Ellen Corcella present. Defense attorney Barry Levin and defendant not present. Court Reporter/ESR Fred Guerino. They jury panel completes questionnaires. (Conte, Daniela) (Entered: 06/22/1994) |
| 06/22/1994 | 845 | MEMO/ORDER as to Alphonse Persico denying [771-1] motion for an order granting disclosure and inspection of grand jury minutes; to dismiss count 12; severing dft A. Persico from co-defendant Fusco; severing counts 10,11, and 14 for for a hearing to determine the competency of government witness John Pate; determining that certain conversations are inadmissible; and precluding the government from introducing evidence of prior criminal activity as to Alphonse Persico (11) (Signed by Judge Charles P. Sifton, dated: 6/20/94). The government will not introduce evidence relating to the murder of Michael Devine. (Conte, Daniela) (Entered: 06/22/1994) |
| 06/24/1994 | 848 | ORDER as to Alphonse Persico signed by Judge Charles P. Sifton, dated: 6/22/94. The jurors are to remain anonymous. Anyone receiving actual notice of this order is not to contact or attempt to determine the identity of the jurors without leave of the Court; nor to communicate the contents of this order to anyone receiving a questionnaire. (Conte, Daniela) (Entered: 06/24/1994) |
| 06/24/1994 | 849 | Acknowledgment of receipt of juror questionnaires as to Alphonse Persico signed by counsel for the government and defense. (Conte, Daniela) (Entered: 06/24/1994) |
| 06/24/1994 | 850 | COPY of letter from AUSA George Stamboulidis to Barry Levin, Esq., dated 6/22/94, Re: forwarding copies of two additional tape recordings intended to be used at trial. (Received without enclosures.) (Conte, Daniela) (Entered: 06/24/1994) |
| 06/27/1994 | 852 | |

Eastern District of New York - LIVE Database V6.1.1　　　　　　Page 28 of 53
Case 1:02-cr-00251-DEK　Document 4369-6　Filed 09/29/16　Page 402 of 635 PageID #: 10404
#: 4709

| | | |
|---|---|---|
| | | RESPONSE by USA as to Alphonse Persico in opposition to defendant's request to represent himself as co-counsel. Response submitted in the form of a letter from AUSA Ellen Corcella and George Stamboulidis to Judge Sifton of 6/24/94. (Conte, Daniela) (Entered: 06/27/1994) |
| 06/27/1994 | 853 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 6/27/94 at 9:30 for jury selection and trial. AUSA George Stamboulidis and Ellen Corcella and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Carmella Jannuzzi. Jury selection begun. Trail continued to 6/28/94. (Conte, Daniela) (Entered: 06/28/1994) |
| 06/28/1994 | 854 | Letter from Ellen Corcella and George Stamboulidis to Judge Sifton dated 6/27/94, Re: moving in limine to introduce evidence that Alphonse Persico was involved in two assaults. (Conte, Daniela) (Entered: 06/28/1994) |
| 06/28/1994 | 855 | COPY of letter from AUSA Ellen Corcella to Barry Levin, Esq., dated 6/28/94, Re: forwarding telephone records from FCI Milan, Michiigan. (Received without enclosures.) (Conte, Daniela) (Entered: 06/28/1994) |
| 06/28/1994 | 856 | TRANSCRIPT of proceedings before Judge Sifton filed in case as to Alphonse Persico for date of 5/31/94 at 2:00. AUSA George Stamboulidis and defense attorney Barry Levin present. Court Reporter/ESR: Burton Sulzer. (Conte, Daniela) (Entered: 06/28/1994) |
| 06/28/1994 | 859 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 6/28/94 at 9:30 for jury selection and trial. AUSA George Stamboulidis and Ellen Corcella and defense attorney Barry Levin present. Court Reporter/ESR Carmella Jannuzzi. Defendant present; in custody. Trial resumed. Jury selection continued. Trial continued to 6/29/94. (Conte, Daniela) (Entered: 07/05/1994) |
| 06/29/1994 | 857 | COPY of letter from AUSA Ellen Corcella to Barry Levin, Esq., dated 6/28/94, RE: forwarding copies of Government Exhibits 624 X and 624 X-1. (Received without enclosures.) (Conte, Daniela) (Entered: 06/29/1994) |
| 06/30/1994 | 863 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 6/30/94 at 9:30 for jury selection and trial. AUSA George Stamboulidis and Ellen Corcella and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Carmella Jannuzzi. Trial resumed. Jury selection resumed and concluded. (Conte, Daniela) (Entered: 07/06/1994) |
| 07/01/1994 | 1364 | LETTER dated 6/29/94 from Martin Goldberg, Esq., to Judge Sifton, requesting a hearing as to whether Gregory Scarpa was a "co-conspirator". (Asreen, Wendy) (Entered: 07/02/1997) |
| 07/05/1994 | 858 | Order of Sustenance for lunch and transportation for 18 jurors and 3 US Marshals beginning 6/30/94 and continuing each day until the conclusion of trial as to Alphonse Persico (Signed by Judge Charles P. Sifton on 6/29/94). (Conte, Daniela) (Entered: 07/05/1994) |
| 07/05/1994 | | |

Eastern District of New York - LIVE Database V6.1.1                    Page 29 of 53
Case 1:02-cr-00251-DEK   Document 4369   Filed 08/19/21   Page 403 of 635 PageID #: 10405
#: 4710

| | | Voir dire begun as to Alphonse Persico (11) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, 9s, 12s on 7/5/94. (Conte, Daniela) (Entered: 07/07/1994) |
|---|---|---|
| 07/05/1994 | | Jury trial as to Alphonse Persico begun on 7/5/94 before Judge Sifton. (Conte, Daniela) (Entered: 07/07/1994) |
| 07/05/1994 | 865 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/5/94 for trial. AUSA George Stamboulidis and Ellen Corcella and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Marsha Diamond. Jury sworn and opening statements given. Trial continued to 7/6/94. (Conte, Daniela) (Entered: 07/07/1994) |
| 07/06/1994 | 860 | COPY of letter from AUSA Ellen Corcella and George Stamboulidis to Barry Levin, Esq., dated 6/29/94, RE: discovery issues pertaining to trial. (Conte, Daniela) (Entered: 07/06/1994) |
| 07/06/1994 | 861 | COPY of letter from AUSA George Stamboulidis to Barry Levin, Esq., dated 7/1/94 Re: confirming that an additional affidavit of Special Agent Christopher Favo has been turned over to him. (Conte, Daniela) (Entered: 07/06/1994) |
| 07/06/1994 | 862 | COPY of letter from AUSA George Stamboulidis and Ellen Corcella to Barry Levin, Esq., dated 7/5/94, Re: forwarding medical records of John Pate. (Received without enclosures.) (Conte, Daniela) (Entered: 07/06/1994) |
| 07/06/1994 | 866 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/6/94 for trial. AUSA George Stamboulidis and Ellen Corcella and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Marsha Diamond. Trial resumed and continued to 7/7/94. (Conte, Daniela) (Entered: 07/07/1994) |
| 07/07/1994 | 869 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/7/94 at 9:30 for trial. AUSA George Stamboulidis and Ellen Corecella; and defense attorney Barry Levin present. Defendants present; in custody. Court Reporter/ESR Marsha Diamond. Trial resumed and continued to 7/8/94. (Conte, Daniela) (Entered: 07/11/1994) |
| 07/08/1994 | 870 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/8/94 at 9:30 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Court Reporter/ESR Marsha Diamond. Trial resumed and continued to 7/11/94. (Conte, Daniela) (Entered: 07/11/1994) |
| 07/11/1994 | 868 | COPY of letter from AUSA George Stamboulidis to Barry Levin dated 7/8/94, Re: furnishing a financial report on John Pate. (Received without enclosures.) (Conte, Daniela) (Entered: 07/11/1994) |
| 07/11/1994 | 871 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/11/94 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Defendant present. Court Reporter/ESR Sheldon Silverman. Trial resumed and continued to 7/12/94. (Conte, Daniela) (Entered: 07/12/1994) |
| | | |

Case 1:02-cr-00251-DEK   Document 4369-6   Filed 09/20/16   Page 404 of 635   Page 406
#: 4711

| 07/12/1994 | 872 | COPY of letter from AUSA George Stamboulidis to Barry Levin dated 7/8/94, Re: forwarding 3500 material as to New York City Police Detective Vito Aleo. (Conte, Daniela) (Entered: 07/12/1994) |
| 07/12/1994 | 873 | COPY of letter from AUSA Ellen Corcella to Barry Levin, dated 7/11/94, Re: advising that the government will seek to admit $10,000.00 as evidence. (Conte, Daniela) (Entered: 07/12/1994) |
| 07/12/1994 | 874 | CALENDAR ENTRY as to Alphonse Persico ; Case called before Judge Charles P. Sifton on date of 7/12/94 for trial Court Reporter/ESR Sheldon Silverman. Trial continued to 7/13/94. (fe) (Entered: 07/13/1994) |
| 07/13/1994 | 875 | Ltr. to J.Sifton from Ellen M.Corcella dtd. 7/12/94 RESPONSE by USA as to Alphonse Persico in support of request to introduce certain statements made by deft. to R.Ross (Jackson, Ramona) (Entered: 07/13/1994) |
| 07/13/1994 | 876 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/13/94 at 9:30 for trial. AUSA George Stamboulidis and Ellen Corcella present. Defendant present; in custody. Court Reporter/ESR not indicated. Trial resumed. Juror #6 is excused by the Court and is replaced by alternate juror #1. Trial continued to 7/14/94. (Conte, Daniela) (Entered: 07/14/1994) |
| 07/14/1994 | 877 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/14/94 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Court Reporter/ESR Shelly Silverman. Trial resumed and continued to 7/15/94. (Conte, Daniela) (Entered: 07/18/1994) |
| 07/18/1994 | 879 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/18/94 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Fred Guerino. Trial resumed. Motion of Bruce Maffeo, Esq., for an order quashing a subpoena is argued. Mr. Maffeo is to submit additional papers in support by 7/20/94; defendant is to respond by 7/21/94; argument is continued to 7/22/94 at 9:30AM. Trial continued to 7/19/94. (Conte, Daniela) (Entered: 07/19/1994) |
| 07/19/1994 | 878 | ORDER as to Alphonse Persico signed by Judge Charles P. Sifton, dated: 7/18/94. Defendant Persico is to attend meetings between his attorney, Barry Levin, and incarcerated witnesses who have to be transported to the Metropolitan Correctional Center pursuant to writs of habeas corpus ad testificandum provided that the witnesses consent in writing to be interviewed by Mr. Levin and defendant Persico. (Conte, Daniela) (Entered: 07/19/1994) |
| 07/19/1994 | 880 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/19/94 at 9:30 for trial. AUSA George Stamboulidis and Ellen Corcella and defense attorney Barry Levin present. Court Reporter/ESR Fred Guerino. Trial resumed and continued to 7/20/94. (Conte, Daniela) (Entered: 07/20/1994) |
| 07/20/1994 | 881 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/20/94 for trial. AUSA George Stamboulidis and |

Case 1:02-cr-00251-DEK   Document 4389-6 Filed 08/19/21   Page 405 of 635 PageID #: 4712

| | | |
|---|---|---|
| | | Ellen Corcella and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Fred Guerino. Trial resumed and continued to 7/21/94. (Conte, Daniela) (Entered: 07/21/1994) |
| 07/21/1994 | 882 | ORDER as to Alphonse Persico and Carmine Persico (Signed by Judge Charles P. Sifton, dated: 7/20/94). Defendant Alphonse Persico is permitted to meet with defense witness Carmine Persico and their respective counsel to conduct defense conferences while both are incarcerated at the Metropolitan Correctional Center from the time of this order until the competetion of Carmine Persico's testimony. (Conte, Daniela) (Entered: 07/21/1994) |
| 07/21/1994 | 883 | CALENDAR ENTRY as to Alphonse Persico ; Case called before Judge Charles P. Sifton on date of 7/21/94 for trial Court Reporter/ESR Fred Guerino. Trial continued to 7/25/94. (fe) (Entered: 07/25/1994) |
| 07/25/1994 | 884 | COPY OF A LETTER dated 7/24/94 from Ellen M. Corcella to Mr. Levin enclosing a financial report regarding Lawrence Mazza. (fe) (Entered: 07/25/1994) |
| 07/25/1994 | 886 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/25/94 for trial. AUSA George Stamboulidis and Ellen Corcella and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Anthony Mancuso. Trial resumed and continued to 7/26/94. (Conte, Daniela) (Entered: 07/27/1994) |
| 07/26/1994 | 887 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/26/94 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Anthony Mancuso. Trial resumed and continued to 7/27/94. (Conte, Daniela) (Entered: 07/27/1994) |
| 07/27/1994 | 885 | ORDER signed by Judge Charles P. Sifton, dated: 7/25/94. George Lombardi, an incarcerated defense witness, is to be transported and detained at the Metropolitan Correctional Center through the completion of his testimony. (Conte, Daniela) (Entered: 07/27/1994) |
| 07/27/1994 | 889 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/27/94 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Defendant present; in custody. Court Reporter/ESR Anthony Mancuso. Trial resumed. Government rests. Trial continued to 7/28/94. (Conte, Daniela) (Entered: 07/28/1994) |
| 07/28/1994 | 890 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 7/28/94 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Court Reporter/ESR Anthony Mancuso. Trial resumed. The defendant's Rule 29 motion for a judgment of acquittal is denied. The defendant rests. Trial continued to 8/1/94. (Conte, Daniela) (Entered: 07/29/1994) |
| 07/29/1994 | 892 | Letter dtd. 6/21/94 from Salvatore Compoccia to AUSA, George Stamboulidis requesting information on J. Angellino. (Asreen, Wendy) (Entered: 08/01/1994) |

Eastern District of New York - LIVE Database V6.1.1    Page 32 of 53
Case 1:02-cr-00251-DEK   Document 1489-6   Filed 08/19/21   Page 406 of 635   PageID #: 10408
#: 4713

| 08/01/1994 | 896 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 8/1/94 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorneys Barry Levin and Kelly Guthy present. Court Reporter/ESR Gene Rudolph. Trial resumed. Charging conference held. Government's summation is continued to 8/2/94. (Conte, Daniela) (Entered: 08/02/1994) |
|---|---|---|
| 08/02/1994 | 895 | NOTICE OF INTENT to Call Witness(es) Re: Alibi as to Alphonse Persico. Notice filed in the form of a copy of a letter from Barry Levin to AUSA George Stamboulidis dated 7/25/94. (Conte, Daniela) (Entered: 08/02/1994) |
| 08/02/1994 | 897 | ORDER of excludable delay as to Alphonse Persico, and Richard Fusco for the period of 5/2/94 to 6/27/94 (Signed by Judge Charles P. Sifton, dated: 8/1/94). (Conte, Daniela) (Entered: 08/02/1994) |
| 08/02/1994 | 898 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 8/2/94 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorneys Barry Levin and Kelly Guthy present. Court Reporter/ESR Gene Rudolph. Trial resumed. Defendant's summation given. Government's rebuttal summation given. Trial continued to 8/3/94. (Conte, Daniela) (Entered: 08/03/1994) |
| 08/03/1994 | 901 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 8/3/94 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Court Reporter/ESR Gene Rudolph. Trial resumed. The Court charges the jury. Alternate jurors excused. Deputy US Marshal sworn. The jury retires to deliberate at 1:00PM. Trial continued to 8/4/94. (Conte, Daniela) (Entered: 08/09/1994) |
| 08/04/1994 | 902 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 8/4/94 at 9:30 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Court Reporter/ESR Gene Rudolph. Trial resumed. The jury resumes its deliberations. Trial continued to 8/5/94. (Conte, Daniela) (Entered: 08/09/1994) |
| 08/05/1994 | 907 | LETTER dated 8/4/94 from Alan S. Futerfas to Judge Sifton requesting an adjournment of the argument of motions and sentencing currently scheduled for 8/12/94 at 9:30. (fe) (Entered: 08/17/1994) |
| 08/05/1994 | 903 | CALENDAR ENTRY as to Alphonse Persico; Case called before Judge Charles P. Sifton on date of 8/5/94 at 9:30 for trial. AUSA George Stamboulidis and Ellen Corcella; and defense attorney Barry Levin present. Court Reporter/ESR Gene Rudolph. Trial resumed. The jury resumes its deliberations at 9:20AM. The jury suspends its deliberations at 3:30PM. Trial continued to 8/8/94. (Conte, Daniela) (Entered: 08/09/1994) |
| 08/08/1994 | 908 | CALENDAR ENTRY as to Alphonse Persico ; Case called before Judge Charles P. Sifton on date of 8/8/94 for trial Court Reporter/ESR Perry Auerbach, Dft and counsel present. Trial resumed. The jury resumes its deliberations at 10:00. Not Guilty: Alphonse Persico (11) count(s) 1s, 1, 2s, 2, |

Case 1:02-cr-00251-DEK   Document 4869-6   Filed 08/19/21   Page 497 of 635 PageID #: 10409

| | | |
|---|---|---|
| | | 3s, 3, 4s, 4, 5s, 5, 6s, 6, 7s, 7, 8s, 8, 9s, 9, 12s, 12 Jury polled and discharged. The dft is discharged. Trial concluded. (fe) (Entered: 08/17/1994) |
| 08/09/1994 | 904 | NOTICE of change of address by counsel for Alphonse Persico. Alan Futerfas has moved to 260 Madison Avenue, 22nd Floor, New York, New York 10016; (212) 684-8400; fax (212) 679-1844. (Conte, Daniela) (Entered: 08/09/1994) |
| 08/17/1994 | 909 | Proposed Verdict Form by counsel for Alphonse Persico. (Conte, Daniela) (Entered: 08/17/1994) |
| 08/17/1994 | 910 | JUDGMENT Alphonse Persico (11) count(s) 1s, 2s , 3s , 4s , 5s , 6s , 7s , 8s , 9s , 12s . The defendant was found not guilty to any charges in the indictment. (Signed by Judge Charles P. Sifton, Dated 8/15/94). (Conte, Daniela) (Entered: 08/17/1994) |
| 08/23/1994 | 1365 | LETTER dated 8/18/94 from Martin Goldberg, Esq., to Judge Sifton, requesting a complete set of the Scarpa reports and related information. (Asreen, Wendy) (Entered: 07/02/1997) |
| 09/12/1994 | 915 | MEMORANDUM by AUSA Ellen Corcella, Leon Rodriguez and George Stamboulidis dated 9/27/93, in opposition to defendants' pretrial motions for seperate trials, dismissal or redaction of counts; discovery; suppression. Exhibits in support attached. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 916 | Appendix A-1, Fusco Pager Clone, submitted by USA in opposition to defendants' pretrial motions. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 917 | Appendix A-1, Quattrache electronic surveillance (12/91-2/92) submitted by USA in opposition to defendants' pretrial motions. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 918 | Appendix A-1, Quattrache electronic surveillance (3/92-8/92) submitted by USA in opposition to defendants' pretrial motions. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 919 | Appendix A-2, McLaughlin electronic surveillance, submitted by USA in opposition to defendants' pretrial motions. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 920 | Appendix A-3, Ambrosino electronic surveillance submitted by USA in opposition to defendants' pretrial motions. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 921 | Appendix A-4, Lompoc electronic surveillance, submitted by USA in opposition to defendants' pretrial motions. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 925 | Bill of Particulars submitted by the USA. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 926 | ORDER, signed by Judge Charles P. Sifton, dated: 2/7/94. Juror questionnaires are to be distributed to all counsel commencing 2/7/94 at 10:00. Jury selection will be anonymous. No attempts to contact or identify the jurors is to be made. (Conte, Daniela) (Entered: 09/12/1994) |

Case 1:02-cr-00251-DEK   Document 4869   Filed 08/09/21   Page 408 of 635 PageID #: 4715

| | | |
|---|---|---|
| 09/12/1994 | 927 | Letter from Carol Hawthorne to Judge Sifton dated 2/17/94, Re: in response to a subpoena for telephone recordings from the Federal Bureau of Prisons. Recordings sent to chambers. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 929 | Letter from AUSA George Stamboulidis to Judge Sifton dated 4/6/94, Re: in opposition to defendant Alphonse Persico's motion for an order releasing him on bail. Enclosures. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 930 | Letter from Barry Levin to Judge Sifton dated 4/27/94, Re: requesting a trial date to resolve discovery disputes. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 931 | Letter from Barry Levin to Judge Sifton dated 5/4/94, RE: in further support of defendant Alphonse Persico's motions for inspection of grand jury minutes and dismissal of the indictment. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 932 | Letter from AUSA Ellen Corcella and George Stamboulidis to Judge Sifton dated 5/31/94, RE: advising that the government has no objections to defendant Alphonse Persico's request to depose Gregory Scarpa, Sr. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 934 | CORRECTED copy of the government's proposed jury questionnaire submitted by AUSA George Stamboulidis as to Alphonse Persico. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 935 | Letter from Barry Levin to Judge Sifton dated 6/13/94, Re: in support of defendant Alphonse Persico's application to preclude any testimony from co-defendant Lawrence Mazza concerning conversations had while incarcerated together. Enclosures. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 936 | MOTION by counsel for Alphonse Persico, dated 6/10/94, in limine to prevent the government from introducing evidence of prior convictions at trial . (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 937 | Letter from Barry Levin to Judge Sifton dated 6/14/94, Re: the government's questionnaire; subpoenas to the NYC Police Department; defendant Alphonse Persico's participation as co-counsel on his own behalf. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 938 | RESPONSE by USA as to Alphonse Persico in opposition to defendant's letter regarding the admissibility of statements made by him to co-defendant Lawrence Mazza while incarcerated. Response submitted in the form of a letter from AUSA Ellen Corcella to Judge Sifton dated 6/15/94. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 939 | Letter from Barry Levin to Judge Sifton dated 6/15/94, Re: forwarding subpoenas to be so ordered for defendant Alphonse Persico's prison records. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 940 | MEMORANDUM by counsel for Alphonse Persico, dated 6/16/94, in opposition to the government's motion for an anonymous jury. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 941 | |

Case 1:02-cr-00251-DEK   Document 4389-6   Filed 08/19/21   Page 409 of 635 PageID #: 4716

| | | |
|---|---|---|
| | | MOTION by counsel for Alphonse Persico, dated 6/13/94, in limine to preclude the use of the term "Persico Faction" and references to defendant as "Allie Boy" . (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 942 | RESPONSE by USA as to Alphonse Persico in opposition to defendant's motion in limine to admit an affidavit by Gregory Scarpa. Response submitted in the form of a letter from George Stamboulidis and Ellen Corcella to Judge Sifton dated 6/21/94. Enclosures. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 943 | Letter from AUSA George Stamboulidis and Ellen Corcella to Judge Sifton dated 6/23/94, Re: in support of the admissibility of statements by co-conspirators. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 944 | Letter MOTION by Barry Levin, counsel for Alphonse Persico to Judge Sifton dated 6/23/94, for the production of Greg Scarpa's informant file and the unsealing of his sentence before Judge Weinstein . Enclosure. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 945 | COPY of letter from AUSA George Stamboulidis to Barry Levin dated 7/1/94, Re: forwarding a redacted version of 3500 material. (Courtesy copy to the Court without enclosures.) (Conte, Daniela) (Entered: 09/12/1994) |
| 09/12/1994 | 946 | Proposed Jury Instructions submitted by counsel for Alphonse Persico. (Conte, Daniela) (Entered: 09/12/1994) |
| 09/13/1994 | 947 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 8/3/94 at 9:30. AUSA George Stamboulidis and Ellen Corcella and defense counsel Barry Levin and Kelly Guthy present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) (Entered: 09/13/1994) |
| 09/14/1994 | 950 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 8/3/94 at 9:30. AUSA George Stamboulidis and Ellen Corcella and defense attorneys Barry Levin and Kelly Guthy present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) (Entered: 09/14/1994) |
| 09/16/1994 | 952 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 8/8/94 at 9:30. AUSA Ellen Corcella and George Stamboulidis and defense attorneys Barry Levin and Kelly Guthy present. Court Reporter/ESR: Perry Auerbach. (Conte, Daniela) (Entered: 09/16/1994) |
| 09/29/1994 | 955 | ORDER as to Victor J. Orena, Pasquale Amato, Carmine Sessa, Michael Sessa, Lawrence A. Fiorenza, Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Joseph Tomasello, Theodore Persico, Richard Fusco, James Delmastro, granting an adjournment of one week til 10/7/94 for the Govt to file responses to the post-trial motions ( Signed by Judge Charles P. Sifton , dated: 9/29/94) (fe) (Entered: 09/29/1994) |
| 09/29/1994 | 956 | LETTER dated 7/16/94 from Ellen Corcella/George A. Stamboulidis requesting that the Govt's in limine motion be granted. (fe) (Entered: 09/29/1994) |
| 10/05/1994 | 957 | ORDER, resetting the briefing schedule for defendants' motions for new trials (Signed by Judge Charles P. Sifton dated: 9/30/94). The government's |

| | | response is due by 10/14/94; defendants to file reply briefs by 10/19/94; return date set for 10/21/94 at 9:30. So ordered on letter from AUSA Ellen Corcella to Judge Sifton dated 9/29/94. (Conte, Daniela) (Entered: 10/05/1994) |
|---|---|---|
| 10/11/1994 | 1366 | LETTER dated 10/10/94 from Martin Goldberg, Esq., to Judge Sifton, in further support of request for hearings and complete disclosure and joins the requests of co-counsel for a new trial. (Asreen, Wendy) (Entered: 07/02/1997) |
| 10/14/1994 | 1312 | MEMORANDUM by USA in in opposition to motions for new trial. (Asreen, Wendy) (Entered: 04/09/1997) |
| 10/19/1994 | 960 | ORDER, resetting the motion hearing date for the Rule 29 and 33 motions to 10/25/94 at 9:30 (Signed by Judge Charles P. Sifton, dated: 10/6/94). So ordered on letter from AUSA Ellen Corcella to Judge Sifton dated 10/4/94. (Conte, Daniela) (Entered: 10/19/1994) |
| 10/24/1994 | 1367 | LETTER dated 10/18/94 from Martin Goldberg, Esq., to Judge Sifton, in further support of motion for a new trial. (Asreen, Wendy) (Entered: 07/02/1997) |
| 10/26/1994 | 964 | TRANSCRIPT of jury selection before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Theodore Persico, Richard Fusco for date of 2/8/94. Appearances by AUSA George Stamboulidis, Andrew Weissmann and Ellen Corcella; and defense attorneys Michael Washor and Joel Winograd for dft T. Persico; Salvatore Marinello for dft J. Russo; Melvyn Roth for dft A. Russo; Marvin Segal for dft Fusco; Richard Rosenkranz for dft Zambardi; Marion Seltzer for dft Monteleone; and Martin Goldberg for dft Fiorenza. Court Reporter/ESR: Anthony Mancuso. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 965 | TRANSCRIPT of proceedings before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Theodore Persico, Richard Fusco for date of 2/9/94. Attorneys for the government and defendants present. Court Reporter/ESR: Anthony Mancuso. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 966 | TRANSCRIPT of proceedings before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Theodore Persico, Richard Fusco for date of 2/10/94. Attorneys for government and defendants present. Court Reporter/ESR: Anthony Mancuso.(Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 967 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Theodore Persico, Richard Fusco for date of 2/14/94. Attorneys for the government and defendants present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |

| 10/26/1994 | 968 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Theodore Persico, Richard Fusco for date of 2/15/94. Attorneys for government and defendants present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 969 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Theodore Persico, Richard Fusco for date of 2/16/94. Attorneys for the government and defendants present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 970 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Theodore Persico, Richard Fusco for date of 2/17/94. Attorneys for the government and defendants present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 971 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Theodore Persico, Richard Fusco for date of 2/18/94. Attorneys for the government and defendants present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 972 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Theodore Persico, Richard Fusco for date of 3/7/94. Attorneys for the government and defendants present. Court Reporter/ESR: Anthony Mancuso. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 973 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Theodore Persico for date of 3/14/94. Attorneys for the government and defendants present. Court Reporter/ESR: Henry Shapiro. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 974 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Theodore Persico for date of 3/14/94. Attorneys for the government and defendants present. Court Reporter/ESR: Henry Shapiro. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 975 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Theodore Persico for date of 3/15/94. Attorneys for the government and defendants present. Court Reporter/ESR: Henry Shapiro. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 976 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Theodore Persico for date of 3/16/94. Attorneys for the government and defendants |

Case 1:02-cr-00251-DEK   Document 4869   Filed 09/29/16   Page 412 of 635 PageID
#: 4719

| | | |
|---|---|---|
| | | present. Court Reporter/ESR: Henry Shapiro. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 977 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Theodore Persico for date of 3/17/94. Attorneys for the government and defendants present. Court Reporter/ESR: Henry Shapiro. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 978 | TRANSCRIPT of trial before Judge Sifton filed in case as to Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Joseph Monteleone SR., Theodore Persico for date of 3/29/94. Attorneys for the government and defendants present. Court Reporter/ESR: Michael Picozzi. (Conte, Daniela) Modified on 10/26/1994 (Entered: 10/26/1994) |
| 10/26/1994 | 990 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 7/11/94. AUSA George Stamboulidis and Ellen Corcella and defense attorneys Barry Levin and Kelly Guthy present. Court Reporter/ESR: Sheldon Silverman. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 991 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 7/12/94. Government and defense attorneys present. Court Reporter/ESR: Sheldon Silverman. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 992 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 7/13/94. Government and defense attorneys present. Court Reporter/ESR: Sheldon Silverman. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 993 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 7/14/94. Government and defense attorneys present. Court Reporter/ESR: Sheldon Silverman. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 994 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 7/20/94. Government and defense attorneys present. Court Reporter/ESR: Frederick Guerino. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 995 | TRANSCRIPT of proceedings before Judge Sifton filed in case as to Alphonse Persico for date of 7/25/94. Government and defense attorneys present. Court Reporter/ESR: Anthony Mancuso. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 996 | TRANSCRIPT of proceedings before Judge Sifton filed in case as to Alphonse Persico for date of 7/26/94. Government and defense attorneys present. Court Reporter/ESR: Anthony Mancuso. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 997 | TRANSCRIPT of proceedings before Judge Sifton filed in case as to Alphonse Persico for date of 7/27/94. Government and defense attorneys present. Court Reporter/ESR: Anthony Mancuso. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 998 | TRANSCRIPT of proceedings before Judge Sifton filed in case as to Alphonse Persico for date of 7/28/94. Government and defense attorneys |

| | | |
|---|---|---|
| | | present. Court Reporter/ESR: Anthony Mancuso. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 999 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 8/1/94. Government and defense attorneys present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 1000 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 8/2/94. Government and defense attorneys present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 1001 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 8/3/94. Government and defense attorneys present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 1002 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 8/4/94. Government and defense attorneys present. Court Reporter/ESR: Gene Rudolph. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 1003 | TRANSCRIPT of proceedings before Judge Sifton filed in case as to Alphonse Persico for date of 8/5/94. Government and defense attorneys present. Court Reporter/ESR: Anthony Mancuso. (Conte, Daniela) (Entered: 10/26/1994) |
| 10/26/1994 | 1004 | TRANSCRIPT of trial before Judge Sifton filed in case as to Alphonse Persico for date of 8/8/94. Government and defense attorneys present. Court Reporter/ESR: Perry Auerbach. (Conte, Daniela) (Entered: 10/26/1994) |
| 11/28/1994 | 1165 | LETTER dated 11/28/94 from George A. Stamboulidis, AUSA to Hon. Judge Sifton, in response to an affidvit submitted by Barry Levin, Esq. dated 11/23/94, in support of his application to have the Court reconsider its decision of 11/9/94, which denied Mr. Levin's application to appear as counsel for Robert Zambardi in the avove-captioned matter. (Greene, Donna) (Entered: 06/18/1996) |
| 12/01/1994 | 1018 | ORDER, signed by Judge Charles P. Sifton, dated: 11/21/94. Defendants are to supplement their brief by 11/21/94; government's sur-reply is due by 12/5/94; additional responses are due by 12/14/94; oral argument set for 12/19/94 at 9:30. So ordered on letter from AUSA Ellen Corcella to Judge Sifton of 11/17/94. (Conte, Daniela) (Entered: 12/01/1994) |
| 12/01/1994 | 1313 | (copy w/atachments) LETTER dated 11/30/94 from Alan Futerfas, Esq., to Judge Sifton, in support of the post trial arguments made on behalf of Anthony Russo, in further support of motion for a new trial and for disclosure of the file relating to the internal investigation of FBI Agent DeVecchio. (Asreen, Wendy) (Entered: 04/09/1997) |
| 12/06/1994 | 1021 | RESPONSE by USA in opposition to defendants' motions for a new trial and/or dismissal of the indictment. Response submitted in the form of a letter from AUSA Valerie Caproni and Ellen Corcella to Judge Sifton dated 12/5/94. Enclosures. (Conte, Daniela) (Entered: 12/06/1994) |
| 12/13/1994 | 1314 | LETTER dated 12/13/94 from Alan Futerfas, Esq., to Judge Sifton, regarding the government's claim that the FBI acted soundly in continuing its |

| | | |
|---|---|---|
| | | relationship with Scarpa even though it knew he was committing murder. (Asreen, Wendy) (Entered: 04/09/1997) |
| 02/07/1995 | 1045 | LETTER dated 1/27/95 from AUSA Ellen Corcella to Judge Sifton Re: forwarding affidavits of special agents and AUSAs; and, requesting that portions of the AUSAs' affidavits remain sealed. (Conte, Daniela) (Entered: 02/07/1995) |
| 02/07/1995 | | ENDORSED ORDER by Judge Charles P. Sifton, dated 1/30/95. Portions of the AUSAs' affidavits submitted shall remain sealed. So ordered on document number 1045. (Conte, Daniela) (Entered: 02/07/1995) |
| 02/07/1995 | 1046 | REDACTED AFFIDAVITS by AUSAs George Stamboulidis, Ellen Corcella and Andrew Weissman, dated 1/27/95, Re: in response to the motions for new trials. (Conte, Daniela) (Entered: 02/07/1995) |
| 02/07/1995 | 1047 | AFFIDAVITS by Special Agents Christopher Favo and Maryann Goldman, dated 1/27/95, Re: in response to the Court's questions. (Conte, Daniela) (Entered: 02/07/1995) |
| 02/23/1995 | 1050 | ORDER, signed by Judge Charles P. Sifton, dated: 2/22/95. Any motion for the disqualification of Alan Futerfas as counsel is referred to Magistrate Gold for a report and recommendation. (Conte, Daniela) (Entered: 02/23/1995) |
| 02/23/1995 | 1052 | LETTER dated 2/21/95 from AUSA Ellen Corcella to Judge Sifton, Re: requesting that the motion for disqualification be referred to Magistrate Gold for a report and recommendation. (Conte, Daniela) (Entered: 02/23/1995) |
| 05/25/1995 | 1086 | LETTER dated 5/25/95 from Alan S. Futerfas to CPS requesting an extension of time to 5.31 to file post trial motions. (Glenn, Marilyn) (Entered: 06/15/1995) |
| 06/15/1995 | 1086 | ENDORSED ORDER permitting atty Alan S. Futerfas until 5.31 to file post trial motions . See endorsement on 2nd page of document #1086. ( Chief Judge Charles P. Sifton , dated 5/31/95) (Glenn, Marilyn) (Entered: 06/15/1995) |
| 07/14/1995 | 1093 | ORDER, dfts are invited to submit their positions relating to the government's disclosure as to the attached 302 report, and its impact, if any, on the pending motions by 7/14/95. Any reply by the govt shall be filed by 7/19/95, at which time the matter will be taken on submission. ( Signed by Chief Judge Charles P. Sifton , dated: 7/7/95; copies mailed by chambers.) (Ferguson, Frances) (Entered: 07/14/1995) |
| 07/14/1995 | 1315 | LETTER dated 7/12/95 from Martin Goldberg, Esq., to Judge Sifton, in support of motion for a new trial. (Asreen, Wendy) (Entered: 04/09/1997) |
| 07/21/1995 | 1098 | LETTER dated 7/21/95 from Andrew Weissman, AUSA, to all counsel enclosing a copy of an Affirmation in Support of Arrest Warrant as to Salvatore Miciotta, who was a witness in this case, filed before Judge Nickerson. (w/enclosure) (Ferguson, Frances) (Entered: 07/24/1995) |
| 07/25/1995 | 1101 | LETTER dated 7/26/95 from AUSA, George Stamboulidis, to Court Reporter Sheldon Silverman, attaching a transcript of testimony with corrections for |

