

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JPM:DEL

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 10, 2022

<u>By ECF and Email</u>

The Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Anthony Russo
                Criminal Docket No. 92-351 (FB)

Dear Judge Block:

      The government respectfully submits this letter in opposition to defendant Anthony Russo's motion for early release filed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). See ECF No. 1897 ("Def. Mot."). As set forth below, the Court should deny the Russo's motion because the considerations set forth in 18 U.S.C. § 3553(a) favor denial.

I.    Background

    A.    Offense Conduct

        1.    The Colombo Crime Family War

      In 1988, Victor Orena became the acting boss of the Colombo crime family of La Cosa Nostra, a nationwide criminal organization that operates through groups structured as "families." See Presentence Investigation Report dated July 1, 1994 ("PSR") ¶ 21. The principal purpose of the Colombo crime family was to generate money for its members and associates through various criminal activities, including the operation of illegal gambling businesses, the extortionate extensions and collections of credit, and the generation of income from various businesses through illegal means and which was often accomplished through violence, including murder. Id. ¶ 22.

      The same year that Orena was elevated to acting boss, he appointed the petitioner Anthony Russo to be a captain of the Colombo crime family. Id. ¶ 87. As a captain, Russo supervised a crew of "made members" and associates. Id. Along with other

crews in the Colombo crime family, Russo's crew produced funds from illegal activities and distributed funds throughout the family's hierarchy.  Id. ¶ 18.

By 1991, a rift formed within the Colombo crime family between Orena, the acting boss, and the crime family's heir apparent Alphonse Persico, who was the son of the Carmine Persico, the family's official boss who was then serving a 100-year prison sentence.  Id. ¶ 23.  During Orena's leadership, many Colombo crime family members had become dissatisfied, particularly with Orena's demanding and retaining an excessive portion of the proceeds of the Colombo family's illegal activities.  Id.  Orena also announced that he intended to become the official boss of the Colombo family by overthrowing Carmine Persico and his son Alphonse Persico.  Id.

Colombo crime family members coalesced around two competing factions, one aligned with Carmine Persico, and the other with Orena.  Id. ¶ 24.  In June 1991, Persico loyalists unsuccessfully attempted to kill Victor Orena, which set off the conflict between the two factions.  See United States v. Monteleone, 257 F.3d 210, 213 (2d Cir. 2001).  Due to these tensions, an internal war broke out in the Colombo crime family in June 1991.  PSR ¶ 24.  Petitioner Russo aligned with the Persico faction.  Id. ¶¶ 37, 87.

A brief truce ensued until November 1991, but it ended when the Orena faction attempted another assassination.  Monteleone, 257 F.3d at 213.  After this murder attempt, petitioner Russo said that he would contact other members of the Persico faction to let them know conflict had resumed, or as a witness testified at trial, that "the shooting started."  Id.

2.  Russo's Violent Acts

The government's evidence at trial included the testimony of four cooperating witnesses — Lawrence Mazza, Carmine Sessa, Joseph Ambrosino (all members of the Persico faction), and Salvatore Miciotta (a member of the Orena faction).  Monteleone, 257 F.3d at 212.  Sessa testified that he attended a meeting in or about June 1991 that included Anthony Russo, Joseph Russo, Joseph Monteleone, and others, during which the petitioner Russo and his cousin Joseph Russo told Sessa that they would call in their men and tell them to prepare for war with the Orena faction.  Id. at 213.

Ambrosino testified that "Anthony Russo assured him that they were ready to attack the Orena side."  Id.  In early 1992, at another meeting, Sessa testified the "Russos [petitioner Russo and Joseph Russo] and provided assurances that their associates 'were out every day looking for people,' particularly those former members of the Russos' crew who had switched allegiances to the Orena side, including John Minerva."  Id.; PSR ¶ 87.

On March 25, 1992, members of petitioner Russo's crews and others stalked John Minerva and Michael Imbergamo to a cafe owned by Minerva on Long Island.  Id. ¶ 45.  At approximately 10:00 p.m., Minerva and Imbergamo left the cafe and were walking to their vehicles when two members of an assassination team fired several shots at Minerva and Imbergamo, killing them both.  Id.