Case 1:02-cr-00251-DEK   Document 4869-6   Filed 09/20/16   Page 415 of 635 PageID #: 4722

| | | review against his notes and requesting that the transcript be corrected. (Asreen, Wendy) (Entered: 04/09/1997) |
|---|---|---|
| 08/16/1995 | 1109 | ORDER as to Alphonse Persico, for parties to show cause in writing by 9/15/95 why the request, if any, for the correction of the trial transcript contained in the govt's annexed letter dated 7/31/95 should not be granted. ( Signed by Chief Judge Charles P. Sifton , dated: 8/10/95; copies mailed by chambers) (Ferguson, Frances) (Entered: 08/16/1995) |
| 08/30/1995 | 1112 | LETTER dated 8/30/95 from AUSA Andrew Weissman to Judge Sifton enclosing a transcript, per request of law clerk Matthew D'Amore, reflecting Judge Ross's ruling precluding the Scarpa issue in 93-CR-1231 (ARR). See transcript dated 6/28/95 at 62-87. Also, the transcript has not been received of Judge Ross's pre-trial ruling on the Scarpa issue in 93-CR-1364 (ARR), rendered orally on 8/28/95. It will be provided to the Court as soon as it is made available. (Ferguson, Frances) (Entered: 08/31/1995) |
| 09/06/1995 | 1114 | LETTER dated 8/23/95 from Ellen M. Corcella to Judge Sifton, Re: Enclosing the proceedings before Judge Dearie in 93 cr 1365 referred to in footnote 13 of the 8/9/95 submission. (Piper, Francine) (Entered: 09/06/1995) |
| 10/03/1995 | 1117 | LETTER dated 7/31/95 from AUSA George Stamboulidis to Judge Sifton, as to dft Alphonse Persico, enclosing a corrected page of the transcript of the trial involving a one-letter change on line 16 of page 588; the twelfth word on that line was corrected from "war" to "car," and requesting that the Court authorize the Clerk to replace the corrected page 588 for the page 588 which is currently in the Court file. (Ferguson, Frances) (Entered: 10/03/1995) |
| 10/03/1995 | 1118 | ORDER as to Alphonse Persico: Parties having not responded to the order to show cause in writing by 9/15/95 why the request for the correction of the trial transcript contained in the govt's [1117-1] letter dated 7/31/95 should not be granted, the correction is GRANTED by the Court and the transcript ordered amended. ( Signed by Chief Judge Charles P. Sifton , dated: 9/22/95) (Ferguson, Frances) Modified on 12/06/1995 (Entered: 10/03/1995) |
| 11/06/1995 | 1121 | LETTER undated from Teresa Fussel to Judge Sifton inquiring as to when the trial will end. (Ferguson, Frances) (Entered: 11/13/1995) |
| 12/06/1995 | 1123 | (COPY) ORDER dated 9/22/95 as to Alphonse Persico, granting the correction of the trial transcript and the transcript is ordered amended . (Copy of the corrected page 588 of the trial transcript annexed.) ( Signed by Chief Judge Charles P. Sifton , dated: 9/22/95) [Also see document #1118 ] (Ferguson, Frances) (Entered: 12/06/1995) |
| 02/22/1996 | 1136 | LETTER dated 2/21/96 from AUSA to Judge Sifton, in opposition to the defendantFusco's Rule 32 motion to withdraw guilty plea and to notify the Court that Fusco is medically cleared to return to Court for sentencing. (DiTomasso, Mike) (Entered: 02/23/1996) |
| 05/15/1996 | 1150 | TRANSCRIPT filed as to trial held on 4/20/94 before Judge Sifton. AUSA: Andrew Weissmann, Ellen Corcella and Geroge Stamboulidis. Court Reporter: Sheldon Silverman. (Asreen, Wendy) (Entered: 04/09/1997) |
| | | |

Eastern District of New York - LIVE Database V6.1.1                    Page 42 of 53
Case 1:02-cr-00251-DEK   Document 4369   Filed 08/19/21   Page 416 of 635 PageID
#: 4723

| 05/16/1996 |      | Sealed envelope containing a application & Order. (Drayton, Lorraine) (Entered: 05/20/1996) |
|------------|------|---------------------------------------------------------------------------------------------|
| 05/24/1996 | 1154 | LETTER dated 5/24/96 from AUSA Andrew Weissmann to Judge Weinstein enclosing a copy of Court Exhibit 12, which was made available to defense counsel on 5/24/96. (Greves, Liz) (Entered: 05/28/1996) |
| 06/11/1996 | 1159 | ORDER directing the parties to exchange papers addressed to the issues discussed in Ms. Caproni's letter dated 5/29/96, on or before 6/5/96, and replies on or before 6/6/96, if required. ( Signed by Chief Judge Charles P. Sifton , dated: 5/30/96) (DiTomasso, Mike) (Entered: 06/11/1996) |
| 06/12/1996 | 1368 | LETTER dated 6/11/96 from Martin Goldberg, Esq., to Judge Sifton, for Lawrence Fiorenza joining the submissions of co-counsel. (Asreen, Wendy) (Entered: 07/02/1997) |
| 06/18/1996 | 1164 | Affirmation of Valerie Caproni in order bring t the Court's attention certain information that has recently come to her attention. (Greene, Donna) (Entered: 06/18/1996) |
| 07/03/1996 | 1168 | SEALED ORDER and Application. Sealed as per order of Mag. Go. Atty File# 92017. (Dobkin, David) (Entered: 07/03/1996) |
| 11/12/1996 | 1369 | LETTER dated 11/8/96 from Dorothy Fiorenza, Esq., to Judge Sifton, forwarding an addendum to the memo and the "Table of Contents". (Asreen, Wendy) (Entered: 07/02/1997) |
| 12/20/1996 | 1370 | LETTER dated 12/20/96 from Dorothy Fiorenza, Esq., to Judge Sifton, in further support of defendants' Brady claim. (Asreen, Wendy) (Entered: 07/02/1997) |
| 02/19/1997 | 1207 | MEMO and ORDER a new trial is ordered with respect to defts Josph and ANthony Russo and deft Joseph Monteleone on COunts 1,2,5,6,9,12. Except as to the relief, all defts' post-trial motions are, in all respect, denied. ( Signed by Chief Judge Charles P. Sifton , dated: 2/18/97) (Dobkin, David) (Entered: 02/25/1997) |
| 03/21/1997 | 1242 | MEMORANDUM AND ORDER that Robert Zambardi's motion to consolidate the indictment in this case with an indictment pending before Judge Raggi- CR-94-1199, and his motion for specific performance of his plea agreement are DENIED. Signed by Chief Judge Charles P. Sifton on 3/17/97. c/m (Asreen, Wendy) (Entered: 04/09/1997) |
| 04/08/1997 | 1250 | LETTER dated 8/17/94 from AUSA Andrew Weissman to Defense counsel, enclosing a copy of the Scarpa "209's" concerning the Colombo Family war. w/enclosure. (rreceived for docketing on 4/8/97). (Dobkin, David) (Entered: 04/08/1997) |
| 04/08/1997 | 1257 | SEALED LETTER dated 12/12/96 As per order of Judge Sifton. Date of Sealing 4/7/97. AUSA Valerie Caproni. (Dobkin, David) (Entered: 04/08/1997) |
| 04/09/1997 | 1304 | NOTICE of Motrion in limine re: other crimes by USA as to Victor J. Orena, Pasquale Amato, Carmine Sessa, Michael Sessa, Lawrence A. Fiorenza, |

| | | Lawrence Mazza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone SR., Alphonse Persico, Joseph Tomasello, Theodore Persico, Richard Fusco, James Delmastro (received for docketing on 4/9/97). (Dobkin, David) (Entered: 04/09/1997) |
|---|---|---|
| 04/09/1997 | 1306 | LETTER dated 5/29/96 from AUSA Ellen Corcella to Judge SIfton re: enclsoure of Affirmation by Valerie Caproni concerning certain newly discovered information concerning the "Girlfriend 302". w/enclosure. (received for docketing on 4/9/97). (Dobkin, David) (Entered: 04/09/1997) |
| 06/30/1997 | 1371 | LETTER dated 6/25/97 from Salvatore Marinello, Esq., to Judge Sifton, requesting that defendant Joseph Russo be permitted to waive his appearance at the 7/2/97 conference. (Asreen, Wendy) (Entered: 07/02/1997) |
| 06/30/1997 | 1372 | MAIL RETURNED: Order dated 6/13/97 regarding the sentencing of Anthony Russo, mailed to Salvatore Marinello at 300 Old Country Road, Mineola. Returned with the notation, "forwarding order expired". (remailed 7/2/97 to address of 55 Mineola Blvd.; docket sheet updated) (Asreen, Wendy) (Entered: 07/02/1997) |
| 06/30/1997 | 1373 | LETTER dated 6/26/97 from Alan Futerfas, Eseq., to Judge Sifton, requesting that Anthony Russo be permittted to waive his appearance at the 7/2/97 conference. (Asreen, Wendy) (Entered: 07/02/1997) |
| 07/02/1997 | 1375 | LETTER dated 1/17/94 from Martin Goldberg, Esq., to Judge Sifton, enclosing a copy of the decision in United States v Abcasis which reaffirmed that the Constitution guarantees criminal defendants an opportunity to present a complete defense. (Asreen, Wendy) (Entered: 07/02/1997) |
| 07/02/1997 | 1376 | LETTER dated 4/29/94 from Martin Goldberg, Esq., to Judge Sifton, in support of the RUle 29 motions before the Court. (Asreen, Wendy) (Entered: 07/02/1997) |
| 07/02/1997 | 1377 | LETTER dated 5/25/94 from Martin Goldberg, Esq., to Judge Sifton, stating that the type of evidence that existed as to Pontillo does not exist as to defendant Fiorenza. (Asreen, Wendy) (Entered: 07/02/1997) |
| 07/02/1997 | 1378 | LETTER dated 8/11/94 from Martin Goldberg, Esq., to Judge Sifton, joining in all motions submitted by co-counsel and to supplement his letter of 6/29/94. (faxed copy w/attachments annexed) (Asreen, Wendy) Modified on 07/02/1997 (Entered: 07/02/1997) |
| 07/02/1997 | 1379 | LETTER dated 7/12/95 from Martin Goldberg, Esq., to Judge Sifton, in support of request for a new trial. (Asreen, Wendy) (Entered: 07/02/1997) |
| 09/11/1997 | | Magistrate Judge Pollak has been selected by random selection to handle any matters that may be referred in this case. (Vaughn, Terry) (Entered: 09/12/1997) |
| 09/29/1997 | 1416 | SEALED LETTER dated 1/27/95 from Alan Futerfas to the Court (Dobkin, David) (Entered: 09/29/1997) |
| 11/13/1997 | 1422 | |

| | | SEALED DOCUMENT. 2 letters dated 10/31/97 & 11/10/97; affidavit dated 10/29/97 placed in vault. Sealed per order of Judge Sifton. (Greene, Donna) (Entered: 11/21/1997) |
|---|---|---|
| 11/14/1997 | 1418 | ORDER that the defense counsel's motion to be relieved as counsel for deft. Lawrence Fiorenza is denied. Counsel is directed to comply with his client's requests as set forth in Fiorenza's affidavit of 10/29/97, Which is ordered sealed except as to defense counsel. ( Signed by Chief Judge Charles P. Sifton , dated: 11/5/97). c/m (Greene, Donna) (Entered: 11/14/1997) |
| 11/18/1997 | 1424 | COPY OF LETTER dated 11/18/97 from Ellen M. Corcella to Judge Sifton, responding to the deft. Richard Fusco's motion requesting that this Court reject the guilty plea he entered prusuant to Rule 11 (e) (1) (C) of the Federal Rules of Criminal Procedure which provided for a 14-year term of incarceration. (Greene, Donna) (Entered: 12/05/1997) |
| 11/21/1997 | 1421 | LETTER dated 11/7/97 from Ellen M. Corcella to Judge Sifton, submitted pursuant to the Court's request that Your Honor be notified when the deft. Richard Fusco is scheduled to return to the Eastern District for Sentnece. Mr. Fusco is currently scheduled for sentence before Your Honor on 11/21/97 at noon. (Greene, Donna) (Entered: 11/21/1997) |
| 12/16/1997 | 1426 | COPY OF LETTER dated 12/5/97 from Ellen M. Corcella to Judge Sifton, in connection with the deft. Richard Fusco's sentencing, which is scheduled for 12/11/97 at 12:00 noon. (Greene, Donna) (Entered: 12/16/1997) |
| 12/16/1997 | 1428 | MAIL RETURNED (Moved Left no Address unable to forward). Order #1418 returned on 12/11/97 (Gonzalez, Mary) (Entered: 12/16/1997) |
| 01/05/1998 | 1440 | MAIL RETURNED. Judgment in a Criminal Case mailed to Marvin Segal on 12/26/97 returned on 1/5/98. " Segal & Hundley moved left no address - unable to forward". (Greene, Donna) (Entered: 01/08/1998) |
| 01/06/1998 | 1439 | SEALED DOCUMENT containing a order and affidavit, to be placed in vault as per order of Judge Sifton dated 12/30/97. (Jean (Entered: 01/06/1998) |
| 02/05/1998 | 1447 | INTER-OFFICE MEMO from Mag. Judge Pollak, to Terry Vaughn, Operations Mgr., dated Feb. 2, 1998, recusing herself from this case and requesting that another mag. judge be assigned by random selection. (Vaughn, Terry) (Entered: 02/05/1998) |
| 02/09/1998 | | Magistrate Judge Caden has been selected by random selection to handle any matters that may be referred in this case. (Vaughn, Terry) (Entered: 02/09/1998) |
| 07/24/1998 | 1461 | COPY OF LETTER dated 7/24/98 from Andrew Weissmann, AUSA to Judge Sifton, requesting the unsealing of the government's 6/29/98, motion pursuant to Section 5K1.1 of the Sentencing. (Greene, Donna) (Entered: 07/31/1998) |
| 07/27/1998 | 1460 | LETTER dated 7/17/98 from Matthew J. Brief, Esq. to Judge Sifton, requesting that both their 6/19/98 5(k)1.1 motion/letter be sealed. (Greene, Donna) (Entered: 07/27/1998) |
| 07/31/1998 | | |

| | | |
|---|---|---|
| | | ENDORSED ORDER on doc. #1461. Application granting the unsealing of government's 6/29/98 motion pursuant to Section 5K1.1 of the Sentencing Guidelines. ( Chief Judge Charles P. Sifton , dated 7/29/98). (Greene, Donna) (Entered: 07/31/1998) |
| 08/03/1998 | 1462 | MAIL RETURNED. Judgment dted 7/22/98 mail to J. Bruce Maffeo returned on 8/3/98. "Forwarding Order Expired". (Greene, Donna) (Entered: 08/03/1998) |
| 08/18/1998 | 1472 | MAIL RETURNED. Endosed Letter dated 8/7/98 from Matthew J. Brief to Judge Sifton returned on 8/18/98. "Return to Sender moved fwdg order expired". (Greene, Donna) (Entered: 08/18/1998) |
| 11/02/1998 | 1484 | LETTER dated 10/29/98 from Alan S. Futerfas to Judge Sifton, Requesting an extension of time from 10/19/98 to 11/2/98 for submission of objections to the Presentence Report for Anthony Russo. (Piper, Francine) (Entered: 11/02/1998) |
| 12/04/1998 | 1487 | COPY OF LETTER dated 12/2/98 from Alan S. Futerfas to Judge Sifton, requesting that the conference previously scheduled for 12/2/98 at 4:30 be continued to a date and time agreed upon by all parties. (Greene, Donna) (Entered: 12/07/1998) |
| 02/04/1999 | 1498 | LETTER dated 12/2/98 from Alan S. Futerfas to Judge Sifton, requesting that the conference set for today at 4:30 be continued to a date and time agreed upon by all parties. (Reddy, Lisa) (Entered: 02/04/1999) |
| 02/17/1999 | 1504 | LETTER dated 2/11/99 from Stephen D. Kelly, AUSA to Judge Sifton, requesting additional time to respond to the defts. Rule 33 motion filed 1/11/99. Counsels propose that the defts. reply brief, if any, be filed by 3/9/99 and that the sentencing be rescheduled on 3/12/99 at 12:00. (Greene, Donna) (Entered: 02/17/1999) |
| 02/17/1999 | 1505 | LETTER dated 1/26/99 from Alan S. Futerfas to Judge Sifton, addressing the responding government criticism of their conduct throughout the trial. (Greene, Donna) (Entered: 02/17/1999) |
| 03/02/1999 | 1507 | ORDER, granting the government's request to extend time to respond to defendants' Rule 33 motion until 3/1/99 . (Signed by Chief Judge Charles P. Sifton, dated 3/1/99). C/M. See letter dated 2/26/99 from AUSA Stephen D. Kelly to Judge Sifton. (Reddy, Lisa) (Entered: 03/02/1999) |
| 03/02/1999 | 1508 | MEMORANDUM by USA in opposition to defendants' Rule 33 motion. (Reddy, Lisa) (Entered: 03/02/1999) |
| 03/24/1999 | 1541 | AFFIDAVIT by Frank Handelman in support of request for payment. (Greene, Donna) (Entered: 04/09/1999) |
| 04/15/1999 | 1548 | MEMORANDUM and ORDER that the defts. letter application for reconsideration of the Court's March 18 memorandum and order is denied. The transcript of the detention hearing of Mazza does not provide a basis for reconsideration. ( Signed by Chief Judge Charles P. Sifton , dated: 4/14/99). c/m (Greene, Donna) (Entered: 04/15/1999) |
| | | |

Case 1:02-cr-00251-DEK   Document 4329-6   Filed 09/20/16   Page 420 of 635 PageID
#: 4727

| 04/19/1999 | 1550 | LETTER dated 3/18/99 from Alan S. futerfas to Judge Sifton, submitting to place before Your Honor a document that is specifically relevant to whether Lawrence Mazza perjured himself at trial in denying that he had been a fugitive and in creating an elaborate story as to why he had left the state and dyed his hair. (Greene, Donna) (Entered: 04/19/1999) |
| --- | --- | --- |
| 04/22/1999 | | Certified copy of docket sheet sent to USCA. (Gonzalez, Mary) (Entered: 04/22/1999) |
| 04/22/1999 | 1553 | MAIL RETURNED. Memorandum and Order dated 4/14/99 mailed to Marvin Segal, Esq. returned on 4/22/99. "No longer at this address." (Greene, Donna) (Entered: 04/26/1999) |
| 04/29/1999 | 1555 | USCA Order filed on 4/27/99 The court noting that a Notice of Appeal filed in 99-1171 is being consolidated with 99-1168. The Court further noting that a new scheduling order will be issued with regards to 99-1168(L) and 99-1171 are hereby consolidated. Judge notified. Ackn mailed. USCA #99-1168 and 99-1171. (Gonzalez, Mary) (Entered: 04/29/1999) |
| 06/30/1999 | 1560 | LETTER dated 6/27/99 from Samuel Gravina, to M. Cecelia Volk, requesting copies of the judgments entered for certain defendants. (Murphy, Margaret) (Entered: 07/14/1999) |
| 12/29/1999 | 1576 | LETTER dated 12/20/99 from David Schoen to Mag. Caden, advising the court that counsel will advise the AUSA of relevant issues in the case. (Piper, Francine) (Entered: 12/29/1999) |
| 07/10/2000 | | CASE reassigned to Judge Jack B. Weinstein from Judge Charles P. Sifton. (Chow, Alice) (Entered: 07/21/2000) |
| 06/21/2001 | 1591 | LETTER dated 10/17/93 from Zachary W. Carter, AUSA to Hon. Charles P. Sifton. Regarding various motions by defendants including thier recent requests for bills of particulars. (Chee, Alvin) (Entered: 06/21/2001) |
| 06/22/2001 | 1599 | LETTER dated 02/02/94 from Michael S. Washor on behalf of all defense counsel, to Hon. Charles P. Sifton. Regarding the outstanding and undecided issues that counsel request be adjudicated before openings to the jury. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1601 | By USA as to Alphonse Persico. Regarding the government's requests to charge defendant. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1602 | The government's memorandum in support of its motion for an anonymous and partially sequestered jury. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1606 | LETTER dated 01/20/94 from Barry I. Slotnick to Hon. Charles P. Sifton. Regarding list of items of evidence to be marked as defense exibits. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1607 | LETTER dated 01/26/01 from Mark M. Baker to Hon. Charles P. Sifton. Regarding several outstanding matters before the Court. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1608 | Transcript of motion before the Hon. C.P. Sifton. November 2, 1993. (Chee, Alvin) (Entered: 06/22/2001) |

Case 1:02-cr-00251-DEK   Document 4369   Filed 09/29/16   Page 421 of 635   PageID #: 4728

| 06/22/2001 | 1610 | Bill of Particulars by USA. (Chee, Alvin) (Entered: 06/22/2001) |
|---|---|---|
| 06/22/2001 | 1613 | Transcript of status conference before Hon. C.P. Sifton. August 5, 1993. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1614 | LETTER dated 06/30/94 from George Stamboulidis, AUSA, to Hon. C.P. Sifton. Letter to move "in limine" to preclude Persico from mentioning certain subjects during course of his opening statements and the balance of trial. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1615 | LETTER dated 3/22/94 from Andrew Weissmann, AUSA, to defense counsels . Regarding government exhibits. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1616 | LETTER dated 02/18/94 from George Stamboulidis, AUSA, to Hon. C.P. Sifton. Regarding FBI 302's (government exhibits). (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1617 | LETTER dated 02/25/94 from Ellen M. Corcella, AUSA, to defense counsels. Regarding materials that are available for review. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1618 | LETTER dated 02/21/94 from George Stamboulidis, AUSA, to Hon. C.P. Sifton. Regarding request by Court on the issue of the opening statement of Samuel Dawson, Esq. in trial of US v. Salerno. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1619 | LETTER dated 03/02/94 from Andrew Weissmann, AUSA, to Hon. C.P. Sifton. Regarding areas to examine on re-direct examination. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1620 | LETTER dated 02/25/94 from Andrew Weissman, AUSA, to Hon. C.P. Sifton. Regarding position of government in connection with defendants' objections to admission of cocconspirators statements under Rule 801 (d) (2) (E). (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1623 | LETTER dated 02/18/94 from Ellen M. Corcella, AUSA, to Hon. C.P. Sifton. Regarding move in limine to limit certain cross-examination of government witness. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1626 | LETTER dated 01/07/94 from Mark M. Baker, counsel for defendant, to Hon. C.P. Sifton. Regarding list of tape recordings and transcripts. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1627 | LETTER dated 01/07/94 from Michael S. Washor to Hon. C.P. Sifton. Regarding request to extend the time to file defense objections. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1629 | LETTER dated 01/12/94 from Barry I. Slotnick, counsel for defendant, to Hon. C.P. Sifton. Regarding marked transcripts. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1630 | |

| | | |
|---|---|---|
| | | LETTER dated 01/26/94 from Barry I. Slotnick, attorney to defendant, to Hon. C.P. Sifton. Regarding confiscated tape player of Alphonse Persico. of (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1634 | LETTER dated 03/03/94 from Richard E. Mischel, interim counsel to defendant, to Hon. C.P. Sifton. Regarding summary of Mr. Persico's efforts to secure substitute counsel. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1635 | LETTER dated 02/08/94 from Barry I. Slotnick, counsel for defendant, to Hon. C.P. Sifton. Regarding move of A. Persico to FCI Otisville from MCC. Request a move back to MCC. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1636 | LETTER dated 01/14/94 from Mark M. Baker to Hon. C.P. Sifton. Regarding request for closed courtroom. (Chee, Alvin) Modified on 06/22/2001 (Entered: 06/22/2001) |
| 06/22/2001 | 1637 | LETTER dated 02/07/94 from Barry I. Slotnick, counsel for defendant, to Hon. C.P. Sifton. Regarding request for copies of various exhibits. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1638 | LETTER dated 02/07/94 from Barry I. Slotnick, attorney for defendant, to Hon. C.P. Sifton. Regarding request for order granting A. Persico permission to observe the trial of his codefendants. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1639 | LETTER dated 02/23/94 from Mark M. Baker, counsel for defendant, to Hon. C.P. Sifton. Regarding request of A. Persico to be maintained in custody at MCC, as well as reinstating Barry Slotnick, Esq. as trial counsel. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1640 | LETTER dated 07/21/94 from Kelly Guthy, attorney to defendant, to Hon. C.P. Sifton. Regarding the instant application to preclude the government from questioning or eliciting testimony from governmental informant and witness, L. Mazza. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1641 | LETTER dated 06/21/94 from Barry Levin, attorney for defendant, to Hon. C.P. Sifton. Regarding defense's exhibit list for trial. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1642 | LETTER dated 06/15/01 from Barry Levin, counsel for defendant, to Hon. C.P. Sifton. Regarding letter from Barry Slotnick, Esq. setting forth which tapes the defense would like marked as defense exhibits. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1644 | LETTER dated 06/30/94 from Kelly Guthy, attorney for defendant, to Hon. C.P. Sifton. Regarding opposition to government's recent motion "in limine", where they seek to introduce evidence of two assaults. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1645 | LETTER dated 07/05/94 from Ellen M. Corcella, AUSA, to Hon. C.P. Sifton. Regarding support of the admissibility of conversations. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1646 | LETTER dated 06/21/94 from Barry Levin, counsel to defendant, to Hon. C.P. Sifton. Regarding government's opposition to the defendant's motion in |

| | | limine to admit the affidavit of G. Scarpa. (Chee, Alvin) (Entered: 06/22/2001) |
|---|---|---|
| 06/22/2001 | 1647 | LETTER dated 06/14/94 from Barry Levin, counsel for defendant, to Hon. C.P. Sifton. Regarding request for a two-week adjournment of the commencement of the Persico trial. (Chee, Alvin) Modified on 06/22/2001 (Entered: 06/22/2001) |
| 06/22/2001 | 1648 | LETTER dated 06/26/94 from Ellen M. Corcella, AUSA, to Hon. C.P. Sifton. Regarding Persico's motion "in limine" to preclude the introduction of his prior conviction under Rule 609 of the Federal Rules of Evidence. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1649 | LETTER dated 06/26/94 from Ellen M. Corcella, AUSA, to Hon. C.P. Sifton. Regarding response to the defendant's motion "in limine" to preclude the use of various terms. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1650 | LETTER dated 07/01/94 from Kelly Guthy, counsel for defendant, to Hon. C.P. Sifton. Regarding judge's directive. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1651 | LETTER dated 06/29/94 from Ellen M. Corcella, AUSA, to Hon. C.P. Sifton. Regarding Persico's motion to dismiss racketeering act one. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1652 | LETTER dated 07/08/94 from Barry Levin, counsel for defendant, to Hon. C.P. Sifton. Regarding the sealed confidential informant file pertaining to G. Scarpa. Request judge unseal file. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1653 | LETTER dated 06/27/94 from Ellen M. Corcella, AUSA, to Hon. C.P. Sifton. Regarding move "in limine" to introduce certain evidence during trial. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1655 | Motion in limine pursuant to federal rule of evidence 1006. Filed by Barry Levin, counsel for defendant. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1656 | Motion in limine pursuant to federal rule of evidence 804. (Chee, Alvin) Modified on 06/22/2001 (Entered: 06/22/2001) |
| 06/22/2001 | 1657 | Subpoena in a criminal case. To U.S. Department of Probation. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1658 | LETTER dated 07/25/94 from Kelly Guthy, attorney for defendant, to Hon. C.P. Sifton. Regarding support of the defendant's within application pursuant to Federal Rules of Criminal Procedure 29 for a judgment of acquittal. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1659 | Affidavit in opposition to motion to quash trial subpoena for J. Bruce Maffeo, Esq. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1660 | LETTER dated 07/20/94 from J. Bruce Maffeo, Esq., to Hon. C.P. Sifton. Regarding response to affidavit of Kelly Guthy, Esq., opposing the motion to quash a subpoena. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1661 | |

Case 1:02-cr-00251-DEK   Document 4369   Filed 09/20/19   Page 424 of 635 PageID #: 4731

| | | |
|---|---|---|
| | | Order to show cause before the Hon. C.P. Sifton as to why an order should not be entered quashing the subpoena served upon J. Bruce Maffeo, Esq. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1662 | Memorandum of law in support of the compelled testimony of J. Bruce Maffeo, Esq. By Barry Levin, attorney for defendant. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1663 | LETTER dated 01/11/94 from Mark M. Baker, counsel for defendant, to Hon. C.P. Sifton. Regarding alleged prior bad acts which the government intends to introduce at trial pursuant to Fed.R.Evid. 404(b). (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1664 | LETTER dated 07/13/94 from Andrew Weismann, AUSA, to Hon. C.P. Sifton. Regarding various potential conflicts that Alan Futerfas, Esq., has in connection with his representation of the defendant. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1665 | LETTER dated 07/11/94 from Barry Levin, counsel for defendant, to Hon. C.P. Sifton. Regarding defendant's instant application to strike certain statements made by government witness. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1666 | LETTER dated 07/21/94 from Kelly Guthy, counsel for defendant, to Hon. C.P. Sifton. Regarding instant application to preclude the government from questioning or eliciting testimony from governmental informant. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1667 | LETTER dated 07/15/94 from Michael S. Washor, counsel for defendant, to Hon. C.P. Sifton. Regarding serveral important issues pertaining to the case. (Chee, Alvin) Modified on 06/22/2001 (Entered: 06/22/2001) |
| 06/22/2001 | 1668 | LETTER dated 07/20/94 from George Stamboulidis, AUSA, to Hon. C.P. Sifton. Regarding position on the legal representation of Carmine Persico. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1669 | Defendant's proposed voir dire questions. Filed by Barry Levin. To Hon. C.P. Sifton and George Stamboulidis, Esq. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1670 | Copy of the government's proposed jury questionaire. To Hon. C.P. Sifton. From George A. Stamboulidis, AUSA. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1671 | LETTER dated 06/16/94 from Ellen M. Corcella, AUSA, to Barry Levin, counsel for defendant. Regarding follow-up on the discovery issues discussed at the pretrial conferences. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1672 | LETTER dated 06/06/94 from Barry Levin, counsel for defendant, to George Stamboulidis, AUSA. Formal notice to US government of the defendant's intention to interview several Bureau of Prison employees. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1673 | LETTER dated 06/06/94 from Barry Levin, attorney for defendant, to George Stamboulidis, AUSA. Regarding request for discovery. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1674 | |

|            |      | LETTER dated 06/10/94 from Barry Levin, counsel to defendant, to Ellen Corcella, AUSA. Regarding request for the Piazza homicide material. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1675 | LETTER dated 06/13/01 from Ellen M. Corcella, AUSA, to Barry Levin, counsel for defendant. Regarding letter of discovery sent by Levin. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1676 | LETTER dated 05/02/94 from Barry Levin, counsel to defendant, to Hon. C.P. Sifton. Regarding motions and any unresolved discovery issues. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1677 | LETTER dated 06/13/94 from Ellen M. Corcella, AUSA, to Hon. C.P. Sifton. Regarding discovery sent by Barry Levin. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1678 | LETTER dated 06/01/94 from Barry Levin, counsel for defendant, to Ellen Corcella, AUSA. Regarding FBI Debriefings (302's) for Lawrence Mazza and John Pate. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1679 | LETTER dated 06/07/01 from Barry Levin, counsel for defendant, to Hon. C.P. Sifton. Regarding the government's lack of good faith in complying with discovery obligations. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1680 | LETTER dated 06/29/94 from Ellen M. Corcella, AUSA, to Barry Levin, counsel for defendant. Regarding certain discovery issues. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1681 | LETTER dated 07/06/94 from Ellen M. Corcella, AUSA, to Barry Levin, counsel for defendant. Regarding FBI laboratory and latent print records. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1682 | LETTER dated 07/01/94 from George Stamboulidis, AUSA, to Barry Levin, counsel for defendant. Regarding copy of Government Exhibit 3500-39 (T). (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1683 | Defendant A. Persico's request to charge. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1687 | LETTER dated 02/03/94 from George Stamboulidis, AUSA, to Hon. C.P. Sifton. Regarding particulars with respect to companies and locations of proposed jury questionnaire. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1688 | LETTER dated 01/21/94 from Salvatore Marinello, AUSA, to Hon. C.P. Sifton. Regarding juror questionnaire. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1689 | LETTER dated 01/31/94 from Andrew Weissman, AUSA, to Hon. C.P. Sifton. Regarding various issues that arose at the status conference on January 28, 1994. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1690 | LETTER dated 01/23/94 from Barry Slotnick, defendant for counsel, to Hon. C.P. Sifton. Defendant requests the Court to include following questions in its customary interrogation of prospective jurors. (Chee, Alvin) (Entered: 06/22/2001) |
| 06/22/2001 | 1691 | |

Eastern District of New York - LIVE Database V6.1.1                    Page 52 of 53
Case 1:02-cr-00251-DEK   Document 4369   Filed 08/19/21   Page 426 of 635   PageID
Case 1:92-cr-00351-DEK   Document 4369-6   Filed 09/20/16   Page 52 of 53 PageID #: 10428
#: 4733

| | | LETTER dated 01/23/94 from George Stamboulidis, AUSA, to Hon. Charles P. Sifton. Regarding government's proposed jury questionnaire. (Chee, Alvin) (Entered: 06/22/2001) |
|---|---|---|
| 06/22/2001 | 1704 | Transcript of trial before the Hon. C.P.S. on April 18, 1994. (Chee, Alvin) (Entered: 06/22/2001) |
| 08/21/2001 | 1708 | LETTER dated 8/14/01 from Michelle Roker with the Court of Appeals to EDNY Appeals Clerk, stating that the Circuit inadvertently issued the mandate and is now recalling it. [Mandate sent to the Circuit on 8/20/01 by mcg.] (Vaughn, Terry) (Entered: 08/21/2001) |
| 02/01/2002 | 1714 | LETTER dated 10/18/93 from Andrew Weissmann to Judge Sifton we write with respect to two issues that arose in connection with Alphonse Persico's detention hearing. (Jackson, Ramona) (Entered: 02/01/2002) |
| 02/05/2002 | 1715 | SEALED DOCUMENT as to Alphonse Persico (Jackson, Ramona) (Entered: 02/05/2002) |
| 06/24/2002 | | CASE reassigned to Judge David G. Trager from Judge Jack B. Weinstein. Parties notified. (Bowens, Priscilla) (Entered: 06/25/2002) |
| 07/10/2002 | 1720 | MAIL RETURNED. Notification of Case Reassignmen mailed to Stephen Kelly, Esq. returned on 7/10/02. "Insufficient address". (Greene, Donna) (Entered: 07/12/2002) |
| 08/22/2007 | 1750 | TRANSCRIPT of Hearing Proceedings as to Victor J. Orena, Pasquale Amato, Lawrence Mazza, Carmine Sessa, Michael Sessa, Lawrence A. Fiorenza, Joseph Russo, Anthony Russo, Robert Zambardi, Joseph Monteleone, SR, Alphonse Persico, Joseph Tomasello, Theodore Persico, Richard Fusco, James Delmastro held on February 28th 1997 before Judge Weinstein. Court Reporter: Diana Pereira. (Attachments: # 1 119-259# 2 word index) (Hong, Loan) (Entered: 08/22/2007) |
| 03/07/2008 | | NOTICE Case ordered from Lee's Summit National Archives for Dorla Henriquez on March 7, 2008. (Hugh, Lewis) (Entered: 03/07/2008) |
| 03/13/2008 | | NOTICE Case received and person called on March 13, 2008. (Hugh, Lewis) (Entered: 03/13/2008) |
| 04/16/2008 | | NOTICE Case sent back to Lee's Summit National Archives on April 15, 2008. (Hugh, Lewis) (Entered: 04/16/2008) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/20/2016 16:31:35 | | | |
| **PACER Login:** | AllonLifshitz:3504698:4299065 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:92-cr-00351-DGT |

Case 1:02-cr-00251-DEK　Document 4869-6　Filed 08/19/21　Page 427 of 635 PageID #: 4734

| Billable Pages: | 30 | | Cost: | 3.00 | |
|---|---|---|---|---|---|

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------------x
     UNITED STATES OF AMERICA,
 3
                          Plaintiff,              Docket No.:
 4                                                10 CR 147
             versus
 5                                                U.S. Courthouse
     FRANCIS GUERRA,                              225 Cadman Plaza East
 6                                                Brooklyn, NY 11201
                          Defendant.
 7   -------------------------------------x
                                                  September 23, 2013
 8                                                2:30 p.m.

 9           Transcript of Criminal Cause for Sentencing

10   Before:   HONORABLE SANDRA L. TOWNES,
                               District Court Judge
11

12                        APPEARANCES

13   For the Government:          LORETTA E. LYNCH, ESQ.
                                  United States Attorney
14                                Eastern District of New York
                                  271 Cadman Plaza East
15                                Brooklyn, New York 11201
                                  BY:  NICOLE M. ARGENTIERI, ESQ.,
16                                     ALLON LITSHITZ, ESQ.,
                                       Assistant U.S. Attorneys
17
     For the Defendant:          LAW OFFICE OF GERALD J.
18                               McMAHON, ESQ.
                                  26 Broadway, 18th Floor
19                                New York, New York 10004
                                  BY:  GERALD J. McMAHON, ESQ.
20                                     MATHEW MARI, ESQ.