2

Mazza testified that shortly after Minerva's murder, he met with petitioner Russo and Joseph Russo at a deli in Manhattan where the Russos admitted their involvement in these murders, bragging that "they had been working on getting [Minerva]" and "finally got to him in front of his cafe," and that they were particularly satisfied because Minerva had worked for Joseph Russo's father for many years before deciding to ally himself with Orena. Id. Sessa testified that two members of the Russos' crews and a member of another crew committed the murder.

In addition, as a captain in the Colombo crime family who supported the Persico faction, Russo was also responsible for aiding and abetting attempts and conspiracies to murder members of the Orena faction during the course of the Colombo war. Id. The factions formed their own assassination teams, which monitored the movements of the other faction and assassinated its members. Id. ¶ 23. This war resulted in the attempted assassinations, woundings, or successful killings of some 25 individuals. By one estimate, 12 people were killed — three of whom were innocent bystanders. For instance, during the course of the violent conflict, 18-year-old Matteo Speranza was murdered while working in a bagel shop owned by two reputed Persico loyalists. Several other innocent bystanders were injured in the feud, including a murder victim's girlfriend who was struck by a bullet and three pedestrians, including a 4-year-old girl, who were hit by a car whose occupants were fleeing from an assassination attempt by gunmen. See George James, Killing Tied to Mafia War in Brooklyn, N.Y. Times, Dec. 9, 1991, available at https://www.nytimes.com/1991/12/09/nyregion/killing-is-tied-to-mafia-war-in-brooklyn.html (last accessed June 10, 2022). Furthermore, as the Honorable Jack B. Weinstein noted in an amended sentencing memorandum and order for the petitioner Russo's co-defendant Orena: "Were it not for the fact that the New York police and Federal Bureau of Investigation had bugged their cars and hideouts and frustrated many of their ambushes, the death toll would have multiplied." United States v. Sessa, 821 F. Supp. 870, 872 (E.D.N.Y. 1993), aff'd sub nom. United States v. Amato, 15 F.3d 230 (2d Cir. 1994), and aff'd sub nom. United States v. Orena, 32 F.3d 704 (2d Cir. 1994), and aff'd, 41 F.3d 1501 (2d Cir. 1994).

### 3. Conviction and Sentence

The jury ultimately convicted Russo of the following crimes:

(1) racketeering, in violation of 18 U.S.C. § 1962(c) (Count One) for the following Racketeering Acts: murder of John Minerva, in violation of New York Penal Law Sections 125.20 and 20.00; murder of Michael Imbergamo, in violation of New York Penal Law Sections 125.20 and 20.00; conspiracy to murder members of the Colombo Crime Family who were aligned with the Orena Faction, in violation of New York Penal Law Sections 125.25 and 105.15; and conspiracy to use extortionate means to collect and attempt to collect extensions of credit, in violation of 18 U.S.C. § 894;

(2) conspiring to participate in a pattern of racketeering activity, in violation of 18 U.S.C. 1962(d) (Count Two);

    (3) the murder-in-aid of racketeering of Minerva, in violation 18 U.S.C. 1959(a)(1) (Count Five);

    (4) the murder-in-aid of racketeering of Imbergamo, in violation 18 U.S.C. 1959(a)(1) (Count Six );

    (5) the conspiracy to murder members of the Orena faction of the Colombo family as part of racketeering activity, in violation of 18 U.S.C. 1959(a)(5) (Count 9);

    (6) conspiring to make extortionate collections of credit, in violation of 18 U.S.C. 894 (Count 11); and

    (7) using and carrying a firearm in relation to crimes of violence, in violation of 18 U.S.C. 924(c)(1) (Count 12).

Under a United States Sentencing Guidelines ("USSG") range of life imprisonment, see PSR ¶ 310, the district court sentenced petitioner Russo to life imprisonment.