21   Court Reporter:             MICHELE NARDONE, CSR, RPR, CRR
                                  Official Court Reporter
22                                Phone:  718-613-2601
                                  Fax:  718-613-2631
23                                Email:  Mishrpr@aol.com

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
```

MICHELE NARDONE, CSR, RPR, CRR – Official Court Reporter

USA v. Guerra

1   either Russo or the defendant were arrested.

2          The testimony of the victim's brother about the

3   victim's relationship with Mrs. Persico before his death.  This

4   and other evidence was sufficient to prove the murder

5   conspiracy and the defendant's part in it by a preponderance of

6   the evidence.

7          Also, the murder of Joseph Scopo, the testimony of

8   Mr. Russo showed by a preponderance of the evidence that the

9   defendant as well as he, Mr. Russo, helped plan it; that they

10  got guns that the defendant came bringing in a gym bag; and

11  that the defendant went to prison to discuss murder plans with

12  Ted Persico; and that the group of them started to look for

13  Mr. Scopo.  He, the defendant, along with Russo and others, met

14  with Theodore Persico, Jr. at his grandmother's funeral and

15  received the okay or order to commit this murder.

16         Now, I find that it was proven, and the witness

17  Mr. Russo testified that the defendant drove the crash car,

18  which was parked on a street behind the vehicle driven by

19  Russo, carrying the shooters, Jada Pappa, and another person.

20  Pappa got out of the vehicle and killed Scopo.  When other

21  people returned fire Russo drove away with that third person

22  and left Pappa on the street.  Russo next saw Pappa minutes

23  later in the defendant's vehicle.

24         Russo testified that the defendant was driving his

25  vehicle, a blue Acura, registered in Mr. Guerra's sister's

MICHELE NARDONE, CSR, RPR, CRR – Official Court Reporter



GOVERNMENT
EXHIBIT
17(c)
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943   10/21/93
Pct 106   Photo # 19
Investigator DET. DEGUILIU

Initials

Case 1:10-cr-00147-DEK   Document 4864-9   Filed 09/22/16   Page 3 of 205   PageID #: 10434



GOVERNMENT
EXHIBIT
**18(a)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943          10/21/93
Pct 106                Photo #    5
Investigator DET. DEGUILIO

Initials



Case 1:02-cr-00251-DEK   Document 869-6   Filed 09/19/21   Page 435 of 635   PageID
Case 1:10-cr-00147-DEK   Document 846-9   Filed 09/21/16   Page 6 of 208   PageID #: 10437
#: 4742

GOVERNMENT
EXHIBIT
**18(c)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943          10/21/93
Pct 106
Investigator DET. DEGUILIO    Photo #   9
Initials



GOVERNMENT
EXHIBIT
**19(a)**
10 CR 147 (DLI)



CRIME SCENE UNIT
10/21/93
Run # 93/2943
Pct 106
Investigator DEI. DEGUILIO
Photo # 22



GOVERNMENT
EXHIBIT
**19(b)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943          10/21/93
Pct 106              Photo #  27
Investigator DET. DEGUILIO

Initials



GOVERNMENT
EXHIBIT
**20(c)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106              Photo #    6
Investigator DET. YOUNG #2387 (1)

Initials *gy*

Case 1:10-cr-00291-DEK Document 846-6 Filed 08/19/20 Page 130 of 202 PageID #: 10044



GOVERNMENT
EXHIBIT
**20(d)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943A          10/21/93
Pct 106                 Photo #    8
Investigator DET. YOUNG #2387 (2)

Initials *JY*

CRIME SCENE UNIT
Run # 93/2943A          10/21/93
Pct 106                 Photo #
Investigator DET. YOUNG #2387

Initials *JY 4/4/93*



GOVERNMENT
EXHIBIT
**20(f)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943A          10/21/93
Pct 106                 Photo #   10
Investigator DET. YOUNG #2387 (1)

Initials

Case 1:92-cr-00851-EK   Document 1869-6   Filed 08/19/21   Page 446 of 635 PageID
Case 1:10-cr-00147-DEK   Document 846-6   Filed 09/21/16   Page 174 of 200 PageID #: 10448
#: 4753



GOVERNMENT
EXHIBIT
**20(g)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943A          10/21/93
Pct 106                 Photo #  12
Investigator DET. YOUNG #2387 (2)

Initials

CRIME SCENE UNIT
Run # 93/2943A          10/21/93
Pct 106                 Photo #  35
Investigator DET. YOUNG #2387

Initials  4/8/99

Case 1:92-cr-00351-EK Document 869-6 Filed 08/19/21 Page 448 of 635 PageID
Case 1:10-cr-00457-DLI Document 846-5 Filed 09/21/20 Page 196 of 206 PageID #: 10450
#: 4755



GOVERNMENT
EXHIBIT
**21(e)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106               Photo #  18
Investigator DET. YOUNG #2387 (1)

Initials

Case 1:02-cr-00651-EK   Document 1869-6   Filed 08/19/21   Page 450 of 635 PageID
Case 1:10-cr-00497-DEK   Document 846-6   Filed 09/21/20   Page 216 of 200 PageID #: 10452
#: 4757



Case 1:02-cr-00851-EK Document 1869-6 Filed 08/19/21 Page 451 of 635 PageID
Case 1:10-cr-00147-DLI Document 846-9 Filed 09/21/16 Page 228 of 266 PageID #: 10453
#: 4758

GOVERNMENT
EXHIBIT
**21(i)**
10 CR 147 (DLI)

```
            CRIME SCENE UNIT
Run # 93/2943A          10/21/93
Pct 106                 Photo #  23
Investigator DET. YOUNG #2387 (1)

Initials
```

```
            CRIME SCENE UNIT
Run # 93/2943A          10/21/93
Pct 106                 Photo #  23
Investigator DET. YOUNG #2387

Initials
```

Case 1:92-cr-00351-EK Document 1869-6 Filed 08/19/21 Page 452 of 635 PageID
Case 1:10-cr-00247-DLI Document 846-69 Filed 09/21/16 Page 236 of 266 PageID #: 10454
#: 4759



Case 1:02-cr-00051-DLK Document 1869-6 Filed 08/19/21 Page 453 of 635 PageID
Case 1:10-cr-00147-DLI Document 846-6 Filed 09/12/16 Page 240 of 208 PageID #: 10455
#: 4760

GOVERNMENT
EXHIBIT
**208(a)**
10 CR 147 (DLI)

281-214955

6192

71

Klü



**GOVERNMENT EXHIBIT**

**212(a)**

**10 CR 147 (DLI)**

SO-2 AGENT:   K. WEVODAU   DATE:102694
CASE AGENT:   FERRANDINO   SQUAD: C-31
FILE #: 87G-NY-228482      ROLL#:4183
PHOTOGRAPHS ARE IN SEQUENTIAL ORDER

15B-NK-85650-1A6

Case 1:02-cr-00851-DEK Document 1869-6 Filed 08/19/21 Page 456 of 635 PageID
Case 1:10-cr-00271-DEK Document 846 Filed 07/21/16 Page 2 of 266 PageID #: 10458
#: 4763



Case 1:92-cr-00851-EK   Document 1869-6   Filed 08/19/21   Page 457 of 635 PageID
Case 1:10-cr-00147-DLI   Document 846-9   Filed 09/17/16   Page 280 of 286 PageID #: 10459
#: 4764

GOVERNMENT
EXHIBIT
**212(b)**
10 CR 147 (DLI)

SO-2 AGENT:   K. WEVODAU   DATE:102694
CASE AGENT:   FERRANDINO SQUAD: C-31
FILE #: 87G-NY-228482   ROLL#:4183
PHOTOGRAPHS ARE IN SEQUENTIAL ORDER

15B-NK-85650-1A6

Case 1:02-cr-00035-DEK Document 846-9 Filed 08/19/21 Page 290 of 288 PageID #: 4760



Case 1:92-cr-00351-EK Document 1869-6 Filed 08/19/21 Page 459 of 635 PageID
Case 1:10-cr-00147-DLI Document 846-6 Filed 05/21/16 Page 30 of 200 PageID #: 10461
#: 4766

**GOVERNMENT
EXHIBIT
212(c)
10 CR 147 (DLI)**

SO-2 AGENT:  K. WEVODAU DATE:102694
CASE AGENT:  FERRANDINO SQUAD: C-31
FILE #: 87G-NY-228482   ROLL#:4183
PHOTOGRAPHS ARE IN SEQUENTIAL ORDER

15B-NK-85650 - 1A6

GOVERNMENT
EXHIBIT
**861**
10 CR 147 (DLI)

## THE CITY OF NEW YORK
### VITAL RECORDS CERTIFICATE

VITAL RECORDS
DEPARTMENT OF HEALTH
DATED THROUGH OF VITAL

AUG 18  11 21 PM '95

**CERTIFICATE OF DEATH**
Certificate No.   156  93 046759

1. NAME OF DECEASED  Eleanor  —  Avena
(Type or Print)   (First Name)   (Middle Name)   (Last Name)

**MEDICAL CERTIFICATE OF DEATH** *(To be filled in by the Physician)*

| 2. PLACE OF DEATH | NEW YORK CITY | 2b. Name of hospital or other facility if not facility, street address | 2c. If in Hospital or Other Facility *(Check)* | 2d. If inpatient, date of current admission |
|---|---|---|---|---|
| | 2a. BOROUGH Brooklyn | Lutheran Medical Center | 1 ☐ DOA  3 ☐ Outpatient  2 ☐ Emerg.  4 ☐ Inpatient | Month 6  Day 24  Year 93 |

| 3a. Date and Hour of Death *(Month)* August | *(Day)* 17 | *(Year)* 1993 | 3b. HOUR 5:45 | ☒ AM  ☐ PM | 4. SEX F | 5. APPROXIMATE AGE 78 |
|---|---|---|---|---|---|---|

6. I HEREBY CERTIFY THAT: *(Check One)*
☐ I attended the deceased   ☒ A staff physician of this institution attended the deceased
☐ Dr. _____ attended the deceased
from June 24 19 93 to August 17 19 93 and last saw h er alive at 1:00 A M
on August 17 19 93 . I further certify that traumatic injury or poisoning DID NOT play any part in causing death, and that death did not occur in any unusual manner and was due entirely to NATURAL CAUSES.
*See first instruction on reverse of certificate.*

Witness my hand this 17 day of August 19 93   Signature _____ D.O. M.D.
Name of Physician Lawrence Faraud   Address Luthern Medical Center
(Type or Print)

**PERSONAL PARTICULARS** *(To be filled in by Funeral Director)*

| 7. Usual Residence a. State N.Y. | 7b. County KINGS | 7c. City, Town, or Location NEW YORK | 7d. Street & House No. | Zip | Apt. No. | 7e. Inside City Limits of 7c ☒ Yes ☐ No |
|---|---|---|---|---|---|---|

| 8. Served in U.S. Armed Forces  No ☒  Yes ☐  Specify years From ___ To ___ | 9. Marital Status *(Check One)* 1 ☐ Never Married  2 ☒ Widowed  3 ☐ Married or separated  4 ☐ Divorced | 10. Name of Surviving Spouse *(If wife, give maiden name)* |
|---|---|---|

| 11. Date of birth *(Month)* *(Day)* *(Year)* | 12 Age at last birthday 78 | If under 1 Year  mos. | If less than 1 Day  days  hours  min. | 13. Social Security No. |
|---|---|---|---|---|

| 14a. Usual Occupation *(Kind of work done during most of working lifetime, do not enter retired)* FACTORY WORKER | 14b. Kind of Business KING RESEARCH |
|---|---|

| 15. Birthplace *(City & State or Foreign Country)* BROOKLYN | 16. Education *(Check only one)*  0-11 ☐  12 ☒  13-15 ☐  16 ☐  17+ ☐ | 17. Other name(s) by which decedent was known |
|---|---|---|

| 18. NAME OF FATHER OF DECEDENT CARL JOHNSON | 19. MAIDEN NAME OF MOTHER OF DECEDENT JEANETTE FOX |
|---|---|

| 20a. NAME OF INFORMANT PATTY AVENA | 20b. RELATIONSHIP TO DECEASED DAUGHTER | 20c. ADDRESS | *(City)* | *(State)* | *(Zip)* |
|---|---|---|---|---|---|

| 21a. NAME OF CEMETERY OR CREMATORY SILVERMOUNT CEMETERY | 21b. LOCATION *(City, Town, State and Country)* STATEN ISLAND N.Y. | 21c. DATE OF BURIAL OR CREMATION AUGUST 20 1993 |
|---|---|---|

| 22a. FUNERAL DIRECTOR BLAIR MAZZARELLA FUNERAL HOME | 22b. ADDRESS 723 CONEY ISLAND AVE BKLYN N.Y |
|---|---|

**VITAL RECORDS**   **DEPARTMENT OF HEALTH**   **THE CITY OF NEW YORK**

VR 15 (1/88)

This is to certify that the foregoing is a true copy of a record on file in the Department of Health and Mental Hygiene. The Department of Health and Mental Hygiene does not certify to the truth of the statements made therein, as no inquiry as to the facts has been provided by law.

Do not accept this transcript unless it bears the security features listed on the back. Reproduction or alteration of this transcript is prohibited by §3.19(b) of the New York City Health Code if the purpose is the evasion or violation of any provision of the Health Code or any other law.

DATE ISSUED   May 13, 2011




Steven P. Schwartz, Ph.D., City Registrar



Q 0 0 5 5 8 7 1 6

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

The City of New York

Case 1:92-cr-00351-EK Document 1869 Filed 08/19/21 Page 461 of ...
Case 1:10-cr-00147-DLI Document 848-9 Filed 06/21/16 Page 328 of 200 PageID
#: 4768

GOVERNMENT
EXHIBIT
862
10 CR 147 (DLI)

723 CONEY ISLAND AVENUE
BROOKLYN, NY 11218

DATE
March 1, 1994

NUMBER

Patty Avena

TERMS:

PLEASE DETACH AND RETURN WITH YOUR REMITTANCE    $ _____

| DATE | CHARGES AND CREDITS | BALANCE |
|------|---------------------|---------|
| | BALANCE FORWARD ⇨ | |
| | FUNERAL OF ELEANOR AVENA | $ 2,621 | 00 |
| | FUNERAL OF: | |

BLAIR - MAZZARELLA FUNERAL HOME    *Thank You*    PAY LAST AMOUNT
IN THIS COLUMN

723 CONEY ISLAND AVENUE
BROOKLYN, NY 11215

DATE
April 6,1994

NUMBER

PATTY AVENA

TERMS:

PLEASE DETACH AND RETURN WITH YOUR REMITTANCE  $ _____

| DATE | CHARGES AND CREDITS | BALANCE |
|------|---------------------|---------|
| | BALANCE FORWARD ⇨ | |
| | FUEERAL OF ELEANOR AVENA | $ 2,621.00 |
| | PLEASE REMIT PAYMENT! | |
| | FUNERAL OF: | |

BLAIR - MAZZARELLA FUNERAL HOME *Thank You*  PAY LAST AMOUNT IN THIS COLUMN

# BLAIR MAZZARELLA
# FUNERAL HOME

723 CONEY ISLAND AVENUE

BROOKLYN, N.Y. 11218    Number  6 9
718-282-1164    Date  3/17/93

| Name of Deceased | Eleanor Hvens |
| Date of Death | Place of Death  Cathwaren Hosp |

## ITEMIZATION OF FUNERAL SERVICES AND MERCHANDISE SELECTED

The following are the charges for the services, merchandise, and livery you have selected. You will not be charged for any item you do not choose unless it is necessary because of other selections you have made. Any such charges are explained below.

### I. FUNERAL HOME CHARGES

(Indicate N/A for items of service and/or merchandise that are not provided.)

**A. Alternative Services**

1. Direct Cremation........................................ $ N/A
2. Direct Burial ............................................ $ N/A

**B.** Transfer of remains to the funeral establishment including personnel, equipment and vehicle........................ $ 175

**C. Preparation of Remains**

1. Embalming (including use of preparation room)........ $ 395

If you select a funeral for which this firm requires embalming such as a funeral with viewing, you may have to pay for embalming. You do not have to pay for embalming you do not approve if you select arrangements such as direct cremation or direct burial. If we charge for embalming, we will explain why below.

2. Other Preparation (including use of preparation room but excluding embalming)

a. Topical Disinfection........................... $ N/A
b. Custodial Care................................. $ N/A
c. Dressing/Casketing............................. $ 40
d. Cosmetology................................... $ N/A
e. Restoration................................... $ N/A
f. Other (specify)_____ $ N/A

**D. Arrangements**

Basic arrangements: including funeral director, other staff, equipment and facilities to respond to initial request for service, the arrangement conference, securing of necessary authorizations and coordination of service plans with parties involved in the final disposition of the deceased. $ 395

**E. Supervision (funeral director and staff)**

1. Supervision for visitation..................... $ 552
2. Supervision for funeral service................ $ 658
3. Other supervision (specify)_____ $ N/A

**F. Use of the facilities**

1. Use of the facilities for visitation.................. $ N/A
2. Use of facilities for funeral service................ $ 700
3. Other use of facilities (specify)_____ $ N/A

**G. Livery**

1. a. Hearse or................................... $ 225
   b. Alternative vehicle.......................... $ N/A
   (Specify type:_____)
2. Flower vehicle................................. $ N/A
3. Limousine(s)................................... $ N/A
   (Specify number: _____ @ $_____ /limousine)
4. Passenger car(s) .............................. $ N/A
   (Specify number: _____ @ $_____ /car)

**H. Merchandise**

1. Casket or alternative container .............. $ 3290
   a. Supplier S. Tackyo
   b. Model name or number Pale Rose
   c. Material: Species of wood_____
      or kind of metal 34 ga weight or gauge. N/a
      or alternative container (describe)_____
   d. Interior Crepe

2. Outer Interment Receptacle .................. $ 850
   a. Supplier_____
   b. Model name or number_____
   c. Material Concrete

**I.** Additional Services and Merchandise Selected (Describe and show price)

1. Memorial Cards ............................... $ 
2. Acknowledgement Cards....................... $ 
3. Casket Plate.................................. $ 15
4. Crucifix/Cross................................ $ 
5. Hairdressing.................................. $ 65
6. Flowers ...................................... $ N/A
7. Clothing or Burial Garments .................. $ 175
8. Register Book................................. $ N/A
9. Death Notices................................. $ N/A
10. ............................................. $ 
11. ............................................. $ 
12. ............................................. $ 

**J. Limited Services**

1. Forwarding remains to_____ $ N/A
2. Receiving remains from_____ $ N/A

TOTAL OF FUNERAL HOME CHARGES    $ 5945

© 1987 AP-47

## II. CASH ADVANCES

These are estimated charges for items to be paid to others. We will charge you no more for these items than is actually paid the third parties. (Describe and show estimated charges.)

| | |
|---|---|
| 1. Cemetery or Crematory | $ 423 |
| 2. Clergy Honoraria | $ 0 10 |
| 3. Death Certificate Transcripts  3 @ 15 | $ 45 |
| 4. Livery | $ N/A |
| 5. Pallbearers  6 @ N'S | $ 168 |
| 6. Public Transportation | $ N/A |
| 7. Gratuities | $ 40 |
| 8. Bridge & Road Tolls | $ N/A |
| 9. Telephone & Telegraph Charges | $ N/A |
| 10. | $ |
| 11. | $ |
| 12. | $ |

ESTIMATED TOTAL OF CASH ADVANCES $ 926

### III. SUMMARY OF CHARGES

| | |
|---|---|
| 1. Funeral Home Charges | $ 5945 |
| 2. Cash Advances | $ 926 |

TOTAL FUNERAL CHARGES $ 6571

## IV. EXPLANATION OF CHARGES

Explain charges for embalming and for any items that are not required by law but may be necessary because of cemetery requirements, crematory requirements or other selections made.

Signature of Licensed Funeral Director                          Date
8-11-93

Printed or Typed Name of Funeral Director
Lynnda Dice // Crigsby  5617

### ACKNOWLEDGEMENT OF RECEIPT

I have received this itemization of funeral services and merchandise selected.

Signature                          Date
Patricia Evena  8-17-93

### PUBLIC NOTICE

The New York State Department of Health is responsible for licensing and regulating New York State funeral directing under the Public Health Law. You may contact the Department at:

Bureau of Funeral Directing
New York State Department of Health
Corning Tower, Empire State Plaza
Albany, New York 12237

EXCLUSION OF WARRANTY. The only warranties, express or implied, granted in connection with the goods sold with this funeral service are the express written warranties, if any, extended by the manufacturers thereof. No other warranties and no warranties of merchantability or fitness for a particular purpose are extended by the funeral director.

## STATEMENT OF GOODS AND SERVICES SELECTED

INVOICE TO_____

_____

The undersigned hereby authorizes the above funeral establishment or its representatives to obtain custody of the remains of

Eleanor Avena

Initial and state your relation to deceased  daughter

The undersigned hereby authorizes the above funeral establishment or its representatives ☒ to embalm ☐ not to embalm the remains of

Eleanor Avena

Initial and state your relation to deceased  daughter

Other Authorization by_____

"Charges are only for those items that are used. If we are required by law to use any items, we will explain the reasons in writing below."

TOTAL FUNERAL CHARGES $ 6571

Date _____ 19 _____
The foregoing statement has been read by (to) me and I hereby acknowledge receipt of a copy of same and agree to pay the above funeral account and for such additional services and materials as are ordered by

me, on or before_____ 19 _____ In the event that this account is not paid in accordance with the terms of this agreement, the undersigned hereby agrees to pay any and all costs and attorney's fees incurred in connection with the collection of this account.

Prior to the discussion of these funeral arrangements, I was presented with a copy of this funeral firm's "General Price List" for which I hereby acknowledge receipt, and have had an opportunity to review the firm's Casket Price List and Outer Interment Receptacle Price List.

TERMS: This account becomes due_____. If bill

remains unpaid beyond_____ a late charge of_____% per month

(annual rate_____%) may be added to the unpaid portion of the balance due.
The liability hereby assumed is in addition to the liability imposed by law upon the estate and others, and shall not constitute a release thereof.

Signature  Patricia Avena

Relation to Deceased .... Daughter

Signature_____

Relation to Deceased _____

By_____
                                        Print Name of Licensed Funeral Director

ADDITIONS OR ALTERATIONS OF SERVICES AND MERCHANDISE SELECTED. The following changes represent items of service and/or merchandise ordered or altered subsequent to the original funeral agreement.

AUTHORIZATION INITIAL

| | |
|---|---|
| (-) Vault | $ 850 |
| + 2 limo + flowers | $ 645 |
| 15 x 3  0.45. | |

Total Adjustments to Funeral Charges ................. $_____

ADJUSTED TOTAL ................. $_____

Credit ................................. $_____

BALANCE DUE ........................ $_____

Viewing: Wed. Thr.
2-5 : 7-9³⁰

Regina Haas R.C.
236-0909 . fr.

DAY 3/20
TIME OF SERVICE 9⁰⁰

PLACE OF SERVICE Sonrpac F.H. 331-5000

| NAME: | FIRST | MIDDLE | LAST | SEX | DATE OF DEATH | | |
|---|---|---|---|---|---|---|---|
| | | | | | MONTH | DAY | YEAR |
| Eleanor | | Avena | | F | 8 | 17 | 93 |

| PLACE OF DEATH | | CITY OR VILLAGE | | TOWN | COUNTY | STATE |
|---|---|---|---|---|---|---|
| Lutheran Hosp.. | | Brooklyn | | | Kings | N.Y. |

LENGTH OF STAY

| LEGAL RESIDENCE | | CITY OR VILLAGE | | TOWN | COUNTY | STATE |
|---|---|---|---|---|---|---|
| | | | | | Kings | N.Y. |

LENGTH OF STAY

| DATE OF BIRTH | | | AGE | PLACE OF BIRTH | CITIZEN OF | VETERAN? | DATES OR WHICH WAR |
|---|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | 78 | Brooklyn | U.S.A | no | |
| July | 15 | 15 | | | | | |

| MARITAL STATUS | SURVIVING SPOUSE MADEN NAME, IF WIFE | WAS DECEASED KNOWN BY ANY OTHER NAME? |
|---|---|---|
| Widow. | | |

EDUCATION INDICATE HIGHEST GRADE COMPLETED ONLY
ELEMENTARY 0 1 2 3 4 5 6 7 8   HIGH SCHOOL 1 2 3 4   COLLEGE 1 2 3 4 5+

| USUAL OCCUPATION | BUSINESS OR INDUSTRY | SOCIAL SECURITY NUMBER |
|---|---|---|
| factory Worker. | King Research | |

NAME & LOCATION OF FIRM OR CO.

| FATHER'S NAME | MOTHER'S MAIDEN NAME |
|---|---|
| Carl Johnson | Jeanette Fox |

| NEXT OF KIN | RELATIONSHIP |
|---|---|
| Patty Avena. | Daughter |

| ADDRESS | TELEPHONE |
|---|---|
| | |

| INFORMANTS NAME | RELATIONSHIP |
|---|---|
| Dan | grandson. |

| ADDRESS | TELEPHONE |
|---|---|
| | |

| MAIL BILL TO: NAME | ADDRESS |
|---|---|
| | |

Loose ok 13:00 wed.

K. F. Gallagher
This 9:45 p.m.

Certificate................... Permit No. ...................
Removal .................... Medical Exam. ..............
Embalmer................... Lady Attend. ....Time.......
Priest Line ................... Ctsgnd. .................
OK Church Regina Pacis Am't: 250 Time 930
OR Cemetery St. John Cemetery Am't: 465 + 18 Time 11:15     727-7020   # 10 (ok)
Cloister...................... Insc. Form ..................     Priest at
Military ...................... Flag ...................          cemetery
Firing Squad ................. Vet. Forms ................
Transcripts.................. Soc. Sec....................
OK Prayer Cards........... Am't ........Type .........
OK Ack. Card ... Abigail Am't: ........Type .........
Memorial Pack # .........................................
OK Name Plate. Priv. Key Door Badge ..........
Clothing...................... Us.............. Family ......
Casket: St. B. Jr. K. 1 Mfg. .........Desc. ........
        Del. ............... Stock.. Pink Rose
Outer Case: .........Mfg. ......Type ......Size.......
Livery ..Scarpaci........ Limousines ...family
Priest at Cemetery........... Viewing Time ..............
Newspapers: ............................................     Portack - Scarpaci   ok
...............................................................
...............................................................     Hearse (a)
Verified ....................................................     Limos Family
                                                                    Limo (ob)
Harry Rfa                                                            Flower Car (a)
                                                                    1) Scarpaci (a)
                                                                    2)
                                                                    3)
                                                                    4

138  Case 1:92-cr-00851-EK  Document 4869 Filed 08/19/21  Page 2 of 2
Case 1:10-cr-00147-DLK  Document 848-69 Filed 09/21/10  Page 380 of 26
#: 4774

GOVERNMENT
EXHIBIT
863
10 CR 147 (DLI)

## TRANSPORTATION INFORMATION

BUS # 1152  VAN # _____  ARRIVED S.F.C. _____  DATE 8/19/93  TIME 754a

# OF INMATES ON BUS  4        Co Sprklios

# OF INMATES RECEIVED  0

# OF INMATES TRAILS  5

TOTAL INMATES UN  9        Returned w/ 5  355/pm

DEPARTING T.M.  84

DESTINATION  Wallkill        ETA _____

NOTIFIED FACILITY _____

EMPLOYEE NOTIFIED _____        TIME _____

NOTIFIED CCC _____        TIME _____

Does Not require reporting — Medical Hab.

SULLIVAN C. F. TRANSPORTATION INFORMATION

DESTINATION Shawangunk  PURPOSE, Medical

ESCORTING OFFICERS        TIMES 1
1) Co Taylor  LEFT  901 Am  E.T.A. 1 Hr
2) Co St Adel  ARRIVED  1030 Am
3) _____  LEFT  110 PM  E.T.A. 1 Hr
RETURNED  227 pm

INMATES TRANSPORTED, (list below) LIST IF C.M.C.
91R6141  Gurganeous

SULLIVAN C. F. TRANSPORTATION INFORMATION

DESTINATION, Bklyn NY  PURPOSE, Funeral

ESCORTING OFFICERS        TIMES 1
1) Hill  LEFT  1010 AM  E.T.A. 1:15
2) Fuebell  ARRIVED  1457 p
3) Bivins  LEFT  312  E.T.A. 315 p
RETURNED  613/p

INMATES TRANSPORTED, (list below) LIST IF C.M.C.
Persico  88A6463
1210 Pm  Count Clear 728

Send CMC & Notification to CCC on inmate Spradley 91A0823
message #616981
100 Pm  Bklyn Funeral trip Stuck in Traffic
won't make 100 Pm Viewing — were told to
proceed to Destination — may make services.
149  Reviewed by — Lt. R Best
315 PM  Relieved by Lt. Henley  Sr M Graf

Case 1:92-cv-00175-DLK Document 1859 Filed 09/21/10 Page 39 of 205 PageID #: 9070
# 4775

6:30 W.C. on rounds
9:00 C.O. Huebsch and Ramos return w/ 2 inmates from St. Clares.
LE 6:00 One on one watch in M.H.U. has been lifted per O.M.U.
11:00 Count correct; In 720 Out 8 Tth 728
Relieved by Lt. Frisbie
Lt. Healy

11:00 Lt Frisbie reviewed log.

| DAY: Wed | DATE: 8/18/93 | TIME SHIFT STARTS: 11:15 pm | TIME SHIFT ENDS: 7:30 am |
|---|---|---|---|
| WEATHER: Rain | | TEMPERATURE: 62° | FIRE CHIEF: Bernard |
| WATCH COMMANDER: Frisbie | | OFFICER OF THE DAY: Caprano |
| SENIOR NURSE ON DUTY: Cepulonis | | INMATES OUT: |
| ANNEX COUNT BEGINNING OF SHIFT: 185 | | END OF SHIFT: 185 |
| MAIN COUNT - BEGINING OF SHIFT: 543/728 | | END OF SHIFT: 543/728 |
| VISITING COUNT - MAIN BUILDING: N/A | | VISITING COUNT - ANNEX: N/A |

Sgt.
Churak - Main
Miller - annex

11:12 C.o. Brooks called from Harris Hosp., Inmate moved from I.C.U. to 5-E-11.
11:15 Line up & briefing.
12:00 AM Count Correct; total 728
1:00 AM C.o. Brooks; all secure at Harris Hosp.
2:00 AM Count Correct; total 728
3:00 AM C.o. Brooks; all secure at Harris Hosp.
4:00 AM Count Correct; total 728
6:00 AM C.o. Brooks; all secure at Harris Hosp.
6:45 AM Count Correct; total 728.
7:15 AM Log Review - Lt Shift Lt Frisbie

| DAY: Wed | DATE: 8/18/93 | TIME SHIFT STARTS: 7:15 am | TIME SHIFT ENDS: 3:30 pm |
|---|---|---|---|
| WEATHER: P/cloudy cool | | TEMPERATURE: 60° | FIRE CHIEF: Fletcher |
| WATCH COMMANDER: Crawford | | OFFICER OF THE DAY: D/O Caprano |
| SENIOR NURSE ON DUTY: Alley | | INMATES OUT: |
| ANNEX COUNT BEGINNING OF SHIFT: 185 | | END OF SHIFT: |
| MAIN COUNT - BEGINNING OF SHIFT: 543 | | END OF SHIFT: |
| VISITING COUNT - MAIN BUILDING: | | VISITING COUNT - ANNEX: |

Sgts
Lere I/S
Coleman F/S
Andoorshy Srn
Ferrie H
Dunn HA
Baker GC
DeVale HA

8388

7:15 AM Lineup + Briefing
9:04 AM Mr. Davis Plant Supt Reviewed Log
8:30 AM Sgt Coleman FDS Reviewed Log

GOVERNMENT
EXHIBIT
864
10 CR 147 (DLI)



J-HAUL

14042

10/26/94  01:48pm

WAR SLOPE U-HAUL          803 59
5P & TH STREET
BROOKLYN          NY  11215
(718) 237-2024

RENTAL CONTRACT
LOCAL OUT

0017586BY

3 IDNT: RUSSO ANTHONY
2131 84ST
BROOKLYN          NY 11214

DF, LTC,
PHONE NO.

| | DATE | TIME |
|---|---|---|
| OUT: | 10/26/94 | 01:48pm |
| DUE: | 10/26/94 | 07:00pm |

EQUIPMENT RENTED

| QTY. | EQUIPMENT NO. | | DESCRIPTION | | LOCAL RATES | ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|
| 00001BH | 7225F | GREAT HAULER TRUCK-2M | | 39.95 | 39.95 |
| | VF00922  PA | RATE PER MI/KM: | 0.99 | | |
| | | MILEAGE OUT: | 78,160.7 | | |
| | | ESTIMATED MILES: | 50.0 | | 49.50 |
| | | SAFEMOVE PROTECTION | | 10.00 | 10.00 |

SALES TAX: 7.38
ESTIMATED RENTAL TOTAL: 106.83

TODAY'S RENTAL DEPOSIT: 200.00
TOTAL DEPOSIT: 200.00
TOTAL COLLECTED TODAY: 200.00
CASH: 200.00

____ (CUSTOMER INITIALS)   I HAVE RECEIVED:   X CONTRACT HOLDER   X USERS GUIDE(S)

BY SIGNING BELOW, I HAVE RECEIVED AND UNDERSTAND THE TERMS AND CONDITIONS PRINTED ON THE CONTRACT HOLDER. I AGREE TO PAY FOR ALL FUEL AND RETURN THE TRUCK FULL OF FUEL OR PAY A MINIMUM $2 PER GALLON FOR ESTIMATED FUEL USED PLUS AN ADDITIONAL $20 SERVICE FEE. I UNDERSTAND THAT ANY REFUND DUE ME WILL NOT BE PAID UNLESS I RETURN WITH ALL EQUIPMENT RENTED AND RENTAL CONTRACT.

CUSTOMER SIGNATURE          10/26/94
                           DATE          EMPLOYEE SIGNATURE 04776

Sublemage is in effect when payment for coverage is received and noted on the contract. As a Sublemover customer, you are relieved of responsibility for most damage, yet we still must determine how the damage occurred. You need to file an Accident/Damage Report for your protection against further claims and so we can recover damage costs from responsible third party (parties). Additionally, if you hit an object or other personal property, a completed Accident/Damage Report is required in case of potential liability claim(s) made against U-Haul.

You are not financially responsible for damages unless there is evidence of gross negligence or abuse. Sublemove does not cover:

• Off-road use of the vehicle.
• Incorrect fuel.
• Cut, blown or damaged tires.
• Damage caused from low oil level.
• Damage caused while the driver or passengers were using any controlled substance (drugs) or alcohol, etc.
• Damage to the truck bed (box), rear doors or cab that resulted from overloading, improper loading or failure to secure the load.
• Mechanical damage resulting from overloading or logging of the vehicle while towing or pulling a load.
• Damage that results from the vehicle being used in the commission of a crime.
• Other damage resulting from willful abuse and serious negligence.
• Damage that results from the failure to comply with the terms of the rental contract.

GOVERNMENT
EXHIBIT
**865(a)**
10 CR 147 (DLI)



GOVERNMENT
EXHIBIT
**865(b)**
10 CR 147 (DLI)



GOVERNMENT
EXHIBIT
**865(c)**
10 CT 147 (DLI)



GOVERNMENT
EXHIBIT
**865(d)**
10 CR 147 (DLI)



GOVERNMENT
EXHIBIT
**865(e)**
10 CR 147 (DLI)



GOVERNMENT
EXHIBIT
**1013(b)**
**10 CR 147 (DLI)**

## SUMMARY CHART
## PHONE RECORDS

| From | | To | | Date Range | Number of Contacts |
|---|---|---|---|---|---|
| **Phone Number** | **Subscriber/User** | **Phone Number** | **Subscriber/User** | | |
| 917-567-8741 | Michael Persico (Romantique) | 917-757-2359 | Francis Guerra | June 2, 2008 - April 20, 2009 | 33 |
| 917- 757-2359 | Francis Guerra | 917-567-8741 | Michael Persico (Romantique) | June 2, 2008 - April 20, 2009 | 81 |
| 917-567-8741 | Michael Persico (Romantique) | 347-288-9628 | Anthony Russo (Maritza Medina) | January 6, 2009 - April 16, 2009 | 3 |
| 347-288-9628 | Anthony Russo (Maritza Medina) | 917-567-8741 | Michael Persico (Romantique) | January 6, 2009 - April 16, 2009 | 11 |
| 917-567-8741 | Michael Persico (Romantique) | 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | January 29, 2009 - April 14, 2009 | 8 |
| 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | 917-567-8741 | Michael Persico (Romantique) | January 29, 2009 - April 14, 2009 | 7 |

1

| From | | To | | Date Range | Number of Contacts |
|------|------|------|------|------|------|
| **Phone Number** | **Subscriber/User** | **Phone Number** | **Subscriber/User** | | |
| 917-757-2359 | Francis Guerra | 347-288-9628 | Anthony Russo (Maritza Medina) | August 20, 2009 – July 26, 2010 | 1339 |
| 347-288-9628 | Anthony Russo (Maritza Medina) | 917-757-2359 | Francis Guerra | August 20, 2009 – July 26, 2010 | 2317 |
| 917-757-2359 | Francis Guerra | 347-231-5175 | Anthony Russo (Maritza Medina) | July 21, 2010 - August 30, 2010 | 142 |
| 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | 917-757-2359 | Francis Guerra | August 21, 2009 - January 20, 2011 | 94 |
| 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | 347-288-9628 | Anthony Russo (Maritza Medina) | September 10, 2009 - July 19, 2010 | 242 |
| 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | 347-231-5175 | Anthony Russo (Maritza Medina) | July 21, 2010 - September 2, 2010 | 69 |
| 914-246-9726 | Michael Persico | 718-996-8358 | Joseph Monteleone (Anna Sottile) | December 31, 1991 - May 17, 1992 | 6 |

2

| From | | To | | Date Range | Number of Contacts |
|------|---|-----|---|-----------|--------------------|
| Phone Number | Subscriber/User | Phone Number | Subscriber/User | | |
| 718-875-3955 | Eric Curcio | 718-745-8345 | Joyce Persico (Alphonse Persico's Mother) | August 18, 1994 | 1 |
| 718-356-0208 | Michael Sessa | 914-246-9726 | Michael Persico | February 29, 1992 – June 10, 1992 | 3 |
| 917-757-2359 | Francis Guerra | 718-312-9032 | Michael Sessa (Smily) | September 25, 2009- December 22, 2010 | 10 |
| 718-312-9032 | Michael Sessa (Smily) | 917-757-2359 | Francis Guerra | September 25, 2009- December 22, 2010 | 28 |
| 917-757-2359 | Francis Guerra | 646-400-9696 | Ambrose | September 10, 2009- February 9, 2011 | 217 |
| 646-400-9696 | Ambrose | 917-757-2359 | Francis Guerra | September 10, 2009- February 9, 2011 | 150 |
| 917-757-2359 | Francis Guerra | 718-234-5580 | Patty Avena | June 9, 2010- December 6, 2010 | 4 |
| 917-757-2359 | Francis Guerra | 917-538-1365 | Scott Reback (Jew) | August 20, 2009- January 6, 2011 | 176 |
| 917-538-1365 | Scott Reback (Jew) | 917-757-2359 | Francis Guerra | August 20, 2009- January 6, 2011 | 137 |

3

| From | | To | | Date Range | Number of Contacts |
|------|------|------|------|------------|--------|
| **Phone Number** | **Subscriber/User** | **Phone Number** | **Subscriber/User** | | |
| 917-757-2359 | Francis Guerra | 917-567-0028 | Suzzie Girl | August 20, 2009- December 17, 2009 | 8 |
| 917-757-2359 | Francis Guerra | 718-680-5072 | Suzzie Girl | August 20, 2009-September 22, 2009 | 8 |
| 718-680-5072 | Suzzie Girl | 917-757-2359 | Francis Guerra | August 20, 2009-September 22, 2009 | 5 |
| 718-219-4572 | Susie Girl Little | 917-757-2359 | Francis Guerra | January 20, 2011 | 2 |
| 917-757-2359 | Francis Guerra | 718-708-0923 | Suzzie Girl | August 27, 2009- December 18, 2009 | 19 |
| 718-708-0923 | Suzzie Girl | 917-757-2359 | Francis Guerra | August 27, 2009- December 18, 2009 | 92 |

4

Case 1:92-cr-00351-EK   Document 1869-6   Filed 08/19/21   Page 470 of 625 PageID
Case 2:10-cr-00147-DLI   Document 846-4   Filed 09/21/16   Page 30 of 200 PageID #: 9481
#: 4786
996

GOVERNMENT
EXHIBIT
**7000**
10 CR 147 (DLI)