    B.    Procedural Background

    Petitioner Russo and his co-defendants have repeatedly and unsuccessfully attempted to overturn their sentences. In 1997, the Honorable Charles P. Sifton granted Russo and his co-defendants a new trial because the court found the government failed to disclose material evidence bearing on the credibility of certain co-conspirator statements. United States v. Persico, No. CR-92-0351 (CPS), 1997 WL 867788, at *1 (E.D.N.Y. Mar. 13, 1997), aff'd in part, rev'd in part sub nom. United States v. Orena, 145 F.3d 551 (2d Cir. 1998). The Second Circuit reversed the district court on appeal and reinstated Russo's conviction, finding "[a] substantial amount of evidence independent of Scarpa's co-conspirator statements remains to link the Russos and Monteleone to these murders," including Mazza's testimony about the Russos boasting that they had succeeded in killing Minerva. Orena, 145 F.3d at 558.

    In 1999, the district court denied a supplemental motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure, claiming government's cooperators, Larry Mazza and Carmine Sessa, had perjured themselves at Russo's trial. See March 18, 1999 Memorandum and Order. In 2001, the Second Circuit affirmed the district court's decision. See Monteleone, 257 F.3d 210. In 2004, the district court denied a petition for habeas relief in which Russo claimed the government had suppressed exculpatory information. See Russo v. United States, No. 03 Civ. 2444 (E.D.N.Y. Nov. 24, 2004). In 2013, the Second Circuit denied Russo's application to file a second/successive habeas petition based on new evidence. Russo v. United States, No. 13-1052, at 1–2 (2d Cir. Apr. 16, 2013). Despite the Court's denial, Russo filed his habeas petition in the district court, which the court denied in 2016 and the Second Circuit later upheld. Russo v. United States, No. 15-CV-0048 (BMC), 2016 WL 1642644, at *4 (E.D.N.Y. Apr. 25, 2016), aff'd, 692 F. App'x 75 (2d Cir. 2017).

II.     The Motion for Compassionate Release

Russo, who is currently 69 years old, now seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), asking the Court to reduce his sentence to time served. He argues he is eligible for compassionate release based on "extraordinary and compelling" circumstances, namely his risk of severe consequences if he contracts COVID-19 given his age and health conditions, his rehabilitative efforts, and the ongoing difficulties of being incarcerated during the pandemic.

III.    Legal Framework

"A district court may not generally modify a term of imprisonment once it has been imposed," except pursuant to a statutory grant of authority. United States v. Savoy, 567 F.3d 71, 72 (2d Cir. 2009) (internal quotation marks omitted); see also United States v. Bernabal, 22 F. App'x 37, 41 (2d Cir. 2001) (quoting United States v. Mendoza, 118 F.3d 707, 709 (10th Cir. 1997) and collecting cases). Section 3582(c) is one source of such authority.

Section 3582(c)(1)(A)(i) permits a court to modify an already imposed sentence upon a showing of "extraordinary and compelling reasons."[1] Specifically, a court may "modify a term of imprisonment" when, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," and to the extent a reduction is consistent with the applicable policy statement in the Sentencing Guidelines, the court "finds that extraordinary and compelling reasons warrant such a reduction." See 18 U.S.C. § 3582; see also United States v. Gotti, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020) (denying Peter Gotti's motion for a sentence reduction); see also id. at 620 ("And I reject the notion that Gotti is no longer a threat to the community."). As the Honorable Colleen McMahon noted in Gotti, "a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification." Id. A court still must consider the Section 3553(a) factors, and even if extraordinary and compelling circumstances may exist, the court may deny the defendant's motion for relief. Id.

The 3553(a) factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the need for the sentence imposed" to serve the purposes of sentencing, including punishment, deterrence, protection of the public, and rehabilitation; (3) the Sentencing Guidelines and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

---

[1] The statute also requires the inmate to exhaust administrative remedies, but as indicated below, the government does not contest exhaustion here, so these requirements are not discussed.

5

The Sentencing Guidelines and BOP policy have set forth clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to Section 3582(c)(1)(A)(i).  See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50 ("Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)"), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  Both the Guidelines and the BOP Program Statement primarily limit compassionate release to cases of serious illness or impairment, advanced age, or a need to care of a child, spouse or registered partner.  See id. (defining criteria applicable to "Terminal Medical Condition(s)," "Debilitated Medical Condition(s)," and "Elderly Inmates with Medical Conditions," among others); see also United States v. Traynor, No. 04 CR 582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009).  As the court recognized in Traynor, Congress indicated that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Sen. Rep. No. 98-225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