```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA      :
3                    PLAINTIFF,    :    10CR147
                                   :
4         versus                   :    United States Courthouse
                                   :    225 Cadman Plaza East
5                                  :    Brooklyn, N.Y.  11201
     FRANK GUERRA,                 :
6                                  :    June 19, 2012
                     DEFENDANT.    :    9:30 A.M.
7    ------------------------------x

8
                         TRANSCRIPT OF JURY TRIAL
9            BEFORE THE HONORABLE SANDRA L. TOWNES
                UNITED STATES DISTRICT COURT JUDGE
10

11   A P P E A R A N C E S :
     For the Government:
12
     LORETTA LYNCH
13   United States Attorney
     BY: NICOLE ARGENTIERI, ESQ.
14   RACHEL NASH, ESQ.
     ALLON LIFSHITZ, ESQ.
15   Assistant United States Attorney
     271 Cadman Plaza East
16   Brooklyn, New York  11201

17

18   For the Defendant:

19   GERALD J. MCMAHON, ESQ.
     MATHEW J. MARI, ESQ.
20   Court Reporter:
     Charisse Kitt, CRI, CSR, RPR, FCRR
21   225 Cadman Plaza East Rm N357
     Brooklyn, New York  11201
22   Tel: (718) 613-2606
     Fax: (718) 613-2696
23

24

25   Proceedings recorded by mechanical stenography, transcription
     by computer-aided transcription.
```

Case 1:02-cr-00251-EK   Document 1360-6   Filed 08/19/21   Page 480 of 635 PageID #:
Case 2:10-cr-00247-DEK   Document 846-4   Filed 09/21/16   Page 31 of 200 PageID #: 4787

Quarantello - Direct/Lifshitz                          1033

1

9                           **JOHN DEGUILIO,**

10   called as a witness, having been duly sworn, was examined and

11   testified as follows:

12              THE COURT:  Please be seated.  Tell us your full

13   name and spell it.

14              THE WITNESS:  John, J-o-h-n, Deguilio,

15   D-e-g-u-i-l-i-o.

16              MR. LIFSHITZ:  May I inquire, Your Honor?

17   DIRECT EXAMINATION

18   BY MR. LIFSHITZ:

19   Q    Good morning, sir.

20   A    Good morning.

21   Q    Where did you work in 1993?

22   A    The New York City Police Department, crime scene unit.

23   Q    And when did you work for the police department?

24   A    From 1984 to 2004.

25   Q    Are you retired now?

Case 1:03-cr-00951-EK   Document 1860-6   Filed 08/19/21   Page 481 of 635 PageID #: 30483
Case 2:10-cr-00747-DEK   Document 846-4   Filed 09/21/16   Page 32 of 206 PageID #: 4788
1034

Deguilio – Direct/Lifshitz

1   A     Yes.

2   Q     And you mentioned the crime scene unit; is that also

3   known as the CSU?

4   A     Yes.

5   Q     Approximately what years did you work in the CSU?

6   A     Early '93 to around September of 2000.

7   Q     And generally speaking, what were your responsibilities

8   when you worked in the CSU?

9   A     I responded to crime scenes and we photographed,

10  sketched, and documented and collected any evidence that was

11  present.

12  Q     Directing your attention to October 20, 1993, did you

13  work that day?

14  A     Yes.

15  Q     What shift?

16  A     I started at 2 p.m. on October 20th, and my shift ended

17  at 8 a.m. on October 21st.

18  Q     Directing your attention to the late evening of the 20th,

19  did you get a call to respond to a crime scene?

20  A     Yes, I did.

21  Q     Where, if anywhere, did you go as a result of getting

22  that call?

23  A     We responded to -- within the 106th Precinct, which was

24  in Queens County, respond to 110th Street between 107th and

25  109th.

Case 1:03-cr-00851-EK   Document 1869-6   Filed 08/19/21   Page 482 of 635 PageID
Case 2:10-cr-00247-DEK   Document 846-4   Filed 08/21/16   Page 33 of 200 PageID #: 30484
#: 4789
1035
Deguilio - Direct/Lifshitz

1   Q      107th and 109th Avenue?

2   A      Correction, 107th.

3   Q      When you arrived what did you see?

4   A      There was police vehicles present and there was yellow

5   tape sectioning off an area within that block.

6   Q      What kind of street was it?

7   A      It was residential.

8   Q      What did you do when you first arrived?

9   A      I conferred with one of the detectives that was at the

10  scene, he advised us what he needed to have done at that

11  location, and then I proceeded to -- I sketched the scene.

12  Q      Scene of 110th Street?

13  A      Yes.

14  Q      What else did you do, if anything, at 110th Street?

15  A      Once I had sketched the scene, I photographed the scene

16  and collected evidence that was located there.

17  Q      Other than 110th Street, where else, if anywhere, did you

18  go in connection with this particular crime scene?

19  A      It was, as I recall, a few blocks away; I believe it was

20  106th Street.  It was a vehicle located that was running and

21  was noted to us that it may have been involved with the prior

22  crime scene that we were working on.

23  Q      The scene at 110th Street?

24  A      Correct.

25          MR. LIFSHITZ:  May I approach, Your Honor?

Case 1:02-cr-00251-EK   Document 860-6   Filed 08/19/21   Page 483 of 635 PageID #: 4790
Case 1:10-cr-00147-DLI   Document 846-4   Filed 09/21/16   Page 54 of 208 PageID #: 3845

1036

Deguilio – Direct/Lifshitz

1       THE COURT:  Yes.

2  Q    I'll hand the witness a series of photographs that have

3  been marked Government Exhibits 17A, -B, and -C; 18A, -B, -C,

4  -D, and -E; 18-1A, -B, and -C?

5       THE COURT:  Don't –– wait.  Don't talk so fast.

6  18-1?

7       MR. LIFSHITZ:  18-1A, -B, and -C; and 19A and -B.

8  Q    Please look at these exhibits and tell us if you

9  recognize them.

10       (Handing.)

11       (Witness perusing.)

12  A    These are the photographs that I had taken of the crime

13  scene.

14  Q    Do they fairly and accurately depict items and scenes you

15  observed that night?

16  A    Yes.

17  Q    October 20, 1993?

18  A    Yes, they do.

19       MR. LIFSHITZ:  Your Honor, the government moves to

20  admit the exhibits that was just handed to the witness.  I can

21  read off the numbers again, if it would help.

22       THE COURT:  Mr. McMahon.

23       MR. McMAHON:  No objection.

24       THE COURT:  All right, no objection.  I will

25  receive, and I will read off the numbers.  Tell me if I've

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Case 1:02-cr-00251-EK   Document 1269-6   Filed 08/19/21   Page 404 of 635 PageID... Case 2:10-cr-00147-DEK   Document 846-4   Filed 09/21/16   Page 33 of 208 PageID #: 4791

1037

Deguilio - Direct/Lifshitz

1    missed anything.

2              MR. LIFSHITZ:  Sure.

3              THE COURT:  17A, 17B, and 17C, 18A, –B, –C, –D,

4    and –– E; 18-1A, –B, and –C; and 19A and –B.

5              MR. LIFSHITZ:  Yes, that's everything.  Thank you,

6    your Honor.

7              THE COURT:  Received.

8              (Government's Exhibits 17A, 17B, 17C, 18A, 18B, 18C,

9    18D, 18E, 18-1A, 18-1B, 18-1C, 19A and 19B received in

10   evidence.)

11             MR. LIFSHITZ:  May I approach again?

12             THE COURT:  Yes.

13             MR. LIFSHITZ:  I will show the witness a board that

14   we've marked as Government Exhibit 17.

15   Q    Does this exhibit consist of enlarged versions of the

16   photographs at Government Exhibits 17A, –B, and –C?

17   A    Yes, they do.

18             MR. LIFSHITZ:  Your Honor, the government would move

19   to admit Exhibit 17.

20             THE COURT:  Mister ––

21             MR. McMAHON:  No objection.

22             THE COURT:  I'll receive Government Exhibit 17.

23             (Government's Exhibit 17 received in evidence.)

24             MR. LIFSHITZ:  Your Honor, may I display it on the

25   easel and ask the witness to stand down?

Case 1:02-cr-00251-EK   Document 1869-6   Filed 08/19/21   Page 485 of 635 PageID 7
Case 1:10-cr-00147-DLI   Document 846-4   Filed 09/21/16   Page 36 of 206 PageID #: 30487
#: 4792                                                                    1038

                        Deguilio - Direct/Lifshitz

1             THE COURT:  Yes, you may.

2             MR. LIFSHITZ:  Thank you.

3    Q    Please explain to the jury what's depicted in the picture

4    on the top left of this board which corresponds to

5    Exhibit 17A?

6    A    This is glass fractures that are on the street opposite

7    107-45 110th Street.

8    Q    What -- is there a car depicted in that picture?

9    A    Yes, a white Cadillac.

10   Q    Is the glass from the Cadillac?

11   A    No, it wasn't.

12   Q    What's depicted in the picture on the bottom left of this

13   board which corresponds to Exhibit 17B?

14   A    If you were standing in front of 107-44 on 110th Street,

15   right in front of the home, this what the photo is showing a

16   Nissan Altima.

17   Q    Does the Cadillac in the top left picture appear in the

18   bottom?

19   A    Yes, it does, on the opposite side of the street.

20   Q    So within that particular picture is the top most car on

21   the right?

22   A    Yes.

23   Q    And is there any damage to the Nissan that's in the

24   foreground of the picture?

25   A    On this photo you can see that the rear window is

Case 1:02-cr-00351-EK   Document 1869-6   Filed 08/19/21   Page 406 of 635 PageID #: 4793
Case 2:10-cr-00247-DEK   Document 846-4   Filed 05/21/16   Page 37 of 206 PageID #: 30488
1039

Deguilio – Direct/Lifshitz

1   shattered.

2   Q    Take a look at the picture on the right of the board,

3   which corresponds to Government Exhibit 17C.

4          What's depicted in that picture?

5   A    This is the Buick that has a fractured rear window and a

6   blown out rear driver's side passenger door window on 106th

7   Street.

8   Q    And is that how it appeared when you found it on

9   106th Street?

10  A    Yes.  The vehicle was running, actually.

11  Q    Thank you.

12         MR. LIFSHITZ:  Your Honor, I'd like to next show the

13  witness a board marked Government Exhibit 18.

14         If you grab the folder containing the 18 series.

15         Does this board contain enlarged versions of 18A,

16  –B, and –C?

17  A    Yes, it does.

18         MR. LIFSHITZ:  Your Honor, I would move to admit

19  Government Exhibit 18.

20         THE COURT:  Any objection.

21         MR. McMAHON:  No, Judge.

22         MR. LIFSHITZ:  And may I place it on the easel.

23         THE COURT:  Exhibit 18 is received.

24         (Government's Exhibit 18 received in evidence.)

25         THE COURT:  Yes, you may.

Case 1:02-cr-00251-EK   Document 1869-6   Filed 09/19/21   Page 487 of 625 PageID
Case 2:10-cr-00247-DEK   Document 846-4   Filed 09/21/16   Page 38 of 208 PageID #: 4089
#: 4794
1040

Deguilio – Direct/Lifshitz

1    MR. LIFSHITZ:  Thank you.

2  Q    Now looking at Exhibit 18, the board that's in front of

3  you, can you please explain what's depicted in the top left

4  picture, which corresponds to 18A?

5  A    This is the Nissan Altima that's in front of 107-43 and

6  107-45 on 110th Street.

7  Q    Is this the opposite prospective of what was on the

8  previous board, the board marked 17?

9  A    Yes.  I was standing in front of the home as it was shot

10  of the passenger side out.  This is the opposite facing.

11  Q    And what can you see in this picture?

12  A    You could also see where the shattered glass -- this

13  window here is blown out, the driver's side door.

14  Q    The front driver's side door?

15  A    That's correct.  And two bullet impact marks on this

16  vehicle.  And you can see that rear window is shattered.

17  Q    Does glass appear in that picture?

18  A    If you stepped out of the vehicle right below it.

19  Q    Under the driver's door?

20  A    Yes.

21  Q    What's depicted in the picture on the top right of this

22  board, which I believe corresponds to 18B?

23  A    This is the same vehicle in this photograph on the left,

24  just another view of it.  And it's showing that the rear

25  window -- you see how it's completely blown out.

Case 1:03-cr-00251-EK Document 1869-6 Filed 08/19/21 Page 488 of 635 PageID: #: 4795
Case 2:10-cr-00147-DLI Document 846-4 Filed 09/21/16 Page 33 of 208 PageID #: 4049
1041

Deguilio - Direct/Lifshitz

1  Q    You're pointing to the vehicle on the right side of the

2  picture that has open doors?

3  A    Yes.  The vehicle was never moved from where it was at

4  that time.

5  Q    And you may have said this, but can you see any damage to

6  the vehicle in this picture?

7  A    Yes.  The rear view shattered window and glass along the

8  front driver's side door.

9  Q    And finally, the bottom 18C.  Can you explain what's in

10 that picture?

11 A    Also the Nissan Altima, closer photograph of it, where

12 you could see where the two bullet impact marks are on the

13 vehicle.  You see the rear window shattered.  You can see that

14 this window here is blown out.  And you can also see on the

15 ground below here the shattered glass.

16 Q    And that's below the drivers window?

17 A    Yes.

18 Q    I think you mentioned ballistics damage just now.  Can

19 you just point it out and describe in your own words where it

20 appears?

21 A    These are bullet impact marks; one is on the driver's

22 side rear door towards the rear.  I will refer to it as the

23 post, between the rear window and door.  There's one right

24 here.

25 Q    Above that door?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Deguilio – Direct/Lifshitz

1  A    Yes.

2  Q    Above the rear driver's side door?

3  A    This is where the bullet impact mark was.

4  Q    Thank you.  You can have a seat.

5       (Witness complies.)

6  Q    I'll show you what's in evidence as

7  Government Exhibit 18E.  I'll just put it up on the Elmo.

8       Can you explain what this picture depicts?

9  A    Yes.  This is the front entryway to 104-35 -- excuse me.

10 Could I refer to paperwork in regards --

11 Q    Yes.  Is there anything that might refresh your

12 recollection?

13 A    Yes, my crime scene report.

14      MR. LIFSHITZ:  For the record, this is 3500JD3.

15 A    Yes, this is 107-43 110th Street.

16 Q    Is there any ballistics damage on this picture?

17 A    Yes.  Between the window and the front door there's an

18 exterior light.  There's a bullet hole just below the light.

19 Q    If you could touch the screen, maybe immediately next to

20 the bullet holes?

21 A    That didn't come out where it was supposed to go.

22 Q    Try again.

23 A    It's still not in the right place.

24 Q    Is this one of the bullet holes?

25 A    Yes.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Case 1:03-cr-00951-EK Document 1869-6 Filed 08/19/21 Page 490 of 635 PageID
Case 2:10-cr-00147-DLI Document 846-4 Filed 09/21/16 Page 61 of 208 PageID #: 4492
#: 4797
1043

Deguilio – Direct/Lifshitz

1   Q      Just below the light around the middle of the picture?

2   A      That's correct.

3   Q      And where did you say the other one was?

4   A      Above the light there's a decorative piece on top of the

5   light, just to the left of it.

6   Q      Partially blocked --

7   A      By the light, yes.

8           THE COURT:  Wait.  Please don't talk at the same

9   time.  Don't talk at the same time.  She can't take both of

10  you.

11          MR. LIFSHITZ:  Yes, Your Honor.

12  Q      Is the second bullet hole partially blocked by the light

13  fixture?

14  A      Yes.

15  Q      I show you what's in evidence as 18D.  What does this

16  picture depict?

17  A      This is 107-45 110th Street.  This is showing -- this is

18  a porch that would stick out from the home.  This is the north

19  side of the front of that building.

20  Q      Are there any bullet holes visible in this picture?

21  A      Yes.

22  Q      And where are they?

23  A      One is to the window that's facing in the aluminum frame

24  and then there's an additional bullet --

25  Q      The window on the right or the left?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Case 1:02-cr-00051-DLK    Document 1869-6    Filed 08/19/21    Page 401 of 625 PageID
Case 2:10-cr-00247-DLK    Document 848-4    Filed 09/21/16    Page 82 of 208 PageID #: 10493
#: 4798
1044

Deguilio - Direct/Lifshitz

1    A    The window to the left, in the -- to the left of the

2    aluminum frame, there's a bullet hole on the other side.

3    Right there, over here.  No --

4    Q    Right above that?

5    A    No, to the left of that, towards the corner of that --

6    Q    Is that -- is that bullet hole easier to see from an

7    anterior view?

8    A    Yes, it is.

9    Q    Okay, we'll get to that.

10        Where is the other bullet hole?

11   A    The other bullet hole is right here.  It would be the

12   window -- first window to the right of the main window.  You

13   can see in this photograph there's a bullet hole.  That's

14   where it would be; correct.

15        And then there's an additional bullet hole further

16   up in the window that would be closer to -- where you see most

17   of this black framework to the right of the photograph.

18   Q    Okay.  Is that bullet hole visible in this picture?

19   A    Yes, further up.  It's a little difficult to see, but

20   it's there.

21   Q    Can you press down on the screen where it is?

22   A    That's not marking it in the correct location.

23        THE COURT:  Is it the glass or around --

24        THE WITNESS:  Yes, the glass.  This is marking it in

25   the wrong location.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Case 1:02-cr-00851-LEK   Document 1860-6   Filed 08/19/21   Page 492 of 635 PageID #: 4799
Case 2:10-cr-00147-DLK   Document 846-4   Filed 09/21/16   Page 63 of 200 PageID #: 4094
1045
Deguilio – Direct/Lifshitz

1        THE COURT:  All right.

2        MR. LIFSHITZ:  Your Honor, can I ask the witness to

3  step down briefly?

4        THE COURT:  Yes.

5  Q   Can you step down to the board that's Exhibit 18.

6        (Witness complies.)

7  Q   On the top left-hand picture, can you indicate where the

8  two houses are that we just saw closeup photographs of.

9  A   Yes, this is 107–43.

10  Q   The gray house in the middle.

11  A   And this is the white house with the black trim, 107–45.

12  Q   On the right side of that picture?

13  A   That's correct.  And this is the house that you were just

14  showing me a photograph of.

15  Q   Okay.

16        THE COURT:  He's pointing to what on the --

17        MR. LIFSHITZ:  He's pointing to the top left picture

18  on the board.  And he first pointed to the middle house in

19  that picture and then he --

20  Q   What's the address of the middle house, just for clarity?

21  A   107–43.

22  Q   And the right-end house on that picture?

23  A   107–45.

24  Q   Okay, thank you.

25        MR. LIFSHITZ:  May I approach again, Your Honor.

Case 1:02-cr-00251-EK   Document 1069-6   Filed 09/19/21   Page 493 of 635 PageID #: 4805
Case 2:10-cr-00247-DLI   Document 846-4   Filed 09/21/16   Page 64 of 208 PageID #: 9045

1046

<div align="center">Deguilio - Direct/Lifshitz</div>

1    THE COURT:  Yes.

2    MR. LIFSHITZ:  You can sit down for a second.

3  Q   I'm going to show the witness the board marked 18-1 and

4  I'll ask you to refer to Government Exhibits 18-A, -B, and -C.

5    (Handing.)

6  Q   Does Government Exhibit 18 contain enlarged versions of

7  18A through -C?

8  A   Yes.

9    MR. LIFSHITZ:  Your Honor, I move to admit

10 Government Exhibit 18-1, the board?

11   THE COURT:  Any objection?

12   MR. McMAHON:  No objection.

13   THE COURT:  I'll receive Government's Exhibit 18-1.

14   MR. LIFSHITZ:  And may I place it on the easel?

15   THE COURT:  Yes.

16   MR. LIFSHITZ:  And have the witness step down.

17 Q   What house do these pictures depict on board 18-1?

18 A   Photograph to the left is 107-45 110th Street, that's an

19 anterior photograph.  This first photo is showing the bullet

20 hole that came through the, the window frame.

21 Q   And where are you pointing on that picture on the left?

22 A   This will be right here to -- it will be the left.  If

23 you're looking from outside, it would be on your left, but

24 this is on your right looking out.

25 Q   And is that the bullet hole you explained was harder to

<div align="center">CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter</div>

Case 1:02-cr-00251-EK   Document 1860-6   Filed 08/19/21   Page 494 of 635 PageID #: 4801
Case 2:10-cr-00147-DEK   Document 849   Filed 09/21/10   Page 65 of 200 PageID #: 1046

1047

Deguilio – Direct/Lifshitz

1    see from the exterior than the anterior?

2    A     Yes, this bullet hole faces 110th Street.

3    Q     And what's depicted in the middle picture?

4    A     This is the anterior door of the same location, 107-45

5    110th Street, depicting a coat rack.  And also there's a

6    bullet hole in this glass pane, and this glass pane.

7    Q     And the first bullet hole you pointed to, is that toward

8    the top of the picture in the middle glass pane?

9    A     Yeah, closer to the curtain.

10   Q     And the second bullet hole you pointed to, is that to the

11   left side of the middle row panes?

12   A     That's correct, closer to where these jackets are.

13   Q     And finally the right hand picture, some what does that

14   depict?

15   A     This is three porch windows that face 110th Street.

16   Q     Is this an exterior view or anterior view?

17   A     That is facing the location.

18   Q     Sorry, was this taken outside the house or inside?

19   A     Yes, I was outside the house when this picture was taken.

20   Q     Does it show any bullet holes?

21   A     There's one in the left window here.

22   Q     A little less than halfway, a little less than the

23   halfway point of that window?

24   A     Right below the multi-panes there's another additional

25   bullet hole here.

Deguilio – Direct/Lifshitz

1   Q    In the middle window?

2   A    It would be another bullet hole here which is the center

3   window of the three windows.

4   Q    Now, are you pointing to a spot a little bit below the

5   middle of that window?

6   A    Yes.  Also below these multi-pane windows and lower

7   window.

8   Q    Thank you.  You may have a seat.

9            (Witness complies.)

10  Q    Now, you mentioned 106th Street before.  Did there come a

11  time on this night where you went to 106th Street?

12  A    Yes, I did.

13  Q    Can you tell us why you went there?

14  A    We were advised there was a vehicle that may have been

15  connected to this crime scene.

16  Q    What did you do at 106th Street?

17  A    I photographed a Buick that was parked on the road.  I

18  noticed a weapon in the vehicle.  And I photographed that

19  weapon also, and eventually I recovered the weapon.

20           (Continued on the next page.)

21

22

23

24

25

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Case 1:92-cr-00351-EK   Document 1869-6   Filed 08/19/21   Page 496 of 635 PageID #:
Case 2:10-cr-00147-DEK   Document 848-4   Filed 09/21/16   Page 87 of 206 PageID #: 4803
1049

Deguilio – Direct/Lifshitz

1   MR. LIFSHITZ:

2   Q    What color was the Buick?

3   A    It was brown and gold.

4         MR. LIFSHITZ:  May I approach, your Honor.

5         THE COURT:  Yes, you may.

6         (Approaching the witness.)

7   Q    Briefly showing him Government's 17 which is already in

8   evidence.

9         Does the right-hand picture on this border depict

10  the Buick?

11  A    Yes, it is.

12  Q    And is that how it was recovered on 106th Street?

13  A    Yes.

14  Q    Now, I'd like to show the witness what's not yet in

15  evidence a board 19, Exhibit 19.

16        Do you have the photographs 19-A and B in front of

17  you?

18  A    Yes I do.

19  Q    Does this board, Exhibit 19, contain enlarged versions of

20  19-A and B?

21  A    Yes, they are.

22        MR. LIFSHITZ:  I move to admit Exhibit 19, your

23  Honor.

24        THE COURT:  Any objection?

25        MR. McMAHON:  No, Judge.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Case 1:02-cr-00051-EK   Document 1369-6   Filed 08/19/16   Page 497 of 635 PageID #: 4804
Case 2:10-cr-00147-DEK   Document 848-4   Filed 09/21/16   Page 88 of 260 PageID #: 20499

1050

Deguilio - Direct/Lifshitz

1    THE COURT:  I'll receive Exhibit 19.

2         (Government's Exhibit 19 was received in evidence as

3    of this date.)

4         MR. LIFSHITZ:  May I publish it on the easel?

5         THE COURT:  Yes.

6         MR. LIFSHITZ:  And ask the witness to stand down.

7         (Witness leaves the witness stand.)

8    Q    Looking at Government Exhibit 19, the board in front of

9    you.

10        What does the picture on the left hand depict?

11   A    This photograph depicts the rear sitting area of the 1984

12   Buick which is showing a semiautomatic weapon with a

13   suppressor, which is more commonly known as a silencer.

14        There's also a wool hat sitting on the seat and

15   there were cartridges also sitting on the seat which would be

16   on the rear passenger side.

17   Q    Just so the record is clear.  The firearm you refer to,

18   is that leaning against the back seat and also on the floor?

19   A    Yes, it is.  The suppressor, the silencer, is against the

20   floor and the weapon itself is up against the seat.

21   Q    And is the wool cap you referred near the middle of the

22   back seat area?

23   A    More towards behind the driver's area, but it's in the

24   center.  Toward the center, also.

25   Q    And you referred so some other evidence toward the top of

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Case 1:02-cr-00251-EK   Document 1869-6   Filed 08/19/21   Page 498 of 635 PageID
Case 2:10-cr-00147-DLI   Document 846-4   Filed 09/21/10   Page 89 of 268 PageID #: 10800
#: 4805
1051

Deguilio – Direct/Lifshitz

1   the picture.  What are those items?

2   A     These are cartridges.

3   Q     What is a cartridge?

4   A     Being an unfired bullet.

5   Q     Again, so the record is clear, are those items on the

6   rear passenger side seat?

7   A     Yes, they are.  Right here.

8   Q     Is there any glass in this picture?

9   A     Yes, glass on the seat and also on the floor of the

10  vehicle.

11  Q     What does the picture on the right depict?

12  A     This photograph here is this weapon that's in the

13  previous photograph.

14  Q     And where was the picture on the right taken?

15  A     This is taken in the 106th Precinct Detective Squad.  I

16  had removed the magazine to make the weapon safe, then I

17  processed it for latent fingerprints.

18  Q     Other than having removed the magazine, does that picture

19  accurately depict the weapon as you found it?

20  A     Yes, it does.

21  Q     Can you point out the magazine, the silencer, and the

22  firearm, please?

23  A     This would be a silencer so it has white metal finish;

24  this is the weapon; and this is the magazine that would insert

25  in this position into the weapon.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Case 1:02-cr-00051-EK   Document 1860-6   Filed 08/19/21   Page 499 of 635 PageID
Case 2:10-cr-00147-DEK   Document 848-4   Filed 08/21/16   Page 700 of 208 PageID #: 3601
#: 4806
1052

Deguilio – Direct/Lifshitz

1    Q    So, the magazine is on the bottom of the picture?

2    A    That's correct.

3    Q    And the silencer is still attached to the gun in this

4    picture?

5    A    Yes, it is.

6    Q    By the way, what, if anything, did you first observe

7    about the Buick that we've been discussing when you first

8    found it on 106th Street?

9    A    It was still running.

10            MR. LIFSHITZ:  Thank you.  You may have a seat.

11            (Witness takes the witness stand.)

12            MR. LIFSHITZ:  Your Honor, may I approach.

13            THE COURT:  Yes, you may.

14            MR. LIFSHITZ:  I will show the witness 12-B-2 which

15    is a brown envelope and ask you to open that up and take a

16    look at what's inside.

17            THE WITNESS:  (Complying).

18    Q    Are there two envelopes in there?

19    A    Yes.

20    Q    Do you recognize those envelopes that were inside the

21    larger envelope?

22    A    Yes, I do.

23    Q    How are you able to recognize them?

24    A    They have the crime scene sticker number that I applied

25    to them.  The run number, my name, my shield number, the date,

Case 1:02-cr-00251-EK  Document 1869-6  Filed 09/19/21  Page 500 of 635 PageID
Case 2:10-cr-00247-DEK  Document 846-4  Filed 08/21/16  Page 7 of 208 PageID #: 10502
#: 4807
                                                                          1053
                            Deguilio - Direct/Lifshitz

1    the precinct, and each one is marked D-2 and one is marked

2    D-3.

3    Q    Do you recognize what is inside those envelopes, D-2 and

4    D-3?

5    A    D-2 is a deformed copper jacketed lead.

6    Q    Are you able to recognize it?

7    A    Yes.  This is still marked as I had marked it then.

8    Q    How?

9    A    D-2.

10   Q    How did you mark it?

11   A    With a metal describer.

12   Q    You marked D-2 on it?

13   A    Yes, I did.

14   Q    And what about D-3?  Take a look at what's inside the

15   envelope marked D-3?

16   A    (Complying).

17   Q    Do you recognize that item?

18   A    Yes, I do.

19   Q    How do you recognize it?

20   A    This is marked D-3.

21   Q    Did you mark it?

22   A    Yes, I did.

23   Q    Okay.  And, for the record, what are D-2 and D-3?

24   A    D-2 is a piece of deformed copper jacketed lead and D-3

25   is also a piece of deformed copper jacketed lead.

                  ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
                            Official Court Reporter

Case 1:02-cr-00251-EK   Document 860-6   Filed 08/19/21   Page 501 of 635 PageID:
Case 2:10-cr-00247-DEK   Document 846-4   Filed 09/21/16   Page 72 of 208 PageID #: 10503
#: 4808.
1054

Deguilio – Direct/Lifshitz

1       MR. LIFSHITZ:  Your Honor, the Government would move

2  to admit Exhibit 12–B–2.

3       THE COURT:  Any objection.

4       MR. McMAHON:  No, Judge.

5       THE COURT:  I will receive Government's

6  Exhibit 12–B–2.

7       (Government's Exhibit 12–B–2 was received in

8  evidence as of this date.)

9  Q    Are the items in there which are in envelopes marked D–2

10  and D–2 items you recovered at the crime scene you visit on

11  the note night of October 20, 1993?

12  A    Yes, they are.

13  Q    Where did you recover each those items?

14  A    D–2 and D–3 were recovered in the roadway behind the

15  vehicle which I noted was the Nissan Altima.

16  Q    On the street closer to the street or closer to the

17  houses?

18  A    It would be within the street.  It would be more or less

19  on the driver's rear driver's side of that vehicle.

20  Q    By the way, is there a voucher number associated with

21  this Exhibit 12–B–2?

22  A    Yes.

23  Q    What is it?

24  A    F195469.

25  Q    When you say "Frank" is that an F?

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Case 1:02-cr-00251-EK   Document 1860-6   Filed 08/19/21   Page 502 of 635 PageID
Case 2:10-cr-00247-DEK   Document 846-4   Filed 09/21/10   Page 73 of 200 PageID #:0504
#: 4809
1055

Deguilio – Direct/Lifshitz

1   A    F for Frank.

2   Q    Okay.

3        MR. LIFSHITZ:  May the witness stand down briefly

4   and I'll show him the board that's in evidence as 18.

5   Government Exhibit 18.

6        (Witness leaves the witness stand.)

7   Q    Can you please point out on this board on the top left

8   picture where you found the items that are contained in

9   12–B–1?

10  A    This general area right here.

11  Q    Are you pointing out the Nissan and closer to the street

12  side?

13  A    In the roadway, yes.

14  Q    Thank you.

15       (Witness takes the witness stand.)

16  Q    Now, I'll show you another envelope this one is marked

17  Government's Exhibit 12–B–1.

18  A    (Complying).

19  Q    You can open that up and take a look at the envelopes

20  inside it.

21       Are those envelopes marked D–1, D–4, D–5, and D–6?

22  A    Yes, they are.

23  Q    Do you recognize the envelopes?

24  A    Yes.  I prepared these myself and they contain the run

25  number, my name and shield number, and the D–1, 4, 5, and 6.

Case 1:92-cr-00851-EK   Document 1860-6   Filed 08/19/21   Page 502 of 635 PageID #: 3605
Case 2:10-cr-00147-DLI   Document 846   Filed 09/21/16   Page 74 of 200 PageID #: 4810
1056

Deguilio – Direct/Lifshitz

1   Q     Can you please look inside each envelope and tell us what

2   you recognize is inside of it and how you recognize it?

3   A     D–1 is a discharged shell.  I scribed it inside the

4   shell.  D–4 is a piece of copper jacketed lead which also has

5   the scribe number of D–4 I placed on it.  D–5 is a piece of

6   deformed metal which also has what I inscribed on it which is

7   D–5.  And D–6 is a piece of deformed lead which I also

8   inscribed D–6 on.

9          MR. LIFSHITZ:  Your Honor, can the witness stand

10  down again so he may refer to Exhibit 18–1 of the boards.

11         THE COURT:  Yes.

12         MR. LIFSHITZ:  You can bring your report if it helps

13  refresh your recollection.

14         (Witness leaves the witness stand.)

15  Q     I would like you to tell the jury and, if possible, point

16  out on that board where you recovered items D–1 and D–4?

17  A     D–1 was recovered right near where this shattered glass

18  is.

19  Q     You're pointing at the top left picture?

20  A     The top left picture is the near where the driver's side

21  door is opened.

22  Q     Yes.

23  A     D–4, if I may refer to my paperwork.

24  Q     To refresh your memory, yes.

25  A     (Complying).  Are you referring to D–4?

Case 1:92-cr-00351-EK Document 1860-6 Filed 08/19/21 Page 504 of 635 PageID
Case 2:10-cr-00147-DLI Document 848-4 Filed 08/21/16 Page 73 of 206 PageID #: 10806
#: 4811
1057

Deguilio – Direct/Lifshitz

1  Q    Yes.

2  A    D-4 was actually recovered inside this location which is

3  107-45.

4  Q    Are you pointing to the top left picture?

5  A    Yes, the home that's white with the black trim.

6  Q    The home on the right of that picture?

7  A    Yes.

8  Q    And where within the home was that found?

9  A    There's an organ.

10  Q    I apologize.  Did you say it was outside the house or

11  inside the house?

12  A    No, D-4 was on the interior.

13  Q    Where was it?

14  A    After you walked through this small porch area, there's a

15  secondary door and there was an organ to the right near the

16  coat rack and it was laying on top of the organ.

17  Q    Did you take handwritten notes as you walked through the

18  crime scene?

19  A    Yes.

20  Q    Would those handwritten notes help refresh your

21  recollection?

22  A    Yes.

23  Q    I will show him what's mark as 3500-JD-4?

24        THE COURT:  All right.

25  Q    Does this document refresh your recollection about where

Case 1:02-cr-00251-EK   Document 1860-6   Filed 08/19/21   Page 505 of 635 PageID 7
Case 2:10-cr-00247-DEK   Document 846-4   Filed 09/21/16   Page 78 of 206 PageID #: 20507
#: 4812

1   item D-4 was found?

2   A    D-4, according to my handwritten notes, what I had

3   written at the scene was six feet north of building line which

4   would have made it outside the location.

5   Q    Which location?

6   A    107-45 110th Street.

7   Q    The house in the top-left picture on the right side of

8   that picture?

9   A    The white house with the black trim.

10          MR. LIFSHITZ:  Your Honor, for the record, I don't

11  believe I move to admit Exhibit 12-B-1 which contains the

12  items.

13          THE COURT:  You're not moving?

14          MR. LIFSHITZ:  I have not, but I now am.  It was an

15  oversight on my part.

16          THE COURT:  Any objection?

17          MR. McMAHON:  No objection.

18          MR. LIFSHITZ:  Thank you.

19          THE COURT:  I will receive Exhibit 12-B-1.

20          MR. LIFSHITZ:  Thank you.

21          (Government's Exhibit 12-B-1 was received in

22  evidence as of this date.)

23  Q    And now let me show you again the board marked as

24  Government Exhibit 18-1.

25          Can you please explain to the jury and point out on

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Case 1:02-cr-00051-EK    Document 1869-6    Filed 08/19/21    Page 506 of 635 PageID:
Case 2:10-cr-00147-DEK   Document 848-4   Filed 09/21/16   Page 7 of 208 PageID #: 9808
#: 4813

1059

Deguilio – Direct/Lifshitz

1   this board where you recovered items D–5 and D–6 which are

2   contained within Exhibit 12–B–1?

3   A    You can't see this photograph, but D–5.

4   Q    Which photograph are you pointing at?

5   A    The middle photograph.

6   Q    Okay.

7   A    The organ was in this area here where D–5 was recovered.

8   Q    On top of an or began?

9   A    Yes.

10  Q    And D–6?

11  A    D–6 was recovered within this jacket that was hanging.

12  Q    Pointing at the same picture?

13  A    Yes.

14  Q    And the jacket that's toward the top of a coat rack?

15  A    Yes.

16  Q    You can return to your seat.

17       (Witness takes the witness stand.)

18  Q    Is there a voucher number associated with

19  Government Exhibit 12–B–1?

20  A    F, as in Frank, 195469.

21       MR. LIFSHITZ:  Your Honor, may I approach again.

22       THE COURT:  Yes.

23       MR. LIFSHITZ:  I will show the witness Government's

24  Exhibits 13–A, B, and C.

25       THE COURT:  13–A?

Case 1:92-cr-00351-EK   Document 1869-6   Filed 09/14/21   Page 507 of 635 PageID #:
Case 2:10-cr-00247-DLI   Document 846-4   Filed 09/21/16   Page 78 of 200 PageID #:30509
#: 4814
1060

Deguilio - Direct/Lifshitz

1   MR. LIFSHITZ:  A, B, and C, yes.

2   Q    Here you go, sir.

3        Can you please tell us if you recognize these items?

4   A    Yes, I do.

5   Q    How are you able to recognize them?

6   A    These are -- this is the weapon that I recovered from the

7   1984 Buick.  The silencer which is no longer attached to the

8   weapon is marked JD-1.

9   Q    Did you make it JD-1?

10  A    Yes, I did.

11  Q    And the firearm itself?

12  A    The firearm also is marked JD-1.

13  Q    On the handle?

14  A    On the handle with black marker.

15       THE COURT:  And your exhibit numbers?

16       MR. LIFSHITZ:  The firearm is 13-A; the silencer is

17  13-B; and the magazine is 13-C, but, for the record, they're

18  all contained in one sealed bag.

19       THE COURT:  Yes.  And 13-D is.

20       MR. LIFSHITZ:  Is a magazine.

21       THE COURT:  Thank you.

22

23  EXAMINATION BY

24  MR. LIFSHITZ:

25  (Continuing.)

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Case 1:03-cr-00251-EK Document 1869-6 Filed 08/19/21 Page 508 of 635 PageID
Case 2:10-cr-00247-DLK Document 840-4 Filed 09/21/16 Page 790 of 208 PageID #: 4815
1061

Deguilio - Direct/Lifshitz

1  Q    Do you recognize the magazine?

2  A    Yes, I do because it has the markings that I etched in

3  JD-1.

4  Q    And just to be clear what are these items?

5  A    Semiautomatic .9 millimeter handgun, a magazine that was

6  removed from it, and this is the suppressor, the silencer,

7  that was attached to the gun when I recovered it.

8  Q    Where did you recover the items?

9  A    The rear seat, driver's side passenger area of the 1984

10 Buick On 106th Street.

11 Q    On October 20, 1993?

12 A    Correct.

13        MR. LIFSHITZ:  Your Honor, the Government would move

14 to admit Exhibits 13-A, B, and C.

15        MR. McMAHON:  No objection.

16        THE COURT:  Received.

17        (Government's Exhibits 13-A, B, C was received in

18 evidence as of this date.)

19 Q    What voucher number is associated with this evidence?

20 A    R195469.

21        MR. LIFSHITZ:  Your Honor, no further questions at

22 this time.

23        MR. McMAHON:  No cross, your Honor.

24        THE COURT:  Thank you.  You may step town.

25        THE WITNESS:  Have a nice day.

Case 1:92-cr-00351-EK Document 4869 Filed 08/19/21 Page 509 of 635 PageID
Case 1:10-cr-00147-DLI Document 846 Filed 07/11/16 Page 800 of 200 PageID #: 10511
#: 4816

1

2048

GOVERNMENT
EXHIBIT
**7001**
10 CR 147 (DLI)