In 2020, the Second Circuit in United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020), provided additional guidance to district courts on what constitutes extraordinary and compelling circumstances.  The Circuit explained the district court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release," finding the Guidelines policy statements "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." Id. at 236.  Since the Second Circuit decided Brooker, several Circuits have reached similar conclusion about defendant-filed motions for compassionate release.  See, e.g., United States v. McCoy, No. 20-6821, 2020 WL 7050097 (4th Cir. Dec. 2, 2020); United States v. Shkambi, 993 F.3d 388, 393 (5th Cir. 2021); United States v. Jones, 980 F.3d 1098, 1100 (6th Cir. 2020); United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020); United States v. Aruda, 993 F.3d 797 (9th Cir. 2021); United States v. McGee, 992 F.3d 1035, 1050–51 (10th Cir. 2021); but see United States v. Bryant, No. 19-14267, 2021 WL 1827158, at *14 (11th Cir. May 7, 2021) (holding district courts are bound by § 1B1.13).

IV.   Discussion

The Court should deny Russo's application for early release.  Russo has not shown "extraordinary and compelling" circumstances justifying the extraordinary remedy he seeks.  Even if he had made that showing, the Court should deny his application given the serious nature of his offenses, which included the murder of two individuals and a plot to kill a dozen more; his disregard for the law and human life; and the need to ensure adequate punishment, deterrence and protection of the community.

   A.   Extraordinary and Compelling Circumstances

Russo argues that he has shown "extraordinary and compelling" circumstances because he is at risk of developing severe complication from COVID-19; he has made

6

"extraordinary efforts" toward rehabilitation; and has endured particularly harsh conditions of confinement. These are not extraordinary and compelling circumstances.

First, as to his COVID-19 concerns, Russo is fully vaccinated against COVID-19. The pandemic is no longer at its early stages, and it is now clear that the threat posed by COVID-19 will regrettably be a continuing one that broadly impacts all of society (whether individuals are incarcerated or at liberty) for many years. While it is a serious disease, it is not a terminal illness "with an end of life trajectory." Gotti, 433 F. Supp. 3d at 619. Nor does being incarcerated appear to put someone at any greater risk of catching the highly contagious new variants of the illness than being at liberty would. Moreover, according to his medical records provided by the Bureau of Prisons ("BOP"), Russo received his first shot of the Moderna vaccine on January 7, 2021; his second shot on February 4, 2021; and his third, booster shot on December 16, 2021. Russo's vaccination gives him significant protection against severe infection. Courts have nearly uniformly denied compassionate release to defendants who either have been vaccinated against COVID-19 or were offered yet refused the vaccine. United States v. Folkes, No. 18-CR-257 (KAM), 2022 WL 1469387, at *6 (E.D.N.Y. May 10, 2022) (collecting cases); United States v. Johnson, 2021 WL 640054, at *4–5 (S.D.N.Y. Feb. 18, 2021) (acknowledging defendant's increased risk of re-contracting COVID-19 due to pre-hypertension and obesity, yet denying compassionate release because defendant received the COVID-19 vaccine); see also United States v. Thomas, Nos. 21-1645 & 21-2105, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022) ("The District Court appropriately recognized that Thomas's vaccination reduced the health risks he relied on in support of his motion. This conclusion does not reward inmates who decline opportunities for vaccination. District courts routinely deny compassionate release to inmates who refuse the COVID-19 vaccine because they have voluntarily failed to mitigate the very health concerns they identify in support of an early release.").

Second, Russo argues the conditions at FCI Allenwood Medium, where he is currently housed, continue to be overly harsh and punitive, citing to lockdowns in December 2021 and January 2022. Although COVID-19 has certainly created difficulties for inmates across the country, the same difficulties are faced by all other inmates at Allenwood. United States v. Brooks, 2021 WL 1550268, at *1 (S.D.N.Y. Apr. 20, 2021) ("While COVID-19 has created harsh conditions of confinement for Mr. Brooks, the same can be said for all other detainees at FCI Fort Dix and, indeed, all other inmates in prison facilities around the country . . . [w]e do not understand the plain meaning of "extraordinary and compelling" nor Congress's use of those terms in Section 3582 to contemplate a generalized fear of contracting COVID-19, without more, as warranting an immediate release from prison."); see also United States v. Tirado, No. 15 Cr. 487-5 (GBD), 2021 WL 392029, at *2 (S.D.N.Y. Feb. 4, 2021) ("Defendant requests a conclusion that being held at FCI Allenwood Low is extraordinary and compelling circumstances warranting release. That conclusion is not warranted, especially considering the BOP's ongoing efforts to combat the threat posed by COVID-19 at its facilities, including FCI Allenwood Low.").