```
 1    UNITED STATES DISTRICT COURT
 2    EASTERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - X
 4   UNITED STATES OF AMERICA,  :
                                        10-CR-147
 5
          -against-                United States Courthouse
 6
                               :   Brooklyn, New York
 7
     FRANCIS GUERRA,
 8
             Defendant.
 9                             :   June 27, 2012
                                   9:30 o'clock a.m.
10   - - - - - - - - - - - - - X
11    TRANSCRIPT OF TRIAL
      BEFORE THE HONORABLE SANDRA L. TOWNES
12    UNITED STATES DISTRICT JUDGE, and a jury
13    ATTORNEYS FOR GOVERNMENT:
      LORETTA E. LYNCH
14    UNITED STATES ATTORNEY
       BY:  NICOLE ARGENTIERI
15          ALLON LIFSHITZ
            RACHEL NASH
16    Assistant United States Attorney
      271 Cadman Plaza East
17    Brooklyn, New York 11201
18    ATTORNEY FOR DEFENDANT:
      GERALD McMAHON, ESQ.
19    MATHEW J. MARI, ESQ
20
      Court Reporter:
21    Marsha Diamond
      225 Cadman Plaza East
22    Brooklyn, New York
      TEL: (718) 613-2489
23    FAX: (718) 613-2369
24       Proceedings recorded by mechanical stenography,
      transcript produced by CAT.
25
                    MARSHA DIAMOND, CSR, RPR
                    OFFICIAL COURT REPORTER
```

06 27 2012 trial chance adam russ castrogiovanni scott curtis

2096

6          THE WITNESS:  First name is Maria, M A R I A; last

7    name is Kinigopoulos, K I N I G O P O U L O S.

8          MS. NASH:  May I inquire, judge?

9          THE COURT:  Yes.

10         MS. NASH:  Thank you.

11   DIRECT EXAMINATION

12   BY MS. NASH:

13   Q    Are you currently employed?

14   A    I am.

15   Q    Where do you work?

16   A    I am an intelligence analyst with the Federal Bureau of

17   Investigation.

18   Q    How long have you been with the FBI?

19   A    Since 2003; and I have been an intel analyst since 2007.

20   Q    Since 2000-what?

21   A    Seven.

22   Q    What do you do as an intelligence analyst with the FBI?

23   A    Some of my duties include reviewing phone records,

24   analyzing them, running background checks, disseminating

25   intelligence to law enforcement.

                    GR      OCR      CM      CRR      CSR

Case 1:92-cr-00351-EK Document 1869 Filed 08/19/21 Page 511 of 635 PageID
Case 1:02-cr-00351-DLI Document 846 Filed 06/21/16 Page 82 of 206 PageID #: 10513
#: 4818

2097

1    Q    I am going to show you several items, Government

2    Exhibit 6002, which is a stipulation in evidence, as well as

3    the underlying exhibits in that stipulation, which are

4    Government Exhibits 1000, 1001, 1001-A, 1002, 1003, 1004,

5    1007-A and 1007-B, 1011, and 1012.

6              MS. NASH:  May I approach, Judge?

7              THE COURT:  Yes.

8    Q    Can you look at Government Exhibit 1000, 1001 and 1001-A,

9    1002, 1003, 1004, 1007-A and B, 1010 and 1012 -- I'm

10   sorry -- 1011 and 1012 and tell us whether you have seen and

11   reviewed those records before?

12   A    I have.

13             And they are all telephone records, which include

14   actual telephone bills with call details itemized and also,

15   generally speaking, any calls made with these phone numbers,

16   incoming, outgoing, subscriber information.

17   Q    Just explain what you mean when you say incoming,

18   outgoing?

19   A    Basically, any contact that the telephone number has,

20   phones made out or telephone calls received.

21   Q    Okay.  Does each exhibit contain the telephone calls that

22   came in or were placed by the particular telephone number in

23   each exhibit?

24   A    Yes, incoming and outgoing calls, basically date, time,

25   duration.

              GR       OCR       CM       CRR       CSR

2098

1    Q    I will leave those with you in case you need to refer to

2    them.

3    A    Okay.

4    Q    In conjunction with your analysis of the phone records

5    contained in the exhibits before you, did you review other

6    documents as well and other information?

7    A    Yes.

8         I reviewed telephone bills, trial testimony and all

9    sorts of prison emails sent and phone records.

10   Q    Showing you Government Exhibit 1009-A in evidence.

11        Can you see that?

12   A    Yes.

13   Q    Are these records that you reviewed in conjunction with

14   your analysis of the phone records?

15   A    Yes.

16        This is actually -- this was taken from a cellphone

17   that was seized after an arrest and this was all the

18   information contained on the memory card of the cellular phone

19   in the phone's address book.

20        THE COURT:  Let me stop you.

21        1009-A is not part of Exhibit 6002, correct?

22        MS. NASH:  Correct, Judge.

23        But this was an exhibit that was introduced in

24   evidence through Agent Adam and it is the contents of the

25   cellular phone address book of Anthony Russo.

              GR      OCR      CM      CRR      CSR

Case 1:92-cr-00351-EK  Document 1469  Filed 08/19/21  Page 513 of 635 PageID
Case 1:02-cr-00027-DEK  Document 846  Filed 07/21/16  Page 840 of 206 PageID #: 4515
#: 4820

2099

1          THE COURT:  No.  I just want to know, is it part

2    of --

3          MS. NASH:  I'm sorry.

4          THE COURT:  I don't have it on my list as part of

5    this list of exhibits.

6          MS. NASH:  Correct

7    EXAMINATION CONTINUES

8    BY MS. NASH:

9    Q    Is this information something you reviewed in conjunction

10   with the exhibits that contain phone records that are the

11   subject of Government Exhibit -- of government stipulation

12   6002?

13   A    Yes, it is.

14   Q    Just once again, to be clear, what type of information is

15   contained in 1009-A?

16   A    These are contacts, name and phone numbers, that were

17   stored in a cellular phone address book that was seized after

18   an arrest.

19   Q    I'm sorry.  Whose cellular phonebook was it?

20   A    Anthony Russo slash Maritza Medina.

21   Q    Did you also review what's in evidence as Government

22   Exhibit 1010-A in conjunction with your analysis of the phone

23   records that are referenced in government stipulation 6002?

24   A    I did.

25          And this is the same thing.  This was a telephone

                    GR       OCR      CM      CRR      CSR

2100

1    that was seized from Francis Guerra and it was all the

2    contacts in his cellular phone address book.

3    Q    Showing you the second to last page of Government

4    Exhibit -- I'm sorry -- the last page of Government

5    Exhibit 912, which are in evidence as prison visitor records

6    for Joseph Monteleone.

7             Are these also records that you reviewed in

8    conjunction with your analysis of phone records?

9    A    Yes, they are.

10   Q    Showing you Government Exhibit 907, which are in evidence

11   as prison records for Alphonse Persico.

12            Did you review these records as well in conjunction

13   with your analysis of phone records?

14   A    Yes, I did.

15            MS. NASH:  Just one moment.

16            (Pause.)

17   Q    Showing you Government Exhibit 906 and specifically an

18   email from October 30, 2009.

19            These are in evidence as the emails between John

20   Pappa and Francis Guerra obtained by the Bureau of Prisons, or

21   maintained by the Bureau of Prisons, I should say.

22            Did you review these as well in conjunction with

23   your analysis of phone records?

24   A    Yes, I did.

25            MS. NASH:  May I approach, Judge?
                 GR      OCR      CM      CRR      CSR

2101

```
 1              THE COURT:  Yes, you may.

 2    Q    Actually, well, yes.

 3              Showing you Government Exhibit 1013-B.

 4              Do you recognize that?

 5    A    I do.

 6    Q    What is Government Exhibit 1013-B?

 7    A    It is a chart I created showing phone contacts between

 8    various phone numbers, number of calls, call direction and the

 9    date range those calls took place.

10    Q    What do you mean by call direction?

11    A    Who made the call and who received the call.

12    Q    Is the information contained in that chart based in part

13    on the exhibits that are contained in government stipulation

14    6002?

15    A    They are.

16    Q    In addition, is the information contained in that chart

17    based in part on the other documents and information that you

18    have testified about before?

19    A    They are.

20    Q    Does the information contained in this chart accurately

21    reflect the -- and accurately summarize the information

22    contained in the exhibits in stipulation 6002, as well as the

23    other exhibits and information that we have discussed?

24    A    Yes.

25              MS. NASH:  Judge, the government moves to admit
                    GR      OCR     CM     CRR      CSR
```

Case 1:92-cr-00351-EK Document 1869 Filed 08/19/21 Page 516 of 635 PageID
Case 1:02-cr-00351-DLI Document 846 Filed 07/21/06 Page 8 of 206 PageID #: 10518
#: 4823

2102

1    Exhibit 1013-B as a summary chart pursuant to Rule 1006.

2            MR. McMAHON:  No objection.

3            THE COURT:  Received.

4            (Marked.)

5    Q    Just before I publish this chart, if I could show you

6    page five of Government Exhibit 907, which is already in

7    evidence as Alphonse Persico's prison records.

8            Let me ask you this.

9            I am having trouble finding the page number.

10           Did you review a prison, an application for -- to

11   visit Alphonse Persico in Government Exhibit 907?

12   A    Yes.

13   Q    Who was that application made by?

14   A    I would have to see it to recall.

15   Q    Okay.  Do you recall -- well --

16   A    I know I reviewed it but I'd have to see it.

17   Q    Give me one moment.  I'm sorry.

18   A    Yes.

19           (Pause.)

20           MS. NASH:  I apologize.

21           (Pause continues.)

22   Q    Showing you Exhibit 57.  I apologize for that.

23           THE COURT:  57?

24           MS. NASH:  Yes.  It is Exhibit 907, page 57.

25           THE COURT:  All right.
                 GR      OCR      CM      CRR      CSR

2103

```
1    Q     Did you review this document in conjunction with

2    preparing your chart, Exhibit 1013-B?

3    A     I did.

4    Q     Is this an application to visit Alphonse Persico?

5    A     It is.

6    Q     Who filled out this application?

7    A     Michael Persico.

8    Q     What phone number did he list?

9    A     (917) 567-8741.

10   Q     Showing you Exhibit 1010-A, the report of the address

11   book contained in the phone seized from Francis Guerra.

12           Can you tell us what the phone number was?

13   A     Sure.

14           It's (917) 757-2359.

15           MS. NASH:  May I now publish the chart, Judge, or at

16   least a part of it?

17           THE COURT:  Yes.

18   Q     Showing you now the first two lines of Government

19   Exhibit 1013-B.

20           Can you explain the information that is reflected in

21   the first two rows of your chart?

22   A     Sure.

23           The first row is contact between a number known to

24   belong to Michael Persico and Francis Guerra for the date

25   range of June 2, 2008 through April 20, 2009, and there were
```

                    GR      OCR      CM      CRR      CSR

Case 1:02-cr-00351-EK Document 1869 Filed 08/19/21 Page 518 of 635 PageID
Case 1:02-cr-00397-DLI Document 846 Filed 07/21/16 Page 890 of 206 PageID #: 10520
#: 4825

2104

1    33 calls from Michael Persico to Francis Guerra.

2        And the second line is telephone calls from Francis

3    Guerra to Michael Persico for the same time period,

4    June 2, 2008, through April 20, 2009, and there were 81

5    contacts.

6    Q    Before I move on to another portion of your chart, can

7    you please just look at Government Exhibit 1002 and 1003 that

8    you have before you?

9    A    Sure.

10    Q    Just tell us what, generally speaking, those records

11    contain, or those exhibits contain?

12    A    Sure.

13        1002 are telephone records for telephone number

14    (347) 231-5175 subscribed to by Maritza Medina for the time

15    period of August 16, 2010 through October 4, 2010.

16        And Government Exhibit 1003 are call record details,

17    phone calls for the time period of August 20, 2009 through

18    July 20, 2010 for telephone number (347) 288-9628 subscribed

19    to by Maritza Medina.

20        (Continued on next page.)

21

22

23

24

25

        GR     OCR    CM    CRR    CSR

2105

1          THE COURT:  May I stop you and have counsel approach

2     the bench?

3               (Side bar.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

              GR      OCR      CM      CRR      CSR

2106

```
 1              (In open court.)

 2      EXAMINATION CONTINUES

 3      BY  MS. NASH:

 4      Q    Can you explain in greater detail the methodology you

 5      used to prepare this chart?

 6      A    Sure.

 7              I reviewed telephone records and then I ran various

 8      reports showing contacts between certain telephone numbers.  I

 9      reviewed --

10              THE COURT:  No.  Let's talk about the lines that you

11      have already testified to.

12              THE WITNESS:  Okay.

13              So I reviewed telephone records belonging to

14      (917) 567-8741, which is subscribed to Romantique and used by

15      Michael Persico.  I did the same thing for (917) 757-2359.

16              THE COURT:  Where did you get the information?

17              THE WITNESS:  The information came through various

18      means.  It was actual phone records.  It was through pen

19      register data.

20              THE COURT:  What do you mean by actual phone

21      records?

22              THE WITNESS:  We had some actual printouts the phone

23      company sent us.  We had them uploaded electronically to our

24      system.  I reviewed them that way.  And then I actually

25      reviewed them sent from the phone company to make sure that
```

                    GR      OCR      CM      CRR      CSR

Case 1:92-cr-00351-EK Document 846-69 Filed 08/19/21 Page 521 of 635 PageID #: 4828
Case 1:02-cr-00307-DLI Document 846 Filed 07/21/16 Page 521 of 266 PageID #: 10523

2107

1    that information sent to us belonged to those phone numbers.

2    Q    To be clear, with respect to the phone number for

3    Romantique, did the -- or subscribed to by Romantique, did

4    the -- through a subpoena, did you obtain phone records for

5    that phone number indicating incoming and outgoing calls for

6    (917) 567-8741?

7    A    No.

8         I believe that one was from prison visitor logs.

9    That's how we attributed that phone number to Michael Persico.

10   Q    I understand.

11        But with -- so you are saying that with respect to

12   the phone number itself, the way you determined the user was

13   to look at the prison record and the individual who listed

14   that phone number on the prison record.

15        Do I have that right?

16   A    Right.

17        We know that phone number is subscribed to by

18   Romantique as the actual subscriber.  We know that Michael

19   Persico used it through the prison log.

20   Q    Through the prison log?

21   A    Through the prison records that he filled out, right.

22   Q    With respect to the subscriber information, did you

23   obtain that through information provided to you by -- provided

24   to the FBI by the phone company?

25   A    Yes.

                    GR    OCR    CM    CRR    CSR

1    Q    The information provided by the phone company, is it

2    that -- is it that information that contained incoming and

3    outgoing phone calls for telephone number (917) 567-8741?

4    A    I believe so, yes.

5    Q    Similarly, for telephone number (917) 757-2359, were you

6    able to determine who used that phone number?

7    A    Yes.

8    Q    Showing you Exhibit 1010, is that one of the ways in

9    which you were able to determine who used phone number

10   (917) 757-2359?

11   A    Yes.

12   Q    Just for the record, remind us, Government Exhibit 1010-A

13   is what?

14   A    That is a printout of the contact information on that

15   phone number that was seized after the arrest of Francis

16   Guerra.  The telephone was in his possession at the time of

17   his arrest.

18   Q    Other than the telephone and the contents of his address

19   book, did the FBI obtain through the phone company incoming

20   and outgoing calls that were placed or received by phone

21   number (917) 757-2359?

22   A    Yes.

23   Q    So now once you reviewed the records that you obtained

24   from the phone company containing incoming and outgoing calls,

25   and reviewed documents such as the prison records or the

GR     OCR     CM     CRR     CSR

2109

1    address book, what did you do in order to create the chart

2    that reflects the number of contacts between two phone

3    numbers?

4    A    I simply ran a report.  I just inputted the two phone

5    numbers I was interested in and ran a report and it gave me

6    the printout.  Then I just double-checked to make sure that

7    the information was correct.

8    Q    When you say run a report, what happens in the process of

9    running that report?

10         What information is distilled at the end of that

11   process?

12   A    Well, it is just a database that I use and I input the

13   telephone number and it just prints you out a sheet of paper

14   that shows you the contacts, the date, duration, incoming,

15   outgoing calls, how long the call lasted and the number of

16   contacts.

17   Q    So the report that is generated through that process

18   would show for the phone numbers the number of times within a

19   particular time period that they were in contact?

20   A    Exactly.

21         (Continued on next page.)

22

23

24

25

            GR      OCR      CM      CRR      CSR

Case 1:92-cr-00351-EK Document 846-9 Filed 08/19/21 Page 524 of 635 PageID #: 4831
Case 1:02-cr-00307-DLI Document 846-9 Filed 08/19/21 Page 554 of 564 PageID #: 10526

2110

1   BY MS. NASH:

2

3   Q    And how were you able to determine the direction of the

4   phone number, whether or not the Michael Persico subscribed to

5   by Romantique called to Francis Guerra and vice versa?

6   A    If it's an incoming call to the first number, it will

7   say "in" before the phone number, and that's how I know it's

8   an incoming call.

9   Q    With respect to the first line now  --

10  A    Yes.

11  Q    -- what information does that reflect?

12  A    It reflects  --

13  Q    To be clear, it's the first line of Exhibit 1013-B.

14  A    So, the first phone number is 917-567-8741, which is

15  Romantique/Michael Persico.  That telephone number called and

16  made an outgoing call to 917-757-2359, Francis Guerra,

17  thirty-three times for the time period of June 2, 2008 through

18  April 20, 2009.

19        And the second line shows the same two contacts in

20  different directions.  So, the second line is calls made from

21  917-757-2359 to 917-567-8741 for the same time period, and

22  there were eighty-one calls in that direction.

23  Q    Did you perform that similar process for the various

24  phone numbers contained in the exhibits referenced in

25  Government's Exhibit Stipulation 6002?
        ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2111

1    A    Yes.

2    Q    I'll take you through that process for the remainder of

3    the chart?

4         If you'd look at the next two lines, first with

5    respect to Exhibits 1002 and 1003, which are referenced in

6    Stipulation 6002.  What do Exhibits 1002 and 1003 contain.

7    A    1002 reflects call records for 347-231-5175, subscribed

8    to by Maritza Medina for the time period August 6, 2010

9    through October 4, 2010.

10        And Government's Exhibit 1003 provides also call

11   details for time period of August 20, 2009 through July 20,

12   2010 for Telephone Number 347  --

13        THE COURT:  Don't talk so fast.

14        THE WITNESS:  Sorry.

15   A    -- for Telephone Number 347-288-9628 subscribed to by

16   Maritza Medina.

17   Q    To back you up for a second, now.   Do those two

18   exhibits, 1003 and 1003, contain phone records obtained by the

19   FBI from the telephone company?

20   A    Yes.

21   Q    And do they contain incoming and outgoing calls placed by

22   and received by those two numbers in the manner that you have

23   previously described?

24   A    Yes, they do.

25   Q    Who is Maritza Medina?
          ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2112

1    A    She, I believe, is Anthony Russo's wife or common-law

2    wife.

3    Q    In conjunction with your analysis, in order to determine

4    who is using the phone numbers, did you review portions of

5    Exhibit 906, which are e-mails between John Pappa and Francis

6    Guerra?

7    A    I did.

8    Q    I'm showing you, before we proceed with the chart, an

9    e-mail dated October 30, 2009 at 2:06 p.m. from Government's

10   Exhibit 906.  Can you identify the phone number associated

11   with the individual listed as Moos in this e-mail?

12   A    347-288-9628.

13   Q    Now, going back to your Chart 1013-B.  Can you explain

14   the information contained in the second two lines of your

15   chart?

16   A    It's the same thing.  It's showing contact between

17   917-567-8741 to Telephone Number 347-288-9628.  So, the first

18   telephone number listed on the left made the telephone calls

19   to the second phone number, and there were three calls for the

20   date range of January 6, 2009 through April 16, 2009.

21        And then the line under that shows contact for the

22   same two phone numbers, except on the left, you have the  --

23   the telephone number making the call is 347-288-9628, and it's

24   making the call to Telephone Number 917-567-8741, and there

25   were eleven calls from January 6, 2009 through April 16, 2009.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2113

1  Q    And if you could look now at Exhibit 1004, which you have

2  as one of the underlying exhibits in the Stipulation 6002?

3  A    Yes.

4  Q    What does Exhibit 1004 contain?

5  A    It's a call detail record, telephone records for

6  Telephone Number 732-673-4274, subscribed to by Ultimate

7  Seafood Service, Inc., and that's for the time period of

8  September 10, 2009 through December 24, 2010.

9  Q    Who owns Ultimate Seafood Service, Inc.?

10 A    Anthony Stropoli.

11 Q    Again, when we're talking about the phone records in

12 Exhibit 1004, are these incoming and outgoing phone calls that

13 the FBI received from the phone company?

14 A    Yes.

15 Q    With respect to that phone number, did you perform the

16 same type of analysis when you compared to it certain of the

17 other phone numbers in the exhibits contained in 6002?

18 A    Yes.

19 Q    If you look at the bottom two lines of your chart, can

20 you explain the information contained in those last two lines?

21 A    Sure.  On the left, you have calls made from Telephone

22 Number 567-8741, which is Romantique/Michael Persico to

23 Telephone Number 732-673-4274, belonging to Ultimate Seafood,

24 Inc., Anthony Stropoli.  And there were eight calls during the

25 time period of January 29, 2009 through April 14, 2009.

             ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2114

1          And then the line under that shows telephone calls

2     made from 732-673-4274, which is Ultimate Seafood,

3     Inc./Anthony Stropoli to Michael Persico at 917-567-8741.  And

4     there were seven calls for the time period of January 29, 2009

5     through April 14, 2009.

6     Q     And if we look now at the first three lines of your chart

7     -- excuse me.  I have turned now to page two of Government's

8     Exhibit 1013-B, and if we look at the first three lines of

9     your chart, are these phone numbers that we have previously

10    discussed and identified with respect to the exhibits in

11    Stipulation 6002?

12    A     Yes.

13    Q     And, again, are these phone records obtained by the FBI

14    that show incoming and outgoing phone calls for these

15    telephone numbers?

16    A     Yes.

17    Q     Did you perform the same analysis for each of these

18    telephone numbers in terms of determining the contacts between

19    them?

20    A     Yes.

21    Q     Can you explain the information contained in the first

22    -- I guess we can start with the first three rows?

23    A     Okay.  So, the first line shows contact between Telephone

24    Number 917-757-2359 to 347-288-9628 for the time period of

25    August 20, 2009 through July 26, 2010.  And there were 1339

              ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    calls made from the telephone number on the left to the

2    telephone number on the right.

3          And the second line shows calls made from

4    347-288-9628 to 917-757-2359 for the time period of August 20,

5    2009 through July 26, 2010.  And there were 2317 calls.

6          The third line, phone calls made from Telephone

7    Number 917-757-2359 to Telephone Number 347-231-5175 for the

8    time period of July 21, 2010 through August 30, 2010.  And

9    there were 142 calls made in that direction.

10    Q   Just to refresh everyone's recollection:  The telephone

11    number that you indicated as used by Francis Guerra is the

12    telephone number listed on Exhibit 1010-A as the phone number

13    associated with the phone seized from him at the time of his

14    arrest?

15    A   Correct.

16    Q   If you look now at the fourth, fifth and sixth lines.  Is

17    that the same telephone number we previously reviewed for

18    Ultimate Seafood, Inc. owned by Anthony Stropoli?

19    A   Yes, it is.

20    Q   Did you perform an analysis with respect to that number

21    and the phone number subscribed to by Maritza Medina, Anthony

22    Russo's wife?

23    A   I did.

24    Q   Can you just briefly summarize the information contained

25    in the second -- I'm sorry -- on the fourth, fifth and sixth

          ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2116

1    lines of your chart?

2    A    Sure.   It's how many calls were made from the phone

3    number on the left, which is 732-673-4274, it's Ultimate

4    Seafood, Inc., Anthony Stropoli, to 917-757-2359, which is

5    Francis Guerra.   And there were 94 calls made in that

6    direction for the time period of August 21, 2009 through

7    January 20, 2011.

8            And then the line under that shows call direction

9    from 732-673-4274, once again Ultimate Seafood, Inc., Anthony

10   Stropoli, to 347-288-9628, which is Anthony Russo/Maritza

11   Medina for the time period of September 10, 2009 through

12   July 19, 2010.   And there were 242 calls made in that

13   direction.

14           The line under that shows calls made from, once

15   again, Ultimate Seafood, Inc., Anthony Stropoli, at

16   732-673-4274 to Anthony Russo, Maritza Medina at 347-231-5175.

17   And it was 69 calls made between July 21, 2010 and September

18   2, 2010.

19   Q    Before we review now the last line of page two of Exhibit

20   1013-B, can you look at Government's Exhibit 1012 that you

21   have  --

22   A    Yes.

23   Q    -- and just explain for the jury what information is

24   contained in Exhibit 1012?

25   A    Sure.  This is an actual phone bill for Telephone Number
                 ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    914-246-9726, and the telephone bill covers the dates of

2    May 16, 1991 to July 31, 1992, and it is subscribed to by

3    Michael Persico.

4    Q    In addition to the bill, do you have records reflecting

5    incoming and outgoing telephone calls for Telephone Number

6    914-246-9727?

7    A    Yes, I do.  That's also in here.

8    Q    Is that also in Exhibit 1012?

9    A    Yes.

10   Q    I'm sorry if you said this already, but who is the

11   subscriber or who is the bill to for Phone Number

12   914-246-9726?

13   A    Michael Persico.

14   Q    Did you take the incoming and outgoing phone calls

15   reflected in the records contained in Exhibit 1012 and compare

16   them to other phone numbers that you have incoming and

17   outgoing phone call information for?

18   A    Yes, I did.

19   Q    Let me show you again Government's Exhibit 912 in

20   evidence, which is the prison records or the visiting records

21   for Joseph Monteleone.  And can you indicate the phone number

22   that is listed for Anna Sottile?

23   A    Sure.  It's 718-996-8358.

24            THE COURT:  And that is exhibit number?

25            MS. NASH:  This is 912.
              ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2118

```
 1              THE COURT:  912.  Thank you.

 2    Q    Can you also look at Government's Exhibit 1011, and tell

 3    us what Government's Exhibit 1011 contains?

 4    A    It's a telephone bill with call detail billed to Anna

 5    Sottile.

 6    Q    For what phone number?

 7    A    718-996-8358.

 8    Q    What time period do the telephone records cover for

 9    Exhibit 1011?

10    A    February 3, 1992 through March 30, 1992.

11    Q    So, looking at the last line of your chart, can you

12    explain the information contained in that row.  And to be

13    clear for the record, we're still on page two of Exhibit

14    1013-B.

15    A    Can you move it up a little bit?

16    Q    I'm sorry.

17    A    That's okay.

18    Q    There you go.

19    A    That is telephone calls made from 914-246-9726, belonging

20    to Michael Persico, to Telephone Number 718-996-8358, which is

21    listed as Anna Sottile/Joseph Monteleone.  And there were six

22    calls made, Michael Persico to that phone number, for the time

23    period of December 31, 1991 to May 17, 1992.

24    Q    Can you look now at Government's Exhibit 1007-A and B,

25    and describe for the jury the information contained in those
              ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER
```

1    exhibits?

2    A    Sure.  They are call telephone records, including billing

3    records and subscriber information, for Telephone Number

4    718-875-3955, which is subscribed to by Elite Auto Body and

5    Eric Curcio, and that's for the time period of November 4,

6    1993 through April 21, 1995.

7    Q    And I'm showing you a copy of Exhibit 1007-B.

8            Is that the billing record that you were just

9    referring to  --

10   A    Yes.

11   Q    -- listed to Elite Auto Body, Inc., Eric Curcio?

12   A    Correct.

13   Q    And 1007-A, what information does that contain?

14   A    That is the actual printout, showing call direction and

15   telephone calls made to that phone number.

16   Q    So, 1007-A are the incoming and outgoing phone calls for

17   the phone number registered to Eric Curcio?

18   A    Correct.

19   Q    And once again, that phone number is what?  The phone

20   number for Eric Curcio or Elite Auto Body is what?

21   A    718-875-3955.

22   Q    I'm going to show you page three of Government's Exhibit

23   907, once again the prison records for Alphonse Persico.

24           Did you review this document among others in

25   preparing this telephone chart.
             ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2120

```
 1    A    I did.

 2    Q    And can you indicate who is listed as the person applying

 3    to visit Alphonse Persico?

 4    A    Joyce Persico.

 5    Q    What phone number does she list?

 6    A    718-745-8345.

 7    Q    Referring back now to your chart, 1013-B, the first line

 8    of page three.  Can you just indicate the information that is

 9    provided there?

10    A    Sure.  It just shows that the telephone number subscribed

11    to by Eric Curcio made one phone call to Joyce Persico at

12    718-745-8345 on August 18, 1994.

13    Q    Now, I'm moving to the second line of page three of

14    Government's Exhibit 1013.  Before I have you explain the

15    information there, if I can direct your attention to

16    Government's Exhibit 907, Alphonse Persico's prison records,

17    pages 24 and 25.  Are these records that you reviewed in

18    conjunction with the preparation of this chart?

19    A    Yes.

20    Q    Who is listed on page 24 of Government's Exhibit 907 as

21    applying to visit Alphonse Persico?