In any event, those measures appear to have achieved their intended goal. According to statistics provided by the BOP as of June 8, 2022, no facility at Allenwood

7

(including Allenwood Low FCI or Allenwood USP) is reporting any current COVID-19 infections for inmates or staff and no facility saw an inmate or staff death during the pandemic. Federal Bureau of Prisons, COVID-19 Coronavirus, available at https://www.bop.gov/coronavirus/index.jsp (last accessed June 8, 2022). Courts have denied requests for early release when faced with similar statistics showing little to no infection at a BOP facility. See United States v. Alamo, 2021 WL 1904975, at *4 (S.D.N.Y. May 12, 2021) (denying compassionate release and noting at the time of the decision, there were zero COVID-19 cases at FCI Fort Dix, reducing the defendant's risk of infection); United States v. Frame, 2021 WL 1338822, at *3 (S.D.N.Y. Apr. 8, 2021) ("With fellow inmates now being vaccinated, [defendant's] risk of reinfection is diminishing.").

Third, Russo argues his strides at rehabilitation should constitute "extraordinary and compelling" circumstances. However, these efforts alone cannot constitute the basis for release, especially for a petitioner whose starting point was convictions for multiple homicides and other serious racketeering offenses. As the Second Circuit noted in United States v. Brooker, "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that 'rehabilitation alone shall not be considered an extraordinary and compelling reason.'" 976 F.3d 228, 237–38 (2d Cir. 2020) (quoting 28 U.S.C. § 994(t)). Courts have denied similar motions from inmates with more extensive rehabilitation efforts than simply avoiding disciplinary infractions and obtaining education. For instance, in United States v. Spencer, the district court found the defendant's commission of and conviction for violent robberies outweighed his efforts at rehabilitation, which included earning his GED, serving as a suicide-watch companion and working for UNICOR, which provides job training and practical work skills for reentry. No. Cr. 95-659, 2020 WL 6504578, at *2 (E.D. Pa. Nov. 5, 2020) (denying motion for release from life sentence for ten armed robberies given the serious nature of his offenses and criminal record).

    B.    Section 3553(a) Factors

Even if the Court finds that Russo has demonstrated "extraordinary and compelling" circumstances, the Section 3553(a) factors weigh against his release.

Russo was a long-time associate and member of the Colombo crime family, a group which continues to profit through crime and enforce its actions with violence. As the late-Judge Weinstein noted in sentencing the acting boss of the Colombo crime family, "[t]hese mobsters, working within their own and with other mobs, have thrived in and cultivated a complex and pervasive culture of crime that infests and sucks dry entire communities and industries within this city and surrounding areas." United States v. Sessa, 821 F. Supp. 870, 874 (1993). These criminal organizations, including the Colombo crime family, continue to affect New York City to this day. See Case No. 21-CR-466 (S-1) (DG) (charging 14 individuals in connection with extortion, extortionate collection of credit, marijuana trafficking conspiracy, fraudulent identification documents for construction safety, and possession of ammunition by felons).

Russo rose through the ranks to serve as a captain of the Colombo crime family, a position from which he gave direction to the "made men" who reported to him. This risk he poses (even at an advanced age) comes from the influence he has over others in the enterprise. See Gotti, 433 F. Supp. 3d at 620 ("The danger posed by a Gambino Family leader like Gotti is not that he will personally engage in acts of violence, but that he can command others to do so."). When the crime family became embroiled in an internal power struggle, Russo entered the fray. He informed other members of the crime family "the shooting started," and to prepare for war and attack the opposing side. Monteleone, 257 F.3d at 213. One witness testified that Russo assured others that his associates were hunting down former members of his crew who had aligned with the opposing faction, including Minerva. On March 25, 1992, Russo's plan succeeded and both Minerva and Imbergamo were gunned down at a cafe in Long Island, New York. PSR ¶ 45.