22    A    Michael Sessa.

23    Q    And turning now to page 25 of Government's Exhibit 907.

24    What telephone number did Michael Sessa list?

25    A    718-356-0208.
```
              ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

2121

1    Q    Can you now indicate the information that is contained in

2    the second row of page three of your summary chart, Exhibit

3    1013-B?

4    A    Sure.  That shows three telephone calls were made from

5    Michael Sessa at 718-357-0208 to Michael Persico at Telephone

6    Number 914-246-9726 between February 29, 1992 and June 10,

7    1992.  There were three calls.

8    Q    I'm going to direct your attention now to Government's

9    Exhibit 1010-A.  Again, it is the report of the address book

10   contained in Francis Guerra's phone?

11   A    Yes.

12   Q    Turning now to page 17.  Can you please read the entry at

13   line 202?

14   A    Sure.  It listed as Smiley, and the telephone number is

15   1-718-312-9032.

16   Q    Did you compare that number or perform an analysis with

17   respect to that number and the incoming and outgoing telephone

18   calls that you have for Francis Guerra's phone, 917-757-2359?

19   A    Yes, I did.

20   Q    Can you indicate, in the second two lines of your chart,

21   page three, Exhibit 1013-B, what information is reflected in

22   those rows?

23   A    Sure.  It shows the number of telephone calls made from

24   Francis Guerra to Michael Sessa for the time period of

25   September 25, 2009 through December 22, 2010.  There were ten

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2122

1    calls made in that direction.

2            The line under that shows calls made from Michael

3    Sessa to Francis Guerra for the same time period.  And there

4    were 28 calls in that direction.

5    Q    Going back now to Exhibit 1010-A, the report containing

6    the information in Francis Guerra's cell phone address book.

7    I'm going to direct your attention to page two of that

8    exhibit.  Can you please indicate who is listed at line nine

9    of page two of Exhibit 1010-A?

10   A    Ambrose.  And the telephone number is 1-646-400-9696.

11   Q    Did you perform an analysis with respect to that phone

12   number and the phone number used by Francis Guerra?

13   A    Yes.

14   Q    Looking at page three of Exhibit 1013-B, your summary

15   chart.  Can you explain what information is reflected in the

16   fifth and sixth rows?

17   A    Sure.  It's contact made from Francis Guerra to Ambrose

18   for the time period of September 10, 2009 through February 9,

19   2011.  There were 217 calls in that direction.

20           The following line shows calls made from

21   646-400-9696, which is Ambrose, to Francis Guerra for the time

22   period of September 10, 2009 through February 9, 2011.  And

23   there were 150 telephone calls made in that direction.

24   Q    Before we proceed to the next rows of your chart, I'm

25   going to direct your attention now to Exhibit 1009-A.  Is that

                 ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2123

1    the report of the address book contained in Anthony Russo's

2    phones?

3    A    Yes.

4    Q    And directing your attention to page fourteen of Exhibit

5    1009-A  -- sorry  -- page five, line 26 of 1009-A.

6    A    I'm sorry.  What line did you say?

7    Q    Page five  -- I'm sorry.  I have not done it yet?

8         Line 26 of page five of 1009-A.  Can you indicate

9    who is listed in the address book of Anthony Russo's phone.

10   A    It's listed as  "Jew," and the Mobile Telephone Number is

11   917-538-1365.

12   Q    If you go to the bottom two rows of your chart of page

13   three; again, Exhibit 1013-A.  Can you indicate what

14   information is provided in that  -- in those rows?

15   A    Can you move it up a little?

16   Q    Sorry.

17   A    There you go.

18        The first line shows calls made from Francis Guerra

19   to Scott Reback,  "Jew," for the time period of August 20,

20   2009 through January 6, 2011.  There were 176 telephone calls.

21        The line under that shows telephone calls made from

22   917-538-1365, which is Scott Reback/Jew to Francis Guerra for

23   the same time period.  And there were 137 phone calls.

24   Q    Again, for the record:  In order to determine the number

25   of calls between these two phone numbers, did you review the

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

[6/27/2012] 06 27 2012 trial chance adam russ castrogiovanni s...

2124

1    incoming and outgoing calls that you have for Francis Guerra's

2    phone number, 917-757-2359?

3    A    Yes.

4    Q    And did you analyze how many incoming and outgoing calls

5    he had to and from the number 917-538-1365?

6    A    Yes.

7    Q    Going back to Exhibit 1010-A, which is the address book

8    in Francis Guerra's cell phone.  I'm going to direct your

9    attention to page fourteen.  Can you identify who is listed at

10   line 170 of page fourteen of Exhibit 1010-A?

11   A    Pat Avena, with the home telephone number list of

12   1-718-234-5580.

13   Q    Now, if you look at your chart, the third row from the

14   bottom.  Can you indicate the information that is contained in

15   that row?  And again, we're on page three of 1013-B.

16   A    It shows that four telephone calls were made from

17   917-757-2359, which is Francis Guerra, to 718-234-5580, which

18   is Pat Avena, for the time period of June 9, 2010 through

19   December 6, 2010.

20   Q    Going back now to Exhibit 1010-A.  Once again, the report

21   for the address books in Francis Guerra's cell phones.  I'm

22   going to direct your attention to page 11.  Can you indicate

23   who is listed at entry line 121?

24   A    Suzzie Girl Litle, and it's Telephone Number

25   718-219-4572.

               ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2125

```
 1   Q    I'm also going to direct your attention, in the same

 2   Exhibit 1010-A, to page 17.  Can you please identify who is

 3   listed at line 210 on page 17 of Exhibit 1010-A?

 4   A    Suzzie Girl, and there are three telephone numbers

 5   listed.  The first one is a mobile listed at 1-917-567-0028,

 6   followed by a home telephone number listed as 718-680-5172,

 7   followed by a work number, which is 718-708-0923.

 8   Q    Looking at page four, the last page of your chart,

 9   Exhibit 1013-B.  Can you summarize the information that is

10   provided here?

11   A    The first line shows calls made from Francis Guerra to

12   Suzzie Girl for the time period of August 20, 2009 through

13   December 17, 2009.  There were eight telephone calls.

14        Second line shows calls made from Francis Guerra to

15   another one of Suzzie Girl's telephone numbers, which was

16   718-680-5072, for the time period of August 20, 2009 through

17   September 22, 2009.

18   Q    To be clear:  I'm sorry to stop you, but these phone

19   numbers that you have listed here for Suzzie Girl are the

20   phone numbers listed in Government's Exhibit 1010-A; is that

21   correct?

22   A    Yes.

23        And there were eight telephone calls for that second

24   line.

25        The third line shows calls made from 718-680-5072,
```

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2126

1  which is Suzzie Girl, to Francis Guerra.  Five calls were made

2  for the time period of August 20, 2009 through September 22,

3  2009.

4          Following line shows calls made from 718-219-4572,

5  which is listed in the address book as Suzzie Girl Little to

6  Francis Guerra.  There were two calls made on January 20,

7  2011.

8          Line under that shows calls made from Francis Guerra

9  to Suzzie Girl at 718-708-0923.  There were 19 telephone calls

10  from August 27, 2009 through December 18, 2009.

11          And the last line shows calls made from Suzzie Girl,

12  718-708-0923, to Francis Guerra for the time period of

13  August 27, 2009 through December 18, 2009.  There were 92

14  calls in that direction.

15          MS. NASH:  Thank you.  Just a moment.

16          (Pause.)

17          MS. NASH:  Nothing further from the government, your

18  Honor.

19          THE COURT:  Cross-examination.

20          MR. McMAHON:  Yes, your Honor.

21  CROSS-EXAMINATION

22  BY MR. McMAHON:

23  Q    Ma'am, are you an agent?

24  A    I am not.

25  Q    So, you are a civilian employee of the FBI?
              ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2127

1    A    Correct.

2    Q    What is your educational background?

3    A    I have a bachelor's degree in criminal justice from John

4    Jay College.

5    Q    Did you go from John Jay to the FBI?

6    A    I did.

7    Q    What sort of training have you had in intelligence

8    analysis?

9    A    I had about thirteen weeks in Quantico, Virginia, various

10   types of training.

11   Q    Now, the information that's on this report, the summary

12   report, which is 1013-B, I think you said you gathered some

13   data and you put it into a computer, and out spits the report?

14   That's the long and short of it?

15   A    No.  Some of the telephone numbers we had pen registers

16   up on.  So, that number is in our database.  I don't input

17   anything.  I just run reports with what's in there already.

18         MR. McMAHON:  Can I see the stipulation?

19   Q    Do you have the stipulation in front of you?  I think

20   it's 6002.

21   A    6002?

22   Q    Yes.  Let me take a look at it for a second?

23         (Pause.)

24         MR. McMAHON:  Is this in evidence?

25         MS. NASH:  Yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Case 1:03-cr-00211-DLF Document 346-469 Filed 09/21/16 Page 1190 of 206 PageID #:10944

2128

1    Q    Would you please show me on that document where it says

2    that you used pen register information?

3    A    It doesn't.  I just know I used pen register information

4    for some of it, not for all of it.

5              MR. McMAHON:  Judge, can we approach sidebar?

6              THE COURT:  Yes.

7

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

            ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2151

CROSS-EXAMINATION CONTINUED

BY MR. McMAHON:

Q    So, ma'am, your chart also includes -- it also includes
pen register data; is that correct?

A    Yes.

Q    Now, when you say on this chart contacts, what do you do
mean?

A    Telephone calls that were made from each phone number.

Q    Okay.  Now, if there was a call was a one second call or
a voicemail or something like that, that would also be listed?

A    It would only be listed if the call was answered.

Q    So if it was answered by voicemail it would be listed?

A    I believe so, yes.

Q    And this chart you have done -- you have a subscriber
user.  The subscriber information, I guess, comes from the

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

[6/27/2012] 06 27 2012 trial chance adam russ castrogiovanni s...

2152

1    phone company?

2    A    Correct.

3    Q    In terms of user, that you would gather from other data,

4    such as the prisons records and stuff you talked about?

5    A    Yes.

6    Q    But you don't know as to these particular calls who the

7    user was at any given call; is that correct?

8    A    Right.

9    Q    You are saying that with respect to this phone, that

10   there is some evidence that the user was the person that you

11   listed?

12   A    Exactly.

13   Q    That's where the user is different from the subscriber?

14   A    Correct.

15   Q    Okay. Now -- and I see that there are some other things

16   in here that have to have come from agent information, such as

17   on page four -- I think it's page three, I'm sorry, Scott

18   Rheback (ph) Jew, do you see that line?

19   A    Correct.

20   Q    One hundred seventy-six calls from Frank Guerra to him?

21   A    Yes.

22   Q    Where do you get the Jew from; is that in the phone book

23   or something?

24   A    That's how it was saved in the telephone book that -- the

25   phone that we seized for the phone of Frank Guerra.

                          MARSHA DIAMOND, CSR

                          OFFICIAL COURT REPORTER

2153

1    Q    Okay. Now, you said that was seized from Frank Guerra?

2    A    Correct, at the time of his arrest. That is the 917

3    757-2359 telephone.

4    Q    Were you at his apartment when he was arrested?

5    A    I was not.

6    Q    So I gather somebody told you that this phone came from

7    Frank Guerra when he was arrested?

8    A    Yes, it was entered into evidence and then I received the

9    printout from --

10   Q    From the evidence log?

11   A    From whatever was printed out. Whoever --

12   Q    The report?

13   A    Correct.

14   Q    Now, on this Scott Rhebock, you know, he is the owner of

15   the Nissan dealership where Frank worked, is that the

16   subscriber?

17        Do you know who the subscriber was?

18        Do you remember as you sit here today who that Scott

19   Rheback is?

20   A    I believe Anthony Russo testified that he was known as

21   the Jew.

22   Q    What I am asking is do you know that Scott Rheback is the

23   owner of the Nissan dealership where Frank worked?

24   A    No, I don't know that.

25   Q    You don't know what the subscriber specifically -- what

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

the subscriber information for that 917 538-1365, you don't know if that was paid by Nissan, by the dealership or by him?
A I have no way of knowing that, correct.
Q Oh, and lastly, it wasn't clear to me. On the number of contacts did you actually count or did some machine count?
A It was -- a report was printed out that lists the number of calls, with the exception of the older calls that I counted myself from the phone records that went back to the 90s. Those we do not have electronically.
Q All right. That's gone a little bit over my head here.
A Okay.
Q This 1013 B is this chart in evidence?
A Yes.
Q And the last column on the right is the number of contacts?
A Yes.
Q And this deals with a certain timeframe in two phone numbers?
A Yes.
Q And the number is 33; is that correct?
A Yes.
Q Now, my question is this actual document, it's a four page -- this four page document, did some computer generate this document or did you put -- withdrawn.
Did a computer generate this document?

2155

```
 1    A    No, I made this document from information that came from
 2    a computer or from hard physical paper copy.
 3    Q    So if the phone records were old you actually counted the
 4    contacts?
 5    A    Yes.
 6    Q    And you would have counted them, what, in the call detail
 7    section?
 8    A    Yes.
 9    Q    So you would have counted each one?
10    A    Only the old -- the two or three old phone bills that are
11    here, yes.
12    Q    So the vast majority of the data has been generated by
13    the some database?
14    A    After I entered the information that I was interested in
15    finding, yes.
16    Q    Okay. So, for example, on 2009 information.  Let's go to
17    a different -- the second line there.  Now, the 81 calls
18    between Francis Guerra and Roman T/Michael Persico, that
19    number of 81 you didn't personally count --
20    A    -- no --
21    Q    A computer database told you there were 81 contacts?
22    A    Correct.
23    Q    And whose database is that that told you that
24    information?
25    A    It's an outside database that we call, Penlink.
```

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

2156

1    Q    P-E-N-L-I-N-K?

2    A    Correct.

3    Q    So somebody put some information into the Penlink and

4    Penlink sent you back a report with that number 81 on it?

5    A    No. I take the information that is in our estimate, FBI

6    system, for this phone number. Let' say, 917 757-2359.  That

7    gets downloaded to my computer, and then uploaded into the

8    Penlink database and then you can run all sorts of reports and

9    would have given you that number.

10   Q    Okay. But when you say that you downloaded the number, I

11   understand when you say the phone number, but what information

12   do you convey to Penlink from which that computer comes up

13   with the number 81?

14   A    Every, every, every, all the information --incoming,

15   outgoing call, date, time, duration, anything that we have

16   captured from the phone company.

17        THE COURT: One moment.  You put that in Penlink?

18        THE WITNESS:  In our system, yes, but it goes into

19   our system, not by me, through the phone company, or however

20   else they are -- depending on where they get it from.

21   Q    This is a little hard to understand for us old timers.

22   A    I understand.

23   Q    You got the phone bills -- withdrawn.

24        You have pen register data.  Somehow you have a list

25   of all calls that were made in the timeframe.  For example, on

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

2157

```
 1    line two, June 2 of 08 to April 20 of 09, you have a computer
 2    that captures the number of every call in that timeframe made
 3    between those two numbers.
 4    A    If there's a pen register.   If you have a pen register
 5    on a phone number, whoever authorizes -- whatever the company
 6    -- Nextel or Sprint or whatever it is, they give that
 7    information to someone else at the FBI.  Whoever handles that,
 8    not me, and it gets entered into our internal system.  That is
 9    a live feed, FBI.  Live feed.  Pen register is live.  You get
10    calls as they happen.  Maybe there's like a 12-hour delay.
11    Okay. Then I take that information and dump it into Penlink,
12    download it into Penlink and then I run my reports.
13    Q    Got it, but meanwhile -- so all of the data that is here
14    is part of a vast array of numbers and calls and contacts, if
15    it is pen register gathered that is sitting in an FBI
16    computer?
17    A    Originating from the telephone company, yes.
18    Q    Yes.  Made from the phone company pursuant to some pen
19    register application and then it's stored in the FBI computer?
20    A    Yes.
21    Q    Okay. And then you ask the computer to generate some of
22    that and you send it to Penlink or you send it all to Penlink?
23    A    I send everything to Penlink, or you can also send
24    certain dates but normally we send everything.
25    Q    And then the computer -- you tell them what kind of
```

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

[6/27/2012] 06 27 2012 trial chance adam russ castrogiovanni s...

2158

```
 1    report you want and then they will send it back to you in this
 2    format or the data will come back?
 3    A    It just comes on the screen and you can just print it out
 4    instantly.
 5    Q    So you will ask it for this date, these two numbers, how
 6    many contacts?
 7    A    Correct.
 8    Q    Is that the terminology used:  contacts or completed
 9    calls, or what is it?
10    A    I think contacts is fair.
11    Q    It has to be more than a minute, more than ten seconds,
12    anything like that or is it just contacts?
13    A    Well, the call would have had to have been answered so --
14    Q    Okay. All right. So then basically the data that is on
15    this chart is taken from this Penlink's computer which dealt
16    with the material that it got previously from the FBI computer
17    which it got from the phone company, correct?
18    A    With the exception of the older records, yes.
19    Q    Okay. Now, when they send this back to you, for example,
20    I don't know, maybe 15 your 20 columns here that you've asked
21    for, is there a specific report that comes from Penlink which
22    you then turn into this document which is in evidence?
23          In other words, is the 81 -- withdrawn.
24          Penlinks didn't do this four page document when they
25    gave you the data?
```

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

1   A    No.

2   Q    When they gave you the data did you print it out?

3   A    Sometimes I did, sometimes I didn't.

4   Q    Did you do the data for this chart and do you have that

5   in your office?

6   A    Somewhere I probably do, yes.

7            MR. McMAHON: Nothing further, Judge.

8            THE COURT:  All right.  Any questions for this

9   witness?

10           MS. NASH:  No Judge.

11           THE COURT:  You may step down. Thank you.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    MARSHA DIAMOND, CSR

                  OFFICIAL COURT REPORTER

GOVERNMENT
EXHIBIT
**7003**
10 CR 147 (DLI)

GOVERNMENT
EXHIBIT
**3500-KO-7**
10 CR 147 (SLT)

DATE, _3-09-93_

DAY _Tuesday_

WEATHER _Clear - Cool_

A PHYSICAL _____ PHOTO _✓_ SURVEILLANCE WAS CONDUCTED IN THE

VICINITY OF _6701 11TH Ave Brooklyn N.Y._ ,

AT WHICH TIME THE FOLLOWING OBSERVATIONS WERE NOTED:

| TIME | INITIALS | OBSERVATIONS |
|------|----------|--------------|
| 12:48P | kwo | Photographic surveillance instituted at the above address with cola roll #6192 |
| 12:50P | kwo | Cola photo's 1, 2 & 3 depict HTV-790 N.Y. (an Oldsmobile Bravada) parked in front of 6701 11TH Ave Brooklyn N.Y. |
| 12:51P | kwo | Cola photo #4 depicts 6701, 11TH Ave Luncheonette |
| 12?P | kwo | Cola photo's 5, 6 & 7 depict Joseph Monteleone Sr. (further noted as JMS) exiting 6701 11TH Ave walking towards HTV-790 N.Y. |
| 1:02P | kwo | Cola photo's 8 & 9 depict JMS entering HTV-790 N.Y. |
| 1:15P | kwo | Cola photo's 10, 11, 12 & 13 depict JMS talking w/a UWM on the sidewalk in front of 2002 W6TH St Brooklyn. |
| 1:33P | kwo | Cola photo #14 depict JMS exiting 196 Ave "S" Brooklyn N.Y. |
| | | Cola photo's 15, 16, 17, 18, 19, 20, & 21 depict JMS talking w/ UWM while standing on the Bridge on Cropsey Ave that crosses the Coney Island Creek. |
| 2:24P | kwo | Cola photo #22 depict UWM standing in the doorway of 196 Ave "S" Brooklyn. |
| 2:25P | kwo | Cola photo's 23 & 24 depict 2 UWM's in front of 196 Ave "S" Brooklyn. |
| 2:26P | kwo | Photographic surveillance terminated with cola |

PAGE _1_ OF _2_

Case 1:09-cr-00375-DLEK Document 46-6 Filed 08/19/21 Page 553 of 635 PageID #: 4860

CONTINUATION PAGE

DATE  3-09-93

| TIME | INITIALS | OBSERVATIONS |
|------|----------|--------------|
| | | *coll # 6192* |
| | *KMO* | *Kevin M. O'Rourke, SA, FBI, NY, N.Y. 4-01-93* |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

1

1871

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF NEW YORK

┌─────────────────────┐
│ GOVERNMENT          │
│ EXHIBIT             │
│ **7004**            │
│ 10 CR 147 (DLI)     │
└─────────────────────┘

3    - - - - - - - - - - - - - X
4    UNITED STATES OF AMERICA,   :

                                   10-CR-147
5

            -against-            United States Courthouse
6

                           :     Brooklyn, New York
7

    FRANCIS GUERRA,
8

               Defendant.
9                          :     June 26, 2012
                                 9:30 o'clock a.m.
10   - - - - - - - - - - - - - X
11   TRANSCRIPT OF TRIAL
     BEFORE THE HONORABLE SANDRA L. TOWNES
12   UNITED STATES DISTRICT JUDGE, and a jury
13   ATTORNEYS FOR GOVERNMENT:
     LORETTA E. LYNCH
14   UNITED STATES ATTORNEY
     BY:  NICOLE ARGENTIERI
15        ALLON LIFSHITZ
          RACHEL NASH
16   Assistant United States Attorney
     271 Cadman Plaza East
17   Brooklyn, New York 11201
18   ATTORNEY FOR DEFENDANT:
     GERALD McMAHON, ESQ.
19   MATHEW J. MARI, ESQ
20
     Court Reporter:
21   Marsha Diamond
     225 Cadman Plaza East
22   Brooklyn, New York
     TEL: (718) 613-2489
23   FAX: (718) 613-2369
24       Proceedings recorded by mechanical stenography,
     transcript produced by CAT.
25
                    MARSHA DIAMOND, CSR
                  OFFICIAL COURT REPORTER

1889

1

2

3

4

5

6

7

8

9

10    F R E D   S A N T O R O                  ,  having been first

11  duly sworn/affirmed, testified as follows:

12            THE COURT:  Tell us your full name and spell it.

13            THE WITNESS:  My name is Fred Santoro F-R-E-D

14  S-A-N-T-O-R-O.

15  DIRECT EXAMINATION

16  BY MS. ARGENTIERI:

17  Q    Are you currently employed?

18  A    No ma'am.

19  Q    Directing your attention to the 1997, where did you work?

20  A    I was a detective in the Brooklyn South Narcotics Major

21  Case Unit.

22  Q    And is that a part of the New York City Police

23  Department?

24  A    Yes, it is.

25  Q    When did you join the New York City Police Department?

                        MARSHA DIAMOND, CSR, RPR

                        OFFICIAL COURT REPORTER

1890

```
1    A    July 16, 1984.

2    Q    You said that in 1997 your assignment was to the major

3    case unit?

4    A    Yes, it was.

5    Q    Can you explain to the jury, generally, what that is?

6    A    Yes. We did long-term investigations into upper echalance

7    drug dealers and we also did traditional organized crime which

8    involved physial surveillance, electronic surveillance which

9    was wiretap, and undercover work.

10   Q    In the course of your work for the Brooklyn Major Case

11   Unit, did you perform video surveillance of Anthony Russo?

12   A    Yes, ma'am.

13   Q    When, approximately, did you conduct that surveillance?

14   A    Approximately 1997 in August.

15             MS. ARGENTIERI: Judge, may I approach?

16             THE COURT: Yes.

17             MS. ARGENTIERI: I am showing the witness Government

18   Exhibit 228 previously shown to the defense counsel (handing

19   to the witness).

20   Q    Do you recognize that?

21   A    Yes.

22   Q    Have you reviewed it prior to today?

23   A    Yes.

24   Q    What is it?

25   A    Copy of the video, the surveillance, that I conducted in
```

MARSHA DIAMOND, CSR, RPR

OFFICIAL COURT REPORTER

```
 1    1997.

 2    Q    And how do you know that's what it is?

 3    A    Because my initials are on it.

 4              MS. ARGENTIERI: Government moves to admit

 5    Government Exhibit 228.

 6              MR. McMAHON: No objection.

 7              THE COURT: Received.

 8              (Exhibit 228  so marked).

 9              MS. ARGENTIERI:  May I publish it to the jury,

10    Judge?

11              THE COURT:  Yes, you may.

12    Q    Sir, before I start the video, where were you physically

13    located when you shot this video?

14    A    I was in the back of a surveillance van on 11th Avenue

15    approximately between 67th and 68th Street in the County of

16    Kings, Brooklyn, New York.

17    Q    And what was at that location?

18    A    Romantique Limousines.

19    Q    Sir, stopping the video for the record at eight seconds,

20    what's in this shot?

21    A    You got Allie Boy Persico and Anthony Russo.

22    Q    And there are two individuals in the photo, can you

23    identify the individual on the left?

24    A    Yes. The individual on the left is Anthony Russo.  He's

25    in a black jogging outfit with white and red stripes, and the
```

                    MARSHA DIAMOND, CSR, RPR

                    OFFICIAL COURT REPORTER

```
 1    person in front of him is Allie Boy Persico who is wearing a

 2    white T-shirt with a logo on the back and sunglasses.

 3    Q    And to the right there looks like a neon sign, what is

 4    that neon sign say?

 5    A    That says Romantique Limousine.

 6    Q    And was that the storefront?

 7    A    Yes.

 8    Q    So where was your car parked in relation to that

 9    storefront?

10    A    I was, approximately, I'd say maybe 20 feet parked on the

11    street.

12              MS. AREGNTIERI: If you can just play the video.

13              (Video playing).

14    Q    Where do you see Allie Boy Persico and Anthony Russo go?

15    A    They start to enter the location Romantique Limousine.

16    Q    Approximately 35 seconds into the video what happens?

17    A    Alley Boy Persico entered into the location.

18    Q    To just -- we are moving just to before two minutes.

19    Right there, who did you see exit?

20    A    Anthony Russo.

21    Q    And then the individual in the doorway, do you recognize

22    that person?

23    A    Yes, ma'am.

24    Q    Who is that?

25    A    Michael Persico. (Continued on next page)
```

                    MARSHA DIAMOND, CSR, RPR

                    OFFICIAL COURT REPORTER

1893

```
1              (Tape continues to play.)

2   EXAMINATION CONTINUES

3   BY  MS. ARGENTIERI:

4   Q    Are you are moving the camera here?

5   A    Yes.

6   Q    What were you able to observe?

7   A    I observed all three individuals cross the street and

8   start to meet up across the street by a parking meter.

9   Q    We are stopping the video at 2:31.

10             Do you see anyone that you recognize in the shot?

11  A    Yes.

12  Q    Who?

13  A    Allie Boy Persico.

14  Q    Can you indicate where for the jury you see Allie Boy

15  Persico?

16  A    He's opposite where I'm sitting, he's opposite across the

17  street, and he's facing me.

18  Q    Is he wearing a white T-shirt?

19  A    Yes, he is.

20  Q    All the way to the right?

21  A    Yes.

22             (Tape plays.)

23  Q    In this shot it looks like how many individuals -- well

24  just wait for it to clear up.

25             (Pause.)
                  GR      OCR     CM     CRR     CSR
```

1894

1   Looking at this video at around three minutes, who

2   is there?

3   A   Well, now the same three individuals, they hook back up.

4   It's Allie Boy Persico, Michael Persico and Anthony Russo.

5   Q   Did you observe them?

6   A   Yes, ma'am.

7   Q   What did they appear to be doing?

8   A   They appear to be having a conversation, or a

9   walk-and-talk, what we used to call it, from across the street

10  from where I'm sitting.

11          (Tape plays.)

12  Q   Did they meet there for a couple of minutes?

13  A   Yes, they did.

14  Q   I am just going to fast forward from four minutes to

15  six minutes.

16          Are they still meeting across the street?

17  A   Yes.

18          (Tape continues to play.)

19  Q   I am going to fast forward to eight minutes.

20          What is the group still doing?

21  A   They are still talking.

22  Q   I am fast forwarding to approximately 9 minutes

23  30 seconds.

24          (Tape continues to play.)

25          At this point did they move on?

          GR      OCR      CM      CRR      CSR

1895

1    A    Yes, ma'am.

2         (Tape plays.)

3    Q    At approximately 10 minutes 30 seconds,  what did you

4    observe them doing?

5    A    I observed Anthony Russo get into a passenger seat of a

6    vehicle.  Michael Russo got into -- actually, Anthony got into

7    the driver's seat, Michael got into the passenger seat, and

8    they drove off towards the higher numbers.  Allie Boy has a

9    brief conversation with them and then he comes back across the

10   street.

11        At this point I believe they know that I'm out there

12   because Allie Boy starts to put on like a little show for the

13   camera.  He starts skipping and laughing.

14        (Tape plays.)

15   Q    Is that what you are talking about there?

16   A    Yes.

17   Q    That's approximately 11 minutes 20 seconds.

18        Where did Allie Boy go just there?

19   A    He went back inside of Romantique Limousines.

20   Q    At some point did he reappear?

21   A    Yes, shortly thereafter.

22   Q    I am just going to fast forward to shortly before

23   19 minutes.

24        (Tape continues.)

25        What does he appear he's doing right there at 19:20?
                    GR      OCR     CM      CRR      CSR

1896

1    A    He just stuck his head out.  I think he was looking to

2    see if I was still out there.

3                (Tape continues.)

4    Q    Later that day, did Anthony Russo and Michael Persico

5    return?

6    A    I don't recall if they returned.  I was out there for a

7    while.  I don't recall if they came back.

8    Q    I am fast forwarding to 34 minutes.

9                (Tape continues.)

10                Who is that in the frame?

11   A    That's Anthony Russo and Michael Persico.

12                (Tape continues.)

13   Q    Approximately how long was your entire surveillance?

14   A    I stood out there approximately three to four hours.  I

15   believe the reason why they pulled away on the first time was

16   because they wanted to see if I was going to follow them but I

17   remained at the location.

18                MS. ARGENTIERI:  I have no further questions, Judge.

19                MR. McMAHON:  No cross, Judge.

20                THE COURT:  You may step down.

21                Thank you.

22                THE WITNESS:  Have a nice day.  Have a nice day.

23                (Witness excused.)

24

25

                GR      OCR      CM      CRR      CSR

Case 1:02-cr-00351-ER   Document 469   Filed 06/17/11   Page 563 of 635 PageID #:4870
Case 1:10-cr-00147-SLT   Document 260   Filed 06/17/11   Page 563 of 635 PageID #:10865

| GOVERNMENT EXHIBIT 7005 10 CR 147 (DLI) | GOVERNMENT EXHIBIT 3500-KW-1 10 CR 147 (SLT) |

DATE  10/26/94

DAY  Wednesday

WEATHER  Cloudy

A PHYSICAL _____ PHOTO ✓ SURVEILLANCE WAS CONDUCTED IN THE VICINITY OF Gowanus Parking Field C  3 Ave.  between 30 + 31 Sts, AT WHICH TIME THE FOLLOWING OBSERVATIONS WERE NOTED: Brooklyn, N.Y.

| TIME | INITIALS | OBSERVATIONS |
|------|----------|--------------|
| 4:30P | KRW | Surveillance was initiated at the above location. |
| 5:02P | KRW | Photos #1 #2 #3 depict (KRW) unk W/M #3 walking on E. 10th St from Bay Parkway (towards the U-Haul) |
| 9:00P | KRW | Surveillance terminated. |
|  | KRW | Kevin R. Wevodau  SA. FBI NY NY  11/23/94 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

PAGE  1  OF  1

1

1452

GOVERNMENT
EXHIBIT
**7006**
10 CR 147 (DLI)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 10-CR-00147(SLT)
                                 :
                                 :
                                 :
        -against-                : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
                                 : Thursday, June 21, 2012
FRANCIS GUERRA,                  : 9:30 a.m.
                                 :
            Defendant.           :
                                 :

- - - - - - - - - - - - - X

            TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
            BEFORE THE HONORABLE SANDRA L. TOWNES
                UNITED STATES DISTRICT JUDGE

                 A P P E A R A N C E S :

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY:  NICOLE M. ARGENTIERI, ESQ.
                     RACHEL NASH, ESQ.
                     ALLON LIFSHITZ, ESQ.
                     Assistant United States Attorneys

For the Defendant:   LAW OFFICE OF GERALD J. MCMAHON
                     67 Wall Street
                     New York, New York 10005
                 BY:GERALD J. MCMAHON, ESQ.



                 Victoria A. Torres Butler, CRR
                    Official Court Reporter

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16  **K E V I N   L.   W E V O D A U,**

17  called by the Government, having been

18  first duly sworn, was examined and testified

19  as follows:

20

21  THE COURT:  Please, be seated.  Tell us your full

22  name and spell it.

23  THE WITNESS:  My name is Kevin L. Wevodau,

24  W-E-V-O-D-A-U.

25  THE COURT:  D-A-U?

 1          THE WITNESS:  Yes.

 2          THE COURT:  Thank you.

 3          MS. ARGENTIERI:  May I enquire?

 4          THE COURT:  Yes, you may.

 5    DIRECT EXAMINATION

 6    BY MS. ARGENTIERI:

 7    Q     Sir, where are you employed?

 8    A     I'm a supervisory senior resident agent for the Federal

 9    Bureau of Investigation in the Philadelphia division assigned

10    to the Scranton and resident agency.

11    Q     And how long have you been a special agent with the

12    Federal Bureau of Investigation?

13    A     Little over 28 years.

14    Q     Directing your attention to October of 1994, what FBI

15    office were you assigned to?

16    A     I was assigned to the special operations group within the

17    New York division.

18    Q     That's the New York office?

19    A     Yes.

20    Q     And what squad specifically were you assigned to?

21    A     SO2.

22    Q     And what were your responsibilities as a special agent

23    assigned to SO2?

24    A     Tasks would be submitted by case agents to the special

25    agent -- to the special operations branch.  Assignments would

*K. L. Wevodau - Direct / Argentieri*                    1548

1   be meted out from there by the coordinators tours to the

2   various squads.  And our task as surveillance agents would be

3   to complete those missions, be they physical surveillance or

4   photographic surveillance.

5   Q    And when you conducted a visual surveillance or

6   photographic surveillance, how -- did you have a practice with

7   regard to documenting it?

8   A    We would be required to complete logs.

9   Q    And when you created those logs, were you careful to be

10  fair and accurate?

11  A    Yes.

12  Q    As you sit here today, do you recall if you conducted a

13  surveillance on October 26th, 1994?

14  A    Not specifically, no.

15          MS. ARGENTIERI:  May I approach?

16          THE COURT:  Yes.

17          MS. ARGENTIERI:  Showing the witness what's marked

18  for identification as 3500 KW-1.

19          (Handing.)

20  Q    Sir, do you recognize that document?

21  A    Yes, this would be a surveillance log, a photographic

22  surveillance log that I would have completed.

23  Q    And on what date did you complete it?

24  A    The log itself was completed on November 23, 1994, for a

25  surveillance done on October 26th, 1994.

1 Q    And at the time that you created this, were you careful

2 to be fair and accurate?

3 A    Yes.

4         MS. ARGENTIERI:  Judge, the Government moves to have

5 this witness refer to this log pursuant to 8035 during his

6 testimony.

7         THE COURT:  Any objection?

8         MR. McMAHON:  No, Judge.

9         THE COURT:  All right.  That request is granted.

10        MS. ARGENTIERI:  I'm also going to show the witness

11 for identification Government's Exhibit s 212-A, B, and C.

12        (Handing.)

13 Q    Sir, do you recognize those photographs?

14 A    These would be the three photographs that were taken as

15 depicted in my surveillance log from that date.

16 Q    And how do you know that those are photographs you

17 specifically took?

18 A    On the back I completed the indications that were SO2

19 agent Kevin Wevodau, the date and the case agent that assigned

20 us to the matter and the file number for which they were

21 taken.

22        MS. ARGENTIERI:  The Government moves to admit

23 212-A, B, and C.

24        MR. McMAHON:  May I see them, Judge?

25        THE COURT:  Yes.

*K. L. Wevodau - Direct / Argentieri*       1550

1      (Handing.)

2      MR. McMAHON:  No objection, Your Honor.

3      THE COURT:  All right, I will receive Government's

4 Exhibits 212-A, B, and C.

5      (Government's Exhibits 212-A, B, and C were received

6 in evidence.)

7      (The above-referred to Exhibit was published to the

8 jury.)

9 Q    Sir, on October 26th, 1994, where were you conducting

10 surveillance?

11 A    The Gowanus Parking Field C, Third Avenue, between 30th

12 and 31st Street, in Brooklyn, New York.

13 Q    And at what time did you initiate your surveillance that

14 day?

15 A    4:30 p.m.

16 Q    And where were you when you initiated the surveillance?

17 A    At the Gowanus Parking Field C, Third Avenue.

18 Q    And did you take photographs that day?

19 A    Yes.

20 Q    At approximately what time did you take photographs?

21 A    5:02 p.m. on that date.

22 Q    And did you describe what you observed as you took the

23 photographs in your log?

24 A    Yes.

25 Q    What did you observe at 5:02 p.m.?

1   A    An unknown white male walking west on 10th Street from

2   Bay Parkway and then I put in parentheses, "towards the

3   U-Haul."

4   Q    And what time did you terminate surveillance that day?

5   A    9:00 o'clock p.m.

6        MS. ARGENTIERI:  Judge, may I publish 212-A, B, and

7   C to the jury?

8        THE COURT:  Yes.

9        MS. ARGENTIERI:  Showing you first 212-A.

10       (The above-referred to Exhibit was published to the

11  jury.)

12  Q    Is this one of the photographs you took that day?

13  A    Yes.

14  Q    And what does that photo show?

15  A    That was the unknown white male.

16       MS. ARGENTIERI:  Showing 212-B.

17       (The above-referred to Exhibit was published to the

18  jury.)

19  Q    What does that show?

20  A    It's another picture of the same unknown white male.

21  Q    And in that photo what does the unidentified male appear

22  to be doing?

23  A    Looking back at me.

24       MS. ARGENTIERI:  Showing you Government's

25  Exhibit 212-C.

1         (The above-referred to Exhibit was published to the

2    jury.)

3    Q    Is that the same unidentified male?

4    A    Yes.

5    Q    And these are the three photos you took that day?

6    A    Yes.

7              MS. ARGENTIERI:  No further questions.

8              THE COURT:  Any cross, Mr. McMahon?

9              MR. McMAHON:  No, Your Honor.

10             THE COURT:  You may step down, thank you.

11             THE WITNESS:  Thank you.

12             (Witness excused.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1646

GOVERNMENT
EXHIBIT
7007
10 CR 147 (DLI)