The internecine conflict claimed many lives, threatened dozens more and flooded city streets with firearms. Three of those victims were innocent bystanders whose deaths resulted from a senseless power struggle. Although the other victims were affiliated with organized crime, they too are victims deserving of justice.

This Court should deny compassionate release as Russo committed serious and violent offenses in his role as a captain in an organized crime syndicate, joining other courts who have denied such applications by other violent members of organized crime. For instance, in United v. Brunetti, 2020 WL 4516541 (E.D. Pa. July 31, 2020), the district court denied relief for a 73-year-old mafia member who had served 26 years of a 40-year sentence. That court found that the defendant had serious medical conditions that could qualify as extraordinary and compelling reasons for release (conditions not present here): a history of tumors in his chest, persistent pain after surgery to remove those tumors, frequent shortness of breath, serious eye conditions, coronary artery disease and a heightened risk for cardiovascular accident or stroke. Id. at *7. The court determined, however, that despite these conditions, the defendant's "serious crimes" — his long-time affiliation with organized crime and his roles in two attempted murders and a conspiracy to murder twelve members of the rival enterprise — made him ineligible for early release. Id. at *3, *10. Similarly, Judge Garaufis denied a motion seeking sentence reduction by a defendant who was involved in organized crime for over thirty years as an employee and high-ranking member of the Bonnano crime family and had engaged in extortion, illegal gambling and murder. See United States v. Urso, No. 03-CR-1382 (NGG), 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019); see also Gotti, 433 F. Supp. 3d at 619-20. Given the serious nature of Russo's conviction, the sentence originally imposes remains the minimum proportionate and just punishment for the defendant's crimes.

Furthermore, it is clear that defendants with robust connections to organized crime may still pose a danger to the community despite advanced age or declining faculties. As noted, in Gotti, the district court denied a motion for compassionate release for Peter Gotti, who headed the Gambino crime family and personally ordered the death of a government cooperator. 433 F. Supp. 3d at 620. The court specifically rejected the notion that the defendant was no longer a threat to the community, explaining the danger "is not that

9

he will personally engage in violence but that he can command others to do so." Id. (noting at that sentencing, the court found "[b]osses don't commit violence themselves, they have subordinates to do their bidding."); United States v. Levine, 834 F. App'x at 243 (noting murder-for-hire requires little physical agility or youth, so the defendant could commit "further horrific acts"). Although Russo's age may reduce the likelihood of him personally inflicting violence upon released, Russo was convicted of ordering others to kill and commit violent acts.

Finally, one of the most compelling reasons to deny the Russo's request for release is the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. See, e.g., United States v. Logan, 2020 WL 730879 (W.D. Ky. Feb. 13, 2020) (denying motion of 81-year-old defendant who suffers from prostate cancer, glaucoma, blindness, diabetes, and other medical conditions, and has served more than 22 years of his life sentence); see also Walker v. United States, 2020 WL 2308468 (S.D. Fla. May 8, 2020) (denying motion of defendant with serious health issues because of the need to ensure adequate punishment, deterrence, and community protection); United States v. Stanley, 2020 WL 6060877 (M.D. La. Oct. 14, 2020) (denying motion of defendant unable to move without wheelchair operator because of the seriousness of his robbery offenses and the need for adequate deterrence). Here, an early release would undermine the goals of sentencing as "the integrity of our justice system demands a sentence sufficient to punish the defendant for his crimes and to deter others who might consider following in his path." 433 F. Supp. 3d at 620 (quoting Casey, J. sentencing transcript 23:22–25). The sentence of life imposed was a serious one for serious crimes committed by the petitioner, and the reasons proffered in his motion are insufficient to reconsider the many prior judgments that the sentence imposed here was appropriate.

V.   Conclusion

For the reasons set forth above, Russo's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) should be denied.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ Devon Lash
Devon Lash
Assistant U.S. Attorneys
(718) 254-6014


cc:   James R. Froccaro, Esq. (counsel to the defendant) (by ECF)
      Defendant Anthony Russo (Allenwood FCI Medium) (by Certified Mail)