```
1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - X
4    UNITED STATES OF AMERICA,  :

                                  10-CR-147
5
          -against-                United States Courthouse
6
                              :    Brooklyn, New York
7
     FRANCIS GUERRA,
8
                Defendant.
9                             :    June 25, 2012
                                   9:30 o'clock a.m.
10   - - - - - - - - - - - - - X
11   TRANSCRIPT OF TRIAL
     BEFORE THE HONORABLE SANDRA L. TOWNES
12   UNITED STATES DISTRICT JUDGE, and a jury
13   ATTORNEYS FOR GOVERNMENT:
     LORETTA E. LYNCH
14   UNITED STATES ATTORNEY
       BY:  NICOLE ARGENTIERI
15          ALLON LIFSHITZ
            RACHEL NASH
16   Assistant United States Attorney
     271 Cadman Plaza East
17   Brooklyn, New York 11201
18   ATTORNEY FOR DEFENDANT:
     GERALD McMAHON, ESQ.
19   MATHEW J. MARI, ESQ
20
21    Court Reporter:
     Marsha Diamond
22   225 Cadman Plaza East
     Brooklyn, New York
23   TEL: (718) 613-2489
     FAX: (718) 613-2369
24
        Proceedings recorded by mechanical stenography,
25   transcript produced by CAT.
                      MARSHA DIAMOND, CSR
                   OFFICIAL COURT REPORTER
```

Case 1:03-cr-00947-DLF Document 846-6 Filed 09/21/18 Page 1449 of 200 PageID #: 10975

1846

                                                    1846

9          THE WITNESS:  Jeffrey Young, J E F F R E Y,

10   Y O U N G.

11          THE COURT:  Thank you.

12   DIRECT EXAMINATION

13   BY MS. ARGENTIERI:

14   Q    Sir, what do you do for a living?

15   A    I'm a retired New York City detective.

16   Q    Prior to your current job, where were you employed?

17   A    Prior to my -- I was employed by the New York City Police

18   Department.

19   Q    What year did you join the New York City Police

20   Department?

21   A    In 1981.

22   Q    And what was your first assignment with the NYPD?

23   A    My first assignment was patrolman with the 77th Precinct.

24   Q    At some point, did you join the Crime Scene Unit?

25   A    Yes.

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

1847

1    Q    When was that?

2    A    That was in 1992.

3    Q    What were your duties and responsibilities as an officer

4    assigned to the Crime Scene Unit?

5    A    As a crime scene officer, I responded to homicides,

6    burglaries.  We would assist the detectives who needed the

7    crime scene to be processed.  By process, I mean taking

8    photographs, making sketches, if necessary, reflecting any

9    physical or ballistic evidence at the scene.

10   Q    Directing your attention to October 21st of 1993.

11        What was your assignment that day?

12   A    We were assigned -- my partner and I were assigned to

13   the -- to 106th Precinct garage to process two vehicles that

14   were involved in a homicide.

15   Q    As you sit here today, do you recall each and every

16   detail of the crime scene you processed on that day?

17   A    No.

18   Q    At the time that you processed the two vehicles, did you

19   document what you did?

20   A    Yes.

21   Q    In notes and for a report?

22   A    Yes, that's right.

23   Q    Were you careful to be fair and accurate?

24   A    Yes.

25        MS. ARGENTIERI:  Judge, may I approach?

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

1848

1    THE COURT:  Yes.

2  Q    I am showing the witness what's been marked as

3  3500 JY one, two and three.

4    What are those things, sir?

5  A    This is the crime scene report that I prepared along with

6  a document -- I'm sorry -- a diagram of the vehicles that were

7  involved.

8    THE COURT:  What exhibit is that?

9    THE WITNESS:  This is JY one, is the crime scene

10 report.

11    THE COURT:  Thank you.

12 Q    And your notes and the diagrams you did are marked as

13 what?

14 A    JY three.

15    MS. ARGENTIERI:  The government asks that the

16 witness be able to refer to these documents during his

17 testimony pursuant to 803(5).

18    THE COURT:  Any objection?

19    MR. McMAHON:  No, Judge.

20    THE COURT:  Your request is granted.

21 Q    Sir, do those documents indicate what the Crime Scene

22 Unit run number was?

23 A    Yes.

24 Q    What was it?

25 A    93-2943-A.

Victoria A. Torres Butler, CRR

Official Court Reporter

06 25 2012  maragni direct cross obondo miller lewis young

1849

1    Q    What were the two vehicles that you processed that day?

2    A    The two vehicles were a 1993 Nissan and a 1984 Buick.

3    Q    With regard to the Buick, what was the license plate

4    number?

5    A    Let's see.  The license plate number on the Buick was

6    RDW 146.

7    Q    Do you recall what color it was?

8    A    I believe it was brown.

9    Q    With regard to the Nissan, what was the license plate

10   number?

11   A    The license is X6W 283.

12   Q    What color was it, if you recall?

13   A    I believe that was a tan.

14   Q    When you arrived -- first of all, where did you process

15   the vehicles, can you describe the location to the jury?

16   A    It was in the garage of the 106th Precinct.

17   Q    When you arrived at the garage of the 106th Precinct,

18   what did you do first?

19   A    We verified the vehicle VIN numbers and license plate

20   numbers and then we proceeded to photograph the vehicles.

21   Q    On this day, did you -- were you able to match the VIN

22   numbers to the paperwork you received?

23   A    Yes.

24   Q    What did you do next?

25   A    Next I photographed the vehicles.

                    Victoria A. Torres Butler, CRR

                         Official Court Reporter

1850

1    Q    Prior to -- when you arrived, were the vehicles secured

2    in any way?

3    A    They were secured in the garage.

4         MS. ARGENTIERI:  Judge, may I approach?

5         THE COURT:  Yes.

6    Q    I am showing the witness what was previously provided to

7    defense counsel and marked for identification as

8    20-A through I.

9         Can you just look through those, sir?

10        (Pause.)

11        What are those?

12   A    Those are photographs of the Buick.

13   Q    Are they photographs you took?

14   A    Yes.

15   Q    How do you know that?

16   A    I have my stamp and initial on the back of the

17   photographs.

18        MS. ARGENTIERI:  The government moves to admit

19   20-A through I.

20        MR. McMAHON:  No objection.

21        THE COURT:  I will receive Government's 20-A

22   through I.

23        (Marked.)

24   Q    Now showing the witness 21-A through I for

25   identification.

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

1851

1    Can you look at those, sir?

2  A    Sure.

3    (Pause.)

4  Q    What are those?

5  A    Those are photographs of -- I took of the Nissan.

6  Q    How do you know they are photographs you took?

7  A    Also stamped on the back with my initials.

8    MS. ARGENTIERI:  The government moves to admit 21-A

9  through I.

10    MR. McMAHON:  No objection.

11    THE COURT:  All right.  Received.

12    (Marked.)

13    MS. ARGENTIERI:  Judge, may I publish certain of

14  these photos to the jury?

15    THE COURT:  Yes.

16  Q    Showing you 20-A in evidence.

17    What is that a photo of?

18  A    That's the photo of the Buick.

19  Q    And it is a front view?

20  A    Yes, front view.

21  Q    What if any damage can you see on the car in this photo?

22  A    There is damage to the driver's side rear window,

23  passenger -- I would say driver's side passenger rear window.

24  Q    To the driver's side window where I am indicating here?

25  A    That's correct.

Victoria A. Torres Butler, CRR

Official Court Reporter

06 25 2012  maragni direct cross obondo miller lewis young

1852

1    Q    And looking at Government Exhibit 20-B, does there appear

2    to be any damage to this side of the car?

3    A    No.

4    Q    I'm sorry.  I should just indicate I meant the passenger

5    side.

6          Government Exhibit 20-C in evidence, what does this

7    photo show?

8    A    This shows the back windshield of the Buick with damage

9    to the windshield.

10   Q    At the center of the photo?

11   A    That's correct.

12   Q    What if anything can you see about the rear driver's side

13   window?

14   A    The rear driver's side window is also broken.

15   Q    Showing you Government Exhibit 20-D in evidence.

16          What is this a view of?

17   A    This is a view of the driver's side interior of the

18   Buick.

19   Q    And what is this object in the middle between the seats?

20   A    That's a screwdriver.

21   Q    Looking at the side panel of the steering wheel, what

22   damage did you observe there?

23   A    The collar of the steering wheel is broken.

24   Q    What is that consistent with?

25   A    That's consistent most times with someone who wants to

Victoria A. Torres Butler, CRR

Official Court Reporter

06 25 2012  maragni direct cross obondo miller lewis young

1853

1  steal the vehicle.

2  Q    Just looking at the seat, was there anything unusual

3  about the seat?

4  A    Aside from the broken glass, the seat was pulled back as

5  far as it could go.

6  Q    The driver's seat?

7  A    The driver's seat.

8  Q    Showing you Government Exhibit 20-E.

9         Is that a view of the driver's seat?

10  A    That's correct.

11  Q    And what were you and your partner measuring here?

12  A    We were measuring the distance from the dash to the back

13  of the seat.

14  Q    Showing you Government Exhibit 20-F in evidence.

15         What is that a view of?

16  A    That's a view of the rear seat of the Buick.

17  Q    And what is this in the seat?

18  A    That's a broken glass CORRECTION.

19  Q    Did you also recover a quantity of ballistics evidence in

20  this car?

21  A    Yes, that's correct.

22         (Continued on next page.)

23

24

25

                    Victoria A. Torres Butler, CRR

                       Official Court Reporter

Case 1:09-cr-00473-LF Document 346 Filed 06/21/18 Page 152 of 206 PageID #:10983

1854

1  BY MS. ARGENTIERI:  (Continued)

2  Q    And do you recall what type of ballistics evidence you

3  recovered from the car?

4  A    They were discharged shells.

5  Q    And have you reviewed a report recently?

6  A    Yes.

7  Q    Do you recall where those shell casings were recovered in

8  the car?

9  A    A number of the shells were recovered on the seat and on

10  the back panel of the windshield.

11  Q    That would be somewhere like up here (indicating)?

12  A    Yes.

13        MS. ARGENTIERI:  Showing you Government's

14  Exhibit 20-G in evidence.

15        (The above-referred to Exhibit was published to the

16  jury.)

17  Q    Is that some of the shells?

18  A    Yes, that's correct.

19        MS. ARGENTIERI:  Showing you Government's

20  Exhibit 20-H in evidence.

21        (The above-referred to Exhibit was published to the

22  jury.)

23  Q    Does that show the floor?

24  A    Yes.

25  Q    And what can you see in that picture?

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

Case 1:92-cr-00351-LEK Document 1869-6 Filed 08/19/21 Page 582 of 635 PageID #: 4889
Case 1:09-cr-00947-DLF Document 346-8 Filed 09/21/18 Page 1539 of 206 PageID # 20584

1855

1       THE COURT:  And what part of the floor?

2    Q    What part of the vehicle's floor?

3    A    That's the passenger side rear floor of the vehicle.

4       THE COURT:  Thank you.

5    Q    And I'm sorry, what can you see in that photo?

6    A    Broken glass and ballistics evidence, discharged shells.

7    Q    Those are all photos of the Buick; is that correct?

8    A    Yes, that's correct.

9       MS. ARGENTIERI:  Showing you Government's

10   Exhibit 21-A in evidence.

11       (The above-referred to Exhibit was published to the

12   jury.)

13   Q    What is that a photo of?

14   A    That's a photo front view of the Nissan.

15       MS. ARGENTIERI:  Showing you Government's

16   Exhibit 21-B.

17       (The above-referred to Exhibit was published to the

18   jury.)

19   Q    What does this photo show?

20   A    That's showing the front view of the windshield of the

21   Nissan.

22   Q    And is there damage indicated in this photo?

23   A    Yes, ballistics damage to the windshield.

24   Q    Are you referring to these bullet holes here

25   (indicating)?

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

1   A    Yes.

2   Q    And what ballistics evidence did you recover, generally,

3   in the Nissan?

4   A    Recovered, I would say, fragmented bullets and copper

5   jacketing.

6        MS. ARGENTIERI:  Showing you Government's

7   Exhibit 21-C.

8        (The above-referred to Exhibit was published to the

9   jury.)

10  Q    What does that show?

11  A    That's the driver's side window.  And it's broken.

12       MS. ARGENTIERI:  Showing you Government's

13  Exhibit 21-D.

14       (The above-referred to Exhibit was published to the

15  jury.)

16  Q    Can you see any ballistics damage in this photo?

17  A    Yes, there's ballistics damage around the door jamb of

18  the driver's side of the vehicle.

19  Q    Is that here, the top of the door (indicating)?

20  A    Yes.

21  Q    And then also over here (indicating)?

22  A    Yes, that's correct.

23       MS. ARGENTIERI:  Showing you Government's

24  Exhibit 21-E in evidence.

25       (The above-referred to Exhibit was published to the

                    Victoria A. Torres Butler, CRR

                       Official Court Reporter

1857

1    jury.)

2    Q    What view of the Nissan is that?

3    A    That's the passenger side and rear view, rear of the

4    vehicle.

5    Q    And what ballistics damage, if any, did you observe?

6    A    That's broken glass, and the back windshield is broken.

7            MS. ARGENTIERI:  Showing you Government's

8    Exhibit 21-I.

9            (The above-referred to Exhibit was published to the

10   jury.)

11   Q    What is that a view of?

12   A    That's the rear seat of the Nissan.

13   Q    And what can you see in this photo?

14   A    There's broken glass on the seat.

15   Q    And does it look like there are other items back there as

16   well?

17   A    There are fragments of ballistics evidence on the seat.

18   Q    You said bullet fragments?

19   A    Yes.

20   Q    Did you collect any ballistics evidence from either of

21   these two vehicles?

22   A    Yes.

23           MS. ARGENTIERI:  Showing you Government's

24   Exhibit 12-C in evidence, which con stains a series of

25   envelopes marked Y-1 through Y-6.

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

1858

1    (The above-referred to Exhibit was published to the

2  jury.)

3  Q    Who filled out these envelopes, sir?

4  A    I did.

5  Q    And how do you know that?

6  A    My name and the Y-1 through Y-6 on the envelopes.

7  Q    And what does that Y stand for?

8  A    Y is the last letter -- I'm sorry, first letter in my

9  last name, Young.

10  Q    And is this your handwriting, sir?

11  A    Yes.

12  Q    And where did you recover this evidence; can you tell

13  from the markings on the outside of the envelope?

14  A    This evidence was recovered from the Nissan.

15  Q    And looking first, for example, at Y-1.  What did you

16  indicate Y-1 contained?

17  A    The deformed copper-jacketed bullet.

18  Q    And where did you indicate within the Nissan you

19  recovered this?

20  A    That would be BHE-14.

21  Q    Does that stand for bullet hole entry?

22  A    That's correct.

23  Q    And in your report, did you document where on the Nissan

24  that was, for example?

25  A    Yes.

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

```
 1    Q     And where was that location?

 2              THE WITNESS:  Can I look at my notes, Your Honor?

 3              THE COURT:  Yes, if you need to refer to your

 4    report, you may.

 5              THE WITNESS:  Thank you.

 6              (Pause in the proceedings.)

 7    A     14 was on the top of the door jamb, on the driver's side.

 8    Q     And just as an example, is this what the item looked

 9    like (showing) --

10    A     Yes.

11    Q     -- that you recovered?

12    A     Yes.

13    Q     And how did you extract it from the door?

14    A     With pliers.

15    Q     And the rest of this evidence was also recovered from the

16    Nissan?

17    A     That's correct.

18    Q     And looking at it, does it all appear to be bullets or

19    bullet fragments?

20    A     Yes, that's correct.

21    Q     And you testified that you also recovered some ballistics

22    evidence from the Buick?

23    A     Yes.

24              MS. ARGENTIERI:  Looking at 14-A-1 in evidence,

25    which contains envelopes marked 22, 23, 24, 25, 26, 28, and
```

1860

1   29.

2            (The above-referred to Exhibit was published to the

3   jury.)

4   Q     Are those envelopes you prepared, sir?

5   A     Yes, that's correct.

6   Q     And where does it indicate that these, that this

7   ballistics evidence was found?

8   A     This is recovered from the Buick.

9   Q     And just looking at it, your description of the evidence

10  contained in these envelopes is what?

11  A     .9-millimeter discharged shells.

12  Q     And just opening the envelope marked Y-23, is that what

13  it looked like (showing)?

14  A     Yes, that's correct.

15  Q     And can you tell from where in the Buick Y-22 through

16  Y-26 were recovered, based on your report?

17  A     Based on my report, the -- I'm sorry, the numbers again?

18  Q     Y-22 through Y-26.

19  A     That was recovered from the top of the rear deck of the

20  car, the back seat.

21  Q     When you say top of the rear deck of the car, can you

22  just describe to the jury what you're talking about?

23  A     Just the area of the back windshield where the speakers

24  might be.

25            MS. ARGENTIERI:  Showing you next 14-A-2 in

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

06 25 2012  maragni direct cross obondo miller lewis young

1861

1    evidence.  This contains items marked Y-7 through Y-12, and

2    Y-27.

3            (The above-referred to Exhibits were published to

4    the jury.)

5    Q    Are those, again, envelopes you filled out?

6    A    Yes, that's correct.

7    Q    And where was this ballistics evidence recovered from?

8    Which car?

9    A    This was also recovered from the Buick.

10   Q    And again, what type of evidence was this, generally?

11   A    These are discharged shells, .9-millimeter discharged

12   shells.

13   Q    And with regard to the envelopes marked Y-7 through Y-12,

14   looking at your report, can you determine from what part of

15   the Buick you recovered these items?

16   A    Yes, this was recovered in a bunch or cluster in the

17   right rear seat.

18   Q    And with regard to Y-27?

19   A    Y-27 was also recovered on the top deck of the back, near

20   the back windshield.

21           MS. ARGENTIERI:  This is 14-A-3 in evidence.  It

22   contains envelopes Y 13 through 21.

23           (The above-referred to Exhibit was published to the

24   jury.)

25   Q    Are those, again, envelopes that you filled out?

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

1862

1    A    Yes.

2    Q    And again, what category of evidence was recovered in

3    these envelopes?

4    A    These were .9-millimeter discharged shells from the

5    Buick.

6    Q    And with regard to 13 through 15, where were these

7    recovered from within the Buick?

8    A    These were also recovered on top of the right rear seat.

9    Q    And what about 16 and 17?

10   A    16 and 17 were also on the left rear seat, top of left

11   rear seat.

12   Q    And then, with regard to 18 through 21, where were they

13   recovered in the Buick?

14   A    They were recovered on the left rear passenger floor.

15   Q    So, where was the majority of the ballistics evidence

16   recovered from in the Buick?

17   A    On, in the rear, rear seat and rear floor.

18        MS. ARGENTIERI:  I'm sorry, there's just one more

19   envelope.  Government's Exhibit 14-B in evidence.  There are

20   envelopes marked Y 30, 31, and 32.

21        (The above-referred to Exhibits were published to

22   the jury.)

23   Q    Are those envelopes that you filled out?

24   A    Yes, that's correct.

25   Q    And where were they recovered from?

Victoria A. Torres Butler, CRR

Official Court Reporter

06 25 2012  maragni direct cross obondo miller lewis young

1863

```
1    A    They were recovered from the Buick.

2    Q    And what type of evidence was this?

3    A    This was also discharged shells.  .9-millimeter

4    discharged shells.

5    Q    Do you recall vouchering any other evidence on the Buick?

6    A    There was also a ski mask recovered.

7              MS. ARGENTIERI:  Judge, may I approach?

8              THE COURT:  Yes, you may.

9              MS. ARGENTIERI:  I'm showing the witness what's

10   marked as Government's Exhibit 15 for identification.

11             (Handing.)

12   Q    What is that?

13   A    This is the ski mask that was recovered.

14             May I take it out?

15   Q    Yes.  How do you know it's the key mask you recovered?

16   A    My initials are on the bottom.

17             MS. ARGENTIERI:  I move to admit Government's

18   Exhibit 15.

19             THE COURT:  Any objection?

20             MR. McMAHON:  No objection.

21             THE COURT:  Received.

22             (Government's Exhibit 15 was received in evidence.)

23             (The above-referred to Exhibit was published to the

24   jury.)

25             MS. ARGENTIERI:  Can I ask the witness just to hold
```

                      Victoria A. Torres Butler, CRR

                          Official Court Reporter

1864

1    it up for the jury, Judge.

2            THE COURT:  Yes.  And this is 15?

3            MS. ARGENTIERI:  Yes, 15.

4            (Showing.)

5    Q    And where was that recovered in the Buick?

6    A    That was recovered on top of the left rear seat of the

7    Buick.

8            MS. ARGENTIERI:  Nothing further, Judge.

9            THE COURT:  Cross-examination?

10           MR. McMAHON:  Nothing, Judge.

11           THE COURT:  You may step down, thank you.

12           THE WITNESS:  Thank you.

13           (Witness excused.)

14

15

16

17

18

19

20

21

22

23

24

25

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

```
                                                          ┌──────────────────────┐
                                                          │    GOVERNMENT        │
                                                          │     EXHIBIT          │
  1  UNITED STATES DISTRICT COURT                         │     7008             │
     EASTERN DISTRICT OF NEW YORK                         │  10 CR 147 (DLI)     │
  2  ------------------------------x                      └──────────────────────┘
     UNITED STATES OF AMERICA     :
  3                  PLAINTIFF,   :     10CR147
                                  :
  4         versus                :     United States Courthouse
                                  :     225 Cadman Plaza East
  5                               :     Brooklyn, N.Y.  11201
     FRANK GUERRA,                :
  6                               :     June 19, 2012
                  DEFENDANT.      :     9:30 A.M.
  7  ------------------------------x

  8
                         TRANSCRIPT OF JURY TRIAL
  9           BEFORE THE HONORABLE SANDRA L. TOWNES
                UNITED STATES DISTRICT COURT JUDGE
 10

 11  A P P E A R A N C E S :
     For the Government:
 12
     LORETTA LYNCH
 13  United States Attorney
     BY: NICOLE ARGENTIERI, ESQ.
 14  RACHEL NASH, ESQ.
     ALLON LIFSHITZ, ESQ.
 15  Assistant United States Attorney
     271 Cadman Plaza East
 16  Brooklyn, New York  11201

 17

 18  For the Defendant:

 19  GERALD J. MCMAHON, ESQ.
     MATHEW J. MARI, ESQ.
 20  Court Reporter:
     Charisse Kitt, CRI, CSR, RPR, FCRR
 21  225 Cadman Plaza East Rm N357
     Brooklyn, New York  11201
 22  Tel: (718) 613-2606
     Fax: (718) 613-2696
 23

 24

 25  Proceedings recorded by mechanical stenography, transcription
     by computer-aided transcription.
```

Proceedings

5                          **MATTHEW TORMEY,**

6    called as a witness, having been duly sworn, was examined and

7    testified as follows:

8              THE CLERK:  Please state and spell your name for the

9    record.

10             THE WITNESS:  Matthew Tormey.  M-a-t-t-h-e-w,

11   T-o-r-m-e-y.

12             MS. NASH:  May I inquire, Judge?

13             THE COURT:  Yes, you may.

14   DIRECT EXAMINATION

15   BY MS. NASH:

16   Q    Good morning.  Were you previously employed by the

17   Federal Bureau of Investigations?

18   A    Yes, I was.

19   Q    How long did you work for the FBI?

20   A    From 1991 through 1999.

21   Q    What was your title at the FBI?

22   A    Special agent.

23   Q    What squad did you work on when you first joined the FBI?

24   A    I did background investigations.

25   Q    Where did you go from there?

```
 1   A     I went to a squad called C31 which was in the violent
 2   crimes program.
 3   Q     During what time period were you on Squad C31?
 4   A     Approximately 1993 through 1999.
 5   Q     What types of crimes did C31 investigate?
 6   A     We investigated a variety of violent crimes, including
 7   murder, drugs, truck highjackings, robberies.
 8   Q     Drawing your attention to the time period between 1995
 9   and 1999, what specifically are some of the crimes and
10   individuals you were investigating?
11   A     I was investigating a group of individuals that consisted
12   of an individual named John Pappa, Calvin Hennigar,
13   Frank Guerra, Anthony Russo, and others, relating to the
14   murder of -- the murders of --
15              MR. McMAHON:  Objection.
16              THE COURT:  Basis?
17              MR. McMAHON:  Judge, what his -- what his
18   investigatory process was is not relevant to the proceeding.
19              THE COURT:  No.  Overruled.
20   A     We were investigating the murder of -- murders --
21   murders, drug dealing, bank robberies, among some other
22   things.
23   Q     What were some of the murders you were investigating
24   during that time period?
25   A     Eric Curcio, Joseph Scopo, Rolando Rivera.
```

Tormey — Direct/Nash

1   Q    Did your duties while you were on C31 include conducting

2   surveillance?

3   A    Yes.

4   Q    Directing your attention to April 24th of 1998, were you

5   conducting surveillance that day?

6   A    Yes.

7   Q    Have you testified on previous occasions about

8   surveillance that you conducted on that day?

9   A    Yes.

10  Q    Have you reviewed that testimony to help refresh your

11  recollection about the surveillance you conducted?

12  A    Yes, I did.

13  Q    Did it, in fact, help refresh your recollection as to

14  what you observed on April 24th of 1998?

15  A    Yes, it did.

16  Q    In what area were you conducting surveillance on that

17  day?

18  A    Eleventh Avenue in Brooklyn.

19  Q    What is located at 11th Avenue in Brooklyn in 1998?

20  A    Romantique Limousines.

21       MS. NASH:  May I approach, Your Honor?

22       THE COURT:  Yes, you may.

23  Q    First I'm showing you Government Exhibit 214A and 214B.

24       Do you recognize those photographs?

25  A    Yes, I do.

1    Q    Do they accurately depict your observations on April 24,

2    1998?

3    A    Yes, they do.

4              MS. NASH:  Government moves to admit 214A and B.

5              MR. McMAHON:  Judge, may I see them?

6              THE COURT:  Yes.

7              MR. McMAHON:  No objection.

8              THE COURT:  All right, I will receive Government

9    Exhibits 214A and 214B.

10             (Government's Exhibits 214A and 214B received in

11   evidence.)

12   Q    I'm showing you now Government Exhibit 214.  Are those

13   fair and accurate enlargements of Government Exhibits 214A and

14   –B?

15   A    Yes, they are.

16             MS. NASH:  The government moves to admit 214.

17             MR. McMAHON:  No objection.

18             THE COURT:  Received, 214.

19             (Government's Exhibit 214 received in evidence.)

20             MS. NASH:  May the witness step down, Your Honor?

21             THE COURT:  Yes.

22             MS. NASH:  Can you step down, sir.

23             (Witness complies.)

24   Q    Starting with the picture on the left-hand side of the

25   board, can you indicate the individuals in the picture?

Tormey – Direct/Nash

1    THE COURT:  Wait.  The picture on the left-hand side

2    of the board is what?

3    MS. NASH:  That is an enlargement of Exhibit 214A.

4    THE COURT:  Thank you.

5    A    The individual in the light colored shirt with the light

6    colored cup to his mouth is Allie Boy; and the individual next

7    to him in the darker -- it looks like a blue jean jacket and

8    hat is BF.

9    Q    What are the full names of those individuals?

10   A    Alphonse Persico and Frank Guerra.

11   Q    Could you put a sticker underneath the individual who you

12   identified as Alphonse Persico or Allie Boy.

13       (Witness complies.)

14   Q    And can you also put a sticker indicating the individual

15   you identified as BF Frank Guerra.

16       (Witness complies.)

17   Q    And similarly looking at the right-hand side picture,

18   which is Government Exhibit 214B or I should say an

19   enlargement of Government Exhibit 214B, can you identify the

20   individuals in the picture for the jury.

21   A    The individual with the light colored shirt is Allie Boy

22   and the individual in the jean jacket is BF.

23   Q    And once again, could you put a sticker indicating the

24   individual who is Alphonse Persico or Allie Boy.

25       (Continued on the next page.)

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Case 1:03-cr-00351-FK Document 1860-6 Filed 09/19/21 Page 598 of 625 PageID: #: 4905
Case 1:10-cr-00147-DLF Document 846-4 Filed 09/21/18 Page 598 of 208 PageID #:9080

1004

Tormey – Direct/Nash

1  Q    And can you do the same for Frank Guerra.

2        (Witness complies.)

3  Q    Thanks.  You can take your seat.

4        (Witness complies.)

5  Q    Directing your attention now to October 27, 1994; were

6  you working that day?

7  A    Yes.

8  Q    And in connection -- On that day were you also conducting

9  surveillance?

10 A    Yes, I was.

11 Q    In connection -- in connection with your observations on

12 October 27, 1994, did you prepare reports?

13 A    Yes, I did.

14 Q    Would those reports help refresh your recollection as to

15 what you observed and what you did?

16 A    Yes.

17       MS. NASH:  May I approach?

18       THE COURT:  Yes, you may.

19 Q    I'm showing you 3500MT28, 29, and 30.  Can you look at

20 those and tell me if those are the reports that you prepared

21 in connection with your work on October 27, 1994.

22       (Witness perusing.)

23 A    Yes, October 27th, 28th, and 31st [sic] of 1994.

24       THE COURT:  That's 28, 29, and 30?

25       THE WITNESS:  I'm sorry, October 27th --

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

1     THE COURT:  No, the exhibit.

2     THE WITNESS:  Yes, 28, 29, and 30.

3     THE COURT:  Thank you.

4  Q    On October 27, 1994, where were you conducting

5  surveillance?

6  A    Seventh Avenue and 23rd Street in Brooklyn.

7  Q    What did you observe that day?

8  A    We were sitting on a U-Haul truck and we observed two

9  individuals go to the back of the truck remove a box, take it

10 to an apartment, return to the truck, take two more boxes out,

11 and then we approached them.

12 Q    What happened after that?

13 A    With regard –– What did we do after that?

14 Q    What, if anything, did you do with regard to the U-Haul

15 truck?

16 A    We looked in the rear of the U-Haul truck to see what the

17 contents of the truck were.  We also looked in the cabin to

18 see the contents of the cabin.

19 Q    What did you find in the U-Haul truck?

20 A    There was a load of hand-held games.

21 Q    What do you mean by load?

22 A    The truck was full with hand-held video games.

23 Q    What, if anything, else did you find in the truck?

24 A    We found a lease agreement for the rental of the truck.

25     MS. NASH:  May I approach, Your Honor?

Case 1:09-cr-00351-ELK Document 1869-6 Filed 09/19/21 Page 600 of 635 PageID #: 4907
Case 1:10-cr-00147-DLF Document 846-4 Filed 09/21/18 Page 171 of 200 PageID #: 10362
1006
Tormey - Direct/Nash

1          THE COURT:  Yes.

2  Q    Showing you first Exhibit 864.  Do you recognize that

3  document?

4  A    Yes, I do.

5  Q    What is that?

6  A    This is the copy of the lease agreement that was found in

7  the truck.

8  Q    The government moves to admit 864?

9         MR. McMAHON:  No objection.

10        THE COURT:  Received.

11        (Government's Exhibit 864 received in evidence.)

12  Q    I'm showing you now a series of photographs marked 865.

13  Do you recognize those?

14        THE COURT:  The series is marked 865?

15        MS. NASH:  Yes, Judge.  I can mark them 865A through

16  -E, if you'd prefer?

17        THE COURT:  Yes, I would.

18  A    Yes, I do.

19  Q    Are those -- what are they?  What are those photographs?

20  A    The first one which depicts --

21  Q    Just describe it, yes, since I haven't moved them in.

22  A    The first one is a picture looking into the rear of the

23  truck and it depicts the boxes in the back of the truck.

24  Q    Are the remaining pictures accurate photographs of what

25  you observed inside the truck?

Case 1:02-cr-00351-FK   Document 1869-6   Filed 09/19/21   Page 601 of 635 PageID #:
Case 1:18-cr-00147-DLF   Document 846-4   Filed 09/21/18   Page 172 of 208 PageID #:10603
#: 4908
1007

Tormey – Direct/Nash

1  A    And inside the boxes, correct.

2         MS. NASH:  Government moves to admit 865A through

3  -E.

4         MR. McMAHON:  No objection.

5         THE COURT:  All right, I'll receive 865A, -B, -C,

6  -D, and -E.

7         (Government's Exhibits 865A through 865E received in

8  evidence.)

9  Q    Showing you first Government Exhibit 864; can you see

10 that on your screen?

11 A    Yes, I can.

12 Q    Can you indicate the name in which this agreement is in?

13 A    Anthony Russo.

14 Q    And can you indicate the date of the agreement?

15 A    October 26, 1994.

16 Q    In connection with this investigation, did you interview

17 Anthony Russo?

18 A    I did.

19 Q    What year was he born in?

20 A    It was 1939.  I don't see it on here.

21 Q    I'm showing you Exhibit 865, which we will mark as 865A;

22 it's the first page of the photographs you reviewed.

23         What does that depict?

24 A    That's a view into the back of the truck that we were

25 surveilling that morning.

Tormey - Direct/Nash

```
 1    Q    Continuation of 865 which we will mark 865B.

 2    A    This is a close --

 3    Q    What does that depict?

 4    A    This is a closeup of some of the boxes that were in the

 5    truck.

 6    Q    And can you read the names of the -- or what is indicated

 7    on the boxes?

 8    A    Mortal Combat, The Lion King, Mighty Morphin Power

 9    Rangers.

10    Q    Third page of 865 through label 865C.

11    A    That's a picture of a Mortal Combat game.

12    Q    865D?

13    A    Picture of the Power Rangers game.

14    Q    And 865E?

15    A    Picture of Lion King Game.

16    Q    Do you know approximately how many cases of video games

17    were in this U-Haul truck?

18    A    Approximately 570.

19    Q    About how many games are in each case?

20    A    Twenty-four.

21    Q    What, if anything, did you discover about the U-Haul

22    truck?

23    A    It had been reported stolen by Mr. Russo.

24    Q    In connection with the investigation that you were

25    conducting between 1995 and 1999, that you have testified
```

Case 1:03-cr-00351-FK   Document 1869-6   Filed 09/19/21   Page 603 of 635 PageID #: 4910
Case 1:10-cr-00147-DLF   Document 546-4   Filed 09/21/18   Page 174 of 206 PageID #:9085
1009

Tormey - Direct/Nash

1   about earlier, what, if any, court orders did you obtain in

2   1998?

3   A    We obtained a court order for blood samples from some of

4   the -- from some of the individuals we were investigating.

5   Q    Who are some of the individuals that you obtained a court

6   order for blood samples for?

7   A    John Pappa, Anthony Russo, Frank Guerra.

8           MS. NASH:  Thank you.  May I have a moment?

9           THE COURT:  Yes.

10          (Pause.)

11          MS. NASH:  No further questions.  Thank you.

12          THE COURT:  Cross-examination.

13          MR. McMAHON:  Yes.

14   CROSS-EXAMINATION

15   BY MR. McMAHON:

16   Q    Former Agent Tormey, what do you do now for a living?

17   A    I'm a compliance officer.

18   Q    What company?

19   A    Pardon me?

20   Q    For a corporation?

21   A    Yes, correct.

22   Q    Now, you said that part of your job was doing

23   surveillances.  Is that correct, sir?

24   A    Correct.

25   Q    And when you do a surveillance, is it generally a two-man

```
 1  team? one-man team? how did you do that?
 2  A    It varies.  There are teams; usually at least two people.
 3  It could be a team of multiple people.
 4  Q    And one person would likely have a camera and the other
 5  one would be making notes.  Is that correct, sir?
 6  A    Possibly.
 7  Q    Now, C31 investigated, I guess, activities of some
 8  organized crime, Colombo family.  Was that part of C31's
 9  jurisdiction, shall we say?
10  A    It -- it could.  It wasn't technically.  We investigated
11  violent crimes.
12  Q    Okay.
13        Now, Johnny Pappa was pretty much a homicidal
14  maniac?
15        MS. NASH:  Objection.
16        THE COURT:  Yes, sustained.
17  Q    Was John Pappa the focus of your investigation for many
18  years?
19  A    Yes.
20  Q    He killed a lot of people?
21  A    He killed people.
22  Q    More than five?
23  A    He was convicted of --
24  Q    I didn't ask what he was convicted of.  You told us who
25  you investigated and everything.
```

Case 1:02-cr-00051-FK Document 1869-6 Filed 09/19/21 Page 605 of 635 PageID
Case 1:10-cr-00147-DLF Document 646-4 Filed 09/21/16 Page 176 of 206 PageID #: 10607
#: 4912
1011

Tormey – Cross/McMahon

1  A    Right.

2  Q    Did he kill more than five people?

3  A    We were investigating multiple homicides.  I don't recall

4  the specific number.

5  Q    Okay.

6        Now, you did a lot of surveillances in your career

7  as an agent?

8  A    Yes.

9  Q    And you took a lot of pictures?

10 A    Again, I'm not sure what you mean by "a lot."  I took

11 pictures on my surveillances, yes.

12 Q    Well, I'm talking about your surveillances.  Did you take

13 pictures?

14 A    I took pictures during surveillances, yes.

15 Q    Do you have a problem with the word "lot"?

16       MS. NASH:  Objection.

17 Q    I want to know how many pictures did you take in your

18 career.  Did you take more than 50 pictures in your career?

19 A    I don't recall specifically.

20 Q    As you sit here today you don't know if you took

21 thousands or 2,000 pictures?

22       MS. NASH:  Objection.

23       THE COURT:  No, overruled.

24 A    Correct.

25 Q    But you took lots of pictures?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Case 1:02-cr-00351-FK   Document 1860-6   Filed 09/19/21   Page 606 of 635 PageID
Case 1:10-cr-00147-DLF   Document 846-4   Filed 09/21/18   Page 17 of 200 PageID #: 8008
#: 4913                                                    1012
                    Tormey – Cross/McMahon

1   A    I took lots of pictures during surveillances yes.

2   Q    And these were the only two that you could find

3   Frank Guerra in?

4             MS. NASH:  Objection.

5             THE COURT:  No, overruled.

6   A    I didn't look for pictures.

7   Q    So you were just basically handed these to identify?

8   A    Correct.

9   Q    Now, do you know whether or not you did a surveillance

10  leading to these pictures.  Is that correct, sir?

11  A    Correct.

12  Q    Now, did you continue surveillance and follow them to

13  Allie Boy Persico's boat?

14  A    No.

15  Q    Where did they go after this picture?

16  A    They headed into Staten Island.

17  Q    Okay.

18           Now, did you see whether or not on one of these

19  occasions they were researching or checking out locations for

20  a bagel store on Staten Island?

21  A    I don't have any idea.

22  Q    Did you see them go into locations at strip malls that

23  had stores in them?

24  A    We followed them from Romantique until they went over the

25  Verrazano Bridge and they were gone.

Tormey - Cross/McMahon

1 Q    Now, you said on direct examination that you were

2 investigating John Pappa, Calvin Hennigar, Frank Guerra, and

3 Anthony Russo.  Is that who you said you were investigating

4 between 9 '5 and '99?

5 A    Among others, correct.

6 Q    Among others were Dino Basciano?

7 A    Dino Basciano had been arrested prior to that.

8 Q    Okay.  Frank Iborti?

9 A    Who?

10 Q    Frank -- Joseph Iborti?

11 A    He had been arrested prior to that.

12 Q    Well, he was arrested in December of '94?

13 A    Correct.

14 Q    And you spent a lot of time with Joseph Iborti?

15 A    I spent time with Joseph Iborti, yes.

16 Q    And you investigated crimes that Joseph Iborti committed,

17 did you not?

18 A    I didn't investigate Joseph Iborti.

19 Q    Did you investigate crimes -- some of the crimes he

20 committed?

21 A    Joseph Iborti provided --

22 Q    It's a yes or no answer, sir.

23      Did you investigate some of the crimes that Joseph

24 Iborti committed?

25 A    Yes.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Case 1:02-cr-00351-EK Document 869-6 Filed 09/19/21 Page 608 of 635 PageID #: 4915
Case 1:10-cr-00147-DLF Document 846-4 Filed 09/21/18 Page 1799 of 208 PageID #90010
1014

Tormey – Cross/McMahon

1 Q    Now, you were also investigating John Sparacino?

2 A    Correct.

3 Q    Sal Sparacino?

4 A    Correct.

5 Q    Eric Curcio?

6 A    Correct.

7 Q    Rolando Rivera?

8 A    Murder of Rolando Rivera.

9 Q    So is there some reason -- well, withdrawn.

10         Now, you took -- you got a court order for DNA and

11 blood samples of Mr. Guerra in 1998.  Is that correct, sir?

12 A    Correct.

13 Q    And he voluntarily complied with your request and

14 provided that information?

15 A    To my recollection, yes.

16 Q    And he was not arrested as a result of providing that

17 scientific evidence?

18 A    Correct.

19 Q    Now, you testified in the grand jury that Curcio and

20 Pappa shot Joe Scopo.  Is that correct, sir?

21         MS. NASH:  Objection:  Outside the scope.

22         THE COURT:  Overruled.

23 A    John Pappa shot Joe Scopo, is what I recall.

24 Q    All right.

25         Directing your attention to 3500MT23, page 19.  If I

Case 1:03-cr-00351-FK   Document 869-6   Filed 09/19/21   Page 609 of 635 PageID #: 4916
Case 1:10-cr-00147-DLF   Document 646-4   Filed 09/21/18   Page 609 of 635 PageID #:10011
1015

Tormey – Cross/McMahon

1    may approach.

2             (Handing.)

3    Q    Take a look at page 19 of that testimony and see if that

4    refreshes your recollection.

5             (Witness perusing.)

6    A    Okay.

7    Q    Does that refresh your recollection, sir, that you

8    testified under oath in the grand jury that Johnny Pappa and

9    Eric Curcio got out of the car and shot Joe Scopo on

10   October 23, 1993?

11   A    That's not accurate.

12   Q    I didn't ask you if that's accurate.  I asked you did you

13   testify under oath in the grand jury on that day?

14   A    I testified under oath in the grand jury that day that

15   Pappa and Curcio got out of the vehicle and Scopo was shot and

16   killed.

17   Q    And did you certainly mean to suggest to the grand jury

18   that day that Curcio and Pappa shot Scopo?

19   A    No, Pappa shot Scopo.

20   Q    But standing next to him getting out of the car with him

21   was Eric Curcio.  Is that correct, sir?

22   A    Correct.

23   Q    Not John Sparacino?

24   A    I'm not sure what you're asking me.

25   Q    Okay.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Tormey - Cross/McMahon

1    But that was your testimony in October, what was

2  that, 1996, or '4?

3  A    That is a piece of my testimony.

4  Q    Well, you have the first page of your testimony.  Does

5  that refresh your recollection as to the date of your

6  testimony?

7  A    I'm sorry.  When I say it was a piece of my testimony, it

8  was several hours of testimony.  This is a page of the

9  testimony, correct.

10  Q    I understand.  But you do try to be truthful on each and

11  every sentence you say in the grand jury?

12  A    Absolutely.

13  Q    You don't just sort of give several hours and then maybe

14  have a sentence or two?

15        MS. NASH:  Objection.

16        THE COURT:  Yes.  You know, there are -- first of

17  all, there isn't any indication that he lied.

18        MR. McMAHON:  I'm not saying he lying, Judge.  What

19  I'm saying is maybe he's mistaken; maybe he's truthful.

20  Q    Did you testify under oath in the grand jury that

21  Eric Curcio and John Pappa got out and Pappa shot Scopo?

22  A    I testified that, yes, Pappa and Curcio got out of the

23  car and Scopo was shot.

24  Q    Okay.

25        Now, when you go into the grand jury to testify,

Case 1:02-cr-00351-FK  Document 1860-6  Filed 09/19/21  Page 611 of 635 PageID #: 4918
Case 1:16-cr-00247-DLF  Document 840-4  Filed 09/21/18  Page 611 of 635 PageID #:10013
1017

Tormey – Cross/McMahon

1    it's like anywhere from 15 to 23 people that are there.  Is

2    that correct, sir?

3    A     Yes.

4    Q     Civilian people?

5    A     Yes.

6    Q     You raised your right hand swear to tell the truth?

7    A     Yes.

8    Q     And you were absolutely truthful to the best of your

9    recollection, to the best of your knowledge.  Is that correct,

10   sir?

11   A     Yes.

12   Q     That's what you said in the grand jury on October --

13   October 10, 1996.  Is that correct, sir?

14   A     If that's the date there, yes.

15   Q     Okay.

16         Now, you also told the grand jury that the order to

17   kill Scopo came from Jo Jo Russo and Joe Monte.  Is that

18   correct, sir?

19   A     I don't specifically recall.

20   Q     Let me refresh your recollection.

21         3500MT25, this would be pages 20 and 21.

22         MR. McMAHON:  May I approach the witness, Your

23   Honor?

24         THE COURT:  Yes, you may.

25   Q     Bottom of page 20, top of page 21.

Case 1:03-cr-00551-FK Document 1069-6 Filed 09/19/21 Page 613 of 635 PageID #: 4919
Case 1:10-cr-00147-DLF Document 346-4 Filed 09/21/18 Page 1033 of 208 PageID #: 60014
1018

Tormey – Cross/McMahon

1  (Witness perusing.)

2  Q   Does that refresh your recollection, sir, that you

3  testified in the grand jury on that occasion under oath that

4  the order to kill Scopo came from Jo Jo Russo and Joe Monte?

5  A   I testified that I was told by a cooperator that another

6  individual had received the authorization from Joe Monte and

7  Jo Jo Russo, correct.

8  Q   And the person they were talking about killing was

9  Joe Scopo.  Is that correct, sir?

10  A   Correct.

11  Q   Now, on that same grand jury appearance, sir, and I would

12  refresh your recollection perhaps to December 9, 1997, did you

13  also make it clear at that grand jury appearance that they --

14  that they, Pappa and Curcio, killed -- they shot Scopo

15  referring to Pappa and Curcio?

16  A   I don't recall.

17  Q   All right.

18       MR. McMAHON:  If I may approach, Your Honor.

19  Q   Page 19, and I'll hand you the cover page so you can see

20  the date.

21       (Witness perusing.)

22  A   I testified that --

23  Q   Yes or no, sir?

24  A   What's the question?

25  Q   You're an attorney, are you not, Mr. Tormey?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Case 1:03-cr-00351-EK   Document 1060-6   Filed 09/19/21   Page 613 of 635 PageID
#: 4920
Case 1:10-cr-00147-DLF   Document 646-4   Filed 09/21/18   Page 164 of 208 PageID #: 9015

Tormey - Cross/McMahon                    1019

1        MS. NASH:  Objection.

2        THE COURT:  Yes, sustained.  What's the question?

3   Do you want it --

4   Q    Does that refresh your recollection that you testified in

5   the grand jury under oath that they, referring to Pappa and

6   Curcio, shot Scopo.  Yes or no?

7   A    No.

8   Q    All right.  Line --

9        MR. McMAHON:  If I may read the question and answer

10  to him, Your Honor?

11       THE COURT:  Yes.

12  Q    "QUESTION: -- at line 14 -- and again, I would ask you to

13  describe for the grand jury, in substance, what you learned

14  from Mr. Iborti?

15       "ANSWER:  Pappa told Iborti that he, Curcio,

16  Sparacino, Anthony Russo, and Frank Guerra were responsible

17  for killing Joe Scopo.  He stated that he was the one who

18  actually -- that he and Curcio got out of the car and he was

19  the one that actually killed Scopo.  And after they shot

20  Scopo, Sparacino had taken off in the car and they were forced

21  to run three blocks to get to a getaway car.

22       Did you give those answers -- that answer to that

23  question?

24  A    That's correct.

25  Q    Now, when you said they shot Scopo, who was the "they"

Case 1:03-cr-00351-ELF   Document 1869-6   Filed 09/19/21   Page 614 of 635 PageID #: 4921
Case 1:10-cr-00147-DLF   Document 346-4   Filed 09/21/18   Page 1020 of 206 PageID #:00816
1020

Tormey - Cross/McMahon

1   that you were referring to in that sentence?

2   A    What it says is that --

3   Q    Who is the "they"?

4   A    Pappa told --

5   Q    Who were you referring to?

6   A    Pappa told Iborti that I --

7   Q    Sir, who is the "they?"  Those are your words.  Who is

8   the "they" that shot Scopo?  In your words, who were you

9   referring to with that pronoun?

10  A    I think it's clear that Pappa -- Iborti told Pappa or

11  Pappa told Iborti.

12  Q    Sir, sir, just answer my question.  I just read to you

13  what you said.

14       MS. NASH:  Objection.

15  Q    Who is the "they"?

16  A    I'm trying to answer your question.

17  Q    Can you associate -- can you put names to "they"?

18  A    The individuals that were present when Scopo was shot.

19  Q    No, no, sir.  I didn't ask you -- the question was that

20  after they shot Scopo, this is Matt Tormey in the grand jury

21  on November -- on December 9, 1997, under oath?

22  A    Correct.

23  Q    When you told that to the grand jury, when you said they

24  shot Scopo, were you referring to Curcio and Pappa?

25  A    I was referring to whoever was named there.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Case 1:03-cr-00351-LEK   Document 869-6   Filed 09/10/21   Page 615 of 635 PageID #: 4922
Case 1:10-cr-00147-DLF   Document 546-4   Filed 05/21/18   Page 1030 of 200 PageID #90617

1021

Tormey - Cross/McMahon

1  Q    Now, are you a lawyer, sir?

2         MS. NASH:  Objection.

3         THE COURT:  Well, you're a lawyer.  He can answer

4  the question.

5  A    Yes, not practicing lawyer.

6  Q    Well, that's okay.  It's a noble profession.

7         And this was based on information from Iborti?

8  A    Correct.

9  Q    And he had told you that Sparacino took off in the car

10 and Pappa and Curcio had to run three blocks to the get-away

11 car?

12 A    I believe that's correct.

13 Q    And the get-away car was Eric Curcio's Green Honda?

14 A    I don't recall.

15        MR. McMAHON:  Nothing further, Judge.

16        THE COURT:  Any redirect?

17        MS. NASH:  Yes, Judge, briefly.

18 REDIRECT EXAMINATION

19 BY MS. NASH:

20 Q    At the time that you provided grand jury testimony, was

21 anyone who was directly involved in the Scopo murder was

22 present at the time of the Scopo murder cooperating with the

23 government?

24 A    Anyone who was present at the scene of the murder?

25 Q    Correct.

Case 1:03-cr-00351-EK   Document 1069-6   Filed 09/19/21   Page 616 of 635 PageID #: 4923
Case 1:03-cr-00247-DLF   Document 846-4   Filed 09/21/16   Page 16 of 200 PageID #:40618
1022

<div align="center">Tormey − Redirect/Nash</div>

1  A    No.

2         THE PLAINTIFF:  No further questions.

3  RECROSS−EXAMINATION

4  BY MR. McMAHON:

5  Q    Agent −− Mr. Tormey, are you suggesting that

6  Anthony Russo is being truthful and Mr. Iborti and Pappa lied?

7         MS. NASH:  Objection.

8         THE COURT:  Yes, objection is sustained.  Improper

9  question.

10  Q    Well, when you told the grand jury what cooperating

11  witnesses tell you, you have every reason to believe that the

12  information you're being given is truthful.  Is that correct,

13  sir?

14  A    Correct.

15  Q    You would not be telling grand jurors, who are deciding

16  whether or not to indict somebody, information that you think

17  is sketchy or a little fuzzy, would you, sir?

18  A    Correct.

19  Q    And you did not in anyway suggest to the grand jury that

20  per this evidence on these days, that you thought that the

21  information maybe wasn't true, did you?

22  A    No.

23         MR. McMAHON:  Nothing further.

24         THE COURT:  All right.

25         MS. NASH:  Nothing further.

<div align="center">CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter</div>

FD-302 (Rev. 3-10-82)

GOVERNMENT
EXHIBIT
**7009**
10 CR 147 (DLI)

GOVERNMENT
EXHIBIT
**3500-MT-28**
10 CR 147 (SLT)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription      10/28/94

At approximately 6:00am, surveillance was initiated in the vicinity of 7th Avenue and 23rd Street in Brooklyn, New York. Parked on 23rd Street, between 6th and 7th Avenues, was a Uhaul straight truck, orange and white in color, bearing Pennsylvania license "YF 08922" (Hereinafter, "the Uhaul").

At approximately 11:20am, two male whites (Unsub #1 and Unsub #2) were observed approaching the rear of the Uhaul and opening the back door. They removed one box, closed the door, and carried the box into an apartment across the street. Unsubs #1 and #2 thereafter returned to the truck, again opened the back door, and began removing boxes and placing them on the sidewalk.

Special Agents Matthew F. Tormey and George Wright approached Unsub #1 and Unsub #2, identified themselves as Special Agents of the FBI, and temporarily detained Unsubs #1 and #2. The individuals were identified as ███████████ and █████████. They stated that they did not rent the truck nor did they know who rented the truck. They saw the truck park there the previous night, October 26, 1994, and observed the driver get out of the truck and run into the graveyard. The driver never came back and they wanted to know what the truck contained. They stated that they had no intention of stealing the entire truck. Thereafter, they were turned over to the custody of the local Police.

A silver "Guard Security" lock was found at the rear of the Uhaul and in the cab of the Uhaul was a rental agreement in the name of ANTHONY RUSSO, ██████████████ Brooklyn, New York, ████████████████████████████████. The Uhaul contained 570 cases of assorted Tri-Action Video games.

---

Investigation on     10/27/94     at   BROOKLYN, NEW YORK     File # ███████████

by    SA's MATTHEW F. TORMEY and GEORGE WRIGHT Date dictated     10/28/94

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 11-15-83)

███████████████

Continuation of FD-302 of _____, On __10/27/94__ , Page __2__

The following identifying information was obtained:

UNSUB #1:
    NAME:               ███████████
    RACE:               WHITE
    SEX:                MALE
    DOB:                ███████
    ADDRESS:           ██████████████████

    TELEPHONE:        ███████████████

    #2:
    NAME:               ███████████
    RACE:               WHITE
    SEX:                MALE
    DOB:
    ADDRESS:           ████████████████████

    TELEPHONE:        ███████████████

FD-302 (Rev. 3-10-82)

GOVERNMENT
EXHIBIT
**7010**
10 CR 147 (DLI)

GOVERNMENT
EXHIBIT
**3500-MT-29**
10 CR 147 (SLT)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription          10/28/94

     Photographs were taken of an orange and white Uhaul truck, Pennsylvania license "YF 08922", and the contents which consisted of 570 cases of assorted hand held video games including "Lion King", "Mortal Kombat", and "Power Rangers".

     An inventory of the passenger section of the truck revealed the following items:

     (1) one package of "KOOL" cigarettes (on front seat); and
     (2) one package of "Marlboro" cigarettes (on floor of passenger side).

     The truck was dusted for fingerprints and one lift was taken from the driver's side view mirror and two were taken from the outside of the passenger door, below the door handle.

     The odometer read 78,190.7 and the gas needle was between Empty and 1/8 of a tank.

Investigation on     10/28/94    at  BROOKLYN, NEW YORK     File # ▮▮▮▮▮▮▮▮▮▮

by   SA MATTHEW F. TORMEY                    Date dictated    10/28/94

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT
7011
10 CR 147 (DLI)

GOVERNMENT
EXHIBIT
3500-MT-30
10 CR 147 (SLT)



FD-302 (Rev. 3-10-82)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription     10/31/94

Photographs were taken of the following items which constitute samples of items found in a Uhaul truck Pennsylvania license "YF 08922" which was recovered on October 27, 1994:

     1) ONE CARTON "LION KING" HAND HELD VIDEO GAMES;

     2) ONE CARTON "MORTAL KOMBAT" HAND HELD VIDEO GAMES; and

     3) ONE CARTON "POWER RANGERS" HAND HELD VIDEO GAMES.

There were twenty-four games in each carton. The labels had been removed from the outside boxes.

These items are being maintained for evidentiary purposes.

Investigation on    10/31/94    at   QUEENS, NEW YORK     File # ▮▮▮▮▮▮▮▮

by   SA MATTHEW F. TORMEY            Date dictated   10/31/94

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT
**3500-AR-9(b)**
10 CR 147 (DLI)

TM:EAG
F.#2010R00153


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ANDREW RUSSO,
    also known as "Mush,"
RALPH ARPAIO,
JOHN AZZARELLI,
    also known as "Johnny Cash,"
DANIEL BOGAN,
ANTHONY CALABRO,
    also known as "Nooch,"
ROGER CALIFANO,
DANIEL CAPALDO,
JOSEPH CARNA,
    also known as "Junior
    Lollipops,"
MICHAEL CASTELLANO,
    also known as "Big Mike,"
BENJAMIN CASTELLAZZO,
    also known as "Benji,"
    "The Claw" and "the Fang,"
DENNIS DELUCIA,
    also known as "Fat Dennis,"
    "Little Dennis" and "the
    Beard,"
GIUSEPPE DESTEFANO,
    also known as "Pooch,"
JOSEPH DIMARCO,
JOHN DUNN,
    also known as "Johnny Five,"
ANTHONY DURSO,
    also known as "Baby Fat
    Larry" and "BFL,"
SCOTT FAPPIANO,
EMANUELE FAVUZZA,
    also known as "Manny,"
VINCENT FEBBRARO,
    also known as "Jimmy Gooch,"
RICHARD FUSCO,
    also known as "Richie,"

I N D I C T M E N T

Cr. No. _____
(T. 18, U.S.C., §§ 371,
892(a), 893, 894(a)(1),
922(g)(1), 924(a)(2),
924(c)(1)(A)(i),
924(c)(1)(A)(ii), 924(d),
981(a)(1)(C), 982,
982(a)(2)(A), 1343, 1349,
1951(a), 1952(a)(3)(A),
1955(a), 1955(d), 1956(h),
1962(d), 1963, 1963(a),
1963(m), 2342(a), 2344(a),
2 and 3551 et seq.; T. 21,
U.S.C., §§ 841(a)(1),
841(b)(1)(D), 846, 853(a),
853(p); T. 28, U.S.C.,
§ 2461(c))

GAETANO GALLO,
      also known as "Tommy,"
GIOVANNI GALLUZZO,
      also known as "John,"
ALI JUSEINOSKI,
JOHN MAGGIO,
REYNOLD MARAGNI,
      also known as "Ren" and
      "Reynolds,"
HECTOR PAGAN,
      also known as "Junior,"
THEODORE PERSICO, JR.,
      also known as "Teddy" and "the
      kid,"
FRANK PONTILLO,
      also known as "Frankie Steel,"
NICKY RIZZO,
JACK RIZZOCASCIO,
      also known as "Jack the Whack,"
JOHN ROSSANO,
ANTHONY RUSSO,
      also known as "Big Anthony,"
JOSEPH SAVARESE,
RALPH SCOPO, JR.,
FRANK SENATORE,
      also known as "Buzz,"
ILARIO SESSA,
      also known as "Larry," "Fat
      Larry" and "FL,"
ANGELO SPATA,
      also known as "Little Angelo,"
LOUIS VENTURELLI,
      also known as "Louie Ices,"
JOSEPH VIRZI and
VITO VIZZI,

                    Defendants.

- - - - - - - - - - - - - - - - - -X

THE GRAND JURY CHARGES:

## INTRODUCTION TO ALL COUNTS

          At all times relevant to this Indictment, unless

otherwise indicated:

                              2

## The Enterprise

1. The members and associates of the Colombo organized crime family of La Cosa Nostra constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact (hereinafter, the "Colombo crime family" and the "enterprise"). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The Colombo crime family engaged in, and its activities affected, interstate and foreign commerce. The Colombo crime family was an organized criminal group that operated in the Eastern District of New York and elsewhere.

2. La Cosa Nostra operated through organized crime families. Five of these crime families - the Bonanno, Colombo, Gambino, Genovese and Luchese crime families - were headquartered in New York City and supervised criminal activity in New York, in other areas of the United States and, in some instances, in other countries. Another crime family, the Decavalcante crime family, operated principally in New Jersey, but from time to time also in New York City.

3. The ruling body of La Cosa Nostra, known as the "Commission," consisted of leaders from each of the crime families. The Commission convened from time to time to decide

3

certain issues affecting all of the crime families, such as rules governing crime family membership.

4. The Colombo crime family had a hierarchy and structure. The head of the Colombo crime family was known as the "boss." The Colombo crime family boss was assisted by an "underboss" and a counselor known as a "consigliere." Together, the boss, underboss and consigliere were the crime family's "administration." With the assistance of the underboss and consigliere, the boss was responsible for, among other things, setting policy and resolving disputes within and between La Cosa Nostra crime families and other criminal groups. The administration further supervised, supported, protected and disciplined the lower-ranking participants in the crime family. In return for their supervision and protection, the administration received part of the illegal earnings generated by the crime family. Members of the Colombo crime family served in an "acting" rather than "official" capacity in the administration on occasion due to another administration member's incarceration or ill health, or for the purpose of seeking to insulate another administration member from law enforcement scrutiny. Further, on occasion, the Colombo crime family was overseen by a "panel" of crime family members that did not include the boss, underboss and/or consigliere.

4

5.      Below the administration of the Colombo crime
family were numerous "crews," also known as "regimes" and
"decinas."  Each crew was headed by a "captain," also known as a
"skipper," "caporegime" and "capodecina."  Each captain's crew
consisted of "soldiers" and "associates."  The captain was
responsible for supervising the criminal activities of his crew
and providing the crew with support and protection.  In return,
the captain often received a share of the crew's earnings.

6.      Only members of the Colombo crime family could
serve as a boss, underboss, consigliere, captain or soldier.
Members of the crime family were referred to on occasion as
"goodfellas" or "wiseguys," or as persons who had been
"straightened out" or who had their "button."  Associates were
individuals who were not members of the crime family, but who
nonetheless engaged in criminal activity for, and under the
protection of, the crime family.

7.      Many requirements existed before an associate
could become a member of the Colombo crime family.  The
Commission of La Cosa Nostra from time to time limited the number
of new members that could be added to a crime family.  An
associate was also required to be proposed for membership by an
existing crime family member.  When the crime family's
administration considered the associate worthy of membership, the
administration then circulated the proposed associate's name on a

5

Case 1:11-cr-00030-SLT *SEALED* Document 1 Filed 01/12/11 Page 6 of 128
#: 4933
Case 1:11-cr-00030-SLT *SEALED* Document 1 Filed 01/12/11 Page 6 of 128

list given to other La Cosa Nostra crime families, which the other crime families reviewed and either approved or disapproved. Unless there was an objection to the associate's membership, the crime family then "inducted," or "straightened out," the associate as a member of the crime family in a secret ceremony. During the ceremony, the associate, among other things: swore allegiance for life to the crime family above all else, even the associate's own family; swore, on penalty of death, never to reveal the crime family's existence, criminal activities and other secrets; and swore to follow all orders issued by the crime family boss, including swearing to commit murder if the boss directed it.

### Methods and Means of the Enterprise

8. The principal purpose of the Colombo crime family was to generate money for its members and associates. This purpose was implemented by members and associates of the Colombo crime family through various criminal activities, including drug trafficking, robbery, extortion, fraud, illegal gambling and loansharking. The members and associates of the Colombo crime family also furthered the enterprise's criminal activities by threatening economic injury and using and threatening to use physical violence, including murder.

9. Although the primary purpose of the Colombo crime family was to generate money for its members and associates, the

6

members and associates at times used the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family. For those purposes, members and associates of the enterprise were asked and expected to carry out, among other crimes, acts of violence, including murder and assault.

10. The members and associates of the Colombo crime family engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities. That conduct included a commitment to murdering persons, particularly members or associates of the crime families, who were perceived as potential witnesses against members and associates of the enterprise.

11. Members and associates of the Colombo crime family often coordinated criminal activity with members and associates of other organized crime families.

### The Defendants

12. At various times relevant to this Indictment, the defendant ANDREW RUSSO, also known as "Mush," was a street boss, captain, soldier and associate within the Colombo crime family.

13. At various times relevant to this Indictment, the defendant BENJAMIN CASTELLAZZO, also known as "Benji," "the Claw" and "the Fang," was an underboss, captain, soldier and associate within the Colombo crime family.

7

Case 1:11-cr-00030-SLT *SEALED* Document 1 Filed 01/12/11 Page 8 of 128
#: 4935
Case 1:11-cr-00030-SLT *SEALED* Document 1 Filed 01/12/11 Page 8 of 128

14. At various times relevant to this Indictment, the defendants JOSEPH CARNA, also known as "Junior Lollipops," DENNIS DELUCIA, also known as "Fat Dennis," "Little Dennis" and "the Beard," REYNOLD MARAGNI, also known as "Ren" and "Reynolds," and ANTHONY RUSSO, also known as "Big Anthony," were captains, soldiers and associates within the Colombo crime family.

15. At various times relevant to this Indictment, the defendants EMANUELE FAVUZZA, also known as "Manny," VINCENT FEBBRARO, also known as "Jimmy Gooch," NICKY RIZZO, JOSEPH SAVARESE and RALPH SCOPO, JR. were soldiers and associates within the Colombo crime family.

16. At various times relevant to this Indictment, the defendants DANIEL BOGAN, ANTHONY CALABRO, also known as "Nooch," ROGER CALIFANO, MICHAEL CASTELLANO, also known as "Big Mike," GIUSEPPE DESTEFANO, also known as "Pooch," SCOTT FAPPIANO, ALI JUSEINOSKI, JACK RIZZOCASCIO, also known as "Jack the Whack," FRANK SENATORE, also known as "Buzz," ILARIO SESSA, also known as "Larry," "Fat Larry" and "FL," and ANGELO SPATA, also known as "Little Angelo," were associates within the Colombo crime family.

## COUNT ONE
(Racketeering Conspiracy)

17. The allegations contained in paragraphs 1 through 16 are realleged and incorporated as if fully set forth in this paragraph.

8

18.  In or about and between June 1991 and January
2011, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants DANIEL
BOGAN, ANTHONY CALABRO, also known as "Nooch," ROGER CALIFANO,
JOSEPH CARNA, also known as "Junior Lollipops," MICHAEL
CASTELLANO, also known as "Big Mike," BENJAMIN CASTELLAZZO, also
known as "Benji," "the Claw" and "the Fang," GIUSEPPE DESTEFANO,
also known as "Pooch," SCOTT FAPPIANO, EMANUELE FAVUZZA, also
known as "Manny," VINCENT FEBBRARO, also known as "Jimmy Gooch,"
ALI JUSEINOSKI, NICKY RIZZO, JACK RIZZOCASCIO, also known as
"Jack the Whack," ANTHONY RUSSO, also known as "Big Anthony,"
FRANK SENATORE, also known as "Buzz," and ANGELO SPATA, also
known as "Little Angelo," together with others, being persons
employed by and associated with the Colombo crime family, an
enterprise that engaged in, and the activities of which affected,
interstate and foreign commerce, did knowingly and intentionally
conspire to violate Title 18, United States Code, Section
1962(c), that is, to conduct and participate, directly and
indirectly, in the conduct of the affairs of that enterprise
through a pattern of racketeering activity, as defined in Title
18, United States Code, Sections 1961(1) and 1961(5), consisting
of the racketeering acts set forth below.  Each defendant agreed
that a conspirator would commit at least two acts of racketeering
activity in the conduct of the affairs of the enterprise.

### RACKETEERING ACT ONE
(Murder/Murder Conspiracy - Joseph Scopo)

19. The defendant named below agreed to the commission of the following acts, either one of which alone constitutes Racketeering Act One:

A.   Conspiracy to Murder Joseph Scopo

20. On or about and between June 20, 1991 and October 20, 1993, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ANTHONY RUSSO, together with others, did knowingly and intentionally conspire to cause the death of Joseph Scopo, contrary to New York Penal Law Sections 125.25(1) and 105.15.

B.   Murder of Joseph Scopo

21. On or about October 20, 1993, within the Eastern District of New York, the defendant ANTHONY RUSSO, together with others, with intent to cause the death of Joseph Scopo, did cause his death, contrary to New York Penal Law Sections 125.25(1) and 20.00.

### RACKETEERING ACT TWO
(Receipt of Stolen Property - Video Games)

22. On or about and between October 20, 1994 and October 27, 1994, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ANTHONY RUSSO, together with others, did knowingly and intentionally receive, possess, conceal, store, barter, sell and

10

dispose of goods, wares and merchandise, to wit: video games of a value of $5,000 or more, which goods, wares and merchandise had crossed a State boundary after being stolen, unlawfully converted and taken, knowing the same to have been stolen, unlawfully converted and taken, contrary to Title 18, United States Code, Sections 2315 and 2.

RACKETEERING ACT THREE
(Wire Fraud - Personal Loans)

23. In or about and between 1995 and 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANTHONY CALABRO, MICHAEL CASTELLANO and FRANK SENATORE, together with others, did knowingly and intentionally devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: telephone calls in which the conspirators made false promises to fund personal loans and faxes of confirmation letters, contrary to Title 18, United States Code, Sections 1343 and 2.

24. It was a part of the scheme that the defendant MICHAEL CASTELLANO, together with others, placed advertisements in newspapers, falsely promising to loan money to individuals

11

GOVERNMENT
EXHIBIT

**3500-AR-9(c)**

10 CR 147 (DLI)

```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - X

 3   UNITED STATES OF AMERICA,   :
                                 :
 4                Plaintiff,     :     11-CR-30
                                 :
 5        -against-              :     United States Courthouse
                                 :
 6                               :     Brooklyn, New York
                                 :
 7   JOHN DOE,                   :
                                 :
 8                defendant.     :
                                 :     May 6, 2011
 9                               :     3:00 p.m.
     - - - - - - - - - - - - X

10                          SEALED
11                 TRANSCRIPT OF PLEADING
             BEFORE THE HONORABLE KIYO MATSUMOTO
12                 UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiff:      LORETTA E. LYNCH, ESQ.
                             United States Attorney
15                           BY:  ALLON LIFSHITZ, ESQ.
                                  JAMES GATTA, ESQ.
16                           Assistant United States Attorneys

17   For the Defendant:      ALEXANDER EISEMANN, ESQ.
                             GEOFFREY S. STEWART, ESQ.

18


19


20
     Court Reporter:         FREDERICK R. GUERINO, C.S.R.
21                           225 Cadman Plaza East
                             Brooklyn, New York
22                           718-224-7686

23


24
     Proceedings recorded by mechanical stenography, transcript
25   produced by CAT.
```

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

1            THE COURT:  Criminal cause for pleading, 11-CR-30,

2   United States of America v. Anthony Russo.

3            Would the parties state their appearances.

4            MR. LIFSHITZ:  Allon Lifshitz and James Gatta with

5   the United States.  With us joined at counsel table is

6   Special Agent Scott Curtis of the F.B.I.

7            Good afternoon.

8            THE COURT:  Good afternoon.

9            MR. EISEMANN:  Alex Eisemann for Mr. Russo.

10           Good afternoon.

11           THE COURT:  Good afternoon.

12           Good afternoon.  Mr. Russo.  How are you, sir?

13           Do you speak and understand English?

14           THE DEFENDANT:  Yes, I do.

15           (The defendant is sworn in at this time.)

16           THE COURT:  Mr. Russo, before deciding whether or

17  not to accept your guilty plea, there are a number of

18  questions that I must ask you in order to assure myself that

19  your plea is valid.  If you do not understand one of my

20  questions, please let me know and I will be glad to clarify.

21  All right, sir?

22           THE DEFENDANT:  Thank you.

23           THE COURT:  Do you understand that having been sworn

24  your answers to my questions will be subject to the penalty

25  of perjury or making false statements if you do not answer

1          THE COURT:  At this time, Mr. Russo, let's start

2     with Count One.  I would like you to tell me in your own

3     words what you did in connection with the acts set forth in

4     Count One of the indictment.

5          THE DEFENDANT:  Between the time of my release from

6     New York State custody, in or around the fall of '92 until

7     February 2011, I was associated with and was a member of the

8     Colombo Crime Family.

9          During that period, I committed a number of crimes,

10    including murder, murder conspiracy, narcotic trafficking,

11    extortion, loansharking, in furtherance of the Colombo Crime

12    Family.  I will describe six of those crimes.

13          In or about 1993, in Brooklyn, I agreed to help

14    other people kill Joey Scarpo, who was a member of the

15    Colombo Crime Family.

16          In or about October 20, 1993, I participated in the

17    murder with other people by driving them to the scene,

18    knowing their intent when they arrived was to kill Scarpo.

19          Between October 20 and October 27, 1994, in

20    Brooklyn, I agreed to purchase video games that had been

21    stolen in New Jersey, and I then attempted to complete that

22    purchase in a location here in Brooklyn.  At that time I

23    received a sample of the stolen property.  I attempted to

24    take possession of the rest of the stolen items.  I thought I

25    saw law enforcement personnel watching me, so I abandoned the

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

1  items which were worth more than $5,000.

2  THE COURT:  They were worth more than five thousand?

3  THE DEFENDANT:  Yes.

4  In or about September 2009, in the Eastern District

5  of New York, I instructed other people to try to collect

6  money owed by another individual.  When I gave these

7  instructions, everyone involved understood that the efforts

8  to collect the money would be backed up by intimidation and

9  threats of violence.  That's how the Colombo family routinely

10  handles these types of clashes.

11  THE COURT:  Take your time, sir.

12  THE DEFENDANT:  In 2010, associates of another

13  organized crime organization stabbed an associate of the

14  Colombo Crime Family.  Between May 2010 and August 2010, I

15  arranged a series of meetings with members of that other

16  organization to seek monetary compensation for that stabbing.

17  In the meetings which took place in Brooklyn and in Staten

18  Island, the members of the other organization agreed to

19  compensate the stabbing victim.  It was clearly understood by

20  everyone involved that if these people didn't come through

21  with the compensation, in the future they would be subject to

22  violence.

23  In September of 2010, in Brooklyn, I sent an

24  individual to collect a debt from someone who was supposed to

25  obtain money for the wife of a member of the Colombo Crime

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER